CAHILL GORDON & REINDEL LLP
JOEL KURTZBERG (*pro hac vice pending*, SBN NY 1758184)
FLOYD ABRAMS (*pro hac vice pending*, SBN NY 2835007)
JASON ROZBRUCH (*pro hac vice pending*, SBN NY 5753637)
LISA J. COLE (*pro hac vice pending*, SBN NY 5927744)
32 Old Slip
New York, New York 10005
Phone: 212-701-3120
Facsimile: 212-269-5420
jkurtzberg@cahill.com

DOWNEY BRAND LLP
WILLIAM R. WARNE (Bar No. 141280)
bwarne@downeybrand.com
MEGHAN M. BAKER (Bar No. 243765)
mbaker@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone:   916.444.1000
Facsimile:   916.444.2100

*Attorneys for Plaintiff X Corp.*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| X CORP.,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT A. BONTA, Attorney General of California, in his official capacity,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff X Corp., by and through its attorneys, Cahill Gordon & Reindel LLP and Downey Brand LLP, alleges for its complaint against Defendant ROBERT A. BONTA, in his official capacity as Attorney General of California, as follows:

**NATURE OF THE ACTION**

1.      Plaintiff X Corp. brings this action challenging the constitutionality and legal validity of California Assembly Bill No. 587 ("AB 587"), which is codified in law at Cal. Bus. & Prof. Code §§ 22675–22681.

2.      AB 587 requires large social media companies like X Corp. to (1) post terms of service dictated by the government and include terms about how content is moderated on their platforms (the "Terms of Service Requirement") and (2) submit, on a semi-annual basis, to the California Attorney General a "terms of service report" that includes, among other things, (a) "a detailed description of content moderation practices used by the social media company for that platform"; (b) information about whether, and if so how, the social media company defines and moderates (i) hate speech or racism, (ii) extremism or radicalization, (iii) disinformation or misinformation, (iv) harassment, and (v) foreign political interference; as well as (c) information and statistics about actions taken by the social media company to moderate these categories of content (the "Terms of Service Report").

3.      AB 587 violates the First Amendment of the United States Constitution and Article I, Section 2, of the California Constitution because it compels companies like X Corp. to engage in speech against their will, impermissibly interferes with the constitutionally-protected editorial judgments of companies such as X Corp., has both the purpose and likely effect of pressuring companies such as X Corp. to remove, demonetize, or deprioritize constitutionally-protected speech that the State deems undesirable or harmful, and places an unjustified and undue burden on social media companies such as X Corp.

4.      The State of California touts AB 587 as a mere "transparency measure" under which certain social media companies must make their content moderation policies and statistics publicly available.  *See* Press Release, *Governor Newsom Signs Nation-Leading Social Media Transparency*

*Measure* (Sept. 13, 2022), https://www.gov.ca.gov/2022/09/13/governor-newsom-signs-nation-leading-social-media-transparency-measure/. Yet, a review of the law's purpose and likely effect — as evidenced by the legislative history and statements from AB 587's author, sponsors, and supporters — demonstrates otherwise. As made clear by both the legislative history and public court submissions from the Attorney General in defending the law, the true intent of AB 587 is to pressure social media platforms to "eliminate" certain constitutionally-protected content viewed by the State as problematic. Ex. 1 (Cal. Assemb. Comm. on Judiciary Report, 2021–22 Sess. (AB 587), Apr. 27, 2021) at 4 ("if social media companies are forced to disclose what they do in this regard [i.e., how they moderate online content], it may pressure them to become better corporate citizens by doing more to eliminate hate speech and disinformation."); Mot. to Dismiss at 15–16, *Minds, Inc., et al.* v. *Bonta*, No. 23-cv-2705 (ECF 23-1) (C.D. Cal. May 25, 2023) ("[T]he Legislature also considered that, by requiring greater transparency about platforms' content-moderation rules and decisions, AB 587 may result in public pressure on social media companies to 'become better corporate citizens by doing more to eliminate hate speech and disinformation' on their platforms. . . . This, too, is a substantial state interest."). AB 587 is, according to the law's lead author, Assembly Member Jesse Gabriel, an "important first step in protecting our democracy from the dangerously divisive content that has become all too common on social media." Ex. 1 at 4. The legislative record is crystal clear that one of the main purposes of AB 587 — if not the main purpose — is to pressure social media companies to eliminate or minimize content that the government has deemed objectionable.

5. The topics that AB 587 forces social media platforms to speak about against their will are highly controversial and politically charged. As the legislative history acknowledges, the categories of speech on which AB 587 focuses are those that are difficult to define because their boundaries are "often fraught with political bias." Ex. 2 (Cal. Assemb. Comm. on Privacy and

Consumer Protection Report, 2021–22 Sess. (AB 587), Apr. 22, 2021) at 4.  And social media companies are frequently criticized, no matter what they do, by individuals on both sides of the political aisle, for their editorial decisions about speech that arguably falls into these ill-defined categories.  The Assembly Reports from the Committee on Privacy and Consumer Protection describe the "complex dilemma" that social media companies increasingly find themselves in when trying to define and moderate the politically-charged and controversial categories of content that are the focus of AB 587:

> As online social media become increasingly central to the public discourse, the companies responsible for managing social media platforms are faced with a complex dilemma regarding content moderation, i.e., how the platforms determine what content warrants disciplinary action such as removal of the item or banning of the user.  In broad terms, there is a general public consensus that certain types of content, such as child pornography, depictions of graphic violence, emotional abuse, and threats of physical harm are undesirable, and should be mitigated on these platforms to the extent possible.  ***Many other categories of information, however, such as hate speech, racism, extremism, misinformation, political interference, and harassment [i.e., the categories that are the focus of AB 587], are far more difficult to reliably define, and assignment of their boundaries is often fraught with political bias***.  ***In such cases, both action and inaction by these companies seems to be equally maligned:  too much moderation and accusations of censorship and suppressed speech arise; too little, and the platform risks fostering a toxic, sometimes dangerous community.***

*Id.* (emphasis added); *see also* Ex. 3 (Cal. Assemb. Floor Analysis, 2021–22 Sess. (AB 587), Apr. 28, 2021) at 1–2 (same) (emphasis added); Ex. 4 (Cal. Assemb. Floor Analysis, 2021–22 Sess. (AB 587), Aug. 24, 2022) at 2 (same) (emphasis added).

6.     In other words, AB 587 seeks to force social media companies to provide the Attorney General and the public detailed information about how, if at all, they define and moderate the boundaries of the most controversial categories of content — i.e., those categories with no "general public consensus" about how to define or moderate them because their boundaries are "fraught with political bias" and are "difficult to reliably define" — and provide detailed information about what actions they have or have not taken in regulating those controversial categories, even though action or inaction "seems to be equally maligned" by members of the

COMPLAINT                                          4

public, depending on their political viewpoint.  Put another way, through AB 587, the State is compelling social media companies to take public positions on controversial and politically-charged issues.  And, because X Corp. must take such positions on these topics *as they are formulated by the State*, X Corp. is being forced to adopt the State's politically-charged terms, which is a form of compelled speech in and of itself.

