# EXHIBIT 1

1   ROB BONTA
    Attorney General of California
2   PAUL STEIN
    Supervising Deputy Attorney General
3   SHARON L. O'GRADY
    Deputy Attorney General
4   State Bar No. 102356
      455 Golden Gate Avenue, Suite 11000
5     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3834
6     Fax:  (415) 703-1234
      E-mail:  Sharon.OGrady@doj.ca.gov
7   *Attorneys for Defendant*

8

9                IN THE UNITED STATES DISTRICT COURT

10           FOR THE CENTRAL DISTRICT OF CALIFORNIA

11                        WESTERN DIVISION

12

| | |
|---|---|
| 13  **MINDS, INC., et al.,** | 2:23-cv-02705- RGK-MAAx |
| 14                          Plaintiffs, | **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO** |
| 15          v. | **DISMISS AMENDED COMPLAINT** |
| 16  **ROBERT BONTA,** | Date:          June 26, 2023 |
| 17                          Defendant. | Time:          9:00 a.m.<br>Courtroom:   10B |
| 18 | Judge:         The Honorable R. Gary<br>                    Klausner |
| 19 | Trial Date:   None set<br>Action Filed: April 13, 2023 |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................1

Background.................................................................................................2

    I.     Assembly Bill 587 ................................................................2

    II.    The Allegations of the FAC ................................................5

           A.     Count I: Violation of the First Amendment.............................6

           B.     Count II: Unconstitutional Overbreadth .................................7

           C.     Count III: Unconstitutional Vagueness ...................................7

Legal Standard ...........................................................................................7

Argument ...................................................................................................8

    I.     Plaintiffs Lack Standing and Their Claims Are Not Ripe..................8

    II.    Plaintiffs' First Amendment Claim Fails............................11

           A.     The Disclosures Required by AB 587 Are Factual and Uncontroversial..................................................................12

           B.     AB 587 Is Reasonably Related to a Substantial State Interest..............................................................................14

           C.     The FAC Fails to Allege Facts That Would Support a Finding That AB 587 Is Unduly Burdensome. .......................17

    III.   Plaintiffs' Overbreadth Claim Fails...................................17

    IV.   Plaintiffs' Vagueness Claim Fails, ...................................19

    V.    Leave to Amend Should be Denied....................................20

Conclusion................................................................................................20

# TABLE OF AUTHORITIES

**Page**

CASES

*Am. Fuel & Petrochem. Mfrs. v. O'Keefe*
   903 F.3d 903 (9th Cir. 2018)..................................................................16

*Am. Hosp. Ass'n v. Azar*
   983 F.3d 528 (D.C. Cir. 2020) ...............................................................14

*Am. Meat Inst. v. U.S. Dept. of Agric.*
   760 F.3d 18 (D.C. Cir. 2014) (en banc)..................................................17

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009)................................................................................8

*Beeman v. Anthem Prescription Mgmt., LLC*
   165 Cal. Rptr. 3d 800 (Cal. 2013) ...................................................13, 14

*Bell Atlantic Corp. v. Twombly*
   550 U.S. 544 (2007)................................................................................8

*Boutilier v. Immigr. & Naturalization Serv.*
   387 U.S. 118 (1967)..............................................................................19

*CTIA – Wireless Assn. v. City of Berkeley*
   928 F.3d 832 (9th Cir. 2019)....................................... 12, 13, 14, 17

*Daniels-Hall v. Nat'l Educ. Ass'n*
   629 F.3d 992 (9th Cir. 2010) .................................................................8

*Envtl. Defense Ctr. v. U.S. E.P.A.*
   344 F.3d 832 (9th Cir. 2003)..................................................................12

*Foti v. City of Menlo Park*
   146 F.3d 629 (9th Cir. 1998)..................................................................18

*French v. Jones*
   876 F.3d 1228 (9th Cir. 2017)................................................................18

*In re Gilead Scis. Sec. Litig.*
   536 F.3d 1049 (9th Cir. 2008)................................................................8

**TABLE OF AUTHORITIES**
(continued)

Page

*Informed Consent Action Network v. YouTube, Inc.*
582 F. Supp. 3d (N.D. Cal. 2022)...............................................................3

*Italian Colors Rest. v. Becerra*
878 F.3d 1165 (9th Cir. 2018)....................................................................8

*King v. Facebook, Inc.*
572 F. Supp. 3d 776 (N.D. Cal. 2021)......................................................3

*Knox v. Brovich*
907 F.3d 1167 (9th Cir. 2018)..................................................................18

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*
416 F.3d 940 (9th Cir. 2005).............................................................8, 20

*Lopez v. Candaele*
630 F.3d 775 (9th Cir. 2010).....................................................................9

*Milavetz, Gallop & Milavetz v. United States*
559 U.S. 229 (2010)................................................................................12

*Murphy v. Twitter, Inc*
274 Cal. Rptr. 3d 360 (Ca1. Ct. App. 2021) ............................................3

*Nat'l Elec. Mfrs. Assn. v. Sorrell*
272 F.3d 104 (2d Cir. 2011)..............................................................14, 17

*Nationwide Biweekly Admin. v. Owen*
873 F.3d 716 (9th Cir. 2017)............................................................12, 13

*Navarro v. Block*
250 F.3d 729 (9th Cir. 2001).....................................................................7

*NetChoice, LLC v. Att'y Gen.*
34 F.4th 1196 (11th Cir. 2022)................................ 3, 9, 11, 14, 15, 17

*NetChoice, LLC v. Paxton*
49 F.4th 439 (5th Cir. 2022).............................................................3, 15

*Noori v. Countrywide Payroll & HR Solutions, Inc.*
257 Cal. Rptr. 3d 102 (Cal. Ct. App. 2019)..........................................17

iii

1
2

# TABLE OF AUTHORITIES
### (continued)

Page

3
4

*O'Handley v. Padilla*
 579 F. Supp. 3d 1163 (N.D. Cal. 2022)......................................................2, 18

5
6

*O'Handley v. Weber*
 62 F.4th (9th Cir. 2023) ....................................................................................19

7
8

*Perry v. Newsom*
 18 F.4th 622 (9th Cir. 2021).............................................................................7

9
10

*Texas v. United States*
 523 U.S. 296 (1998)..........................................................................................9

*Thomas v. Anchorage Equal Rights Comm'n*
 220 F.3d 1354 (9th Cir. 2000)........................................................................8, 9

11
12
13

*United States v. Sineneng-Smith*
 140 S. Ct. 1575 (2020)......................................................................................18

14
15

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
 455 U.S. 489 (1982)..........................................................................................19

16
17

*Wolfson v. Brammer*
 616 F.3d 1045 (9th Cir. 2010).........................................................................9

18
19

*Yuksel v. Twitter, Inc.*
 No. 22-cv-05415-TSH, 2022 WL 16748612 (N.D. Cal. Nov. 7,
 2022) .................................................................................................................3

20
21

*Zauderer v. Office of Disciplinary Counsel*
 471 U.S. 626 (1985).........................................................................12, 14, 17

22

STATUTES

23
24
25

United States Code
 Title 18 § 2251.................................................................................................18
 Title 47 § 230(c)(2)(A) ....................................................................................11

26
27
28

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

California Business and Professions Code

§ 22675-81 ...................................................................................... 3, 4, 5

§ 22675(d) .............................................................................................. 3

§ 22675(e) .............................................................................................. 3

