# EXHIBIT 26

# The Constitutionality of Mandating Editorial Transparency

ERIC GOLDMAN[†]

*This Article explores the underappreciated constitutional problems that arise when regulators compel Internet services to disclose information about their editorial operations and decisions (what the Article calls "mandatory editorial transparency"). In particular, this Article highlights the inevitable problems caused by regulators' attempts to confirm the accuracy of Internet services' disclosures. The prospect of such enforcements will motivate Internet services to change their decisions to please regulators—thus having the same effect on speech as more direct, and obviously unconstitutional, speech regulations. This makes mandatory editorial transparency regulations another policy dead-end in regulators' quest to control online speech.*

† Professor of Law, Associate Dean for Research, and Co-Director of the High Tech Law Institute, Santa Clara University School of Law. egoldman@gmail.com. http://www.ericgoldman.org. I'm grateful for comments from Jane Bambauer, Ashutosh Bhagwat, Colleen Chien, Deep Gulasekaram, Jeffrey Hermes, Brad Joondeph, Daphne Keller, Frank LoMonte, Emma Llanso, Brian Love, Mark MacCarthy, Jess Miers, Tyler Ochoa, Irina Raicu, Eric Robinson, David Sloss, Rebecca Tushnet, David Yosifon, and the participants at a Media Law Resource Center (MRLC) workshop, "The Internet and the Law: Legal Challenges in the New Digital Age" conference sponsored by the Pound Civil Justice Institute and UC Hastings Center for Litigation and Court (with special thanks to Scott Dodson and Zahra Takhshid); Stanford Cyber Policy Center (with special thanks to Nathaniel Persily); Knight First Amendment Institute Research Seminar; Indiana University Maurer School of Law, Center for Intellectual Property Research workshop series; IP Scholars Conference (IPSC) 2021; RightsCon 2021; and the Santa Clara University School of Law Faculty Workshop. I also thank Brent Weigel for his research assistance. This project was supported in part by a grant from the John S. and James L. Knight Foundation.

Electronic copy available at: https://ssrn.com/abstract=4005647

## TABLE OF CONTENTS

I.   TRANSPARENCY AS A REGULATORY POLICY ......................................... 1206
    A.  WHAT EDITORIAL TRANSPARENCY MEANS ............................... 1207
    B.  EXAMPLES OF EDITORIAL TRANSPARENCY LAWS: FLORIDA
        AND TEXAS ................................................................................ 1209
II.  THE CONSTITUTIONALITY OF EDITORIAL TRANSPARENCY ................... 1212
    A.  MANDATORY PUBLISHER TRANSPARENCY .................................. 1213
        *1.  Constitutional Limits on Publisher Transparency* .............. 1213
        *2.  Additional Concerns About Compelled Speech* .................. 1217
        *3.  Distinguishing Editorial Transparency Laws from Other
           Mandatory Disclosures* ...................................................... 1218
    B.  EXTENDING THE CONSTITUTIONAL PROTECTIONS FOR
        PUBLISHERS TO SOCIAL MEDIA PLATFORMS ............................. 1220
    C.  *TWITTER V. PAXTON*: A CASE STUDY OF WEAPONIZED
        EDITORIAL TRANSPARENCY ....................................................... 1226
III. ALTERNATIVE WAYS TO VALIDATE EDITORIAL  TRANSPARENCY
    DISCLOSURES ...................................................................................... 1228
    A.  THIRD-PARTY AUDITING ............................................................ 1228
    B.  PROCEDURAL REQUIREMENTS .................................................... 1229
    C.  EMPOWERMENT OF INDEPENDENT RESEARCHERS ...................... 1229
CONCLUSION .............................................................................................. 1231

Electronic copy available at: https://ssrn.com/abstract=4005647

## INTRODUCTION

Federal and state regulators around the country have made it a high priority to "fix" user-generated content (UGC) on the Internet. Many regulators would simply prefer to tell Internet services[1] what UGC they must, can, or cannot publish. However, that option is unconstitutional; plus, there's a deep partisan divide over what content should be published online.[2]

To bypass these obstacles, requiring Internet services to provide more "transparency" has emerged as an attractive plan B for regulators. For example, in 2021, Florida and Texas imposed wide-ranging disclosure obligations[3] on "social media platforms."[4] Mandatory transparency laws are generally popular,[5] and they are widely viewed as less constitutionally problematic than outright censorship.[6] After all, mandatory disclosure laws are prevalent in our society, and they often survive constitutional scrutiny.[7]

This Article explores the underappreciated constitutional problems that arise when regulators compel Internet services to disclose information about their editorial operations and decisions (what this Article calls "mandatory editorial transparency"). In particular, this Article highlights the inevitable problems caused by regulators' attempts to confirm the accuracy of Internet services' disclosures. The prospect of such enforcements will motivate Internet services to change their decisions to please regulators—thus having the same effect on speech as more direct, and obviously unconstitutional, speech

---

1. Synonyms for "Internet services" include "platforms" (used in the Florida, Texas and Maryland laws discussed herein), "social media," and "UGC services."

2. Republicans generally want to compel Internet services to carry more UGC, including anti-social content. Democrats generally want Internet services to remove more UGC, even constitutionally protected content.

3. This Article uses "transparency requirements" and "mandatory disclosure" interchangeably.

4. Florida defined "social media platform" as "any information service, system, Internet search engine, or access software provider that [p]rovides or enables computer access by multiple users to a computer server, including an Internet platform or a social media site," subject to additional qualifications. FLA. STAT. § 501.2041(1)(g) (2021). Texas defined "social media platform" as "an Internet website or application that is open to the public, allows a user to create an account, and enables users to communicate with other users for the primary purpose of posting information, comments, messages, or images," also subject to additional qualifications. TEX. BUS. & COM. CODE ANN. § 120.001(1) (West 2021).

5. *See, e.g.*, ARCHON FUNG, MARY GRAHAM & DAVID WEIL, FULL DISCLOSURE: THE PERILS AND PROMISE OF TRANSPARENCY xiii (2007) ("Who could oppose providing more information to the public?").

6. *See, e.g.*, MARK MACCARTHY, TRANSATLANTIC WORKING GRP., TRANSPARENCY REQUIREMENTS FOR DIGITAL SOCIAL MEDIA PLATFORMS: RECOMMENDATIONS FOR POLICY MAKERS AND INDUSTRY 2, 29 (2020), https://www.ivir.nl/publicaties/download/Transparency_MacCarthy_Feb_2020.pdf [hereinafter MACCARTHY TAWG] ("[T]ransparency does not raise the free expression issues that bedevil mandated requirements for removal of problematic material . . . [it] limits the dangers to democratic self-governance that arise when government agencies are able to control the flow of information citizens rely upon for making democratic decisions.").

7. *See* VALERIE C. BRANNON, CONG. RSCH. SERV., R45700, ASSESSING COMMERCIAL DISCLOSURE REQUIREMENTS UNDER THE FIRST AMENDMENT 1 (2019), https://sgp.fas.org/crs/misc/R45700.pdf ("Commercial disclosure requirements have largely withstood constitutional scrutiny") [hereinafter CRS REPORT].

Electronic copy available at: https://ssrn.com/abstract=4005647

regulations. This makes mandatory editorial transparency regulations another policy dead-end in regulators' quest to control online speech.

This Article proceeds in three parts. Part I defines transparency as a regulatory policy and then reviews the laws enacted in Florida and Texas. Part II explains how mandatory editorial transparency would be unconstitutional if imposed on traditional publishers and then explains why the same concerns apply to online publishers of UGC. Part II also includes a case study showing how regulators are already using editorial transparency enforcement to advance their censorship. Part III evaluates some potential alternatives to validate editorial transparency.

## I. Transparency as a Regulatory Policy

Professors Ben-Shahar and Schneider have explained that "mandated disclosure is ubiquitous. Innumerable federal and state statutes, municipal ordinances, administrative regulations, and court rulings demand sometimes marvelously elaborate disclosures from businesses."[8]

Transparency laws have several perceived advantages over other regulatory policies.[9] First, transparency laws do not dictate a company's choices outright. Instead, the laws generate information that can help consumers make better marketplace choices. For this reason, transparency requirements often appeal to a wide range of constituents, including those who might be otherwise skeptical of government regulation.[10] Second, transparency laws can enable advocates and regulators to hold companies accountable for the company's choices. In Justice Brandeis' oft-cited words, "sunlight is the best disinfectant."[11] Third, transparency laws can "nudge" a company's choices by increasing the company's focus on disclosure[12] and encouraging the company to make choices that will be well-received when publicly disclosed.

---

8. Omri Ben-Shahar & Carl E. Schneider, *The Failure of Mandated Disclosure*, 159 U. PA. L. REV. 647, 650 (2011). *See generally* OMRI BEN-SHAHAR & CARL E. SCHNEIDER, MORE THAN YOU WANTED TO KNOW: THE FAILURE OF MANDATED DISCLOSURE (2014) (their associated book).

9. *See* MACCARTHY TAWG, *supra* note 6, at 7; TRANSATLANTIC WORKING GRP., FREEDOM AND ACCOUNTABILITY: A TRANSATLANTIC FRAMEWORK FOR MODERATING SPEECH ONLINE 22 (2020), https://cdn.annenbergpublicpolicycenter.org/wp-content/uploads/2020/07/Freedom_and_Accountability_TWG_Final_Report.pdf ("Transparency can achieve many aims simultaneously: enable governments to develop evidence-based policies and strengthen their ability to exercise independent oversight; push firms to examine issues or collect data that they otherwise would not; empower citizens to understand their information environment.").

10. *See* BEN-SHAHAR & SCHNEIDER, *supra* note 8, at 5 (mandatory disclosures resonate with "free-market principles" and the "autonomy principle").

11. "Sunlight is said to be the best of disinfectants." Louis D. Brandeis, *What Publicity Can Do*, HARPER'S WKLY, Dec. 20, 1913, at 10, https://www.sechistorical.org/collection/papers/1910/1913_12_20_What_Publicity_Ca.pdf.

12. *See* John Roberts, *No One Is Perfect: The Limits of Transparency and an Ethic for 'Intelligent' Accountability*, 34 ACCT., ORG. & SOC'Y 957, 958 (2009) ("[T]he effects of transparency depend on how it changes conduct *behind* closed doors."); FUNG ET AL., *supra* note 5, at 43 ("Businesses may be forced to establish new systems of monitoring, measuring, review, and reporting . . . disclosures may change their practices in response to new knowledge as well as to public pressure."). As the cliché goes, "what gets measured gets done."

Electronic copy available at: https://ssrn.com/abstract=4005647

Finally, transparency laws can look like a bargain to regulators. Any compliance costs incurred by the regulated companies do not impact regulators' budgets,[13] and regulators consider the costs as standard costs of doing business (even when the costs raise entry barriers and increase consumer prices). Furthermore, regulators are not required to set aside money for enforcement.[14] Regulators may instead hope that the marketplace or competitors will do the desired policing, or that any enforcement costs can be covered by existing enforcement budgets.

In summary, transparency laws are routinely lauded as low-cost and "light touch" regulatory tools compared to direct regulations.[15] As Professors Ben-Shahar and Schneider observed, "when lawmakers are besieged, mandated disclosure looks like rescue. Its critics are few. Lawmakers can be seen to have acted. The fisc is unmolested."[16]

### A. What Editorial Transparency Means

This Article focuses on the policy approach of mandatory editorial transparency, defined as requirements for publishers to disclose information about their editorial operations and decisions. Mandatory editorial transparency requirements can be structured in a virtually infinite number of ways,[17] but at minimum, the requirements must enumerate the information to disclose and specify who gets it.

