# EXHIBIT 27

DRAFT – March 3, 2023

# Platform Transparency and the First Amendment

Daphne Keller[1]
Stanford Cyber Policy Center
March 3, 2023

[1] I am indebted to Alex Abdo, Corbin Barthold, evelyn douek, Eric Goldman, Ramya Krishnan, Genevieve Lakier, Nate Persily, Amanda Shanor, Rebecca Tushnet, and Eugene Volokh for their feedback on this Paper; and to Afi Blackshear for indefatigable research assistance.

1

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

# Platform Transparency and the First Amendment

I.    Introduction .................................................................................................3

II.   The *NetChoice* Transparency Rules and Key Precedent ..........................5

  A.  The Texas and Florida Transparency Laws...........................................5

  B.  Key Precedent .......................................................................................9

III.  The Threat: State Influence on Platforms' Content Moderation ...............11

  A.  Enforcement Problems .........................................................................13

    1.   Examples ........................................................................................14

    2.   Tailoring Possibilities ....................................................................18

  B.  Burden Problems ..................................................................................19

    1.   Examples ........................................................................................21

    2.   Tailoring Possibilities ....................................................................23

  C.  Regulating Speech About Speech ........................................................24

    1.   Platforms as Newspapers?..............................................................24

    2.   Speech About Speech .....................................................................26

IV.   The Goals: What Are Transparency Laws Trying to Achieve? ................30

  A.  Consumer Protection Goals and *Zauderer* ........................................32

    1.   Stretching *Zauderer* to Cover Systemic Platform Disclosures....33

    2.   Narrowing Platform Disclosures to Fit Within *Zauderer*............36

  B.  Regulatory System Goals and non-*Zauderer* Case Law ....................38

    1. The State Interest in Regulatory Systems.........................................39

    2. *NetChoice* and the Future of the Regulatory State .........................41

    3. Tailoring Disclosure Rules in Regulatory Systems..........................43

  C.  Democratic Self-Governance Goals .....................................................44

    1.   Alternate Transparency Mandates with Clearer Links to Democratic Interests............46

    2.   First Amendment Considerations for Democracy-Based Mandates ...........................47

    3.   Other Democracy-Related Transparency Cases ...............................49

    4.   Legislative Design and Tailoring Considerations ...........................50

V.    Conclusion..................................................................................................52

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

# I.    Introduction

In its coming term, the Supreme Court will likely consider whether "platform transparency laws" – laws compelling Internet companies like Facebook and YouTube to disclose more about how they moderate their users' speech – violate the First Amendment. The question arises as part of the *NetChoice* cases, in which platforms are challenging new social media laws in Texas and Florida.[2] Both the parties' arguments and the courts' rulings have, to date, been quite superficial. This Paper examines in depth the First Amendment concerns that arise when lawmakers require transparency about platforms' moderation of online speech. It argues that the rulings so far have disregarded the key issue: the risk that transparency laws will become a mechanism for governments to quietly reshape platforms' editorial policies, and thus assume new state control over ordinary people's online speech. It surfaces important precedent, practical issues, and policy considerations that have been unexamined in the literature to date. As a doctrinal matter, it concludes that applicable First Amendment law is highly indeterminate. Advocates -- and justices -- can effectively pick the outcomes they want, and find arguments to support them.

This moment of constitutional inflection won't last. For those who believe that platform transparency is important, but who also fear new state power over online speech, now is the time to think much harder about the First Amendment, and about what we hope to achieve through platform transparency laws.

***

The transparency provisions in the Texas and Florida laws have largely been overshadowed, in litigation and in public discussion, by other obligations those laws create: so-called "must carry" duties, which effectively require platforms to carry material like hate speech and disinformation against their will.[3] Platforms challenged these laws in two cases, *NetChoice v. Moody* in Florida and *NetChoice v. Paxton* in Texas (collectively called "*NetChoice*" here).[4] The platforms' brief to the 11th Circuit, for example, spent just one of its 67 pages on transparency.[5] The court rulings – most recently from the 5th and 11th Circuits – have not been much better.[6] Both circuits upheld

---

[2] FLA. STAT. § 501.2041 (Fla. 2021), H.B. 20 § 120.052, 87th Leg., 2d Spec. Sess. (Tex. 2021).

[3] *See* Daphne Keller, *Who Do You Sue?*, LAWFARE BLOG (Jan. 29, 2019), https://www.lawfareblog.com/who-do-you-sue-state-and-platform-hybrid-power-over-online-speech, for a take on these First Amendment issues. *See also* Daphne Keller, *Lawful but Awful? Control over Legal Speech by Platforms, Governments, and Internet Users*, U Chi. L. Rev. Online (2022), for a more recent assessment of the Texas and Florida carriage requirements. A document tracking arguments raised and resolved in the *NetChoice* cases to date is here.

[4] *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082 (N.D. Fla. 2021), *aff'd, vacated, and remanded* by 34 F.4th 1196 (11th Cir. 2022); *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092 (W.D. Tex. 2021), *vacated and remanded* by 49 F.4th 439 (5th Cir. 2022).

[5] Brief for Appellees, *NetChoice, LLC v. Moody*, 34 F.4th 1196 (11th Cir. 2022) (No. 21-12355), https://netchoice.org/wp-content/uploads/2021/11/11.8.2021-FILED-NetChoice-Brief.pdf.

[6] *Moody*, 34 F.4th 1196 (11th Cir. 2022); *Paxton*, 49 F.4th 439 (5th Cir. 2022).

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

some or all of the challenged transparency laws.[7] Their analysis was perhaps understandably cursory, given the parties' scant briefing on transparency issues.

The *NetChoice* transparency questions, like other questions in the case, are truly novel. As one 5th Circuit judge put it, "[t]hese activities native to the digital age have no clear ancestral home within our First Amendment precedent."[8] The job of the parties' lawyers, of course, is to make the questions look easy, like something resolved long ago in another context. Platforms attempt to do this by arguing that they are basically like newspapers.[9] They compare transparency mandates to laws requiring the *Wall Street Journal* to publicly explain every detail of its editorial policies and publication decisions.[10] Such mandates, they argue, are obviously counter to the First Amendment, and prohibited by a case about litigation discovery against newspapers, *Herbert v. Lando*.[11] Texas and Florida, on the other hand, insist that their rules are basic consumer protection measures, to be reviewed under standards from a case about deceptive attorney advertising, *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*.[12] Their arguments frame detailed disclosures about editorial rules applied to online speech as the constitutional equivalent of warning labels on cigarettes or food.[13]

Both the "platforms are newspapers" and "platforms are ordinary sellers of goods and services" arguments usefully illuminate some aspects of platform transparency laws. But both are also incomplete, whether as analogies for the function of today's platforms or as pointers to relevant case law. The platforms' newspaper analogy frames Internet users as mere readers with no relevant rights – even though badly drafted transparency laws would use state power to reshape users' online speech rights. The States' arguments position Internet users as consumers, in a transactional relationship with platforms. That framing, too, is incomplete as a legal foundation for users' rights as speakers, readers, and participants in democratic societies.

This Paper will begin following this Introduction, in Part II, by describing the specific transparency mandates in at issue in the *NetChoice* cases, and briefly outlining relevant precedent. Part III will then describe the concrete ways in which poorly-tailored transparency mandates may cause platforms to change the editorial policies that they apply to Internet users' speech. This burden on speech is fundamentally different from the burdens created by transparency mandates for commercial offerings in areas like food safety. Case law addressing analogous problems exists, but is scant. Part IV will explore the potential state interests and First Amendment framings for platform transparency laws, and delve more deeply into the case law. That Part begins in IV.A with the consumer protection interests advanced by the States in *NetChoice,* and critiques *Zauderer* as a basis for upholding the Texas and Florida laws. It then

---

[7] *Moody*, 34 F.4th at 1222-23; *Paxton*, 49 F.4th at 485-90.

[8] *Paxton*, 49 F.4th at 497.

[9] Petition for Writ of Certiorari at 1, *Moody*, No. 22-277, 2023 WL 349996 (2022) ("These websites, no less than newspapers and other traditional media, sometimes face intense criticism for how they exercise their editorial discretion and how they articulate and explain their editorial decisions.")

[10] *Id*. at 31.

[11] Brief of Appellees at 50, *Paxton*, 49 F.4th 439 (No. 21-12355); *see Herbert v. Lando*, 441 U.S. 153, 174 (1979) (First Amendment prohibits any "law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end").

[12] *See, e.g.*, Opening Brief for Appellants at 44-47, *Moody*, 34 F.4th 1196 (No. 21-12355).

[13] *Id*. at 49.

4

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

considers, in IV.B, precedent involving more complex disclosures from regulated industries, and flags what I believe is a major lurking issue in *NetChoice*: its implications for companies' expanding use of the First Amendment as a legal tool against the regulatory state. Finally, in IV.C, it discusses a fundamentally different basis for transparency mandates, as a tool to advance democratic self-governance goals. This foundation is underexplored in case law and academic literature about platform transparency. But it is, I will argue, profoundly important as a basis for future, better transparency laws.

The First Amendment case law governing the transparency mandates in *NetChoice* is messy and indeterminate. Like many First Amendment cases, the outcome of this one will likely turn on the standard of review. Platforms' arguments in *NetChoice* would lead to strict scrutiny, effectively killing most possible transparency laws. The States' arguments, by contrast, have led to a standard of review so lax as to disregard major constitutional issues. A better standard of review would lie in between. Courts should insist on a clear connection between states' goals and the laws' consequences, and require meaningful tailoring to address the problems identified in this paper. Conceivably such a standard could be derived from *Zauderer* itself, though given the analysis in the 5th and 11th Circuits so far, I am skeptical. More likely, it could be found under intermediate or exacting scrutiny.

The First Amendment issues at stake in *NetChoice* are complex. This Paper does not come close to addressing them all. I hope that publishing it can contribute to and accelerate an expert discussion, collectively generating far more robust analysis than we have seen so far, before the question reaches the Court.

## II.    The *NetChoice* Transparency Rules and Key Precedent

This Part will describe the specific legislative mandates at issue in *NetChoice*. It will also briefly sketch out key case law. These cases will be explored in more detail later in the Paper.

### A. The Texas and Florida Transparency Laws

The *NetChoice* litigation is not about "platform transparency" in the abstract. It is about a widely varying set of disclosures, set out in specific statutes.  First Amendment analysis should not be identical for all of them.

The details of individual transparency laws should matter at every step of First Amendment analysis. Different mandates may advance different state interests, for one thing. Different mandates may achieve the States' goals to greater or lesser degrees – and burden speech in different ways. Finally, of course, statutory details matter when courts ask whether lawmakers could have designed or tailored laws better, to minimize harm to speech rights.

5

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

Many of the disclosures required in *NetChoice* resemble long-standing transparency demands from civil society groups.[14] That support from human rights-oriented groups generally seems like a point in the laws' favor. On the other hand, some thoughtful critics have suggested that the civil society models are in need of updating, and reflect dated expectations about platforms' content moderation operations. Here is a list of the specific requirements in *NetChoice*, beginning with the ones that most closely resemble common transparency proposals from civil society groups. I am assigning each a capitalized, defined term for consistent use in this Paper.[15]

1. Published Speech Rules: Platforms must publish detailed explanations of the rules they enforce for users' speech -- often called "content policies" or "Community Guidelines."[16] Giving users enough information to understand what they will be allowed to see and say on the platform is a near-universal demand from transparency advocates.[17] Florida's version of these rules requires "detailed definitions" of standards used for content removals and any other form of content management, including algorithmic ranking.[18] I know of no legal precedent or civil society consensus about what level of detail such disclosures should include. As a current example, Facebook's published community standards – – which I suspect would not meet the Texas or Florida requirements  – run about 100 pages.[19]

2. Rule Change Notices: Platforms must notify users of changes to Published Speech Rules before they come into effect.[20] At a high level, it seems reasonable to require platforms to notify users when the rules change. In practice, platform speech rules often evolve rapidly in response to emerging and unanticipated forms of online abuse, ranging from the Tide Pod Challenge to new terminology or behavior used by terrorists.[21] A Rule Change Notice requirement might have very different meaning depending what counts as

---

[14] *See, e.g.,* Heidi Tworek, *Time for Transparency From Digital Platforms, But What Does That Really Mean?*, LAWFARE BLOG, (Jan. 20, 2022, 8:01 AM), https://www.lawfareblog.com/time-transparency-digital-platforms-what-does-really-mean; Mark MacCarthy, *Transparency is Essential For Effective Social Media Regulation*, BROOKINGS, (Nov. 1, 2022), https://www.brookings.edu/blog/techtank/2022/11/01/transparency-is-essential-for-effective-social-media-regulation/.

[15] The 11th Circuit also upheld a Florida provision allowing de-platformed users to export stored data, concluding that it did not trigger any First Amendment scrutiny. *Moody*, 34 F.4th at 1223. (Florida 501.2041(2)(i)) "Data portability" rules of this sort are legally distinct enough that I will not include them in this discussion of transparency. I will note, though, that Florida's rule shows its drafters' overall haste and imprecision. They appear not to have reconciled the mandate with major areas of federal law, including copyright and the criminal laws governing child abuse material.

[16] FLA. STAT. § 501.2041(2)(d) (Fla. 2021) (upheld), H.B. 20 § 120.052., 87th Leg., 2d Spec. Sess. (Tex. 2021) (upheld).

[17] *See supra* note 12

[18] FLA. STAT § 501.2041(2)(a) (upheld).

[19] Daphne Keller, *State Abuse of Transparency Laws and How to Stop It*, THE CENTER FOR INTERNET AND SOCIETY, (Sept. 19, 2022, 3:49 PM P.S.T.), https://cyberlaw.stanford.edu/blog/2022/09/state-abuse-transparency-laws-and-how-stop-it.

[20] FLA. STAT. § 501.2041(2)(c) (upheld in large part).

[21] Lindsey Bever, *Teens are Daring Each Other to Eat Tide Pods. We Don't Need to Tell You That's a Bad Idea.*, THE WASHINGTON POST, (Jan. 17, 2018, at 8:07 PM E.S.T.), https://www.washingtonpost.com/news/to-your-health/wp/2018/01/13/teens-are-daring-each-other-to-eat-tide-pods-we-dont-need-to-tell-you-thats-a-bad-idea/; *see generally,* Renee DiResta, *The Tactics & Tropes of the Internet Research Agency*, N.Y. TIMES, https://int.nyt.com/data/documenthelper/533-read-report-internet-research-agency/7871ea6d5b7bedafbf19/optimized/full.pdf.

6

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

a "change," and how detailed or intrusive the "notice" to users must be. Florida's Rule Change Notice provision has a second requirement which the 11th Circuit held unconstitutional:[22] It only allows platforms to update rules every thirty days, effectively meaning they cannot change editorial policies swiftly in response to new developments.[23]

3. <u>Individual Notices</u>: Platforms must notify users affected by content moderation decisions, and provide detailed explanations.[24] Notice requirements like this have been a standard civil society demand for years. They are usually coupled with a right to appeal the platform's decision – an element that Texas's law includes, but Florida's does not.[25] In principle, such notices function like a notification of criminal charges or service of process for civil litigation. In practice, the scale of large platforms' obligations would dwarf any functioning court system. Texas's and Florida's rules require platforms like YouTube (and presumably Facebook) to provide several billion annual notices, each explaining a new decision. In Florida, platforms face up to $100,000 in statutory damages for any notice deemed insufficiently "thorough" or "precise."[26] The 11th Circuit said Florida's Individualized Notice requirement likely violated the platforms' First Amendment rights, given its burden and the civil damages provision.[27] The 5th Circuit upheld Texas's.[28]

4. <u>Appeals</u>: Platforms must allow users to appeal platform content moderation decisions and inform them of the outcome.[29] Platforms' challenge to the Appeals requirement is a little unclear. Elements of Appeals that might potentially be challenged as compelled speech include (1) exercising editorial judgment for a second time by re-assessing an earlier decision, (2) notifying users of the outcome, and (3) building the remarkable (and as far as I know unprecedented) new product feature Texas requires: a portal to "track the status" of appeals, as well as that of notices alleging that other people's posts are unlawful.[30] The Fifth Circuit did not address these questions in upholding Texas's Appeals requirement.

5. <u>Statistical Transparency Reports</u>: Platforms must periodically publish aggregate, statistical data about their content moderation.[31] Such reports are relatively common from

---

[22] *Moody, LLC v. Attorney General, Florida*, 34 F.4th 1196, 1228-29 (11th Cir. 2022).
[23] *See supra* note 19.
[24] FLA. STAT. § 501.2041(2)(d) (held unconstitutional); Tex. H.B. 20 §§ 120.101-104 (upheld).
[25] *Id.*
[26] FLA. STAT. § 501.2041(6)(a)
[27] *Moody*, 34 F.4th at 1230-31.
[28] *Paxton*, 49 F.4th at 485. The Individual Notice rules in *NetChoice* lack carveouts that practitioners might consider standard. Florida's Individual Notice mandate has no exception for ongoing law enforcement investigations, meaning that platforms are required to send notifications that may tip off the investigations' targets. Texas's has no exception for purveyors of clearly unlawful child sexual abuse material. Neither State provides an exception for commercial spammers, who are likely to use information from notices to more effectively game platforms' rules and deceive or defraud users. These are not clearly First Amendment issues, but do show the laws' generally scattershot design.
[29] Tex. H.B. 20 §§ 120.101-104 (upheld).
[30] *Id.*
[31] *Id.* § 120.053 (upheld).

7

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

larger platforms, though current ones provide varying degrees of detail.[32] Texas's law requires platforms to track and disclose how many items of content the platform took any form of action against, and for each of those actions (1) what rule was being enforced, (2) the source of the notice (or what internal tools caused the platform to review the content), (3) what action was taken, (4) whether the user appealed the action, (5) whether that appeal succeeded, and (6) the country of the affected user.[33] This is the kind of reporting I've written the most about, urging legislators to carefully identify which kinds of data will actually serve their goals.[34] Texas's requirements are similar but not identical to those in EU law and many civil society proposals.

6. Explanations: Platforms must publish descriptions or explanations of specified aspects of platforms' content moderation.[35] Some Explanation requirements – like the new algorithmic transparency requirements under the EU's Digital Services Act – are comparatively narrow. (Though the EU's is, importantly, complemented by measures such as independent audits or researcher access to platform data.) Texas's Explanation law is sprawling. It requires "a description of each tool, practice, action, or technique used in enforcing the acceptable use policy[,]"and "accurate information regarding … content management, data management, and business practices….sufficient to enable users to make an informed choice regarding the purchase of or use of access to or services from the platform " with "specific information" on five enumerated topics, such as how the platform "curates and targets content to users[.]"[36]

7. View Count Disclosures: For any user whose content has been moderated, platforms must, upon request, disclose how many people saw that user's posts.[37] This mandate is not one I have encountered in other proposals. I am told it was intended to help users identify when they have been "shadowbanned" -- although as I read Florida's law, any user whose content has been moderated at all can require the platform to share view count data. Features like this have in the past most often been commercial services sought by advertisers, marketers, businesses and would-be influencers. Some platforms have offered for-pay versions of this service, others have never included it.[38] Having the State of Florida mandate this change in a business offering seems odd. It doesn't tread too heavily on the user free expression issues I especially care about, though.

