CAHILL GORDON & REINDEL LLP
JOEL KURTZBERG (admitted *pro hac vice*)
FLOYD ABRAMS (admitted *pro hac vice*)
JASON ROZBRUCH (admitted *pro hac vice*)
LISA J. COLE (admitted *pro hac vice*)
32 Old Slip
New York, New York 10005
Telephone: 212-701-3120
Facsimile: 212-269-5420
jkurtzberg@cahill.com

DOWNEY BRAND LLP
WILLIAM R. WARNE (Bar No. 141280)
bwarne@downeybrand.com
MEGHAN M. BAKER (Bar No. 243765)
mbaker@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone: 916-444-1000
Facsimile: 916-520-5910

*Attorneys for Plaintiff X Corp.*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| X CORP., | No. 2:23-cv-01939-WBS-AC |
| Plaintiff, | |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| ROBERT A. BONTA, Attorney General of California, in his official capacity, | EXTENDED ORAL ARGUMENT REQUESTED |
| Defendant. | Date:  November 13, 2023 |
| | Time:  1:30 p.m. |
| | Crtrm: 5 |

## TABLE OF CONTENTS

INTRODUCTION ................................................. 7

STATEMENT OF FACTS .......................................... 16

  I.  AB 587's Statutory Scheme and Its Application to X Corp. 16

    a.  Terms of Service Requirement ......................... 17

    b.  Terms of Service Report ............................. 18

    c.  Penalties .......................................... 21

  II.   The Topics On Which AB 587 Forces X Corp. To Speak Are Extremely Controversial ..................................... 22

  III.  X Corp. Is Already Transparent About Its Content-Moderation Policies ...................................... 29

  IV.   AB 587 Is Intended To And Will Suppress Speech Based On Content And Viewpoint ..................................... 35

LEGAL STANDARD .............................................. 44

ARGUMENT ................................................... 45

  V.   X Corp. Is Likely To Succeed On The Merits ............. 45

    a.   X Corp. Is Likely To Succeed On Its Claims Under The First Amendment To The U.S. Constitution And Article 1, Section 2, Of The California Constitution................. 45

      i. X Corp.'s Editorial Judgments About Content On X Are Constitutionally-Protected Speech...........................46

      ii. Strict Scrutiny Applies Because AB 587 Is A Content- and Viewpoint-Based Regulation Of Speech................... 50

      iii. AB 587 Does Not Withstand Strict Or Even Intermediate Scrutiny.................................... 60

      iv. Zauderer Does Not Apply And AB 587 Would Fail Zauderer In Any Event.................................... 65

    b.   X Corp. Will Likely Succeed On Its 47 U.S.C. § 230(c)(2) Preemption Claim......................................... 70

  VI.   X Corp. Will Suffer Irreparable Harm Absent A Preliminary Injunction, The Balance Of Equities Weighs Heavily In Its Favor, And An Injunction Is In The Public's Interest ........ 74

CONCLUSION ................................................. 76

1

**TABLE OF AUTHORITIES**

**Page(s)**

2

**Cases**

3

*ACA Connects* v. *Bonta*,
    24 F.4th 1233 (9th Cir. 2022).................................72

4

*Agency for Int'l Dev.* v. *Alliance for Open Soc'y Int'l,
    Inc.*,
    570 U.S. 205 (2013)..........................................49

5

6

*American Academy of Pain Management* v. *Joseph*,
    353 F.3d 1099 (9th Cir. 2004)...............................63n

7

8

*Animal Legal Def. Fund* v. *Wasden*,
    878 F.3d 1184 (9th Cir. 2018)...........................46, 57

9

*In re Apple Inc. App Store Simulated Casino-Style Games
    Litig.*,
    625 F. Supp. 3d 971 (N.D. Cal. 2022)........................73

10

11

*Baird* v. *Bonta*,
    2023 WL 5763345 (9th Cir. Sept. 7, 2023)....................75

12

*Bolger* v. *Youngs Drug Prod. Corp.*,
    463 U.S. 60 (1983)..........................................63n

13

14

*Brown* v. *Moody's Investor Services, Inc.*,
    2010 WL 1557650 (Cal. Super. Ct., L.A. County Apr.
    16, 2010)...............................................43, 59

15

16

*California Chamber of Com.* v. *Council for Educ. & Rsch.
    on Toxics*,
    29 F.4th 468 (9th Cir. 2022), *cert. denied*, 143 S.
    Ct. 1749 (2023).........................................44, 75

17

18

*City of Austin, Texas* v. *Reagan Nat'l Advert. of
    Austin, LLC*,
    142 S. Ct. 1464 (2022)......................................56

19

20

*City of Montebello* v. *Vasquez*,
    1 Cal. 5th 409 (2016).......................................45n

21

22

*Crownholm* v. *Moore*,
    2022 WL 17968586 (E.D. Cal. Dec. 27, 2022)..................57

23

*Delano Farms Co.* v. *California Table Grape Com.*,
    4 Cal. 5th 1204 (2018)......................................45n

24

25

*Doe* v. *Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016)................................. 73

*Domen* v. *Vimeo, Inc.*,
    991 F.3d 66 (2d Cir. 2021), *amended and superseded*
    *on other grounds*, 2021 WL 4352312 (2d Cir. Sept. 24,
    2021), *cert. denied*, 142 S. Ct. 1371 (2022)................. 72

*Edenfield* v. *Fane*,
    507 U.S. 761 (1993)........................................ 62

*Entertainment Software Ass'n* v. *Blagojevich*,
    469 F.3d 641 (7th Cir. 2006)........................... 12, 55

*Forsyth* v. *Motion Picture Association of America, Inc.*,
    2016 WL 6650059 (N.D. Cal. Nov. 10, 2016)................... 55

*Herbert* v. *Lando*,
    441 U.S. 153 (1979).............................. 8, 48, 59–60

*Høeg* v. *Newsom*,
    2023 WL 414258 (E.D. Cal. Jan. 25, 2023) (Shubb, J.)... 44, 60,
    66, 75

*HomeAway.com, Inc.* v. *City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019)............................... 72

*Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of*
    *Boston*,
    515 U.S. 557 (1995)..................................... 9, 49

*IMDb.com Inc.* v. *Becerra*,
    962 F.3d 1111 (9th Cir. 2020)................... 63, 63n, 64n

*Indus. Truck Ass'n, Inc.* v. *Henry*,
    125 F.3d 1305 (9th Cir. 1997).............................. 71

*Jones* v. *Google LLC*,
    73 F.4th 636 (9th Cir. 2023)............................... 74

*Jorgensen* v. *Cassiday*,
    320 F.3d 906 (9th Cir. 2003).............................. 76n

*Junior Sports Mags. Inc.* v. *Bonta*,
    80 F. 4th 1109 (9th Cir. 2023)................. 44, 64, 65, 75

*Manhattan Cmty. Access Corp.* v. *Halleck, 139 S. Ct.*
    *1921, 1932 (2019)*..................................... 9, 48

*Miami Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974)................................. 47, 62–63

*Missouri v. Biden*,
    2023 WL 6425697 (5th Cir. Oct. 3, 2023).................... 59

*Motion Picture Ass'n of America v. Specter*,
    315 F. Supp. 824 (E.D. Pa. 1970)........................... 55

*Nat'l Ass'n of Wheat Growers v. Bacerra*, 468 F. Supp.
    3d 1247 (E.D. Cal. 2020)........................ 52, 64, 66, 75

*Nat'l Inst. Of Fam. & Life Advocs. v. Bacerra*,
    138 S. Ct. 2361 (2018).......................... 52, 61, 65, 67

*NetChoice, LLC v. Att'y Gen., Fla.*,
    34 F.4th 1196 (11th Cir. 2022)............................. 46

*NetChoice, LLC v. Bonta*,
    2023 WL 6135551 (N.D. Cal. Sept. 18, 2023)................. 59

*O'Handley v. Padilla*,
    579 F. Supp. 3d 1163 (N.D. Cal. 2022), *aff'd sub
    nom. on other grounds*, *O'Handley v. Weber*, 62 F.4th
    1145 (9th Cir. 2023)................................... 8, 46

*PC Drivers Headquarters, LP v. Malwarebytes Inc.*,
    371 F. Supp. 3d 652 (N.D. Cal. 2019)....................... 72

*Radici v. Associated Ins. Companies*,
    217 F.3d 737 (9th Cir. 2000)........................... 71, 73

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015)............................. 50, 51, 57, 60

*Republican Nat'l Comm. v. Google, Inc.*,
    2023 WL 5487311 (E.D. Cal. Aug. 24, 2023)................. 73

*Riley v. Nat'l Fed'n of the Blind*,
    487 U.S. 781 (1988).............................. 48, 49, 64n

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    141 S.Ct. 63 (2020)..................................... 74–75

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995)....................................... 58

*Smith v. California*,
    361 U.S. 147 (1958)............................... 11, 12, 54

*Sorrell* v. *IMS Health, Inc.*,
    564 U.S. 552 (2011)....................................56, 58

*U.S. Telecom Ass'n* v. *FCC*,
    855 F.3d 381 (D.C. Cir. 2017) (Kavanaugh, J.,
    dissenting from denial of rehearing *en banc*)................46

*Volokh* v. *James,* 2023 WL 1991435 (S.D.N.Y. Feb. 14,
    2023)..................................................53

*In re Volkswagen "Clean Diesel" Marketing, Sales
    Practices, and Products Liability Litigation*,
    959 F.3d 1201 (9th Cir. 2020).............................74

*Washington Post* v. *McManus*,
    944 F.3d 506 (4th Cir. 2019)..........................49, 50

*Wooley* v. *Maynard*,
    430 U.S. 705 (1977)......................................48

*Zauderer* v. *Office of Disciplinary Counsel*,
    471 U.S. 626 (1985)..................................*passim*

**Statutes**

Cal. Bus. & Prof. Code §§ 22675–22681 ....................*passim*

Cal. Gov't Code §§ 11180–81 ....................14, 40, 59, 60

Gender Expression Non-Discrimination Act, S.1047/A.747
    (N.Y. 2019)..............................................25

47 U.S.C. § 230 .........................................*passim*

U.S. Const. art. VI, cl. 2 ...................................71

**Other Authorities**

Daphne Keller, *Platform Transparency and the First
    Amendment*, Stanford Cyber Policy Center (Mar. 3,
    2023)....................................................62

Eric Goldman, *The Constitutionality of Mandating
    Editorial Transparency*, 73 Hastings L.J. 1203 (2022)........40

**INTRODUCTION**

Plaintiff X Corp. brings this motion for a preliminary injunction against Defendant's enforcement of California Assembly Bill No. 587 ("AB 587"), which is codified in law at Cal. Bus. & Prof. Code §§ 22675–22681 and, if not enjoined, it will take effect on January 1, 2024.   § 22677(b)(2).[1]

AB 587 requires X Corp. and other large social media companies to (1) post terms of service dictated by the government, including terms about how content is moderated on their platforms and (2) submit, on a semi-annual basis, to the California Attorney General a "terms of service report" that includes, among other things, (a) a detailed description of content-moderation practices used by the social media company for that platform; (b) information about whether and, if so, how the social media company defines and moderates (i) hate speech or racism, (ii) extremism or radicalization, (iii) disinformation or misinformation, (iv) harassment, and (v) foreign political interference; as well as (c) information and statistics about actions taken by the social media company to moderate these categories of content.

AB 587 violates X Corp.'s rights under the First Amendment of the United States Constitution and Article I, Section 2, of the California Constitution because it compels social media companies

---

[1] All statutory references are to California Business and Professions Code unless specified otherwise. For the convenience of the Court, AB 587 is provided as Exhibit 2 to the Affidavit of Joel Kurtzberg, dated Oct. 6, 2023 ("Kurtzberg Aff.").

like X Corp. to engage in speech against their will, impermissibly interferes with the constitutionally-protected editorial judgments of social media companies such as X Corp., has both the purpose and likely effect of pressuring social media companies such as X Corp. to restrict, remove, demonetize, or deprioritize constitutionally-protected speech that the State deems undesirable or harmful and places an unjustified and undue burden on social media companies, such as X Corp.

The editorial judgment that X Corp. enjoys over the X social media platform is First Amendment-protected, as if it were "a newspaper or a news network." *O'Handley* v. *Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022), *aff'd sub nom. on other grounds*, *O'Handley* v. *Weber*, 62 F.4th 1145 (9th Cir. 2023) ("Like a newspaper or a news network, [X Corp.] makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment."). The U.S. Supreme Court has long instructed that, under the First Amendment, laws that "subject[] the editorial process to private or official examination" to "serve some general end such as the public interest" do not "survive constitutional scrutiny." *Herbert* v. *Lando*, 441 U.S. 153, 174 (1979). X Corp. does not forego this right simply because it is a social media platform — indeed, such constitutional protections over the editorial process are not "restricted to the press," but applies equally to "business

corporations generally" and "ordinary people engaged in unsophisticated expression as well as professional publishers." *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995).   As the Supreme Court has made abundantly clear, the First Amendment prohibits the government from interfering with the rights of private parties, such as X Corp., to exercise "editorial control over speech and speakers on their properties or platforms." *Manhattan Cmty. Access Corp.* v. Halleck, 139 S. Ct. 1921, 1932 (2019).   This, Defendant cannot and does not dispute.  *See* Kurtzberg Aff. Ex. 1 (Mot. to Dismiss, *Minds, Inc., et al.* v. *Bonta*, No. 23-cv-2705 (ECF 23-1) (C.D. Cal. May 25, 2023)) at 18-19 (citing *Padilla*, 579 F. Supp. 3d at 1172) (acknowledging "social media companies are private actors with their own First Amendment rights").

