1   CAHILL GORDON & REINDEL LLP
    JOEL KURTZBERG (admitted *pro hac vice*)
2   FLOYD ABRAMS (admitted *pro hac vice*)
    JASON ROZBRUCH (admitted *pro hac vice*)
3   LISA J. COLE (admitted *pro hac vice*)
    32 Old Slip
    New York, New York 10005
4   Telephone: 212-701-3120
    Facsimile: 212-269-5420
5   jkurtzberg@cahill.com

6   DOWNEY BRAND LLP
    WILLIAM R. WARNE (Bar No. 141280)
7   bwarne@downeybrand.com
    MEGHAN M. BAKER (Bar No. 243765)
    mbaker@downeybrand.com
8   621 Capitol Mall, 18th Floor
    Sacramento, CA 95814
9   Telephone: 916-444-1000
    Facsimile: 916-520-5910

10  *Attorneys for Plaintiff X Corp.*

11

12                      UNITED STATES DISTRICT COURT

13                   EASTERN DISTRICT OF CALIFORNIA

14                         SACRAMENTO DIVISION

15

16  X CORP.,                        No. 2:23-cv-01939-WBS-AC

17            Plaintiff,

          v.                        **AFFIDAVIT OF ▇▇▇▇▇▇**
18                                  **IN SUPPORT OF X CORP.'S MOTION**
    ROBERT A. BONTA, Attorney       **FOR PRELIMINARY INJUNCTION**
    General of California, in his
19  official capacity,

20            Defendant.

21

22

23

24

25

1   ███████████, being duly sworn, deposes and states as follows:

2       1.   I am a ████████ on the Trust and Safety Team at X Corp,

3   covering product, policy, and operations.  In this role, I assist

4   with the creation, implementation, and enforcement of policies —

5   including content moderation policies — on the X platform.

6       2.   I am submitting this affidavit in support of Plaintiff's

7   Motion for Preliminary Injunction.  I have personal knowledge of

8   the facts set forth herein, unless otherwise noted.  If called upon

9   as a witness, I could and would competently testify to those facts.

10  **I.   Applicability of AB 587**

11      3.   I have reviewed and am familiar with the law in this

12  case: California's AB 587.  AB 587 applies to X Corp. and its X

13  platform.

14      4.   X Corp. is a "social media company," as defined by

15  § 22675(d), as it is a "person or entity that owns or operates a

16  social media platform," as defined by the statute.  X Corp. owns

17  and operates X, which is a social media platform, as defined by AB

18  587.

19      5.   X Corp. generated more than one hundred million dollars

20  in gross revenue during the 2023 calendar year.

21      6.   X is a "social media platform," as defined by § 22675(e),

22  as it is a public internet-based application that has users in

23  California.  A substantial function of X is to connect users in

24  order to allow users to interact socially with each other within

25

AFFIDAVIT OF ███████████          2

the service or application.  X allows users to construct public or semipublic profiles for purposes of signing into and using the application.  X also allows users to create or post content viewable to others and populate a list of other users with whom an individual shares a social connection within the system.

**II.   Burdens of AB 587**

7.   AB 587 purports to require large social media companies, such as X Corp., to (1) post terms of service dictated by the government and include terms about how content is moderated on their platforms (the "Terms of Service Requirement") and (2) submit, on a semi-annual basis, to the California Attorney General a "terms of service report" that includes, among other things, (a) "a detailed description of content moderation practices used by the social media company for that platform"; (b) information about whether, and if so how, the social media company defines and moderates (i) hate speech or racism, (ii) extremism or radicalization, (iii) disinformation or misinformation, (iv) harassment, and (v) foreign political interference; as well as (c) information and statistics about actions taken by the social media company to moderate these categories of content (the "Terms of Service Report").  §§ 22676, 22677.

8.   The Terms of Service Requirement in AB 587 burdens X Corp. by letting the State mandate the format and contents of X Corp.'s Terms of Service.  Specifically, it requires X Corp. to,

AFFIDAVIT OF ███████████             3

1   among other things:

2       a. Make public commitments to respond to and resolve

3         reports of flagged content or violations of the terms

4         of service within a specified time period.