7.      AB 587 thus mandates X Corp. to speak about sensitive, controversial topics about which it does not wish to speak in the hopes of pressuring X Corp. to limit constitutionally-protected content on its platform that the State apparently finds objectionable or undesirable.  This violates the free speech rights granted to X Corp. under the First Amendment to the United States Constitution and Article I, Section 2, of the California Constitution.

8.      The First Amendment affords X Corp. "both the right to speak freely and the right to refrain from speaking at all," *Wooley* v. *Maynard*, 430 U.S. 705, 714 (1977), because "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'"  *Id.*; *Riley* v. *Nat'l Fed'n of the Blind*, 487 U.S. 781, 797 (1988).  *See also Agency for Int'l Dev.* v. *Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (the First Amendment "prohibits the government from telling people what they must say").  These protections against compelled speech apply equally to "compelled statements of 'fact'" and "compelled statements of opinion" because "either form of compulsion burdens protected speech." *Riley*, 487 U.S. at 797–98.  AB 587 violates X Corp.'s First Amendment right to not speak about controversial topics and to decide for itself what it will say or not say about these topics.

9.      Moreover, "[l]ike a newspaper or a news network," X Corp.'s "decisions about what content to include, exclude, moderate, filter, label, restrict, or promote" on its platform are "protected by the First Amendment," *O'Handley* v. *Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022), *aff'd sub nom. on other grounds*, *O'Handley* v. *Weber*, 62 F.4th 1145 (9th Cir. 2023).

AB 587 also violates the First Amendment because it has the purpose and intended chilling effect of pressuring social media companies into limiting or censoring constitutionally-protected content that the State finds objectionable.  AB 587 would also impermissibly inject the government into X Corp.'s editorial judgments — e.g., by dictating the contents of X Corp.'s Terms of Service and compelling controversial disclosures about how X Corp. moderates content on its platform as part of an effort to pressure social media companies to regulate content in a manner desired by the State, as opposed to allowing the social media companies to regulate content on their platforms as they deem fit.

10.     The First Amendment unequivocally prohibits this kind of interference with a traditional publisher's editorial judgment.  For example, if a law were to require newspapers to promulgate Terms of Service that disclose (i) a time by which they will respond to requests to publish letters to the editor or opinion pieces; (ii) detailed disclosures about their criteria for publication and statistics about the bases for decisions regarding whether to publish letters to the editor or opinion pieces; and (iii) statistics about how many submissions were accepted and rejected on the ground that they contained "hate speech" or "misinformation," it would undoubtedly violate the First Amendment because it would impermissibly interfere with the constitutionally-protected editorial judgment of newspapers.  *See, e.g.*, *Herbert* v. *Lando*, 441 U.S. 153, 174 (1979) (a law that "subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest . . . would not survive constitutional scrutiny as the First Amendment is presently construed"); *id*. at 172 (concluding that "if inquiry into editorial conclusions threatens the suppression . . . of truthful information," it raises First Amendment problems); *Miami Herald Pub. Co.* v. *Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials — whether fair or unfair — constitute the

exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.").

11. That X is a social media platform does not change the analysis.[1] These core First Amendment principles prohibit the government from interfering with the right of private parties, like X Corp., to exercise "editorial control over speech and speakers on their properties or platforms." *Manhattan Cmty. Access Corp.* v. *Halleck*, 139 S. Ct. 1921, 1932 (2019). And the U.S. Supreme Court has made clear that the right to choose whether to speak and how to tailor one's speech is not "restricted to the press." *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995). This fundamental right applies equally to "business corporations generally" and "ordinary people engaged in unsophisticated expression as well as professional publishers." *Id.* A private social media company's editorial judgment about how to regulate content on its platform and what to say (or not to say) about its regulation of content is therefore fully protected under the First Amendment. *Id.*; *see also U.S. Telecom Ass'n* v. *FCC*, 855 F.3d 381, 435 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing *en banc*) (the government may not "tell Twitter or YouTube what videos to post" or "tell Facebook or Google what content to favor" any more than it may "tell *The Washington Post* or the *Drudge Report* what columns to carry"); *Tornillo*, 418 U.S. at 258 (editorial control and judgment protected from government regulation by First Amendment).

12. AB 587 also imposes tremendously burdensome requirements on social media companies, requiring them to keep records about potentially hundreds of millions of content moderation decisions made on a daily basis. Ex. 2 at 4. Worse yet, it threatens draconian financial penalties of up to $15,000 per violation per day if compliance is not made in "reasonable, good

---

[1] X Corp. provides the X service ("X," formerly the platform referred to as Twitter).

faith," a term that the statute does not define and that gives the Attorney General nearly unfettered discretion to threaten to impose draconian fines if social media companies' content moderation policies are not to the State's liking.  Given the broad enforcement powers granted to the Attorney General under Cal. Gov't Code §§ 11180–81, AB 587 empowers the Attorney General to issue civil investigative demands to social media companies about their content moderation policies and practices to determine if they have complied with the statute in "reasonable, good faith."  This broad, unfettered discretion to scrutinize the editorial judgments of social media companies empowers the Attorney General to use his enforcement powers to pressure social media companies to regulate content in ways that the government wants — which is one of the stated purposes of the law.

13.     Concerns about the potential use of AB 587 in this manner are not speculative: Attorney General Bonta has already written to X Corp. (and other social media companies) threatening that "[t]he California Department of Justice will not hesitate to enforce [AB 587]," while in the same proverbial breath reminding the companies of their "responsibility" to combat what the Attorney General views as the "dissemination of disinformation that interferes with our electoral system."  Letter from Attorney General Robert Bonta to Twitter, Inc., et al., 4 (Nov. 3, 2022),                             https://oag.ca.gov/system/files/attachments/press-docs/Election%20Disinformation%20and%20Political%20Violence.pdf.

14.     AB 587 also violates the Dormant Commerce Clause.  By failing to restrict its extensive reporting requirements to information about Californians, AB 587 places an undue, excessive burden on interstate commerce.  That failure is by design — indeed, as bill author Jesse Gabriel's press release upon the passage of AB 587 made clear, the goal is for AB 587 to have

"national implications."[2]  Thus, the law will not just impact content moderation of California users but is intended to and will impact content moderation nationwide.

15.    Moreover, AB 587 directly contravenes the immunity provided for providers and users of interactive computer services set forth by 47 U.S.C. § 230(c)(2), which prohibits liability "on account" of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."  This is because, *first*, AB 587 imposes civil liability on social media companies that are covered by the statute if they attempt to "restrict access to or availability of material that the [social media company] or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" without making the disclosures required by AB 587.  The immunity afforded by Section 230(c)(2) is broad — it covers "any action" voluntarily taken in good faith to regulate objectionable content.  Because AB 587 imposes liability on such actions if they are taken without the required disclosures, AB 587 is preempted by the broad immunity afforded by Section 230(c)(2).

16.    AB 587 also contravenes the immunity provided to X Corp. by Section 230(c)(2) for the additional reason that Attorney General Bonta may penalize X Corp. — under his unfettered discretion as to what constitutes "misrepresent[ation]" and "reasonable, good faith" — if X Corp. were to "restrict access" to content in a way that, in Attorney General Bonta's view, is contrary to X Corp.'s promulgated content moderation policies.