§ 22676(a) ........................................................................................ 3, 13

§ 22676(a)(5) ......................................................................................... 4

§ 22676(a)(5)(B)(iv)-(v) ....................................................................... 4

§ 22676(b) .............................................................................................. 3

§ 22676(c) .............................................................................................. 4

§ 22677(a)(1), (a)(4) ............................................................................. 4

§ 22677(a)(3) ................................................................................. *passim*

§ 22677(a)(4)(A) ................................................................................... 4

§ 22677(a)-(b) ....................................................................................... 4

§ 22680 .................................................................................................. 4

§ 22681 .................................................................................................. 4

California Penal Code

§ 311 .................................................................................................... 18

§ 311.12 ............................................................................................... 18

**CONSTITUTIONAL PROVISIONS**

United States Constitution

First Amendment .......................................................................... *passim*

Article III ...................................................................................... 1, 8, 11

**COURT RULES**

Federal Rule of Civil Procedure

12(b)(1) ................................................................................................. 7

12(b)(6) .............................................................................................. 7, 8

**OTHER AUTHORITIES**

Assembly Bill 587

(2022 Cal. Stats., ch. 269) ........................................................... *passim*

2021-22 Sess. (June 23, 2022) ........................................................... 16

2021-22 Sess. (Aug. 11, 2022) ........................................................... 16

2021-22 Sess. (April 21, 2021) ........................................................... 16

**INTRODUCTION**

Plaintiffs challenge Assembly Bill 587, a straightforward disclosure statute that requires social media companies with annual gross revenues of at least $100 million to publicly disclose information about their content-moderation policies and decisions, i.e., whether and how they take action against content and users that violate their terms of service.  The statute is intended to provide transparency to California consumers.  Notwithstanding Plaintiffs' hyperbole, the statute does not dictate either the substantive content of any platform's terms of service or the manner in which those terms must be enforced.  The case should be dismissed.

Preliminarily, Plaintiffs' [First] Amended Complaint, Docket entry 20 ("FAC"), fails to allege a case or controversy under Article III of the Constitution. The initial complaint was brought on behalf of three Plaintiffs who are not required to make disclosures under the statute. Their only claims of harm were—and still are—based on speculative and conclusory allegations about the law's downstream effects on social media platforms and users who are not subject to its requirements. The FAC, filed after the Attorney General moved to dismiss the initial complaint, seeks to cure the standing problem by adding a fourth Plaintiff—a national association of religious broadcasters that allegedly has a single member covered by the law's disclosure requirements.  But the FAC still fails to allege a justiciable controversy.  The one allegedly affected member, Salem Media Group, Inc., will allegedly be subject to investigation and fines if "Attorney General Bonta believe[s] that [it] has not correctly categorized, flagged, and actioned speech on its platforms." FAC ¶ 107.  This claim of injury is totally divorced from the statute's actual requirements, however. Salem and other covered social media companies simply must disclose their terms of service, along with certain information about content-moderation decisions they have made based on their *own* policies and practices.  Nothing in AB 587 allows the Attorney General to "second guess" Salem's "categorization, flagging, and actioning" of any content. *Id.* ¶¶ 31-32

(misnumbered, at page 10), 107.  The statute does not dictate any company's content-moderation rules or require that any company take action against or restrict access with respect to any particular item of content or user.

Even if Plaintiffs could establish standing, Plaintiffs still fail to state any claim as a matter of law.  Plaintiffs' First Amendment challenge fails because the statute simply requires that social media companies make purely factual disclosures about their terms of service, a requirement that is constitutionally permissible under longstanding Supreme Court and Ninth Circuit jurisprudence.  Although Plaintiffs claim that AB 587 will make it more likely that (other) social media platforms will "censor" their posts, the Ninth Circuit has made clear that social media platforms are private actors, and that, absent exceptional circumstances not alleged here, the State cannot be held responsible for their content-moderation decisions.

Plaintiffs' constitutional overbreadth and vagueness claims fail as a matter of law for the same reasons.  AB 587 does not regulate what users may say on social media, or what social media platforms can or must do to moderate content that they deem harmful or otherwise inappropriate under their own policies.  It simply requires social media companies to provide greater transparency about their content-moderation rules and the steps they take to enforce those rules.

The defects in the FAC cannot be cured.  The Court should dismiss the FAC without leave to amend.

## BACKGROUND

### I.   ASSEMBLY BILL 587

Social media platforms, such as Twitter, have terms of service, including content-moderation rules, to which individuals must agree as a condition of using the platform.  *See, e.g.*, *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1172 (N.D. Cal. 2022), *aff'd sub. nom*. *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). These rules give the platform the right to take action against content or users that violate the rules.  *Id*. at 1186.  In recent years, content-moderation by social media

companies has drawn public concern, with numerous lawsuits filed by users whose accounts were limited or suspended for posting content that violated the platforms' rules. *See, e.g., Informed Consent Action Network v. YouTube, Inc.*, 582 F. Supp. 3d (N.D. Cal. 2022); *Yuksel v. Twitter, Inc.*, No. 22-cv-05415-TSH, 2022 WL 16748612 (N.D. Cal. Nov. 7, 2022); *King v. Facebook, Inc.*, 572 F. Supp. 3d 776 (N.D. Cal. 2021); *Murphy v. Twitter, Inc*, 274 Cal. Rptr. 3d 360 (Ca1. Ct. App. 2021). Some states have passed laws prohibiting social media platforms from moderating, restricting, or otherwise limiting particular kinds of content. *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1205-1206 (11th Cir. 2022) (describing Florida statute); *NetChoice, LLC v. Paxton*, 49 F.4th 439, 445-446 (5th Cir. 2022) (describing Texas statute). In marked contrast, California's recently passed Assembly Bill 587 (2022 Cal. Stats., ch. 269) ("A.B. 587") does not regulate content-moderation policies or decision-making by private social media platforms. It is simply a disclosure statute.

Codified at California Business and Professions Codes sections 22675-22681,[1] AB 587 provides that social media companies, as defined in the statute,[2] must post the terms of service for each social media platform owned or operated by the company "in a manner reasonably designed to inform all users of the social media platform of the existence and contents of the terms of service." § 22676(a). The posted terms of service must contain a "description of the process users must follow to flag content, groups, or other users that they believe violate the terms of service," "the social media company's commitments on response and resolution time," and a

---

[1] All statutory citations are to the California Business and Professions Code, unless otherwise indicated. For the convenience of the Court, AB 587 is attached as an appendix to this brief.

[2] AB 587 defines "social media company" as a person or entity that owns or operates one or more "social media platforms." § 22675(d). A "social media platform" is defined as a "public or semi-public internet-based service that has users in California and meets" specific criteria. § 22675(e).

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 10 of 34   Page ID
#:229
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 11 of 35

1   "list of potential actions the social media company may take against an item of

2   content or a user…."  § 22676(b).

3       The social media companies also must, commencing January 1, 2024, submit

4   to the Attorney General a semi-annual "terms of service report" containing specific

5   factual information.  § 22677(a)-(b).  The reports must include the "current version

6   of the platform's terms of service" and a "detailed description of content

7   moderation practices used by the social media company …."  § 22677(a)(1), (a)(4).