First, any editorial transparency law must specify what information the publisher is required to disclose. Options include:

*Disclosures of the publisher's editorial policies*, such as disclosures of an Internet service's "house rules"[18] regarding how it handles "lawful-but-

---

*See What's Your Feed Reading Speed?*, Matthew Cornell: Blog (July 30, 2007, 1:46 AM), http://www.matthewcornell.org/blog/2007/7/30/whats-your-feed-reading-speed.html#1 (providing an etymology of this cliché).

13. Regulators often dismiss companies' objections about the costs as self-interested representations. *See* Ben-Shahar & Schneider, *supra* note 8, at 682 (mandated disclosure regulation "looks cheap. It requires almost no government expenditures, and its costs seem to be imposed on the story's villain, the stronger party who withholds information").

14. *Id.*

15. Fung et al., *supra* note 5, at 5 ("The ingeniousness of targeted transparency lies in its mobilization of individual choice, market forces, and participatory democracy through relatively light-handed government action."); Ben-Shahar & Schneider, *supra* note 8, at 5–6.

16. Ben-Shahar & Schneider, *supra* note 8, at 684.

17. MacCarthy categorized mandatory editorial transparency options as "platform rules," "range of enforcement techniques," "complaint procedures," "how platforms explain their decisions," and "appeals process". MacCarthy TAWG, *supra* note 6, at 18–19. *Cf.* Fung et al., *supra* note 5, at 37–39 (required disclosures can be warnings, "rights-to-know," or targeted transparency). *See generally* Daphne Keller, *Some Humility About Transparency*, Stan. L. Sch. Ctr. for Internet & Soc'y (Mar. 19, 2021), http://cyberlaw.stanford.edu/blog/2021/03/some-humility-about-transparency (discussing the confusion about what editorial transparency means and what disclosures advocates should favor).

18. Eric Goldman & Jess Miers, *Online Account Terminations/Content Removals and the Benefits of Internet Services Enforcing Their House Rules*, 1 J. Free Speech L. 191, 195 (2021). Synonyms for these disclosures include: terms of service (TOS), terms of use (TOU), terms & conditions (T&Cs), acceptable use policies (AUP), and community guidelines.

Electronic copy available at: https://ssrn.com/abstract=4005647

objectionable" content[19] or repeat copyright infringers.[20] Regulators could also require services to disclose their "algorithms" as codifications of their editorial policies.

*Explanations of the publisher's decisions*,[21] such as an explanation of why the publisher chose not to publish an author's content.

*Statistics about editorial decisions*, such as the total number of content items that an Internet service blocked or removed in a specified time period. Spurred by civil society initiatives such as the Manila Principles (adopted in 2015)[22] and the Santa Clara Principles (adopted in 2018[23] and updated in 2021[24]), some Internet services voluntarily publish "transparency reports," compiling statistics about their editorial decisions and other activities.[25] Some examples: Google's report on "right to be forgotten" requests;[26] Facebook's transparency center;[27] and Twitter's statistics about law enforcement requests.[28] Regulators have begun compelling publication of these statistics.[29]

---

19. Also called "lawful-but-awful" content. *See* Eric Goldman & Jess Miers, *Why Can't Internet Companies Stop Awful Content?*, ARS TECHNICA (Nov. 27, 2019), https://arstechnica.com/tech-policy/2019/11/why-cant-internet-companies-stop-awful-content.

20. To qualify for the Digital Millennium Copyright Act (DMCA) online safe harbor, Internet services must "inform[] subscribers and account holders" of their policy towards repeat infringers. 17 U.S.C. § 512(i)(1)(A) (2020). Many services publish the disclosures to the general public, even though they could provide it to a narrower audience. *See* Amanda Reid, *Readability, Accessibility, and Clarity: An Analysis of DMCA Repeat Infringer Policies*, 61 JURIMETRICS J. 405, 412 (2021).

21. This is analogous to the GDPR's "right of explanation." Commission Regulation 2016/679, On the Protection of Natural Persons with Regard to the Processing of Personal Data and on the Free Movement of Such Data [2016] O.J. (L119/1) Recital 71; *see* Margot E. Kaminski, *The Right to Explanation, Explained*, 34 BERKELEY TECH. L.J. 189, 204 (2019).

22. MANILA PRINCIPLES ON INTERMEDIARY LIABILITY, ELEC. FRONTIER FOUND 51 (2015), https://www.eff.org/files/2015/07/08/manila_principles_background_paper.pdf (transparency reports should include "information about all content restrictions taken by the intermediary, including actions taken on government requests, court orders, private complainant requests, and enforcement of content restriction policies"). The Manila Principles also call for disclosures of "content restriction policies" (Principle VI.e) and public explanations of content restrictions (Principle VI.f). *Id* at 40–51.

23. *See* ACCESS NOW, ACLU FOUND. OF N. CALIF., ACLU FOUND. OF S. CALIF., ARTICLE 19, BRENNAN CTR. FOR JUST., CTR. FOR DEMOCRACY & TECH., ELEC. FRONTIER FOUND., GLOB. PARTNERS DIGIT., INTERNETLAB, NAT'L COAL. AGAINST CENSORSHIP, NEW AMERICA'S OPEN TECH. INST., RANKING DIGIT. RTS., RED EN DEFENSA DE LOS DRECHOS DIGITALES & WITNESS, SANTA CLARA PRINCIPLES ON CONTENT CONSULTATION REPORT (2021), https://santaclaraprinciples.org/images/SantaClara_Report.pdf. Principle #1 says: "Companies should publish the numbers of posts removed and accounts permanently or temporarily suspended due to violations of their content guidelines." *Id* at 7.

24. *See id.*

25. *See* MACCARTHY TAWG, *supra* note 6, at 11, 21.

26. *Requests to Delist Content Under European Privacy Law*, GOOGLE, https://transparencyreport.google.com/eu-privacy/overview?hl=en (last visited July 1, 2022).

27. *Transparency Reports*, FACEBOOK, https://transparency.fb.com/data/ (last visited July 1, 2022).

28. *See, e.g.*, Twitter, Inc. v. Lynch, 139 F. Supp. 3d 1075, 1077 (N.D. Cal. 2015); Twitter, Inc. v. Holder, 183 F. Supp. 3d 1007, 1009 (N.D. Cal. 2016); Twitter, Inc. v. Sessions, 263 F. Supp. 3d 803, 806 (N.D. Cal. 2017); Twitter, Inc. v. Barr, 445 F. Supp. 3d 295, 298 (N.D. Cal. 2020); *see also* Cathy Gellis, *A Paean to Transparency Reports*, TECHDIRT (Aug. 31, 2020), https://www.techdirt.com/articles/20200829/10223345205/paean-to-transparency-reports.shtml.

29. *See, e.g.*, Gesetz zur Verbesserung der Rechtsdurchsetzung in sozialen Netzwerken [Netzwerkdurchsetzungsgesetz] [NetzDG] [Act to Improve Enforcement of the Law in Social Networks], Sept.

Electronic copy available at: https://ssrn.com/abstract=4005647

*Disclosures of source data*, such as the data that supported the publisher's editorial function. In the newsroom context, source data includes unpublished journalistic material, such as a journalist's research notes or source list. In the Internet context, source data includes the corpus of third-party content submitted for publication,[30] including UGC items that have been withdrawn from publication by the service or author, as well as items shared with limited audiences (such as notes from private conversations).

Second, any editorial transparency law must specify who can access the disclosed information. Disclosures can be published to the general public or to smaller audiences, such as an explanation provided to an affected content submitter, confidential filings with government agencies, or discovery in litigation.

### B. EXAMPLES OF EDITORIAL TRANSPARENCY LAWS: FLORIDA AND TEXAS

The "social media censorship" laws enacted by Florida[31] and Texas[32] are actual examples of mandatory editorial transparency laws.[33] Both laws purportedly restrict "social media platforms" (that meet minimum-size thresholds) from "censoring"[34] their users. Both laws also require mandatory editorial transparency.

Florida's law requires social media platforms to publish their editorial policies[35] and provide individualized explanations to users who experience adverse editorial decisions.[36]

---

1, 2017, BUNDESGESETZBLATT, TEIL I [BGBL I] at 3352, art. 1, § 2(1) (Ger.), translation at https://www.bmj.de/SharedDocs/Gesetzgebungsverfahren/Dokumente/NetzDG_engl.pdf;jsessionid=22975E96 F887017497EB10566BFB78E0.1_cid297?__blob=publicationFile&v=2; MACCARTHY TAWG, *supra* note 6, at 11 (discussing NetzDG). Regulators are also enacting mandatory disclosures about non-editorial activities. *See, e.g.*, Arkansas Online Marketplace Consumer Inform. Act, S. 470, 93th Gen. Assemb., Reg. Sess. (Ark. 2021) (enacted) (online marketplaces must require marketplace vendors to disclose specified information in their public listings).

30. This can include third-party content beyond UGC, such as ads. *See, e.g.*, *Ad Library*, FACEBOOK, https://www.facebook.com/ads/library/ (last visited July 1, 2022).

31. S. 7072, 2021 Leg., Reg. Sess. (Fl. 2021) (enacted).

32. H.R. 20, 87th Leg., 2d Special Sess. (Tex. 2021) (enacted).

33. Florida and Texas outpaced Congress on this topic, but Congress has floated mandatory editorial transparency bills as well. *See, e.g.*, Platform Accountability and Transparency Act, S. 797, 117th Cong. (2021); Eric Goldman, *Comments on the "Platform Accountability and Consumer Transparency Act" (the "PACT Act")*, TECH. & MKTG. L. BLOG (July 27, 2020), https://blog.ericgoldman.org/archives/2020/07/comments-on-the-platform-accountability-and-consumer-transparency-act-the-pact-act.htm.

34. The statutory references to "censorship" are deceptive because Internet services can never engage in "censorship", while forcing Internet services to publish unwanted speech does constitute government-dictated "censorship."

35. Social media platforms must "publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban." FLA. STAT. § 501.2041(2)(a) (2021).

36. When a social media platform "censors or shadow bans" a user's content or deplatforms a user, it must provide the user with "a thorough rationale explaining the reason that the social media platform censored the user [and] a precise and thorough explanation of how the social media platform became aware of the censored content or material, including a thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable." *Id.* § 501.2041(2)(d), (3).

Electronic copy available at: https://ssrn.com/abstract=4005647

*HASTINGS LAW JOURNAL*

Like Florida, Texas' law requires social media platforms to publish their editorial policies (the law calls them "acceptable use policies")[37] and provide explanations to users affected by those policies.[38] However, Texas' transparency obligations go much further than Florida's.

Texas also requires that social media platforms "publicly disclose accurate information regarding its content management, data management, and business practices."[39] This general requirement includes: "specific information regarding the manner in which the social media platform: (1) curates and targets content to users; (2) places and promotes content, services, and products, including its own content, services, and products; (3) moderates content; (4) uses search, ranking, or other algorithms or procedures that determine results on the platform; and (5) provides users' performance data on the use of the platform and its products and services."[40]

Texas also requires social media platforms to publish biannual transparency reports containing the following statistics:[41]

- (1) [T]he total number of instances in which the social media platform was alerted to illegal content, illegal activity, or potentially policy-violating content by:

- (A) user complaint;

- (B) an employee of or person contracting with the social media platform; or

- (C) an internal automated detection tool;

- (2) . . . the number of instances in which the social media platform took action with respect to illegal content, illegal activity, or potentially policy-violating content known to the platform due to the nature of the content as illegal content, illegal activity, or potentially policy-violating content, including:

  - (A) content removal;

  - (B) content demonetization;

  - (C) content deprioritization;

  - (D) the addition of an assessment to content;

---

37. Tex. Bus. & Com. Code Ann. § 120.052 (West 2021).

38. *Id.* § 120.103(a)(1).