---

[32] See ACCESS NOW, *Transparency Reporting Index*, https://www.accessnow.org/transparency-reporting-index/.
[33] *Supra* note 30.
[34] Daphne Keller, *Some Humility About Transparency*, MEDIUM, (Mar. 19, 2021), https://medium.com/freeman-spogli-institute-for-international-studies/some-humility-about-transparency-5814cbbb1a72.
[35] Tex. H.B. 20 §§ 120.051(a) & 120.053(7) (both upheld).
[36] *Id.*
[37] FLA. STAT. § 501.2041(2)(e) (upheld).
[38] Twitter added a feature of this sort once Elon Musk acquired the company. *See* Mitchell Clark, *Twitter is Now Showing Everyone How Many Views Your Tweets Get* (Dec. 22, 2022), THE VERGE, https://www.theverge.com/2022/12/21/23522064/twitter-view-count-roll-out-personal-info. *See also* FLICKR, *flickr pro*, https://www.flickr.com/account/upgrade/pro (allowing users to purchase "advanced stats" to see which photos are trending and which have performed best).

8

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

8. <u>Candidate Notices</u>: Platforms must tell a political candidate if the platform "willfully provides free advertising" for that candidate.[39] Honestly, I don't understand this one.[40] The 11th Circuit also seems confused, speculating that Candidate Notices might help candidates "make better ad-purchasing decisions[.]"[41] I wonder if this rule might have more to do with candidates' record-keeping and campaign finance laws. Whatever this is, it did not come from any canon of platform transparency proposals that I'm aware of.

9. <u>Enforcement Mechanisms</u>: Both laws allow some civil suits, with high damage awards available to plaintiffs in Florida.[42] Those cases could, presumably, lead to additional compulsory disclosures in the discovery process. Attorneys General (AGs) also have broad enforcement powers, and can compel platforms to share internal documents and information about content moderation. Texas AG Ken Paxton, who has demanded extensive disclosures from Twitter in express retaliation for that platform's ouster of former President Trump, asserts that he already has similar powers under pre-existing consumer protection laws.[43] It is unclear how much Florida's social media law expands the AG's investigative toolkit, but it does specifically authorize the AG to investigate and "subpoena any algorithms" if she "suspects" that any violation is occurring or "imminent."[44] (Florida 501.2041(3)(c)(5) and 501.2041(8)) Both AGs' power to compel disclosures would in any case appear to be expanded by the new *substantive* laws they are tasked with enforcing. AGs may now investigate the accuracy of any of the mandated disclosures, for example, as well as whether platforms are properly complying with the laws' must-carry requirements.[45]

## B. Key Precedent

Two key cases illustrate the divergent approaches of the States and platforms in *NetChoice*. The briefs and rulings to date rely heavily on them.

---

[39] FLA. STAT. § 106.072(4) (upheld).

[40] It may relate to the theory, expressed in a since-rejected FEC complaint, that platform moderation of stories about Hunter Biden's laptop constituted political advertising. Mychael Schnell, *FEC Finds Twitter Didn't Dreak Law by Blocking Spread of Hunter Biden Story*, THE HILL (Sept. 13, 2021, 4:02 PM E.S.T), HTTPS://THEHILL.COM/POLICY/TECHNOLOGY/572024-FEC-FINDS-TWITTER-DIDNT-BREAK-LAW-BY-BLOCKING-SPREAD-OF-HUNTER-BIDEN-STORY/.

[41] *Moody, LLC v. Attorney General, Florida*, 34 F.4th 1196, 1230 n.14 (11th Cir. 2022).

[42] FLA. STAT. § 501.2041(6).

[43] Benjamin Din, *Twitter Sues Texas Attorney General Over Investigation Into Content Moderation Practices*, POLITICO, (Mar. 08, 2021, 9:39 PM E.S.T.), https://www.politico.com/news/2021/03/08/twitter-texas-ken-paxton-trump-474568; Caitlin Vogus, *CDT Leads Brief in Support of Rehearing in Twitter v. Paxton*, CENTER FOR DEMOCRACY & TECHNOLOGY, (Apr. 11, 2022), https://cdt.org/insights/cdt-leads-brief-in-support-of-rehearing-in-twitter-v-paxton/.

[44] FLA. STAT. §§ 501.2041(3)(c)(5) & 501.2041(8).

[45] The platforms' briefs do not seem to call out Florida's Enforcement Mechanism for challenge. That may be deliberate, or an oversight. The briefs also do not address 501.2041(2)(g) (annual notices about algorithms) or 501.2041(f)(1) (requiring platforms to "[c]ategorize algorithms"), both of which appear to be transparency mandates.

9

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

- Texas, Florida, and some amici argue for permissive review under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, and both the 5th and 11th Circuits accepted their arguments. *Zauderer* is a 1985 Supreme Court case about an attorney who advertised that clients would pay "no legal fees" if they did not recover damages.[46] The Supreme Court upheld a state rule requiring that the ad disclose that clients would nonetheless owe legal *costs*, reasoning that the clients might otherwise be misled about the financial arrangement being offered.[47] Lower courts have interpreted *Zauderer*'s rule in a number of ways, but at its simplest the case permits compelled disclosures of "purely factual and uncontroversial information" about the terms on which a company offers its services, unless the disclosures are unjustified or unduly burden speech.[48] As I will discuss throughout this Paper, I think these cases are mismatch the *NetChoice* issues, in part because the disclosures required in those cases did not lead to changes in the disclosing parties' underlying speech or editorial practices. The disclosures upheld under *Zauderer* to date have also been vastly simpler, and necessary for the enforcement of non-speech-related regulations or the avoidance of constitutionally regulable harms.

- Platforms and some amici build their transparency arguments on the overall centerpiece of their challenge to must-carry mandates, analogizing platforms' editorial role to that of newspapers. A key case for them is *Herbert v. Lando*, a 1979 Supreme Court ruling which permitted judicially supervised and limited discovery into a newspaper's editorial process, but noted that disclosures "merely to satisfy curiosity or to serve some general end such as the public interest… would not survive constitutional scrutiny[.]"[49] As I will discuss in Part III.C., I don't think this comparison is perfect either. It elides important differences between platforms and traditional newspapers, including differences in their relationships with users or readers. But *Lando* at least focuses attention on the deeper issue behind the "compelled speech" problem in *NetChoice*: the risk that transparency laws will effectively use state power to change platforms' editorial policies, reshaping users' ability to speak and access information online.

There is also a short list of prior cases specifically about platform transparency. Because other states have enacted or may soon enact other transparency laws, the list of lower court cases may grow while *NetChoice* is pending.

- The only Circuit Court case to date (other than the *NetChoice* rulings themselves) is *Washington Post v. McManus*.[50] That case concerned a Maryland law requiring both platforms and online newspapers to make disclosures about online campaign ads. The 4th Circuit resoundingly rejected the law as a "compendium of traditional First Amendment

---

[46] *Supra* note 10; 471 U.S. 626, 626 (1985).

[47] *Zauderer*, 471 U.S. 626, 652 ("The State's application to appellant of the requirement that an attorney advertising his availability on a contingent-fee basis disclose that clients will have to pay costs even if their lawsuits are unsuccessful (assuming that to be the case) easily passes muster. . .").

[48] *See, e.g., Netchoice, L.L.C. v. Paxton*, 49 F.4th, 439, 485 ("The Platforms next contend that they are entitled to pre-enforcement facial relief against Section 2 of HB 20. Again, we disagree. Section 2 requires the Platforms to make certain disclosures that consist of 'purely factual and uncontroversial information' about the Platforms' services.")

[49] 441 U.S. 153, 174 (1979).

[50] *Washington Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019).

10

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

infirmities," upholding online news sources' as-applied challenge. A Washington State case also involving campaign ad transparency seemingly reached the opposite conclusion.[51] The state court judge reportedly rejected Meta's First Amendment challenge to that law, although the only published rulings to date do not address the issue. In February of 2023, a district court struck down New York's platform transparency law, which required specific disclosures about hate speech policies.[52] A similar constitutional challenge to California's new platform transparency law is pending.

As Part IV.A.2 will discuss, all of these laws differed from the ones in *NetChoice* in important ways. The Maryland, Washington, New York, and California laws all required disclosure only about online speech or platform policies regarding particular topics or viewpoints. That made the laws far less burdensome, and far more targeted to address particular harms, compared to the sweeping obligations enacted in Texas and Florida. At the same time, it made them more clearly content-based, and thus more vulnerable to First Amendment challenge. The Texas and Florida requirements are some ways more akin to the power asserted by some Attorneys General under existing consumer protection law to demand broad disclosures from platforms about *all* content moderation, in order to assess whether the platforms' public representations are misleading. This authority is disputed in several ongoing cases.[53]

## III.   The Threat: State Influence on Platforms' Content Moderation

The transparency laws in *NetChoice* are likely to cause platforms to change their editorial policies, or offer users fewer speech-enabling features. That is a matter of First Amendment concern for platforms, of course. But it is an even bigger concern for Internet users. The speech that they are permitted to share and read online will be shaped by state influences which are largely hidden to them, and which they have few opportunities to challenge.

This threat to speech is fundamentally different from the threat in cases like *Zauderer*. That case, like most cases about consumer-facing disclosures, is about forcing a business to say something it prefers not to say. *NetChoice* is about state action that causes platforms to change editorial practices in their underlying and ongoing service.  There is room for disagreement about how real this threat is as a practical matter. As an eighteen-year veteran of state/platform

---

[51] *State of Washington v. Meta Platforms, Inc.*, No. 20-2-707774-7 (Wash. Sup. Ct., Oct. 2022), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_Releases/Penalties%20judgment.pdf. *See also* Todd Bishop, *Judge Rejects Facebook's Attempt to Declare Washington State Campaign Ad Law Unconstitutional*, GEEK WIRE (Sept. 2, 2022), https://www.geekwire.com/2022/judge-rejects-facebooks-attempt-to-declare-washington-state-campaign-ad-law-unconstitutional/.

[52] Volokh v. James, No. 22-CV-10195, 2023 WL 1991435, at *11 (S.D.N.Y. 2023).

[53] *Twitter, Inc. v. Paxton*, No. 21-15869 (9th Cir. 2022) (rejecting on ripeness grounds Twitter's First Amendment challenge to sweeping disclosure demands from the Texas Attorney General); *Google, Inc. v. Hood*, 822 F. 3d 212 (5th Cir. 2016) (rejecting on ripeness grounds Google's challenge to disclosure demands from the Mississippi Attorney General); *D.C. v. Meta*, No. 2021-CA-004450-2 (D.C. Super. Ct. Mar. 2022) (upholding against First Amendment challenge the D.C. Attorney General's subpoena demanding identities of individuals whose posts Facebook removed under its Covid disinformation policies).

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

relationships, I believe the threat is very real.[54] But even if the threat were just a little bit real – if transparency laws would only burden Internet users' expression rights a tiny bit – that would still be a qualitatively different problem than the problems addressed in cases about labels on meat or pricing disclosures in advertisements.

The speech issues raised by *platform* transparency laws have more in common with the problems that arise under intermediary liability laws, like the Digital Millennium Copyright Act (DMCA) in the U.S. or the Digital Services Act (DSA) in the EU. Those laws expose platforms to costly litigation and potential liability for user speech, which they can avoid by simply taking more speech down – even if the speech is legal. Platforms' pattern of over-removal in order to streamline compliance and avoid risk under such laws is very well documented.[55] Erring on the side of silencing users is often the economically rational choice, and the one that a game theorist would expect platforms to make. Under transparency laws like the ones in Texas and Florida, too, platforms will face situations in which making changes to their rule for online speech – whether by removing more user speech or leaving more of it up – offers the safest and most cost-efficient course of action.

This risk should not, I think, be a constitutional death knell for platform transparency laws. But it does mean that the doctrinal problems with transparency laws are thorny and complex. They involve competing First Amendment rights and poorly developed areas of constitutional law. They involve both speech that is arguably commercial (platforms' public statements describing their products and content moderation) and speech that presumably is not (that of platforms in setting their editorial policies, and of users whose online speech rights are affected when those policies change in response to state pressure).

The *practical* problems with transparency laws and speech, though, are not all that complicated. In some cases, there are simple and obvious ways to improve the laws, and reduce threats to online speech. Lawmakers will only make those changes if courts apply standards of First Amendment review that are stringent enough to require such efforts.

This Part will discuss the two major, practical problem areas for free expression under transparency laws like the ones in *NetChoice*. The first involves platform compliance that sacrifices Internet users' rights when State AGs seek to enforce the laws. The second involves changes to individual platforms' speech rules, and to the overall online speech ecosystem, as a result of the burdens the laws create. It will also discuss legal precedent about speech compulsions that affect commercial entities' exercise of speech and editorial rights in their overall businesses. This precedent is scant, but nonetheless illuminating, for the platform transparency issues in *NetChoice*.

---

[54] So far, I have found no one with experience in platform operations and platform-government discussions who disagrees.
[55] *See* Daphne Keller, *Empirical Evidence of Over-removal by Internet Companies Under Intermediary Liability Laws: An Updated List*, THE CENTER FOR INTERNET AND SOCIETY (Feb. 8, 2021), https://cyberlaw.stanford.edu/blog/2021/02/empirical-evidence-over-removal-internet-companies-under-intermediary-liability-laws for a list of studies. The extensive procedural requirements for legal "notice and takedown" processes under the EU's new law are intended to address this problem.

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

## A. Enforcement Problems

The first big way that transparency laws could cause platforms to change their speech policies is through the laws' enforcement process. If an AG investigation causes Facebook to change its rules about hate speech or electoral disinformation the First Amendment is very much implicated. Users' speech rights, as well as platforms', will be affected.

This problem has no analog in ordinary consumer protection cases about non-speech businesses. If ingredient disclosure requirements incentivize Frito-Lay to make healthier food, or if inspections cause restaurants to improve hygiene, no First Amendment harm results. Indeed, prompting the regulated companies to change their practices may be an acknowledged and legitimate goal of such laws.[56]

The link between enforcement of transparency laws and state influence on platforms' underlying editorial operations is straightforward. Platform disclosures will have limited value unless independent observers can vet their accuracy. But as Eric Goldman has pointed out, giving state officials that power will, in very predictable situations, also give them the opportunity to shape platforms' substantive editorial policies.[57] They may even directly influence whether particular posts or speakers appear on the platform. This problem is most evident when state actors abuse their power under transparency laws – like when an AG deliberately pressures platforms to favor her political allies and supporters, or disfavor her adversaries. But an AG who tries in good faith to enforce the law as she understands it can easily have the same speech-suppressive effect. This makes the state influence under transparency laws very different from classic "jawboning" situations, in which state actors leverage power over non-speech areas of law, such as taxation, to strongarm platforms into silencing users or otherwise giving up speech rights.[58] Here, the state actor is exercising power expressly granted in legislation.

This risk can arise in the most basic enforcement scenarios, any time an AG inquires about whether platforms' actual editorial practices match with their public descriptions. This situation would arise under the *NetChoice* rules about Published Speech Rules, Rule Change Notices, Individual Notices, or Explanations, for example. Inevitably, many individual content moderation decisions will *not* match these published policies. Content moderation is rife with inconsistency and error. If Facebook were to achieve a remarkable 99.9% accuracy rate in moderating the over 350 million photos uploaded daily, that would still lead to at least 350,000 mistakes every day.[59] A large number of those decisions will also inevitably fall in gray areas – requiring moderators to interpret rules that do not expressly address the situation at hand. Platforms can no more draft rules to cover all future questions than legislatures or Restatement drafters can exhaustively document the rules for future disputes about defamation or copyright

---

[56] Sarbanes-Oxley, for example, uses the threat of disclosures to incentivize compliance. Firms that can avoid having negative PCAOB audit results published by remediating defects within 12 months. Sarbanes-Oxley Act of 2002 Pub. L. No. 107-204 § 104(g)(2). *See generally* OMRI BEN-SHAHAR & CARL E. SCHNEIDER, MORE THAN YOU WANTED TO KNOW: THE FAILURE OF MANDATED DISCLOSURES (Princeton University Press 2014).

[57] Eric Goldman, *The Constitutionality of Mandating Editorial Transparency*, 73 Hastings L.J. 1203 (2022).

[58] Genevieve Lakier, *Informal Government Coercion and The Problem of "Jawboning"*, LAWFARE BLOG (Jul. 26, 2021), https://www.lawfareblog.com/informal-government-coercion-and-problem-jawboning.

[59] Daphne Keller, *State Abuse of Transparency Laws and How to Stop It*, THE CENTER FOR INTERNET AND SOCIETY, (Sept. 19, 2022), https://cyberlaw.stanford.edu/blog/2022/09/state-abuse-transparency-laws-and-how-stop-it.

13

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

fair use.[60] And platforms can't, like courts, publish every new decision documenting an evolving "common law." Such publication would in many cases violate privacy laws. It would also be so voluminous as to be useless to ordinary users.

This ever-expanding universe of de facto platform speech rules, and the impossibility of capturing it in transparency disclosures, means that disclosures may inevitably strike enforcers as incomplete or inaccurate. Any enforcer will be able to identify particular removal choices that, clearly or arguably, render published disclosures false. Elected officials, like most State AGs, may be particularly motivated to address transparency "failings" that involve media- and constituent-friendly culture war issues. Those will not be hard to find.

### 1. Examples

An AG that wanted platforms to change their speech policies could readily cite concerns about the accuracy of disclosures as ground for making the platform do so. Texas AG Ken Paxton's existing case against Twitter – brought under Texas's pre-existing consumer protection law, and prior to Elon Musk's acquisition of the platform – illustrates the problem.[61] Enforcers could find endless ground for disagreement about whether a platforms' disclosures are accurate. I describe five examples in this blog post.[62] Here is another. This one happens to involve a politically conservative AG, but it could just as easily involve a liberal one. It happens to involve an individual post, but could easily involve broader platform policy changes. It happens to involve state pressure to keep user speech *up*, but could just as easily involve pressure to take it *down*.

Imagine that Floyd, a Facebook user in Florida, posts a comment saying that gay teachers should not be allowed to mention their sexual orientation in elementary school classes. Facebook has a posted policy against "homophobic comments," and takes down Floyd's post for violating it. Floyd complains to the Florida AG, saying that his remark didn't violate Facebook's posted rule. As Floyd sees it, he did not express fear or hostility toward LGBTQ+ people – he simply stated his beliefs about whether children should be exposed to information about adult sexual behavior.

---

[60] It is hard to calculate how many content moderation decisions are "new," since social media platforms may use filters to remove all duplicates of a particular image or other content, without examining contextual differences. As a very rough comparison point, though, Google says 15% of its queries are entirely new, and have never been seen by the company before. That's a daily rate of around 1.2 million new items. Arooj Ahmed, *Google is Still Not The All-Knowing Almighty Search Engine as 15 Percent of Queries are "never seen before" by Tech Giant*, DIGITAL INFORMATION WORLD, (Aug. 31, 2020), https://www.digitalinformationworld.com/2020/08/google-is-still-not-the-all-knowing-almighty-search-engine-as-15-percent-of-queries-are-never-seen-before-by-tech-giant.html#.