The State of California claims that AB 587 is simply a "transparency measure," under which certain social media companies must make their already-existent content-moderation policies and statistics publicly available.  *See, e.g.*, *id.* Ex. 4 (Press Release, *Governor Newsom Signs Nation-Leading Social Media Transparency Measure* (Sept. 13, 2022), available at https://www.gov.ca.gov/2022/09/13/governor-newsom-signs-nationleading-social-media-transparency-measure/ (last visited Oct. 6, 2023)).  But a careful review of the law's purpose and likely effect – as evidenced by the text, legislative history, and

statements from AB 587's author, sponsors, and supporters, and Attorney General ("AG") Bonta in defending and preparing to enforce the law — demonstrates that AB 587 targets constitutionally-protected speech on the basis of content and viewpoint.  The law's sponsors – and even AG Bonta – do nothing to hide this fact. Indeed, both the legislative history and AG Bonta's legal briefs in defending the law openly concede that AB 587 seeks to "pressure" social media companies into restricting constitutionally-protected speech that the government finds objectionable and undesirable. *See, e.g.*, Kurtzberg Aff. Ex. 5 (Cal. Assemb. Comm. on Judiciary Report, 2021–22 Sess. (AB 587), Apr. 27, 2021) at 4 ("if social media companies are forced to disclose what they do in this regard [i.e., how they moderate online content], it may **pressure them** to become better corporate citizens by doing more **to eliminate hate speech and disinformation**.") (emphasis added); *id.* Ex. 1 ("[T]he Legislature also considered that, by requiring greater transparency about platforms' content-moderation rules and decisions, AB 587 may result in public pressure on social media companies to 'become better corporate citizens by doing more to **eliminate hate speech and disinformation' on their platforms**. . . . This, too, is a substantial state interest.") (emphasis added).  The *statute itself* even contradicts the State's claim that it is nothing more than a transparency statute by titling Chapter 22.8, in which AB 587 resides, "***Content Moderation Requirements*** for Internet Terms of

1   Service" (emphasis added).

2       AB 587 compels social media companies to engage in speech
3   against their will about one of the most controversial political
4   topics: how to define speech that should be restricted or
5   disfavored on social media platforms and how to apply those
6   definitions and decide what speech to permit or limit on such
7   platforms.  Such "speech about speech" has historically triggered
8   heightened First Amendment protection, because it has the potential
9   to impact, not only the speaker's First Amendment rights to make
10  editorial judgments about what speech belongs on a given platform
11  (e.g., a bookstore, movie theater, or here, a social media
12  platform), but also *the public's* right to access to
13  constitutionally-protected speech that the government may not
14  suppress directly.

15      For example, in *Smith* v. *California*, 361 U.S. 147 (1958), the
16  United States Supreme Court struck down, on First Amendment
17  grounds, a Los Angeles ordinance applying strict liability to
18  booksellers that sold obscene books because "the bookseller's
19  burden [under the law] would become the public's burden, by, for
20  restricting him, the public's access to reading matter would be
21  restricted. . . . The bookseller's limitation in the amount of
22  reading material with which he could familiarize himself, and his
23  timidity in the face of absolute criminal liability, thus would
24  tend to restrict the public's access to forms of the printed word,

25

1  which the State could not constitutionally suppress directly." *Id.*

2  at 153-54.  The same concerns that motivated the Court to protect

3  booksellers from the law in *Smith* – to avoid "self-censorship,

4  compelled by the State, that would be a censorship affecting the

5  whole public," *id.* – apply to AB 587.  By pressuring social media

6  companies to censor content on their platform, AB 587 creates a

7  "double whammy" of First Amendment problems because it violates

8  **both** the social media companies' constitutionally-protected right

9  to decide what is permitted on their platforms and the public's

10 right to access constitutionally-protected content on those

11 platforms that the State deems objectionable.

12     For this reason, cases involving compelled "speech about

13 speech" have typically been subjected to heightened scrutiny and

14 struck down as violative of the First Amendment.  *See, e.g., Smith*,

15 361 U.S. at 153-54; *Entertainment Software Ass'n* v. *Blagojevich*,

16 469 F.3d 641, 651-53 (7th Cir. 2006) (applying strict scrutiny to,

17 and striking down on First Amendment grounds, an Illinois law

18 requiring video game retailers to adopt and explain to consumers

19 in a written brochure a video game rating system for "sexually

20 explicit" content).

21     Moreover, AB 587 seeks to force social media companies to

22 provide the Attorney General and the public detailed information

23 about how, if at all, they define and moderate the boundaries of

24 the most controversial categories of content — i.e., those

25

categories that the legislative history describes as having no "general public consensus" about how to define or moderate them because their boundaries are "fraught with political bias" and are "difficult to reliably define"[2] — and provide detailed information about what actions they have or have not taken in regulating those controversial categories, even though the social media companies "seem[] to be equally maligned" by members of the public, whether they restrict such content or not.[3]  Put another way, through AB 587, the State is compelling social media companies to take public positions on controversial and politically-charged issues.  And, because X Corp. must take such positions on these topics **as they are formulated by the State**, X Corp. is being forced to adopt the State's politically-charged terms, which is a form of compelled speech in and of itself.

Even more problematic is the fact that AG Bonta maintains unfettered discretion to determine whether a social media company has violated AB 587 (resulting in penalties of up to $15,000 per violation per day) because the statute does not define what constitutes a "reasonable, good faith attempt to comply" or a "material[] omi[ssion] or misrepresent[ation]" in the Terms of Service Reports submitted to the Attorney General. § 22678(a)(2)(C), (a)(3).  AG Bonta also holds broad pre-litigation

---

[2] Kurtzberg Aff. Ex. 6 (Cal. Assemb. Comm. on Privacy and Consumer Protection Report, 2021–22 Sess. (AB 587), Apr. 22, 2021) at 4.
[3] *Id.*

1    enforcement powers under Cal. Gov't Code §§ 11180-81 — including

2    but not limited to the ability to issue subpoenas for the production

3    of documents, the attendance of witnesses, and testimony — to

4    determine whether X Corp. has violated AB 587. Cal. Gov't Code §§

5    11180-81.[4]  Moreover, and importantly, concerns about AG Bonta's

6    use of threats to enforce AB 587 to pressure social media platforms

7    to restrict constitutionally-protected content that the State

8    disapproves of are not speculative, given that he **has already**

9    written to X Corp. (and other major social media companies)

10   threatening that "[t]he California Department of Justice will not

11   hesitate to enforce [AB 587]," while in the same proverbial breath

12   reminding the companies of their "duty" and "responsibility" to

13   combat what the Attorney General views as the "dissemination of

14   disinformation that interferes with our electoral system."

15   Affidavit of Wifredo Fernandez, dated Oct. 4, 2023 ("Fernandez

16   Aff.") Ex. 1 (Letter from Attorney General Bonta to Twitter, Inc.,

17   et al. (Nov. 3, 2022), available at

18   https://oag.ca.gov/system/files/attachments/press-

19   docs/Election%20Disinformation%20and%20Political%20Violence.pdf

20   (last visited Oct. 6, 2023)).

21       Finally, AB 587 directly conflicts with, and is thus preempted

22   by, the immunity afforded by 47 U.S.C. § 230(c)(2).[5]  Kurtzberg

23

---

24   [4] For the convenience of the Court, Cal. Gov't Code §§ 11180-81 is
     provided as Exhibit 7 to the Kurtzberg Affidavit.
     [5] For the convenience of the Court, 47 U.S.C. § 230 is provided as Exhibit
25   3 to the Kurtzberg Affidavit.

Aff. Ex. 3 (47 U.S.C. § 230).  That is because, as the title of Chapter 22.8 to Division 8 of the Business and Professions Code (in which AB 587 resides) makes plain, the law sets "Content Moderation Requirements for Internet Terms of Service."  But 47 U.S.C. § 230(c)(2) provides immunity for an interactive computer service, such as X, for "*any action* voluntarily taken in good faith to restrict access to or availability of material that the provider considers to be . . . objectionable, whether or not such material is constitutionally protected."  The "content moderation requirements" imposed by AB 587 – certain mandatory disclosures – provide for liability if those requirements are not satisfied.  But Section 230(c)(2) protects *any action* taken in good faith to restrict access to objectionable content – even actions taken either without the requisite disclosures mandated by AB 587, or that, in AG Bonta's view, contravene X Corp.'s promulgated content-moderation policies.  As such, AB 587 imposes liability where Section 230(c)(2) says it cannot.

For these reasons, as well as those set forth below, AB 587 violates the First Amendment of the U.S. Constitution and Article 1, Section 2, of the California Constitution, and directly conflicts with, and is thus preempted by, the immunity afforded by 47 U.S.C. § 230(c)(2).  Plaintiff respectfully asks this Court to (1) declare AB 587 unconstitutional and unlawful, (2) prevent it from going into effect, and (3) immediately enjoin its enforcement.

**STATEMENT OF FACTS**

**I.   AB 587's Statutory Scheme and Its Application to X Corp.**

AB 587 applies to "social media companies" – defined as persons or entities owning or operating one or more "social media platforms" – that earn more than one hundred million dollars in gross revenue in the preceding calendar year.   §§ 22675(d) (defining "social media company") and 22680 (imposing $100M gross revenue requirement).[6]

X Corp. satisfies these requirements.  Affidavit of Trust & Safety Team, dated Oct. 6, 2023 ("T&S Aff."), ¶¶ 3-6.  It is a "social media company" under the statute, as it operates X (formerly Twitter), which is a "social media platform" under the statute because (1) it is a public internet-based application that has users in California; (2) a substantial function of X is to connect users in order to allow users to interact socially with each other within the service or application; (3) it allows users to construct public or semipublic profiles for purposes of signing into and using the application; and (4) it allows users to create or post content viewable to others and populate a list of other

---

[6] A "social media platform" is a "public or semipublic internet-based service or application that has users in California" (i) for which "[a] substantial function of the service or application is to connect users in order to allow users to interact socially with each other within the service or application," or (ii) allows users to (a) "[c]onstruct a public or semipublic profile for purposes of signing into and using the service or application," (b) "[p]opulate a list of other users with whom an individual shares a social connection within the system," or (c) "[c]reate or post content viewable by other users."  § 22675(e).

users with whom an individual shares a social connection within the system.  *See* T&S Aff. ¶¶ 4, 6; § 22675(e) (defining social media platform).   X Corp. generated more than $100 million in gross revenue during the 2023 calendar year.   T&S Aff. ¶ 5.

AB 587 has three main components: (i) a requirement that social media companies publicly post their terms of service, including processes for flagging content and potential actions that may be taken with respect to flagged content ("Terms of Service Requirement"), *see* § 22676; (ii) a requirement that social media companies submit to AG Bonta, who will in turn disseminate publicly, a report including whether and, if so, how they define hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference ("Terms of Service Report"), *see* § 22677; and (iii) a penalty provision, whereby companies may be liable to pay $15,000 per violation per day and may be sued in court for failing to make a "reasonable, good faith attempt" to comply with AB 587's requirements or "[m]aterially omit[ting] or misrepresent[ing] required information in a" Terms of Service Report, *see* § 22678.

### a. Terms of Service Requirement

AB 587's Terms of Service Requirement mandates that social media companies publicly post, "in a manner reasonably designed to inform all users" of its "existence and contents," their platforms'

1   terms of service.[7]  § 22676(a).  Those terms of service must include

2   (i) "contact information," so that users may "ask the social media

3   company questions about" the terms, (ii) a "description of the

4   process that users must follow to flag content, groups, or other

5   users that they believe violate the terms of service," as well as

6   "the social media company's commitments on response and resolution

7   time," and (iii) a "list of potential actions the social media

8   company may take against an item of content or a user, including,

9   but not limited to, removal, demonetization, deprioritization, or

10  banning."  § 22676(b).  Finally, the terms of service must be made

11  available in all Medi-Cal threshold languages pursuant to the

12  Health and Safety Code § 128552.  § 22676(c).  There are twelve

13  applicable Medi-Cal threshold language: (1) Arabic, (2) Armenian,

14  (3) Cambodian, (4) Cantonese, (5) Farsi, (6) Hmong, (7) Korean,

15  (8) Mandarin, (9) Russian, (10) Spanish, (11) Tagalog, and (12)

16  Vietnamese.[8]  T&S Aff. ¶ 8(b).  X Corp. currently offers product

17  features in eight of these twelve languages.

18              **b. Terms of Service Report**

19      AB 587 requires social media companies to submit bi-annual

20  Terms of Service Reports, on April 1 and October 1 of each year,

21

---

22  [7]  X Corp's Terms of Service are publicly available at
    https://twitter.com/en/tos.  *See* Kurtzberg Aff. Ex. 8.

23  [8]  *See* T&S Aff. Ex. 1 (*Primary Language of Newly Medi-Cal Eligible)
    Individuals*, California Department of Health Care Services, available at
    https://data.chhs.ca.gov/dataset/primary-language-of-newly-medi-cal-

24  eligible-individuals/resource/706bf0a7-9bb4-4674-9b58-917daac10d25)
    (last visited Oct. 6, 2023)).