5         § 22676(b)(2).

6       b. Create and publish Terms of Service in twelve

7         different languages – specifically, the Medi-Cal

8         threshold languages pursuant to the Health and Safety

9         Code § 128552, if the platform offers product features

10        in those languages. § 22676(c). Upon information

11        and belief this includes: (1) Arabic, (2) Armenian,

12        (3) Cambodian, (4) Cantonese, (5) Farsi, (6) Hmong,

13        (7) Korean, (8) Mandarin, (9) Russian, (10) Spanish,

14        (11) Tagalog, and (12) Vietnamese. *See* **Exhibit 1**,

15        which is a true and correct copy of the *Primary*

16        *Language of Newly Medi-Cal Eligible Individuals*,

17        California Department of Health Care Services,

18        available at

19        https://data.chhs.ca.gov/dataset/primary-language-

20        of-newly-medi-cal-eligible-

21        individuals/resource/706bf0a7-9bb4-4674-9b58-

22        917daac10d25 (last visited Oct. 6, 2023). X Corp.

23        currently offers product features in eight of twelve

24        applicable Medi-Cal threshold languages.

25

AFFIDAVIT OF ███████████                    4

9.   Compliance with the Terms of Service Report of AB 587 would be even more burdensome – particularly in light of the quantity of content posted on X.

10.   Our current best estimate is that, over the past 30 days, there have been on average, approximately 7,000 posts (formerly called "tweets") made on X every second.   If we extrapolate from that number, that would be approximately 420,000 posts per minute, 604.8 million posts per day, and almost 221 billion posts per year.

11.   To complete the Terms of Service Report required by AB 587, X Corp. would need to keep track of and categorize any and all of the content moderation decisions made as to the almost 221 billion posts each year, including the millions of moderation actions taken each year by automated enforcement tools.

12.   The Terms of Service Report required by AB 587 would force X Corp. to disclose "any existing policies intended to address" the categories of content identified by the statute (i.e., "hate speech or racism," "extremism or radicalization," "disinformation or misinformation," "harassment," and "foreign political interference." § 22677(a)(4)(A) and (a)(3).

13.   This would be extremely difficult for X Corp. to do.   X Corp. already has detailed descriptions of its content moderation policies available to the public online.   (This is addressed in more detail below.)   But X Corp.'s categories of content moderation, while comprehensive, do not align with the categories

AFFIDAVIT OF ███████████                    5

1  identified in the statute.   And the listed statutory categories

2  are controversial and difficult to define.

3      14.   For example, X Corp. does not currently regulate "hate

4  speech," "racism," or "extremism" *per se*, yet these are three

5  categories of conduct that AB 587 forces social media companies to

6  publicly address.   § 22677(a)(3).   But X Corp. regulates "violent

7  speech," "hateful conduct," and "violent and hateful entities,"

8  categories of content that may include content that some people

9  might   argue   constitutes   "hate   speech,"   "racism,"   and/or

10  "extremism."   *See* **Exhibit 2** (Violent Speech Policy), **Exhibit 3**

11  (Hateful   Conduct   Policy)   and   **Exhibit 5**   (Violent and Hateful

12  Entities Policy).   Thus, X Corp.'s current policies do not fit

13  within the allotted statutory categories.   And it is not at all

14  clear whether X Corp.'s "violent speech," "hateful conduct," and

15  "violent and hateful entities" policies are "intended to address"

16  the statutory categories, which tend to mean different things to

17  different people.

18      15.   Because the statute provides the Attorney General with

19  discretion to impose significant civil penalties for noncompliance

20  – of up to $15,000 per violation per day, § 22678 – which includes

21  a violation for material omissions or misrepresentations in the

22  Terms of Service Report, § 22678 at (a)(2)(C), it gives the Attorney

23  General complete discretion to determine whether he believes that

24  it would be a violation to submit a report that did not include

25

AFFIDAVIT OF ▉▉▉▉▉▉▉                  6

1   information about a policy like the "hateful conduct" policy, which

2   does not fit neatly into the statutory categories.