17.    In pursuing this action, X Corp. seeks declaratory relief and preliminary and permanent injunctive relief on the grounds that AB 587 (i) violates X Corp.'s free speech rights

---

[2] Press Release, *Office of Assembly member Jesse Gabriel, After Two-Year Fight, Governor Newsom Signs Landmark Social Media Transparency Bill* (Sept. 13, 2021) https://a46.asmdc.org/press-releases/20220913-after-two-year-fight-governor-newsom-signs-landmark-social-media.

under the First Amendment to the United States Constitution and Article I, Section 2, of the California Constitution; (ii) violates the Dormant Commerce Clause of the United States Constitution; and (iii) directly conflicts with, and is thus preempted by, the immunity afforded by 47 U.S.C. § 230(c)(2).

18.     In pursuing this action, X Corp. seeks to vindicate the deprivation of constitutional rights under color of state statute, ordinance, regulation, custom, and/or usage.  X Corp. is also entitled to attorneys' fees and costs if it prevails on any of its § 1983 claims.  *See* 42 U.S.C. § 1988.

## PARTIES

19.     Plaintiff X Corp. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in San Francisco, California.  X Corp. is successor in interest to Twitter, Inc.  X Corp. provides the X service.  X is a real-time, open, public conversation platform, where people can see every side of a topic, discover news, share their perspectives, and engage in discussion and debate.  X allows people to create, distribute, and discover content and has democratized content creation and distribution.  X allows users to create and share ideas and information instantly through various product features, including public posts.

20.     AB 587 applies to X Corp. because it is a "social media company," as defined in the statute — i.e., an "entity that owns or operates one or more social media platforms" — and has generated more than $100 million in gross revenue in the preceding calendar year.

21.     X is a "social media platform," as defined by AB 587, because it is a public internet-based service or application with users in California and (1) "[a] substantial function of the service or application is to connect users in order to interact socially with each other within the service or application" and (2) it allows its users to (a) "construct a public or semipublic profile for purposes of signing into and using the service or application"; (b) "[p]opulate a list of other users with whom an individual shares a social connection within the system"; and (c) "[c]reate or post content

viewable by other users, including but not limited to, on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."

22.     Defendant Robert Bonta is the Attorney General of the State of California and is charged with enforcing AB 587.  X Corp. sues Attorney General Bonta in his official capacity as the person charged with enforcing AB 587.

## JURISDICTION

23.     This Court has jurisdiction over X Corp.'s federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. § 1983 because X Corp. alleges violations of its rights under the Constitution and laws of the United States.  The Court has jurisdiction over X Corp.'s state claim pursuant to 28 U.S.C. § 1367.

24.     This Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and under the Court's inherent equitable jurisdiction.

## VENUE

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), (2) because the Defendant is located, resides, and has offices in this judicial district and in the State of California, and the violations of X Corp.'s rights are occurring and will occur within this judicial district.  AB 587 was also enacted in this judicial district.

## FACTUAL ALLEGATIONS

### I.     AB 587's Statutory Scheme

26.     AB 587, which applies to "social media companies" (defined as persons or entities owning or operating one or more "social media platforms"[3]), has three main components — (i) a

---

[3] A "social media platform" is a "public or semipublic internet-based service or application that has users in California" (i) for which "[a] substantial function of the service or application is to connect users in order to allow users to interact socially with each other within the service or application," or (ii) allows users to (a) "[c]onstruct a public or semipublic profile for purposes of signing into and using the service or application,"

requirement that social media companies publicly post their terms of service, including processes for flagging content and potential actions that may be taken with respect to flagged content ("Terms of Service Requirement"), *see* § 22676; (ii) a requirement that social media companies submit to Attorney General Bonta, who will in turn disseminate publicly a report including, among other things, whether and, if so, how they define hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference ("Terms of Service Report"), *see* § 22677; and (iii) a penalty provision, whereby companies may be liable to pay $15,000 per violation per day and may be sued in court for failing to make a "reasonable, good faith attempt" to comply with AB 587's requirements, *see* § 22678.

### a. Terms of Service Requirement

27.     AB 587's Terms of Service Requirement mandates that social media companies publicly post, "in a manner reasonably designed to inform all users" of its "existence and contents," their platforms' terms of service.  § 22676(a).  Those terms of service must include (i) "contact information," so that users may "ask the social media company questions about" the terms, (ii) a "description of the process that users must follow to flag content, groups, or other users that they believe violate the terms of service," as well as "the social media company's commitments on response and resolution time," and (iii) a "list of potential actions the social media company may take against an item of content or a user, including, but not limited to, removal, demonetization, deprioritization, or banning."  § 22676(b).

28.     The Terms of Service Requirement is an impermissible attempt by the State to inject itself into the content moderation editorial process.  By requiring Terms of Service that contain certain provisions about how content is moderated, the State is requiring social media companies

---

(b) "[p]opulate a list of other users with whom an individual shares a social connection within the system," or (c) "[c]reate or post content viewable by other users."  § 22675(e).

that are covered by the statute to moderate content in ways that the State deems appropriate, rather than leaving those constitutionally-protected editorial choices to the social media companies.  The requirements may not mandate that a particular process or methodology be used, but they do force social media companies to make certain disclosures about how the content moderation process works, how users can flag objectionable content, how quickly the companies will respond to flagged content, and what actions the companies may take with respect to potentially objectionable content.

29.     These forced disclosures violate the First Amendment of the U.S. Constitution and Article I, Section 2, of the California Constitution.

**b. Terms of Service Report**

30.     AB 587 requires social media companies to submit bi-annual Terms of Service Reports, on April 1 and October 1 of each year, to Attorney General Bonta, who will then make them publicly available.  The Report must include:

a.  A statement of whether, and if so how, the platform's terms of use define hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference, **§ 22677(a)(3)**;

b.  The current version of the terms of service and a "complete and detailed description of any changes" to the terms since any previous report, **§ 22677(a)(2)**;

c.  A "detailed description" of the platform's "content moderation practices," including, but not limited to:

i.   Any "existing policies intended to address the categories of content described in [§ 22677(a)(3)]," **§ 22677(a)(4)(A)**;

ii.  How "automated content moderation systems enforce" the platform's terms of service and "when these systems involve human review," **§ 22677(a)(4)(B)**;

iii.  How the "company responds to user reports of violations of the terms of service," **§ 22677(a)(4)(C)**; and

iv.  How the "company would remove individual pieces of content, users, or groups that violate the terms of service, or take broader action against" individual or groups of users "that violate the terms of service," **§ 22677(a)(4)(D)**;

d.  Information regarding "content that was flagged by the social media company as content belonging to any of the categories described in [§ 22677(a)(3)]" including:

i.  The "total number of flagged items of content," **§ 22677(a)(5)(A)(i)**;

ii.  The "total number of actioned items of content," **§ 22677(a)(5)(A)(ii)**;

iii.  The "total number of actioned items of content that resulted in action taken by the social media company against the user or group of users responsible for the content," **§ 22677(a)(5)(A)(iii)**;

iv.  The "total number of actioned items of content that were removed, demonetized, or deprioritized" by the company, **§ 22677(a)(5)(A)(iv)**;

v.  The "number of times actioned items of content were viewed by users," **§ 22677(a)(5)(A)(v)**;