8   The reports must also include a statement of "whether the current version of the

9   terms of service define each of the following categories of content, and, if so, the

10  definitions of those categories," and "any existing policies intended to address the

11  categories," which are:  "[h]ate speech or racism"; "[e]xtremism or radicalization";

12  "[d]isinformation or misinformation"; "[h]arassment"; and "[f]oreign political

13  interference."  § 22677(a)(3), (a)(4)(A).  Finally, the reports must include

14  "information on content that was flagged by the social media company as content

15  belonging to any of the categories," including the number of items of content that

16  were "flagged" or "actioned" by the social media company, and how those items of

17  content were "flagged" of "actioned," e.g., whether by company employees,

18  artificial intelligence software, or users.  § 22676(a)(5), (a)(5)(B)(iv)-(v).  The

19  Attorney General shall compile all terms of service reports and make them publicly

20  available in a "searchable repository on its official internet website."  § 22676(c).

21      Exempt from the statute are social media companies with annual gross

22  revenues of less than $100 million.  § 22680.  Also exempt are platforms "for

23  which interactions between users are limited to direct messages, commercial

24  transactions, consumer reviews of products, sellers, services, events, or places, or

25  any combination thereof."  § 22681.

26      Nothing in AB 587 requires social media companies to disclose the identities

27  of or information about specific users.  *See* §§ 22675-81.  Nothing in AB 587

28  dictates the substantive content of social media companies' terms of service.  *See*

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 11 of 34   Page ID
#:230
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 12 of 35

§§ 22675-81.  Nothing in AB 587 requires that social media companies take, or prohibits them from taking, any action whatsoever against any item of content or user.  *See* §§ 22675-81.  And nothing in AB 587 requires that social media companies' terms of service define any categories of content.  *See id.*

An Assembly Judiciary Committee Report explained:

In essence, AB 587 is a transparency measure. It would require social media companies to post their "terms of service," especially as to the kinds of online behavior and activities they permit and, conversely, what kinds of behavior and activities subject a user to a temporary or permanent prohibition from using the social media service. Presumably, requiring these postings will serve three purposes. First, it will let users know what social media platforms do to flag and remove certain kinds of content, which may affect what sites users prefer to use. Second, it lets users know in advance what kind of content or conduct could lead to their being temporarily or permanently banned from using the social media service. Third, if social media companies are forced to disclose what they do in this regard, it may pressure them to become better corporate citizens by doing more to eliminate hate speech and disinformation.

Cal. Assemb. Comm. on Judiciary Report, 2021-22 Sess. (A.B. 587), Apr. 27, 2022, Request for Judicial Notice ("RJN") Exh. 1, Docket entry 23-3.

## II.   THE ALLEGATIONS OF THE FAC

Plaintiff Minds, Inc. ("Minds") operates a social networking service.   FAC ¶ 10.  The service can be accessed through Minds' own website or "as an app for Android and iPhone." *Id.*  While Minds has content-moderation rules that ban, *inter alia*, "revenge porn," "doxxing," and "malware," it does not "have any regulation of the eight [sic] categories of speech identified in AB 587." *Id.* ¶ 90. Minds has

Case 2:23-cv-02705-HDV-MAA    Document 23-1    Filed 05/25/23    Page 12 of 34    Page ID
#:231
Case 2:23-cv-01939-WBS-AC    Document 19-1    Filed 10/06/23    Page 13 of 35

1    less than $100 million in annual revenue, *id.* ¶ 92, and thus is exempt from AB

2    587's requirements.

3        Plaintiff Tim Pool ("Pool") is a "social media content creator" with millions of

4    followers on various platforms. FAC ¶ 11.  Pool has been "frequently accuse[d] of

5    creating 'hate speech,' 'disinformation,' and 'extremism'—labels he strongly

6    rejects—often with the explicit intention of pressuring social networks to

7    deplatform him."  *Id.* ¶¶ 11, 100.

8        Plaintiff The Babylon Bee LLC ("The Bee") publishes satirical news articles

9    on its website, which it also posts to Twitter, Facebook, Instagram, and YouTube.

10   *Id.* ¶ 12.  Its satire has been criticized for "draw[ing] on and reinforce[ing]

11   misinformation and conspiracy," and for trafficking in "hate speech,

12   misinformation, and disinformation."  *Id.* ¶¶ 12, 101.  In 2022, Twitter suspended

13   The Bee for violating Twitter's hateful conduct policy; the account was restored

14   after Elon Musk purchased Twitter.  *Id.* ¶ 101.

15       Plaintiff National Religious Broadcasters ("NRB") is an association of

16   "Christian communicators" with hundreds of members that use social media

17   platforms.  *Id.* ¶¶ 13, 15.  One of its members, Salem Media Group Inc. ("Salem"),

18   is itself a social media company subject to AB 587's disclosure requirements.  *Id.*

19   ¶ 16.  Due to AB 587, Salem will allegedly be subject to "onerous reporting

20   requirements" and will face investigation and fines if the Attorney General does not

21   "agree" with its content-moderation decisions.  *Id.* ¶ 107.

22       Shorn of hyperbole and rhetoric, the claims alleged in the FAC are as follows:

23   **A.    Count I: Violation of the First Amendment**

24       The FAC alleges that AB 587 was "written with the express intent to

25   discourage expression of constitutionally protected viewpoints which may be

26   subjectively deemed as 'hate speech,' 'racism,' 'extremism,' and 'misinformation,'

27   and disinformation.'"  FAC ¶ 111.  AB 587 allegedly makes it "more likely" that

28   Plaintiffs Pool and Bee and numerous unspecified NRB members will "have their

content moderated and censored based on viewpoint." *Id.* ¶ 118.  And it allegedly imposes on Plaintiff Minds "an artificial ceiling on [its] ability to grow its social network and raise capital all while the law casts the platform, which is committed to free speech, as an outlier in the social media industry." *Id.* ¶ 120.  The FAC further alleges that AB 587 "threatens the anonymity of users which threatens their ability to speak and interact with plaintiffs." *Id.* ¶ 117.  Finally, it alleges that "NRB members, such as Salem Media, will be forced to provide burdensome reporting and compelled to censor speech to avoid penalties." *Id.* ¶ 121.

## B.  Count II: Unconstitutional Overbreadth

The FAC alleges that AB 587 is overbroad because it "regulates 'hate speech,' 'racism,' 'extremism,' and 'misinformation,' and 'disinformation,'" and thus "extends to a variety of legal, constitutionally protected speech." *Id.* ¶¶ 124-25.  Further, "its unconstitutional applications outweigh the limited number of applications to cases of speech which fall outside the scope of the First Amendment." *Id.* ¶ 126.

## C.  Count III: Unconstitutional Vagueness

The FAC alleges that AB 587 is unconstitutionally vague because it "includes numerous broad, vague and ambiguous terms," such as "'hate speech,' 'racism,' extremism,' 'radicalization,' 'disinformation,' 'misinformation,' and 'foreign political interference,'" and "contains no explicit standards for what any of these terms mean." *Id.* ¶¶ 130-31.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a complaint on the basis that there is no subject matter jurisdiction.  In such situations, the party asserting jurisdiction has the burden of proving it exists.  *Perry v. Newsom*, 18 F.4th 622, 630 (9th Cir. 2021).

A complaint may also be dismissed for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Dismissal is proper where there is

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 14 of 34   Page ID
#:233
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 15 of 35

no cognizable legal theory or there are insufficient facts alleged to support a

cognizable legal theory. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).   To

defeat a Rule 12(b)(6) motion, a plaintiff must allege facts sufficient to "raise a

right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 555 (2007).  A court must assume the plaintiff's allegations of fact are

true and draw all reasonable inferences in the plaintiff's favor. *See Daniels-Hall v.

Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  However, the court is not

required to "accept as true allegations that are unwarranted deductions of fact or

unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th

Cir. 2008).  And "[t]he tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).  "A pleading that offers 'labels and conclusions' or a

'formulaic recitation of the elements of a cause of action'" cannot survive a motion

to dismiss.  *Id*.

Leave to amend need not be granted if "it is clear that the complaint could not

be saved by an amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,

416 F.3d 940, 946 (9th Cir. 2005).

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING AND THEIR CLAIMS ARE NOT RIPE.

Although NRB was added as a Plaintiff to avoid dismissal on standing

grounds, the FAC still fails to allege a case or controversy under Article III of the

Constitution.  To establish standing, Plaintiffs must allege: (1) they suffered an

"injury in fact," which is an "actual or imminent" invasion of a legally protected

interest that is "concrete and particularized"; (2) the injury must be "fairly

traceable" to the challenged conduct of the defendant; and (3) it must be likely that

the [plaintiffs'] injury will be redressed by a favorable judicial decision." *Italian

Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) (citations omitted).

Plaintiffs must "face a realistic danger of sustaining a direct injury as a result of

1    [defendant's] alleged illegal action." *Thomas v. Anchorage Equal Rights Comm'n*,

2    220 F.3d 1354, 1139 (9th Cir. 2000).  "The touchstone for determining injury in

3    fact is whether the plaintiff has suffered an injury or threat of injury that is credible,

4    not 'imaginary or speculative.'" *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir.

5    2010) (citation omitted); *see Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d

6    at 1139.  Where an allegation of injury is conjectural or hypothetical and not clean-

7    cut and concrete, concepts of standing and ripeness overlap.  *Wolfson v. Brammer*,

8    616 F.3d 1045, 1058 (9th Cir. 2010).  *See Texas v. United States*, 523 U.S. 296, 300

9    (1998); *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d at 1138.  "A claim is

10   not ripe for adjudication if it rests upon contingent future events that may not occur

11   as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. at

12   300; *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d at 1138.

13          Here, the FAC does not plausibly allege any injury-in-fact caused by

14   AB 587's disclosure requirements.  Indeed, the named Plaintiffs are not even

15   subject to AB 587.[3]  Instead, the FAC rests largely on farfetched allegations that the

16   law will somehow "cause social media companies to censor" content posted by

17   Minds, Pool, The Bee, and unspecified members of the NRB (FAC ¶ 103), without

18   citing any provision in the law that actually does that.  Nothing in AB 587 tells

19   social media companies what, if any, content-moderation actions they must take, or

20   requires them to "censor" anyone. *Cf. NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1203-

21   05 (challenging Florida statute's content-moderation restrictions on private social

22   media platforms).

23          In similar fashion, the FAC alleges that by regulating large social media

24   companies, the law will set "industry standards" and thereby ensure that Minds and

25   other "less moderated platforms" will be viewed as "outliers" and "pariahs." *Id.*

26   _____

27          [3] As noted, Plaintiff NRB allegedly has a single member that meets the
     definition of a "social media company."  Otherwise, none of the named Plaintiffs,
     and none of NRB's other (unspecified) members, is required to make disclosures
28   under the statute.

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 16 of 34   Page ID
#:235
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 17 of 35

¶¶ 70, 80; *see id.* ¶ 98 (alleging that AB 587 "creates an environment where Minds' lack of content moderation policies put it at odds with the state-mandated industry standards created by the law"). This, in turn, will allegedly "limit the company's growth" and at the same time prevent it from "being the target of any strategic acquirer with $100 million or more in annual revenues …." *Id.* ¶ 92. Again, this rests on a blatant misreading of AB 587, which does not dictate the terms of any company's content-moderation policy, and does not require any platform to take any particular action with respect to any content or user. It also rests on pure speculation about future events in the marketplace, and the actions of a host of third-parties that may or may not behave the way Plaintiffs predict, and for reasons that have nothing to do with AB 587. *See* FAC ¶ 80 (alleging that AB 587 will make it "more likely that advertisers and app store platforms will not do business with Minds".) Indeed, the FAC alleges that Google and Apple *already* require social media apps used on iPhone and Android phones to have content-moderation rules and procedures, and that Google and Apple have "banned, suspended, or not approved social media apps for insufficient levels of content moderation for 'hate speech' and 'disinformation.'" *Id.* at ¶¶ 81-86. Plaintiffs' real complaint is that other persons and entities have their own free speech rights and have exercised them to criticize Minds, Pool, The Bee, and others for spreading COVID disinformation, racist commentary, and hate speech, and to advocate that they be banned or "deplatformed," and that some social media platforms have chosen (or will choose) to take action against them and others. *Id.* ¶¶ 11-12, 22, 24, 66, 80-86, 89, 99-102. None of these activities are alleged to have been triggered by AB 587, indeed they predate AB 587.

Finally, to the extent that the FAC tries to allege an injury directly caused by AB 587's disclosure requirements, it fails. It alleges that NRB (standing in for Salem) has an injury-in-fact, because the statute gives the Attorney General and city attorneys "power to challenge whether a social media platform has correctly

1   categorized, flagged or actioned, effectively allowing these government agents to

2   second guess social media platform decisions." FAC ¶ 31-32 (misnumbered, at

3   page 10). Further, "this enforcement regime will force social media platforms to err

4   on the side of flagging and actioning any speech that arguably falls into any of the

5   specified categories." *Id.* This, again, is based on a fundamental misreading of the

6   statute, and therefore does not plausibly allege an injury-in-fact. AB 587 only

7   authorizes fines against a social media company that "*[m]aterially omits or*

8   *misrepresents required information* in a report submitted" to the Attorney General.

9   § 2278(a)(2)(C). This does not by any stretch authorize the Attorney General to

10  "second guess" content-moderation decisions by social media platforms; AB 587

11  does not tell social media platforms what they must do, it only requires them to

12  accurately *report* their terms of service and actions they have taken to enforce their

13  terms of service, so the public has a better understanding of their policies and

14  practices.

15      Social media platforms are statutorily exempt from liability for "any action

16  voluntarily taken in good faith to restrict access to or availability of material that

17  the provider or user considers to be obscene, lewd, lascivious, filthy, excessively

18  violent, harassing, or otherwise objectionable, whether or not such material is

19  constitutionally protected." 47 U.S.C. § 230(c)(2)(A). The fact that Apple, Google,

20  or others may (or may not) choose to take action against Plaintiffs or others does

21  not give Plaintiffs standing to challenge AB 587, which does not impose any

22  obligations on social media platforms to restrict access. Plaintiffs' speculation that

23  at some future date a social media platform, encouraged somehow by AB 587, may

24  take action against them or others falls far short of establishing Article III

25  jurisdiction.

26  ## II.  PLAINTIFFS' FIRST AMENDMENT CLAIM FAILS.