39. *Id.* § 120.051(a).

40. *Id.* The law also amorphously requires that these disclosures "be sufficient to enable users to make an informed choice regarding the purchase of or use of access to or services from the platform." *Id.* § 120.051(b).

41. This overreaching list of disclosures is not unusual:

> Mandated disclosure's appeal to lawmakers and the allure of the more-is-better mantra lead lawmakers to mandate disclosure too often and too broadly. . . . Only broad disclosure accommodates the variety of discloses and circumstances. One can always imagine that disclosing one more datum might help. Because it is hard to anticipate what data will help, safety seems to lie in broad mandates. . . . Lawmakers might set a mandate's scope by asking consumers what they want to know. Alas, they say virtually everything.

Ben-Shahar & Schneider, *supra* note 8, at 684–85.

Electronic copy available at: https://ssrn.com/abstract=4005647

- o   (E) account suspension;
- o   (F) account removal; or
- o   (G) any other action taken in accordance with the platform's acceptable use policy;
- (3) the country of the user who provided the content for each instance described by Subdivision (2);
- (4) the number of coordinated campaigns, if applicable;
- (5) the number of instances in which a user appealed the decision to remove the user's potentially policy-violating content;
- (6) the percentage of appeals described by Subdivision (5) that resulted in the restoration of content; and
- (7) a description of each tool, practice, action, or technique used in enforcing the acceptable use policy.[42]

Collectively, Texas explicitly adopted three of the four different information disclosure categories outlined in Part I(A): disclosures of editorial policies, explanations of editorial decisions, and statistics of editorial decisions/operations.

Texas' law will also inevitably require social media platforms to disclose source data, even though that requirement is stated only implicitly. That's because social media platforms will misreport or provide erroneous reports (intentionally or not),[43] and regulators cannot guilelessly accept the self-reports.[44] To double-check the accuracy of any disclosures, regulators will need access to the source data.[45]

For example, consider how Texas would verify a social media platform's disclosure of "the number of instances in which the social media platform took action with respect to illegal content, illegal activity, or potentially policy-violating content known to the platform due to the nature of the content as illegal

---

42. TEX. BUS. & COM. CODE ANN. § 120.053 (West 2021).

43. Some reasons why social media platforms may underreport or misreport: they may underinvest in their reporting systems; they may skew any judgment calls in how they characterize data or otherwise make self-beneficial interpretations of the legal requirements; they may avoid disclosing any information that might constitute a trade secret or help gamers; they may resist confirming they violated a law; and they may suppress any information that conflicts with their public narratives. On the latter point, see, e.g., Davey Alba & Ryan Mac, *Facebook, Fearing Public Outcry, Shelved Earlier Report on Popular Posts*, N.Y. TIMES (Aug. 20, 2021), https://www.nytimes.com/2021/08/20/technology/facebook-popular-posts.html. *See generally* FUNG ET AL., *supra* note 5, at 72–73 (discussing ways to game disclosure requirements); Ben-Shahar & Schneider, *supra* note 8, at 698–702 (explaining why companies shirk mandatory disclosure obligations).

44. *Cf.* FUNG ET AL., *supra* note 5, at 45 ("targeted transparency policies do not work unless they are enforced…the government must develop methods to monitor compliance with disclosure requirements").

45. Mark MacCarthy, *A Consumer Protection Approach to Platform Content Moderation*, *in* FUNDAMENTAL RIGHTS PROTECTION ONLINE: THE FUTURE REGULATION OF INTERMEDIARIES 115, 134 (Bilyana Petkova & Tuomas Ojanen eds., 2019) ("The only way to determine whether the program functions effectively in terms of its output is to examine the content judgments of the platforms and second guess whether they were in accordance with the platforms announced content rules."). Regulators could use sampling techniques, but that wouldn't solve any constitutional infirmity with respect to the sample. Part III will explore other possible policy alternatives.

Electronic copy available at: https://ssrn.com/abstract=4005647

content, illegal activity, or potentially policy-violating content."[46] The regulator would need access to the service's entire database corpus—including any deleted content—to make its own independent calculations.

A similar dynamic occurs with disclosures of "acceptable use policies."[47] A social media platform can easily disclose many of its codified written policies (though doing so may expose trade secrets or enable malicious users).[48] However, services may have unwritten policies or policies hastily adopted on-the-spot in response to exigencies and unforeseeable circumstances.[49] Plus, publishers routinely and intentionally make exceptions to their editorial policies[50]—it's called editorial *discretion*, after all—and sometimes make editorial judgments they later acknowledge as mistakes.[51] To confirm that the service actually follows its published policies, or to discover undisclosed policies, a regulator will need access to the entire database corpus (including deleted content) to identify anomalies or unusual patterns that reflect undisclosed policies.[52]

## II. The Constitutionality of Editorial Transparency

This Part has three subparts. The first subpart shows how and why mandatory editorial transparency would be unconstitutional if imposed on

---

46. Tex. Bus. & Comm. Code Ann. § 120.053(2) (West 2021).

47. The analysis is possibly different with respect to algorithms that encode editorial decisions because, in theory, those algorithms can be evaluated solely by inspection of the code. Algorithm disclosures are nevertheless problematic, even without any associated source-data disclosure, because of the chilling effects of government review of editorial decisions discussed in Part II(A)(1). The disclosures also raise significant trade secret concerns.

48. *See* Plaintiff-Appellant's Opening Brief on Appeal, Twitter, Inc. v. Paxton, No. 21-15869 (9th Cir. July 16, 2021) [hereinafter Twitter Appellate Brief]. Non-Internet publishers may also prefer not to disclose their editorial policies because defamation plaintiffs may adversely cite their policies to show "actual malice." *See* Erik Wemple, *CNN Fights to Keep Internal Editorial Guidelines Under Wraps. Why?*, Wash. Post (May 7, 2018), https://www.washingtonpost.com/blogs/erik-wemple/wp/2018/05/07/cnn-fights-to-keep-internal-editorial-guidelines-under-wraps-why/ (CNN, "CBS News, ABC News and Fox News keep their own guidelines under wraps").

49. This highlights the perniciousness of Florida allowing social media platforms to amend their editorial policies only once every thirty days. It assumes the platforms can articulate every possible editorial policy in advance before they've seen the full corpus of content needing curation.

50. As the maxim goes, "rules are made to be broken."

51. There are countless examples of traditional publishers admitting they made publication decisions that, in retrospect, "did not meet their editorial standards." *See, e.g.*, Helen Pidd, *BBC Says Interview with Epstein Lawyer Did Not Meet Its Standards*, Guardian (Dec. 30, 2021), https://www.theguardian.com/media/2021/dec/30/bbc-says-interview-with-epstein-lawyer-alan-dershowitz-did-not-meet-its-standards; Maanvi Singh, *New York Times Says Senator Tom Cotton's Op-ed Did Not Meet Editorial Standards*, Guardian (June 5, 2020), https://www.theguardian.com/media/2020/jun/05/new-york-times-says-tom-cotton-opinion-piece-did-not-meet-editorial-standards; *Editor's Note*, CNN Pols. (June 23, 2017), https://www.cnn.com/2017/06/23/politics/editors-note/index.html (a CNN story "did not meet CNN's editorial standards and has been retracted"). Florida and Texas bills would punish social media platforms for making similar "mistakes" as deviations from stated editorial policies, even though traditional publishers rarely face liability for non-defamatory deviations from their "editorial standards."

52. Individual anecdotes also could be used as inculpatory evidence, but those anecdotes may not be enough to establish that a platform had undisclosed policies.

Electronic copy available at: https://ssrn.com/abstract=4005647

traditional publishers, such as print newspapers. The second subpart shows why those constitutional principles extend to Internet services publishing UGC and other third-party content. The third subpart uses a case study to illustrate how editorial transparency obligations enable illegitimate enforcement actions.

A. Mandatory Publisher Transparency

### 1. Constitutional Limits on Publisher Transparency

The Florida and Texas laws appear to break new ground in regulating publishers. My research did not identify any pre-Internet laws that imposed mandatory editorial transparency on traditional publishers.[53] As a result, prior to the cases discussed below, I am not aware of any associated lawsuits analyzing the First Amendment implications of mandatory editorial transparency. However, the law has addressed the partially analogous situation of generating evidence about a publisher's editorial decision-making process.

As a starting point, the Constitution limits the compelled disclosure of traditional publishers' source data. For example, the execution of search warrants against publishers raises heightened concerns because law enforcement could indiscriminately grab source data they are not entitled to have.[54] Emphasizing this concern, Congress enacted the Privacy Protection Act of 1980[55] to impose additional restrictions on search warrants directed towards individuals disseminating "public communications."[56]

These concerns are partly ameliorated with respect to other investigatory and discovery methods, where a judge can supervise the requests before disclosure. Still, investigations, or discovery into publishers' decisions or operations, create significant constitutional concerns.[57]

---

53. For example, "the government does not require [newspaper] editorial boards to have and disclose the standards they use for their decisions about what to publish and what not to publish." MacCarthy, *supra* note 45, at 21.

54. 3 Rodney A. Smolla, Smolla & Nimmer on Freedom of Speech § 25:36 (2021) (explaining how search warrants are more intrusive to newsroom operations than subpoenas because it's harder for the publisher to protect its various interests when the data gathering is so invasive). However, the Constitution does not categorically restrict the execution of search warrants in newsrooms. Zurcher v. Stanford Daily, 436 U.S. 547, 567 (1978) ("[W]e decline to reinterpret the Amendment to impose a general constitutional barrier against warrants to search newspaper premises, to require resort to subpoenas as a general rule, or to demand prior notice and hearing in connection with the issuance of search warrants.").

55. 42 U.S.C. § 2000a.

56. *Id.* The Department of Justice also restricts its evidence-gathering with respect to publishers. 28 C.F.R. § 50.10 (detailing restrictions on the DOJ's issuance of subpoenas to news media entities); *see also* Memorandum from the Att'y Gen. to the Deputy Att'y Gen., the Assoc. Att'y Gen., Heads of Dep'ts Components, U.S. Att'ys & Fed. Prosecutors on the Subject of the Use of Compulsory Process to Obtain Information From, or Records of, Members of the News Media 1 (July 19, 2021), https://www.justice.gov/ag/page/file/1413001/download (adopting further restrictions on the DOJ's use of "compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of newsgathering activities").

57. *Cf.* United States v. Cuthbertson, 630 F.3d 139, 147 (3d Cir. 1980) ("The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes.").