[61] *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022). Paxton has sought discovery of, in Eric Goldman's words, "every document regarding every editorial decision that Twitter has ever prepared," in order to ascertain whether Twitter accurately represented its speech policies to consumers. Paxton's investigation was prompted by the platform's ouster of President Trump. Benjamin Din, *Twitter Sues Texas Attorney General Over Investigation Into Content Moderation Practices*, POLITICO (Mar. 8, 2021), https://www.politico.com/news/2021/03/08/twitter-texas-ken-paxton-trump-474568. As the AG explained (on Twitter, ironically), his aim is to reshape Twitter's speech policies by preventing it from "closing conservative acc[oun]ts." Eric Goldman, *The Constitutionality of Mandating Editorial Transparency*, 73 Hastings L.J. 1203, 1226 (2022).

[62] Daphne Keller, *State Abuse of Transparency Laws and How to Stop It*, THE CENTER FOR INTERNET AND SOCIETY (Sept. 19, 2022), https://cyberlaw.stanford.edu/blog/2022/09/state-abuse-transparency-laws-and-how-stop-it. For what it's worth, the blog post was reviewed by half a dozen people with experience in frontline content moderation, engaging with State AGs about platform content issues, or both. None questioned the plausibility of these scenarios.

14

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

The AG agrees that nothing in Facebook's Published Speech Rules adequately informed consumers that posts like this would be removed. The rules, she concludes, are misleading, and violate Florida's platform transparency laws. She contacts Facebook to say she is considering bringing an enforcement action. Her office wants the company to disclose a month's worth of other posts removed under the "homophobia" policy, in order to identify any other discrepancies between the platform's Published Speech Rules and its actual editorial practices. She also plans to hold a press conference to show her constituents how she is holding Facebook to account for its secret woke agenda.

Again, this scenario could just as easily involve AG pressure for a platform to *remove* speech. If Facebook left Floyd's post up, for example, an AG in a liberal State like California might argue that *that* choice showed the falsity of the company's stated policy against homophobia. In that case, the way to appease the AG would be to take the post down.

Faced with pressure like that from the hypothetical Florida AG action, Facebook has roughly three choices. First, it can litigate about whether the remark is "actually" homophobic. In the process, it will incur bad press, expenses, and ill-will from a powerful state enforcer. It will also have to disclose more decisions, knowing that the AG will inevitably find some she considers improper for new and different reasons. Litigation has a lot of downsides, but I would expect bigger, better-resourced platforms would litigate cases like this in the early days of transparency mandates. Both they and enforcers will want to clarify and test the new laws' limits. Longer term, platforms may also litigate when a dispute affects their revenue or reputation, or threatens values particularly important to executives. But platforms are not going to litigate every case, and potential cases will arise constantly.

Second, Facebook could change its posted policies to make them more accurate and non-misleading. This is precisely what transparency laws are supposed to make them do. Platforms will surely do it in some cases. But it is far from costless. For our Florida example, it might mean adding detail to the policy against homophobic posts, saying that it prohibits "endorsement of unequal employment conditions based on sexual orientation," for example. The platform could choose to spell out an exception for relevant occupational qualifications. If it doesn't add the exception, it may run into trouble with the Florida AG later on if the platform fails to remove a post calling on schools to hire more LGBTQ+ counselors. If it does add the exception, it risks running into trouble for not spelling out what Facebook considers to be "relevant occupational qualifications." The endless emergence of new questions not quite covered by the last iteration of a rule will be familiar to litigators, Trust and Safety professionals, and parents of argumentative children everywhere.

Once Facebook settles on a rule, the work is not over. Now it must articulate the same rule in dozens of languages.[63] This may require vetting the rule with local legal and policy experts – who might flag, for example, conflicts with German employment law or with Facebook's position in ongoing litigation in Brazil. The final wording must then be added to webpages, user

---

[63] Platforms have strong reasons to maintain consistent policies around the world to the extent possible, as discussed in Daphne Keller, *Who Do You Sue?*, HOOVER INST., Aegis Series Paper No. 1902 (Jan. 29, 2019), at 8, https://www.hoover.org/sites/default/files/research/docs/who-do-you-sue-state-and-platform-hybrid-power-over-online-speech_0.pdf.

15

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

interfaces in apps, and communications like email messages used in Individual Notices and Appeals. The exercise may also involve updating training, materials, and tools for a distributed workforce of tens of thousands of moderators. This is all costly and cumbersome.

The third option is to concede that the Florida AG is correct, and reinstate Floyd's post about LGBTQ+ teachers. That would be the easiest, cheapest, and safest course. It is the course we should expect platforms to take some of the time, and perhaps much of the time. We already know that platforms regularly remove users' legal speech in order to avoid litigation risk or expense to themselves.[64] They revise or reinterpret their own voluntarily enacted rules to appease politically powerful actors, both by removing more content and by leaving more content up.[65] Decisions like this overwhelmingly take place behind closed doors. Users and the public are unlikely to ever know what has happened, much less have the opportunity to challenge the rule changes before a court. Users who are silenced at state behest have obvious First Amendment concerns in this scenario. Arguably, so do users whose online reading material is reshaped, perhaps in ways they would not have chosen, by invisible state influence.

Another illustration of this problem, perhaps more concerning to politically conservative critics of platforms, comes from Washington, D.C. The AG there subpoenaed Meta (which operates Facebook) as part of an investigation, under consumer protection law, of the platform's public statements about restricting Covid disinformation. The subpoena sought the identities of users who had posted disinformation, arguing that it needed to know their names in order to determine whether Facebook was adequately penalizing repeat offenders. This information, the AG argued, was relevant in determining the truthfulness of Facebook's public statements. The D.C. Superior Court agreed, upholding the subpoena over the company's statutory and constitutional objections.[66]

Although Meta "accuses the District of engaging in the regulation of disfavored consumer Speech[,]" the Court determined, the D.C. AG in fact sought only to

> determine whether Meta's public statements about its aggressiveness in regulating Facebook posts with negative information about vaccines are false or misleading. OAG expressly represents that it is not seeking to regulate consumer speech, to

---

[64] Daphne Keller, *Empirical Evidence of Over-removal by Internet Companies Under Intermediary Liability Laws: An Updated List*, THE CENTER FOR INTERNET AND SOCIETY (Feb. 8, 2021), https://cyberlaw.stanford.edu/blog/2021/02/empirical-evidence-over-removal-internet-companies-under-intermediary-liability-laws.

[65] Elizabeth Dwoskin, *Outside Audit Says Facebook Restricted Palestinian Posts During Gaza War*, THE WASHINGTON POST (Sept. 23, 2022), https://www.washingtonpost.com/technology/2022/09/22/facebook-censorship-palestinians/; Newley Purnell & Jeff Horwitz, *Facebook's Hate-Speech Rules Collide with Indian Politics*, THE WALL STREET JOURNAL (Aug. 14, 2020, 12:47 PM E.S.T.), https://www.wsj.com/articles/facebook-hate-speech-india-politics-muslim-hindu-modi-zuckerberg-11597423346.

[66] *D.C. v. Meta*, Case No. 2021 CA 004450 2 (D.C. Superior Ct. March 9, 2022). In a pending case raising similar issues, bankers raise a First Amendment challenge to the Kentucky Attorney General's demands for sweeping disclosures about financial institutions' environmental policies and communications with environmental groups, calling the disclosure requirements a form of surveillance. *Hope of Kentucky v. Cameron*, 22-CI-00842 (October 31, 2022), Complaint, https://www.kybanks.com/kba-files/pdf/comleg/2022_10_31_HOPE_KBA_Complaint_vs_AGCameron_CIDs_22CI842_AsFiled.pdf.

16

Electronic copy available at: https://ssrn.com/abstract=4377578

punish any Facebook user for posting information, or to "moderate content posted on Facebook."[67]

As the D.C. case illustrates, state enforcement of transparency requirements can easily implicate surveillance, as well as speech issues. With respect to speech and First Amendment rights, the users most affected in a case like this might be *future* users who wish to post lawful speculation about vaccine efficacy. Facebook could seek to avoid conflict with the AG by terminating those users' accounts more readily. In other hypothetical cases, like the ones described in the blog post, the platform's safest course might involve other adjustments in the development or enforcement of editorial policy.[68] A platform might, for example, decide to avoid – or seek out – organizations like the Southern Poverty Law Center for advice on domestic extremism. Or it might forego updates to machine learning models, or go without nuanced and adaptable internal rules for new racist slang or cultural signifiers like Hawaiian shirts in the U.S.[69] The possibilities for state influence are as varied as the evolving speech culture of the Internet.

We should particularly worry about platform acquiescence to enforcers' speech preferences in two situations. One is in cases that do not affect platforms' bottom line – where the change sought by the AG will affect only users or topics that do not generate much ad revenue. The other is in cases where failing to comply will give the AG an opportunity to grandstand and attack platforms on politically polarizing topics – what counts as hate speech or disinformation; how users may speak about gender identity, marriage equality, or critical race theory; and any number of other culture war flashpoints. In other words, we should worry about state actors determining what Internet users can see, say, and read online precisely in the areas of most contested and culturally or politically significant speech.

The First Amendment problems here are illustrated most starkly when AGs enforce transparency laws. But a version of the same problem arises when lawmakers create private rights of action. Under Florida's law, Floyd could bring a claim saying that the User Notice he received was insufficiently "thorough" or "precise." The law incentivizes these suits, offering plaintiffs up to $100,000 in statutory damages. Texas offers no such monetary bounty for plaintiffs, though they can recover fees and get injunctions. But litigating Texas cases remains financially risky for platforms. They face stiff fines if they fail to comply with Texas State courts' orders to change their practices or posted materials – even if different courts reach different conclusions. As the Supreme Court noted in *NYT v. Sullivan*, financial exposure from civil claims can create First Amendment harms as surely as state enforcement, and be "markedly more inhibiting[.]"[70] To

---

[67] Id. at 2 (internal quotations omitted). In language reminiscent of the 5th Circuit's must-carry analysis in NetChoice, the D.C. court continued, "If either party can be said to be regulating consumer speech, it is Meta through enforcement of its content moderation policies."

[68] Daphne Keller, *State Abuse of Transparency Laws and How to Stop It*, THE CENTER FOR INTERNET AND SOCIETY (Sept. 19, 2022), https://cyberlaw.stanford.edu/blog/2022/09/state-abuse-transparency-laws-and-how-stop-it.

[69] *Id.*

[70] *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964). As *Sullivan* makes clear, civil rights of action are subject to First Amendment challenge for this very reason. "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law[.]" *Id.* The issue here is analogous to the one the Supreme Court declined to review in Texas's infamous SB 8 abortion law, which awards plaintiffs up to $10,000 for bringing civil claims against people who aid or abet abortions. *In re Whole Woman's Health, et al.*, 142 S. Ct. 701, 211 L. Ed. 2d 581(2022).

17

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

avoid litigation, damages, or fines platforms may choose to settle such cases, including by reinstating posts or changing their moderation practices to appease claimants.

Transparency laws like the ones in Texas and Florida will predictably create situations in which prosecutors or plaintiffs credibly assert that platforms are currently violating the law, but that they can fix that by making different content moderation choices. The question is not *whether* this dynamic will cause platforms to make concessions that effectively grant states hidden power over Internet users' speech rights. It is how often, and which speech will be affected.

## 2. Tailoring Possibilities

It does not seem possible to fully eliminate the enforcement-related problems described in this subpart. It should be possible to better tailor transparency laws to reduce the risks, though. Here is a preliminary list of possibilities – all imperfect and in need of tire kicking, but worthy of further discussion.

- AGs themselves could be subject to more transparency requirements, as a check on improper behavior. In particular, the law could require disclosures of transparency-related communications between AGs and platforms.[71]
- Transparency statutes could set higher litigation burdens for AGs or plaintiffs to obtain discovery or prevail in cases that turn on disputed interpretation of speech rules.[72] They could be required to show, for example, that no reasonable person would agree with platforms' interpretation of speech rules.
- Transparency statutes could set limits on the degree of granularity and additional detail required of platforms in explicating policies.
- Civil damages could be eliminated in favor of injunctive relief. Or damages could be reduced, or made available only in certain cases – such as in disputes affecting businesses, or in cases involving termination of entire user accounts (aka "deplatforming"), rather than in disputes about particular posts.
- Transparency statutes could instruct judges in transparency cases to consider the rights and interests of absent third parties – much as courts might do under the public interest prong of some preliminary injunction standards.

---

[71] Better transparency about AG pressure on platforms is warranted in any case. It should not take the apparent intervention of North Korean hackers for Americans to learn what their AGs are up to. Mike Masnick, *Attorney General Downplays Ties to MPAA… Just as NYTimes Reveals MPAA Actually Wrote the Letter He Sent to Google*, TECH DIRT (Dec. 17, 2014, 9:48 AM), https://www.techdirt.com/2014/12/17/attorney-general-downplays-ties-to-mpaa-despite-letter-he-sent-google-revealed-as-written-mpaa/; Nick Wingfield & Eric Lipton, *Google's Detractors Take Their Fight to the States*, N.Y. TIMES (Dec. 16, 2014), https://www.nytimes.com/2014/12/17/technology/googles-critics-enlist-state-attorneys-general-in-their-fight.html; Eric Lipton, *Lobbyists, Bearing Gifts, Pursue Attorneys General*, N.Y. TIMES (Oct. 28, 2014), https://www.nytimes.com/2014/10/29/us/lobbyists-bearing-gifts-pursue-attorneys-general.html?_r=1; Emily St. James, *The 2014 Sony Hacks, Explained*, VOX (Jun. 3, 2015), https://www.vox.com/2015/1/20/18089084/sony-hack-north-korea.

[72] A model for this might be found in cases following *Tattered Cover*, which held that law enforcement agents seeking access to bookstore purchased records must, in order to protect customers' First Amendment rights, make a stronger showing of need before obtaining a warrant. *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1048 (Colo. 2002).

18

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

- Third parties, such as user-rights organizations, could be given standing to bring cases or intervene in cases where state action will predictably harm the rights of current or future platform users.

The other approach would be to cast a broader net in deciding which transparency laws to enact in the first place. As later sections of this Paper will discuss, there are plenty of other models for platform transparency – including disclosure rules more explicitly designed to promote democratic self-governance. Lawmakers could prioritize those, or more generally opt for mandates that *don't* put AGs in the position of telling platforms how to apply or explain their rules. Purely quantitative requirements like Statistical Transparency Reports, for example, would create less opportunity for state pressure about specific moderation choices.

## B.  Burden Problems

The second way that the *NetChoice* transparency rules may cause platforms to change their speech policies is more boring, but no less important. Pervasive and ongoing burdens like the ones Texas and Florida chose will make hosting and moderating speech more expensive – perhaps very significantly so. Platforms can avoid these costs by eliminating features or editorial practices that are no longer cost-efficient in light of new transparency costs. One way to do that is to adopt editorial policies that are simpler, blunter, or more standardized. Another is to stop offering certain speech-enabling features, or even to exit certain product markets entirely.

Consolidation of users onto major platforms has already reduced the web's once-raucous range of discursive communities, whittling away at what the Supreme Court in *Reno* called the "astoundingly diverse content" once available online.[73] Lawmakers, the public, and courts should be extremely wary of state action that makes this concentration worse. Entrenching giant incumbents and driving smaller competitors out of the market is not just bad economic policy. It also reduces the diversity of online forums for speech. Lawmakers in Texas and Florida seem conflicted about this -- simultaneously *citing* the concentration of power in platform hands as a basis for regulation and *contributing* to that concentration through the laws' new burdens. This is a one-way ratchet toward more state interference with users' online speech rights.[74]

Burden-related risks like these could very easily be reduced. The first step is to stop treating "platform transparency" as a single thing, rather than a vast menu of possible legislative options. The second is to be much more rigorous in asking what transparency measures are a match for particular platforms. There are sensible, low-hanging fruit opportunities to improve platform transparency laws like the ones in Texas and Florida. I will list just a few of the numerous possibilities below.

---

[73] *ACLU v. Reno*, 929 F. Supp. 824, 877, *aff'd* by 521 U.S. 844, 846 n.30 (1997).
[74] This problem is most evident in the laws' must-carry provisions, as I discuss in *Lawful but Awful? Control over Legal Speech by Platforms, Governments, and Internet Users*, U. Chi. L. Rev. (2022), https://lawreviewblog.uchicago.edu/2022/06/28/keller-control-over-speech/. But the transparency provisions also contribute to it, as discussed in the main text.

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

The 5th Circuit ruling in NetChoice was particularly egregious in its disregard for burden concerns. Rather absurdly, it called Texas's requirements "one-and-done" obligations.[75] Platforms described the same requirements as "encompass[ing] everything platforms do[.]"[76] That is also an exaggeration -- but not by that much. The laws' obligations are sweeping, burdensome, and ongoing. Platforms must track each of billions of content moderation decisions, produce individual justifications for each, review appeals, and issue reports tracking the results, broken down based on numerous statutorily enumerated factors.[77] They must publicly document changes of speech rules that evolve and iterate constantly in response to changing human behavior in diverse cultures around the world. This is an undertaking of Borgesian scale.[78]

If transparency laws imposed only economic or operational burdens, of course, the burdens wouldn't matter for First Amendment purposes.[79] But the burdens Texas and Florida have created are specifically triggered when platforms choose to exercise editorial control over online content. Those burdens can be reduced by eliminating or simplifying editorial control – which could mean removing more speech, or removing less. Platforms can and almost certainly will elect to change the rules for users' online speech in response to these laws. That means the burdens matter for both platforms' and users' First Amendment rights. So, too, do legislative tailoring options that would reduce or better target these burdens.

The strongest concerns about burden problems involve smaller and less well-resourced platforms.[80] The Fifth Circuit appeared to labor under the misapprehension that Texas's law applied only to YouTube, Facebook, and Twitter (which is, incidentally, far smaller than the other members of this triumvirate). The reality is that Texas's law likely also reaches the likes of Reddit, Quora, Skype, Rumble, LinkedIn, Picsart, Discord, Twitch, Stack Exchange, Wikipedia, Glassdoor, Vimeo, Steam, and Minecraft.[81]  Many of those companies have nothing like their enormous competitors' role in public discourse.

Lawmakers' justifications for applying identical mandates to such diverse platforms is unclear. The smaller platforms' relative lack of capacity for compliance, though, is obvious. Many of these platforms have only a few thousand employees in total. Meta, by contrast, has over 15,000 people working on content moderation alone.[82] The Texas and Florida laws require these smaller

---

[75] *Netchoice, L.L.C. v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022).

[76] Brief of Appellees at 53, *Paxton*, 49 F.4th 439 (No. 21-51178).

[77] FL cert petition brief cites Santa Clara principles for point that platforms already can, and easily do, notice and appeals and other transparency. That's (a) not true and (b) just signatories. *See* Petition for Writ of Certiorary at 27-8, *Attorney General v. Netchoice, LLC*, 34 F.4th 1196 (11th Cir. 2022).

[78] *See generally* Jorge Luis Borges, *A Universal History of Infamy* (Penguin Books, London, 1975) (describing a map the size of the territory depicted).

[79] Similarly, if they were burdens on the entire business – such as tax or labor and employment obligations – they might not raise concerns about free expression.