25

1    to Attorney General Bonta, who will then make them publicly

2    available.  §§ 22677(b)(1) and 22677(c).  The Report must include:

3        i.  A statement of whether, and if so how, the platform's terms

4            of use define hate speech, racism, extremism,

5            radicalization, disinformation, misinformation,

6            harassment, and foreign political interference, §

7            22677(a)(3);

8       ii.  The current version of the terms of service and a "complete

9            and detailed description of any changes" to the terms since

10           any previous report, § 22677(a)(2);

11      iii. A "detailed description" of the platform's "content

12           moderation practices," including, but not limited to:

13           a. Any "existing policies intended to address the categories

14              of content described in [§ 22677(a)(3)]," §

15              22677(a)(4)(A);

16           b. How "automated content moderation systems enforce" the

17              platform's terms of service and "when these systems

18              involve human review," § 22677(a)(4)(B);

19           c. How the "company responds to user reports of violations

20              of the terms of service," § 22677(a)(4)(C); and

21           d. How the "company would remove individual pieces of

22              content, users, or groups that violate the terms of

23              service, or take broader action against" individual or

24              groups of users "that violate the terms of service,"

25

1 § 22677(a)(4)(D);

2  iv.  Information regarding "content that was flagged by the

3       social media company as content belonging to any of the

4       categories described in [§ 22677(a)(3)]" including:

5       a. The "total number of flagged items of content,"

6          § 22677(a)(5)(A)(i);

7       b. The "total number of actioned items of content,"

8          § 22677(a)(5)(A)(ii);

9       c. The "total number of actioned items of content that

10         resulted in action taken by the social media company

11         against the user or group of users responsible for the

12         content," § 22677(a)(5)(A)(iii);

13      d. The "total number of actioned items of content that were

14         removed, demonetized, or deprioritized" by the company,

15         § 22677(a)(5)(A)(iv);

16      e. The "number of times actioned items of content were

17         viewed by users," § 22677(a)(5)(A)(v);

18      f. The "number of times actioned items of content were

19         shared, and the number of users that viewed the content

20         before it was actioned," § 22677(a)(5)(A)(vi); and

21      g. The "number of times users appealed" company actions

22         "taken on that platform and the number of reversals of

23         social media company actions on appeal disaggregated by

24         each type of action," § 22677(a)(5)(A)(vii);

25

v.   All of the information required by § 22677(a)(5)(A)
     "disaggregated" by:

   a. The "category of content, including any relevant
     categories described in [§ 22677(a)(3)],"
     § 22677(a)(5)(B)(i);

   b. The "type of content" (e.g., "posts, comments,
     messages"), § 22677(a)(5)(B)(ii);

   c. The "type of media of the content" (e.g., "text, images,
     and videos,"), § 22677(a)(5)(B)(iii);

   d. How "the content was flagged" (e.g., "flagged by company
     employees or contractors, flagged by artificial
     intelligence software, flagged by community moderators,
     flagged by civil society partners, and flagged by
     users"), § 22677(a)(5)(B)(iv); and

   e. How "the content was actioned" (e.g., "actioned by
     company employees or contractors, actioned by artificial
     intelligence software, actioned by community moderators,
     actioned by civil society partners, and actioned by
     users"), § 22677(a)(5)(B)(v).

**c. Penalties**

AB 587 also sets forth a penalty scheme under which social media companies may be fined $15,000 per violation per day, and may be enjoined in any court of competent jurisdiction by AG Bonta or by a "city attorney," if the company (i) "[f]ails to post terms

of service in accordance with Section 22676," (ii) "[f]ails to timely submit" a Terms of Service Report, or (iii) "[m]aterially omits or misrepresents required information in a" Terms of Service Report.  § 22678.  AB 587's penalty provision further instructs that the court shall, "[i]n assessing the amount of a civil penalty pursuant to paragraph . . . consider whether the social media company has made a reasonable, good faith attempt to comply with the provisions of this chapter."  *Id.*

## II.  The Topics On Which AB 587 Forces X Corp. To Speak Are Extremely Controversial

The State is using AB 587 to frame the debate around core political and societal issues as the State wants to frame them and in a way that will, by generating immense controversy, pressure social media companies to moderate content as the State sees fit. Fernandez Aff. ¶¶ 18-20; T&S Aff. ¶¶ 37-38.  To that end, AB 587 compels disclosures from social media companies about the most controversial types of content moderation, as underscored by its legislative history.  T&S Aff. ¶ 29.  According to that legislative history, while there may be a "general public consensus" that some types of constitutionally-unprotected content (e.g., child pornography or threats of physical harm) should be limited on social media platforms to the extent possible, AB 587 focuses primarily on categories of content for which the State has an opinion (e.g., hate speech, racism, extremism, misinformation, political interference, and harassment) but for which there is no

1   such "general public consensus."  Kurtzberg Aff. Ex. 6 at 4; *see*

2   *also id.* Ex. 9 (Cal. Assemb. Floor Analysis, 2021–22 Sess. (AB

3   587), Apr. 28, 2021) at 1–2 (same); *id.* Ex. 10 (Cal. Assemb. Floor

4   Analysis, 2021–22 Sess. (AB 587), Aug. 24, 2022) at 2 (same).

5       As the legislative history acknowledges, the categories of

6   speech on which AB 587 focuses are those that are difficult to

7   define because their boundaries are "often fraught with political

8   bias."  Kurtzberg Aff. Ex. 6 at 4.  And social media companies are

9   frequently criticized **no matter what they do** when making editorial

10  decisions about whether and/or how to limit speech on their

11  platforms that arguably falls into these ill-defined categories.

12  T&S Aff. ¶ 28.  The Assembly Reports from the Committee on Privacy

13  and Consumer Protection accurately describes the "complex dilemma"

14  that social media companies increasingly find themselves in when

15  trying to define and moderate the politically-charged and

16  controversial categories of content that are the focus of AB 587:

17      As online social media become increasingly central to the
        public discourse, the companies responsible for managing
18      social media platforms are faced with a complex dilemma
        regarding content moderation, i.e., how the platforms
19      determine what content warrants disciplinary action such as
        removal of the item or banning of the user. In broad terms,
20      there is a general public consensus that certain types of
        content, such as child pornography, depictions of graphic
21      violence, emotional abuse, and threats of physical harm are
        undesirable, and should be mitigated on these platforms to
22      the extent possible. **Many other categories of information,
        however, such as hate speech, racism, extremism,**
23      **misinformation, political interference, and harassment [i.e.,
        the categories that are the focus of AB 587], are far more**
24      **difficult to reliably define, and assignment of their
        boundaries is often fraught with political bias. In such**

25

*cases, both action and inaction by these companies seems to be equally maligned: too much moderation and accusations of censorship and suppressed speech arise; too little, and the platform risks fostering a toxic, sometimes dangerous community.*

Kurtzberg Aff. Ex. 6 at 4 (emphasis added).  This is consistent with X Corp.'s experience.  T&S Aff. ¶ 28.  Specifically, "[t]here is intense public debate and controversy about how to define the categories of content that should be limited on the social media platform and how to apply those categories to content on the social media platform.  No matter what decisions are made, there are almost always large groups of people who disagree with them."  T&S Aff. ¶ 28.  Content-moderation decisions are so controversial that, in X Corp.'s experience, employees who publicly admit to being part of that decision-making process are frequently harassed, doxed, and attacked vociferously just for being involved.  *See* Affidavit of Ben Elron, dated Oct. 6, 2023 ("Elron Aff.") ¶¶ 5–8, 12–13.

Defining and regulating these categories of content is a politically-charged and controversial undertaking.  T&S Aff. ¶ 25.  Because these controversial categories are "difficult to reliably define" and "assignment of their boundaries is often fraught with political bias," Kurtzberg Aff. Ex. 6 at 4, decisions about how to define and moderate such content are inherently political.  *See* T&S Aff. ¶ 25.

As a result, views about how to define these categories of content or whether there is too much or too little moderation of

them are controversial questions.  T&S Aff. ¶ 26.  To take just a few examples of how controversial and politically-charged these questions can be:

    i.    Some people view speech intentionally misgendering a transgender individual as "hate speech" and harassment. *See* Kurtzberg Aff. Ex. 11 (*National Institute of Health, Gender Pronouns Resource*, U.S. Department of Health and Human Services (Mar. 8, 2023), available at https://dpcpsi.nih.gov/sgmro/gender-pronouns-resource (last visited Oct. 6, 2023)) ("Being misgendered (i.e., being referred to with incorrect pronouns) can be an extremely hurtful and invalidating experience.  Intentional refusal to use someone's correct pronouns is equivalent to harassment and a violation of one's civil rights."); Gender Expression Non-Discrimination Act, S.1047/A.747 (N.Y. 2019).  Others insist that forcing someone to call a transgender individual by their preferred pronouns violates their deeply-held beliefs about what is true. *See* Kurtzberg Aff. Ex. 12 (Khorri Atkinson, *Fight Over Transgender Pronouns at Work Faces Muddy Legal Waters*, Bloomberg Law (Apr. 13, 2023), available at https://news.bloomberglaw.com/daily-labor-report/fight-over-transgender-pronounsat-work-faces-muddy-legal-waters (last visited Oct. 6, 2023)) ("[T]here's been a steady

increase in internal complaints from workers who say their religious beliefs prevent them from calling a transgender person by their desired name or pronoun[.]").

ii. Political debates rage about whether and when criticism of Israel can be considered anti-Semitic hate speech. *See id.* Ex. 13 (*A Guide to Recognizing When Anti-Israel Actions Become Antisemitic*, American Jewish Committee, available at https://www.ajc.org/sites/default/files/pdf/2021-10/A%20Guide%20to%20Recognizing%20When%20Anti-Israel%20Actions%20Become%20Antisemitic.pdf (last visited Oct. 6, 2023)) ("Sometimes antisemitism is not easy to recognize—especially when it involves Israel"); Kurtzberg Aff. Ex. 14 (*Is Criticism of Israel Antisemitic?*, Anne Frank House, available at https://www.annefrank.org/en/topics/antisemitism/all-criticism-israel-antisemitic/ (last visited Oct. 6, 2023)) ("Criticism of Israel or of the policies of the Israeli government is not automatically antisemitic.").

iii. Some commentators have defined the term "racism" to apply only when discrimination based on race is directed at traditionally disadvantaged groups. *See id.* Ex. 15 (*The Myth of Reverse Racism*, Alberta Civil Liberties Research Centre, available at https://www.aclrc.com/myth-of-reverse-racism (last visited Oct. 6, 2023)) ("While

1           assumptions and stereotypes about white people do exist,

2           this is considered racial prejudice, not racism. . . . [It]

3           is not considered racism because of the systemic

4           relationship to power.").  Others have argued that the term

5           "racism" should apply when there is discrimination based on

6           race directed at any group.  *See id.* Ex. 16 (*Can White*

7           *People Experience Racism?*, The Economist, available at

8           https://www.economist.com/openfuture/2018/09/18/can-

9           white-people-experience-racism (last visited Oct. 6,

10          2023); *id.* Ex. 17 (Michelle Gao, *Who Can be 'Racist'?*, The

11          Harvard Crimson (Aug. 10, 2018), available at

12          https://www.thecrimson.com/column/between-the-

13          lines/article/2018/8/10/gao-whocan-be-racist/ (last

14          visited Oct. 6, 2023)).

15    iv.   In March 2020, many commentators insisted that it was

16          "disinformation" to suggest that the COVID-19 virus

17          originated in a lab in Wuhan, China.  *See id.* Ex. 18

18          (Marlette Vazquez, Calling COVID-19 the "Wuhan Virus" or

19          "China Virus" is Inaccurate and Xenophobic, Yale School of

20          Medicine (Mar. 12, 2020), available at

21          https://medicine.yale.edu/news-article/calling-covid-19-

22          the-wuhan-virus-or-chinavirus-is-inaccurate-and-

23          xenophobic/ (last visited Oct. 6, 2023)).  Others insisted

24          that suppressing such views was tantamount to censorship.

25

1         *See id.* Ex. 19 (*Michael Shellenberger Testimony to the House*

2         *Select Committee on the Weaponization of the Federal*

3         *Government*, The Censorship Industrial Complex: U.S.

4         Government Support For Domestic Censorship And

5         Disinformation Campaigns, 2016 – 2022 (Mar. 9, 2023),

6         available at https://judiciary.house.gov/sites/evo-

7         subsites/republicansjudiciary.house.gov/files/evo-media-

8         document/shellenberger-testimony.pdf (last visited Oct. 6,

9         2023)).

10     These examples show that AB 587 focuses on the most

11 controversial and politically-charged categories of content

12 moderation. T&S Aff. ¶ 29. It forces social media companies to

13 speak publicly and take a position on these controversial topics,

14 notwithstanding that doing so will usually result in public

15 criticism from one group or another. As the California Assembly's

16 Committee on Privacy and Consumer Protection Report makes clear,

17 "both action and inaction by these [social media] companies [in

18 regulating these controversial categories of content] seems to be

19 equally maligned." Kurtzberg Aff. Ex. 6 at 4; *see also id.* Ex. 9

20 at 1–2 (same); *id.* Ex. 10 at 2 (same).

21     Despite this controversy, X Corp. does not shy away from its

22 responsibility to make difficult content moderation decisions on

23 its social media platform. But that responsibility belongs to X

24 Corp., and it is not for the State to dictate, directly or

25

indirectly through "pressure," how it should be done.   Fernandez Aff. ¶ 20; T&S Aff. ¶ 36.

### III.   X Corp. Is Already Transparent About Its Content-Moderation Policies

The State attempts to justify its unconstitutional overreach by claiming that AB 587 will "requir[e] social media companies to be transparent about their content-moderation policies and decisions."   Specifically, the State asserts that AB 587 is a "transparency measure" that will (1) "let users know what social media platforms do to flag and remove [hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference]" and (2) "let[] users know in advance what kind of content or conduct could lead to their being temporarily or permanently banned from using the social media service."   Kurtzberg Aff. Ex. 5 at 4; *id.* Ex. 1 at 5 (citing same).