3       16.   The Terms of Service Report required by AB 587 would also

4   force X Corp. to disclose "[h]ow automated content moderation

5   systems enforce terms of service and when these systems involve

6   human review."   § 22677(a)(4)(B).

7       17.   This would harm X Corp. because it would force X Corp.

8   to disclose publicly information about its automated content

9   moderation systems that is highly confidential and that could put

10  X Corp. at a competitive disadvantage if made public.   Moreover,

11  disclosure of this information to the public would undermine X

12  Corp.'s policy enforcement by providing malicious actors with

13  information that they would likely leverage in attempts to

14  circumvent and manipulate our policy enforcement mechanisms.

15  Disclosure of this information is therefore likely to compromise

16  the safety and integrity of the X platform.

17      18.   Perhaps most significantly, the Terms of Service Report

18  required by AB 587 would also force X Corp. to:

19          a. Collect, analyze, and generate reports detailing (i)

20             the total number of flagged items of content; (ii) the

21             total number of actioned items of content; (iii) the

22             total number of actioned items of content that

23             resulted in action taken by the social media company

24             against the user or group of users responsible for the

25

content; (iv) the total number of actioned items of content that were removed, demonetized, or deprioritized by the social media company; (v) the number of times actioned items of content were viewed by users; and (vi) the number of times actioned items of content were shared, and the number of users that viewed the content before it was actioned. § 22677(a)(5)(A).

b. All of the information in ¶ 14(i) above must then be disaggregated into (i) the category of content; (ii) the type of content, including, but not limited to, posts, comments, messages, profiles of users, or groups of users; (iii) the type of media of the content, including, but not limited to, text, images, and videos; (iv) how the content was flagged, including, but not limited to, flagged by company employees or contractors, flagged by artificial intelligence software, flagged by community moderators, flagged by civil society partners, and flagged by users; (v) how the content was actioned, including, but not limited to, actioned by company employees or contractors, actioned by artificial intelligence software, actioned by community moderators, actioned by civil society partners, and

actioned by users; and (vii) the number of times users appealed social media company actions taken on that platform and the number of reversals of social media company actions on appeal disaggregated by each type of action.   § 22677(a)(5)(B).

19.   The reporting requirement under AB 587 requires three reports be submitted to the Attorney General in 2024.   The first report is due on January 1, 2024 and covers activity within the third quarter of 2023.   § 22677(b)(2).

20.   It would be enormously burdensome to create and categorize those records for the almost 221 billion posts made on X each year.   X Corp. does not currently have the tools, infrastructure, or staff levels necessary to meet the onerous reporting requirements of AB 587.   Indeed, X Corp. would need to design, build, and implement entirely new tools and workflows, including a new categorization system for moderation actions, in order to comply in good faith with the requirements of AB 587.

21.   In the third quarter of 2023, there were approximately 55 billion posts on X.   X Corp. has not undertaken the burden of identifying how many of these 55 billion posts may constitute hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, or foreign political interference, and doing so would require making numerous highly controversial decisions regarding what posts fit in each of those categories.

1   Nor has X Corp. aggregated statistics on actions and appeals taken
2   with respect to this content, as required in § 22677(a)(5).

3       22.  My team's initial estimate is that implementing the
4   infrastructure and processes necessary to comply with the
5   requirements of AB 587 would require at least six months and involve
6   at least thirty X Corp. employees — diverting engineering,
7   business, and legal resources away from existing, mission-critical
8   projects.  To comply with AB 587, X Corp. would need to indefinitely
9   commit resources to the maintenance and operation of this new
10  compliance infrastructure.

11      23.  X Corp. would need to hire new employees and/or onboard
12  contractors in order to allocate resources to achieve good faith
13  compliance with AB 587.  Doing so would cost X Corp. hundreds of
14  thousands or millions of dollars per year.