vi.  The "number of times actioned items of content were shared, and the number of users that viewed the content before it was actioned," **§ 22677(a)(5)(A)(vi)**; and

vii.  The "number of times users appealed" company actions "taken on that platform and the number of reversals of social media company actions on appeal disaggregated by each type of action," **§ 22677(a)(5)(A)(vii)**;

e.  All of the information required by § 22677(a)(5)(A) "disaggregated" by:

i.  The "category of content, including any relevant categories described in [§ 22677(a)(3)]," **§ 22677(a)(5)(B)(i)**;

ii.   The "type of content" (e.g., "posts, comments, messages"), **§ 22677(a)(5)(B)(ii)**;

iii.  The "type of media of the content" (e.g., "text, images, and videos,"), **§ 22677(a)(5)(B)(iii)**;

iv.   How "the content was flagged" (e.g., "flagged by company employees or contractors, flagged by artificial intelligence software, flagged by community moderators, flagged by civil society partners, and flagged by users"), **§ 22677(a)(5)(B)(iv)**; and

v.    How "the content was actioned" (e.g., "actioned by company employees or contractors, actioned by artificial intelligence software, actioned by community moderators, actioned by civil society partners, and actioned by users"), **§ 22677(a)(5)(B)(v)**.

31.    The Terms of Service Report is also an impermissible attempt by the State to inject itself into the content moderation editorial process.  By requiring detailed disclosures about how controversial content is moderated, the State is impermissibly compelling social media companies to make disclosures about how their editorial processes work.  This will inevitably lead to controversy that will have been generated by the way the State has required the debate to have been framed.  By compelling social media companies to make politically-charged disclosures about content moderation, the State is impermissibly trying to generate public controversy about content moderation in a way that will pressure social media companies, such as X Corp., to restrict, limit, disfavor, or censor certain constitutionally-protected content on X that the State dislikes.

32.    These forced disclosures violate the First Amendment of the U.S. Constitution and Article I, Section 2, of the California Constitution.

**c.    Penalties**

33.    AB 587 also sets forth a penalty scheme under which social media companies may be fined $15,000 per violation per day, and may be enjoined in any court of competent jurisdiction by Attorney General Bonta or by a "city attorney," if the company (i) "[f]ails to post terms of

COMPLAINT                                    15

service in accordance with Section 22676," (ii) "[f]ails to timely submit" a Terms of Service Report, or (iii) "[m]aterially omits or misrepresents required information in a" Terms of Service Report. § 22678. AB 587's penalty provision further instructs that the court shall, "[i]n assessing the amount of a civil penalty pursuant to paragraph . . . consider whether the social media company has made a reasonable, good faith attempt to comply with the provisions of this chapter." *Id*.

## II. The Topics About Which AB 587 Forces X Corp. to Speak are Extremely Controversial and Inherently Subject to Disagreement

34.     As the legislative history makes clear, AB 587 compels disclosure from social media companies about the most controversial types of content moderation. While there may be a general public consensus that some types of constitutionally-unprotected content (e.g., child pornography or threats of physical harm) should be limited on social media platforms to the extent possible, AB 587 focuses primarily on categories of content (e.g., hate speech, racism, extremism, misinformation, political interference, and harassment) for which there is no such "general public consensus." Ex. 2 at 4; *see also* Ex. 3 at 1–2 (same); Ex. 4 at 2 (same).

35.     How to define and regulate these categories of content is a politically-charged and controversial undertaking. That is because, as the California Assembly Committee on Privacy and Consumer Protection Report about AB 587 candidly acknowledged, these categories are "far more difficult to reliably define, and assignment of their boundaries is often fraught with political bias." Ex. 2 at 4; *see also* Ex. 3 at 1–2 (same); Ex. 4 at 2 (same).

36.     As a result, "the companies responsible for managing social media platforms are faced with a complex dilemma regarding content moderation." *Id.* No matter what they do when regulating these controversial categories of content, they are likely to be criticized. "In such cases, both action and inaction by these companies seems to be equally maligned: too much moderation and accusations of censorship and suppressed speech arise; too little, and the platform risks fostering a toxic, sometimes dangerous community." *Id.*

37.    Because these controversial categories are "difficult to reliably define" and "assignment of their boundaries is often fraught with political bias," *id.*, decisions about how to moderate such content are inherently political.  As a result, views about whether there is too much or too little moderation of these types of content are controversial political questions.

38.    To take just a few examples of how controversial and politically-charged these questions can be:

- Some people view speech intentionally misgendering a transgender individual as "hate speech" and harassment.  *See* National Institute of Health, *Gender Pronouns Resource*, U.S. Department of Health and Human Services (Mar. 8, 2023), https://dpcpsi.nih.gov/sgmro/gender-pronouns-resource#:~:text=Being%20misgendered%20(i.e.%2C%20being%20referred,violation%20of%20one's%20civil%20rights ("Being misgendered (i.e., being referred to with incorrect pronouns) can be an extremely hurtful and invalidating experience. Intentional refusal to use someone's correct pronouns is equivalent to harassment and a violation of one's civil rights."); Gender Expression Non-Discrimination Act, S.1047/A.747 (N.Y. 2019).  Others insist that forcing someone to call a transgender individual by their preferred pronouns violates their deeply-held beliefs about what is true.  *See* Khorri Atkinson, *Fight Over Transgender Pronouns at Work Faces Muddy Legal Waters*, Bloomberg Law (Apr. 13, 2023), https://news.bloomberglaw.com/daily-labor-report/fight-over-transgender-pronouns-at-work-faces-muddy-legal-waters ("[T]here's been a steady increase in internal complaints from workers who say their religious beliefs prevent them from calling a transgender person by their desired name or pronoun[.]").

- Political debates rage about whether and when criticism of Israel can be considered anti-Semitic hate speech.  *See A Guide to Recognizing When Anti-Israel Actions Become Antisemitic*, American Jewish Committee (last accessed Sept. 8, 2023) https://www.ajc.org/sites/default/files/pdf/2021-10/A%20Guide%20to%20Recognizing%20When%20Anti-Israel%20Actions%20Become%20Antisemitic.pdf ("Sometimes antisemitism is not easy to recognize—especially when it involves Israel"); *Is Criticism of Israel Antisemitic?*, Anne Frank House (last accessed Sept. 8, 2023) https://www.annefrank.org/en/topics/antisemitism/all-criticism-israel-antisemitic/ ("Criticism of Israel or of the policies of the Israeli government is not automatically antisemitic.").

- Some commentators have defined the term "racism" to apply only when discrimination based on race is directed at traditionally disadvantaged groups.  *See The Myth of Reverse Racism*, Alberta Civil Liberties Research Centre (last accessed Sept. 8, 2023) https://www.aclrc.com/myth-of-reverse-racism ("While assumptions and stereotypes about white people do exist, this is considered racial prejudice, not racism. . . .  [It] is not considered racism because of the systemic relationship to power.").  Others have argued that the term "racism" should apply when there is discrimination based on race directed at any group. *See Can White People Experience Racism?*, The Economist (Sept. 18, 2018) https://www.economist.com/open-future/2018/09/18/can-white-people-experience-racism; Michelle Gao, *Who Can be 'Racist'?*, The Harvard Crimson (Aug. 10, 2018) https://www.thecrimson.com/column/between-the-lines/article/2018/8/10/gao-who-can-be-racist/.