27      As explained, AB 587 does not dictate content-moderation policies or

28  decisions about any particular content or user on social media. It merely requires

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 18 of 34   Page ID
#:237
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 19 of 35

covered social media companies to post their content-moderation policies and

procedures so users can see them, and to report information about their content-

moderation policies and decisions to the Attorney General on a semi-annual basis,

so he can compile that information and make it available on his official website,

enabling consumers to compare different platforms.  Thus, AB 587 does nothing to

convert private content-moderation decisions into state action, and Plaintiffs do not

and could not allege otherwise.  *See infra* Section III.  Rather, AB 587 is in the

same mold as other consumer disclosure statutes, such as food labeling and truth-

in-lending laws.  To the extent it regulates speech by covered social media

companies, it involves compelled commercial speech of purely factual and

uncontroversial information, consistent with the First Amendment.

The test for compelled commercial disclosures was established in *Zauderer v.*

*Office of Disciplinary Counsel*, 471 U.S. 626 (1985).  "Under *Zauderer*, compelled

disclosure of commercial speech complies with the First Amendment if the

disclosure is reasonably related to a substantial governmental interest and is purely

factual and uncontroversial."  *CTIA – Wireless Assn. v. City of Berkeley*, 928 F.3d

832, 845 (9th Cir. 2019) ("*CTIA*").  *Zauderer* and its progeny reflect the

unexceptional principle that "[t]he First Amendment does not generally protect

corporations from being required to tell prospective customers the truth."

*Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721 (9th Cir. 2017).

### A.   The Disclosures Required by AB 587 Are Factual and Uncontroversial.

Starting with the first part of the *Zauderer* test, the Ninth Circuit has explained

that the factual and uncontroversial requirement is satisfied where the law in

question does not "attempt[] to 'prescribe what shall be orthodox in politics,

nationalism, religion or other matters of opinion, or force citizens to confess by

word or act their faith therein.'"  *Envtl. Defense Ctr. v. U.S. E.P.A.*, 344 F.3d 832,

849 (9th Cir. 2003).  "Uncontroversial" refers to the "factual accuracy of the

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 19 of 34   Page ID
#:238
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 20 of 35

compelled disclosure, not to its subjective impact on the audience." *CTIA*, 854
F.3d at 1117. *See, e.g.*, *Milavetz, Gallop & Milavetz v. United States*, 559 U.S. 229,
251 (2010) (upholding law requiring that certain bankruptcy lawyers disclose
themselves as "debt relief agencies," despite law firm's argument that the term was
"confusing and misleading"); *Nat'l Biweekly Admin. v. Owen*, 873 F.3d at 733
(upholding requirement that mortgage refinancing company disclose that its
solicitations were not authorized by the lender); *CTIA*, 928 F.3d at 846-47
(upholding ordinance requiring cell phone retailers to disclose that cell phone use
could cause exposure to "RF radiation" in excess of federal safety guidelines,
notwithstanding argument that term was "fraught with negative associations").[4]

Here, although the FAC is littered with conclusory allegations that AB 587 is
"viewpoint discriminatory," *see* FAC ¶¶ 6-8, 80, 109, 111, 113, it fails to identify
any provision of the law that requires any disclosure that is not purely factual.  AB
587 simply requires that social media companies post their terms of service and
specific factual information about those terms of service, § 22676(a), and provide
semi-annual reports to the Attorney General that include their current terms of
service (§ 22677(a)(1)), as well as related statistical information on "content that
was flagged by the social media company as content belonging to any of the
categories described in [§ 22677(a)(3)]."  § 22678.

AB 587 only requires social media companies to state "*whether* the current
version of the terms of service defines each of the following categories of content,
and, *if so*, the definitions of those categories, including *any* subcategories."

---

[4] In *Beeman v. Anthem Prescription Mgmt., LLC*, 165 Cal. Rptr. 3d 800, 821-
22 (Cal. 2013), the California Supreme Court applied the California Constitution's
free speech provision and upheld a state law requiring prescription drug claim
processors to compile and disclose information on pharmacy fees. *Id.* at 804.
Drawing on federal law, the Court expressly rejected arguments that the statute
forced the affected parties to support a political position adverse to their interests,
merely because the information might be used to influence public debate on drug
reimbursement rates.  *Id.* at 816.

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 20 of 34   Page ID
#:239
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 21 of 35

§ 22677(a)(3) (italics added).  Thus, if a social media company's terms of service do not use the categories listed in AB 587, its report to the Attorney General would simply disclose that fact.  Likewise, if a social media company does not moderate— or "flag"—content meeting its own definitions of "hate speech," "misinformation," or the other categories listed in AB 587, it would have no numerical data on that subject to include its report.  *See id.*  All of the disclosure requirements are purely factual and noncontroversial.

### B.   AB 587 Is Reasonably Related to a Substantial State Interest.

AB 587 also meets the second part of the *Zauderer* test, because it is "reasonably related to a substantial governmental interest."  *CTIA*, 928 F.3d at 845. California clearly has a substantial interest in requiring social media companies to be transparent about their content-moderation policies and decisions, so consumers can make informed decisions.  *E.g., Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 540-41 (D.C. Cir. 2020) (upholding statute requiring hospitals to disclose pricing information, "to achieve goal of informing consumers about a particular product trait") (quoting *Am. Meat Inst. v. U.S. Dept. of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014) (en banc); *Nat'l Elec. Mfrs. Assn. v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2011) (rejecting challenge to regulation requiring disclosure of information concerning mercury-containing products "to better inform consumers about the products they purchase").  *Accord Beeman v. Anthem Prescription Mgmt., LLC*, 165 Cal. Rptr. 3d at 822.

As explained above, the purposes of AB 587 include letting users know "what social media platforms do to flag and remove certain kinds of content, which may affect what sites users prefer to use," and "what kind of content or conduct could lead to their being temporarily or permanently banned from using the social media service."  *See* RJN, Exh. 1, Docket entry 23-3.  AB 587 directly advances these substantial state interests.  Indeed, courts looking at similar disclosure requirements in the social media space have expressed no

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 21 of 34   Page ID
#:240
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 22 of 35

1  concern about their constitutionality.  In addition to content-moderation

2  restrictions, the statute at issue in *NetChoice, LLC v. Att'y Gen.*, 34 F.4th at

3  1230, contains provisions requiring that social media platforms "publish the

4  standards, including detailed definitions, it uses or has used for determining

5  how to censor, deplatform, and shadow ban," and that they inform users about

6  changes to their terms of service before implementing them.  *Id.*  On an appeal

7  from an order granting a preliminary injunction, the Eleventh Circuit held that

8  the statute's content-moderation restrictions were likely unconstitutional, but

9  that Florida's interest in requiring social media platforms to publish their

10  content-moderation standards was likely legitimate, because it ensures that

11  "consumers who engage in commercial transactions with platforms by

12  providing them with a user and data for advertising in exchange for access to a

13  forum—are fully informed about the terms of that transaction and aren't

14  misled about platforms' content-moderation."  *Id*.  Similarly, the Texas statute

15  at issue in *NetChoice, LLC v. Paxton* required large social media platforms to

16  "publish an acceptable use policy and disclose information about the

17  Platforms' content management and business practices," and a report

18  containing high-level statistics about their content-moderation activities.

19  49 F.4th at 485.  Despite the law's other problems, there was no dispute that

20  its disclosure requirements "advance the state's interest in enabling users to

21  make an informed choice regarding whether to use the Platforms."  49 F.4th at

22  485 (cleaned up).  Here, AB 587 provides similar transparency and is

23  constitutional.