Electronic copy available at: https://ssrn.com/abstract=4005647

The 1979 Supreme Court opinion *Herbert v. Lando*[58] explored the boundaries of these issues. The plaintiff, a public figure, sued the television show *60 Minutes* for defamation.[59] The defendants claimed they lacked actual malice about the allegedly defamatory statements, an absolute defense to the defamation claim.[60] To assess the legitimacy of the actual malice defense, the plaintiff propounded interrogatories that essentially demanded an explanation for the show's publication decision.[61] The defense declined to answer the interrogatories because it claimed "the First Amendment protected against inquiry into the state of mind of those who edit, produce, or publish, and into the editorial process."[62]

*Herbert*'s majority opinion rejected the defense's position and required the defense to provide the requested explanations.[63] The majority explained that "unless liability is to be completely foreclosed, the thoughts and editorial processes of the alleged defamer would be open to examination."[64]

The majority placed several qualifications on this authorization of discovery. First, the plaintiff sued for defamation predicated on the defense's allegedly false statements.[65] The Court notes that "if inquiry into editorial conclusions threatens the suppression not only of information known or strongly suspected to be unreliable, but also of truthful information, the issue would be quite different."[66] Second, the majority says that discovery into editorial processes should be rare ("in the tiny percentage of instances in which error is claimed and litigation ensues"), not commonplace.[67] Third, the majority emphasized that "the requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied."[68]

The majority's qualifications already project some problems with mandatory editorial transparency requirements, especially as Florida and Texas imposed them. Their mandatory explanation obligations do not apply only to the "tiny percentage" of circumstances where defendants are accused of defamation; the laws instead categorically require explanations of potentially billions of decisions *each day*, regardless of a service's truthfulness. Furthermore, other

---

58. 441 U.S. 153, 153 (1979).

59. *Id.*

60. New York Times Co. v. Sullivan, 376 U.S. 254, 285–86 (1964); Curtis Publ'g Co. v. Butts, 388 U.S. 130, 166 (1967).

61. *Lando*, 441 U.S. at 157.

62. *Id.*

63. *Id.* at 155.

64. *Id.* at 160.

65. *Id.* at 156.

66. *Id.* at 172.

67. *Id.* at 174.

68. *Id.* at 177. Despite this qualification about relevancy, the majority seemed unconcerned with the volume of discovery in the case: "Lando's deposition alone continued intermittently for over a year, and filled 26 volumes containing nearly 3,000 pages and 240 exhibits. As well as out-of-pocket expenses of the deposition, there were substantial legal fees, and Lando and his associates were diverted from newsgathering and reporting for a significant amount of time." *Id.* at n.25.

Electronic copy available at: https://ssrn.com/abstract=4005647

transparency requirements, including the disclosures of editorial policies and statistics, are broad-based and burdensome,[69] not the kind of contextually tailored information disclosures the Federal Rules of Civil Procedure requires.[70]

The *Herbert* majority added this crucial qualification: "[t]here is no law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest; and if there were, it would not survive constitutional scrutiny as the First Amendment is presently construed."[71]

This passage anticipated the moves Florida and Texas would make over four decades later. Both states mandated editorial transparency categorically, not in response to a specific legal violation (such as defamation). Thus, the disclosures are required without a plaintiff showing a prima facie case of legal value, without a plaintiff justifying the need for discovery, and without any judicial oversight of the disclosure's appropriateness. In other words, both laws require the disclosures "to satisfy curiosity or to serve some general end such as the public interest"[72]—exactly what *Herbert* said legislatures could not do.

A 2019 Fourth Circuit case, *Washington Post v. McManus*,[73] was even more emphatic than *Herbert v. Lando* about the constitutional problems of mandatory source-data disclosures.[74] The *McManus* case involved Maryland's Online Electioneering Transparency and Accountability Act, enacted in 2018 in response to allegations of foreign interference in the 2016 U.S. presidential election.[75]

Maryland's law imposed two new obligations on "online platforms."[76] First, it required platforms to publish specified source data:

> [W]ithin 48 hours of an ad being purchased, platforms must display somewhere on their site the identity of the purchaser, the individuals exercising control over the purchaser, and the total amount paid for the ad.

---

69. For example:

   If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims. The resulting wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties…permitting litigants unrestricted, court-enforced access to journalistic resources would risk the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties.

Gonzales v. Nat'l Broad. Co., Inc., 194 F.3d 29, 34–35 (2d Cir. 1998).

70.  *See Lando*, 441 U.S. at 177.

71.  *Id.* at 174.

72.  The Texas law enumerates "the public interest" as one of its purported justifications. H.R. 20, 87th Leg., 2d Special Sess. § 1(3) (Tex. 2021) (enacted) ("[S]ocial media platforms…are affected with a public interest.").

73.  944 F.3d 506 (4th Cir. 2019).

74.  However, the *McManus* opinion did not cite *Herbert*.

75.  *McManus*, 944 F.3d at 510.

76.  Md. Code Ann., Elec. Law § 1-101(dd-1) (West 2021).

Electronic copy available at: https://ssrn.com/abstract=4005647

They must keep that information online for at least a year following the relevant election.[77]

Second, it required that platforms collect and make source data available to regulators for inspection: "platforms must collect records concerning their political ad purchasers and retain those records for at least a year after the election so that the Maryland Board of Elections can review them upon request."[78]

The court called the law "a compendium of traditional First Amendment infirmities,"[79] especially the law's inspection right given its source-data disclosure implications:

> Not only does it compel the Publishers to turn over information to state regulators, it also brings the state into an unhealthy entanglement with news outlets. The core problem with this provision of the Act is that it lacks any readily discernable limits on the ability of government to supervise the operations of the newsroom. As it stands now, the Act requires news outlets to provide Maryland with no less than six separate disclosures, each assertedly justified by the state's interests in informing the electorate and enforcing its campaign finance laws. But with its foot now in the door, Maryland has offered no rationale for where these incursions might end . . . . Without clear limits, the specter of a broad inspection authority, coupled with an expanded disclosure obligation, can chill speech and is a form of state power the Supreme Court would not countenance.[80]

The "unhealthy entanglements" are an inevitable consequence of every mandatory editorial transparency law where enforcement requires regulator access to source-data disclosure,[81] whether or not the law expressly calls out source-data disclosure (which the Maryland law did). The inevitability of these adverse speech consequences and how they prospectively change publishers' editorial choices, should support facial constitutional challenges, rather than requiring publishers to raise as-applied challenges post-enforcement.

Though mandatory explanations of editorial decisions may not require source-data disclosure, they are still problematic because they require publishers to detail their editorial thought process. The prospect of having to explain decisions inevitably causes publishers to steer their editorial decisions towards what provides the most defensible explanation, not necessarily what is best for

---

77. *McManus*, 944 F.3d at 511–12.

78. *Id.* at 512.

79. *Id.* at 513.

80. *Id.* at 518–19; *see also* Comm.-Serv. Broad. of Mid-Am., Inc. v. FCC, 593 F.2d 1103, 1110 (1978) (striking down a law requiring some broadcasters to record the programs they broadcast and make those recordings available on request). Similar election ad-related disclosure rules applicable to broadcasters may be Constitutional, which reflects the reduced Constitutional protection that broadcasters receive compared to other media. *See generally* Reno v. Am. C.L. Union, 521 U.S. 844 (1997).

81. Courts have routinely acknowledged that government investigations can chill the investigated party's First Amendment rights. *See, e.g.*, White v. Lee, 227 F.3d 1214, 1228 (9th Cir. 2000).

Electronic copy available at: https://ssrn.com/abstract=4005647

their audience.[82] In *Herbert*, the Supreme Court tolerated this risk of decision-making distortion if it would lead to reduced publication of unconstitutional content (defamatory material). In contrast, categorical and indiscriminate explanation obligations affect the editorial decision-making process for both unconstitutional and constitutionally-protected content, and the distortion of the latter creates intolerable outcomes under both *Herbert* and *McManus*.

In summary, mandatory editorial transparency restrictions affect the substance of the published content, similar to the effects of outright speech restrictions. This indicates that the laws should be categorized as content-based restrictions and trigger strict scrutiny.[83] If strict scrutiny applies, mandatory editorial transparency laws will routinely fail any constitutional challenge—especially given that transparency laws routinely do not effectively advance their goals.[84]

### 2. Additional Concerns About Compelled Speech

The prior section explained how mandatory editorial transparency conflicts with the First Amendment by creating unhealthy entanglements between the government and publishers, which in turn distort and chill speech. This makes such laws a straightforward speech restriction.

Mandatory editorial transparency laws also should qualify as "compelled speech." For example, in the *McManus* case, the Fourth Circuit said: "the Act's publication and inspection requirements ultimately present compelled speech problems twice over . . . [and] forces news publishers to speak in a way they would not otherwise."[85]

The First Amendment limits the ability of governments to compel speech. As Chief Justice Roberts has indicated, "freedom of speech prohibits the government from telling people what they must say."[86] This principle applies most strongly when the government literally puts words in citizens' mouths; but

---

82. *See Comm.-Serv. Broad. of Mid-Am.*, 593 F.2d at 1115 (declaring a mandatory source-data disclosure law unconstitutional because it facilitates regulators' exercise of their "power and persuasion which create the chill"). "In seeking to identify the chilling effect of a statute our ultimate concern is not so much with what government officials will actually do, but with how reasonable broadcasters will perceive regulation, and with the likelihood they will censor themselves to avoid official pressure and regulation." *Id*. at 1117.

83. *See* Reed v. Town of Gilbert, 576 U.S. 155, 156 (2015).

84. Fung et al. explain:

  Targeted policies were effective only when they provided facts that people wanted in times, places, and ways that enabled them to act. . . . the starting point for any transparency policy was an understanding of the priorities and capacities of diverse audiences who might use the information.

FUNG ET AL., *supra* note 5, at xiv. Broad-based and categorical editorial transparency requirements are unlikely to reflect any "understanding of the priorities and capacities" of the information consumers who should benefit from them. Worse, when miscalibrated, "transparency policies can do more harm than good." *Id.* at 90.

85. Wash. Post v. McManus, 944 F.3d 506, 514 (4th Cir. 2019).

86. Rumsfeld v. F. for Acad. & Inst. Rts., Inc., 547 U.S. 47, 58 (2006); *see also* Nat'l Inst. of Family & Life Advoc. v. Becerra, 138 S. Ct. 2361, 2379 (2018); Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 796–97 (1988).

it can also apply when the government forces someone to speak when they would prefer not to speak.

Yet, it is not clear how the compelled speech doctrine applies to mandatory editorial transparency laws.[87] As Professor Eugene Volokh lamented, the doctrine's "details are often hard to pin down" and the cases "seem hard to wrestle into a fully coherent pattern."[88]

The *McManus* court relied on the compelled speech doctrine to strike down Maryland's ad disclosure law, saying "the integrity of these expressive commodities is presumptively at risk as soon as the government compels any alteration to their message."[89] Thus, the compelled speech doctrine could provide another reason to strictly scrutinize any mandatory editorial transparency laws.[90] Alternatively, courts could appropriately apply strict scrutiny due to the speech distortion/unhealthy entanglements concerns, without reaching the compelled speech doctrine at all. Another possibility is that the compelled speech analysis could merge into the speech restriction analysis because both doctrines recognize the same speech harms (that is, the chilling effects and distorted speech decisions).[91]

### 3. Distinguishing Editorial Transparency Laws from Other Mandatory Disclosures

This section explains why the widespread prevalence of transparency laws does not confirm the validity of mandatory editorial transparency laws.

As a starting point, publishers must comply with laws that apply to businesses generally.[92] For example, publishers must comply with employment laws and tax laws just as other businesses do.[93] In the same vein, publishers must comply with many generally applicable mandatory disclosure laws. For example, publicly-listed publishers must file disclosures with the Securities & Exchange Commission consistent with securities laws; publishers must file

---

87.  *See generally* CRS REPORT, *supra* note 7.

88.  Eugene Volokh, Essay, *The Law of Compelled Speech*, 97 TEX. L. REV. 355, 356, 392 (2018).

89.  *McManus*, 944 F.3d at 514.