[80] [disclosures omitted for purposes of anonymization].

[81] Eric Goldman, *The 5th Circuit Puts the 1st Amendment in a Blender & Whips Up a Terrible #MAGA Kool-aid* – *Netchoice v. Paxton*, Technology & Marketing Law Blog (Sept. 20, 2022), https://blog.ericgoldman.org/archives/2022/09/the-5th-circuit-puts-the-1st-amendment-in-a-blender-whips-up-a-terrible-maga-kool-aid-netchoice-v-paxton.htm.

[82] Business Inside, *Content Moderators for Meta Threaten to Stop Work Until Paid in Full* (Jan. 12, 2022), https://www.businessinsider.in/tech/news/content-moderators-for-meta-threaten-to-stop-work-until-paid-in-full/articleshow/88848336.cms.

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

platforms to shoulder transparency burdens that incumbents never even attempted until they were already very, very large. Google, for example, released its first transparency report when the company had about 24,000 employees and was worth over $300 billion.[83] Facebook released its first transparency report when it was worth $139 billion.[84] It first allowed users to appeal removals of photos, videos, and posts (but not comments) beginning in 2018, when the company was worth $374 billion and had some 35,000 employees.[85] Demanding better transparency from smaller companies earlier in their growth cycle may be sound policy. But saddling them with transparency burdens identical to those of giant incumbents is not.

Differences between smaller and larger platforms are exacerbated by international legal developments. Companies that already have a foothold in foreign markets like China, India, or the EU are already being forced to invest in changes that will render compliance in Texas and Florida much easier. New European laws will compel large platforms to implement transparency systems much like the ones at issue in *NetChoice* by the summer of 2023.[86] At that point, the initial outlay for transparency compliance will be a sunk cost for the biggest platforms, but not for their smaller rivals. That dynamic will, presumably, reduce the large platforms' inclination to resist transparency mandates in the U.S. A cynic might speculate that this has shaped the *NetChoice* plaintiffs' U.S. litigation priorities.

1.  Examples

Mis-calibrated burdens may cause platforms, particularly small ones, to simplify their speech rules or give up on speech-supporting features. Data illustrating this issue at smaller companies is hard to come by. But we do have some relevant statistics from YouTube. The *NetChoice* briefs state that YouTube currently provides Individual Notices and Appeals for some 9 million videos

---

[83] ABC News, *Countries with GDP Below Google's $332B Market Cap* (Jul. 28, 2009), https://abcnews.go.com/Business/slideshow/countries-gdps-googles-332b-market-cap-20617789/image-20617882; Robert Young, *Insights from the Google Transparency Report*, Search Engine Watch (Jun. 29, 2011), https://www.searchenginewatch.com/2011/06/29/insights-from-the-google-transparency-report/.

[84] Hayley Tsukayama, *Facebook Releases First Report on World Governments' Data Requests*, The Washington Post (Aug. 27, 2013), https://www.washingtonpost.com/business/technology/facebook-releases-first-report-on-world-governments-data-requests/2013/08/27/40e2d396-0f24-11e3-8cdd-bcdc09410972_story.html; Companies Market Cap, *Market capitalization of Meta Platforms (Facebook) (META)*, https://companiesmarketcap.com/meta-platforms/marketcap/.

[85] *Facebook Unveils Appeal Process For When It Removes Posts*, Yahoo News (Apr. 24, 2018), https://sg.news.yahoo.com/facebook-unveils-appeal-process-removes-posts-092814445.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAMoCptAjZqwD-rrk8OPpcaeSi9o5V9jE_nyFXeO0MBpkxiDMW-0C7aNaKJeb1FXNHVQxUQM_gFWlzxiV7Y8nuJgV2DCcPAScus1FoVvmKmDGxb31q224IxT-Ii_Xj1IlZSNteqCf-KvEaeG2vQEZbcGtpdrG_euNErZWYNVGcgI7; MacroTrends, *Meta Platforms: Number of Employees 2010-2022 | META*, https://www.macrotrends.net/stocks/charts/META/meta-platforms/number-of-employees.

[86] David Nosák, *The DSA Introduces Important Transparency Obligations for Digital Services, but Key Questions Remain*, Center for Democracy & Technology (Jun. 18, 2021), https://cdt.org/insights/the-dsa-introduces-important-transparency-obligations-for-digital-services-but-key-questions-remain/. This Senate testimony summarizes the DSA's transparency provisions. Daphne Keller, *U.S. Senate Committee on the Judiciary, Subcommittee on Subcommittee on Privacy, Technology and the Law, Hearing on Platform Transparency: Understanding the Impact of Social Media* (2022), https://www.judiciary.senate.gov/imo/media/doc/Keller%20Testimony1.pdf.

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

every quarter.[87] The Texas law requires those same processes for *comments* posted on videos. Adding those would be a 100x increase over the platform's current operations. If the company maintained comments in their current form, its Trust and Safety team would have to process an additional billion Individual Notices (and potential Appeals) per quarter.

YouTube comments have mixed value to the platform. They can be very important to some video creators, like musical artists who are building a following. This in turn benefits YouTube, bringing more popular video content to the platform and making it a destination for users seeking content like music videos. But even academic researchers studying YouTube comments find many "irrelevant" and "trivial", and say that they are "tedious" to review – an assessment that YouTube's content moderators surely share.[88]

A YouTube manager assessing the costs and benefits of issuing a *billion* additional Individual Notices per quarter would almost certainly consider ways to avoid that expense. One option would be to reduce the quantity of moderation, by setting more permissive standards for comments. A second option would be to reduce the quality of moderation. YouTube could, for example, apply blunter, automatable standards, like "remove any comment containing a term from our bad words list, regardless of context." Such lists are commonly used by moderators at platforms with fewer resources. (For a sense of how clumsy this content moderation is, here are two examples of badwords lists. Unless you work in Trust and Safety, both lists are probably NSFW.) By deploying simplistic, easily explained, and hard-to-dispute rules for comments, YouTube could simplify its Published Speech Rules and Explanations, and swiftly reject almost any Appeal. Another option, if YouTube wanted to cut costs, would be to permit fewer comments. They could be allowed, for example, only on videos of a certain length or on high ad-revenue content like popular, professionally produced videos. Users might then be able to comment on Cardi B music videos or Marvel movie trailers, but not on videos by unsigned artists or ordinary people – including videos documenting police brutality and other non-commercial, publicly important information.

A giant like YouTube need not accept those options. If it sees a business interest in continuing to host comments and provide more nuanced moderation, it can likely afford to do so. Smaller companies may not have that freedom. For them – and their users – the operational burden created by transparency laws would also be a speech burden. The video comments example discussed here is one of many. I have discussed others in publications and Congressional testimony. Smaller platforms might, for example, adopt standardized industry rules and blocking mechanisms instead of maintaining their own unique speech rules.[89] They might minimize the number of changes made each year, forfeiting the ability to respond nimbly to changing user behavior or social norms. They might accept a higher rate of spam and coordinated inauthentic

---

[87] Brief of Appellees at 2, *Netchoice, L.L.C. v. Paxton*, 49 F.4th 439 (No. 21-51178).
[88] Rhitabrat Pokharel, *Classifying YouTube Comments Based on Sentiment and Type of Sentence*, https://arxiv.org/abs/2111.01908. [*DK find new link for "irrelevant" source*]
[89] This standardization problem already exists, through content moderation tools developed and shared by major platforms (like GIFCT for terrorism, and Google's recently announced tool, which allegedly also identifies Covid disinformation) or major back-end hosting services (like Amazon Web Services' Rekognition tool). *See generally* evelyn douek, *The Rise of Content Cartels*, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY (Feb. 11, 2020). https://knightcolumbia.org/content/the-rise-of-content-cartels.

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

disinformation campaigns, because it is too expensive to fight these problems while constantly having to disclose the tools used to do so.

### 2. Tailoring Possibilities

We do not have to accept these speech problems as the unavoidable cost of platform transparency. Laws could be adjusted in numerous ways to ameliorate them. Most obviously, legislators could consult with economists and industry experts before deciding *which* platforms should bear particular burdens – based on size, technical function, revenue, or other factors.[90] Smaller platforms might, for example, be required to produce Statistical Transparency Reports less frequently, or in less detail. The lawmakers behind the NetChoice laws made no such effort. There is no indication that they even knew which companies they were regulating, beyond the few high-profile ones referenced repeatedly in legislative history. If Texas's law was truly intended to have the scope the State's lawyers described to the court – reaching only Twitter, YouTube, and Facebook – then amending the law to make this actually true would be an obvious first step.

Other refinements might be appropriate for platforms of all sizes. For example,

- Lawmakers could standardize required metrics across jurisdictions, so that platforms do not face a fifty-state patchwork of inconsistent reporting rules.[91] (Texas 120.053)
- They could clarify the level of detail required in Published Speech Rules, so that new reporting obligations are not potentially triggered by every new moderation decision about a novel slang term or risqué photo. (Florida 501.2041(2)(d), Texas 120.052)
- They could require Rule Change Notices and updates to Published Speech Rules only for major changes, or aggregated on a quarterly basis for smaller changes. (Florida 501.2041(2)(c))
- They could exempt platforms from disclosures of speech rules that are only being used on a small scale for short-term tests. (Florida 501.2041(2)(c)-(d), Texas 120.052)
- They could – and should – excuse platforms from certain disclosures that would primarily benefit spammers, scam artists, and other actors trying to game the system and subject other users to unwanted content in violation of platform rules. (Florida 501.2041(2)(c)-(d), Texas 120.051(a), 120.052, 120.053(7), 120.101-104)

As a First Amendment matter, adjustments like these all represent options to better tailor platform transparency laws to advance states' goals with less burden on speech. I could come up with a lot more possibilities. Trust and Safety professionals could surely improve on mine. None of this is rocket science. But it is hard to draft good rules without understanding and referencing the mechanics of content moderation. Lawmakers won't bother trying to do that if courts adopt lenient First Amendment review of the sort applied by the 5th and 11th Circuits in *NetChoice*.

---

[90] See generally Goldman and Miers, *Regulating Internet Services by Size*, Santa Clara Univ. L. Studies Research Paper, (2021) (noting difficulties in defining appropriate metrics); Daphne Keller, *Reported Monthly Active Usage Data for Content Hosting Platforms* (2022) (listing reported data).
[91] Susan Ness, *Modularity for International Internet Governance*, LAWFARE BLOG (Jul. 19, 2022), https://www.lawfareblog.com/modularity-international-internet-governance.

23

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

### C. Regulating Speech About Speech

Laws compelling individuals or companies to speak can violate the First Amendment as surely as laws restricting their speech. In most compelled speech cases, the problem is that simple – the government is *making someone speak* when they don't want to. That relatively straightforward issue exists in *NetChoice*, too. But the bigger and more important concern is that Texas and Florida are requiring platforms to *speak about their speech and editorial policies*. This obligation will likely cause them to change those policies. The compulsion to engage in what I'll call "speech about speech" affects both platforms' and users' rights, and creates an entirely different category of First Amendment problem than exists in cases like *Zauderer*.[92]

This section will begin by interrogating the platforms' preferred comparison, to laws compelling newspapers to disclose details of their editorial policies, then review relatively scant case law addressing compelled speech about speech.

#### 1. Platforms as Newspapers?

The analogy between platforms and newspapers is central to the plaintiffs' arguments about both the transparency and must-carry provisions in *NetChoice*. Laws compelling platforms to carry speech against their will, they argue, are no different from the newspaper right-of-reply law struck down in *Miami Herald v. Tornillo*.[93] By the same token, they say, lawmakers can no more compel transparency about editorial processes from YouTube or Facebook than they could from the Miami Herald or Washington Post.

Texas and Florida take the opposite tack, disregarding the unique issues raised by laws compelling speech about speech. They argue that their laws are ordinary consumer protection mandates -- no different from requiring labels on meat or sugary beverages. As I will discuss in Part IV.A, I think platform transparency does serve important consumer protection goals. But the consumer protection case law tells us very little about the problem of state influence on platforms' editorial policies and content moderation.

The moderation-specific problem has more in common with the one newspapers raised in *Lando*. The primary harm from forcing newspapers to disclose records of their editorial process in that defamation case did not arise at the moment of handing over discovery documents. It came from the resulting chill on newspapers' underlying editing and publishing practices. Importantly, while the Supreme Court recognized this chill, it did not shield newspapers from all such disclosures. The *Lando* Court allowed limited, judicially supervised discovery to proceed, for a plaintiff who had already made a credible showing in early motions practice.[94] That tells us that carefully calibrated disclosure mandates can be permissible, even when they may impose a burden on editorial freedom. But the limited discovery approved in *Lando* is dramatically

---

[92] Compelled speech arguments against disclosure requirements for non-speech industries are very different. In Rebecca Tushnet's words, they often "translate[] cost-based objections into free speech arguments". Rebecca Tushnet, *COOL Story: Country of Origin Labeling and the First Amendment*, 70 Food & Drug L.J. 25, 26 (2015), https://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=2934&context=facpub.

[93] Supra note 96.

[94] See generally *Herbert v. Lando*, 441 U.S. 153 (1979).

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

different from Texas's and Florida's requirements for platforms to explain *every* editorial decision, just in case anyone wants to sue. And while *Lando* involved only newspapers' potential self-censorship, the laws at issue in *NetChoice* give platforms reason to silence the speech of other people: their users.[95]

The point is not that large platforms are just like newspapers for transparency purposes. The two have important similarities, of course. Both newspapers and platforms have their own speech rights,[96] and both are sometimes important conduits for third party speech.[97] But differences between the two are also substantial. Platforms process far more information, at far greater speed than newspapers. They have far less commercial or editorial interest in defending users' posts than a newspaper has in defending its articles.[98] In most cases, a rational platform's motivation to keep lawful user speech online will be dwarfed by its motivation to avoid liability – and to adopt streamlined, scalable, and automatable procedures for legal compliance. This is one reason that, for liability purposes, U.S. law has created special legal regimes for platforms – but not newspapers – since the 1990s.[99]

Platforms like Facebook or TikTok also play a unique societal role, given their function in daily life – intermediating speech that might once have communicated in person, by a note passed in class, or by phone call. In some ways, they combine attributes of a newspaper with attributes of the public square. Texas's and Florida's concerns about Silicon Valley's influence on public discourse are not unfounded. Giant platforms really do control access to a global audience of unprecedented size. For some speakers, that arguably means that there is no real substitute for presence on a major platform. The harm from being excluded after investing time and money to cultivate followers or build community can be significant.[100] That said, users who go to

---

[95] Laws with this "censorship by proxy" effect can violate the First Amendment. *Smith v. California*, 388 U.S. 913 (1967) (rejecting strict liability for booksellers in an obscenity case, because of threat to rights of readers and book publishers); *Bantam Books*, 372 U.S. 58 (1963) (recognizing standing for publishers to challenge state action directed at book stores, and upholding their First Amendment challenge); *ACLU v. Ashcroft*, 322 F.3d 240, 266 n.33 (3d Cir. 2003) (affirming ACLU "listener" standing to challenge law regulating online speakers), aff'd, *Ashcroft v. ACLU*, 542 U.S. 656 (2004); *Woodhull Freedom Found. v. United States*, 948 F.3d 363 (D.C. Cir. 2020) (recognizing standing for Internet users to challenge law establishing platform liability); *Center for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606 (E.D. Pa. 2004) (recognizing Internet users' standing to challenge law regulating ISPs, based on the law's interference with their right to receive information).

[96] *See, e.g., Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 214 (1974); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995); *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 204 L. Ed.2d 405 (2019).

[97] The New York Times in *Sullivan*, *supra* note 70, for example was acting as a conduit for speech by civil rights activists in the form of paid advertising.

[98] The Supreme Court noted an analogous disparity of interest between movie producers and theater owners in *Freedman v. Maryland*, noting that for the latter, "it may take very little to deter exhibition in a given locality" because "stake in any one picture may be insufficient to warrant a protracted and onerous course of litigation[.]"380 U.S. 51, 59 (1965).

[99] Digital Millennium Copyright Act, 17. U.S.C. § 512 (detailed notice and takedown system); 47 U.S.C. § 230 (broad immunity for many civil and state criminal claims); 18 U.S.C. § 2258A-C (special platform reporting regime and prohibition on monitoring requirement for child sexual abuse material); 21 U.S.C. § 841(h) (criminal drug laws specific to Internet).

[100] Though many content creators in the analog world may feel a comparable lack of control in, for example, musician-label or author-publisher relationships. Some choose to distribute their work via Internet platforms for this very reason.

25

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

platforms to read, listen, or participate in civil discourse may have different interests than the speakers who primarily value platforms as megaphones. Few users want an unchecked free-for-all of "lawful but awful" speech. For many, platforms' curation is part of their value proposition. I think it is fair to assume that the vast majority of platform users derive value *both* from the public-square-like freedom to speak instantaneously to a global audience, *and* from platforms' newspaper-like editorial curation.

Platforms also differ from newspapers in some ways for transparency purposes. Readers can tell what's in the newspaper by looking at it. (Though they don't know which stories got left out.) If they want to know what they'll get for their subscription fees in the future, they can make a good guess by looking at older editions of the paper. Researchers, too, can look at the paper itself to understand its political slant or gaps in coverage. The same kind of information about social media platforms is much harder to gather, since newsfeeds are ephemeral and personalized for each user.

### 2. Speech About Speech

Imperfect analogies to older media or technologies bedevil platform regulation generally.[101] Reliance on such precedent is particularly difficult in the transparency context, because case law of compelled speech about speech is sparse. This Part will review the case law I'm aware of. It is necessarily impressionistic, because the cases are mostly not in conversation with one another or even asking the same questions.

For starters, the Supreme Court has told us that laws governing speech distributors are constitutionally constrained, in ways that laws governing distributors of other goods are not. In *Smith v. California*, for example, the Court rejected strict liability for booksellers, reasoning that such liability would "tend to restrict *the public's* access to forms of the printed word which the State could not constitutionally suppress directly."[102] In other words, the relevant First Amendment rights were not only those of the *bookstore* (the analog of today's platforms), but instead the rights of the *readers* who depended on it. The Court in *Smith* also rejected analogies between information and non-speech consumer goods. There is, the Court wrote in 1959, "no specific constitutional inhibition against making the distributors of food the strictest censors of their merchandise[.]"[103] But "the constitutional guarantees of the freedom of speech and of the press stand in the way of imposing a similar requirement on the bookseller."[104]

The problem identified in *Smith* recurs in *NetChoice*. The courts below equated disclosures about editorial policies and disclosures about ordinary consumer goods or services, without examining speech-related differences. A transparency law that causes a business to change its underlying practices can be a good thing outside the speech context. The public wins and First Amendment

---

[101] See generally *Denver Area Educational Telecomm.Consortium v. F.C.C*, 518 U.S. 727 (1996) (across six opinions, justices arguing about value of analogies in assessing cable companies' First Amendment challenge to content liability and must-carry rules).

[102] 361 U.S. 147, 154 (1958) (emphasis added). The Court continued, "The bookseller's self-censorship, compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered. Through it, the distribution of all books, both obscene and not obscene, would be impeded." *Id*. at 153.

[103] *Id*. at 152.