But X Corp. already provides its users with detailed information about (1) how it moderates (or does not moderate) the categories of content set forth in AB 587 and (2) the kinds of content and conduct that may lead to users being removed from the platform.   T&S Aff. ¶¶ 30–36.   There is no evidence whatsoever that users of the X platform — or of other social media platforms covered by AB 587 — do not have sufficient information about these topics, such that a government mandate of the sort AB 587 imposes is

1    necessary.

2         Given the inherent controversy tied to each of the topics in

3    § 22677(a)(3), including that they are "difficult to reliably

4    define" and are "often fraught with political bias," the task of

5    moderating them, and doing so with the right balance, is extremely

6    difficult.   T&S Aff. ¶¶ 26–28.   The State knows this full well

7    because the legislators that enacted AB 587 discussed in detail

8    the fact that, with respect to the topics in § 22677(a)(3), "both

9    action and inaction by [social media] companies seems to be equally

10   maligned: too much moderation and accusations of censorship and

11   suppressed speech arise; too little, and the platform risks

12   fostering a toxic, sometimes dangerous community."   Kurtzberg Aff.

13   Ex. 6 at 4; *see also id.* Ex. 9 at 1–2 (same); *id.* Ex. 10 at 2

14   (same).

15        Given these difficulties and the delicate and contentious

16   nature of content moderation decisions, X Corp. dedicates immense

17   time, energy, and financial and employee resources to these

18   moderation efforts and to ensuring that they are fully accessible

19   and understandable to users of the X platform.   T&S Aff. ¶ 36.   To

20   that end, X's content moderation policies are publicly-available

21   on its website with clear explanations as to how they are applied.

22   T&S Aff. ¶¶ 30–32.   For instance, pursuant to X's:

23        i.   **Violent Speech Policy**, X Corp. prohibits users from

24             "threaten[ing], incit[ing], glorif[ying], or express[ing]

25

desire for violence or harm," and informs users that if they violate this policy, X Corp. may "immediately and permanently suspend" the user's account, "temporarily lock [the user] out of [their] account," or "may make the violative content less visible by restricting its reach on X."  T&S Aff. Ex. 2 (*Violent Speech Policy*, X Corp., June 2023, available at https://help.twitter.com/en/rules-and-policies/violent-speech (last visited Oct. 6, 2023));

ii.  **Abuse and Harassment Policy**, X Corp. prohibits users from "shar[ing] abusive content, harrass[ing] someone, or encourag[ing] other people to do so," gives examples thereof (including "targeted harassment," "insults," and "violent event denial"), and informs users that X Corp. may make such content "less visible" (including by "restricting [its] discoverability" or "downranking" it), and may "exclud[e]" the content from "email or in-product recommendations," or may "requir[e] [its] removal."  T&S Aff. Ex. 3 (*Abuse and Harassment*, X Corp., June 2023, available at https://help.twitter.com/en/rules-and-policies/abusive-behavior (last visited Oct. 6, 2023));

iii.  **Hateful Conduct Policy**, X Corp. prohibits users from "directly attack[ing] other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age,

disability, or serious disease," gives examples thereof (including "hateful references," "incitement," "slurs," and "tropes"), and informs users that potential enforcement options for content violating this policy include "requiring Post removal" and "making [the] content less visible," and that X Corp. may "suspend[] accounts that violate" the policy. T&S Aff. Ex. 4 (*Hateful Conduct Policy*, X Corp., Apr. 2023, available at https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy (last visited Oct. 6, 2023));

iv.   **Violent and Hateful Entities Policy**, X Corp. prohibits users from "affiliat[ing] with or promot[ing] the activities of violent and hateful entities," "including (but not limited to) terrorist organizations, violent extremist groups, [and] perpetrators of violent attacks." The policy provides examples of prohibited content (including "recruiting, or providing or distributing services (such as media/propaganda) to further stated goals" of violent and hateful entities and informs users that X Corp. will "immediately and permanently suspend any account" determined to be in violation of the policy. T&S Aff. Ex. 5 (*Violent and Hateful Entities Policy*, X Corp., April 2023, available at https://help.twitter.com/en/rules-and-policies/violent-

1    entities (last visited Oct. 6, 2023));

2    v.   **Abusive Profile Information Policy**, X Corp. prohibits users

3    from using their "username, display name, or profile bio to

4    engage in abusive behavior, such as targeted harassment or

5    expressing hate towards a person, group, or protected

6    category," gives examples thereof (including "violent

7    threats," "abusive slurs," and "sexist tropes"), and

8    informs users that if they violate the policy, X Corp. will

9    "permanently suspend the account on first violation." T&S

10    Aff. Ex. 6 (*Abusive Profile Information*, X Corp., available

11    at https://help.twitter.com/en/rules-and-policies/abusive-

12    profile (last visited Oct. 6, 2023));

13    vi.  **Crisis Misinformation Policy**, X Corp. will "take action on

14    accounts that use X's services to share false or misleading

15    information that could bring harm to crisis-affected

16    populations," gives examples of such information

17    (including, in the "context of international armed

18    conflict," posts that contain "demonstrably false or

19    misleading allegations of war crimes or mass atrocities

20    against specific populations or groups"), and informs users

21    that if posts violating the policy may receive a "warning

22    notice" and their "visibility" may be "temporarily

23    reduce[d]." T&S Aff. Ex. 7 (*Crisis Misinformation Policy*,

24    X      Corp.,      Aug.      2022,      available      at

25

1      https://help.twitter.com/en/rules-and-policies/crisis-

2      misinformation (last visited Oct. 6, 2023));

3   vii.   **Synthetic and Manipulated Media Policy**, X Corp. prohibits

4      users from "shar[ing] synthetic, manipulated, or out-of-

5      context media that may deceive or confuse people and lead

6      to harm," gives examples thereof (including "media likely

7      to result in widespread confusion on public issues, impact

8      safety, or cause serious harm"), and informs users that if

9      they violate the policy, X Corp. may require them to "remove

10      this content," may apply a "label and/or warning message to

11      the post," and may "temporarily reduce the visibility of

12      the[ir] account or lock or suspend the[ir] account."  T&S

13      Aff. Ex. 8 (*Synthetic and Manipulated Media Policy*, X Corp.,

14      Apr. 2023, available at https://help.twitter.com/en/rules-

15      and-policies/manipulated-media  (last  visited  Oct.  6,

16      2023)); and

17   viii.   **Civic Integrity Policy**, X Corp. prohibits the use of X's

18      services "for the purpose of manipulating or interfering in

19      elections  or  other  civic  processes,  such  as  posting  or

20      sharing content that may suppress participation, mislead

21      people about when, where, or how to participate in a civic

22      process, or lead to offline violence during an election,"

23      and informs users that Posts violating the policy may be

24      "exclud[ed],"     "remov[ed],"     "restrict[ed],"     or

25

"downrank[ed]."  T&S Aff. Ex. 9 (*Civic Integrity Policy*, X Corp.,           Aug.           2023,           available           at https://help.twitter.com/en/rules-and-policies/election-integrity-policy (last visited Oct. 6, 2023)).

In sum, X Corp. provides a high level of transparency to its users as to how it moderates content.  Some of its categories cover content that arguably falls within the controversial and difficult-to-define categories of speech that are the focus of AB 587 in § 22677(a)(3) – although, for the reasons highlighted above, any discussion about the degree of overlap and/or application of these categories to specific examples is likely to engender a heated debate.  T&S Aff. ¶¶ 25–28.

Crucially, however, it is for X Corp. – not the State of California – to decide how to define its content moderation policies and how to apply them.  AB 587 seeks to frame the debate about content moderation around the categories of content that the State wants to see moderated differently to pressure social media companies to regulate content the way the State thinks is appropriate.  Fernandez Aff. ¶ 20; T&S Aff. ¶ 37.  This heavily interferes with X Corp.'s constitutionally-protected editorial discretion in this area.

**IV.  AB 587 Is Intended To And Will Suppress Speech Based On Content And Viewpoint**

California Governor Gavin Newsom has argued publicly that AB 587 does nothing more than "pull back the curtain" and provide

"transparency" as to the already-existent content-moderation policies of social media companies. *See, e.g.*, Kurtzberg Aff. Ex. 4. This claim, however, is belied by the record. *See id.* Exs.5, 6, 9, 10, 20, 21, 25. However, AB 587 goes far beyond merely providing "transparency." It compels – and is designed to compel – social media companies to take positions on controversial topics and grants the government significant new enforcement powers to police those disclosures, with the purpose of "pressuring" social media companies to censor, limit, or disfavor particular viewpoints that the State finds objectionable and that are identified in the eight content categories in § 22677(a)(3).

The legislative record is abundantly clear on this point: according to AB 587's authors, sponsors, and supporters, the law's true purpose and desired effect is to use the compelled disclosures to pressure social media companies into regulating and censoring constitutionally-protected content that the government believes is undesirable. For instance:

i. Within the April 27, 2021 Assembly Committee on Judiciary Hearing Report for AB 587, lead bill author Jesse Gabriel stated that AB 587 is an **"important first step"** in ensuring that **"social media companies [] moderate or remove hateful or incendiary content"** on their platforms. He hoped that AB 587 will **"pressure them" to "eliminate hate speech and disinformation."** *Id.* Ex. 5 at 4 (emphasis added);

ii.  The official bill comments accompanying AB 587's May 24, 2021 Assembly Floor Analysis applauded the bill's **_unique, data driven approach" to "content moderation on social media."_**  *Id.* Ex. 20 (Cal. Assemb. Analysis, 2021-22 Sess. (AB 587), May 24, 2021) at 2 (emphasis added);

iii.  The July 13, 2021 Senate Judiciary Committee Hearing Report for AB 587 cites to comments from official bill sponsor Anti-Defamation League ("ADL") that emphasized that the law will **_allow "policymakers [to] take meaningful action to decrease online hate and extremism."_**  *Id.* Ex. 21 (Cal. Sen. Judiciary Report, 2021-22 Sess. (AB 587), July 13, 2021) at 13 (emphasis added);

iv.  In July 2020, California Senator Scott Wiener, who ultimately co-authored AB 587, tweeted, "Social media platforms have a moral obligation—& **_need to have a legal obligation_**—not to become engines for violent hate speech." *Id.* Ex. 22 (Senator Scott Wiener (@Scott_Wiener), Twitter (July 2, 2020, 1:32 PM EST), available at https://twitter.com/Scott_Wiener/status/1278743357032812544(last visited Oct. 6, 2023)) (emphasis added);

v.  On March 29, 2021 in a press release about AB 587, the ADL, an official sponsor of AB 587, clarified that the intent of the law is to **_"improv[e]" the "enforcement of [social media companies' content-moderation] policies" or "provide enough_**

1    ***evidence for legal action against them.***   *Id.* Ex. 23 (Press

2    Release, *California Legislators Introduce Bipartisan Effort*

3    *to Hold Social Media Companies Accountable for Online Hate*

4    *and   Disinformation*   (Mar.   29,   2021),   available   at

5    https://a46.asmdc.org/press-releases/20210329-california-

6    legislators-introducebipartisan-effort-hold-social-

7    media(last visited Oct. 6, 2023)) (emphasis added).

8    vi.   In that same March 29, 2021 press release, the National

9    Hispanic Media Coalition, another official supporter of AB

10   587, emphasized AB 587's value in ***disrupting social media***

11   ***companies'   facilitation   of   "white   supremacy,   hate,***

12   ***conspiracies,   and   extremism   online"*** by   carrying   that

13   content on their platforms.   *Id.* (emphasis added);

14   vii.   On June 21, 2021, lead bill author Jesse Gabriel Tweeted

15   that AB 587 was going to ***"address . . . concerns that***

16   ***platforms   aren't   doing   enough   to   stop   the   spread   of***

17   ***misinformation and hate speech."***   *Id.* Ex. 24 (Assm. Jesse

18   Gabriel (@AsmJesseGabriel), Twitter (June 14, 2021, 5:37 PM

19   EST),                   available                   at

20   https://twitter.com/AsmJesseGabriel/status/14045536995028

21   70529   (last   visited   Oct.   6,   2023))   (emphasis   added,

22   internal quotation omitted).

23   AB 587's legislative record also makes clear that it aims to

24   censor ***particular viewpoints*** espoused on social media platforms

25

1   with respect to the eight categories of content in § 22677(a)(3).

2   *See id.* Exs. 5, 6, 9, 10, 20, 21, 25.   For instance, within the

3   April 27, 2021 Assembly Committee on Judiciary Hearing Report for

4   AB 587, bill author Jesse Gabriel cited a "study of Twitter posts"

5   that supposedly found that "the greater proportion of tweets

6   related to race- and ethnicity-based discrimination in a given

7   city, the more hate crimes were occurring in that city."  *Id.* Ex.

8   5 at 4.   Similarly, the June 28, 2022 Senate Judiciary Committee

9   Hearing Report for AB 587 cites a study finding that a third of

10   individuals who "experience online harassment . . . attribute at

11   least some harassment to their identity . . . affecting the ability

12   of already marginalized communities to be safe in digital spaces."

13   *Id.* Ex. 25 (Cal. Sen. Judiciary Report, 2021–22 Sess. (AB 587),

14   June 28, 2022) at 8; *see also id.* at 18 (Los Angeles County

15   Democratic Party noting its support for AB 587 because social media

16   companies "enable[] the micro targeting of vulnerable

17   individuals.").