15      24.  This does not even factor in burdens imposed by follow-
16  up questions that will almost surely be asked by the Attorney
17  General about compliance.  Given the broad enforcement powers
18  granted to the Attorney General under California law, AB 587 would
19  authorize the Attorney General to issue document demands and
20  follow-up requests to social media companies about their content
21  moderation policies and practices to determine if they have
22  complied with the statute in "reasonable, good faith."
23  § 22678(a)(3).  Responding to such requests would impose
24  significant additional burdens on X Corp. and other social media

25

AFFIDAVIT OF ████████              10

1    companies.

2    **III.    The Controversial Nature of Content Moderation**

3         25.   Social   media   content   moderation   is   an   inherently
4    controversial undertaking.   How social media companies define
5    categories of speech that will or will not be permitted on their
6    platforms and how they apply their rules on content moderation to
7    particular posts are fraught with sensitive and controversial
8    questions and are subject to rigorous debate and controversy.  Put
9    another way, deciding what content should appear on a social media
10   platform is a question that engenders considerable debate among
11   reasonable people about where to draw the correct proverbial line.

12        26.  At X Corp., we take very seriously our responsibility to
13   make well-thought out content moderation decisions and to make sure
14   those decisions are accessible and understandable to our users.
15   But in making these difficult calls, we have learned that, no
16   matter what we do, some portion of the public will likely take
17   issue with the way we have made these difficult judgment calls.

18        27.  As the California Assembly Committee on Privacy and
19   Consumer Protection correctly explained in analyzing AB 587,
20   content moderation by social media companies presents those
21   companies with a "complex dilemma" because, whatever those
22   companies do, their decisions are subject to controversy and "both
23   action and inaction by these companies seem[] to be equally
24   maligned[.]"  Affidavit of Joel Kurtzberg in Support of Motion for

25   AFFIDAVIT OF █████████              11

1  Preliminary Injunction, Exs. 5, 8, and 9.

2      28.  This is consistent with our experience at X Corp.  There

3  is intense public debate and controversy about how to define the

4  categories of content that should be limited on the social media

5  platform and how to apply those categories to content on the social

6  media platform.  No matter what decisions are made, there are

7  almost always large groups of people who disagree with them.

8      29.  And the categories identified by the statute are among

9  the most difficult to define and the most controversial to apply.

10  While there is a general consensus that clear and extreme illegal

11  content, such as child pornography, should not be permitted on a

12  social media platform, there is no such consensus as to the

13  categories identified by the statute – e.g., "hate speech, racism,

14  extremism,    misinformation,    political    interference,    and

15  harassment."  Those categories of content are defined differently

16  by different people and are therefore highly controversial to

17  define and apply in practice.

18  **IV.   Content Moderation at X Corp.**

19      30.  X Corp. goes to great lengths to make its content

20  moderation policies relevant and transparent.  X Corp.'s rules,

21  policies, and procedures about content moderation are all publicly

22  available and are regularly revisited and updated based on X

23  Corp.'s editorial judgments about what should and should not be

24  permitted on the X platform.

25

AFFIDAVIT OF ███████████                12

31.   Annexed hereto are true and correct copies of current X Corp. policies that concern content moderation and transparency efforts:

      a. **Exhibit 2:** *Violent Speech Policy*, X Corp., June 2023, available at https://help.twitter.com/en/rules-and-policies/violent-speech (last visited Oct. 6, 2023);

      b. **Exhibit 3:** *Abuse and Harassment*, X Corp., June 2023, available at https://help.twitter.com/en/rules-and-policies/abusive-behavior (last visited Oct. 6, 2023);

      c. **Exhibit 4:** *Hateful Conduct Policy*, X Corp., Apr. 2023, available at https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy (last visited Oct. 6, 2023);

      d. **Exhibit 5:** *Violent and Hateful Entities Policy*, X Corp., Apr. 2023, available at https://help.twitter.com/en/rules-and-policies/violent-entities (last visited Oct. 6, 2023);

      e. **Exhibit 6:** *Abusive Profile Information*, X Corp., available at https://help.twitter.com/en/rules-and-policies/abusive-profile (last visited Oct. 6, 2023);

      f. **Exhibit 7:** *Crisis Misinformation Policy*, X Corp., Aug. 2022, available at https://help.twitter.com/en/rules-and-policies/crisis-misinformation (last visited Oct. 6,