COMPLAINT                                             18

- In March 2020, many commentators insisted that it was "disinformation" to suggest that the COVID-19 virus originated in a lab in Wuhan, China.  *See* Marlette Vazquez, *Calling COVID-19 the "Wuhan Virus" or "China Virus" is Inaccurate and Xenophobic*, Yale School of Medicine (Mar. 12, 2020), https://medicine.yale.edu/news-article/calling-covid-19-the-wuhan-virus-or-china-virus-is-inaccurate-and-xenophobic/.  Others insisted that suppressing such views was tantamount to censorship.  *Michael Shellenberger Testimony to the House Select Committee on the Weaponization of the Federal Government*, The Censorship Industrial Complex: U.S. Government Support For Domestic Censorship And Disinformation Campaigns, 2016 - 2022 (Mar. 9, 2023) https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/shellenberger-testimony.pdf.

39.     As these examples make clear, AB 587 focuses on the most controversial and politically-charged categories of content moderation.  It forces social media companies to speak publicly and take a position on these controversial topics, notwithstanding that doing so will almost always result in public criticism from one political group or another.  As the California Assembly's Committee on Privacy and Consumer Protection Report makes clear, "both action and inaction by these [social media] companies [in regulating these controversial categories of content] seems to be equally maligned." Ex. 2 at 4; *see also* Ex. 3 at 1–2 (same); Ex. 4 at 2 (same).

40.     The problem with this from a First Amendment standpoint is obvious.  AB 587 forces X Corp., under threat of substantial civil penalty, to publish whether and, if so, how it defines, and whether and, if so, how it moderates, (i) hate speech, (ii) racism, (iii) extremism, (iv) radicalization, (v) disinformation, (vi) misinformation, (vii) harassment, and (viii) foreign political interference — categories of speech that are almost entirely constitutionally-protected.  Defining

these controversial categories and making decisions about how or whether to moderate them is an exercise "fraught with political bias," that is likely to result in controversy, no matter what the social media companies do. *Id.* The First Amendment does not permit the government to compel social media companies to publicly take positions on these controversial political topics against their will. *Wooley*, 430 U.S. at 714 (the First Amendment affords X Corp. "both the right to speak freely and the right to refrain from speaking at all"); *Riley*, 487 U.S. at 797 (same); *Agency for Int'l Dev.*, 570 U.S. at 213 (the First Amendment "prohibits the government from telling people what they must say"). This is particularly true given the highly controversial and politically-charged nature of questions about content moderation.

41. And by requiring X Corp. to disclose whether and, if so, how it regulates these controversial and difficult-to-define categories of content, AB 587 impermissibly attempts to pressure X Corp. to adopt — and regulate — these categories of content, even if X Corp. would prefer to categorize content differently. For example, X Corp. does not currently regulate "hate speech," "racism," or "extremism," which are three categories of conduct that AB 587 forces social media companies to publicly address. But X Corp. does regulate "hateful conduct," a category of content that may include content that some people might argue constitutes "hate speech," "racism," or "extremism." *See Safety and Cybercrime: Hateful Conduct*, X. Corp. (last accessed Sept. 8, 2023) https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy. While AB 587 does not force X Corp. to adopt and regulate these three categories, it intentionally attempts to pressure X Corp. to do so in an insidious and impermissible way. Because the Terms of Service Report forces disclosures about content moderation to cover the controversial topics that the State has defined, social media companies like X Corp. will feel pressure to indicate that they take steps to regulate such content, rather than be subject to a pronouncement that, for example, they do not regulate "hate speech" or "racism" at all. AB 587 was passed with the intent of pressuring social

media companies to do just that.  It is, in short, an attempt by the State to impermissibly frame the debate about content moderation in a way that pressures social media companies to regulate constitutionally-protected content that the State finds objectionable.

42.     This type of compelled speech cannot pass constitutional muster.  An analogy helps illustrate the point.  Imagine, for instance, a state law that, in the interest of transparency, forced individuals running for President of the United States to publish their positions on several "hot button" political issues (e.g., whether abortion should be permitted in cases of incest and rape or whether former President Trump committed any crimes) on which, in the government's view, most political candidates were avoiding stating their positions.  Even if the law did not mandate politicians to take any particular position, but simply required them, under the threat of civil penalties, to publicly spell out their position (or lack thereof) on those controversial issues as part of an effort to "pressure" them to adopt a certain political view, there can be little doubt that such a law would trigger heightened scrutiny under the First Amendment.  AB 587 is no different.

43.     The Attorney General has suggested that AB 587 involves merely compelled commercial speech of "purely factual and uncontroversial information," and is thus subject to the more relaxed standard of review under *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).  That is simply untrue.  As the legislative history of AB 587 makes plain, the categories of speech that are focused on by AB 587 are controversial to define and controversial to moderate.  And the speech that is compelled about the definitions of these categories and application of content moderation rules is not commercial; rather, it is core political speech about controversial questions on which reasonable minds can disagree.  What is more, AB 587's compelled disclosure is not purely factual because it may mislead consumers — that is, if a company submits a Terms of Service Report explaining that it does not moderate the controversial categories of content required by the State (because, instead, the company moderates categories of content pursuant to *its own*

policies and terminology), there is a high likelihood that consumers could be misled to believe that the company is not moderating content sufficiently, even if that is not the case.  As such, *Zauderer* does not apply.

44.     Even if *Zauderer* did apply, AB 587 fails to satisfy even the more relaxed test set forth in that case because the legislation is unduly burdensome and unjustified.  *Id.* at 651.  As noted in the legislative history of AB 587, "the largest social media platforms are faced with thousands, if not millions of similarly difficult decisions related to content moderation on a daily basis."  Ex. 2 at 4.  This enormous burden, of course, is the reason why the statute limits itself to social media companies with over $100 million in gross revenue from the preceding year.  *Id.* at 7.  Indeed, the legislative history for AB 587 describes the amount of content received by many of these platforms as "enormous."  *Id.*

## III.    AB 587's Will Suppress Speech Based on Content & Viewpoint

45.     According to California Governor Gavin Newsom, AB 587 does nothing more than "pull back the curtain" and provide "transparency" as to the already-existent content moderation policies of social media companies.  *See, e.g.*, Press Release, *Governor Newsom Signs Nation-Leading Social Media Transparency Measure* (Sept. 13, 2022), https://www.gov.ca.gov/2022/09/13/governor-newsom-signs-nation-leading-social-media-transparency-measure/.

46.     Governor Newsom's claim is belied by the record.  Even if AB 587 uses "transparency" as its effectuating mechanism, it does so *for the purpose of* censoring particular viewpoints with respect to eight content categories in § 22677(a)(3).  And AB 587 will do so successfully, given its amorphous penalty scheme (it is entirely unclear what constitutes a "reasonable, good faith attempt to comply") that can and will likely be used to silence viewpoints with which Attorney General Bonta and the State of California disagree.  *See Sorrell* v. *IMS Health*

*Inc.*, 564 U.S. 552, 565 (2011) (applying "heightened scrutiny" to law intended to suppress speech "in conflict with the goals of the state").