24       As explained, the Legislature also considered that, by requiring greater

25  transparency about platforms' content-moderation rules and decisions, AB 587 may

26  result in public pressure on social media companies to "become better corporate

27  citizens by doing more to eliminate hate speech and disinformation" on their

28

platforms.  RJN, Exh. 1, Docket entry 23-3. This, too, is a substantial state interest.[5]
Although Plaintiffs contend the Legislature's "true" purpose was to squelch
disfavored speech, and make it more likely that social media platforms will
"censor" Plaintiffs and others, such speculation fails in the face of the plain text and
the history of the bill, both of which make clear that the Legislature took pains to
ensure that AB 587 "*does not require* social media companies to moderate or
remove hateful or incendiary content." *Id.* at 4 (emphasis added).

Courts "assume that the objectives articulated by the legislature are actual
purposes of the statute, unless an examination of the circumstances forces [the
courts] to conclude that they could not have been a goal of the legislature." *Am.
Fuel & Petrochem. Mfrs. v. O'Keefe*, 903 F.3d 903, 912 (9th Cir. 2018).  Nothing
alleged in the FAC overcomes that strong presumption.[6]  More fundamentally,

---

[5] The Legislature was concerned that "social media has become a powerful and largely unregulated platform for groups espousing hate, violence, bigotry, conspiracy theories and misinformation." RJN, Exh. 1, Docket entry 23-3.  Use of social media has ballooned from only five percent of adults in 2005 to over 70 percent of adults in 2022.  A.B 587 S. Judiciary Comm. Report, 2021-22 Sess. (June 23, 2022), RJN, Exh. 2, Docket entry 23-4.  During that time, social media companies' content-moderation policies have dramatically evolved; at the same time, "proliferation of objectionable content and 'fake news' has led to calls for swifter and more aggressive action in response." *Id.*  The Legislative history notes that a recent study of Twitter posts determined that "more targeted, discriminatory tweets posted in a city related to a higher number of hate crimes."  A.B. 587 S. Rules Comm. Rep., 2021-22 Sess. (Aug. 11, 2022), RJN, Exh. 3, Docket entry 23-5; *see* A.B. 587 Assemb. Comm. on Judiciary Rep., 2021-22 Sess. (April 21, 2021), RJN, Exh. 4, Docket entry 23-6.  The Legislature also was concerned that social media companies were deploying a number of methods of content moderation, but there was a lack of transparency into those methods.  RJN, Exh. 2 at 11, Docket entry 23-4, and recognized "backlash against perceived censorship in response to filtering of content and alleged 'shadow banning,'' RJN, Exh. 3 at 3, Docket entry 23-5.  AB 587 was the Legislature's response to these concerns.

[6] In an attempt to demonstrate that AB 587's "true" purpose is to suppress protected speech, the FAC cites and mischaracterizes public comments made by the Governor and the Attorney General.  *Compare* FAC ¶¶ 21-25 *with* RJN Exhs. 5-6, Docket entries 23-7, 23-8.  These statements are not part of the bill's legislative history.  *See Am. Fuel & Petrochem. Mfrs. v. O'Keefe*, 903 F.3d at 912 (holding that the district court correctly found that statements by public officials "do not

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 23 of 34   Page ID
#:242
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 24 of 35

1   when, as here, a statute is facially constitutional, "a plaintiff cannot bring a free-

2   speech challenge by claiming that the lawmakers who passed it acted with a

3   constitutionally impermissible purpose." *NetChoice, LLC v. Att'y Gen.*, 34 F.4th at

4   1224.

5   The "[m]andated disclosure of accurate, factual, commercial information does

6   not offend the core First Amendment values of promoting efficient exchange of

7   information or protecting individual liberty interests.  Such disclosure furthers,

8   rather than hinders, the First Amendment goal of the discovery of truth and

9   contributes to the efficiency of the 'marketplace of ideas.'" *Nat'l Elec. Mfrs. Assn.*

10  *v. Sorrell*, 272 F.3d at 113-114.  AB 587 "furthers, rather than hinders," that goal.

11  **C.   The FAC Fails to Allege Facts That Would Support a Finding
        That AB 587 Is Unduly Burdensome.**

12

13  A disclosure requirement could violate the First Amendment if it was so

14  "unjustified or unduly burdensome" that it "chill[s] protected commercial speech."

15  *Zauderer*, 471 U.S. at 651. *See CTIA*, 928 F.3d at 848–49; *Am. Meat Inst. v. U.S.*

16  *Dep't of Agric.*, 760 F.3d at 27 ("*Zauderer* cannot justify a disclosure so

17  burdensome that it essentially operates as a restriction on constitutionally protected

18  speech").  Nothing in the statute or the FAC suggests that the disclosure

19  requirements of AB 587—which apply only to social media companies with $100

20  million in annual revenues—unduly burdens protected speech.  Plaintiff's

21  conclusory allegations of burden, FAC ¶¶ 6, 31, 12, are insufficient.  Indeed,

22  Plaintiffs concede that burden is consistent with other business regulations.  *Id.* ¶ 6.

23

24  _____

25  demonstrate that objectives identified by the legislature were not the true goals" of
    the statute).  Moreover, under California law, legislative history consists of

26  materials relating to the bill that the legislature as a body had before it when
    deliberated over the bill.  *Noori v. Countrywide Payroll & HR Solutions, Inc.*, 257

27  Cal. Rptr. 3d 102, 110 n. 11 (Cal. Ct. App. 2019).  The statements plaintiffs cite
    were not before the Legislature, and in fact post-date the Legislature's vote.  *See*

28  RJN, Exhs. 5-6, Docket entries 23-7 – 23-8.

17

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 24 of 34   Page ID
#:243
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 25 of 35

1   **III.   PLAINTIFFS' OVERBREADTH CLAIM FAILS.**

2        Plaintiffs' overbreadth claim also fails as a matter of law.  A statute may be

3   unconstitutionally overbroad only where a plaintiff has shown that the "law is

4   written so broadly that it may inhibit the constitutionally protected speech of a third

5   party, even if his own speech may be prohibited."  *Foti v. City of Menlo Park*, 146

6   F.3d 629, 635 (9th Cir. 1998).  To prevail on a facial overbreadth challenge, a

7   plaintiff must show that "a substantial number of [a law's] applications are

8   unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Knox*

9   *v. Brovich*, 907 F.3d 1167, 1180 (9th Cir. 2018) (quoting *United States v. Stevens*,

10  559 U.S. 460, 473 (2010)).  Invalidation of a statute for First Amendment

11  "overbreadth is 'strong medicine' that is not to be 'casually employed.'"  *United*

12  *States v. Sineneng-Smith*, 140 S. Ct. 1575, 1581 (2020) (citation omitted).

13       Here, Plaintiffs' overbreadth challenge rests on their misunderstanding of the

14  statute, specifically, their contention that AB 587 "regulates 'hate speech,' 'racism,'

15  'extremism,' and 'misinformation,' and 'disinformation,'" and thus "extends to a

16  variety of legal, constitutionally protected speech."  *Id.* ¶ 112.  As discussed above,

17  AB 587 simply requires social media companies to publicly disclose information

18  *about* their content-moderation policies and decisions; it does not regulate the

19  *substance* of those policies and decisions.  Nor does it regulate the speech of social

20  media users, who are free to post any content they wish, subject to the platform's

21  *independent* content-moderation policies and decision-making.[7]  As made clear by

22  _____

23       [7] Plaintiffs further suggest that the law is under-inclusive because it does not
     include child pornography in addition to the categories of content listed in section
24   22677(a)(3).  *See* FAC ¶¶ 33-34.  This, too, fails to state a claim.  Child
     pornography is not speech under the First Amendment and is a crime under
25   California and federal law.  *See* Cal. Penal Code §§ 311-311.12; 18 U.S.C. § 2251.
     The appropriate response to child pornography on a social media platform is a
26   criminal prosecution, not merely suspension of the sex offender's social media
     account.  Moreover, "the First Amendment imposes no freestanding
27   'underinclusiveness limitation' . . . ."  *French v. Jones*, 876 F.3d 1228, 1238 (9th
     Cir. 2017) (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015)).