90.  *See* Berin Szoka & Ashkhen Kazaryan, *Section 230: An Introduction for Antitrust & Consumer Protection Practitioners*, 3 GLOB. ANTITRUST INST. REP. DIGIT. ECON. 1059, 1101–03, 1109 (2020), https://gaidigitalreport.com/wp-content/uploads/2020/11/Szo%CC%81ka-Kazaryan-Section-230.pdf (discussing the compelled speech problems with mandatory editorial transparency). *Cf.* Am. for Prosperity Found. v. Bonta, 594 U.S. 742 (2021) (in a compelled speech case, requiring that the government show the law is "narrowly tailored").

91.  As Professor Volokh summarized, "[s]peech compulsions, the Court has often held, are as constitutionally suspect as are speech restrictions." Volokh, *supra* note 88, at 355.

92.  The "First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." Brandzburg v. Hayes, 408 U.S. 665, 682 (1972).

93.  However, a general-purpose regulation (such as a tax law) may nevertheless create Constitutional problems when imposed on publishers with censorial effects. *See, e.g.*, Grosjean v. Am. Press Co., 297 U.S. 233, 244 (1936); Minn. Star Trib. Co. v. Comm'r, 460 U.S. 575, 585 (1983).

Electronic copy available at: https://ssrn.com/abstract=4005647

income tax forms; and publishers must file reports about their lobbying activities.[94]

When a general disclosure law prompts a company to change its behavior (which sometimes is the legislature's hope or intent), those changes do not necessarily impact the company's speech outputs. For example, if a food-labeling law induces a food manufacturer to modify the amount of saturated fat or sugar in its product, the product change did not affect the manufacturer's freedom of speech.[95] In contrast, if an editorial transparency law causes a publisher to change its editorial practices, then the law has speech effects that are absent in ordinary product configuration decisions. Indeed, the legislature may expressly intend for the mandatory editorial transparency law to motivate the publisher to change its speech.[96]

Furthermore, with general disclosure obligations, regulators can confirm the disclosures' accuracy without reviewing editorial-related source data. For example, determining the accuracy of a publisher's securities filing or tax return should not require investigating the publisher's editorial decision-making process.[97] In contrast, validating editorial disclosures necessarily requires regulatory scrutiny of editorial decisions, with the associated unwanted effects on the publisher's speech.

Finally, imposing transparency obligations on publishers of third-party speech is distinguishable from imposing the same disclosure obligations on the first-party speakers. In the context of campaign finance disclosures, the *McManus* court explained how mandatory editorial transparency economically distorts publishers' editorial decisions:

> Disclosure obligations applied to neutral third-party platforms are thus, from a First Amendment perspective, different in kind from conventional campaign finance regulations. First, platform-based campaign finance regulations like the one here make it financially irrational, generally speaking, for platforms to carry political speech when other, more profitable options are available. Second, platform-based campaign finance regulations create freestanding legal liabilities and compliance burdens that independently deter hosting political speech. For example, to avoid the Act's various sanctions . . . the Publishers here have claimed that they would have to acquire new software for data collection; publish additional web pages; and disclose proprietary pricing models . . . . Faced with this headache, there is good reason to suspect many platforms would simply conclude: Why bother?[98]

---

94. S.E.C. v. McGoff, 647 F.2d 185, 190 (D.C. Cir. 1981) ("The Supreme Court has consistently rejected claims that the press is shielded by the Constitution against laws of general applicability . . .").

95. CRS REPORT, *supra* note 7, at 31.

96. The history of Florida's and Texas's laws are filled with pro-censorship statements by proponents. *See generally* NetChoice, LLC v. Moody, 546 F. Supp. 3d 1082 (N.D. Fla. 2021); NetChoice, Inc. v. Paxton, 2021 WL 5755120 (W.D. Tex. Dec. 1, 2021).

97. *Cf. McGoff*, 647 F.2d at 191 (an SEC subpoena could not reach materials related to "editorial policy" or newsgathering).

98. Wash. Post v. McManus, 944 F.3d 506, 516 (4th Cir. 2019).

Electronic copy available at: https://ssrn.com/abstract=4005647

*HASTINGS LAW JOURNAL*

Considering these differences, it's a false equivalency to characterize mandatory editorial transparency as just another business compliance cost or the same as general disclosure laws. General disclosure laws may be constitutional, even as applied to publishers, and yet mandatory editorial transparency laws may not be.

## B. EXTENDING THE CONSTITUTIONAL PROTECTIONS FOR PUBLISHERS TO SOCIAL MEDIA PLATFORMS

The prior subpart explained why mandatory editorial transparency laws likely trigger strict scrutiny when imposed on traditional publishers. This subpart now shows how the same result occurs when those obligations are imposed on Internet services that publish third-party content, including the "social media platforms" targeted by Florida and Texas.

This doctrinal extension should be rather straightforward.[99] The First Amendment protects publication decisions. Like traditional publishers, Internet services publish third-party content.[100] As a California federal district court opinion explained, "Like a newspaper or a news network, Twitter makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment."[101] No further analysis should be required.

Yet, regulators and commentators have undertaken remarkable efforts to identify some legal basis that would override this simple and intuitive principle in favor of a counterintuitive conclusion that Internet services that publish third-party content deserve less constitutional protection than traditional publishers. These workaround proposals have included arguments that:

- social media platforms are common carriers;[102]

---

99. *See* Ashutosh Bhagwat, *Do Platforms Have Editorial Rights?*, 1 J. FREE SPEECH L. 97, 117 (2021) ("[I]t seems unexceptional that social media platforms are entitled to First Amendment editorial rights.").

100. For example, a publisher's editorial judgment includes "republishing and highlighting" articles—exactly what Internet services do with third-party content. *See* Bursey v. United States, 466 F.2d 1059, 1087 (9th Cir. 1972).

101. O'Handley v. Padilla, 2022 WL 93625, at *41 (N.D. Cal. Jan. 10, 2022).

   In proceedings before the Federal Election Commission, several commissioners characterized Twitter as a "press entity" or "media entity." In the Matter of Twitter, Inc., MURs 7821, 7827 & 7868, FED. ELEC. COMM'N, Sept. 13, 2021, https://www.fec.gov/files/legal/murs/7827/7827_14.pdf (Supplemental Statement of Reasons of Vice Chair Allen Dickerson & Commissioner James E. "Trey" Trainor, III); *id.* https://www.fec.gov/files/legal/murs/7827/7827_13.pdf (Statement of Reasons of Commissioner Sean J. Cooksey).

102. Social Media Platforms, Fla. S.B. 7072 § 1(6) ("Social media platforms…should be treated similarly to common carriers"); Tex. H.B. 20 § 1(3) ("social media platforms function as common carriers"); *id.* § 1(4) ("social media platforms with the largest number of users are common carriers by virtue of their market dominance"); *see also* Complaint for Declaratory Judgment and Injunctive Relief at 3, State of Ohio ex rel Yost v. Google LLC, 21 CV H 06 0274 (Ohio C.P. Ct. June 8, 2021), https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Filed-Complaint-(Time-Stamped).aspx [hereinafter Ohio Complaint] ("Google's provision of internet search is properly classified as a common carrier . . . under Ohio common law.").

- social media platforms are utilities;[103]
- social media platforms are public forums or public squares,[104] or the modern-day equivalent of these government-operated public spaces, and, thus, state actors; and
- social media platforms have publicly claimed that they are one of the foregoing entities, so the Constitution should treat them as such.[105]

If any workaround argument succeeds, the door would open for regulatory interventions beyond just mandatory editorial transparency. Regulators would be able to impose regulations on "social media platforms" that the Constitution would not permit for traditional publishers—and regulators would enthusiastically embrace this power to dictate virtually every aspect of Internet services. As a result, the legal review of mandatory editorial transparency is a microcosm in the broader regulatory push for unrestricted Internet censorship.

As an exemplar of why some advocates think social media platforms warrant less constitutional protection than traditional publishers like newspapers,[106] this Article will evaluate the justifications proffered by the Knight First Amendment Institute's amicus brief[107] regarding Florida's social media censorship law.[108]

First, the brief argued that newspapers publish mostly "content they themselves create or specifically solicit," while social media content mostly "is generated by the platforms' users."[109] This argument is flawed both legally and factually. Legally, it's unclear why First Amendment protections should vary based on how the publisher sourced the published content (that is, "specifically solicited" third-party content somehow deserves greater protection than other third-party content). Factually, social media platforms do "solicit" the third-party content they publish (it's their raison d'être); while traditional publishers

---

103. Fla. S.B. 7072 § 1(5) ("Social media platforms have become as important for conveying public opinion as public utilities for supporting modern society"); *see also* Ohio Complaint, *supra* note 102, at 3 ("Google's provision of internet search is properly classified as a . . . public utility under Ohio common law.").

104. *Prager Univ. v. Google LLC*, 951 F.3d 991, 997 (9th Cir. 2020); Tex. H.B. 20 § 1(3) ("[S]ocial media platforms . . . are central public forums for public debate . . .").

105. *Prager Univ.*, 951 F.3d at 999.

106. A comparison between the publication activities of social media platforms and newspapers is necessarily incomplete because a wide diversity of other publishers receive vigorous First Amendment protections. *See, e.g.*, Shoen v. Shoen, 5 F.3d 1289, 1293 (9th Cir. 1993) (book author qualified for the same treatment as other journalists because "what makes journalism journalism is not its format but its contents"); *see also* von Bulow v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987) (the press's "intended manner of dissemination may be by newspaper, magazine, book, public or private broadcast medium, handbill or the like").

107. Brief of Amicus Curiae, The Knight First Amendment Institute at Columbia University Supporting Plaintiffs-Appellees, NetChoice LLC v. Att'y Gen. of Fl., No. 21-12355 (11th Cir. Nov. 15, 2021), https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=3585&context=historical [hereinafter KFAI Brief]. The brief nominally opposed the Florida law, but its arguments sought to show how states could impose mandatory editorial transparency on social media platforms—which is what Florida was defending in court.

108. The KFAI Brief was filed in the Eleventh Circuit appeal of NetChoice, LLC v. Moody, 546 F.Supp.3d 1082 (N.D. Fla. 2021).

109. KFAI Brief, *supra* note 107, at 19.

Electronic copy available at: https://ssrn.com/abstract=4005647

can, and often do, publish unsolicited third-party content, including reader-generated content[110] and other content from third-party sources.[111]

Second, the brief argued that "there is an incredible disparity in scale between newspapers and social media platforms."[112] This argument points towards the need for greater, not lesser, constitutional protections for social media platforms. After all, government censorship causes greater harm when imposed on a bigger scale; and the burden of editorial transparency compliance increases when imposed on social media platforms operating at scale.[113] For example, a newspaper would struggle to explain its *dozens* of daily publication decisions; it will be exponentially harder for social media platforms to explain potentially *billions* of daily publication decisions.[114]

Third, the brief argued that "newspapers are coherent speech products in a way that social media platforms are not."[115] The Supreme Court has not adopted the term "coherent speech products,"[116] and it may not be a constitutionally recognized concept.[117] Furthermore, the brief does not adequately appreciate how platforms use their idiosyncratic "house rules" to curate content that meets their audiences' needs.[118]

---

110. For example, a letterzine is "a fanzine in which the contents consist primarily or entirely of letters submitted by the readers." *Letterzine*, THE OXFORD DICTIONARY OF SCIENCE FICTION (2006).

111. For example, early American newspapers routinely republished third-party content without obtaining permission. *See, e.g.*, Nicholas Marshall, *The Rural Newspaper and the Circulation of Information and Culture in New York and the Antebellum North*, 88 N.Y. HIST. 133, 140 (2007):

> Nearly one half of the paper [the *Freeman's Journal*] was simply reprinted from papers exchanged around the country, and this figure severely underrepresents the actual practice, since it only accounts for attributed reprints. The editor many times simply summarized pieces gleaned from outside sources, without attribution, a common and perfectly legal practice. Editors had responsibility for much of the operations of the paper and could not be expected to produce much original copy. The figure for local news, 8 percent, probably closely approximates the extent of their own writing.