[104] *Id*. at 152-53.

26

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

rights are not harmed, for example, when publicly posted health-inspection scores incentivize restaurants to clean their kitchens. The same cannot be said of a law that incentivizes YouTube, Twitter, or Reddit to change its editorial rules.

Transparency laws' impact on platforms' underlying editorial practices and on the online speech opportunities for users also shape any analysis of whether mandates like the ones in *NetChoice* regulate commercial speech. Whether or not the disclosures themselves can be deemed commercial, the answer should be different for the actual editorial policies enforced by platforms, and for the user posts that they affect.[105]

One line of cases tells us that companies in the speech business cannot avoid *all* disclosure requirements simply by pointing to the likely chill on their underlying speech or editorial practices. *Lando* is of course one such case. The plaintiff's discovery requests there were justified because he had plausibly alleged a violation of law – defamation.[106] Without discovery, he could not prove his case or vindicate his legal rights. The Supreme Court has applied similar reasoning to disclosures about universities' tenure decision-making and employment discrimination. Universities objected that disclosure of tenure discussion records would chill their underlying speech and academic freedom, by deterring frankness in peer reviews. The Court rejected their claim, reasoning that any such burden was justified as part of the EEOC's authorized regulatory efforts to "detect and remedy instances of discrimination."[107] These cases are distinguishable from *NetChoice*, of course, in part because they involve targeted investigation into specific alleged violations of underlying laws, with procedural hurdles before authorities could compel disclosures. More importantly, the disclosures were necessary for enforcement of underlying laws against distinct harms: defamation and discrimination. *NetChoice*, by contrast, requires disclosures for their own sake. The "harm" that Texas and Florida seek to remedy is a circular one: Platforms must publish information, in order that they may be punished if the information is false.

More systematic speech-about-speech mandates can be found in Communications regulation. The FCC requires broadcast, cable and other regulated providers to make ongoing public disclosures, for example.[108] Many are technical, but some specifically cover political speech, "community issues" programming, and children's programming. These reports are extremely slight compared to the ones at issue in *NetChoice*.[109] And, importantly, congressional and FCC power to require these reports stems from constitutionally unique authority to regulate speech disseminated via broadcast and cable in the first place. No such authority exists for speech

---

[105] *Riley v. Nat'l Fed'n of the Blind of North Carolina*, 487 U.S. 781 (1988), speaks to situations in which commercial and non-commercial speech are intertwined, and rejects compelled disclosures for charitable solicitors under "exacting" scrutiny.

[106] *Herbert v. Lando*, 441 U.S. 153, 154 (1979).

[107] *Univ. of Pennsylvania v. EEOC*, 493 U.S. 182 (1990); *Branzburg* v. *Hayes,* 408 U. S. 665, 706 (1972). A comparable recent ruling, *Bongo Productions, LLC v. Lawrence*, 603 F.Supp.3d 584 (M.D. Tenn. 2022) (striking down as compelled speech a mandatory disclosure designed to prevent businesses from establishing trans-friendly bathrooms). *Riley*, *supra* note 105, rejected a compelled disclosure about charitable solicitors' compensation in part because the disclosure might cause potential donors to end the conversation, thus effectively discouraging charities and solicitors from speaking in the first place.

[108] Fed. Commc'n Comm'n, *About Public Inspection Files*, https://publicfiles.fcc.gov/about.

[109] I reviewed the latest filing from a Bay Area radio station (KFOG), and it listed a single show, which had aired twelve times in the reporting period.

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

disseminated online – for now. The Court's longstanding holding on this point, from *Reno*, may of course be revisited as the Court resolves the must carry claims in *NetChoice*.[110]

A more intriguing FCC-administered analog to the *NetChoice* transparency mandates is the V-Chip parental control system of the 1990s. The V-Chip laws required broadcasters to establish and implement a rating system for their content, and manufacturers to build rating systems into digital televisions so that users could block content based on the ratings. Legal academics including Jack Balkin wrote extensively about the system's First Amendment ramifications.[111] These questions were never litigated, and the system itself never achieved much adoption or success. The compulsory V-Chip labels differed from Texas's and Florida's requirements in their connection to broadcast-specific First Amendment doctrine, of course, as well as in their child protection goals. The labeling system was also intended to let TV recipients themselves decide what content they wished to block. In other words, the goal was to *decentralize* power over speech and put it in the hands of individuals – not, like the Texas and Florida laws, to effectively centralize that control in government hands.[112]

Lawmakers' attempts to require "speech about speech" or to regulate content labels in other contexts have run into constitutional difficulties. In *Entertainment Software Ass'n v. Blagojevich*, for example, the 7th Circuit struck down a law requiring video game stores to put warning stickers on games if they met a statutory definition of "sexually explicit."[113] Like the Supreme Court in *Smith*, the *Blagojevich* court rejected comparisons between these labels and health warnings on consumer goods, noting that the State's definition of "sexually explicit" was "far more opinion-based than the question of whether a particular chemical is within any given product."[114] It declined to apply *Zauderer*'s relaxed standard of review, noting that the labels were both "non-factual" and conveyed a "highly controversial message" about what counts as "explicit" content.[115] Following similar reasoning, it also rejected a separate requirement for stores to post signs about games' age-appropriateness ratings from the private Entertainment Software Ratings Board (ESRB).[116]

Private ratings systems like the ESRB's, or like the MPAA's more famous one for movies, provide a potentially valuable point of comparison with the platform systems in *NetChoice*. In each case, a private clearinghouse assesses and "rates" third party speech. The ratings meet an important public demand. They also create nominally voluntary speech restrictions that almost certainly could not survive First Amendment review if enacted by governments. Indeed, courts have struck down laws giving legal effect to MPAA ratings, much as the *Blagojevich* court did with the ESRB's.[117]

---

[110] 521 U.S. 844.

[111] Jack Balkin, *Media Filters and the V-Chip — Part I*, 45 Duke L.J. 1133 (1996), https://jackbalkin.yale.edu/media-filters-and-v-chip-part-i.

[112] *Supra* note 3.

[113] 466 F.3d 641, 643 (7th Cir. 2006).

[114] *Id*. at 652.

[115] *Id*.

[116] *Id*. at 653.

[117] Jane Friedman's excellent *The Motion Picture Rating System of 1968: A Constitutional Analysis of Self-Regulation by the Film Industry*, 73 COLUM. L. REV. 185 (1973), describes several cases, including failed lawmaker attempts to criminalize the screening of X rated films.

28

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

MPAA ratings, like platform decisions to remove, demote, "shadowban," or demonetize content, can have very real consequences for the distribution and commercial viability of third party speech. Movie makers who received an unwanted X rating, in the days before cable television and video cassette recorders, faced serious problems. They had far less chance of reaching an intended audience – or recouping the movie's costs – than creators of videos removed from YouTube today. This situation led to must-carry-like litigation about MPAA ratings. At least two courts in the 1990s said that filmmakers harmed by inaccurate or unfair ratings could sue the ratings board.[118] Under the MPAA system, no single company served as a gatekeeper on speech, the way that Texas and Florida say today's biggest platforms do. Instead, MPAA ratings determined the willingness of theater owners, television station operators, and other intermediaries to distribute or exhibit films. That made the ratings highly effective private rules for cineplex monoculture -- and in some critics' eyes, an antitrust violation.[119]

MPAA ratings, like platforms' content moderation choices, are speech about speech. The mechanics by which ratings are conveyed may be different – MPAA raters issue a letter rating, while platform raters may simply take content down. But in both cases, raters or moderators are expressing editorial judgments about third party speech. Like platforms, the MPAA uses pre-defined, value-laden editorial rules and standards. Like them, it often reaches debatable conclusions. And like them, its conclusions – its speech about third party speech – often make people mad.

A rare ruling assessing the "speechiness" of the editorial judgment underlying ratings can be found in the 2016 Forsyth case.[120] Plaintiff there sued the MPAA for rating a film G, saying the film was in fact unsuitable for children. The MPAA responded with an anti-SLAPP motion, which the district court granted.[121] Its ruling emphasized that the rating itself was an expression of opinion, and that "the underlying 'product'—films—are not mere commercial products, but are expressive works."[122] Even if the ratings themselves "could somehow be deemed not to constitute speech[,]" the court said, the raters' "acts in applying the ratings to movies would constitute 'conduct in furtherance of the exercise of the  . . . . constitutional right of free speech.'"[123]

---

[118] In a ruling reminiscent of the 9th Circuit's 2020 *Malwarebytes* case, the D.C. Circuit in 1995 said that if a plaintiff could prove that his X rating resulted from the MPAA's bias against independent filmmakers, he could proceed with a claim for violation of an implied covenant of good faith and fair dealing. *Maljack Prods. v. Motion Picture Ass'n of Am.*, 52 F.3d 373 (D.C. Cir. 1995); see also *Miramax Films Corp. v. Motion Picture Ass'n of Am.*, 560 N.Y.S.2d 730 (N.Y. Sup. Ct. 1990) ("the MPAA's ability to affect a film's profitability as a result of its evaluation based on [subjective] standards… makes it little more than a marketing tool to promote a given film to a target audience.").

[119] See, e.g., Ian G. Henry, *The MPAA: A Script for an Antitrust Production*, West Virginia Research Repository 385, vol. 116 (2013) https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1154&context=wvlr.

[120] *Forsyth v. Motion Picture Ass'n of America*, No. 16-cv-00935-RS, 2016 WL 6650059 (N.D. Cal. 2016).

[121] *Id*. at *1.

[122] *Id*. at *3.

[123] *Id*. at *4. Some other possible "speech about speech" examples include legally mandated accessibility mechanisms, like closed captioning. Courts have rejected claims that simple transcription-based caption mandates unconstitutionally compel speech, since they just replicate audio content. *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 430 (9th Cir. 2014); Blake Reid *Copyright and Disability*. But the D.C. Circuit rejected, in part on constitutional avoidance grounds, an FCC regulation that would have required

29

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

These cases do not add up to a single clear First Amendment rule for speech about speech. I would hazard, however, that some recurring lessons from other areas of platform regulation are also relevant here.

- Laws that regulate intermediaries may indirectly harm the First Amendment rights of speakers and readers who depend on them for distribution of speech. Excessive harm to those speakers' and readers' rights can render a law unconstitutional. (*Smith*)
- Analogies between laws governing distributors of speech and laws governing distributors of ordinary goods often fall short, given the unique constitutional dimension of speech distribution. (*Smith*)
- Intermediaries' judgments about third party speech, and editorial decisions about whether and how to convey that speech, are themselves speech. (*Forsyth*, as well as the cases platforms cite in the must-carry component of *NetChoice – Tornillo*, *Hurley*, *Halleck*, etc.) This can put intermediaries' First Amendment interests into conflict with the speech and information interests of some users (the ones who want to speak).[124] It can also put platforms' interests into alignment with the speech and information interests of other users (the ones who want a curated newsfeed or a space for civil discourse).
- Solutions that increase competition among platforms, support alternate channels of communication, or devolve control over speech to individual users may be less constitutionally suspect than solutions that centralize control in the hands of state actors. (1990s scholarship on V-Chip, end-to-end design principles, etc.)

None of this is new. All of these points have been discussed since at least the 1990s. But because the details of transparency mandates have been so little explored, scholars have not had the time to examine whether and how these points may apply to transparency, too.

## IV.   The Goals: What Are Transparency Laws Trying to Achieve?

The goals of transparency laws matter. Lawmakers are unlikely to design good laws if they don't know what they are trying to accomplish. And courts in First Amendment cases should, in principle, care what interest a state asserts -- and look closely at whether the law actually advances it.

For many advocates of platform transparency, a major goal is to preserve and advance users' real abilities to exercise First Amendment rights online, and to engage in democratic self-governance. Many lawmakers, including in Texas and Florida, presumably share this goal. The Court's earliest foundations for protecting commercial speech indicate that the two areas are connected:

---

newly crafted descriptions of video content. *Motion Picture Ass'n of America, Inc. v. F.C.C.*, 309 F.3d 796 (D.C. Cir. 2002). Another broad analog is 18 U.S.C § 2257, which requires pornography producers to maintain records of performers' names and ages. The most recent of many constitutional rulings regarding 2257 record-keeping requirements applied strict scrutiny, and upheld some as-applied claims while rejecting a facial challenge. *Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 419 (3d Cir. 2020).
[124] *Supra* note 120.

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

in *Virginia Board*, it expressly invoked the need for a "free flow of information" in order to protect "public decision making in a democracy."[125]

More recent First Amendment case law about compelled commercial speech, though, effectively discourages the States' lawyers from being honest about any democracy-related goals. *Zauderer*, which acts as a get-out-of-jail-free card to avoid strict First Amendment scrutiny, is most obviously relevant in the consumer protection context. (*Zauderer* itself upheld a commercial price disclosure requirement.) In *NetChoice*, Texas and Florida maintain that platform transparency laws are ordinary consumer protection mandates – which is, indeed, one legitimate framing for transparency rules. It is perhaps most compelling for laws like the ones in Texas and Florida, which seem particularly designed to protect the interests of those high-profile platform users who build an audience on social media and fear losing it. But even for those laws, the consumer protection framing is reductive. And for other compelling transparency models, pro-transparency First Amendment arguments grounded in *Zauderer* and consumer protection might simply fail. Research-oriented laws, like the draft federal Platform Accountability and Transparency Act (PATA), may be particularly difficult to sell to courts as consumer protection measures, or as otherwise permitted under *Zauderer*.

As I see it, the debates and case law around platform transparency include at least three major state interests. Each could matter in *NetChoice*, and each raises significant implications for other issues well beyond the questions raised in this case. I will discuss each, and relevant case law, in this Part.

- The first is the *consumer protection goal* of providing individual consumers with the information they need in order to make informed decisions in selecting goods or services. *Zauderer* and many cases applying involving point-of-sale warnings or labels fall in this category.
- The second is what I will call the *regulatory goal* of requiring companies to disclose information that is needed in order to enforce other laws. Disclosures made by companies that are not in the speech business (like pharmaceutical companies' filings with the FDA), or disclosures that serve non-speech regulatory purposes (like a newspaper's IRS filings) fall in this category.
- The third is what I'll call the *democratic goal* of providing information that lawmakers and individuals can use to shape their understanding and participation in public discourse, elections, and other building blocks of democracy.

These categories can overlap in practice. For example, Internet users get the same benefit from learning about disinformation campaigns on major platforms, regardless of whether lawmakers view those users as consumers in need of state protection, or as sovereign citizens engaged in self-governance. Regulatory goals and consumer protection goals, too, often overlap. The SEC, for example, collects some information for its own regulatory purposes, but also requires public disclosures to investors as the "consumers" of stocks.

---

[125] *Virginia State Pharmacy Bd. v. Virginia Citizens Consumer Council*, 425 U.S. 748, 766 (1976).

31

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

Case law does not always split neatly into these three categories, either. In particular, state actors in increasingly point to *Zauderer* as the justification for disclosure mandates that I would call "regulatory."[126] Occasionally, lower courts have also adopted this analysis. But the Supreme Court has not adopted such a broad reading of that case. And it *has* upheld regulatory compelled speech mandates on other grounds, with no mention of *Zauderer*.[127]

As I will discuss in this Part, I think there are numerous reasons, ranging from the theoretical to the tactical, for transparency advocates to consider arguments beyond *Zauderer*. Some of these concerns are extremely important in themselves, and deserve much closer examination than this article can provide. Perhaps most pressingly, a *NetChoice* resolution that turned on either consumer protection or regulatory goals might have serious implications for cases in which non-speech businesses raise First Amendment claims to challenge a broad array of longstanding, non-speech-related laws.[128]

Subpart (A) will assess consumer protection precedent, and argue that *Zauderer* is a poor fit for the *NetChoice* transparency mandates as a doctrinal matter. It will also briefly explore the constitutional differences between the *NetChoice* transparency rules and rules currently being litigated in more politically liberal States, New York and California.  Subpart (B) will examine the distinct, non-*Zauderer* line of Supreme Court cases supporting disclosure mandates in non-speech industries, and argue that those cases do not support Texas and Florida in *NetChoice*, either. It will then discuss administrative law and the "Lochnerization" of the First Amendment as a weapon against ordinary, non-speech regulation as a highly important third-rail issue that may nevertheless shape the outcome in *NetChoice*. It will also briefly explore regulatory models as a better source for well-tailored transparency rules. Finally, Subpart (C) will examine what I think is actually the most relevant state goal advanced by platform transparency mandates: democratic self-governance. The *NetChoice* outcome could look very different – in good ways and bad – if advocates and courts rooted their analysis in this alternate foundation.

## A.  Consumer Protection Goals and *Zauderer*

Florida and Texas have told courts that their transparency mandates are intended to advance consumer protection interests. Parts of the Texas law reflect this, requiring disclosures to be "sufficient to enable users to make an informed choice" about platform usage.[129] 120.051(b). Both the 5th and 11th Circuits adopted this framing, with the latter calling Florida's transparency rules a means for "preventing deception" of "consumers who engage in commercial transactions with platforms[.]" This all makes sense as a general matter. Consumers should know what they are going to get when they put their time, money, family photos, reputations, or safety in a company's hands. The disclosures required by Texas and Florida make that more feasible.

---

[126] Food and Drug Administration, *Food Labeling: Revision of the Nutrition and Supplement Facts Labels*, https://*www.regulations.gov/document/FDA-2012-N-1210-0875* (citing *Zauderer* as basis for resolving First Amendment concerns in FDA rulemaking.)

[127] *See, e.g.*, *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 471, 472 (1997) (upholding Secretary of Agriculture's marketing orders that assessed fruit producers to cover the expenses of generic advertising of California fruit).

[128] See Amanda Shanor, *First Amendment Coverage*, 93 N.Y.U. L. Rev. 318 (2018).

[129] The platforms' cert petition says the Texas government and legislature did not assert a consumer protection interest during the legislative process, however.

32

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

The consumer protection framing is also a matter of litigation convenience. Calling transparency laws "consumer protection" measures makes it easier to rely on *Zauderer*. The Supreme Court (unlike some lower courts) has only ever held that case applicable to consumer-facing disclosure mandates.  Falling under *Zauderer* means lawmakers can avoid the strict scrutiny that courts might otherwise apply. As I will discuss in this Part, I think *Zauderer* has only limited relevance, in part because it does not address the specific "speech about speech" issues raised in *NetChoice*. But it may prove problematic for transparency advocates on another basis, too. As I'll discuss in Subpart 1, the Supreme Court has never approved use of *Zauderer* for disclosures anywhere near as sweeping, pervasive, or untethered to immediate consumer need as the ones in *NetChoice*. Business-friendly justices may be reluctant to do so, or to embrace the idea that such expansive mandates can be justified in the name of consumer protection. At the same time, as I'll discuss in 2, states that adopt narrower disclosure rules, targeted to specific harms, may run into their own sets of constitutional problems.