18       The mechanism for applying this pressure to social media

19   companies lies, in large part, in AB 587's amorphous and draconian

20   penalty scheme.   The law affords the Attorney General unfettered

21   discretion in deciding what constitutes a "reasonable, good faith

22   attempt to comply" or a "material[] omi[ssion] or

23   misrepresent[ation]" in the Terms of Service Report.   § 22678.   If

24   the Attorney General decides that there is even a reason to suspect

25

that those amorphous standards might have been violated, he is empowered to issue compulsory demands for documents or testimony to investigate further. *See* Cal. Gov't Code § 11180, *et seq*. And, even if no charges are ever filed, those compulsory requests can impose substantial costs on social media companies, so much so that the obvious response of many will be to avoid such inquiries altogether by modifying the content moderation policies to please the Attorney General. T&S Aff. ¶ 24. As one leading commentator put it:

> Through actual or threatened enforcement, regulators can influence what content Internet services publish – and punish Internet services for making editorial decisions the regulators disagree with. This enables regulators – especially elected officials – to pursue investigations and enforcement actions purely for political payoffs, such as showing their constituents how they are 'tough on Big Tech.'

*Kurtzberg Aff*. Ex. 26 (Eric Goldman, *The Constitutionality of Mandating Editorial Transparency*, 73 Hastings L.J. 1203, 1227 (2022)).

Concerns about the enforcement mechanisms of AB 587 being used in this way are not theoretical. They have already happened. Less than two months after AB 587's enactment, AG Bonta sent a threatening letter to the CEOs of X Corp. and other leading social media companies, reminding them of their companies' "responsibility" to combat what AG Bonta described as the "dissemination of disinformation that interferes with our electoral

system," while simultaneously reminding them that **the "California Department of Justice will not hesitate to enforce" AB 587**. Fernandez Aff. Ex. 1 (emphasis added).

This threat of enforcement of AB 587 was coupled with a series of carefully-worded demands from the Attorney General appearing in other sections of the letter.  Specifically, the letter states:

> "It is [] **incumbent on your companies** to institute and enforce durable dynamic policies that will actually prevent disinformation and misinformation from spreading."

> "I **urge** you to strengthen and accelerate your companies' ongoing efforts to consistently, transparently, and aggressively address violations of your policies with respect to disinformation and violations of state and federal law."

> "I **implore** you to do more to rid your platforms of the dangerous disinformation, misinformation, conspiracy theories, and threats that fuel political violence, spread fear and distrust, and ultimately chill our democratic process."

> "You **must** continue to take action pursuant to [X Corp.'s] policies and enforce [X Corp.'s] terms against disinformation, voter suppression, and coordinated inauthentic or violent behavior."

> "I [] **implore** you to employ your immense resources, tools, and familiarity with the operation of your social media platforms to stop the spread of disinformation, misinformation, conspiracy theories, and threats that fuel political violence."

Fernandez Aff. ¶ 16 (quoting Fernandez Aff. Ex. 1 at 2-3, 8 (emphasis added)).

AG Bonta's press release reinforced the message that the he was trying to show his constituents that he was being "tough on Big Tech" and demanding action from the social media companies in

1    limiting the dissemination of "disinformation":

2

3         "In advance of the upcoming 2022 midterm elections, social
         media platforms **must** take further action – such as enforcement
         of their content moderation policies and terms of service –
4         to stop the spread of disinformation and misinformation that
         attack the integrity of our electoral processes." Exhibit 2
5         at 1-2 (emphasis added).

6

7    Fernandez Aff. ¶ 17 (quoting Fernandez Aff. Ex. 2 at 1-2 (emphasis

     added)).
8

9        Any sophisticated reader of the letter would have concluded

10   what Wifredo Fernandez, X Corp.'s Head of U.S. Governmental

     Affairs, did, namely, that:
11

12        [L]etters from Attorneys General, such as this one, that
         'urge' companies to take action that the Attorney General
13        claims they have a 'duty' or 'responsibility' to do, and, at
         the same time, threaten enforcement of certain specified laws,
14        are a precursor to legal action taken by the Attorney General
         if the companies don't 'voluntarily' take the actions
15        requested by the Attorney General.

16        Based on my experience in governmental affairs and in dealing
         with numerous offices of Attorneys General across the country,
17        I interpret Attorney General Bonta's letter as a thinly-veiled
         threat from the Attorney General to try to force X Corp. to
18        limit specific speech – here, 'misinformation' or
         'disinformation,' presumably as defined by Attorney General
19        Bonta's Office – that Attorney General Bonta finds
         objectionable or face enforcement action. The letter and
20        press release make clear that the Attorney General intends to
         use enforcement of AB 587 as one of his many tools to 'urge'
21        or pressure social media companies to 'enforce[] their content
         moderation policies and terms of service' in order 'to stop
22        the spread of disinformation and misinformation that attack
         the integrity of our electoral processes.'"

23   Fernandez Aff. ¶¶ 19-20 (quoting Fernandez Aff. Ex. 2).

24       It is not difficult to imagine what will happen if Attorney

25

General Bonta concludes that X Corp. does not do enough, in his view, to get rid of content that he sees as "disinformation" on its social media platform.  AB 587 grants AG Bonta nearly unfettered discretion to determine if, in his view, X Corp. has complied with AB 587 in "reasonable, good faith" or has made a "material[] omi[ssion] or misrepresent[ation]" in its Terms of Service Report. § 22678.  And AG Bonta is free to employ his broad pre-litigation investigatory powers — including, but not limited to, issuing subpoenas for the production of documents, the attendance of witnesses, and testimony — to impose substantial costs on X Corp. by seeking documents and information about what, if anything, it has done to limit the spread of "disinformation," as he interprets it.  *See* Petition to Enforce Investigative Subpoena, *Brown* v. *Moody's Investor Services, Inc.*, 2010 WL 1557650 (Cal. Super. Ct., L.A. County Apr. 16, 2010) (California AG stating that he "possesses **broad pre-litigation powers** under California Government Code section 11180 *et seq.* to investigate and prosecute actions") (emphasis added).

The end result is that AB 587 is not merely a "transparency measure."  It provides the Attorney General with broad powers to pressure social media companies, like X Corp., with threats of investigation and enforcement if the companies fail to moderate content on their platforms in a manner that the State desires.  As the legislative history makes plain, that is precisely what the

1  State designed AB 587 to accomplish.  And as the threatening letter

2  from AG Bonta to X Corp. CEO Elon Musk makes plain, that is

3  precisely how the State of California intends to use the law, and

4  is already using the law.  Fernandez Aff. ¶¶ 18–19.

5                          **LEGAL STANDARD**

6       To succeed on a motion for a preliminary injunction, a

7  plaintiff must establish that (1) it is "likely to succeed on the

8  merits"; (2) it is "likely to suffer irreparable harm in the absence

9  of preliminary relief"; (3) the "balance of equities tips in [its]

10 favor"; and (4) an "injunction is in the public interest."  *Høeg*

11 v. *Newsom*, 2023 WL 414258, at *2 (E.D. Cal. Jan. 25, 2023) (Shubb,

12 J.) (citing *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

13 (2008)).

14      Likelihood of success on the merits is the "most important

15 among these factors," and this is "especially true" for

16 constitutional claims because "the remaining *Winter* factors

17 typically favor enjoining laws thought to be unconstitutional."

18 *Junior Sports Mags. Inc.* v. *Bonta*, 80 F. 4th 1109, 1115 (9th Cir.

19 2023); *see also California Chamber of Com.* v. *Council for Educ. &*

20 *Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) ("'Irreparable

21 harm is relatively easy to establish in a First Amendment case.'

22 The plaintiff 'need only demonstrate the existence of a colorable

23 First Amendment claim.'") (citation omitted), *cert. denied*, 143 S.

24 Ct. 1749 (2023).

25

1

**ARGUMENT**

2

**V.   X Corp. Is Likely To Succeed On The Merits**

3        X Corp. is likely to succeed on the merits of its claims (1)

4  under the First Amendment of the U.S. Constitution and Article 1,

5  Section 2, of the California Constitution[9] and (2) that AB 587

6  directly conflicts with, and is thus preempted by, 47 U.S.C. §

7  230(c)(2).

8                    **a. X Corp. Is Likely To Succeed On Its Claims Under The**
                     **First Amendment To The U.S. Constitution And Article**
9                    **1, Section 2, Of The California Constitution**

10       AB 587 violates the First Amendment to the U.S. Constitution

11  and Article I, Section 2, of the California Constitution because

12  it (i) impermissibly interferes with the constitutionally-

13  protected editorial judgments of social media companies such as X

14  Corp. by compelling them to engage in speech against their will;

15  (ii) has both the purpose and likely effect of pressuring companies

16  such as X Corp. to remove, demonetize, or deprioritize

17  constitutionally-protected speech that the State deems undesirable

18  or harmful; (iii) does not support a compelling, substantial, or

19  important government interest; and (iv) places an unjustified and

20

_____

21  [9] AB 587 violates Article I, Section 2, of the California Constitution
    for all of the same reasons that it violates the First Amendment of the
22  U.S. Constitution. *See, e.g.*, *City of Montebello* v. *Vasquez*, 1 Cal. 5th
    409, 421 n.11 (2016) ("[T]he California liberty of speech clause is
23  broader and more protective than the free speech clause of the First
    Amendment."); *Delano Farms Co.* v. *California Table Grape Com.*, 4 Cal.
24  5th 1204, 1221 (2018) ("[O]ur case law interpreting California's free
    speech clause has given respectful consideration to First Amendment case
25  law for its persuasive value[.]").

undue burden on social media companies such as X Corp.

     i. *X Corp.'s Editorial Judgments About Content On X Are Constitutionally-Protected Speech*

     We start with a basic premise that AG Bonta has conceded: namely, that "social media companies," like X Corp., "are private actors with their own First Amendment rights." Kurtzberg Aff. Ex. 1 at 18-19. Those First Amendment rights protect editorial judgments made about what content to include on a social media platform. That is, "[l]ike a newspaper or a news network," X Corp.'s "decisions about what content to include, exclude, moderate, filter, label, restrict, or promote" on its platform are "protected by the First Amendment." *Padilla*, 579 F. Supp. 3d at 1186-87, *aff'd sub nom. on other grounds*, *Weber*, 62 F.4th 1145; *see also NetChoice, LLC* v. *Att'y Gen., Fla.*, 34 F.4th 1196, 1213 (11th Cir. 2022) ("When platforms choose to remove users or posts, deprioritize content in viewers' feeds or search results, or sanction breaches of their community standards, they engage in First-Amendment-protected activity."); *Animal Legal Def. Fund* v. *Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018) ("decisions about content . . . are expressive in the same way as the written word or a musical score"); *U.S. Telecom Ass'n* v. *FCC*, 855 F.3d 381, 435 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing *en banc*) (the government may not "tell Twitter or YouTube what videos to post" or "tell Facebook or Google what content to favor" any more than it may "tell *The Washington Post* or the *Drudge*

1    *Report* what columns to carry").

2       There is overwhelming authority supporting the proposition

3 that the First Amendment protects editorial judgments about what

4 to publish. The U.S. Supreme Court has long made clear, for

5 example, that attempts to inject the government into the editorial

6 processes of newspapers are constitutionally suspect. In *Herbert*

7 v. *Lando,* 441 U.S. 153 (1979), for instance, the Court noted that

8 a law that "subjects the editorial process to private or official

9 examination merely to satisfy curiosity or to serve some general

10 end such as the public interest . . . would not survive

11 constitutional scrutiny as the First Amendment is presently

12 construed." *Id.* at 174; *see also id.* at 172 (concluding that "if

13 inquiry into editorial conclusions threatens the suppression . . .

14 of truthful information," it raises First Amendment problems). And

15 in *Miami Herald Pub. Co.* v. *Tornillo*, 418 U.S. 241, 258 (1974),

16 the Court held that "[t]he choice of material to go into a

17 newspaper, and the decisions made as to limitations on the size

18 and content of the paper, and treatment of public issues and public

19 officials — whether fair or unfair — constitute the exercise of

20 editorial control and judgment. It has yet to be demonstrated how

21 governmental regulation of this crucial process can be exercised

22 consistent with First Amendment guarantees of a free press as they

23 have evolved to this time."

24       These cases make clear that the First Amendment prohibits the

25

government from interfering with the editorial discretion of traditional publishers. If there were a law, for instance, that compelled newspapers to publicly disclose Terms of Service containing (i) detailed disclosures about their criteria for publication and statistics about the bases for decisions regarding whether to publish letters to the editor or opinion pieces; and (ii) statistics about how many submissions were accepted and rejected on the ground that they contained "hate speech" or "misinformation," it would undoubtedly interfere with the constitutionally-protected editorial judgment of newspapers.

That X is a social media platform does not change the analysis. The U.S. Supreme Court has thwarted governmental attempts to inhibit "private entities' rights to exercise editorial control over speech and speakers on their properties or platforms." *Halleck*, 139 S. Ct. at 1932. Accordingly, a private social media company's editorial judgment on how to regulate content on its platform is therefore fully protected under the First Amendment.

There is also overwhelming authority for the proposition that social media companies' First Amendment rights extend to decisions about what to say – and what not to say – about how content on those platforms is moderated. That is because the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley* v. *Maynard*, 430 U.S. 705, 714 (1977); *Riley* v. *Nat'l Fed'n of the Blind*, 487 U.S. 781, 797 (1988); *see*

1   *also Agency for Int'l Dev.* v. *Alliance for Open Soc'y Int'l, Inc.*,

2   570 U.S. 205, 213 (2013) (the First Amendment "prohibits the

3   government from telling people what they must say"). These

4   protections against compelled speech apply equally to "compelled

5   statements of 'fact'" and "compelled statements of opinion" because

6   "either form of compulsion burdens protected speech." *Riley*, 487

7   U.S. at 797–98. And the right to choose whether and how to tailor

8   one's message is not "restricted to the press." *Hurley*, 515 U.S.