2023);

    g. **Exhibit 8**: *Synthetic and Manipulated Media Policy*, X Corp., Apr. 2023, available at https://help.twitter.com/en/rules-and-policies/manipulated-media (last visited Oct. 6, 2023);

    h. **Exhibit 9**: *Civic Integrity Policy*, X Corp., Aug. 2023, available at https://help.twitter.com/en/rules-and-policies/election-integrity-policy (last visited Oct. 6, 2023).

32. Additional X Corp. rules, policies, and procedures that may address content moderation and transparency efforts are available to the public at http://help.twitter.com/en/rules-and-policies (last visited Oct. 6, 2023).

33. As detailed in these policies, X Corp. does moderate content that may arguably be covered by some of the controversial categories set forth in AB 587. For example, X Corp. moderates hateful conduct, crisis misinformation, violent speech, abuse and harassment, child sexual exploitation, abusive profiles, violent and hateful entities, and glorification of violence.

34. X Corp. crafted its rules, policies, and procedures with the objective of ensuring all can engage in the critical public debates surrounding these topics freely and safely.

35. In creating its rules, policies, and procedures around

AFFIDAVIT OF ██████████                14

content moderation, X Corp. takes into consideration insights gained over the past seventeen years that the platform has been operational, including feedback from trusted experts at X Corp., our users, and the public at large.

36.  X Corp. dedicates immense time, energy, and resources into crafting these rules, policies, and procedures and ensuring they are accessible and understandable to its users.

37.  Through AB 587, the government is impermissibly trying to frame the content moderation debate and force social media companies like X Corp. to conform moderation practices to the government's content moderation priorities and categorizations.

38.  By compelling speech about these controversial topics, the State is, in our view, trying to pressure X Corp. to regulate content in the way it wants by framing the public debate about content moderation.  If X Corp. does not regulate the categories of content identified by the statute, then the State and/or the public may easily try to pressure X Corp. to do so by drawing attention to that fact or threatening enforcement actions unless X Corp. agrees to do so.

39.  X Corp. would be harmed by AB 587's requirements that it make certain statements about a controversial topic against its will.

AFFIDAVIT OF ███████████               15

1    Dated: ██████████████████
                October 6, 2023
2                                                   ███████████
3                                        ██████████████████
4
5
      Sworn to before me this
6
      6 day of October, 2023
7
8     See attached Certificate
9     Notary Public
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
      AFFIDAVIT OF ██████████              16

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

} SS.

Subscribed and sworn to (or affirmed) before me on this __6__ day of __October__, 20__23__, by

_____, proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

CLAIRE GILBERT
COMM. # 2432385
NOTARY PUBLIC
COUNTY
My Comm. Exp. Dec. 25, 2026

NOTARY'S SIGNATURE

PLACE NOTARY SEAL IN ABOVE SPACE

## OPTIONAL INFORMATION

The information below is optional. However, it may prove valuable and could prevent fraudulent attachment of this form to an unauthorized document.

**CAPACITY CLAIMED BY SIGNER (PRINCIPAL)**

- [x] INDIVIDUAL
- [ ] CORPORATE OFFICER _____
- [ ] PARTNER(S)                           TITLE(S)
- [ ] ATTORNEY-IN-FACT
- [ ] TRUSTEE(S)
- [ ] GUARDIAN/CONSERVATOR
- [ ] OTHER: _____

_____

_____

**ABSENT SIGNER (PRINCIPAL) IS REPRESENTING:**
NAME OF PERSON(S) OR ENTITY(IES)

_____

_____

**DESCRIPTION OF ATTACHED DOCUMENT**

__16__
NUMBER OF PAGES

__10/6/23__
DATE OF DOCUMENT

OTHER

RIGHT
THUMBPRINT
OF
SIGNER

Top of thumbprint here