47.     The legislative record is abundantly clear: according to AB 587's authors, sponsors, and supporters, the law's true purpose and desired effect is to use the compelled disclosures to pressure social media companies into regulating and censoring constitutionally-protected content that the government believes is undesirable.  For instance:

- Within the April 27, 2021 Assembly Committee on Judiciary Hearing Report for AB 587, lead bill author Jesse Gabriel stated that AB 587 is an **"important first step"** in ensuring that **"social media companies [] moderate or remove hateful or incendiary content"** on their platforms.  He hoped that AB 587 will **"pressure them" to "eliminate hate speech and disinformation."**  Ex. 1 at 4 (emphasis added);

- The official bill comments accompanying AB 587's May 24, 2021 Assembly Floor Analysis applauded the bill's **"unique, data driven approach"** to **"content moderation on social media."**  Ex. 5 (Cal. Assemb. Analysis, 2021-22 Sess. (AB 587), May 24, 2021) at 2 (emphasis added);

- The July 13, 2021 Senate Judiciary Committee Hearing Report for AB 587 cites to comments from official bill sponsor ADL that emphasized that the law will **allow "policymakers [to] take meaningful action to decrease online hate and extremism."**  Ex. 6 (Cal. Sen. Judiciary Report, 2021–22 Sess. (AB 587), July 13, 2021) at 13 (emphasis added);

- In July 2020, California Senator Scott Wiener, who ultimately co-authored AB 587, tweeted, "Social media platforms have a moral obligation—& **need to have a legal obligation**—not to become engines for violent hate speech."  Senator Scott Wiener

(@Scott_Wiener), Twitter (July 2, 2020, 1:32 PM EST), https://twitter.com/Scott_Wiener/status/1278743357032812544 (emphasis added);

- On Mach 29, 2021 in a press release about AB 587, the Anti-Defamation League ("ADL"), an official sponsor of AB 587, clarified that the intent of the law is to **"improv[e]" the "enforcement of [social media companies' content-moderation] policies" or "provide enough evidence for legal action against them."** Press Release, *California Legislators Introduce Bipartisan Effort to Hold Social Media Companies Accountable for Online Hate and Disinformation* (Mar. 29, 2021), https://a46.asmdc.org/press-releases/20210329-california-legislators-introduce-bipartisan-effort-hold-social-media (emphasis added).

- In that same March 29, 2021 press release, the National Hispanic Media Coalition, another official supporter of AB 587, emphasized AB 587's value in **disrupting social media companies' facilitation of "white supremacy, hate, conspiracies, and extremism online"** by carrying that content on their platforms. *Id.* (emphasis added);

- On June 21, 2021, lead bill author Jesse Gabriel Tweeted that AB 587 was going to **"address . . . concerns that platforms aren't doing enough to stop the spread of misinformation and hate speech."** Assm. Jesse Gabriel (@AsmJesseGabriel), Twitter (June 14, 2021, 5:37 PM EST), https://twitter.com/AsmJesseGabriel/status/1404553699502870529 (emphasis added, internal quotation omitted).

48.     It is clear, moreover, that AB 587 aims to censor *particular viewpoints* espoused on social media platforms with respect to the eight categories of content in § 22677(a)(3). For instance, within the April 27, 2021 Assembly Committee on Judiciary Hearing Report for AB 587, bill author Jesse Gabriel cited a "study of Twitter posts" that supposedly found that "the greater proportion of

tweets related to race- and ethnicity-based discrimination in a given city, the more hate crimes were occurring in that city."  Ex. 1 at 4; Request for Judicial Notice, Ex. 1 at 4, *Minds Inc.*, No. 23-cv-2705 (ECF 23-3) (C.D. Cal. May 25, 2023) (citing same).

49.     Similarly, the June 28, 2022 Senate Judiciary Committee Hearing Report for AB 587 cites a study finding that a third of individuals who "experience online harassment . . . attribute at least some harassment to their identity . . . affecting the ability of already marginalized communities to be safe in digital spaces."  Ex. 7 (Cal. Sen. Judiciary Report, 2021–22 Sess. (AB 587), June 28, 2022) at 8; *see also id.* at 18 (Los Angeles County Democratic Party noting its support for AB 587 because social media companies "enable[] the micro targeting of vulnerable individuals.").

50.     That Attorney General Bonta plans to use threats of enforcement of AB 587 to pressure the social media companies to regulate speech that the government does not like is not in doubt.  In fact, he has already done so.  Less than two months after AB 587's enactment, the Attorney General reminded X Corp. and other social media companies of their "responsibility" to combat what the Attorney General views as the "dissemination of disinformation that interferes with our electoral system," while simultaneously reminding them that the **"California Department of Justice will not hesitate to enforce" AB 587**.  Letter from Attorney General Robert Bonta to Twitter, Inc., et al., 4, (Nov. 3, 2022),  https://oag.ca.gov/system/files/attachments/press-docs/Election%20Disinformation%20and%20Political%20Violence.pdf (emphasis added).

51.     That AB 587 grants Attorney General Bonta nearly unfettered discretion to determine if, in his view, X Corp. has complied with AB 587 in "reasonable, good faith" and grants him the ability to investigate potential violations (pursuant to Cal. Gov't Code §§ 11180–81) by issuing document demands about the social media companies' content moderation practices compounds the problem.  The end result is that AB 587 violates the First Amendment of the United

States Constitution and Section I, Article 2, of the California Constitution by impermissibly injecting the State into X Corp.'s constitutionally-protected editorial decisions in a manner that is designed to pressure X Corp. to regulate constitutionally-protected content in ways that the State wants.

52.     Because AB 587 forces X Corp. to make disclosures about how it defines and moderates controversial categories of content as part of an effort to pressure X Corp. to regulate constitutionally-protected content that the State disfavors, strict scrutiny applies.

53.     AB 587 fails to satisfy strict — or even intermediate — scrutiny.  It does not serve a compelling (or even a substantial governmental interest), will not directly and materially advance any such interest, and is not narrowly tailored to further any such interest.

54.     AB 587 purports to further the government's interest in transparency in content moderation.  But there is no evidence that AB 587's compelled speech solves any real problem at all.  Indeed, X Corp. is already transparent with its users and the public about its content moderation. *See Rules and Policies*, X Corp. (last accessed Sept. 8, 2023) https://help.twitter.com/en/rules-and-policies.  X Corp. supports transparency in content moderation — but not in the impermissible manner proscribed by AB 587.  Here, there is no evidence that the Act's compelled speech solves any real problem at all.  X Corp. is already transparent about its content moderation policies, and there is no compelling, substantial, or important governmental interest in compelling transparency using the type of governmental oversight proscribed by AB 587.

55.     The government's other stated interest in passing AB 587 – to "pressure" social media companies to "become better corporate citizens by doing more to eliminate hate speech and disinformation," Ex. 1 at 4; *see also* Mot. to Dismiss at 15–16, *Minds, Inc., et al.* v. *Bonta*, No. 23-cv-2705 (ECF 23-1) (C.D. Cal. May 25, 2023), is not compelling, substantial, or important.  State

pressure to moderate constitutionally-protected content that the State disfavors is an illegal, unconstitutional, and illegitimate purpose.