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 25 of 34   Page ID
#:244
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 26 of 35

case law in this circuit, social media companies are private actors with their own First Amendment rights, and their content-moderation decisions are not attributable to the State absent exceptional circumstances not alleged here. *See O'Handley v. Padilla*, 579 F. Supp. 3d at 1172 ("Like a newspaper or a news network, [social media platforms] make decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment."); *O'Handley v. Weber*, 62 F.4th at 1156-618 (9th Cir. 2023) (holding that First Amendment claim based on alleged government influence on private actor requires that the government official "exercise coercive power or [have] provided such encouragement, either overt or covert, that the choice must be deemed in law to be that of the State" (citation omitted).

## IV.  PLAINTIFFS' VAGUENESS CLAIM FAILS,

The FAC also fails to allege a cognizable claim that AB 587 is unconstitutionally vague.  A challenge on vagueness grounds will be upheld only if the enactment is impermissibly vague in all of its applications, or specifies "no standard of conduct . . . at all." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 494-495, 489 n. 7 (1982); *Boutilier v. Immigr. & Naturalization Serv.*, 387 U.S. 118, 121 (1967) (statute must be "so vague and indefinite as really to be no rule or standard at all").

Plaintiffs allege that AB 587 is unconstitutionally vague because it "includes numerous broad, vague and ambiguous terms" such as "'hate speech,' 'racism,' extremism,' 'radicalization,' 'disinformation,' 'misinformation,' and 'foreign political interference.'"  FAC ¶ 118.  But Plaintiffs do not explain why those terms are either vague or indefinite.  Moreover, Plaintiffs themselves plainly understand the terms, since they are able to allege that Minds' content-moderation policy does *not* regulate these categories of content.  *Id.* ¶ 86.  More fundamentally, AB 587 does not require that social media companies moderate user content at all.  And with respect to those terms in particular, AB 587 simply requires a covered social

19

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 26 of 34   Page ID
#:245
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 27 of 35

media company to include in its report to the Attorney General "[a] statement of *whether* the current version of the terms of service defines" each of those terms, and if so, include the definitions in its report.  § 22677(a)(3) (italics added).  Thus, the social media companies themselves decide how they choose to define those terms. Plaintiffs' claim of unconstitutional vagueness fails as a matter of law.

## V.   LEAVE TO AMEND SHOULD BE DENIED.

Leave to amend need not be granted if "it is clear that the complaint could not be saved by an amendment." *Livid Holdings Ltd.*, 416 F.3d at 946.  Plaintiffs have already amended once, they still lack standing, their claims still fail as a matter of law, and the defects in the FAC cannot be saved by yet another round of changes. The Court should not grant Plaintiffs leave to amend.

## CONCLUSION

The Court should dismiss the FAC without leave to amend.

Dated:  May 25, 2023                    Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General


*/s/ Sharon L. O'Grady*
SHARON L. O'GRADY
Deputy Attorney General
*Attorneys for Defendant*

SA2023302140
43718068.docx

20

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 27 of 34   Page ID
#:246
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 28 of 35

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant, certifies that this brief contains 6,555 words, which:

X complies with the word limit of L.R. 11-6.1.

X complies with the word limit set by court order dated April 13, 2023.

Dated:  May 25, 2023                    Respectfully submitted,

                                         ROB BONTA
                                         Attorney General of California


                                         */s/ Sharon L. O'Grady*
                                         SHARON L. O'GRADY
                                         Deputy Attorney General
                                         *Attorneys for Defendant*

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 28 of 34   Page ID
#:247
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 29 of 35

# **Appendix**

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 29 of 34   Page ID
#:248
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 30 of 35

## Assembly Bill No. 587

### CHAPTER 269

An act to add Chapter 22.8 (commencing with Section 22675) to Division 8 of the Business and Professions Code, relating to social media.

[Approved by Governor September 13, 2022. Filed with
Secretary of State September 13, 2022.]

LEGISLATIVE COUNSEL'S DIGEST

AB 587, Gabriel. Social media companies: terms of service.

Existing law requires an operator of a commercial website or online service that collects personally identifiable information through the internet about individual consumers residing in California who use or visit its commercial website or online service to make its privacy policy available to consumers, as specified.

This bill would require a social media company, as defined, to post their terms of service for each social media platform, as defined, owned or operated by the company in a specified manner and with additional specified information, subject to certain exceptions. The bill would define "terms of service" to mean a policy or set of policies adopted by a social media company that specifies, at least, the user behavior and activities that are permitted on the internet-based service owned or operated by the social media company, and the user behavior and activities that may subject the user or an item of content to being actioned, as defined.

This bill would also require the social media company to submit reports, as specified, starting no later than January 1, 2024, to the Attorney General. The bill would specify the information required by the reports, including, but not limited to, the current version of the terms of service for each social media platform owned or operated by the company, specified categories of content and what policies the social media company has for that platform to address that content, and data related to violations of the terms of service for each platform. The bill would require the Attorney General to make all terms of service reports submitted pursuant to those provisions available to the public in a searchable repository on its official internet website.

The bill would state the intent of the Legislature that a social media company that violates the above provisions shall be subject to meaningful remedies sufficient to induce compliance with these provisions, and would specify civil penalties that a company shall be liable for if the bill's provisions are violated, and how the Attorney General or a city attorney may bring an action against violators. The bill would specify that the duties, obligations, remedies, and penalties imposed by the bill are cumulative to existing law.

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 30 of 34   Page ID
#:249
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 31 of 35

Ch. 269                        — 2 —

*The people of the State of California do enact as follows:*

SECTION 1.   It is the intent of the Legislature that a social media company that violates this act shall be subject to meaningful remedies sufficient to induce compliance with this act.

SEC. 2.   Chapter 22.8 (commencing with Section 22675) is added to Division 8 of the Business and Professions Code, to read:

## Chapter 22.8.   Content Moderation Requirements for Internet Terms of Service

22675.   For purposes of this chapter, the following definitions apply:

(a)  "Actioned" means a social media company, due to a suspected or confirmed violation of the terms of service, has taken some form of action, including, but not limited to, removal, demonetization, deprioritization, or banning, against the relevant user or relevant item of content.

(b)  (1)  "Content" means statements or comments made by users and media that are created, posted, shared, or otherwise interacted with by users on an internet-based service or application.

(2)  "Content" does not include media put on a service or application exclusively for the purpose of cloud storage, transmitting files, or file collaboration.

(c)  "Public or semipublic internet-based service or application" excludes a service or application used to facilitate communication within a business or enterprise among employees or affiliates of the business or enterprise, provided that access to the service or application is restricted to employees or affiliates of the business or enterprise using the service or application.

(d)  "Social media company" means a person or entity that owns or operates one or more social media platforms.