*See generally* WILL SLAUTER, WHO OWNS THE NEWS? (2019) (discussing how early newspaper editors viewed their role as principally curatorial).

112. KFAI Brief, *supra* note 107, at 19.

113. *See* NetChoice, Inc. v. Paxton, 2021 WL 5755120, at *36 (W.D. Tex. Dec. 1, 2021) (Texas' mandatory editorial obligations "are inordinately burdensome given the unfathomably large numbers of posts on these sites and apps").

114. *Cf.* MALENA DAILEY, NETCHOICE, BY THE NUMBERS: WHAT CONTENT SOCIAL MEDIA REMOVES AND WHY (2021) https://netchoice.org/wp-content/uploads/2021/11/Content-Moderation-By-The-Numbers-v5.pdf.

115. KFAI Brief, *supra* note 107, at 20.

116. The term comes from Volokh, *supra* note 88, at 358.

117. *See, e.g.*, Brief of Amici Curiae, The Reporters Comm. for Freedom of the Press et al., in Support of Appellees and Affirmance, at 22, NetChoice LLC v. Att'y Gen. of Fl., No. 21-12355, (11th Cir. filed Nov. 15, 2021), https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=3587&context=historical (the phrase is "incoherent, unworkable, and lacks any limiting principle to cabin its scope").

118. Twitter Appellate Brief, *supra* note 48, at 9, 34 ("Twitter's moderation policies and procedures are functionally equivalent to the internal editorial decision-making processes of news organizations.…just like a newspaper editor or bookstore owner, Twitter makes decisions about what content to disseminate or not disseminate through its platform."); *see* O'Handley v. Padilla, 2022 WL 93625, at *9 (N.D. Cal. Jan. 10, 2022) ("a Twitter user encountering O'Handley's tweets would indeed think that Twitter is the kind of place that allows such tweets on its platform. A user who encountered enough such tweets might think that Twitter was content to be complicit in spreading election misinformation"); *see also* Goldman & Miers, *supra* note 18, at 195.

Electronic copy available at: https://ssrn.com/abstract=4005647

Fourth, the brief argued that "newspapers generally do not remove content once it has been published, whereas removing content after publication is a major part of social media platforms' operations."[119] Consistent with the laws of physics, it is true that newspapers cannot remove content from already-printed editions. However, newspapers increasingly remove online content,[120] so the brief may factually overstate the divergence in practice. Plus, the fact that social media platforms have the ability to depublish/unpublish content heightens, not lessens, the constitutional concerns with regulator demands to pressure social media platforms to stop publishing the content. Furthermore, while newspapers and social media platforms may primarily exercise their editorial discretion at different stages in the publication process (newspapers at selection, social media platforms at removal), this timing difference does not override that each entity still makes those decisions using its editorial judgments.

Fifth, the brief argued that platforms' use of algorithmic content moderation and machine learning means that "newspapers' decisions are explainable in a way that platforms' decisions often are not."[121] So long as the judgment reflects the publisher's editorial decision, it's unclear why this distinction matters. Plus, human editors of all types routinely make intuitive decisions that can be hard to explain (at least in any understandable way) and, as discussed in Part I.B, cannot be logically squared with prior decisions.

Despite its efforts, the Knight First Amendment Institute's arguments do not provide a sound justification for giving newspapers greater First Amendment protection than social media platforms. And shortly after it was filed, a judge implicitly but emphatically rejected its arguments as well as the arguments of other proponents of social media exceptionalism.[122] In *NetChoice v. Paxton*, the district court addressed the question of "whether social media platforms exercise editorial discretion or occupy a purgatory between common carrier and editor"[123] and concluded:

---

119. KFAI Brief, *supra* note 107, at 21.

120. *See, e.g.*, Claire Miller & David Folkenflik, *From Cleveland to Boston, Newsrooms Revisit Old Stories to Offer a 'Fresh Start,'* NPR (Feb. 23, 2021, 4:45 PM), https://www.npr.org/2021/02/23/970239121/ from-cleveland-to-boston-newsrooms-revisit-old-stories-to-offer-a-fresh-start; KATHY ENGLISH, THE LONGTAIL OF NEWS: TO UNPUBLISH OR NOT TO UNPUBLISH 4, 6 (2009), http://www.journalismproject.ca/sites/ www.j-source.ca/files/attachments/Long%20Tail%20report_Kathy_English.pdf (78% of newspaper editors believe that news organizations should sometimes unpublish online articles); Aaron Minc, *How to Permanently Remove Unwanted Newspaper Articles From the Internet*, MINC LAW, https://www.minclaw.com/how-to-remove-news-articles-from-google-and-internet (Feb. 24, 2022) (claiming that the law firm has "obtained removals of hundreds of online news articles"). *See generally* R. Michael Hoefges, *Taking It Back in Cyberspace: State Retraction Statutes, Defamation Suits Against Online Newspapers*, 19 NEWSPAPER RSCH. J. 95 (1998) (discussing how retraction statutes apply to online newspapers).

121. KFAI Brief, *supra* note 107, at 21–22.

122. NetChoice, Inc. v. Paxton, 2021 WL 5755120, at *50 (W.D. Tex. Dec. 1, 2021).

123. The Florida district court judge also addressed this issue in NetChoice, LLC v. Moody, 546 F.Supp.3d 1082, 1093 (N.D. Fla. 2021) saying, "it cannot be said that a social media platform, to whom most content is invisible to a substantial extent, is indistinguishable for First Amendment purposes from a newspaper or other traditional medium. But neither can it be said that a platform engages only in conduct, not speech."

Electronic copy available at: https://ssrn.com/abstract=4005647

> Social media platforms "routinely manage . . . content, allowing most, banning some, arranging content in ways intended to make it more useful or desirable for users, sometimes adding their own content." Making those decisions entails some level of editorial discretion, even if portions of those tasks are carried out by software code. While this Court acknowledges that a social media platform's editorial discretion does not fit neatly with our 20th [c]entury vision of a newspaper editor hand-selecting an article to publish, **focusing on whether a human or AI makes those decisions is a distraction**. It is indeed new and exciting—or frightening, depending on who you ask— that algorithms do some of the work that a newspaper publisher previously did, but **the core question is still whether a private company exercises editorial discretion over the dissemination of content, not the exact process used**….This Court is convinced that social media platforms, or at least those covered by HB 20, curate both users and content to convey a message about the type of community the platform seeks to foster and, as such, exercise editorial discretion over their platform's content.[124]

This passage deftly cuts through all of the distracting sophistry about machines, algorithms, and automation to highlight the only question that matters: do social media platforms exercise editorial discretion? As indicated at this subpart's beginning, the answer is, and always has been, clearly "yes."

In contrast with the Knight First Amendment Institute brief's argument, the *Paxton* court specifically noted how social media platforms make their publication decisions to "convey a message about the type of community the platform seeks to foster."[125] In other words, each social media platform caters to the needs of its audience, and those needs differ from other social media platforms because the services' audiences differ.[126] Audience-specific curation is essential to a social media platform's successful functioning; as the court says, "content moderation [is] the very tool that social medial [sic] platforms employ to make their platforms safe, useful, and enjoyable for users."[127]

Thus, the *NetChoice v. Paxton* decision indicates that social media platforms and other online publishers of third-party content qualify for the same constitutional protections as traditional publishers, which necessitates strict scrutiny for mandatory editorial transparency laws. With respect to the means-fit analysis, the *Paxton* court noted that Texas' requirements were "inordinately burdensome,"[128] compelled publishers to speak when they do not want to, and

---

124. NetChoice, Inc. v. Paxton, 2021 WL 5755120, at *8 (W.D. Tex. Dec. 1, 2021) (emphasis added).

125. *Id.*

126. Brief of Amici Curiae Center for Democracy & Technology et al. Supporting Plaintiff-Appellant Twitter, Inc. Urging Reversal, at 12, Twitter, Inc. v. Paxton, No. 21-15689 (9th Cir. 2022) ("Content moderation requires innumerable exercises of editorial discretion that shape what users can say and what information they receive.") [hereinafter CDT Brief]; *id.* at 20–22 (discussing how UGC services make their editorial decisions).

127. NetChoice, Inc. v. Paxton, 2021 WL 5755120, at *14 (W.D. Tex. Dec. 1, 2021).

128. *See* Wash. Post v. McManus, 944 F.3d 506, 516 (4th Cir. 2019) (Maryland's law "makes certain political speech more expensive to host than other speech because compliance costs attach to the former and not to the latter. Accordingly, when election-related political speech brings in less cash or carries more obligations than all the other advertising options, there is much less reason for platforms to host such speech").

Electronic copy available at: https://ssrn.com/abstract=4005647

exposed social media platforms to enforcement consequences that "chill the social media platforms' speech and application of their content moderation policies and user agreements."[129]

Depending on a law's specific details, mandated editorial transparency imposed on Internet services could trigger (or fail) strict scrutiny for additional reasons, such as:

*Distinctions between media types.* The Supreme Court said in *Reno v. ACLU* that cases allowing incursions into other media categories do not provide any "basis for qualifying the level of First Amendment scrutiny that should be applied to the Internet."[130] Any editorial transparency law that treats Internet services worse than offline publishers seemingly violates this principle.

*Distinctions between media entities based on size.* Linking editorial transparency to entity size creates a regulatory catch-22.[131] Without safe harbors for small entities, the compliance costs and burdens have a greater risk of driving them out of the industry.[132] On the other hand, if a law distinguishes between smaller and larger entities, the regulator must justify the differential treatment and explain why the selected size cutoff appropriately advances those justifications.[133] Also, the pool of regulated entities cannot be so narrow that the law looks retaliatory or becomes a bill of attainder.

The law's specifics may be impermissibly vague.[134]

---

129. NetChoice, Inc. v. Paxton, 2021 WL 5755120, at *11 (W.D. Tex. Dec. 1, 2021).

130. Reno v. Am. C.L. Union, 521 U.S. 844, 845 (1997).

131. *See* Eric Goldman & Jess Miers, *Regulating Internet Services by Size*, 2 CPI ANTITRUST CHRON. 24, 26–28 (2021) (discussing the many challenges associated with making size-based distinctions among Internet services).

132. *See* Comments of Michael Masnick Opposing the National Telecommunications and Information Administration's Petition for Rulemaking, In the Matter of Section 230 of the Communications Act of 1934 (Sept. 2, 2020), https://s3.documentcloud.org/documents/7192747/Michael-Masnick-FCC-Comments-RM-11862.pdf:

> A mandate for transparency would likely burden a small site like Techdirt in multiple ways. First, it would require costly lawyers and review to make sure we were in compliance with any stated administrative rules. Second, it would likely make our moderation practices significantly worse, as we would not be able to continue to freely experiment and innovate around how we handle content moderation on the site, as any change would require careful and expensive vetting to remain in compliance.
>
> Finally, it would likely make the experience for our community significantly worse and less useful and hospitable.

*See* Ben-Shahar & Schneider, *supra* note 8, at 738 ("mandated disclosure can have anticompetitive effects").