1.  Stretching *Zauderer* to Cover Systemic Platform Disclosures

In *Zauderer*, the Supreme Court upheld a rule requiring that an attorney advertising services with "no legal fees" disclose that clients might still owe litigation costs.[130] States may mandate such disclosures of "purely factual and uncontroversial information" about the terms of a commercial offer, the Court said, if lawmakers have sufficient justification and the disclosure does not unduly burden speech.[131] To date, the Supreme Court has only said that *Zauderer* is the correct test in cases involving advertising and the risk of consumer deception.[132]

Lower courts have used the test more expansively, including in situations that do not involve advertising or deception, and that fall outside traditional consumer protection contexts.[133] But *Zauderer* and cases applying it are largely focused on speech harms caused by disclosures themselves. In assessing a law's "speech burden," courts typically consider questions like whether the company agrees with the message it must speak, or whether mandatory labels crowd out the company's own speech in places like billboards or packaging. Courts have rightly rejected arguments that the operational burden created by disclosure laws are relevant for First Amendment purposes, in cases where the regulated companies' underlying business did not involve speech. The D.C. Circuit held, for example, that meat-packing companies' First Amendment rights were not harmed by the costly operational changes they had to make in order to keep track of meat's country of origin for labeling purposes.[134] I am aware of no cases that apply *Zauderer* to resolve the problem identified in Part III: that compelled speech or disclosure mandates may cause the regulated company to change its underlying editorial activity and speech

---

[130] *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 652 (1985).

[131] *Id*. at 651.

[132] Eric Goldman, *Zauderer and Compelled Editorial Transparency* (2022).

[133] *See, e.g.*, *CTIA–The Wireless Ass'n v. City of Berkeley*, 158 F. Supp. 3d 897 (2016), *cert. denied* by 928 F.3d 832 (2016) (holding that an ordinance requiring retailers to provide safety notice regarding radio frequency energy emissions from cell phones did not violate First Amendment, and citing other cases applying *Zauderer* outside the advertising and consumer deception context).

[134] *American Meat Inst. v. U.S. Dept. of Agric.*, 760 F.3d 18, 23 (D.C. Cir 2014). For example, "[i]n a matter of great concern to plaintiffs because of its cost implications," the rule "eliminated the flexibility allowed in labeling commingled animals" in meat products. *Id.* at 21.

Electronic copy available at: https://ssrn.com/abstract=4377578

practices. Nothing in *Zauderer* precludes that, of course. The Court could, in principle, use that case's burden-on-speech prong to broadly consider the rights of platforms and the public, and balance competing First Amendment interests.[135]

*Zauderer* and lower cases applying it also very rarely involve sweeping, systemic, and ongoing disclosures of the sort involved in *NetChoice*. (Systemic disclosure regimes are more common in agency-administered regulatory regimes and are, I will argue in Part IV.B, justifiable based on precedent other than *Zauderer*.) *Zauderer* itself required only a general disclosure about attorneys' costs, not specifics about billing practices. And many lower courts' *Zauderer* applications involve short, consumer-facing labels and warnings, sometimes using generic language set forth by statute.[136] Courts have upheld requirements for health warnings on cigarettes, for example, and country-of-origin labels on meat. They have struck down requirements to label sugary beverages and milk from cows treated with rBST. As a practical matter, many of the mandates upheld only required companies to track down enough data to answer a yes/no question that legislators deemed uniquely important to consumers (like whether lightbulbs contain mercury), or a single quantitative measurement (like the calories in a menu item). Even the most expansive recent applications of *Zauderer* by lower courts involve disclosures that are modest compared to the ones in *NetChoice*. The D.C. Circuit's 2020 ruling in *American Hospital Association v. Azar*, for example, upheld rules requiring hospitals to disclose prices for medical procedures – an effort that was estimated to require a comparatively trivial 150 employee work-hours in the first year, and 42 thereafter.[137]

---

[135] *See* Ramya Krishnan, *How the Supreme Court Could Encourage Platform Transparency*, SLATE (Jan. 9, 2023), https://slate.com/technology/2023/01/supreme-court-florida-texas-social-media-laws.html, for an argument that the Court could draw on other precedent in adopting a sliding scale to analyze speech burdens under *Zauderer*,
    with an eye toward protecting both the public interest and the platform's core First Amendment right to
    make editorial decisions. Some disclosures will be seen to further public understanding of the
    platforms' services while implicating editorial decisions only at the margins, if at all. But the more that
    a disclosure could chill platforms' editorial decision making, the more clearly the government would
    need to show that it furthered an important interest.

[136] California generates a lot of these, like the 29-word disclosure struck down in *NIFLA* or the radiation and sugar-content disclosures in two 9th Circuit cases. *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361 (2018); *CTIA–The Wireless Ass'n v. City of Berkeley*, 158 F. Supp. 3d 897 (2016); *American Beverage Ass'n v. City and Cty. Of San Francisco*, 916 F.3d 749 (2019). A federal regulation requiring disclosure of GMOs in food products that came into effect in 2022 currently faces a similar First Amendment challenge. *Natural Grocers v. Vilsack*, --- F.Supp.3d ----, No. 20-cv-05151-JD, 2022 WL 4227248 (N.D. Cal. 2022).

[137] One other federal case relied on *Zauderer* in upholding what I would call purely "regulatory" requirements, to confidentially disclose pharmaceutical pricing information to a regulator. *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir. 2005). The California Supreme Court reached a similar conclusion about more consumer-facing, *public* pricing disclosures, applying *Zauderer* under the state constitution. *Beeman v. Anthem*, 58 Cal. 4th 329 (2013) (noting that the lack of precedent "simply reflects the absence, over many years, of free speech challenges to the hundreds of California statutory provisions and regulations ... that require individuals or entities to ascertain and disclose factual information[.]" (cleaned up)). The Ninth Circuit had, in the same case, upheld the disclosures but rejected *Zauderer* as the basis, in a decision later vacated to certify the state law question to California courts. *Beeman v. Anthem*, 652 F.3d 1085 (9th Cir. 2011). *See also Env't Def. Ctr., Inc. v. E.P.A.*, 344 F.3d 832 (9th Cir. 2003) (upholding EPA requirement for municipalities to distribute materials explaining the dangers of pollution in stormwater drainage systems, under unclear test, citing *Zauderer*); *Full Value Advisors v. SEC*, 633 F. 3d 1101 (D.C. Cir. 2011) (upholding confidential disclosures to SEC, largely relying on tradition and describing standard as "rational basis," but noting that the securities context leads to "different applications of First Amendment principles[,]" citing but not relying entirely on *Zauderer*, and declining to reach the unripe constitutional questions about disclosing the data to the public).

34

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

The mandates in *NetChoice* are also very different from *Zauderer* in the consumer risks that disclosures are intended to offset. *Azar*, like *Zauderer* itself, was about a classic consumer protection concern: making sure buyers understood the cost of services. Many other cases involve specific, legislatively-identified health risks. The Second Circuit, in striking down rBST labeling requirement for milk, ruled in part because lawmakers had offered no evidence that the health risk existed – only that some consumers thought it might, and thus wanted the information. The *NetChoice* laws lack even that kind of nexus with a specific perceived risk, other than the "risk" that users might have unanswered questions about platform content moderation.

Consumers may, of course, be quite *interested* in knowing all the information that Texas and Florida require about platforms' enforcement of speech rules. But nothing in *Zauderer* suggests that such generalized interest, untethered to any specific risk of harm, is enough to overcome businesses' First Amendment objections. Supreme Court Justices who are generally concerned about regulatory burdens on businesses seem likely to have concerns about expansive application of *Zauderer* proposed in *NetChoice*. Justice Kavanaugh, for example, wrote in a D.C. Circuit opinion that it was "plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information," since "that would be true of any and all disclosure requirements."[138] He expressed concern about constitutional theories that would support "free-wheeling government power to mandate compelled commercial disclosures." Justice Thomas, too, has historically been hostile to expansive uses of *Zauderer*. His partial concurrence in the 2010 *Milavetz* ruling, for example, questioned the adequacy of *Zauderer*'s "protection against government-mandated disclosures[,]" and his 2018 opinion for the majority in *NIFLA* described *Zauderer* as "rejecting "broad prophylactic rules[.]"[139]  Writing for the Court in that ruling, he also strongly indicated that the *Zauderer* standard is available only for disclosures in advertising. The statements made by the attorney in *Zauderer*, he wrote, "would have been fully protected if they were made in a context other than advertising."[140]

---

[138] *American Meat Inst. v. U.S. Dept. of Agric.*, 760 F.3d 18, 30-32 (applying *Central Hudson* but saying *Zauderer* is a version of *Central Hudson*.) (Kavanaugh, J., concurring).The Second Circuit stated similar concerns in rejecting the rBST disclosure rule under *Central Hudson*. *Int'l Dairy Foods Ass'n v. Amestoy* 92 F.3d 67, 74 (1996) ("Were consumer interest alone sufficient, there is no end to the information that states could require manufacturers to disclose about their production methods.") compare *Herbert v. Lando*, 441 U.S. 153, 174 (1979) ("There is no law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest; and if there were, it would not survive constitutional scrutiny as the First Amendment is presently construed.")

[139] *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2377 (2018) (internal quotations omitted).

[140] *Id.* at 2374 (internal quotations omitted). Respected colleagues have told me they read *NIFLA* as holding or signaling that *Zauderer* does apply outside the advertising context. I do not see that in the case, and the *NIFLA* language quoted above appears to refute it. *NIFLA* did hold that one mandate at issue in the case could not survive *Zauderer* review, but it did so without deciding what standard actually applied. *NIFLA* at 2376-78. *See also Milvaetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 255 (2010) (*Zauderer* applies only to "advertisements that, by their nature," create a risk of consumer deception) (Thomas, J., concurring).

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

In short, it is far from clear that *Zauderer* can, as a doctrinal matter, be stretched to encompass the platform transparency mandates in *NetChoice*.[141]

### 2. Narrowing Platform Disclosures to Fit Within *Zauderer*

In principle, platform transparency laws would look more like *Zauderer* and conventional consumer protection measures if they were narrowly drafted to address more specific risks of harm. This might have the added benefit of reducing burden on platforms, and showing more legislative effort to tailor the laws' impact. Requiring transparency only for specific content-moderation-related risks, however, more starkly highlights the problems with requiring transparency about editorial policies in the first place. And the legislative precision that makes ordinary consumer protection laws *less* problematic under the First Amendment may, in the platform context, make laws *more* problematic.

The platform transparency law recently struck down in New York illustrates the issue. It required platforms to post their policies about "hateful conduct," as defined in the statute. The state asserted that this policy advanced an interest in reducing racially motivated violence. The district court reasoned that this compelled platforms to "weigh in on the debate about the contours of hate speech when they may otherwise choose not to speak[,]" effectively leading them to convey a message dictated by the state.[142] It rejected the State's comparison to laws requiring restaurants to disclose the calorie count in food, and concluded that the speech at issue was not commercial or eligible for constitutional review short of strict scrutiny. Litigation is pending about a platform transparency law in California, which similarly requires transparency about platforms' rules and enforcement practices for statutorily-specified kinds of content.[143]

Platform transparency mandates like the ones in New York and California create burdens and enforcement risks that, like those in *NetChoice*, may affect the platforms' actual editorial functions. But they do so only for particular kinds of editorial policies. The result, recognized in the New York case and in the 4th Circuit's *Washington Post v. McManus* ruling, is a content-based burden on editorial processes. As the *McManus* court explained, by requiring disclosures only for political ads, the campaign advertising transparency law under review "single[d] out one particular topic of speech—campaign-related speech—for regulatory attention."[144] As a result, it

---

[141] *See* Ramya Krishnan, *How the Supreme Court Could Encourage Platform Transparency*, SLATE (Jan. 9, 2023), https://slate.com/technology/2023/01/supreme-court-florida-texas-social-media-laws.html, for an argument in favor of using *Zauderer* for platform transparency.

[142] *Volokh* supra note 52 at ll.

[143] California's listed categories are hate speech or racism, extremism or radicalization, disinformation or misinformation, harassment, and foreign political interference. New York defines "hateful conduct" to mean "the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression." This would appear to encompass some First Amendment protected speech. Compare *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) ("Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'")

[144] *McManus* contained considerable additional analysis beyond that discussed here. In considering the relevant scrutiny, it reasoned that while exacting scrutiny applies to campaign-related disclosure requirements for *speakers*, who are motivated to speak, that reasoning did not extend to the platforms carrying their speech. *Washington Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019). It further distinguished platform disclosure laws from laws for

36

Electronic copy available at: https://ssrn.com/abstract=4377578

made "certain political speech more expensive to host than other speech because compliance costs attach[,]" and imposed a content-based restriction on online speech.[145]

Texas and Florida arguably evade this problem. Their "disclose it all, let consumers sort it out" approach allows those States to avoid overtly referencing particular kinds of speech or editorial rules, the way the New York and California laws do. They still incentivize platforms to change their speech policies, though, as discussed in Part III. State influence is arguably more pernicious under the Texas and Florida laws, both because it is hidden and because those States' AGs can become arbiters of the truth of *every* disclosed content policy. New York and California AGs can assert that power only for speech in statutorily defined categories.  In what is perhaps a perverse outcome, a speech mandate saying "tell us everything" may face fewer First Amendment barriers than a speech mandate saying "tell us some things."

The Texas and Florida laws do also make some interesting distinctions between First Amendment interests – not based on the content of moderated speech, but on the preferences of the affected user. Some aspects of the laws seem designed to protect the interests of *speakers*, rather than the interests of other *readers* who may prefer to see a curated newsfeed, interact with friends and family without encountering unwanted pornography or racial epithets, or generally participate in more civil, rule-bound discourse online.[146] This prioritization of speakers' preferences is most evident in the laws' primary must-carry provisions, of course. But it also carries over, subtly, in the transparency rules. Florida's unusual View Count transparency rule, for example, is entirely about speakers' interest in knowing how large an audience they reached. And Texas's Individual Notice and Appeal rules let affected *speakers* challenge takedown decisions, but offer no similar second bite at the apple to users who ask platforms to remove posts that violate the platform's rules. This is consumer protection for people who value platforms as megaphones.

Prioritizing speakers over listeners may arguably be justified, as a pure consumer protection measure. Users like politicians, influencers, or musicians who use a platform to build a following and reach an audience have a particular interest in knowing about speech rules that might cause them to lose access to those hard-won audiences. As a hierarchy of First Amendment interests, however, preferencing speakers' interests over those of listeners is not clearly justified.

---

broadcast and other older media, citing *Reno* for the proposition that "what goes for broadcasters is too much a product of their technical circumstances to serve as a template for state regulation writ large." *Id.* at 519. The Washington Post served as the named plaintiff objecting to transparency measures in *McManus*. Its editorial board later endorsed transparency legislation directed solely at platforms.

[145] As discussed above, a more recent case in Washington State – reported in the press but not in any published court rulings to date – reached a different conclusion, upholding that state's political ad transparency requirements against a First Amendment challenge by Facebook. *Supra* note 51.

[146] For discussions of First Amendment rights to read and access information, see *Lamont v. Postmaster General*, 381 U.S. 301 (1965) (upholding right to receive foreign communist literature by mail); *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) (it is the "right of the viewers and listeners, not the right of the broadcasters, which is paramount" in broadcast compelled carriage); *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) ("fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more").

37

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

## B. Regulatory System Goals and non-*Zauderer* Case Law

The disclosures at issue in *NetChoice* are, in scale and complexity, less like consumer-facing labels and more like the disclosures historically required from companies in regulated industries. Drug manufacturers must report in detail on their operations, for example. So must companies that manufacture or import dangerous chemicals, or are responsible for greenhouse gas emissions. Compliance with regulatory requirements can be quite expensive. Financial transparency mandates under laws like Sarbanes Oxley, for example, may be intertwined with auditing systems costing regulated companies millions of dollars per year.[147] Like the laws in *NetChoice*, these can require ongoing, systemic, and detailed tracking and reporting about companies' core operations. Unlike the laws in *NetChoice*, the regulated businesses are not generally in the business of editing speech. And the primary audience for such disclosures is often the government – not individual consumers.

In a sense, regulatory disclosure requirements promote consumer protection. But they do not primarily do so by helping consumers understand the terms of a proposed transaction. Regulatory protections for public health or the environment turn on a richer idea of the public good, and the role of the state in setting substantive legal requirements. Enforcing agencies are not there just to ensure that companies *disclose* their practices, at which point consumers are free to accept or reject the proffered bargain. Rather, they are there to ensure that companies follow substantive, state-established rules. Disclosures allow regulators to enforce the rules, and also encourage companies to follow them in the first place. If companies could too easily invoke the First Amendment to avoid these disclosures, the purposes of the regulations themselves would be thwarted. The constitutional justifications for regulatory transparency mandates are critical for the administrative state generally, in ways that go far beyond the narrower tech policy questions at issue in *NetChoice*.

Some experts, including agency lawyers, have asserted that disclosure mandates of this sort are justified by *Zauderer*. The Supreme Court has never rejected that theory, but I am skeptical about the current Court's sympathies for it. In any case, *Zauderer* is clearly not the only possible basis for reconciling ordinary regulatory disclosures with the First Amendment. The Court has also repeatedly stated that compelled speech may be justified as "part of a far broader regulatory system that does not principally concern speech, " and identified this reasoning as an alternative to *Zauderer* in avoiding strict scrutiny.[148] This constitutional reasoning has in recent years appeared more often in dicta than in holdings, leaving its precise parameters far from clear.[149]

---

[147] Jagan Krishnan, Dasaratha Rama, and Yinghong Zhang. 2008. Costs to comply with SOX Section 404. Auditing: A Journal of Practice & Theory 27, 1 (2008), 169–186.

[148] *United Fruit* at ___; *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2373 (2018) ("In addition to disclosure requirements under *Zauderer,* this Court has upheld regulations of professional conduct that incidentally burden speech").

[149] *See, e.g. v. American Ass'b of Political Consultants*, 983 F.3d 528, 542 (distinguishing "impermissible speech restrictions" from "traditional or ordinary economic regulation of commercial activity that imposes incidental burdens on speech"); *NIFLA* at 2376 ("we do not question the legality of health and safety warnings long considered permissible"); *Sorrell* at 567 (the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech… courts have generally been able to distinguish impermissible content-based speech restrictions from traditional or ordinary economic regulation of commercial activity that imposes incidental burdens on speech").

38

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

But whatever the standard is, it provides an independent, non-*Zauderer* foundation for the ordinary disclosures required by agencies enforcing non-speech-related laws.

This body of law does not support Texas and Florida in *NetChoice*, because their disclosure mandates lack any nexus to legitimate non-speech regulation. It matters for the case, though, in much the way that an iceberg matters for a ship. Depending how advocates and justices frame these arguments in *NetChoice*, their case may be on a collision course with this broader body of law, and with highly fraught questions about the First Amendment and the regulatory state.

Below, I will discuss (1) why the non-*Zauderer* cases about ordinary regulatory disclosures do not support the transparency mandates in *NetChoice*, (2) how that body of law, and closely adjacent questions about First Amendment challenges to the regulatory state, may nonetheless affect outcomes in *NetChoice*, and (3) how regulatory models might help in designing and tailoring better transparency legislation for platforms.