9   at 574. Rather, it is "enjoyed by business corporations generally

10  and by ordinary people engaged in unsophisticated expression as

11  well as by professional publishers." *Id.*

12      A Fourth Circuit case, *Washington Post* v. *McManus*, 944 F.3d

13  506 (4th Cir. 2019), striking down a Maryland law (the Online

14  Electioneering Transparency and Accountability Act) requiring

15  source-data disclosures from online platforms, illustrates the

16  point. In an effort to address foreign interference in U.S.

17  elections, the law required "online platforms" "within 48 hours of

18  an ad being purchased" to "display somewhere on their site the

19  identity of the purchaser, the individuals exercising control over

20  the purchaser, and the total amount paid for the ad." *Id.* at 511–

21  12. The law also required the platforms to preserve the data for

22  a year and make it available to the government for inspection upon

23  request. *Id.* at 512. The court called the law "a compendium of

24  traditional First Amendment infirmities," *id.* at 513, and struck

25

1    it down, holding that "the law brings the state into an unhealthy

2    entanglement with news outlets. . . . Without clear limits, the

3    specter of a broad inspection authority, coupled with an expanded

4    disclosure obligation, can chill speech and is a form of state

5    power the Supreme Court would not countenance." *Id.* at 518-19.

6         The same is true of AB 587.  Given that the First Amendment

7    protects private social media companies from compelled speech and

8    gives those entities a right to moderate content on their platforms

9    as they deem fit, laws, like AB 587, that compel speech that

10   interferes with the exercise of editorial discretion, present a

11   "compendium of traditional First Amendment infirmities," *McManus*,

12   944 F.3d at 513, and are unconstitutional.

13            ii.  *Strict Scrutiny Applies Because AB 587 Is A Content-*
                  *and Viewpoint-Based Regulation Of Speech*
14

15        Strict scrutiny applies here because AB 587 is content-based.

16   "Content-based laws — those that target speech based on its

17   communicative content — are presumptively unconstitutional and may

18   be justified only if the government proves that they are narrowly

19   tailored to serve compelling state interests." *Reed* v. *Town of*

20   *Gilbert, Ariz.*, 576 U.S. 155, 171 (2015).  There is no doubt that

21   AB 587 fits that definition: it singles out specific categories of

22   speech — hate speech, racism, extremism, radicalization,

23   disinformation, misinformation, harassment, and foreign political

24   interference — that are almost entirely constitutionally protected

25   and that the State has openly conceded that it wants to "pressure"

1  the social media companies to limit.

2      This does not even present a close call.  Strict scrutiny

3  applies to AB 587 for at least four reasons: (1) it singles out

4  and attempts to place burdens on constitutionally-protected speech

5  that the State finds objectionable; (2) it regulates "speech about

6  speech" and therefore runs the risk of infringing both the social

7  media companies' First Amendment rights to exercise their editorial

8  judgment and the public's First Amendment rights to access

9  constitutionally-protected content; (3) the law's stated purpose

10  is to "pressure" social media companies into disfavoring or

11  limiting content that the State finds objectionable; and (4) the

12  law's likely effect, due to the unfettered discretion it gives AG

13  Bonta to enforce violations, will be to allow the State to suppress

14  particular content - and specific viewpoints – that the State

15  disfavors.

16      *First*, AB 587 plainly "targets speech based on its

17  communicative content," *Reed*, 576 U.S. at 171, making it content-

18  based and presumptively unconstitutional.  It does not require

19  social media companies simply to disclose their content moderation

20  policies generally, but rather forces them to focus on categories

21  of content - hate speech, racism, extremism, radicalization,

22  disinformation, misinformation, harassment, and foreign political

23  interference – that the State disfavors.  That, in itself, is

24  sufficient to trigger strict scrutiny.

25

The law is also content-based because it "compel[s]" X Corp. to "speak a particular message," which necessarily "alters the *content* of" its speech. *Nat'l Inst. Of Fam. & Life Advocs.* v. *Bacerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*") (quoting *Riley*, 487 U.S. at 795). And these are not the type of "purely factual and uncontroversial" disclosures under *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626 (1985), that necessitate a less-stringent standard of review. *See* Section V(a)(iv) below. Rather, as the legislative history makes clear, the disclosures are about how to define and moderate the categories of content that are the most difficult to define because their boundaries are "often fraught with political bias." Kurtzberg Aff. Ex. 6 at 4. As a result, the social media companies are typically criticized no matter what content-moderation decisions they make about these controversial categories. *Id.; see also* T&S Aff. ¶¶ 25–29. This renders AB 587's "compelled [disclosures] controversial under *Zauderer*" because they require X Corp. to "t[ake] sides in a heated political controversy" and "convey a message fundamentally at odds with its mission," *Nat'l Ass'n of Wheat Growers* v. *Becerra*, 468 F. Supp. 3d 1247, 1259 (E.D. Cal. 2020) (Shubb, J.) (quoting *CTIA - The Wireless Ass'n* v. *City of Berkeley, California*, 928 F.3d 832, 845 (9th Cir. 2019)), which is to provide a robust engagement and debate community **pursuant to its own principles**, rather than those of the State. Given the controversial nature of the compelled

1  disclosures, strict scrutiny applies.

2       Courts have applied strict scrutiny to analogous state

3  statutes aimed at compelling social media companies to disclose

4  how they moderate specific categories of content.  In *Volokh* v.

5  *James*, for example, the Southern District of New York applied

6  strict scrutiny to, and preliminarily enjoined on First Amendment

7  grounds, a New York law that, like AB 587, forced social media

8  networks to make disclosures about and implement complaint

9  mechanisms with respect to a particular category of content —

10  namely, that which "vilifies," "humiliates," or "incites

11  violence."  2023 WL 1991435, at *2, *8–10 (S.D.N.Y. Feb. 14,

12  2023).  The court applied strict scrutiny because the law

13  "regulate[d] speech based on its content."  *Id.* at *8.  The law

14  could not pass constitutional muster because it "both compels

15  social media networks to speak about the contours of hate speech

16  and chills the constitutionally protected speech of social media

17  users, without articulating a compelling governmental interest or

18  ensuring that the law is narrowly tailored to that goal."  *Id.* at

19  *1.[10]

20

21  [10] AB 587's Terms of Service Requirement similarly violates the First
    Amendment because it impermissibly interferes with X Corp.'s right to
    decide for itself what its Terms of Service cover.  By mandating that X
22  Corp.'s Terms of Service contain certain provisions about how content is
    moderated, the State is requiring it to moderate content in ways that
23  the State deems appropriate, rather than leaving those constitutionally-
    protected editorial choices to X Corp.  The Terms of Service Requirement
24  may not mandate that a particular process or methodology be used, but it
    does force X Corp. to make certain disclosures about how the content-
25  moderation process works, how users can flag objectionable content, how

***Second***, strict scrutiny also applies because AB 587 is a regulation of "speech about speech," and such regulations have historically triggered heightened First Amendment protections. This is because such laws have the potential to impact not only the speaker's First Amendment rights to make editorial judgments about what speech to permit on a given platform (e.g., a bookstore, movie theater, or social media platform), but also ***the public's*** right to access constitutionally-protected speech that the government may not suppress directly.

Thus, in *Smith* v. *California*, 361 U.S. 147 (1958), the Supreme Court struck down, on First Amendment grounds, a Los Angeles ordinance imposing strict liability on booksellers selling obscene books because such liability would "tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly." *Id.* at 154. The same concerns that motivated the Court to protect booksellers from the law in *Smith* – concerns associated with avoiding "self-censorship, compelled by the State, that would be a censorship affecting the whole public," *id.* – apply to AB 587, which has the potential to engender self-censorship in social media companies, compelled by the State, that can affect the First Amendment rights of both the social media companies and those that use their platforms. Because

---

quickly the companies will respond to flagged content, and what actions the companies may take with respect to potentially objectionable content. The First Amendment does not permit the State to dictate to X Corp. what its Terms of Service about content moderation should be.

1   of this "double whammy" of free speech violations, heightened

2   scrutiny is necessary.

3        Other regulations that compel "speech about speech" have been

4   subjected to heightened scrutiny.  For example, in *Entertainment*

5   *Software Ass'n* v. *Blagojevich*, 469 F.3d 641, 651–53 (7th Cir.

6   2006), the Seventh Circuit applied strict scrutiny to and struck

7   down a law requiring companies selling video games to identify some

8   games as "sexually explicit" and to distribute brochures explaining

9   the rating system to consumers.  For similar reasons, courts have

10  routinely struck down efforts by states to give legal effect to

11  MPAA ratings to films.  *See, e.g.*, *Motion Picture Ass'n of America*

12  v. *Specter*, 315 F. Supp. 824 (E.D. Pa. 1970) (striking down as

13  unconstitutional a Pennsylvania law prohibiting showing previews

14  for "X" and "R" rated movies at "G" or "GP" films); *cf. Forsyth* v.

15  *Motion Picture Association of America, Inc.*, 2016 WL 6650059, at

16  *4-5 (N.D. Cal. Nov. 10, 2016) (granting an anti-SLAPP motion in a

17  case in which a filmmaker sued the MPAA for giving a film a "G-

18  rating" and holding that the MPAA had a First Amendment right to

19  rate films as it saw fit).

20       AB 587 should be met with similar skepticism.  It burdens not

21  only the free speech rights of X Corp., but also those of its

22  users.  Strict scrutiny should therefore apply.

23       ***Third***, AB 587's legislative record, as well as statements made

24  by AG Bonta in defending and preparing to enforce the law,

25

1  demonstrate that its main purpose is to "pressure" X Corp. to

2  "eliminate" certain constitutionally-protected content viewed by

3  the State as problematic.  *See, e.g.*, Kurtzberg Aff. Ex. 5 at 4

4  ("[I]f social media companies are forced to disclose what they do

5  in this regard [i.e., how they moderate online content], it may

6  pressure them to become better corporate citizens by doing more to

7  eliminate hate speech and disinformation."); *id.* Ex. 1 at 15-16

8  ("[T]he Legislature also considered that, by requiring greater

9  transparency about platforms' content-moderation rules and

10  decisions, AB 587 may result in public pressure on social media

11  companies to 'become better corporate citizens by doing more to

12  eliminate hate speech and disinformation' on their platforms. . .

13  .  This, too, is a substantial state interest.").

14  　　　Accordingly, "[f]ormal legislative findings accompanying" AB

15  587 make clear its illicit "purpose and practical effect," *Sorrell*

16  v. *IMS Health, Inc.*, 564 U.S. 552, 565 (2011), which is to regulate

17  speech on X "based on 'the topic discussed or the idea or message

18  expressed,'" *City of Austin, Texas* v. *Reagan Nat'l Advert. of*

19  *Austin, LLC*, 142 S. Ct. 1464, 1474 (2022) (citing *Reed*, 576 U.S.

20  at 171).  This, the First Amendment does not permit, absent a

21  compelling state interest and means that are narrowly tailored to

22  achieve that interest, since "subtler forms of discrimination that

23  achieve identical results based on function or purpose" do not

24  escape strict scrutiny. *City of Austin*, 142 S. Ct. at 1474 (citing

25

1   *Reed*, 576 U.S. at 159–60, 163–64). As the Supreme Court made clear

2   in *Reed*, because "strict scrutiny applies **either** when a law is

3   content based on its face **or when the purpose and justification**

4   **for the law are content based**, a court must evaluate each question

5   before it concludes that the law is content neutral and thus subject

6   to a lower level of scrutiny." *Reed*, 576 U.S. at 166 (emphasis

7   added); *see also Wasden*, 878 F.3d at 1204 ("A regulation is content-

8   based," and thus "constitutional only if it withstands strict

9   scrutiny," if "the purpose and justification for the law are

10  content based."); *Crownholm* v. *Moore*, 2022 WL 17968586, at *4 (E.D.

11  Cal. Dec. 27, 2022) (quoting *Reed*, 576 U.S. at 163–64) ("A law may

12  be content based" if it "rel[ies] on a content-based 'purpose and

13  justification.'") (citation omitted), *appeal dismissed*, 2023 WL

14  3059179 (9th Cir. Feb. 3, 2023).

15       To be sure, AB 587 reaches even further, targeting **particular**

16  **viewpoints** with respect to the content categories in § 22677(a)(3).

17  For instance, within the April 27, 2021 Assembly Committee on

18  Judiciary Hearing Report for AB 587, bill author Jesse Gabriel

19  cited a "study of Twitter posts" that supposedly found that "the

20  greater proportion of tweets related to race- and ethnicity-based

21  discrimination in a given city, the more hate crimes were occurring

22  in that city." Kurtzberg Aff. Ex. 5 at 4; *see also id.* Ex. 25 at

23  8 (citing study which found that a third of individuals who

24  "experience online harassment . . . attribute at least some

25

harassment to their identity . . . affecting the ability of already marginalized communities to be safe in digital spaces"); *id.* at 18 (Los Angeles County Democratic Party noting its support for AB 587 because social media companies "enable[] the micro targeting of vulnerable individuals."). And the ADL, a sponsor of AB 587, has made no secret of the fact that its support for AB 587 is based largely on its view that it will reduce the spread of hate speech on social media platforms. *See* Kurtzberg Aff. Ex. 5 at 6.