56.     AB 587 also fails to satisfy heightened scrutiny because there is no evidence that it will "directly and materially" advance a compelling, substantial, or important governmental interest.  Likewise, it regulates much more speech than is necessary to achieve any compelling, substantial, or important goal.

**IV.     AB 587 Excessively and Unduly Burdens X Corp.'s Nationwide and Global Activities**

57.     In addition to forcing X Corp. to speak about highly controversial topics about which it does not wish to speak, AB 587 establishes an unduly burdensome disclosure requirement regime, under the threat of significant financial penalties and civil suits.

58.     The undue burden that AB 587 places on X Corp. is compounded by the law's failure to limit the Terms of Service Report's information requirements to information about Californians. To be clear, this was an intentional decision, made to ensure that the AB 587 "will have national implications."[4]  But AB 587 does not stop there.  Regulations like AB 587, which govern global social media platforms' publication of content, are inherently *international* in scope.  AB 587 applies just as much to posts by Texans, in Texas, or Australians, in Australia, as it does to Californians, in California.  And even if a post was made by a Californian, in California, it is available globally and viewed globally.

59.     The burden AB 587 places on X Corp. is even further compounded by the sheer volume of posts that occur on X.  As of August 2022, 6,000 posts are sent on X every second; 350,000 posts are sent every minute; 500 million posts are sent every day; and 200 billion posts are sent every year.  David Sayce, *The Number of Tweets Per Day in 2022* (last visited Sept. 6, 2023),

---

[4] Press Release, *Office of Assembly member Jesse Gabriel, After Two-Year Fight, Governor Newsom Signs Landmark Social Media Transparency Bill* (Sept. 13, 2021) https://a46.asmdc.org/press-releases/20220913-after-two-year-fight-governor-newsom-signs-landmark-social-media.

https://www.dsayce.com/social-media/tweets-day/#:~:text=Every%20second%2C%20on%20average%2C%20around%206%2C000%20tweets%20are%20tweeted%20on,200%20billion%20tweets%20per%20year.

60.     In light of this volume, and in light of the specificity and depth of information required to comply with AB 587 — i.e., at least 161 categories of information must be disclosed bi-annually[5] — the tremendous burden AB 587 creates for X Corp. is clear.  X Corp. will be forced to expend significant monetary and employee resources to comply with AB 587, all for the unconstitutional and unjustifiable goal of moderating particular content and viewpoints with which Attorney General Bonta and the State of California disagree.

### FIRST CAUSE OF ACTION

**(Declaratory Relief and Preliminary and Permanent Injunctive Relief for Violations of the First Amendment to the United States Constitution (42 U.S.C. § 1983) and Article I, Section 2, of the California Constitution)**

61.     X Corp. realleges and incorporates herein by reference Paragraphs 1 through 60 above.

62.     AB 587 violates the First Amendment to the United States Constitution and Article I, Section 2, of the California Constitution by compelling X Corp. to divulge publicly, under the threat of significant financial penalty and civil suit, its opinions and confidential editorial processes with respect to extremely controversial subject matters.  *Tornillo*, 418 U.S. at 258 (editorial control and judgment protected from government regulation by First Amendment).[6]  Each of the content

---

[5] *See* Eric Goldman, *Will California Clone-and-Revise Some Terrible Ideas from Florida/Texas' Social Media Censorship Laws? (Analysis of CA AB587)*, Technology & Marketing Law Blog (June 21, 2022), https://blog.ericgoldman.org/archives/2022/06/will-california-clone-and-revise-some-terrible-ideas-from-florida-texas-social-media-censorship-laws-analysis-of-ca-ab587.htm ("All told, there are 7 categories of disclosures, and the bill indicates that the disclosure categories have, respectively, 5 options, at least 5 options, at least 3 options, at least 5 options, and at least 5 options. So I believe the bill requires that each service's reports should include no less than 161 different categories of disclosures (7×5+7×5+7×3+7×5+7×5).").

[6] AB 587 violates Article I, Section 2, of the California Constitution for all of the same reasons that it violates the First Amendment to the United States Constitution.  *See, e.g.*, *City of Montebello* v. *Vasquez*, 1 Cal. 5th 409, 421 n.11 (2016) ("[T]he California liberty of speech clause is broader and more protective than the free

categories about which X Corp. is compelled to speak — hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference, § 22677(a)(3) — is "anything but an 'uncontroversial' topic." *Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra ("NIFLA")*, 138 S. Ct. 2361, 2372 (2018); *see also Wooley*, 430 U.S. at 714 ("First Amendment" protects "both the right to speak freely and the right to refrain from speaking at all."). The same is true about how such categories of speech are defined and policed on X.

63.     The deep-seated controversy inherently tied to each topic in § 22677(a)(3) makes crystal clear that AB 587's compelled disclosures are not the sort of purely factual and uncontroversial disclosures that fit within the narrow exception to strict scrutiny set forth under *Zauderer*.  Strict scrutiny thus applies because AB 587 "compel[s]" X Corp. to "speak a particular message," which necessarily "alters the *content* of" its speech.  *NIFLA*, 138 S. Ct. at 2371 (quoting *Riley*, 487 U.S. at 795 (emphasis added)).  AB 587 fails to satisfy strict (or even intermediate) scrutiny.

64.     Moreover, "[f]ormal legislative findings accompanying" AB 587 make clear its illicit "purpose and practical effect," *Sorrell*, 564 U.S. at 565, which is to regulate speech on X "based on 'the topic discussed or the idea or message expressed.'" *City of Austin, Texas* v. *Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022) (citing *Reed* v. *Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015)).  Indeed, the official legislative record demonstrates that AB 587 was intended to pressure X Corp. to censor particular viewpoints on X that the government deems undesirable, notwithstanding that such editorial "decisions about what content to include" on X are "protected by the First Amendment." *O'Handley*, 579 F. Supp. 3d at 1186–87, *aff'd sub nom. on other grounds*, 62 F.4th 1145; *see also Sorrell*, 564 U.S. at 565 (applying "heightened scrutiny" to

---

speech clause of the First Amendment."); *Delano Farms Co.* v. *California Table Grape Com.*, 4 Cal. 5th 1204, 1221 (2018) ("[O]ur case law interpreting California's free speech clause has given respectful consideration to First Amendment case law for its persuasive value[.]").

law intended to suppress speech "in conflict with the goals of the state"); *Reed*, 576 U.S. at 166 ("Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny.").

65.     Here, as in *Sorrell*, the California legislature's "expressed statement of purpose" demonstrates that AB 587 "imposes burdens . . . aimed at a particular viewpoint." *Sorrell*, 564 U.S. at 565; *see also id.* at 578–79 ("[A] State's failure to persuade does not allow it to hamstring the opposition.  The State may not burden the speech of others in order to tilt public debate in a preferred direction.").  It is hornbook law that such "ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional." *Rosenberger* v. *Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995) (internal quotation omitted).

66.     This, the First Amendment does not permit, absent a compelling state interest and means that are narrowly tailored to achieve that interest, since "subtler forms of discrimination that achieve identical results based on function or purpose" do not escape strict scrutiny. *City of Austin*, 142 S. Ct. at 1474 (citing *Reed*, 576 U.S. at 159–60, 163–64).