(e)  "Social media platform" means a public or semipublic internet-based service or application that has users in California and that meets both of the following criteria:

(1)  (A)  A substantial function of the service or application is to connect users in order to allow users to interact socially with each other within the service or application.

(B)  A service or application that provides email or direct messaging services shall not be considered to meet this criterion on the basis of that function alone.

(2)  The service or application allows users to do all of the following:

(A)  Construct a public or semipublic profile for purposes of signing into and using the service or application.

(B)  Populate a list of other users with whom an individual shares a social connection within the system.

(C)  Create or post content viewable by other users, including, but not limited to, on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users.

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 31 of 34   Page ID
#:250
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 32 of 35
— 3 —                              Ch. 269

(f) "Terms of service" means a policy or set of policies adopted by a social media company that specifies, at least, the user behavior and activities that are permitted on the internet-based service owned or operated by the social media company, and the user behavior and activities that may subject the user or an item of content to being actioned.

22676.  (a)  A social media company shall post terms of service for each social media platform owned or operated by the company in a manner reasonably designed to inform all users of the social media platform of the existence and contents of the terms of service.

(b)  The terms of service posted pursuant to subdivision (a) shall include all of the following:

(1)  Contact information for the purpose of allowing users to ask the social media company questions about the terms of service.

(2)  A description of the process that users must follow to flag content, groups, or other users that they believe violate the terms of service, and the social media company's commitments on response and resolution time.

(3)  A list of potential actions the social media company may take against an item of content or a user, including, but not limited to, removal, demonetization, deprioritization, or banning.

(c)  The terms of service posted pursuant to subdivision (a) shall be available in all Medi-Cal threshold languages, as defined in subdivision (c) of Section 128552 of the Health and Safety Code, in which the social media platform offers product features, including, but not limited to, menus and prompts.

22677.  (a)  On a semiannual basis in accordance with subdivision (b), a social media company shall submit to the Attorney General a terms of service report. The terms of service report shall include, for each social media platform owned or operated by the company, all of the following:

(1)  The current version of the terms of service of the social media platform.

(2)  If a social media company has filed its first report, a complete and detailed description of any changes to the terms of service since the previous report.

(3)  A statement of whether the current version of the terms of service defines each of the following categories of content, and, if so, the definitions of those categories, including any subcategories:

(A)  Hate speech or racism.

(B)  Extremism or radicalization.

(C)  Disinformation or misinformation.

(D)  Harassment.

(E)  Foreign political interference.

(4)  A detailed description of content moderation practices used by the social media company for that platform, including, but not limited to, all of the following:

(A)  Any existing policies intended to address the categories of content described in paragraph (3).

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 32 of 34   Page ID
#:251
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 33 of 35

(B)  How automated content moderation systems enforce terms of service of the social media platform and when these systems involve human review.

(C)  How the social media company responds to user reports of violations of the terms of service.

(D)  How the social media company would remove individual pieces of content, users, or groups that violate the terms of service, or take broader action against individual users or against groups of users that violate the terms of service.

(E)  The languages in which the social media platform does not make terms of service available, but does offer product features, including, but not limited to, menus and prompts.

(5)  (A)  Information on content that was flagged by the social media company as content belonging to any of the categories described in paragraph (3), including all of the following:

(i)  The total number of flagged items of content.

(ii)  The total number of actioned items of content.

(iii)  The total number of actioned items of content that resulted in action taken by the social media company against the user or group of users responsible for the content.

(iv)  The total number of actioned items of content that were removed, demonetized, or deprioritized by the social media company.

(v)  The number of times actioned items of content were viewed by users.

(vi)  The number of times actioned items of content were shared, and the number of users that viewed the content before it was actioned.

(vii)  The number of times users appealed social media company actions taken on that platform and the number of reversals of social media company actions on appeal disaggregated by each type of action.

(B)  All information required by subparagraph (A) shall be disaggregated into the following categories:

(i)  The category of content, including any relevant categories described in paragraph (3).

(ii)  The type of content, including, but not limited to, posts, comments, messages, profiles of users, or groups of users.

(iii)  The type of media of the content, including, but not limited to, text, images, and videos.

(iv)  How the content was flagged, including, but not limited to, flagged by company employees or contractors, flagged by artificial intelligence software, flagged by community moderators, flagged by civil society partners, and flagged by users.

(v)  How the content was actioned, including, but not limited to, actioned by company employees or contractors, actioned by artificial intelligence software, actioned by community moderators, actioned by civil society partners, and actioned by users.

(b)  (1)  A social media company shall electronically submit a semiannual terms of service report pursuant to subdivision (a), covering activity within the third and fourth quarters of the preceding calendar year, to the Attorney General no later than April 1 of each year, and shall electronically submit

91

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 33 of 34   Page ID
#:252
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 34 of 35

— 5 —                                           Ch. 269

a semiannual terms of service report pursuant to subdivision (a), covering activity within the first and second quarters of the current calendar year, to the Attorney General no later than October 1 of each year.

(2) Notwithstanding paragraph (1), a social media company shall electronically submit its first terms of service report pursuant to subdivision (a), covering activity within the third quarter of 2023, to the Attorney General no later than January 1, 2024, and shall electronically submit its second terms of service report pursuant to subdivision (a), covering activity within the fourth quarter of 2023, to the Attorney General no later than April 1, 2024. A social media platform shall submit its third report no later than October 1, 2024, in accordance with paragraph (1).

(c) The Attorney General shall make all terms of service reports submitted pursuant to this section available to the public in a searchable repository on its official internet website.

22678.  (a) (1) A social media company that violates the provisions of this chapter shall be liable for a civil penalty not to exceed fifteen thousand dollars ($15,000) per violation per day, and may be enjoined in any court of competent jurisdiction.

(2) A social media company shall be considered in violation of the provisions of this chapter for each day the social media company does any of the following:

(A) Fails to post terms of service in accordance with Section 22676.

(B) Fails to timely submit to the Attorney General a report required pursuant to Section 22677.

(C) Materially omits or misrepresents required information in a report submitted pursuant to Section 22677.

(3) In assessing the amount of a civil penalty pursuant to paragraph (1), the court shall consider whether the social media company has made a reasonable, good faith attempt to comply with the provisions of this chapter.

(b) Actions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or by a city attorney of a city having a population in excess of 750,000, or by a city attorney in a city and county in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association.

(c) If an action pursuant to this section is brought by the Attorney General, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the General Fund. If the action is brought by a city attorney, one-half of the penalty collected shall be paid to the treasurer of the city in which the judgment was entered, and one-half to the treasurer of the county in which the judgment was entered.

22679.  (a) The duties and obligations imposed by this chapter are cumulative to any other duties or obligations imposed under local, state, or federal law and shall not be construed to relieve any party from any duties or obligations imposed under law.

Case 2:23-cv-02705-HDV-MAA   Document 23-1   Filed 05/25/23   Page 34 of 34   Page ID
#:253
Case 2:23-cv-01939-WBS-AC   Document 19-1   Filed 10/06/23   Page 35 of 35

(b)  The remedies or penalties provided by this chapter are cumulative to each other and to any other remedies or penalties available under local, state, or federal law.

22680.  This chapter shall not apply to a social media company that generated less than one hundred million dollars ($100,000,000) in gross revenue during the preceding calendar year.

22681.  This chapter shall not be construed to apply to an internet-based service or application for which interactions between users are limited to direct messages, commercial transactions, consumer reviews of products, sellers, services, events, or places, or any combination thereof.

O