133. *See* NetChoice, Inc. v. Paxton, 2021 WL 5755120 (W.D. Tex. Dec. 1, 2021) (discussing Texas' lack of evidence in justifying its cutoff); NetChoice, LLC v. Moody, 546 F. Supp. 3d 1082, 1094 (N.D. Fla. 2021) ("[D]iscrimination between speakers is often a tell for content discrimination. . . . the application of [Florida's] requirements to only a small subset of social-media entities would be sufficient, standing alone, to subject these statutes to strict scrutiny."). *Cf.* Grosjean v. Am. Press Co., 297 U.S. 233, 251 (1936) ("The form in which the tax is imposed is in itself suspicious. It is not measured or limited by the volume of advertisements. It is measured alone by the extent of the circulation of the publication in which the advertisements are carried, with the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers.").

134. *See* NetChoice, Inc. v. Paxton, 2021 WL 5755120, at *12 (W.D. Tex. Dec. 1, 2021) (holding that several phrases in Texas' social media censorship law were vague).

Electronic copy available at: https://ssrn.com/abstract=4005647

C. *Twitter v. Paxton*: A Case Study of Weaponized Editorial
    Transparency

As this Article has emphasized, the implications of compelled source-data
disclosure deserve heightened attention. As Part II.A showed, such disclosures
distort the publisher's speech decisions and bring the "state into an unhealthy
entanglement with" publishers.[135] Furthermore, censorship-minded regulators
can use their investigatory or enforcement powers for retaliatory or other
pretextual purposes, to drain a publisher's resources, or to obtain improper
access to citizens' private information.[136]

Texas Attorney General Ken Paxton's investigations into Twitter provides
a case study of these concerns. The lawsuit relates to Twitter's "deplatforming"
of then-President Donald Trump following the U.S. Capitol insurrection on
January 6, 2021.[137] After Twitter permanently suspended Trump's account,
Paxton tweeted: "I will fight them [including Twitter] with all I've got."[138]
Paxton's office opened an investigation and issued a civil investigation demand
(CID) to Twitter. While on the surface Paxton's move might appear like a
routine action by an attorney general to protect the public interest, it is not.[139]

First, Paxton repeatedly made clear that he was retaliating against Twitter
for deciding to stop publishing Trump's content.[140] Not surprisingly, Twitter
received this message from Paxton's moves: "Change your content-moderation
decisions to favor my political allies, or there will be serious consequences."[141]

Second, the CID sought an invasively deep look into Twitter's editorial
processes. In particular, the CID demanded "all…policies and procedures
related to content moderation on your platform, including any policies or
procedures that limit the reach or visibility of content intended for public
viewers."[142] Because "content moderation" and "editorial decisions" are
synonyms, the CID demanded every document regarding every editorial
decision that Twitter has ever prepared.

Third, the CID is "continuing in nature," and Twitter cannot wrest free of
the CID until/unless the Texas AG's office compels Twitter's response.[143]

135.  Wash. Post v. McManus, 944 F.3d 506, 518 (4th Cir. 2019).

136.  For example, source-data disclosures may include depublished items that posters disavowed. Also,
regulators could seek non-public postings of political or personal enemies for targeting purposes.

137.  *Permanent Suspension of @realDonaldTrump*, Twitter: Blog (Jan. 8, 2021),
https://blog.twitter.com/en_us/topics/company/2020/suspension.

138.  Ken Paxton (@KenPaxtonTX), Twitter (Jan. 9, 2021, 11:58 AM), https://twitter.com/KenPaxtonTX/
status/1347996281461989376.

139.  *See generally* CDT Brief, *supra* note 126 (outlining many problems with Paxton's enforcement).

140.  Twitter Appellate Brief, *supra* note 48, at 11.

141.  *Id.* at 2.

142.  Off. of the Att'y Gen. of Tex., Consumer Prot. Div., Civil Investigative Demand to Twitter, Inc., ¶ 2
(Jan.   13,   2021),   https://www.texasattorneygeneral.gov/sites/default/files/images/admin/2021/Press/
Twitter-Parler%20CID%20011321.pdf [hereinafter Texas CID].

143.  *See* Twitter, Inc. v. Paxton, 2021 WL 1893140 (N.D. Cal. May 11, 2021); Twitter, Inc. v. Paxton, 2021
WL 2334133 (N.D. Cal. June 8, 2021); Twitter, Inc. v. Paxton, 2021 U.S. App. LEXIS 19557 (9th Cir. June 30,

Electronic copy available at: https://ssrn.com/abstract=4005647

Leaving the CID as an ongoing obligation puts Twitter in an impossible position,[144] because every editorial choice it makes might simultaneously trigger disclosure via the CID. This has an unquestionably chilling effect. As Twitter explained, "Any time a Twitter employee thinks about writing something related to content moderation, the employee knows that AG Paxton has already demanded production of whatever the employee chooses to write. . . . [That] would lead a person of 'ordinary firmness' to think twice about what to write or what editorial decisions to make and document."[145]

Paxton's investigation of Twitter, including his use of the ongoing CID, shows the censorship potential of editorial transparency.[146] Through actual or threatened enforcement, regulators can influence what content Internet services publish—and punish Internet services for making editorial decisions the regulators disagree with.[147] This enables regulators—especially elected officials—to pursue investigations and enforcement actions purely for political payoffs, such as showing their constituents how they are "tough on Big Tech." If courts do not curb abusive enforcement actions and investigations initiated under the guise of editorial transparency, many more will follow.

It is noteworthy that Paxton based Twitter's CID on Texas' general consumer protection law,[148] not the social media censorship law (which had not yet been enacted). Though mandatory editorial transparency laws provide a clear template for censorial investigations and enforcements, regulators can also co-opt standard consumer protection, false advertising, and unfair and deceptive practices laws to support illegitimate editorial transparency investigations and enforcement.[149] Indeed, the "consumer protection" legal framing could help regulators obfuscate otherwise-illegitimate motives. Given this risk, courts should skeptically review all editorial transparency-based investigations and

---

2021). While this article was in press, the Ninth Circuit again rejected Twitter's concerns. *Twitter, Inc. v. Paxton*, 26 F.4th 1119 (9th Cir. 2022).

144. *See* CDT Brief, *supra* note 126, at 23–30.

145. Twitter Appellate Brief, *supra* note 48, at 23.

146. As a precursor to Paxton's effort, former Mississippi AG Jim Hood investigated Google's editorial decisions regarding its search results. *See generally* Google, Inc. v. Hood, 822 F.3d 212 (5th Cir. 2016). Like Twitter, Google could not proactively enjoin the investigation—despite the MPAA's improper role in the enforcement. *See, e.g.*, Russell Brandom, *Project Goliath: Inside Hollywood's Secret War Against Google*, THE VERGE (Dec. 12, 2014, 12:59 PM), https://www.theverge.com/2014/12/12/7382287/project-goliath.

147. CDT Brief, *supra* note 112, at 7, 9 ("[G]overnments around the world increasingly are using investigations and threats of other penalties to engage in censorship by pressuring or punishing hosts for making content moderation decisions with which they disagree. . . . even pre-enforcement, threatened punishment of speech has a chilling effect.").

148. *See* Texas CID, *supra* note 142.

149. An example: under the pretense of protecting privacy, the FTC made unnecessarily invasive demands about Internet services' editorial practices, including demanding to know "how the Company targets, surfaces, or promotes content" and "how user-created content presentation is influenced by, impacted by, or in any way associated with the Company's advertising goals and outcomes," and demanding "all of the Company's content moderation policies and content promotion policies." *See* Order to File a Special Report, FTC Matter No. P205402, ¶¶ 33, 35 (Dec. 11, 2020), https://www.ftc.gov/system/files/documents/reports/6b-orders-file-special-reports-social-media-service-providers/6bs_order_os_final.pdf.

Electronic copy available at: https://ssrn.com/abstract=4005647

enforcements, no matter what legal authority the regulator invokes to justify their actions.[150]

## III. ALTERNATIVE WAYS TO VALIDATE EDITORIAL TRANSPARENCY DISCLOSURES

Part II identified the constitutional problems caused by regulators' demand for source-data disclosures from publishers. This Part evaluates the feasibility of three potential workarounds to this issue: (1) third-party auditing, (2) procedural requirements, and (3) empowerment of independent researchers.

### A. THIRD-PARTY AUDITING

Third-party audits are sometimes used in mandatory disclosure contexts, such as financial statements filed by publicly listed companies. Similarly, instead of disclosing source data to regulators or the public, Internet services could have third parties audit their editorial disclosures.

With respect to editorial transparency, a third-party audit requirement theoretically removes the need for regulators to obtain source data. Furthermore, the audit increases the likelihood of accurate disclosures because the auditor cares about its reputation[151] and will be risk-averse about any possible inaccuracies.

To succeed, any audit requirement will need a cohort of auditors who have expertise in editorial operation audits, and that expertise needs to be backed by a credentialing process.[152] Neither currently exists.[153] Regulators could help

---

150. As Twitter explained, consumer protection-based enforcement over Twitter's public representations about its editorial practices "would be no more legitimate than a law-enforcement official's investigation of statements by traditional media outlets, such as newspapers or cable news networks, regarding their publicly professed editorial philosophies (for example, that they deliver 'All the News That's Fit to Print' or are 'Fair and Balanced.')." Twitter Appellate Brief, *supra* note 48, at 41; *see also* Brief of Amici Curiae, The Reporters Comm. for Freedom of the Press & Media L. Resource Ctr., Inc. Supporting Plaintiff-Appellee at 6, Twitter, Inc. v. Paxton, No. 21-15689 (9th Cir. 2022) (discussing how regulators can misuse consumer protection laws).

151. For example, the accounting firm Arthur Andersen imploded when their complicity in the Enron scandal became clear. *See* Ken Brown & Ianthe Jeanne Dugan, *Arthur Andersen's Fall from Grace is a Sad Tale of Greed and Miscues*, WALL ST. J. (June 7, 2002), https://www.wsj.com/articles/SB1023409436545200.

152. *See generally* Julian Jaursch, *Why the EU Needs to Get Audits for Tech Companies Right*, TECHDIRT (Aug. 19, 2021), https://www.techdirt.com/articles/20210818/16443447385/why-eu-needs-to-get-audits-tech-companies-right.shtml (discussing some challenges of configuring audit obligations for UGC services).

153. Industry efforts to encourage audits are underway. Digital Trust & Safety Partnership (DTSP) members will obtain independent third-party verification of their compliance with the DTSP best practices framework. *See generally* DIGIT. TR. & SAFETY P'SHIP, THE SAFE FRAMEWORK: TAILORING A PROPORTIONATE APPROACH TO ASSESSING DIGITAL TRUST & SAFETY (2021), https://dtspartnership.org/wp-content/uploads/2021/12/DTSP_Safe_Framework.pdf. GARM is also pushing for audits to address brand safety. *See* Kate Kaye, *Getting Facebook, YouTube, TikTok, Twitter and Others to Independent GARM Brand Safety Verification is a Diplomatic Dance*, DIGIDAY (May 24, 2021), https://digiday.com/marketing/as-facebook-commits-to-independent-garm-brand-safety-verification-getting-youtube-tiktok-twitter-and-others-on-board-is-a-diplomatic-dance. "Social media councils" could also provide audit services to their members. *See, e.g.*, DIGI. GLOB. POL'Y INCUBATOR, ARTICLE 19 & U.N. SPECIAL RAPPORTEUR ON FREEDOM OF OPINION & EXPRESSION, SOCIAL MEDIA COUNCILS: FROM CONCEPT TO REALITY 32 (2019), https://fsi-live.s3.us-west-1.amazonaws.com/s3fs-public/gdpiart_19_smc_conference_report_wip_2019-05-12_final_1.pdf.

Electronic copy available at: https://ssrn.com/abstract=4005647

accelerate the development of a credentialing process and a community of credentialed auditors through financial incentives and other infrastructure support.