## 1. The State Interest in Regulatory Systems

The state interest in regulatory disclosures is not, or not primarily, about informing consumers about the terms of a transaction. Instead, it is about enforcing legitimate underlying regulation. U.S. law often requires companies to make broad and detailed disclosures in areas such as food safety, environmental protection, or securities regulation. The First Amendment basis for such "underlying and oft unnoticed forms of disclosure the Government requires for its essential operations" is unclear and contested.[150]  It is clear, however, that lawmakers' authority to compel disclosures in this context does not rest solely on *Zauderer*. In its 2018 *NIFLA* ruling, the Supreme Court described *Zauderer* as one of two avenues for lawmakers to compel speech from commercial actors without triggering strict scrutiny.[151] The other basis comes from Supreme Court cases holding that "States may regulate professional conduct, even though that conduct incidentally involves speech." [152] The Court cited *Casey*, which upheld a law requiring doctors to convey state-mandated messages to patients seeking abortions, as an example.[153] That law, the *NIFLA* Court said, "regulated speech only as part of the practice of medicine, subject to reasonable licensing and regulation by the State."[154]

Other Supreme Court cases have applied similar logic in upholding other forms of compelled commercial speech. *Glickman v. Wileman Brothers*, for example, upheld a law requiring regulated agricultural producers to contribute funding for commercials, over the producers' First

---

[150] *Full Value Advisors v. SEC*, 633 F. 3d 1101 (D.C. Cir. 2011).

[151] *NIFLA* at 2373.

[152] *It at* 2372. (The Court in this passage refers to "professional" speech rather than "commercial" speech, in order to address the reasoning of the decision under review. But elsewhere in the case, it rejects the idea that "professional" speech is constitutionally distinguishable from other commercial speech. *Id.*

[153] *Id*. at 2373, citing *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992).

[154] *Id*. at 2373 (internal quotations omitted).

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

Amendment objections.[155] The Court has described these laws as "traditional or ordinary economic regulation of commercial activity that imposes incidental burdens on speech[.]"[156]

The underlying state interest in these cases is whatever led the state to adopt the "regulatory system" in the first place. In *Casey* it was, per the Court, the state's interest in regulating the practice of medicine. The IRS might similarly justify tax filing requirements based on a state interest in taxation; or the Department of Labor might justify requiring employers to display workplace posters based on a state interest in protecting workers.[157] Not all such laws will survive First Amendment review, of course. The D.C. Circuit struck down a workplace poster law requirement, for example.[158]

The standard of review in Supreme Court cases about compelled speech in regulatory contexts is, to put it mildly, unclear. The disclosures may simply not be protected speech, and thus receive no First Amendment review all.[159] Or courts might apply rational basis review,[160] intermediate scrutiny,[161] exacting scrutiny,[162] or even strict scrutiny.[163] It is unsurprising, given this precedential mess, that litigants and courts themselves may look to *Zauderer* as an alternate or primary justification. In *Azar*, for example, the D.C. Circuit relied on *Zauderer*, but also invoked the non-*Zauderer* regulatory case law, saying that "[r]equiring hospitals to disclose prices before

---

[155] *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 472 (1997) (rejecting First Amendment challenge to law requiring citrus farmers to support joint ad campaign). *Glickman*, like many cases in this area, involve compelled financial support for third party speech rather than disclosures of information specific to a particular business. See, e.g., *United States v. United Foods*, 533 U.S. 405, 415-16 (2011) (upholding First Amendment challenge to law requiring mushroom farmers to support joint ad campaign), *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018) (upholding First Amendment challenge to law requiring union contributions). *NIFLA* and *Casey* are closer to the labeling context: both involve posted or verbal disclosures to patients about abortion-related medical services.

[156] *Barr*, 140 S.Ct. 2335, 2359 (2020) (striking down law exempting certain government debt-related calls from general restriction on robocalls).

[157] U.S. Dep't of Labor, *Workplace Posters*, https://www.dol.gov/general/topics/posters.

[158] *Nat'l Ass'n of Mfrs. V. N.L.R.D.*, 717 F.3d 947, 964 (D.C. Cir. 2013).

[159] In *First Amendment Coverage*, Amanda Shanor describes "large swaths of the administrative state, including antitrust, securities, and pharmaceutical regulation" as falling outside the scope of First Amendment protection, and argues that a single, stable legal standard defining "uncovered" speech may not be "feasible or normatively desirable."

[160] *Barr* at 2359 (characterizing *Glickman* as a "rational basis" standard) (Breyer, J., concurring).

[161] The cases supporting intermediate scrutiny generally involve speech *restriction* rather than *compulsion* in the context of regulatory systems. *Barr* at 2356 (reviewing under intermediate scrutiny and concluding that robocall law exemption failed because it was not "narrowly tailored to serve a significant governmental interest") (Sotomayor, J. concurring) (internal citations omitted); *Barr* at ___ (standard is intermediate scrutiny, law survives) (Gorsuch, J., dissenting in part); *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (law restricting disclosure of patient data for pharmaceutical marketing purposes fails both intermediate and strict scrutiny, does not resolve which applies); *City of Austin v. Reagan National Advertising*, 142 S. Ct. 1464, 1479-1481 (2022) (*Sorrell*'s standard would apply to sign ordinance in cases where signs were commercial speech) (Alito, J., concurring in part).

[162] *Janus v. American Fed'n of State, Cty., and Mun. Emp.*, 138 S. Ct. 2448, 2483 (2018) (characterizing *United Foods* as an exacting scrutiny standard and saying union contribution mandate at issue in *Janus* failed both that standard and strict scrutiny); *Riley v. Nat'l Fed'n of the Blind of North Carolina*, 487 U.S. 781 (1988) (upholding First Amendment challenge to compelled disclosures for charitable solicitors under standard that the majority calls "exacting" and the dissent calls "strict").

[163] *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361(2018) (as to first disclosure mandate, strict scrutiny applies but the mandate fails even intermediate scrutiny).

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

rendering services undoubtedly qualifies as 'traditional or ordinary economic regulation of commercial activity.'"[164]

Whatever the standard of review for regulatory disclosure requirements is, it should not affect the outcome of *NetChoice*. The regulatory systems cases permit speech compulsions when they are necessitated by some *other*, valid, non-speech-related law. The Texas and Florida transparency laws have no such foundation. They are the product of legal regimes concerned solely with speech: The carriage mandates enacted in Texas and Florida. Nothing in the regulatory systems cases indicates that States may simply bootstrap a speech compulsion onto another law that is *itself* a speech compulsion. If the States' must-carry rules were struck down, the transparency mandates would be left as free-standing obligations untethered to any regulation at all. In either scenario, the transparency rules would lack any nexus with "traditional or ordinary economic regulation of commercial activity" of the sort that might justify "incidental burdens on speech[.]"[165]

## 2. *NetChoice* and the Future of the Regulatory State

The Supreme Court does not have to address the relationship between the First Amendment and the administrative state in *NetChoice*. But it could. Its ruling could limit -- or, more likely, unleash -- more litigation seeking to "weaponize[e]" the First Amendment against "economic and social laws that legislatures long would have thought themselves free to enact[.]"[166] This context may drive unpredictable alignments on the Court, and equally unpredictable outcomes. Parties and amici in the case should be attentive to this dynamic in formulating their arguments.

If the Supreme Court agrees to review the *NetChoice* transparency provisions, as seems very likely, we should expect those provisions to receive far more attention from conventional business interests than they have so far. Companies like ExxonMobil in Texas or Royal Caribbean in Florida, for example, may not be happy to learn that their States' AGs are saying

---

[164] *American Hospital Ass'n v. Azar*, 983 F.3d 528, 542 (quoting *Barr v. American Ass'n of Political Consultants*, 983 F.3d 528). No opinion in *Barr* cites *Zauderer* – though this is perhaps unsurprising since *Barr* involves a speech restriction rather than a compulsion.

[165] *Barr* at 2359. Of course, the Court could change this. It could uphold the *NetChoice* must-carry mandates on reasoning similar to that applied for cable or broadcast, and repudiate this aspect of *Reno v. ACLU*. In that case, the Texas and Florida must-carry requirements might themselves be deemed adequate underlying regulation to require "incidental" disclosure requirements.

[166] *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2383 (2018) (Breyer, J., in dissent). The NIFLA majority responded that "we do not question the legality of health and safety warnings long considered permissible, or purely factual and uncontroversial disclosures about commercial products." *Id.* at 2380-81. Similarly in the 2020 *Barr* decision, the conservative plurality stated that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech," and that "courts have generally been able to distinguish impermissible content-based speech restrictions from traditional or ordinary economic regulation of commercial activity that imposes incidental burdens on speech." *Barr v. American Ass'n of Political Consultants, Inc.*, 140 S.Ct. 2335, 2341, 2347 (2020). Recent First Amendment Scholarship examining First Amendment challenges to traditional regulation includes views as divergent as Enrique Armijo, *The Content-Discrimination Two-Step Post-Reed and Austin*, Cato Sup. Ct. Rev., 2021-2022 and Shanor, Amanda and Light, Sarah E., *Greenwashing & the First Amendment* (July 25, 2022). Columbia Law Review, Forthcoming 2022, Available at SSRN: https://ssrn.com/abstract=4178318.

41

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

*Zauderer* provides, effectively, a blank check for expansive, state-mandated disclosures about operational details in the name of "consumer protection." They may rightly worry that if companies like Twitter or Reddit cannot object to such laws on First Amendment grounds, then brick and mortar businesses will have still less chance of doing so in future cases. One response for non-speech businesses would be to adopt the stance that West Virginia's AG recently did in an SEC matter: insisting, as the platforms do in *NetChoice*, that disclosure mandates should be subject to strict scrutiny. Another would be to find arguments that justify disclosure mandates for platforms, without justifying them for companies in industries like energy or hospitality. Justifying transparency mandates based on the democratic-self-governance interests unique to major speech platforms, rather than on consumer protection interests common to many companies, might be a first step in such arguments.

The intersections between *NetChoice* and First Amendment "Lochnerization" issues could play out in a number of ways. Perhaps most consequentially, the Court could expressly limit *Zauderer* to cases involving advertising and consumer protection. That would eliminate it as a basis for broader regulatory disclosure mandates, and shift vast edifices of regulatory law into relying solely on the non-*Zauderer* justifications discussed in IV.B.1 of this Paper. Given the ambiguity of the non-*Zauderer* case law, it is far from clear what a clarified standard under those cases would look like. But both Justice Kavanaugh and Justice Thomas have invoked history and tradition as what the former called "reliable guides" in discerning when lawmakers may "justify the infringement on the speaker's First Amendment autonomy that results from a compelled commercial disclosure[.]"[167] That focus could lead to rather restrictive interpretations of lawmakers' power to compel disclosures to regulators like the FDA, EPA, SEC, or EEOC.

A ruling that embraced the idea, implied by some arguments below, that *Zauderer* is in fact the sole, slim reed upholding all regulatory disclosure mandates would also erode pro-regulatory arguments. Such a decision might eliminate alternate "regulatory system" constitutional justifications for compelling disclosures incidental to the enforcement of other non-speech laws. The interpretation of *Zauderer* in *NetChoice* would then be critically important for larger issues of the administrative state. As discussed above, I do not think that conservative or business-friendly justices will read that case expansively – at least, not unless they can find a way to read it expansively for platforms, while simultaneously reading it restrictively for other companies.

*NetChoice* does not *have to* veer so close to the constitutional third rail of First Amendment "Lochnerization," though. The compelled speech issues it raises are distinct from those raised in other commercial contexts for at least three major reasons. First, *NetChoice* involves unique concerns about state influence on platforms' underlying editorial practices, as discussed in III.A and B. It could be resolved on those grounds, without addressing the more typical compelled speech issues that arise with disclosure laws for other industries. Second, *NetChoice* raises unique concerns about the speech rights of platform *users*. That First Amendment issue has no

---

[167] *American Meat Inst. v. U.S. Dept. of Agric.*, 760 F.3d 18, 31 (Kavanaugh, J., concurring) (D.C. Cir 2014). Justice Thomas, writing for the majority in *NIFLA*, said that the "Court's precedents do not permit governments to impose content-based restrictions on speech without "'persuasive evidence . . . of a long (if heretofore unrecognized) tradition'" to that effect." *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361 at 2372 (2018.

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

analog in cases about disclosure mandates in non-speech industries.[168] Third, as I will discuss in the next subpart, states' interest in platform transparency laws involve democratic-self-governance goals. That is quite different from the interests animating most consumer protection or regulatory disclosure laws, and could lead to different outcomes in First Amendment analysis.

In principle, these differences mean that the Court could rule on the transparency issues in *NetChoice* without saying a word about compelled speech in other industries. The Court could, for example, accept platforms' argument that *Lando* provides the best analogy, and apply strict scrutiny. Or it could treat the disclosure mandates as commercial speech, reviewed under intermediate scrutiny under *Central Hudson*. It could, perhaps, find its way to using the "exacting" scrutiny applicable in the electoral context. If the Court upheld Texas's and Florida's carriage mandates, it could even justify transparency measures as merely incidental to the must-carry regulation, and permissible under cases like *Casey*. In principle, the Court could even apply *Zauderer* while avoiding any swipes at the foundations of the regulatory state. Such an opinion could focus on *Zauderer*'s "burden on speech" prong, and reason that the impact on editorial practices in *NetChoice* is unique to platforms, and distinguishable from disclosures from non-speech industries.

There is no one right path to resolving the platforms' First Amendment challenges to transparency mandates in *NetChoice*. But whatever path the Court chooses will have consequences far beyond this case, and may well shape lawmakers' options for regulating companies far outside the Internet context.


## 3. Tailoring Disclosure Rules in Regulatory Systems

Existing regulatory disclosure regimes are relevant for one final reason. They are our primary – and perhaps our only – models for tracking and documenting the operation of systems that rival major platforms' content moderation in scale and technical complexity. If the Court in *NetChoice* did adopt a standard of review that required meaningful tailoring for platform transparency laws, then regulatory precedent might tell us something about how to do that tailoring. Specifically, agency rulemaking itself could provide better tailoring than static requirements set by legislators.

Relying on agencies as front-line protectors of First Amendment rights is hardly typical in U.S. law, of course. The point here is not that agencies should be tasked with decisions about what speech is permissible. Rather, it is that they might be uniquely capable of addressing questions about system design for transparency about content moderation. These systemic questions lie at the heart of platform transparency laws.

Rulemaking processes under laws like the federal Administrative Procedures Act (APA) enable agencies to gather information, hear from interested parties, fine-tune legal requirements, and update those requirements in light of new information or evolving technologies and business

---

[168] See generally Rozenshtein, Alan Z., *Silicon Valley's Speech: Technology Giants and the Deregulatory First Amendment* (August 25, 2021). 1 Journal of Free Speech Law 337 (2021), available at SSRN: https://ssrn.com/abstract=3911460 (arguing that platform speech claims aid Lochnerization, but user speech claims do not).

Electronic copy available at: https://ssrn.com/abstract=4377578

practices. Agencies already do this in setting disclosure rules about systems that rival platform content moderation in scale and complexity. An environmental agency might require municipal water suppliers to disclose contaminant parts per *million* in drinking water, for example, but not parts per *billion* or *trillion*. Comparable clarity is sorely lacking in the Texas and Florida disclosure requirements. Agencies can also revise disclosure rules to better align with substantive regulatory goals. For municipal water, that might mean requiring detailed disclosures about specific dangerous chemicals, but not about other substances that the agency knows to be benign. For platforms, that might look something more like the New York and California laws discussed in Part IV.A.2 than like the Texas and Florida laws.

Experience and precedent from regulatory systems also provide models for tailored rules governing purely consumer-facing disclosures. The familiar, FDA-mandated black and white panels listing ingredients and key nutrients in packaged food are an example. Requirements for these labels are periodically updated using APA rulemaking processes. For the 2016 update, the FDA received almost 300,000 comments and issued a 259 page report justifying its conclusions. The hospital pricing disclosures in *Azar*, which the DC Circuit upheld under *Zauderer*, fit this model, too. They were the product of an extensive fact-finding process in Congress and again at the Department of Health and Human Services, and a detailed, APA-compliant rulemaking process. Legislators in Texas and Florida undertook no such review before enacting disclosure rules far more sweeping, detailed, and technical than the ones in *Azar*. And, unlike the law at issue in Azar, the Texas and Florida mandates provide no realistic mechanism for fine-tuning.

For the laws at issue in *NetChoice*, the only source of clarification will come from case-by-case litigation. That would not be a good way to sort out highly technical reporting rules in the best of circumstances. It is particularly inappropriate when, as with the *NetChoice*, the rules affect people – platforms' users – who may have no opportunity to litigate at all. Texas's and Florida's unusual litigation rules and incentives make it even less likely that courts will clarify transparency rules in an efficient, fair, or reasonable way. In Texas, private claimants can continue to sue and seek new outcomes of previously resolved issues, "regardless of whether another court has enjoined" enforcement of the statutory provision at issue.[169] In Florida, plaintiffs are incentivized to sue early and often, because the statute offers up to $100,000 in statutory damages per claim.[170]

The point here is not that we should *want* an overall regulatory system for platform content moderation. The point is that, for complex technical systems like platforms' content moderation operations, disclosure rules refined through regulatory processes have a better chance of being carefully tailored, compared to rules thrown together hastily by legislators.

## C. Democratic Self-Governance Goals

---

[169] 143.007 provides in part (d) that a "user may bring an action under this section regardless of whether another court has enjoined the attorney general from enforcing this chapter or declared any provision of this chapter unconstitutional unless that court decision is binding on the court in which the action is brought"; and (e) says that Nonmutual issue preclusion and nonmutual claim preclusion are not defenses[.]"
[170] FLA. STAT. § 501.2041(6)(a)

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

For many platform transparency advocates, the goal is not merely to protect individuals' rights as consumers, but to empower them as participants in public discourse and democratic self-governance. This is the transparency argument that I personally find most compelling. We should expect and demand better transparency from platforms like YouTube and Facebook, not just because we are consumers of their products, but also because of the major role platforms play in shaping our information ecosystem and political outcomes. Without better information about the role platforms play, we are individually and collectively impaired in the project of democratic self-governance. I will call this a "democracy interest."

The transparency laws in *NetChoice* would seem, in reality, to have been prompted at least in part by goals of this sort. Texas and Florida lawmakers' express intention to prevent platform "censorship," and Florida's special carriage requirements for political speech and journalism, both clearly serve goals other than consumer protection. Those laws' transparency measures, which facilitate enforcement of these "anti-censorship" mandates, might be expected to share that legislative purpose. In briefs addressing the transparency measures, however, the States assert only an interest in consumer protection. This is understandable, given the benefits of the *Zauderer* line of consumer-focused cases as a basis for contesting platforms' First Amendment challenge.

Squeezing democratic self-governance interests into the doctrinal box of consumer protection is convenient for litigation purposes, and has worked out well so far for Texas and Florida. But I think we should be uneasy about relying on the transactional logic of consumer protection to support democratic self-governance, or to advance Internet users' own First Amendment interests. There are real downsides to situating the beneficiaries of transparency laws as passive consumers of commercial products, rather than active participants in society. Among other things, the consumer-protection logic makes it harder to justify transparency mandates that serve interests held by society broadly, as opposed to the interests of individual platform customers.