Thus, here, as in *Sorrell*, the California legislature's "expressed statement of purpose" demonstrates that AB 587 "imposes burdens . . . aimed at a particular viewpoint." *Sorrell*, 564 U.S. at 565; *see also id.* at 578–79 ("[A] State's failure to persuade does not allow it to hamstring the opposition. The State may not burden the speech of others in order to tilt public debate in a preferred direction."); *id.* at 565 (applying "heightened scrutiny" to law intended to suppress speech in conflict with the goals of the state"). It is hornbook law that such "ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional." *Rosenberger* v. *Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995) (internal quotation omitted).

***Finally***, strict scrutiny should apply to AB 587 for the additional reason that — when coupled with (i) AG Bonta's public threats to enforce the law specifically against X Corp.; (ii) his ability to investigate potential violations of AB 587 through broad

subpoena power; and (iii) his unfettered discretion of what constitutes a "material[] omi[ssion] or misrepresent[ation]" or a "reasonable, good faith attempt to comply," § 22678(a)(2)(C), (a)(3) — it lends itself to impermissible government coercion. Specifically, by reminding X Corp. of its "responsibility" to combat what AG Bonta views as the "dissemination of disinformation that interferes with our electoral system," while simultaneously reminding X Corp. that the "California Department of Justice will not hesitate to enforce" AB 587, Fernandez Aff. Ex. at 1, AG Bonta has "made clear" that X Corp. will "suffer adverse consequences" if it "fail[s] to comply" with AB 587's disclosure requirements. *Missouri* v. *Biden*, 2023 WL 6425697, at *22 (5th Cir. Oct. 3, 2023); *see also NetChoice, LLC* v. *Bonta*, 2023 WL 6135551, at *8 (N.D. Cal. Sept. 18, 2023) (requiring companies to enforce their own content-moderation policies "would essentially press private companies into service as government censors, thus violating the First Amendment by proxy"); Fernandez Aff. ¶¶ 18–19.

Further actualizing AG Bonta's threat is that he "possesses broad pre-litigation powers under California Government Code section 11180 et seq. to investigate and prosecute actions," Petition to Enforce Investigative Subpoena, *Brown*, 2010 WL 1557650, including but not limited to "issu[ing] subpoenas" for the "production of . . . documents," the "attendance of witnesses," and "testimony," Cal. Gov't Code § 11181(a); *see also Herbert*, 441

U.S. at 174 (a law that "subjects the editorial process to private or official examination . . . would not survive constitutional scrutiny").   It is entirely within the unilateral power and unfettered discretion of AG Bonta to make an initial determination as to whether X Corp. has violated AB 587 by failing to make a "reasonable, good faith attempt to comply" or by making a "material[] omi[ssion] or misrepresent[ation]" in its Terms of Service Report.   § 22678(a)(2)(C), (a)(3).   And given how controversial content moderation decisions are, a political case can always be made that the decisions were made "incorrectly" or "in bad faith."   Although these key terms dictate whether X Corp. will face severe financial penalties, including fines of up to $15,000 per violation per day, § 22678(a)(1), AB 587 "provides no clarity on [their] meaning."   *Høeg*, 2023 WL 414258, at *8.   This is a far cry from "mak[ing] a request with no strings attached." *Weber*, 62 F.4th at 1158.

> iii.   *AB 587 Does Not Withstand Strict Or Even Intermediate Scrutiny*

AB 587 fails strict scrutiny because the State cannot prove that it is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 164 (citing *R.A.V.* v. *St. Paul*, 505 U.S. 377, 395 (1992)); *see also id.* at 171 (it is the State's "burden" to do so).   First, the State cannot prove that the interest supposedly served by AB 587 — "requiring social media companies to be transparent about their content-moderation policies and decisions,

so consumers can make informed decisions," Kurtzberg Aff. Ex. 1 —
is a compelling one because, at least as to X Corp., it does not
remedy any harm that is "real" rather than "purely hypothetical."
*NIFLA*, 138 S. Ct. at 2377; *see Edenfield* v. *Fane*, 507 U.S. 761,
770–71 (1993) (government "must demonstrate that the harms it
recites are real").

There is no evidence, for example, that consumers lack
information about how content is regulated on X.  Nor could there
be.  As noted above, X provides detailed information to the public
about what categories of content are not permitted on X and how
such content is regulated.  T&S Aff. ¶¶ 30–32, 34.  Put another
way, the State does not have a compelling interest in requiring X
Corp. to be transparent about its content-moderation policies
because X Corp. is already transparent about those policies.  X
Corp. has dedicated immense time, energy, and financial and
employee resources to ensuring that its content-moderation policies
— including its Violent Speech Policy, Abuse and Harassment Policy,
Hateful Conduct Policy, Violent and Hateful Entities Policy,
Abusive Profile Information Policy, Crisis Misinformation Policy,
Synthetic and Manipulated Media Policy, and Civic Integrity Policy
— are accessible and understandable to its consumers.  T&S Aff.
¶¶ 30–32, 34.  X Corp. supports transparency in content moderation,
but not in the impermissible manner required by AB 587.

In any event, mandatory transparency is not a compelling or

substantial governmental interest in the "speech about speech" context presented by AB 587, precisely because laws governing compelled "speech about speech" implicate First Amendment concerns that are simply not present with mandatory transparency laws outside of the speech context.  While a transparency law outside of the speech context — e.g., a law requiring restaurants to publicly disclose their grades from Health Department inspections — may accomplish its goal of getting restaurants to take certain desired action (here, to clean up their kitchens) without having any adverse impact on the public's or the restaurants' First Amendment rights, the same cannot be said of a law, like AB 587, that is designed to pressure social media companies to change their content moderation policies.  Indeed, even the authors of AB 587 concede that the law is designed to do precisely that.[11]  *See, e.g.*, Kurtzberg Aff. Ex. 5 at 4; *id.* Ex. 1 at 15-16.

That asserted interest, i.e., "pressur[ing]" X Corp. to "eliminate hate speech and disinformation" on its platform, *id.* Ex. 1 at 15, *Minds, Inc.*, No. 23-cv-2705 (ECF 23-1), cannot be compelling because it is an admission by the State that AB 587 is intended to interfere with X Corp.'s constitutionally-protected speech on the basis of content and viewpoint.  *See, e.g.*, *Tornillo*,

---

[11] *See* Kurtzberg Aff. Ex. 27 (Daphne Keller, *Platform Transparency and the First Amendment*, Stanford Cyber Policy Center (Mar. 3, 2023)) (proffering this example), available at https://ssrn.com/abstract=4377578 or http://dx.doi.org/10.2139/ssrn.4377578.

1   418 U.S. at 258 (editorial control and judgment is protected from

2   government regulation by First Amendment).

3       In any event, AB 587 cannot withstand strict scrutiny because

4   "a less restrictive alternative would serve the Government's

5   purpose." *IMDb.com Inc.* v. *Becerra*, 962 F.3d 1111, 1125 (9th Cir.

6   2020) (quoting *United States* v. *Playboy Entm't Grp., Inc.*, 529 U.S.

7   803, 813 (2000)); *see also id.* (citing *Wasden*, 878 F.3d at 1204)

8   ("a statute is not narrowly tailored if it is either underinclusive

9   or overinclusive in scope"). AB 587 is "overinclusive" because it

10  applies to X Corp. despite the fact that X's content-moderation

11  policies are already transparent. Moreover, at least three "less

12  restrictive alternatives" exists: (i) a version of AB 587 that

13  applies only to social media companies that do not disclose how

14  content is moderated at all; (ii) a version of AB 587 that does

15  not target specific categories of content that the State disfavors;

16  and (iii) a version of AB 587 that, while requiring covered

17  companies to disclose their content-moderation policies, does not

18  require them to take positions on specific categories of

19  controversial speech. Accordingly, AB 587 does not and cannot

20  survive strict scrutiny.

21      Even if intermediate scrutiny applied (and it does not),[12] AB

22  _____

23  [12] AB 587 is also not a commercial speech regulation. Commercial speech
    is "speech which does 'no more than propose a commercial transaction.'"
    *Bolger* v. *Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983) (quoting

24  *Virginia State Board of Pharmacy* v. *Virginia Citizens Consumer Council,
    Inc.*, 425 U.S. 748, 762 (1976)); *IMDb.com Inc.*, 962 F.3d at 1122 (same);

25  *see American Academy of Pain Management* v. *Joseph*, 353 F.3d 1099, 1106

587 would fail its "high bar" for the same reasons that AB 587

fails strict scrutiny. *See Junior Sports Mags. Inc.*, 90 F.4th at

1116 (quoting *Central Hudson Gas & Electric Corp.* v. *Public Service*

*Commission of New York*, 447 U.S. 557, 566 (1980)) (intermediate

scrutiny requires the government to prove that speech regulation

"directly and materially advances a substantial government

interest" and is "not more extensive than is necessary to further

that interest"). The State cannot meet its burden because it has

not demonstrated the existence of any "real" transparency problem

with respect to X Corp. The State may not, as it has done here,

"restrict protected speech to prevent something that does not

appear to occur." *Id.* at 1117-18 ("the First Amendment requires

more than fact-free inferences to justify governmental infringement

on speech"); *see Nat'l Ass'n of Wheat Growers*, 468 F. Supp. 3d at

1265 (quoting *Ibanez* v. *Fla. Dept. of Business and Professional*

*Regulation, Bd. of Accountancy*, 512 U.S. 136, 136 (1994)

("government has the burden to 'demonstrate that the harms it

recites are real and that its restriction will in fact alleviate

_____

(9th Cir. 2004) (quoting *Central Hudson*, 447 U.S. at 561 ("Commercial
speech represents 'expression related solely to the economic interests
of the speaker and its audience[.]'")). The topics on which AB 587
forces X Corp. to take a position are core political speech and are in
no way utilized by X Corp. to propose commercial transactions or generate
business. *See also Riley*, 487 U.S. at 782 (speech does not "retain[]
its commercial character when it is inextricably intertwined with
otherwise fully protected speech"). Accordingly, "[b]ecause AB [587]
does not regulate commercial speech, or any other form of speech entitled
to reduced scrutiny only," this Court should "apply strict scrutiny to
determine its validity." *IMDb.com Inc.*, 962 F.3d at 1125.

them to a material degree'")).   To justify AB 587, "California spins a web of speculation—not facts or evidence," *Junior Sports Mags. Inc.*, 80 F.4th at 1119, which does not withstand constitutional muster.

Moreover, even if the State's interest in eliminating or reducing certain types of content on X were substantial – and it is not – AB 587 would not even "directly and materially advance" that interest.   If X Corp. were forced to disclose highly confidential information about how its automated content-moderation systems enforce X Corp.'s policies, malicious actors would likely be able use that knowledge to circumvent and manipulate those systems, thereby compromising the safety and integrity of the X platform and potentially increase forms of speech on X that violate X's content moderation policies. T&S Aff. ¶ 17.

> iv. *Zauderer Does Not Apply And AB 587 Would Fail Zauderer In Any Event*

The more relaxed standard of review under *Zauderer* does not apply because AB 587's compelled disclosures are not "purely factual and uncontroversial information." *Zauderer*, 471 U.S. at 651.   Each of the content categories about which X Corp. is compelled to speak — hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference, § 22677(a)(3) — is "anything but an 'uncontroversial' topic." *NIFLA*, 138 S. Ct. at 2372.   These

content categories are "fraught with political bias" and, as the State knows full well, AB 587's requirements will generate significant controversy because "both action and inaction" are "equally maligned." Kurtzberg Aff. Ex. 6 at 4; *see also* T&S Aff. ¶¶ 25-29. Further, adding to the controversial nature of these topics, is that they reside in "quickly evolving area[s]" that are subject to "ongoing disagreement" where "certain conclusions once considered to be" the "consensus [are] later proved to be false." *Høeg*, 2023 WL 414258, at *1, *9 (striking down statute prohibiting "dissemin[ation]" of "misinformation or disinformation related to COVID-19").

AB 587's compelled disclosures are also not "purely factual" since they are framed in a way that may mislead consumers. That is, if a company submits a Terms of Service Report explaining that it does not moderate the controversial categories of content required by the State (because, instead, the company moderates categories of content pursuant to its *own* policies and terminology), there is a high likelihood that consumers could be misled to believe that the company is not moderating content sufficiently, even if that is not the case. *See Nat'l Ass'n of Wheat Growers*, 468 F. Supp. 3d at 1259-61 (compelled statements that would be "misleading to the ordinary consumer" are "not factual and uncontroversial" under *Zauderer*); *see also id.* at 1259 (quoting *CTIA - The Wireless Ass'n*, 928 F.3d at 847) ("'a statement

may be literally true but nonetheless misleading and, in that sense, untrue' and therefore not meet *Zauderer*'s requirements").

*Zauderer* also applies only to instances of "commercial advertising," *see NIFLA*, 138 S. Ct. at 2372, and the speech implicated by AB 587 is not commercial advertising at all. It is, rather, speech about content moderation policies that are not part of any sales pitch or promotion for the X platform.