67.     AB 587 also violates the First Amendment of the United States Constitution and Article I, Section 2, of the California Constitution because it would impermissibly interfere with the constitutionally-protected editorial judgment of social media companies.  *See, e.g.*, *Herbert*, 441 U.S. at 174 (a law that "subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest . . . would not survive constitutional scrutiny as the First Amendment is presently construed"); *Tornillo*, 418 U.S. at 258 ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials — whether fair or unfair — constitute the exercise of editorial control and judgment.  It has yet to be demonstrated

how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.").

68.     There is a *bona fide* and actual controversy between X Corp. and Attorney General Bonta because Attorney General Bonta is charged with enforcing, and intends to enforce, AB 587, even though it violates the First Amendment to the United States Constitution and Article I, Section 2, of the California Constitution.

69.     X Corp. maintains that AB 587 is illegal and unconstitutional.  Attorney General Bonta claims otherwise.

70.     X Corp. requests a judicial determination regarding the validity of AB 587 to prevent the harm caused by its enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of X Corp.'s constitutional rights, which would occur if AB 587 is applied to X. Corp.

71.     In light of the violation of the First Amendment to the United States Constitution and Article I, Section 2, of the California Constitution, X Corp. seeks preliminary and permanent injunctive relief against enforcement of AB 587.  X Corp. would be irreparably harmed if it were forced to comply with AB 587's requirements and has no adequate remedy at law.

### SECOND CAUSE OF ACTION

**(Declaratory Relief and Preliminary and Permanent Injunctive Relief for Violation of the Dormant Commerce Clause of the United States Constitution (42 U.S.C. § 1983))**

72.     X Corp. realleges and incorporates herein by reference Paragraphs 1 through 71 above.

73.     AB 587 violates the Dormant Commerce Clause of the United States Constitution because "the burden" it "impose[s] on interstate commerce" is "clearly excessive in relation to [its] putative local benefits."  *Nat'l Pork Producers Council* v. *Ross*, 143 S. Ct. 1142, 1157 (2023) (quoting *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

74.     AB 587 imposes significant burdens on interstate commerce because it "regulat[es] [] activities that are inherently national or require a uniform system of regulation." *Nat'l Pork Producers Council* v. *Ross*, 6 F.4th 1021, 1031 (9th Cir. 2021), *aff'd*, 143 S. Ct. 1142 (internal quotation omitted).  Those burdens, moreover, are "clearly excessive in relation to the putative local benefits." *Id.* at 1026 (quoting *Pike*, 397 U.S. at 142).  That is, AB 587 places burdens on interstate commerce — by regulating global platform content — that far exceed the alleged benefit of increased social media transparency for Californians.

75.     It was the intent of AB 587 and the likely effect to impact and change how content is moderated on social media platforms nationwide, not only in California.

76.     There is a *bona fide* and actual controversy between X Corp. and Attorney General Bonta because Attorney General Bonta is charged with enforcing, and intends to enforce, AB 587, even though it violates the Dormant Commerce Clause of the United States Constitution.

77.     X Corp. maintains that AB 587 is illegal and unconstitutional.  Attorney General Bonta claims otherwise.

78.     X Corp. requests a judicial determination regarding the validity of AB 587 to prevent the harm caused by its enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of X Corp.'s constitutional rights, which would occur if AB 587 is applied to X. Corp.

79.     In light of the violation of the Dormant Commerce Clause of the United States Constitution, X Corp. seeks permanent injunctive relief against enforcement of AB 587.  X Corp. would be irreparably harmed if it were forced to comply with AB 587's requirements and has no adequate remedy at law.

## THIRD CAUSE OF ACTION

**(Declaratory Relief and Preliminary and Permanent Injunctive Relief for Immunity Under and Preemption by 47 U.S.C. § 230(c)(2))**

80.     X Corp. realleges and incorporates herein by reference Paragraphs 1 through 79 above.

81.     47 U.S.C. § 230(c)(2) preempts AB 587 due to the direct conflict between them.

82.     AB 587 imposes liability on X Corp. with regard to how it moderates content on X. This directly contravenes the immunity granted under § 230(c)(2), which provides that "[n]o provider or user of an interactive computer service shall be held liable on account" of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."

83.     X is an "interactive computer service," as that term is defined under Section 230(c)(2).

84.     The immunity provided by Section 230(c)(2) is very broad.  It precludes liability for "any action" taken voluntarily in good faith by an interactive computer service to restrict access to certain content.  AB 587 imposes such liability, however, if actions are taken by interactive computer services to restrict access to content without certain requisite disclosures.

85.     The phrase "any action" in Section 230(c)(2) means "any action" — including any actions taken in good faith to restrict access to content without the public disclosures mandated by AB 587.

86.     AB 587 also contravenes the immunity provided to X Corp. by Section 230(c)(2) because Attorney General Bonta may penalize X Corp. if he determines, in his unfettered discretion as to what constitutes "misrepresent[ation]" and "reasonable, good faith," that X Corp. is

"restrict[ing] access" to content in a way that, in Attorney General Bonta's view, is contrary to X Corp.'s promulgated content moderation policies.

87.     There is a *bona fide* and actual controversy between X Corp. and Attorney General Bonta because Attorney General Bonta is charged with enforcing, and intends to enforce, AB 587, even though such enforcement is precluded and preempted by 47 U.S.C. § 230(c)(2).

88.     X Corp. maintains that AB 587 is invalid and void as a matter of law.  Attorney General Bonta claims otherwise.

89.     X Corp. seeks a declaratory judgment that AB 587 is legally invalid and unenforceable because it is precluded and preempted by 47 U.S.C. § 230(c)(2).

90.     In light of the violation of the Section 230(c)(2), X Corp. seeks preliminary and permanent injunctive relief against enforcement of AB 587.  X Corp. would be irreparably harmed if it were forced to comply with, or litigate, AB 587's requirements and has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, X Corp. respectfully requests that this Court enter judgment in X Corp.'s favor and grant the following relief:

1.     A declaration that AB 587 violates the First Amendment of the United States Constitution and Article I, Section 2, of the California Constitution;

2.     A declaration that AB 587 violates the Dormant Commerce Clause of the United States Constitution;

3.     A declaration that the imposition of civil penalties under AB 587 is precluded and preempted by 47 U.S.C. § 230(c)(2) and are therefore null and void and have no legal effect;

4.     A preliminary and permanent injunction enjoining Attorney General Bonta from enforcing AB 587 against X Corp.;

5.      An award of fees, costs, expenses, and disbursements, including attorneys' fees, to which X Corp. is entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

6.      Such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, X Corp. demands a trial by jury in this action of all issues so triable.

Dated:      September 8, 2023

By: /s/ William R. Warne
DOWNEY BRAND LLP
William R. Warne (SBN 141280)
Meghan M. Baker (SBN 243765)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Phone: 916-444-1000
Facsimile: 916-444-2100

CAHILL GORDON & REINDEL LLP
Joel Kurtzberg (*pro hac vice pending*)
Floyd Abrams (*pro hac vice pending*)
Jason Rozbruch (*pro hac vice pending*)
Lisa J. Cole (*pro hac vice pending*)
32 Old Slip
New York, NY 10005
Phone: 212-701-3120
Facsimile: 212-269-5420
jkurtzberg@cahill.com

1886555

COMPLAINT                                    35