Third-party editorial audits mitigate, but do not eliminate, the need for source-data disclosures to regulators. While auditors' statements would need to be double-checked less frequently than Internet services' unaudited self-disclosures, any regulatory double-checking would require a review of the same source data reviewed by the auditors. That takes us right back to the initial problem.

Furthermore, the costs of third-party editorial audits could be prohibitive for many services. As an analogy, publicly listed companies on average spent $2.5 million in 2020 to prepare audited financial statements.[154] Those high costs reflect the huge number of records involved in a financial audit. Yet, that volume of records would be trivial compared to editorial audits, which could involve billions of "auditable" records *each day.* The associated costs inevitably would force some services out of the industry.

## B. PROCEDURAL REQUIREMENTS

In addition, or as an alternative, to mandatory editorial transparency, regulators could impose procedural requirements for editorial operations, such as requiring publishers to designate an officer in charge of transparency compliance or requiring publishers to produce their mandated disclosures using specified software.[155] While regulators have imposed compliance mechanics on other corporate functions, they sound a lot like government control over editorial operations.

## C. EMPOWERMENT OF INDEPENDENT RESEARCHERS

If independent researchers can obtain the right data from Internet services, the researchers can help hold services accountable.[156] Their research can confirm Internet services' public disclosures, generate transparency report-like statistics, and identify publication anomalies that services might not voluntarily disclose (or even recognize).

But how can independent researchers obtain the necessary data? Internet services offer APIs that researchers could access, and Facebook has a "sandbox"

---

154. *FERF'S 12th Annual Public Company Audit Fee Study Report Reveals Acquisitions and Economic Uncertainty as Primary Contributors to Increased Audit Scope and Fees*, PR NEWSWIRE (Nov. 2, 2021), https://www.yahoo.com/now/ferfs-12th-annual-public-company-120000059.html.

155. *See generally* SANTA CLARA PRINCIPLES ON TRANSPARENCY & ACCOUNTABILITY IN CONTENT MODERATION, TOOLKIT FOR SOCIAL MEDIA COMPANIES (2021), https://santaclaraprinciples.org/images/SantaClara_Companies.pdf (enumerating various procedural commitments that companies can make regarding their editorial operations).

156. *See* Nicolas P. Suzor, Sarah Meyers West, Andrew Quodling, & Jillian York, *What Do We Mean When We Talk About Transparency? Towards Meaningful Transparency in Commercial Content Moderation*, 13 INT'L J. COMM. 1526, 1529 (2019); MACCARTHY TAWG, *supra* note 6, at 13–14.

Electronic copy available at: https://ssrn.com/abstract=4005647

that provides data access to researchers subject to some privacy protections.[157] Yet, so long as the Internet service provides data to researchers, the service can cherry-pick the shared data and distort any research findings.[158]

Researcher scraping[159] may be a better option. Via scraping, independent researchers could create datasets without service cherry-picking (though scraping would not reach some data, such as unpublished content or content in private messaging systems). Plus, regulators could authorize researcher scraping without encountering the same constitutional problems associated with mandatory editorial transparency,[160] though there still could be concerns about Fifth Amendment takings or distinctions among speakers.

For this option to be viable, legal reforms would be required. Scraping currently occupies a legal gray zone. Scraping is a ubiquitous Internet practice, but the law does not clearly permit third parties to engage in unrestricted scraping—even for independent research purposes.[161] Furthermore, unless prohibited from doing so,[162] Internet services could selectively block scraping to serve their proprietary interests, such as blocking researchers they consider adversarial.[163]

Thus, if independent researchers are going to become the policy solution to increase accountability of Internet services, regulators would need to force the services to permit independent researcher scraping.[164] Regulators could further enhance the accountability mechanisms by financially supporting independent research.

However, regulators would need to tread carefully with who benefits from any compulsory right to scrape. This right cannot be extended to everyone. Many entities would love to have unrestricted scraping access for dubious or

---

157. *See* SOC. SCI. ONE, https://socialscience.one (last visited July 1, 2022).

158. *See* Laura Edelson & Damon McCoy, Opinion, *We Research Misinformation on Facebook. It Just Disabled Our Accounts.*, N.Y. TIMES (Aug. 10, 2021), https://www.nytimes.com/2021/08/10/opinion/facebook-misinformation.html ("[O]ur work shows that the archive of political ads that Facebook makes available to researchers is missing more than 100,000 ads."); *see also* MACCARTHY TAWG, *supra* note 6, at 14.

159. "Web scraping generally refers to the retrieval of content posted on the World Wide Web through the use of a program other than a web browser or an application programming interface (API)." Andrew Sellars, *Twenty Years of Web Scraping and the Computer Fraud and Abuse Act*, 24 B.U. J. SCI. & TECH. L. 372, 373 (2018); *see also* Han-Wei Liu, *Two Decades of Laws And Practice Around Screen Scraping in the Common Law World and Its Open Banking Watershed Moment*, 30 WASH. INT'L L.J. 28, 28 (2020) (defining "screen scraping" as "using an agent to collect, parse, and organize data from the web in an automated manner").

160. *See* Sandvig v. Sessions, 315 F. Supp. 3d 1, 2–3 (D.D.C. 2018) (discussing how independent research scraping efforts may be protected by the First Amendment); *see also* Jeff Hermes, *Does the First Amendment Include a Right to Scrape Photographs from Public Websites?*, 2020 MEDIA L. RES. CTR. BULL. 41 (2020).

161. *Compare* Sandvig v. Barr, 451 F. Supp. 3d 73 (D.D.C. 2020) (implicitly authorizing scraping for academic research purposes) *with* Facebook, Inc. v. BrandTotal LLC, 499 F. Supp. 3d 720 (N.D. Cal. 2020) (Facebook can block data gathering by a corporate researcher).

162. *See* hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 988, 995 (9th Cir. 2019); hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180 (9th Cir. 2022).

163. *See, e.g.*, Mike Clark, *Research Cannot Be the Justification for Compromising People's Privacy*, META (Aug. 3, 2021), https://about.fb.com/news/2021/08/research-cannot-be-the-justification-for-compromising-peoples-privacy.

164. *See, e.g.*, Platform Accountability and Transparency Act, S. 979 (117th Cong. 2021).

Electronic copy available at: https://ssrn.com/abstract=4005647

illegitimate reasons, including data brokers, analytics services, consumer-profiling companies,[165] and other privacy-invasive services;[166] as well as state actors who are data-mining their own citizens or building adversarial profiles of other countries' citizens. Further, unrestricted scraping could become an unmanageable financial drain for Internet services.

Limiting scraping rights to "researchers" partially solves those problems, but malefactors could claim this status. For example, Facebook's data leakage to Cambridge Analytica—part of Russia's campaign to interfere with the 2016 United States elections—was caused by an academic researcher.[167]

Thus, any compelled scraping access right must distinguish between legitimate independent researchers and pretextual researchers like Cambridge Analytica.[168] It would also need to allow Internet services to manage the potentially significant burdens that independent researcher scraping could impose on their computer systems. Finally, datasets in researchers' possession pose significant privacy and security risks, so those researchers would need to implement privacy and security protections that are vigorously policed.

Despite these significant challenges, independent researcher-generated transparency deserves further consideration as a substitute for mandatory editorial transparency. And as a substitute, it shows how mandatory editorial transparency may not be the least restrictive means available to legislators to achieve their policy goals.

## CONCLUSION

In closing, this Article highlights two reasons why free speech enthusiasts should reconsider any support for mandatory editorial transparency.

First, mandatory editorial transparency might feel like a low-risk way to increase Big Tech accountability, but it's a trap. Mandatory editorial transparency will enhance regulators' power over online speech, and they will use those powers in ways that are adverse to their constituents' interests, such as

---

165. As just one example, Clearview AI—a controversial facial recognition vendor—claims it has scraped 10 billion images. *See* Will Knight, *Clearview AI Has New Tools to Identify You in Photos*, WIRED (Oct. 4, 2021), https://www.wired.com/story/clearview-ai-new-tools-identify-you-photos/.

166. *See generally* Zachary Gold & Mark Latonero, *Robots Welcome? Ethical and Legal Considerations for Web Crawling and Scraping*, 13 WASH. J. L. TECH. & ARTS 275 (2018); Benjamin L. W. Sobel, *A New Common Law of Web Scraping*, 25 LEWIS & CLARK L. REV. 147 (2021); Geoffrey Xiao, Note, *Bad Bots: Regulating the Scraping of Public Personal Information*, 34 HARV. J.L. & TECH. 701 (2021).

167. *See* Att'y Gen. v. Facebook, Inc., 487 Mass. 109, 118 (2021). *See generally* In re Facebook, Inc., Consumer Privacy User Profile Litigation, 402 F. Supp. 3d 767 (N.D. Cal. 2019); Kogan v. Facebook, Inc., 334 F.R.D. 393 (S.D.N.Y. 2020).

168. *See* MACCARTHY TAWG, *supra* note 6, at 16 (discussing the importance of "tiered access"); *cf.* Christopher Morten, *Publicizing Corporate Secrets for Public Good*, 171 U. PENN. L. REV. (forthcoming), https://ssrn.com/abstract=4041556 (arguing that government agencies should provide some constituent communities with additional but controlled access to corporate data in their possession).

Electronic copy available at: https://ssrn.com/abstract=4005647

controlling speech they do not like.[169] Texas AG Paxton's retaliatory investigation into Twitter shows how online speech will irreparably suffer when regulators weaponize editorial transparency.

Second, free speech advocates may hope that adoption of editorial transparency laws might reduce regulators' motivation to enact more damaging anti-speech regulations.[170] This is also a trap. Unconstitutional "solutions" are never a real alternative to other unconstitutional regulations.[171] Further, regulators will not treat transparency as a substitute for unconstitutionally invasive regulation, as Florida and Texas showed when they packaged transparency requirements with other censorship policies.

If mandatory transparency is not the solution, then what is? This Article suggested a few policy ideas worth further exploration, such as spurring the certification of editorial audit professionals and perhaps enabling independent researcher scraping through legal reform and financial support. Otherwise, regulators should deploy their resources to encourage pro-social online activity, such as increased digital citizenship education and funding for research into content moderation best practices.[172] If regulators view their roles as facilitators of healthy online interactions rather than as disciplinarians, they are far more likely to achieve policy outcomes that benefit their constituents without violating the Constitution.

---

169. *A Note to Regulators*, SANTA CLARA PRINCIPLES, https://santaclaraprinciples.org/regulators/ (last visited July 1, 2022) (warning that regulators "state actors must not exploit or manipulate companies' content moderation systems to censor dissenters, political opponents, social movements, or any person").

170. *See* Mike Masnick, *Transparency is Important; Mandated Transparency is Dangerous and Will Stifle Innovation and Competition*, TECHDIRT (Oct. 29, 2020, 9:38 AM), https://www.techdirt.com/articles/20201028/17461945607/transparency-is-important-mandated-transparency-is-dangerous-will-stifle-innovation-competition.shtml ("I've heard from a variety of policymakers over the last few months who also seem focused on this transparency issue as a 'narrow' way to reform 230 without mucking up everything else . . .").

171. *Cf.* Comm.-Serv. Broad. of Mid-Am., Inc. v. FCC, 593 F.2d 1102, 1123 (D.C. Cir. 1978) (striking down a mandatory recordkeeping and disclosure law that, during enactment, was characterized as an alternative to censorship).

172. *See* Eric Goldman, *Section 230's Application to States' Regulation of Social Media* 6 (Santa Clara Univ. Legal Studs. Rsch. Paper, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3961703.

Electronic copy available at: https://ssrn.com/abstract=4005647