In this final Part, I will start in Subpart 1 by discussing potential transparency laws that bear a clearer nexus with democratic self-governance. Those laws may be harder to defend on consumer protection grounds than the *NetChoice* laws. For advocates of those laws, it may be important to flesh out alternate First Amendment arguments, including arguments expressly grounded in democracy interests. The second and third Subparts will examine some of the sparse relevant precedent, under the First Amendment and in other areas of law. The fourth Subpart will list potentially relevant inquiries about government transparency that may help in improved design or tailoring of platform transparency laws.

Up to this point, this Paper has been concerned with the things that *don't* work about platform transparency laws. Part III described practical ways in which the enforcement process or burden of these laws might affect platforms' ability to apply their own editorial policies, and reshape Internet users' ability to seek and impart information online. Part IV.A and IV.B explained why precedent from cases about consumer protection or regulation do not address those concerns. This Part is more positive, but also more speculative. It sketches out areas of development for transparency laws outside of *NetChoice*'s marriage of convenience with consumer protection and *Zauderer*. It is very much a sketch – many of the questions raised here would benefit from

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

additional thinking, and from the expertise of practitioners versed in fields including election law, government transparency laws, and media law.

1.  Alternate Transparency Mandates with Clearer Links to Democratic Interests

Many common platform transparency proposals – ones Florida and Texas chose not to enact – have clearer connections to democracy interests, and weaker connections to consumer protection. That is most obvious with laws like the federal draft Honest Ads Act, which would have required platform disclosures about political campaign ads.[171] Such election-related disclosures clearly relate to democratic interests, rather than consumer protection in the commercial sense. The link to democratic self-governance is also evident in disclosure mandates that are intended to inform the legislative process. As Nate Persily put it in proposing that platforms be compelled to disclose data to vetted researchers, "for policymakers to effectively regulate Facebook — as well as Google, Twitter, TikTok and other Internet companies — they need to understand what is actually happening on the platforms."

Individual participants in democracy have interests in understanding how public discourse is shaped by platforms and their users, too. Knowing about things like Russian disinformation campaigns on social media, patterns of over-removal by platforms seeking to avoid liability, or racial or political bias in platforms' own content moderation may also help us as consumers. But it is particularly and acutely relevant to democracy interests.

Compelled platform disclosures of the sort mandated in Texas and Florida are poorly suited for revealing systemic problems like platform bias in moderation, or undetected disinformation campaigns. That's in part because these problems are often not apparent to platforms themselves. Even the most "raw" aggregate data required in Texas and Florida -- the Statistical Transparency Reports – can at best tell us only what the *platform* thinks happened. The more granular data in those States' Individual Notices may be informative about individual cases, but provide little information about larger patterns.

Reliable information on topics like disinformation campaigns or platform errors has, to date, primarily come from independent researchers. These include academics, journalists, and civil society organizations. A few studies are the product of special access granted by platforms to trusted experts. But some of the most important findings build on public or widely available data.[172] Public data sources have multiple advantages. For one thing, they allow work to be done by researchers with diverse interests, skillsets, or backgrounds. That enhances the odds of identifying – and fixing -- previously unnoticed problems. As the open source software mantra goes, "with enough eyeballs, all bugs are shallow." Availability of source data also means that researchers' conclusions can be checked by third parties. And, importantly for the First Amendment concerns discussed here: When platform data is made public, state actors like AGs

---

[171] Honest Ads Act, S. 1356, 116th Cong. (2019), https://www.congress.gov/bill/116th-congress/senate-bill/1356.
[172] Academic publications using data from the Lumen Database at Harvard, for example, likely number far into the hundreds. *See Perfect 10, Inc., v. Google, Inc.,* No. 105316 (C.D. Cal. 2010), https://www.eff.org/files/filenode/Perfect10_v_Google/p10_chilling_effects_amicus_brief.pdf (citing studies as of 2010).

46

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

are largely eliminated as gatekeepers, or as sources of the undue influence on speech discussed in Part III.B.

Many proposed or enacted laws, like PATA in the U.S. or some provisions of the DSA in Europe, are designed to unleash more independent research. Mechanisms for doing so include reforming U.S. laws that currently deter researchers from "scraping" content displayed by platforms; requiring platforms to simplify access to already-public data by offering research APIs; and creating new legal mechanisms for researchers to review internal platform data.

Research-oriented laws are comparatively difficult to justify on consumer protection grounds. They may indirectly help consumers, but they are not much like the point-of-sale labels, warnings, or price lists approved under *Zauderer*. And, unlike the *NetChoice* laws, proposals like PATA are not particularly focused on telling people what to expect from their *own* experience as consumers using a platform. They are often more about understanding the big picture of platforms' societal impact.

### 2. First Amendment Considerations for Democracy-Based Mandates

These more democracy-oriented transparency proposals have upsides and downsides for First Amendment purposes. The upsides are mostly practical; the downsides are mostly doctrinal. U.S. courts have had few opportunities to consider disclosure rules for privately-held information that is of public importance to the functioning of democracy. Like so many other questions about private Internet platforms' relationships with – or functional substitution for -- real-world governments, the issues are novel and legal precedent is sparse. But, like those other areas of law, the rules around platform transparency are likely to evolve quickly. Bringing considerations based on democracy interests to bear on transparency discussions would be very timely, even without the forcing function of *NetChoice*.

As a practical matter, many of the democracy-related transparency proposals described in this Part can be crafted to avoid the threats to free expression discussed in Part III.  The opportunities for abuse by state enforcers discussed in III.A would be minimized under rules that are simply about the mechanics of access to already-public data. An AG investigating platforms' compliance with research API requirements, for example, would likely never be put in a position to second-guess platforms' editorial policies, much less individual content moderation decisions. Enforcement would likely instead center on technical questions, like whether a data set is complete or correctly formatted. Basic proposals to reform scraping laws would pose even less risk of abuse by enforcers, because they would require no active enforcement by the state. Such reforms would just stop platforms from suing researchers. Some research-oriented proposals would also be less burdensome for platforms, meaning that the threats to competition and diversity of online speech rules discussed in III.B would also be reduced. Scraping law reform, in particular, would place little or no First-Amendment-relevant burden on platforms.[173]

---

[173] All of these proposals are complicated, and not immune from First Amendment critique. Scraping law reform *could* burden platforms, for example, if it effectively led them to tolerate scraping that slowed down their servers or endangered their users. But that doesn't seem like a burden that would, like the *NetChoice* laws, potentially incentivize changes in editorial policy. Other more ambitious proposals, like the real-time content dashboards proposed in PATA, would be very burdensome and raise more of the problems discussed in Part III.B. Proposals

47

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

Of course, lawmakers who expressly asserted democracy-related goals for platform transparency laws might find it much harder to do what Texas and Florida have done: bypass strict scrutiny by invoking *Zauderer*. Without the figleaf of consumer protection goals, states might have to defend their laws under more stringent standards of review, be it the special "exacting scrutiny" standard applied in election-related cases, or more conventional intermediate or strict scrutiny.

One important question involves the same "are platforms newspapers" question that animates so many platform regulation debates, and is central to the underlying must-carry claims in *NetChoice*. If states have an interest in compelling platform transparency based on the companies' role in shaping public discourse and political outcomes, might they also assert that same interest in compelling transparency from the Washington Post or Fox News? I think the answer is probably no, because of the distinctions between platforms and newspapers discussed in Part III.C.1. In particular, platforms' role as communications infrastructure for ordinary people in daily life is a key differentiator. But this question deserves more exploration.

The only major federal ruling about an overtly democracy-related platform transparency law to date is *Washington Post v. McManus*, which involved election ad disclosures by sites hosting online ads. In it, the 4th Circuit upheld a First Amendment challenge to Maryland's online campaign ads transparency law.[174] It reasoned that more lenient standards of review might apply to traditionally regulated media like broadcast, or to laws that regulate political speakers directly – but not to laws that regulated the Internet, and incentivized platforms to simply avoid hosting certain ads based on their political content. A more recent case in Washington State – reported in the press but not in any published court rulings to date – reached a different conclusion, upholding that State's political ad transparency requirements against a First Amendment challenge by Facebook.

In principle, the same considerations that shape judicial review of election-related transparency mandates might apply to platforms. In its seminal *Citizens United* ruling, the Supreme Court upheld campaign ad disclosure requirements based on the state's interest in ensuring "that the voters are fully informed about the person or group who is speaking… so that the people will be able to evaluate the arguments to which they are being subjected[.]"[175] Users' general interest in asking "why am I seeing this?" with respect to politically important information online is arguably similar. In the 9th Circuit's formulation, the more relaxed exacting scrutiny standard for election-related disclosures is justified in part because voters have an "interest in knowing who was trying to sway their views" including through "subtle and indirect communications" before

---

that would effectively put government agencies in a position to sanction some research projects but not others could raise questions about improper state influence, akin to those discussed in III.A.

[174] *Washington Post v. McManus*, 944 F.3d 506, 520 (4th Cir. 2019) (declining to decide between strict and exacting scrutiny and holding that law fails both standards).

[175] *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 317 (2010) (internal quotations omitted). The Court noted that disclosure mandates might nonetheless be unconstitutional if objectors presented sufficient evidence of resulting "threats, harassment, or reprisals" against members of named groups. This risk has become more relevant in the platform context with recent threats against Twitter content moderators identified in the "Twitter Files." *See* Donie O'Sullivan, *Former Top Twitter Official Forced to Leave Home Due to Threats Amid 'Twitter Files' release*, CNN (Dec. 12 2022), https://www.cnn.com/2022/12/12/tech/twitter-files-yoel-roth/index.html.

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

an election.[176] The same reasoning might apply to laws requiring transparency about *platforms'* role in swaying views. Arguing for exacting scrutiny on this basis would require stretching Supreme Court precedent far beyond its original context, of course. But that's what Texas and Florida are already doing in relying on *Zauderer*. It's what almost everyone has to do, in arguing almost every constitutional question about platform regulation, because the questions involved are genuinely novel. The law is in flux. For issues like those currently before the Supreme Court in *Gonzalez*, and soon to be in *NetChoice*, it is likely at an inflection point. If we ever want platform regulation to advance democracy-related goals, now would be a good time to start identifying the constitutional underpinnings for such laws.

### 3. Other Democracy-Related Transparency Cases

Another way to think about democracy interests in transparency is to view platforms not as entities that *influence* real world governance, but as entities that *carry out* their own, private governance. If platforms are the "new governors," perhaps their disclosure obligations should build on the transparency rules we now apply to state agencies, legislatures, executives, and courts.[177] I think this framing is very fruitful for the design and tailoring of platform transparency laws, as I'll explain in Part IV.C.4. But it doesn't otherwise tell us much about First Amendment standards. After all, the First Amendment interests in government disclosures are generally on the *public*'s side. The government does not get to assert First Amendment rights, or object on compelled speech grounds to laws like the Freedom of Information Act. And questions about compelling private actors to speak in order to provide information about the government just don't come up much.

There are a smattering of cases, however, broadly supporting the idea of *some* democracy-based interest in compelling speech, even outside of the election context. In 2002, for example, the Supreme Court declined to review private individuals' claims that laws compelling them to answer census questions violated the First Amendment.[178] The lower court in that case rejected the claim in strong language, saying "[t]here is no right to refrain from speaking when essential operations of government require it for the preservation of an orderly society[.]" Of course, democratic interests in the census are unusually clear, given its constitutionally prescribed role in shaping electoral representation.

More often, conflicts between private companies and the public interest in understanding government reach courts the form of intellectual property claims. Companies object to FOIA

---

[176] *Nat'l Ass'n for Gun Rights v. Mangan*, 933 F.3d 1102, 1114 (9th Cir. 2019) (discussing transparency mandates about funding for electioneering).

[177] Kate Klonick, *The New Governors: The People, Rules, and Processes Governing Online Speech*, 131 Harv. L. Rev. 1598 (2018), https://harvardlawreview.org/wp-content/uploads/2018/04/1598-1670_Online.pdf. In the electoral context, Justice Scalia suggested that voters who sign their support of referendum petitions had reduced First Amendment protection against compelled disclosures, because they were functionally acting as legislators rather than individual speakers. *Doe v. Reed* concurrence.

[178] *Morales v. Daley*, 116 F. Supp. 2d 801, 815 (S.D. Tex. 2000), *aff'd sub nom*. *Morales v. Evans*, 275 F.3d 45 (5th Cir. 2001), *cert. denied*, 534 U.S. 1135 (2002).

49

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

disclosures that allegedly include their trade secrets, for example.[179] Disputes of this sort can also arise when private vendors provide important services to governments, or carry out traditional state roles. Commercial providers of algorithms used by courts in sentencing, for example, have argued on trade secret grounds that their algorithms cannot be disclosed -- even to lawyers representing affected criminal defendants.[180]

Courts have in some cases upheld the public's rights to access information relevant for democratic self-governance, using intellectual property doctrines that are themselves grounded in democratic or First Amendment considerations. The Supreme Court, for example, rejected a claim that authoritative annotations to Georgia legislation were copyrighted and could not be freely distributed.[181] The operative prohibition on copyright in government works arose, the Court explained, from the "animating principle" that "no one can own the law," and that because "[e]very citizen is presumed to know the law… all should have free access to its contents."

A lower court similarly rejected efforts by the voting machine company Diebold to prevent disclosures about problems with machines used in elections. The court held that sharing the company's copyrighted materials was fair use, and noted that doctrine's role in ameliorating conflict between copyright and the First Amendment.[182] It would, the court wrote, be "hard to imagine a subject the discussion of which could be more in the public interest[.]" These cases demonstrate appropriate judicial reluctance to let private companies withhold important information about key democratic infrastructure, like legal codes and the mechanics of electoral administration. Similar reasoning might be relevant for courts considering platform transparency mandates, if states asserted an underlying interest in protecting democratic self-governance.

### 4. Legislative Design and Tailoring Considerations

Experience with disclosures from actual governments could also be useful in designing functional transparency laws for platforms. Looking to existing transparency measures from legislatures, courts, police, and other state bodies can help us identify effective mechanisms, and avoid obvious pitfalls in platform transparency measures.[183] This matters for legislative drafting, and should also matter for courts assessing how well transparency laws achieve their goals, and whether they are adequately tailored to avoid harms to speech rights.

---

[179] Dep't of Justice, FOIA Guide, 2004 Edition: Exemption 4 (2004), https://www.justice.gov/archives/oip/foia-guide-2004-edition-exemption-4#:~:text=Exemption%204%20of%20the%20FOIA,government%20and%20submitters%20of%20information..

[180] Vera Eidelman, *The First Amendment Case for Public Access to Secret Algorithms Used in Criminal Trials*, 34 Ga. St. U. L. Rev. 915, 933 (2018).

[181] In ongoing litigation, private companies that develop technical standards used in building codes are raising similar claims, asserting that building code specifications may not be freely and publicly disseminated.

[182] Diebold sent ISPs notices under the Digital Millennium Copyright Act (DMCA), demanding removal of links to leaked internal emails about their machines' technical problems. The Internet users who had posted the emails sued Diebold, saying that it had misrepresented its rights, in violation of 17 USC 512(f). The court upheld their claim. *Diebold* is one of the very few cases to actually vindicate users' rights in this situation.

[183] Case law about election-related disclosures might provide other examples of "tailoring." The disclosures at issue in *NAGR v. Mangan*, for example, were limited in terms of what activities or financial expenditures triggered the disclosure obligation, the degree of detail required in the disclosures, and the pre- and post-election temporal window in which additional disclosure obligations applied. *Supra* 176, at 23-27.

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

If platforms are like governments, their speech rules are like legislation. A platform user's interest in knowing Twitter's rules might be analogized to her interest in "know[ing] the law" of her state, as in the *Georgia* copyright case. But legislators – including in Texas and Florida – are not expected to expose every step of the lawmaking process to public scrutiny.[184] Experience with real-world legislative transparency might also help in answering questions like these:

- Should platform Trust and Safety teams have to disclose every meeting, conversation, and interim draft created while establishing Published Speech Rules?

- Should the required detail and clarity of Published Speech Rules match the detail and clarity of, say, state civil codes? Of summaries like the Restatement of Torts?

- Should we expect *more* detailed written rules from platforms than we do from legislatures, given that platforms are less able to supplement their rules through a "common law" of case reports?

Experience with real-world courts could also be useful for designing Individual Notices and other transparency requirements about specific moderation decisions. The judicial analogy, like the legislative one, is imperfect. Platforms can at best dispense very quick and highly imperfect justice, with nothing like the procedural rights that would exist in court. Generating truly court-like paperwork would be grindingly inefficient, and probably not welcomed by most users. Still, drafters of platform transparency laws can still learn from experience with real government actors and considering questions like these.

- Do civil procedure rules or local court rules have something to teach us about the mechanics of platforms' Individual Notices or communications about Appeals – how they should be delivered, for example, or what events should trigger new notices?

- Should platform users, like legal defendants, be told who has accused, sued, or borne witness against them?[185]

- Should platforms have to disclose moderators' internal deliberations or draft opinions?

- When should information be excluded from public disclosures – much as court documents might anonymize children or abuse victims, or redact trade secrets?

There is no indication that the Texas or Florida legislators considered any such questions – or even thought about the concerns of *actual* state actors. State law enforcement agents, for example, may be surprised to learn that platforms must notify users of all content moderation actions – even when doing so would compromise ongoing police investigations.

---

[184] For a discussion of reasons not to disclose such detail, *see* David Pozen, *Transparency's Ideological Drift*, 128 Y.L.J. 100 (2018).

[185] Civil society groups around the world have called for platforms to at least inform users when their speech has been removed at the request of governments. That information may not be required under the state laws in *NetChoice*, though the Florida law does require platforms to provide a "thorough rationale" in Individual Notices to affected users, including "how the social media platform became aware of the censored content."

51

Electronic copy available at: https://ssrn.com/abstract=4377578

DRAFT – March 3, 2023

## V.    Conclusion

The threat to First Amendment rights from badly drafted platform transparency laws is all too real. Internet users and the general public will gain little if laws like the ones in *NetChoice* provide better information about platforms' speech rules, only to subject those rules to manipulation by unaccountable state actors. But the public interest in better information about major platforms' editorial practices is real as well. Better platform disclosures can not only protect Internet users as consumers, but empower them as active participants in democratic self-governance. As with so many issues in platform regulation, this one has speech and informational interests on all sides.

Well-designed transparency laws for major platforms should be able to survive First Amendment review. But Courts should hold lawmakers to a far more searching standard of review than has been applied in the *NetChoice* cases so far under *Zauderer*. Judicial scrutiny should require clear connections between state interests and the required disclosures, and careful tailoring. Concrete examples of better tailoring have been described throughout this paper. Platform law practitioners and Trust and Safety professionals could easily identify more. That careful review that platform transparency laws deserve won't happen if courts continue to accept States' simplistic formulation -- that compelled speech about editorial policies is constitutionally indistinguishable from labels on food or warnings in advertisements for commercial services.

Received case law does not provide real answers to the constitutional questions raised by platform transparency mandates. Advocates and courts can find precedent to support almost any standard of First Amendment review, and are thus free to be as outcome-oriented as they wish in advancing their preferred policies. With Supreme Court review of the *NetChoice* cases imminent, now is the time to think much harder about what those preferred policies should actually be, and what doctrinal framework will best achieve it.

Electronic copy available at: https://ssrn.com/abstract=4377578