Even if *Zauderer* did apply — and it does not — AB 587 would fail that level of review, because its disclosure requirements are "unduly burdensome" and "unjustified." *Zauderer*, 471 U.S. at 651. X Corp. would, simply put, need to undertake herculean efforts to comply with AB 587. *See* T&S Aff. ¶¶ 11, 20, 22-24. The Terms of Service Report alone requires the disclosure of at least 161 categories of information on a bi-annual basis. *See* Kurtzberg Aff. Ex. 28 (Eric Goldman, *Will California Clone-and-Revise Some Terrible Ideas from Florida/Texas' Social Media Censorship Laws? (Analysis of CA AB587)*, Technology & Marketing Law Blog (June 21, 2022), available at https://blog.ericgoldman.org/archives/2022/06/will-california-clone-and-revise-some-terrible-ideas-fromflorida-texas-social-media-censorship-laws-analysis-of-ca-ab587.htm (last visited Oct. 6, 2023)) ("All told, there are 7 categories of disclosures, and the bill indicates that the disclosure categories have, respectively, 5 options, at least 5 options, at least 3 options,

1   at least 5 options, and at least 5 options. So I believe the bill

2   requires that each service's reports should include no less than

3   161 different categories of disclosures (7×5+7×5+7×3+7×5+7×5).").

4       This burden is further compounded by the sheer volume of

5   posts, comments, and messages that occur on X (approximately

6   420,000 posts per minute, 604.8 million posts per day, and 221

7   **billion** posts per year), *see* T&S Aff. ¶¶ 10, 20; Kurtzberg Aff.

8   Ex. 6 at 4 (stating that "the largest social media platforms are

9   faced with thousands, if not millions of similarly difficult

10  decisions related to content moderation on a daily basis," and

11  describing the amount of content received by many of these

12  platforms as "enormous").   It would be enormously burdensome to

13  create and categorize the records required by AB 587 for the roughly

14  221 billion posts made on X each year.  T&S Aff. ¶ 20.  X Corp.

15  does not currently have the tools, infrastructure, or staff levels

16  necessary to meet AB 587's requirements.   X Corp. would need to

17  design, build, and implement entirely new tools and workflow,

18  including a new categorization system for moderation actions, in

19  order to comply in good faith the AB 587's requirements.  *Id*. ¶

20  20.

21      Indeed, X Corp. estimates that implementing the infrastructure

22  and processes needed to comply with AB 587's requirements will take

23  at least six months and involve at least 30 X Corp. employees,

24  which will divert engineering, business, and legal resources away

25

1    from existing, mission-critical projects. *Id*. ¶ 22. Complying

2    with AB 587 will require X Corp. to indefinitely commit resources

3    to the maintenance and operation of this new compliance

4    infrastructure. *Id*. ¶ 22. X Corp. would also need to hire new

5    employees and/or onboard contractors in order to allocate resources

6    to achieve good faith compliance with AB 587. *Id*. ¶ 23. Doing so

7    would cost X Corp. hundreds of thousands or millions of dollars

8    per year. *Id*. ¶ 23.

9        Adding even further to the burdens imposed by AB 587 are (i)

10   the law's failure to limit the Terms of Service Report's

11   information requirements to information about Californians, *see*

12   Kurtzberg Aff. Ex. 29 (Press Release, Office of Assembly member

13   Jesse Gabriel, *After Two-Year Fight, Governor Newsom Signs Landmark

14   Social Media Transparency Bill* (Sept. 13, 2021), available at

15   https://a46.asmdc.org/press-releases/20220913-after-two-year-

16   fight-governor-newsom-signs-landmark-social-media (last visited

17   Oct. 6, 2023)) (lauding AB 587 because it "will have national

18   implications"); and (ii) the efforts that X Corp. would need to

19   expend in complying with investigatory subpoenas and other

20   requests, *see* Ex. 7; *see also* T&S Aff. ¶ 24, which are likely given

21   AG Bonta's proclamation that he "will not hesitate to enforce [AB

22   587]," *see* Fernandez Aff. Ex. 1. AB 587's disclosure requirements

23   are unduly burdensome, and the law fails *Zauderer* scrutiny on that

24   basis alone.

25

Furthermore, AB 587's disclosure requirements are unjustified. They either (i) at best seek to rectify a problem that, at least as to X Corp., is purely hypothetical and not real or (ii) at worst, are a method of pressuring X Corp. to moderate constitutionally-protected content that the State disfavors, particularly when viewed in light of AG Bonta's letter regarding the enforcement of AB 587. They are unjustified either way, and AB 587 would fail *Zauderer* scrutiny on this basis alone as well.

### b. X Corp. Will Likely Succeed On Its 47 U.S.C. § 230(c)(2) Preemption Claim

AB 587 directly conflicts with, and is thus preempted by, the immunity afforded by Section 230 of the Communications Decency Act (47 U.S.C. § 230(c)(2)) because it imposes civil liability on social media companies such as X Corp. if they take actions in good faith to restrict access to content as described in § 230(c)(2) without making AB 587's required disclosures. AB 587 also contravenes the immunity provided to X Corp. by Section 230(c)(2) because AG Bonta may penalize X Corp. if he determines, in his unfettered discretion as to what constitutes "misrepresent[ation]" and "reasonable, good faith," *see* § 22678, that X Corp. is "restrict[ing] access" to content in a way that, in AG Bonta's view, is contrary to X Corp.'s promulgated content-moderation policies. Due to these conflicts, moreover, any "liability imposed under [AB 587]" would be "inconsistent" with Section 230, *see* § 230(e)(3), which means that AB 587 is expressly preempted as well.

The Supremacy Clause of the U.S. Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Congress has the power under the Supremacy Clause to preempt state law when there exists a "conflict" between federal and state law — that is, "where it is impossible to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Indus. Truck Ass'n, Inc.* v. *Henry*, 125 F.3d 1305, 1309 (9th Cir. 1997) (defining "conflict preemption"). A state law is also preempted by federal law on the basis of "express preemption" when "Congress explicitly defines the extent to which its enactments preempt state law." *Id.* Whether a law is preempted is "almost entirely a question of Congressional intent." *Radici* v. *Associated Ins. Companies*, 217 F.3d 737, 741 (9th Cir. 2000).

47 U.S.C. § 230(c)(2) states that "[n]o provider or user of an interactive computer service[13] shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively

---

[13] X Corp. is a provider of an interactive computer service. § 230(f)(2) ("The term 'interactive computer service means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.").

violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." Moreover, 47 U.S.C. § 230(e)(3), the statute's "express preemption provision[]," *ACA Connects* v. *Bonta*, 24 F.4th 1233, 1246 (9th Cir. 2022), states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." Section 230 thus "explicitly preempts inconsistent state laws." *HomeAway.com, Inc.* v. *City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019).

AB 587 conflicts with, and is thus preempted by, 47 U.S.C. § 230(c)(2). If X Corp. takes actions in good faith to moderate content that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," without making the disclosures required by AB 587, it will be subject to liability, but Section 230(c)(2) protects X Corp. from any liability for any such action.

The immunity afforded to providers of interactive computer services is "broad, applying to 'any action.'" *PC Drivers Headquarters, LP* v. *Malwarebytes Inc.*, 371 F. Supp. 3d 652, 660 (N.D. Cal. 2019) (quoting 47 U.S.C. § 230(c)(2)(B)); *see also Domen* v. *Vimeo, Inc.*, 991 F.3d 66, 71–72 (2d Cir. 2021), *amended and superseded on other grounds*, 2021 WL 4352312 (2d Cir. Sept. 24, 2021), *cert. denied*, 142 S. Ct. 1371 (2022) ("our Circuit and others note 'that Section 230 immunity is broad'") (citation

omitted).  "Any action" means *any* action — including those taken

(i) without making the State's forced disclosures or (ii) that, in

AG Bonta's view, are contrary to X Corp.'s stated policies, thereby

leading him to believe that X Corp. has failed to comply with the

law in "reasonable, good faith."

Furthermore, applying § 230(c)(2)'s broad immunity here

comports with "Congressional intent."  *Radici*, 217 F.3d at 741.

Congress enacted Section 230 "to encourage *voluntary* monitoring

for offensive or obscene material."  *Republican Nat'l Comm.* v.

*Google, Inc.*, 2023 WL 5487311, at *7 (E.D. Cal. Aug. 24, 2023)

(quoting *Carafano* v. *Metrosplash.com, Inc.*, 339 F.3d 1119, 1123

(9th Cir. 2003) (emphasis added)); *see also Doe* v. *Internet Brands,*

*Inc.*, 824 F.3d 846, 851–52 (9th Cir. 2016) ("[A] website should be

able to act as a 'Good Samaritan' to *self-regulate* offensive third

party content without fear of liability.") (emphasis added); *In re*

*Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F.

Supp. 3d 971, 979 (N.D. Cal. 2022) ("The legislative history . . .

makes clear that Congress enacted Section 230 to remove the

disincentives to *self-regulation*[.]") (emphasis added).  AB 587

was enacted for the purpose of "pressur[ing]" X Corp. to "eliminate

hate speech and disinformation" on its platform, and AG Bonta is

using threats of enforcement to make sure it happens.  This is

entirely antithetical to the objectives set forth by Congress in

enacting Section 230, which were to encourage self-regulation that

1  was unfettered by the types of threats of liability that AB 587

2  permits and encourages.

3       Due to this direct conflict between AB 587 and § 230(c)(2),

4  any "liability imposed under [AB 587]" would be "inconsistent" with

5  the federal statute, *see* § 230(e)(3), which means that AB 587 is

6  expressly preempted as well.  Section 230 contains an "express pre-

7  emption clause," which is "the best evidence of Congress' pre-

8  emptive intent."  *In re Volkswagen "Clean Diesel" Marketing, Sales

9  Practices, and Products Liability Litigation*, 959 F.3d 1201, 1211

10 (9th Cir. 2020) (quoting *CSX Transp., Inc.* v. *Easterwood*, 507 U.S.

11 658, 664 (1993)).  And, although express and conflict preemption

12 are "distinct inquiries, they effectively collapse into one when,"

13 as here, "the preemption clause uses the term 'inconsistent.'"

14 *Jones* v. *Google LLC*, 73 F.4th 636, 644 (9th Cir. 2023).  Under

15 "either approach," the key inquiry is whether the "state law stands

16 as an obstacle to the accomplishment and execution of the full

17 purposes and objectives of Congress."  *Id.*  AB 587's legislative

18 record makes clear that this is so.

19  **VI.  X Corp. Will Suffer Irreparable Harm Absent A Preliminary
        Injunction, The Balance Of Equities Weighs Heavily In Its
20      Favor, And An Injunction Is In The Public's Interest**

21      Absent preliminary injunctive relief, X Corp. will suffer

22 irreparable harm, as the "loss of First Amendment freedoms, for

23 even minimal periods of time, unquestionably constitutes

24 irreparable injury."  *Roman Cath. Diocese of Brooklyn* v. *Cuomo*,

25

1  141 S. Ct. 63, 67 (2020) (quoting *Elrod* v. *Burns*, 427 U.S. 347,

2  373 (1976)); *Nat'l Ass'n of Wheat Growers*, 468 F. Supp. 3d at 1265

3  (same); *see also California Chamber of Com.*, 29 F.4th at 482

4  ("'Irreparable harm is relatively easy to establish in a First

5  Amendment case.' The plaintiff 'need only demonstrate the existence

6  of a colorable First Amendment claim.'") (citation omitted), *cert.*

7  *denied*, 143 S. Ct. 1749 (2023).

8       Because X Corp. has established not only a colorable First

9  Amendment claim, but a "likelihood that [AB 587] violates the U.S.

10  Constitution," it has "also established that both the public

11  interest and the balance of the equities favor a preliminary

12  injunction." *Høeg*, 2023 WL 414258, at *12 (quoting *Ariz. Dream*

13  *Act Coal.* v. *Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014)); *see also*

14  *Junior Sports Mags. Inc.*, 80 F.4th at 1120, at *8 ("When the

15  government is a party, the last two factors merge."). It is "always

16  in the public interest to prevent the violation of a party's

17  constitutional rights," *Baird* v. *Bonta*, 2023 WL 5763345, at *4 (9th

18  Cir. Sept. 7, 2023), and "California 'has no legitimate interest

19  in enforcing an unconstitutional' law." *Nat'l Ass'n of Wheat*

20  *Growers*, 468 F. Supp. 3d at 1266.[14]

21  _____

22  [14] Federal Rule of Civil Procedure 65(c) provides that "[t]he court may
    issue a preliminary injunction or a temporary restraining order only if
    the movant gives security in an amount that the court considers proper
23  to pay the costs and damages sustained by any party found to have been
    wrongfully enjoined or restrained." The Ninth Circuit, however, "h[as]
24  recognized that Rule 65(c) invests the district court with discretion as
    to the amount of security required, *if any*. The district court may
25  dispense with the filing of a bond when it concludes there is no realistic

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

## CONCLUSION

For the reasons set forth above, this Court should preliminarily enjoin AB 587 before it takes effect on January 1, 2024.


DATED: October 6, 2023       /s/ Joel Kurtzberg

                             CAHILL GORDON & REINDEL LLP
                             Joel Kurtzberg (admitted *pro hac vice*)
                             Floyd Abrams (admitted *pro hac vice*)
                             Jason Rozbruch (admitted *pro hac vice*)
                             Lisa J. Cole (admitted *pro hac vice*)
                             32 Old Slip
                             New York, NY 10005
                             Telephone: 212-701-3120
                             Facsimile: 212-269-5420

                             DOWNEY BRAND LLP
                             William R. Warne (Bar No. 141280)
                             Meghan M. Baker (Bar No. 243765)
                             621 Capitol Mall, 18th Floor
                             Sacramento, CA 95814
                             Telephone: 916-444-1000
                             Facsimile: 916-444-2100


                             *Attorneys for Plaintiff X Corp.*

---

likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen* v. *Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation omitted).  No security is necessary for the granting of this motion, as the Attorney General will not suffer any loss or damage if the status quo is maintained and AB 587 is not enforced against X Corp. X Corp. has demonstrated a likelihood of success on its claims that AB 587 cannot be lawfully enforced by the state.