1  ROB BONTA
   Attorney General of California
2  ANTHONY R. HAKL,
   Supervising Deputy Attorney General
3  ANNA FERRARI, SBN 261579
   GABRIELLE D. BOUTIN, SBN 267308
4  Deputy Attorneys General
    1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone:  (916) 210-6053
    Fax:  (916) 324-8835
7   E-mail:  Gabrielle.Boutin@doj.ca.gov
   *Attorneys for Defendant Attorney General*
8  *Rob Bonta, in his official capacity*

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11                  SACRAMENTO DIVISION

12

| | |
|---|---|
| **X CORP.,** | 2:23-CV-01939-WBS-AC |
| Plaintiff, | **DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| v. | Date:       November 13, 2023 |
| **ROBERT A. BONTA, ATTORNEY GENERAL OF CALIFORNIA, IN HIS OFFICIAL CAPACITY,** | Time:       1:30 p.m.<br>Courtroom:    5<br>Judge:     Hon. William B. Shubb |
| Defendant. | Trial Date:   None set<br>Action Filed: 9/08/2023 |

# TABLE OF CONTENTS

**Page**

Introduction ..................................................... 1

Background ...................................................... 3

    I.   Background on Assembly Bill 587 ....................... 3

    II.  Text of Assembly Bill 587 ............................ 5

Legal Standard .................................................. 7

Argument ........................................................ 8

    I.   Plaintiff Has Not Shown a Likelihood of Success on
        the Merits Because AB 587 Does Not Violate the
        First Amendment ...................................... 8

        A.   AB 587 Satisfies the Zauderer Test for
            Compelled Commercial Disclosures ................ 8

        B.   Even if the AB 587 Did Not Satisfy the
            Zauderer Test, It Would Still Be
            Constitutional Under Central Hudson
            Intermediate Scrutiny ......................... 20

        C.   AB 587 Does Not Violate the First Amendment
            Based on Plaintiff's "Editorial Judgments"
            Theory ........................................ 24

        D.   AB 587 Is Not Subject to Strict Scrutiny, But
            Satisfies It In Any Event ..................... 28

    II.  Plaintiff Has Not Shown a Likelihood of Success
        Because The AB 587 Is Not Preempted By Section 230
        of the Communications Decency Act ................... 38

        A.   Section 230 Does Not Conflict-Preempt AB 587 ... 39

        B.   Section 230 Does Not Expressly Preempt AB 587 .. 42

    III. Plaintiff Has Failed to Establish the Remaining
         Winter Factors Necessary for a Preliminary
         Injunction .......................................... 44

Conclusion ..................................................... 45

**TABLE OF AUTHORITIES**

**Page**

CASES

Am. Beverage Ass'n v. City and County of San Francisco
    916 F.3d 749 (9th Cir. 2019)................................. 29

Am. Fuel & Petrochem. Mfrs. v. O'Keefe
    903 F.3d 903 (9th Cir. 2018)............................. 16, 33

Am. Hosp. Ass'n v. Azar
    983 F.3d 528 (D.C. Cir. 2020)............................... 13

Am. Meat Inst. v. U.S. Dept. of Agric.
    760 F.3d 18 (D.C. Cir. 2014) ............................... 16

Arellano v. Clark County Collection Service, LLC
    875 F.3d 1213 (9th Cir. 2017)............................... 43

Barnes v. Yahoo!, Inc.
    570 F.3d 1096 (9th Cir. 2009)............................... 39

Bd. of Trustees of State Univ. of N.Y. v. Fox
    492 U.S. 469 (1989)........................................ 24

Bolger v. Youngs Drug Prods. Corp.
    463 U.S. 60 (1983)......................................... 21

Cal. Redevelopment Assn. v. Matosantos
    53 Cal. 4th 231 (2011)..................................... 24

California Chamber of Commerce v. Becerra
    529 F. Supp. 3d 1099 (E.D. Cal. 2021)...................... 20

California v. Azar
    911 F.3d 558 (9th Cir. 2018)............................. 7, 8

Carafano v. Metrosplash.com, Inc.
    339 F.3d 1119 (9th Cir. 2003)........................... 39, 43

Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of
    New York
    447 U.S. 557 (1980).................................... 20, 23

Chula Vista Citizens for Jobs & Fair Competition v.
    Norris
    782 F.3d 520 (9th Cir. 2015)............................... 37

## TABLE OF AUTHORITIES
### (continued)

**Page**

*City of Austin, Texas v. Reagan Nat'l Advert. of*
  *Austin, LLC*
  596 U.S. 61 (2022).........................................32

*City of Chicago, Ill. v. StubHub!, Inc.*
  624 F.3d 363 (7th Cir. 2010)..............................39

*City of Los Angeles v. Alameda Books, Inc.*
  535 U.S. 425 (2002).......................................21

*CTIA – Wireless Assn. v. City of Berkeley*
  928 F.3d 832 (9th Cir. 2019)..........................passim

*Doe v. Internet Brands*
  824 F.3d 846 (9th Cir. 2016)..............................39

*Drakes Bay Oyster Co. v. Jewell*
  747 F.3d 1073 (9th Cir. 2014)..............................7

*Edenfield v. Fane*
  507 U.S. 761 (1993).......................................22

*Entertainment Software Ass'n v. Blagojevic*
  469 F.3d 641, 643 (7th Cir. 2006).....................30, 31

*Envtl. Defense Ctr. v. U.S. E.P.A.*
  344 F.3d 832 (9th Cir. 2003)..............................10

*Fair Hous. Council of San Fernando Valley v.*
  *Roommates.com*
  521 F.3d 1157 (9th Cir. 2008).........................39, 43

*First Resort, Inc. v. Herrera*
  860 F.3d 1263 (9th Cir. 2017)..............................32

*Fla. Bar v. Went For It, Inc.*
  515 U.S. 618 (1995).......................................22

*Greater New Orleans Broadcasting Ass'n, Inc. v. United*
  *States*
  527 U.S. 173 (1999).......................................23

*Harbor Missionary Church Corp. v. City of San*
  *Buenaventura*
  642 F. App'x 726 (9th Cir. 2016).....................37, 38

1

**TABLE OF AUTHORITIES**
(continued)

2
                                                                    **Page**

3  *Herbert v. Lando*
4      441 U.S. 153 (1979).......................................... 25

*HomeAway.com v. City of Santa Monica*
5      918 F.3d 676 (9th Cir. 2019)............................. 40, 42

6  *Hunt v. City of Los Angeles*
7      638 F.3d 703 (9th Cir. 2011)................................. 21

8  *Informed Consent Action Network v. YouTube, Inc.*
      582 F. Supp. 3d (N.D. Cal. 2022)............................. 3
9
*Interpipe Contracting, Inc. v. Becerra*
10     898 F.3d 879 (9th Cir. 2018)................................ 32

11 *King v. Facebook, Inc.*
12     572 F. Supp. 3d 776 (N.D. Cal. 2021)........................ 3

13 *Miami Herald*
      418 U.S. 241, 244 (1974).................................... 26
14
*Milavetz, Gallop & Milavetz v. United States*
15     559 U.S. 229 (2010)..................................... 10, 34

16 *Moody v. Netchoice*
      --- S.Ct. ----, No. 22-277, 2023 WL 6319654 (U.S.
17     Sept. 29, 2023)............................................. 9

18 *Motion Picture Ass'n of Am. v. Specter*
19      315 F. Supp. 824, 825-26 (E.D. Penn. 1970)................ 31

20 *Murphy v. Twitter, Inc*
       274 Cal. Rptr. 3d 360 (Cal. Ct. App. 2021)................. 3
21
*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*
22     556 F.3d 114 (2d Cir. 2009)................................ 34

23 *Nat'l Ass'n of Wheat Growers v. Becerra*
24     468 F. Supp. 3d 1247 (E.D. Cal. 2020)...................... 20

25 *Nat'l Elec. Mfrs. Assn. v. Sorrell*
      272 F.3d 104 (2d Cir. 2011)............................. 13, 16
26
*National Institute of Family and Life Advocates v.*
27     *Becerra*
       138 S.Ct. 2361 (2018).................................. 13, 28
28

iv

## <u>TABLE OF AUTHORITIES</u>
### (continued)

**Page**

*Nationwide Biweekly Admin. v. Owen*
    873 F.3d 716 (9th Cir. 2017)........................ 8, 10, 34

*NetChoice, LLC v. Att'y Gen.*
    34 F.4th 1196 (11th Cir. 2022).......................... *passim*

*Netchoice, LLC v. Paxton*
    --- S.Ct. ----, No. 22-555, 2023 WL 6319650 (U.S.
    Sept. 29, 2023).......................................... 9

*NetChoice, LLC v. Paxton*
    49 F.4th 439 (5th Cir. 2022)........................... *passim*

*Noori v. Countrywide Payroll & HR Solutions, Inc.*
    257 Cal. Rptr. 3d 102 (Cal. Ct. App. 2019).................. 16

*O'Handley v. Padilla*
    579 F. Supp. 3d 1163 (N.D. Cal 2022)....................... 3

*Project Veritas v. Schmidt*
    72 F.4th 1043 (9th Cir. 2023)............................ 24

*PruneYard Shopping Ctr. v. Robins*
    447 U.S. 74 (1980) ...................................... 26

*Reed v. Town of Gilbert, Ariz.*
    576 U.S. 155 (2015).................................. 32, 36

*S.F. Apartment Ass'n v. City & Cnty. of S.F.*
    881 F.3d 1169 (9th Cir. 2018).......................... 34

*Schall v. Martin*
    467 U.S. 253 (1984).................................... 37

*Smith v. People of the State of California*
     361 U.S. 147 (1959).................................... 30

*Turner Broad. Sys., Inc. v. FCC*
    520 U.S. 180 (1997).................................... 20

*United States v. Edge Broad. Co.*
    509 U.S. 418 (1993).................................. 20, 21

*Valle Del Sol Inc. v. Whiting*
     709 F.3d 808 (9th Cir. 2013)........................... 23

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Volokh v. James*
--- F.Supp.3d ----, No. 22-cv-10195, 2023 WL 1991435,
   (S.D.N.Y. Feb. 14, 2023)...................................29

*Washington Post v. McManus*
   944 F.3d 506 (4th Cir. 2019)..........................27, 28

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008)................................2, 7, 44, 45

*Yuksel v. Twitter, Inc.*
   No. 22-cv-05415-TSH, 2022 WL 16748612 (N.D. Cal.
   Nov. 7, 2022)..............................................3

*Zauderer v. Office of Disciplinary Counsel*
   471 U.S. 626 (1985)...................................*passim*

**STATUTES**

United States Code, Title 47
   § 230(c)(2).........................................42, 44
   § 230(c)(2)(A)..............................2, 39, 40, 41
   § 230(e)(3)............................................42

# TABLE OF AUTHORITIES
### (continued)

**Page**

California Business & Professions Code
    § 22675-81.................................................... 7
    § 22675-22681................................................. 5
    § 22675(d)..................................................... 5
    § 22675(e)..................................................... 5
    § 22676........................................ 4, 14, 17, 38
    § 22676(a)..................................................... 5
    § 22676(a)(3)................................................. 17
    § 22676(a)(5)................................................. 6
    § 22676(b)..................................................... 5
    § 22676(c)..................................................... 6
    § 22677............................................. 4, 14, 38
    § 22677(a)(1)................................................. 5
    § 22677(a)(3).............................................. 6, 10
    § 22677(a)(4).............................................. 5, 41
    § 22677(a)(4)-(5)......................................... 14, 23
    § 22677(a)(4)(A)............................................. 6
    § 22677(a)(5)(A)............................................. 18
    § 22677(a)(5)(B)(1).......................................... 10
    § 22677(a)-(b)................................................ 5
    § 22677(c).................................................... 12
    § 22677(c)(1)................................................. 12
    § 22677(c)(4)................................................. 12
    § 22678........................................................ 4, 6
    § 22678 (a)(2)(A)............................................ 40
    § 22678 (a)(2)(B)............................................ 40
    § 22678(a)(2)(C)....................................... 36, 40, 41, 42
    § 22678(a)(3)................................................. 19
    § 22678(b).................................................... 19
    § 22678(c)(3)................................................. 6
    § 22680.................................................... 7, 17
    § 22681....................................................... 7
    § 22777(a)(3)................................................. 11
    § 22777(a)(5)(B)(1).......................................... 11
    § 22777(a)(5)(B)(iv)-(v)..................................... 6

California Government Code
    § 11180...................................................... 36

Communications Decency Act
    § 230 .................................................... *passim*

# TABLE OF AUTHORITIES
### (continued)

**Page**

**OTHER AUTHORITIES**

Assembly Bill 587 ....................................... *passim*

Joan Donovan, *Why social media can't keep moderating
    content in the shadows,* MIT TECHNOLOGY REVIEW, November
    6, 2020, available at
    https://www.technologyreview.com/2020/11/06/1011769/
    social-media-moderation-transparency-censorship/
    (last viewed Oct. 27, 2023)................................. 22

**INTRODUCTION**

Plaintiff seeks to preliminarily enjoin California Assembly Bill ("AB") 587, a straightforward disclosure statute that requires social media companies with annual gross revenues of at least $100 million to publicly disclose information about their content-moderation policies and decisions, i.e., whether and how they take action against content and users that violate their terms of service.  The statute is intended to provide transparency to Californians who consume and disseminate news and information on social media.  Notwithstanding Plaintiff's representations, the statute does not dictate either the substantive content of any platform's terms of service or the manner in which those terms must be enforced.  Plaintiff's motion for preliminary injunction should be denied.

Plaintiff has failed to show that it is likely to succeed on the merits of any claim.  Plaintiff's First Amendment challenge fails because the statute meets the applicable *Zauderer* test for compelled speech in a commercial context: the law only requires covered social media companies make purely factual disclosures about their voluntary, existing content moderation policies and practices.  Plaintiff argues that these requirements are somehow improper and subject to higher scrutiny because they may result in public pressure on Plaintiff to change its terms or service or content moderation practices.  That concern does not take the law outside the scope of *Zauderer*, which often applies when companies would prefer not to disclose certain facts about their products or services.  AB 587 would, in any event, satisfy a higher level of scrutiny.  It serves the essential state interest of

1

maintaining an informed, enfranchised, and safe populace by providing Californians with information necessary to navigate among the disinformation, threats, and hate speech on social media.  And, while other states have attempted to impose particular content moderation practices on social media companies, because AB 587 is merely a disclosure statute, its burdens are minimal.

Plaintiff also cannot prevail on its claim that SB 587 is preempted by section 230 of the Communications Decency Act. Section 230 generally immunizes social media platforms for their good faith, voluntary actions restricting content on their sites. 47 U.S.C. § 230(c)(2)(A).  AB 587 is not inconsistent with this immunity because the bill does not penalize platforms for *any* of their content moderation actions, including any restrictions on content.  AB 587 merely provides that a platform may be penalized if it fails to properly disclose specified high-level information about its general content moderation policies and practices.

Finally, Plaintiff has failed to establish any of the other *Winter* factors required for a preliminary injunction.  Plaintiff argues only that those factors are present because, purportedly, Plaintiff will likely succeed on its First Amendment claim. However, because that claim fails on the merits, Plaintiff has suffered no irreparable harm and the balance of the equities and public interest favor Defendant.

For these reasons, explained in detail below, the Court should deny Plaintiff's motion for preliminary injunction.

**BACKGROUND**

**I.   BACKGROUND ON ASSEMBLY BILL 587**

Social media platforms, such as Plaintiff X Corp., have terms
of service, including content-moderation rules, to which
individuals must agree as a condition of using the platform.
*See, e.g.*, *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1172 (N.D.
Cal 2022), *aff'd sub. nom. O'Handley v. Weber*, 62 F.4th 1145 (9th
Cir. 2023).  These rules give the platform the right to take
action against content or users that violate the rules.  *Id.* at
1186.  In recent years, content moderation by social media
companies has drawn public concern, with numerous lawsuits filed
by users whose accounts were limited or suspended for posting
content that violated the platforms' rules.  *See, e.g., Informed
Consent Action Network v. YouTube, Inc.*, 582 F. Supp. 3d (N.D.
Cal. 2022); *Yuksel v. Twitter, Inc.*, No. 22-cv-05415-TSH, 2022 WL
16748612 (N.D. Cal. Nov. 7, 2022); *King v. Facebook, Inc.*, 572 F.
Supp. 3d 776 (N.D. Cal. 2021); *Murphy v. Twitter, Inc*, 274 Cal.
Rptr. 3d 360 (Cal. Ct. App. 2021).  Some states have passed laws
prohibiting social media platforms from moderating, restricting,
or otherwise limiting particular kinds of content.  *NetChoice,
LLC v. Att'y Gen.*, 34 F.4th 1196, 1205-1206 (11th Cir. 2022),
*cert. granted in part sub. nom. Moody v. Netchoice*, --- S.Ct. ---
-, 2023 WL 6319654 (describing Florida statute) ("*Netchoice
(Fla.)*"); *NetChoice, LLC v. Paxton*, 49 F.4th 439, 445-446 (5th
Cir. 2022), *cert. granted in part*, --- S.Ct. ----, 2023 WL
6319650 (describing Texas statute) ("*Netchoice (Tex.)*").

In marked contrast, California's AB 587 does not regulate
content-moderation policies or decision-making by private social

3

1   media platforms.  Instead, it is "a transparency measure."
2   Boutin Dec., Ex. 2 at 4 (Assem. Judiciary Comm. Analysis).  The
3   law merely requires social media companies, as defined, to post
4   their terms of service and to submit semiannual reports to the
5   Attorney General about their terms of service and content
6   moderation policies and outcomes.  Cal. Bus. & Prof. Code
7   §§ 22676, 22677.  The Legislature's purpose was "to increase
8   transparency around what terms of service social media companies
9   are setting out and how it ensures those terms are abided by.
10  The goal is to learn more about the methods of content moderation
11  and how successful they are."  Boutin Dec., Ex. 11 at 3 (Sen.
12  Floor Analysis), Ex. 6 at 12 (Sen. Judiciary Comm. Analysis).

13       In other words, AB 587 is simply a disclosure statute
14  intended to provide the public with information about large
15  social media platforms' voluntarily content moderation policies
16  and practices.  *See* Cal. Bus. Prof. Code §§ 22676, 22677, 22678;
17  *see also* Boutin Dec., Ex. 6 at 11-12 (Sen. Judiciary Comm.
18  Analysis).  It allows users to know "what social media platforms
19  do to flag and remove certain kinds of content, which may affect
20  what sites users prefer to use," and "what kind of content or
21  conduct could lead to their being temporarily or permanently
22  banned from using the social media service."  Boutin Dec., Ex 2
23  at 4 (Assem. Judiciary Comm. Analysis).  The Legislature also
24  considered that, by requiring greater transparency about
25  platforms' content-moderation rules and decisions, AB 587 may
26  encourage—though not require—social media companies to "become
27  better corporate citizens by doing more to eliminate hate speech
28  and disinformation" on their platforms.  *Id.*

1    **II. TEXT OF ASSEMBLY BILL 587**

2        AB 587 was enacted in September 2022 and is codified at

3    California Business and Professions Codes sections 22675-22681.

4    AB 587 provides that, commencing January 1, 2024, social media

5    companies, as defined in the statute,[1] must post the terms of

6    service for each social media platform owned or operated by the

7    company "in a manner reasonably designed to inform all users of

8    the social media platform of the existence and contents of the

9    terms of service." *Id.* § 22676(a).  The posted terms of service

10   must contain a "description of the process users must follow to

11   flag content, groups, or other users that they believe violate

12   the terms of service," "the social media company's commitments on

13   response and resolution time," and a "list of potential actions

14   the social media company may take against an item of content or a

15   user." *Id.* § 22676(b).

16       The social media companies also must, commencing January 1,

17   2024, submit to the Attorney General a semiannual "terms of

18   service report" containing specific factual information.  *Id.*

19   § 22677(a)-(b).  The reports must include the "current version of

20   the platform's terms of service" and a "detailed description of

21   content moderation practices used by the social media company …."

22   *Id.* § 22677(a)(1), (a)(4).  The reports must also include a

23   statement of "whether the current version of the terms of service

24   define each of the following categories of content, and, if so,

25   the definitions of those categories," and "any existing policies

26   ─────────────

        [1] AB 587 defines "social media company" as a person or entity that owns
27   or operates one or more "social media platforms."  Cal. Bus. & Prof. Code
     § 22675(d).  A "social media platform" is defined as a "public or semi-public
     internet-based service that has users in California and meets" specific
28   criteria.  *Id.* § 22675(e).

intended to address the categories," which are:  "[h]ate speech
or racism"; "[e]xtremism or radicalization"; "[d]isinformation or
misinformation"; "[h]arassment"; and "[f]oreign political
interference." *Id.* § 22677(a)(3), (a)(4)(A).  Finally, the
reports must include "information on content that was flagged by
the social media company as content belonging to any of the
categories," including the number of items of content that were
"flagged" or "actioned" by the social media company, and how
those items of content were "flagged" of "actioned," e.g.,
whether by company employees, artificial intelligence software,
or users.  *Id.* § 22676(a)(5), (a)(5)(B)(iv)-(v).  The Attorney
General is directed to compile all terms of service reports and
make them available to the public in a "searchable repository on
its official internet website." *Id.* § 22676(c).

AB 587 creates a civil penalty for certain violations of the
reporting requirements, which are enforceable by certain law
enforcement officials in a court of law.  *Id.* § 22678.  In
assessing the amount of any penalty, "the court shall consider
whether the social media company has made a reasonable, good
faith attempt to comply with the provisions of this chapter.[2]
*Id.* § 22678(c)(3).  The law does not give the Attorney General
the authority or discretion to assess or collect penalties
outside of a court action.  *See id.* § 22678.

Social media companies with annual gross revenues of less
than $100 million are exempt from the statute's requirements.

---

[2] By the statute's plain terms, this determination is the responsibility
of the "court."  *Id.* § 22678(c)(3).  AB 587 does *not* "afford[] the Attorney
General unfettered discretion in deciding what constitutes a 'reasonable, good
faith attempt to comply' or a 'material[] omi[ssion] or misrepresent[ation]'
in the Terms of Service Report."  *See* Pltf.'s Mtn., ECF No. 20, at 39.

1    *Id.* § 22680.  Also exempt are platforms "for which interactions

2    between users are limited to direct messages, commercial

3    transactions, consumer reviews of products, sellers, services,

4    events, or places, or any combination thereof."  *Id.* § 22681.

5        Nothing in AB 587 requires social media companies to disclose

6    the identities of or information about specific users.  *See id.*

7    §§ 22675-81.  Nothing in AB 587 dictates the substantive content

8    of social media companies' terms of service.  *See id.* §§ 22675-

9    81.  Nothing in AB 587 requires that social media companies take,

10   or prohibits them from taking, any action whatsoever against any

11   item of content or user.  *See id.*  And nothing in AB 587 requires

12   that social media companies' terms of service define any

13   categories of content.  *See id*.

14                    **LEGAL STANDARD**

15       Injunctive relief is an "extraordinary remedy that may only

16   be awarded upon a clear showing that the plaintiff is entitled to

17   such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555

18   U.S. 7, 20 (2008)).  "A plaintiff seeking a preliminary

19   injunction must establish that he is likely to succeed on the

20   merits,that he is likely to suffer irreparable harm in the

21   absence of preliminary relief, that the balance of equities tips

22   in his favor, and that an injunction is in the public interest."

23   *Winter*, 555 U.S. at 20.  "When the government is a party, these

24   last two factors," balance of the equities and public interest,

25   "merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092

26   (9th Cir. 2014); *California v. Azar*, 911 F.3d 558, 575 (9th Cir.

27   2018) (same).  Analysis of the first factor (i.e., likelihood of

28   success on the merits) is a "threshold inquiry," and thus if a

1  movant fails to establish that factor, the court "need not

2  consider the other factors." *Azar*, 911 F.3d at 575.

3                              **ARGUMENT**

4  **I.  PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE**
       **AB 587 DOES NOT VIOLATE THE FIRST AMENDMENT**

5

6      **A.  AB 587 Satisfies the *Zauderer* Test for Compelled**
           **Commercial Disclosures**

7      As explained, AB 587 does not dictate content-moderation

8  policies or decisions about any particular content or user on

9  social media.  It merely requires covered social media companies

10 to post their content-moderation policies and procedures so users

11 can see them, and to report information about their content-

12 moderation policies and decisions to the Attorney General on a

13 semi-annual basis, so he can make that report available on his

14 official website, enabling consumers to compare different

15 platforms.  AB 587 is in the same mold as other consumer

16 disclosure statutes, such as food labeling and truth-in-lending

17 laws.  To the extent it regulates speech by covered social media

18 companies, it involves compelled commercial speech of purely

19 factual and uncontroversial information, consistent with the

20 First Amendment.

21     The standard for analyzing compelled disclosures in the

22 context of commercial speech is the test established in *Zauderer*

23 *v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).  *Zauderer*

24 and its progeny reflect the unexceptional principle that "[t]he

25 First Amendment does not generally protect corporations from

26 being required to tell prospective customers the truth."

27 *Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721 (9th Cir.

28 2017).

1    Circuit courts have applied *Zauderer* to disclosure

2    regulations very similar to those at issue here.  In addition to

3    their content-moderation restrictions, the statutes at issue in

4    *NetChoice (Fla.)* and *NetChoice (Tex.)* contained provisions

5    requiring disclosures about content moderation policies and

6    practices.[3]  *NetChoice (Fla.)*, 34 F.4th at 1230; *NetChoice*

7    *(Tex.)*, 49 F.4th at 485.  In both cases, the required disclosures

8    included terms of service and related information and, in

9    *Netchoice (Tex.)* the disclosures also included "information about

10   the Platforms' content management and business practices," and a

11   report containing high-level statistics about their content-

12   moderation activities.  *NetChoice (Tex.)*, 49 F.4th at 485;

13   *NetChoice (Fla.)*, 34 F.4th at 1230.  The application of *Zauderer*

14   is equally appropriate here.

15       "Under *Zauderer*, compelled disclosure of commercial speech

16   complies with the First Amendment if the disclosure is reasonably

17   related to a substantial governmental interest and is purely

18   factual and uncontroversial."  *CTIA – Wireless Assn. v. City of*

19   *Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) ("*CTIA*").

20

21

22

23

24   ─────────────────
        [3] In both cases, the Supreme Court has granted certiorari, but only in
25   part.  The Court will consider the statutes' provisions mandating particular
     content moderation practices, but will not consider the statutes' transparency
26   provisions that are comparable to AB 587.  *See Moody v. Netchoice*, --- S.Ct. -
     ---, No. 22-277, 2023 WL 6319654, at *1 (U.S. Sept. 29, 2023) (identifying
27   issues from United States' amicus brief for which certiorari was granted);
     *Netchoice, LLC v. Paxton*, --- S.Ct. ----, No. 22-555, 2023 WL 6319650 (U.S.
28   Sept. 29, 2023) (same); Brief for the United States as Amicus Curiae, Nos. 22-
     277, 22-393, 22-555 (S.Ct. Aug. 14, 2023), at 2023 WL 5280330.

1

       **1.  The disclosures required by AB 587 are purely**
           **factual and uncontroversial**

2

3      The  Ninth Circuit has explained that *Zauderer*'s factual and

4  uncontroversial requirement is satisfied where the law in

5  question does not "attempt[] to prescribe what shall be orthodox

6  in politics, nationalism, religion or other matters of opinion,

7  or force citizens to confess by word or act their faith therein."

8  *Envtl. Defense Ctr. v. U.S. E.P.A.*, 344 F.3d 832, 849 (9th Cir.

9  2003) (internal quotation omitted).  "Uncontroversial" refers to

10  the "factual accuracy of the compelled disclosure, not to its

11  subjective impact on the audience."  *CTIA*, 854 F.3d at 1117.

12  *See, e.g.*, *Milavetz, Gallop & Milavetz v. United States*, 559 U.S.

13  229, 251 (2010) (upholding law requiring that certain bankruptcy

14  lawyers disclose themselves as "debt relief agencies," despite

15  law firm's argument that the term was "confusing and

16  misleading"); *Nat'l Biweekly Admin. v. Owen*, 873 F.3d at 733

17  (upholding requirement that mortgage refinancing company disclose

18  that its solicitations were not authorized by the lender); *CTIA*,

19  928 F.3d at 846-47 (upholding ordinance requiring cell phone

20  retailers to disclose that cell phone use could cause exposure to

21  "RF radiation" in excess of federal safety guidelines,

22  notwithstanding argument that term was "fraught with negative

23  associations").

24      AB 587's required disclosures related to specified categories

25  of content ("disinformation," "hate speech," etc.) are factual

26  and uncontroversial.[4]  *See* Cal. Bus. & Prof. Code §§ 22677(a)(3),

27

      [4] AB 587's disclosure requirements related to specified categories of
content are the only provisions of the bill that Plaintiffs argue are not
"factual and controversial" under *Zauderer*.  *See* Mtn. at 65-67.

28

1   (5)(B)(1).  Those provisions merely require companies to disclose

2   *whether* their terms of service "define" specified categories of

3   content (and what those definitions are) and, *if*

4   *so*,"[i]nformation on content that was flagged by the social media

5   company as content belonging to any of" those categories.  *Id.*

6   § 22777(a)(3), (5)(B)(1).  This is purely factual information

7   about the company's actual policies and actual conduct, whose

8   accuracy is not subject to factual controversy.  If a social

9   media company's terms of service do not define the categories

10  listed in AB 587 in its terms of service, its report to the

11  Attorney General would simply disclose that fact.  Likewise, if a

12  social media company does not moderate—or "flag"—content meeting

13  its own definitions of those categories, it would have no

14  numerical data on that subject to include its report.  *See id*.

15      AB 587's category-related requirements are not controversial

16  merely because the proper definition of those categories may be

17  publicly debated or because Plaintiff elects to utilize different

18  content categories that may overlap with those listed the

19  statute.  *See* Mtn. at 30, 35.  AB 587 does not require a company

20  to define any category at all in its terms of service, nor to

21  take any position on the proper definition of the categories

22  listed in the statute.  For example, it does not require

23  Plaintiff to define "disinformation" in its terms of service.

24  And, if Plaintiff nevertheless chooses to do so, the law does not

25  dictate what that definition should be.  AB 587 only requires

26  Plaintiff to disclose whether it has elected to define each

27  category in its terms of service and, if so, what that definition

28  actually is.  While Plaintiff may not wish to disclose such

1  definitions for fear of the "subjective impact on its audience,"

2  that does not render the requirement controversial under

3  *Zauderer*.  *CTIA*, 854 F.3d at 1117.

4      AB 587's category-related requirements also do not compel

5  statements that are misleading to consumers.  See Mtn. at 66.

6  Plaintiffs argue that these requirements could mislead the public

7  into believing that the company is not sufficiently moderating

8  content because the company chooses to utilize categories

9  different than those in the statute.  Mtn. at 66.  This is quite

10 unlikely.  AB 587 requires the Attorney General to make public

11 the entire terms of service report submitted by each company, not

12 merely the company's statements on the categories in isolation.

13 Cal. Bus. & Prof. Code § 22677(c).  The terms of service reports

14 must include the entire "current version of the terms of service

15 of the social media platform."  *Id.* § 22677(c)(1).  The reports

16 also must include a "detailed description of content moderation

17 practices used by the social media company for that platform."

18 *Id.* § 22677(c)(4).  The bill does not limit how a company may

19 explain or qualify these practices.  *Id.* (description must

20 include, but is "not limited to" certain subjects).  Thus, AB

21 587's disclosure requirements allow companies to make clear what

22

23

24

25

26

27

28

Defendant's Oppo. to Mtn. for Preliminary Injunction (2:23-CV-01939-WBS-AC)

they are actually doing to moderate content.  It does not compel

Plaintiff to make misleading statements.[5]

### 2. **AB 587 is reasonably related to a substantial state interest**

AB 587 also meets the second part of the *Zauderer* test,

because it is "reasonably related to a substantial governmental

interest." *CTIA*, 928 F.3d at 845.  California has a substantial

interest in requiring social media companies to be transparent

about their content-moderation policies and decisions so that

consumers can make informed decisions about where they consume

and disseminate news and information.  *See Netchoice (Fla.)*, 34

F.4th at 1230; *Netchoice (Tex.)*, 49 F.4th at 485; *see also, e.g.,*

*Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 540-41 (D.C. Cir. 2020)

(upholding statute requiring hospitals to disclose pricing

information, "to achieve goal of informing consumers about a

particular product trait") (quoting *Am. Meat Inst. v. U.S. Dept.*

*of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014) (en banc); *Nat'l*

*Elec. Mfrs. Assn. v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2011)

(rejecting challenge to regulation requiring disclosure of

information concerning mercury-containing products "to better

inform consumers about the products they purchase").  The goal of

AB 537 was to advance this interest.  Boutin Dec., Ex. 6 at 12

(Sen. Judiciary Comm. Analysis), Ex. 2 at 4 (Assem. Judiciary

---

[5] Plaintiff also briefly asserts in this section of its brief that *Zauderer* does not apply here because that test applies only to "instances of 'commercial advertising'."  Mtn. at 66 (citing *National Institute of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2372 (2018) ("*NIFLA*")).  However, *NIFLA* did not purport to narrow *Zauderer* to compelled speech in commercial advertisements (*id.*) and, indeed, the Ninth Circuit subsequently applied the test to compelled commercial disclosures that were not advertisements (*CTIA*, 928 F.3d 832 (applying *Zauderer* to ordinance requiring cell phone retailers to inform prospective purchasers regarding cell phone radiation)).

1  Comm. Analysis).  And, AB 587 does advance that interest, by

2  requiring companies to disclose and explain their terms of

3  service, Cal. Bus. Prof. Code §§ 22676, 22677, and to report

4  high-level information about their content moderation practices,

5  *id.* §22677(a)(4)-(5).

6       The statute at issue in *NetChoice (Fla.)*, 34 F.4th at 1230,

7  contains provisions requiring that social media platforms

8  "publish the standards, including detailed definitions, it uses

9  or has used for determining how to censor, deplatform, and shadow

10 ban," and that they inform users about changes to their terms of

11 service before implementing them.  *Id.*  On an appeal from an

12 order granting a preliminary injunction, the Eleventh Circuit

13 held that the statute's content-moderation restrictions were

14 likely unconstitutional, but Florida's interest in requiring

15 social media platforms to publish their content-mediation

16 standards was likely legitimate, because it ensures that

17 "consumers who engage in commercial transactions with platforms

18 by providing them with a user and data for advertising in

19 exchange for access to a forum—are fully informed about the terms

20 of that transaction and aren't misled about platforms' content-

21 moderation."  *Id.*  Similarly, the Texas statute at issue in

22 *NetChoice (Tex.)* contains provisions requiring large social media

23 platforms to "publish an acceptable use policy and disclose

24 information about the Platforms' content management and business

25 practices," and publish a report containing high-level statistics

26 about their content-moderation activities. 49 F.4th at 485.

27 Despite the law's other problems, there was no dispute that its

28 disclosure requirements "advance the state's interest in enabling

14

1    users to make an informed choice regarding whether to use the

2    Platforms." *Id.* (cleaned up).  Here, AB 587 provides similar

3    transparency and is similarly constitutional under *Zauderer*.

4        The California Legislature also considered that, by requiring

5    greater transparency about platforms' content-moderation rules

6    and decisions, AB 587 may encourage—*though not require*—social

7    media companies to "become better corporate citizens by doing

8    more to eliminate hate speech and disinformation" on their

9    platforms.  Boutin Dec., Ex. 2 at 4 (Assem. Judiciary Comm.

10   Analysis).  This, too, is a substantial state interest.[6]

11   However, Plaintiff's contention that the Legislature intended to

12   use AB 587 to "squelch" disfavored speech (*see* Mtn. at 9-10)

13   fails in the face of the plain text and the history of the bill.

14   Both show that the Legislature took pains to ensure that AB 587

15   "*does not require* social media companies to moderate or remove

16   hateful or incendiary content."  Boutin Dec., Ex. 2 at 4 (Assem.

17

18

19   _____

20   [6] The Legislature was concerned that "social media has become a powerful
     and largely unregulated platform for groups espousing hate, violence, bigotry,
     conspiracy theories and misinformation."  Boutin Dec., Ex. 2 at 4 (Assem.
21   Judiciary Comm. Analysis).  Use of social media has ballooned from only five
     percent of adults in 2005 to over 70 percent of adults in 2022.  *Id.*, Ex. 6 at
22   1. (Sen. Judiciary Comm. Analysis)  During that time, social media companies'
     content-moderation policies have dramatically evolved; at the same time,
23   "proliferation of objectionable content and 'fake news' has led to calls for
     swifter and more aggressive action in response."  *Id.*  The legislative history
24   notes that a recent study of Twitter posts determined that "more targeted,
     discriminatory tweets posted in a city related to a higher number of hate
25   crimes."  *Id.*, Ex. 10 at at 3 (Sen. Floor Analysis); *see id.*, Ex 2 at 4.  The
     Legislature also was concerned that social media companies were deploying a
26   number of methods of content moderation, but there was a lack of transparency
     into those methods, *id.*, Ex. 6 at 11 (Sen. Judiciary Comm. Analysis), and
27   recognized "backlash against perceived censorship in response to filtering of
     content and alleged 'shadow banning,'' Ex. 10 at 3 (Sen. Floor Analysis).

28

1  Judiciary Comm. Analysis) (emphasis added).[7]  *See also infra* at

2  pp. 3-7.

3      In sum, AB 587's "[m]andated disclosure of accurate, factual,

4  commercial information does not offend the core First Amendment

5  values of promoting efficient exchange of information or

6  protecting individual liberty interests.  Such disclosure

7  furthers, rather than hinders, the First Amendment goal of the

8  discovery of truth and contributes to the efficiency of the

9  'marketplace of ideas.'"  *Nat'l Elec. Mfrs. Assn. v. Sorrell*, 272

10  F.3d at 113-114.

11      **3.  AB 587 is not unjustified or unduly burdensome**

12      A disclosure requirement could violate the First Amendment if

13  it was so "unjustified or unduly burdensome" that it "chill[s]

14  protected commercial speech."  *Zauderer*, 471 U.S. at 651. *See*

15  *CTIA*, 928 F.3d at 848-49; *Am. Meat Inst. v. U.S. Dep't of Agric.*,

16  760 F.3d at 27 ("*Zauderer* cannot justify a disclosure so

17  burdensome that it essentially operates as a restriction on

18  constitutionally protected speech").  Plaintiff has not shown

19  that AB 587 is such a requirement.

20

21

_____

22      [7] In an attempt to demonstrate that AB 587's purpose is to suppress
protected speech, Plaintiff cites a public letter from the Attorney General.
23  As explained below in further detail, *infra* at pp. 35-36, Plaintiff's
characterization of this letter is not accurate.  In any event, the letter is
24  not part of the bill's legislative history. *See Am. Fuel & Petrochem. Mfrs.
v. O'Keefe*, 903 F.3d 903, 912 (9th Cir. 2018) (holding that the district court
25  correctly found that statements by public officials "do not demonstrate that
objectives identified by the legislature were not the true goals" of the
26  statute).  Moreover, under California law, legislative history consists of
materials relating to the bill that the Legislature as a body had before it
when it deliberated over the bill.  *Noori v. Countrywide Payroll & HR
27  Solutions, Inc.*, 257 Cal. Rptr. 3d 102, 110 n. 11 (Cal. Ct. App. 2019).  The
statements Plaintiff cites were not before the Legislature and, rather, post-
28  date the Legislature's vote.

AB 587 applies only to social media platforms that gross over $100 million in revenue per year.  Cal. Bus. & Prof. Code § 22680.  It merely requires a subject company to make their terms of service available to users and to submit semiannual reports to the Attorney General on their terms of service and content moderation policies and outcomes.  *Id.* §§ 22676, 22677.  The law does not require companies to utilize any particular content categories in their terms of service or actual content moderation practices, nor to report on any flagged posts in categories that they do not utilize.  *See id.* §§ 22676(a)(3) (report to Attorney General must include a "statement of *whether* the current version of the terms of service defines each of the following categories . . ." (emphasis added)), 22677(a)(5)(A) (report must include "[i]nformation on content that *was* flagged by the social media company as content belonging to any of the categories described in paragraph (3) . . ." (emphasis added)).

Plaintiff is subject to AB 587 because it grosses over $100 million per year.  Redacted Affidavit, ECF No. 23, ¶ 5; Cal. Bus. & Prof. Code § 22680.  Plaintiff's contention that, despite this high revenue, compliance with AB 587 would entail "herculean" efforts (Mtn. at 67) appears to rely on a misapprehension of the statute and is not supported by facts.  Plaintiff argues that it would be "enormously burdensome to create and categorize the records required by AB 587 for the roughly 221 billion posts made on X each year."  Mtn. at 68.  But AB 587 does not require Plaintiff to categorize all of its posts.  It only requires Plaintiff to report certain statistics on *flagged* posts *if* Plaintiff already utilizes the categories enumerated in the

17

statute.  *Id.* § 22677(a)(5)(A).  Plaintiff has submitted no evidence of the cost or burden of what the statute actually requires it to do, nor how that would cause chilling of protected speech.  *See NetChoice (Tex)*, 49 F.4th at 486 ("*Zauderer* does not countenance a broad inquiry into whether disclosure requirements are 'unduly burdensome' in some abstract sense, but instead instructs us to consider whether they unduly burden (or 'chill') protected speech and thereby intrude on an entity's First Amendment speech rights").  Just as the Fifth Circuit concluded when evaluating the burden of the Texas law requiring social media companies to report high-level content moderation statistics, "[a]t best, [plaintiffs have] shown that *some* of the transparency report's disclosures, *if* interpreted in a particularly demanding way by [the state], *might* prove unduly burdensome due to unexplained limits on the Platforms' technical capabilities. But none of these contingencies have materialized." *Id.* at 486.  Indeed, here, Plaintiff appears to maintain that it does not, in fact, utilize the categories in AB 587.  Red. Affid., ¶ 13 ("But X Corp.'s categories of content moderation, while comprehensive, do not align with the categories identified in the statute"); *see also* Mtn. at 30-35 (describing X Corp. terms of service categories).  If that is the case, then AB 587's disclosure requirements regarding statistics on flagged items will cause it no burden at all because Plaintiff just simply state in its report to the Attorney General that it does not use the categories.  *See* Cal. Bus. & Prof. Code § 22677(a)(5)(A) (requiring disclosure only of "[i]nformation on content that was flagged by the social media company as content

1  belonging to any of the categories described in paragraph (3)"

2  (emphasis added)).

3      Finally, AB 587's enforcement mechanism does not unduly

4  burden Plaintiff, and is certainly not "draconian."  Mtn. at 39.

5  To enforce the law, the Attorney General or other appropriate

6  state official must bring a court action to adjudicate a possible

7  violation of the law.  Cal. Bus. & Prof. Code § 22678(b).

8  According to AB 587's plain text, it is "the court," not the

9  Attorney General that has the discretion to determine "whether

10  the social media company has made a reasonable, good faith

11  attempt to comply with" AB 587.  *Id.* § 22678(a)(3).  Plaintiff

12  also suggests that the law is unduly burdensome because the

13  Attorney General has some sort of unusual investigatory powers to

14  enforce it.  Mtn. at 40.  This is not so.  AB 578 confers no

15  particular investigatory powers on the Attorney General.

16  Accordingly, Plaintiff cites only a provision of the California

17  Government Code that governs all state agencies' general powers

18  to conduct investigations and hearings.  *Id.* (citing Cal. Gov.

19  Code § 11180).

20      Because AB 587 satisfies the *Zauderer* test for compelled

21  commercial speech and is not so unjustified or unduly burdensome

22  as to chill protected speech, the law does not violate the First

23  Amendment.  The Court need not inquire further to conclude that

24  Plaintiff's First Amendment claim is not likely to succeed on the

25  merits and the motion for preliminary injunction should be

26  denied.

27

28

**B.   Even if the AB 587 Did Not Satisfy the *Zauderer* Test, It Would Still Be Constitutional Under *Central Hudson* Intermediate Scrutiny**

Even if AB 587 did not satisfy the *Zauderer*, it would still be constitutional under the *Central Hudson* intermediate scrutiny test for commercial speech.   *See Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1258 (E.D. Cal. 2020) ("If the *Zauderer* standard does not apply here because the warning requirement is not purely factual and uncontroversial . . . the court should then proceed to examine the warning requirement under *Central Hudson*'s intermediate scrutiny") (citing *National Institute of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2372 (2018) ("*NIFLA*") (internal quotation omitted)); *California Chamber of Commerce v. Becerra*, 529 F. Supp. 3d 1099, 1121-22 (E.D. Cal. 2021) (assuming without deciding that *Central Hudson* analysis should be applied if regulation compelling commercial speech does not satisfy *Zauderer*); *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980).

Under *Central Hudson*, government regulation of commercial speech will be upheld so long as: (i) the government asserts a substantial interest, (ii) the regulation directly advances the government's asserted interest, and (iii) the regulation is no more restrictive than necessary to serve that interest.   *See Central Hudson*, 447 U.S. at 564.

When applying intermediate scrutiny, courts give "substantial deference to the predictive judgments of [the legislature]." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (internal quotation and citation omitted); *see also United States*

20

1  *v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993) ("Within the bounds

2  of the general protection provided by the Constitution to

3  commercial speech, we allow room for legislative judgments").

4  The legislature may rely on evidence "reasonably believed to be

5  relevant to the problem" (*id.* at 51) and such evidence need not

6  be empirical (*see, e.g., City of Los Angeles v. Alameda Books,*

7  *Inc.*, 535 U.S. 425, 439 (2002) (plurality opinion) (explaining

8  that city did not need empirical data to support its conclusion

9  that adult-bookstore ordinance would lower crime)).[8]

10  **1.  AB 587 serves a substantial government interest**

11  As discussed above in the context of *Zauderer* scrutiny, AB

12  587 serves California's substantial interest in social media

13  transparency regarding their content-moderation policies and

14  decisions, so that consumers can make informed decisions about

15  which platforms they use to gather and disseminate information.

16  *See supra* at pp. 13-16; *see also NetChoice (Fla.)*, 34 F.4th at

17  1230 (recognizing that state disclosure requirements on social

18  media platforms' content management serves substantial state

19  interest); *NetChoice (Tex.)*, 49 F.4th at 485 (same).  The first

20  prong of *Central Hudson* scrutiny is satisfied.

21

22  _____

23  [8] Plaintiff briefly asserts in a footnote that *Central Hudson* scrutiny does not apply here because AB 587 does not regulate commercial speech. Factors in deciding whether speech constitutes "commercial speech" include

24  whether (1) the speech is an advertisement; (2) the speech refers to a particular product; and (3) the speaker has an economic motivation.  *See Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger v.*

25  *Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-68 (1983)).  These factors are not dispositive, and not all of them "must necessarily be present in order for

26  speech to be commercial."  *Bolger*, 463 U.S. at 67, n.14.  Factual disclosures from social media companies about their user policies and practices are

27  commercial speech, because they relate to a "particular product" (i.e., the platforms) and are made with the economic motivation for people to elect to

28  properly utilize those platforms.

### 2. AB 587 directly advances the government's asserted interest

The second *Central Hudson* prong is also easily satisfied. For this requirement, a state must show "that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 762 (1993). Nevertheless, "empirical data [need not] come . . . accompanied by a surfeit of background information," and such restrictions may be "based solely on history, consensus, and simple common sense." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (quotation marks omitted).

As explained above, AB 587 directly advances the state's interest in ensuring transparency in social media companies' content moderation policies and practices. *See supra* at pp. 13-16. The need for this transparency is real and not hypothetical. An article from the MIT Technology Review, cited in the Legislative history, explains, "social media has become the terrain for a low-grade war on our cognitive security, with misinformation campaigns and conspiracy theories proliferating." Joan Donovan, *Why social media can't keep moderating content in the shadows*, MIT Technology Review, November 6, 2020, available at https://www.technologyreview.com/2020/11/06/1011769/social-media-moderation-transparency-censorship/ (last viewed Oct. 27, 2023); Boutin Dec., Ex. 6 at 11 (Sen. Judiciary Comm. Analysis). However, social media platforms "rarely provide detailed insight into their content moderation practices." *Id.* at 12.

Plaintiff appears to argue that AB 587 does not directly advance the state's interest in increasing the transparency of

1  social media content moderation because X Corp. is already

2  sufficiently transparent by posting its terms of service.  Mtn.

3  at 64.  That fact does not mean that AB 587 does not directly

4  advance the state's interest in *increasing* transparency (and even

5  maintaining the low levels of current transparency) to help the

6  public make informed choices about where to obtain and

7  disseminate news and information.  Better transparency under SB

8  587 includes information about what actions social media

9  platforms *actually* take to enforce their terms of service and

10  moderate their content.  *See* Cal. Bus. & Prof. Code §

11  22677(a)(4)-(5).  In any event, a statute does not violate the

12  First Amendment merely because one company may currently comply

13  with parts of it voluntarily.

14      **3.   AB 587 is not "more extensive that necessary" to
            serve the government's asserted interest in
15          transparency**

16      Plaintiff does not argue that AB 587 is "more extensive than

17  necessary" to serve the State's asserted interest.  *Central*

18  *Hudson*, 447 U.S. at 564; *see* Mtn. at 63-65.  Indeed, the law

19  satisfies that final prong of *Central Hudson*.

20      A restriction on commercial speech must also not be "more

21  extensive than necessary to serve the interests that support it."

22  *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*,

23  527 U.S. 173, 188 (1999).  "The test is sometimes phrased as

24  requiring a reasonable fit between government's legitimate

25  interests and the means it uses to serve those interests." *Valle*

26  *Del Sol Inc. v. Whiting*, 709 F.3d 808, 825 (9th Cir. 2013)

27  (internal quotation omitted).  The law need "not necessarily [be]

28  the single best disposition but one whose scope is in proportion

23

1  to the interest served . . . ." *Bd. of Trustees of State Univ.*
2  *of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).  So long as a statute
3  falls within those bounds, courts "leave it to governmental
4  decisionmakers to judge what manner of regulation may best be
5  employed."  *Id.*

6      The disclosure requirements in AB 587 are a "reasonable fit"
7  with the state's interest in ensuring transparency in social
8  media companies' content moderation policies and practices.  Its
9  scope is modest and its burden on large, well-resourced social
10  media companies is minimal because, rather than prescribe any
11  terms of service or content moderation practices, the law merely
12  requires companies to disclose their terms of service and
13  generally report on what they are already doing to moderate
14  content.  AB 587 is therefore no more extensive than necessary in
15  relation to its purpose creating public transparency.[9]

16      **C.  AB 587 Does Not Violate the First Amendment Based on**
17          **Plaintiff's "Editorial Judgments" Theory**

18      Plaintiff appears to argue that, regardless of whether AB 587
19  satisfies *Zauderer*, the law categorically violates the First
20  Amendment based on a theory that it interferes with Plaintiff's
21  "editorial judgments about content."  Mtn. at 46.  This argument
22  is unavailing here, just as it was in *Netchoice (Fla.)* and

23

24          [9] The disclosure requirements of AB 587 are generally severable for the
    purposes of an injunction because they are "grammatically, functionally, and
25  volitionally separable."  *Cal. Redevelopment Assn. v. Matosantos*, 53 Cal. 4th
    231, 271 (2011); *Project Veritas v. Schmidt*, 72 F.4th 1043, 1063 (9th Cir.
26  2023) ("To determine whether a state statute is severable, we are bound by
    state statutes and state court opinions").  Thus, even if this Court were to
27  find that AB 587 likely violates the First Amendment, the Court should only
    consider preliminarily enjoining the specific provisions of AB 587 that the
    Court concludes are likely unconstitutional.
28

*Netchoice (Tex.)*, where both the Fifth and Eleventh Circuits held that the challenged disclosure statutes did not violate the First Amendment based on the "editorial judgments" theory. *Netchoice (Fla.)*, 34 F.4th at 1233; *Netchoice (Tex.)*, 49 F.4th 487-88. Indeed, none of Plaintiffs' cited cases involve regulations compelling commercial speech and therefore none even consider whether *Zauderer* should apply.

*Herbert v. Lando* is a defamation case that merely says, in dicta, that "[t]here is no law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest; and if there were, it would not survive constitutional scrutiny as the First Amendment is presently construed." 441 U.S. 153, 174 (1979). The Fifth Circuit explained in *Netchoice (Tex.)* why *Herbert* is distinguishable from social media transparency laws: "*Herbert* held that a defamation plaintiff could obtain discovery into the editorial processes that allegedly defamed him. And in the course of so holding, the Court rejected the editor's request to create 'a constitutional privilege foreclosing direct inquiry into the editorial process.'" *Netchoice (Tex.)*, 49 F.4th at 487 (quoting *Herbert*, 441 U.S. at 176) (internal citation omitted). Moreover, here and in *Netchoice (Tex.)*, the *Zauderer* test accounts for the hypothetical scenario asserted in *Herbert* by requiring compelled commercial speech to be purely factual and to reasonably relate to a particular substantial governmental interests—the disclosures are not required "merely to satisfy mere curiosity." *Herbert*, 441 U.S. at 176.

1     In *Miami Herald Pub. Co. v. Tornillo*, the Supreme Court ruled

2 that a Florida statute violated the First Amendment by requiring

3 a newspaper that criticized a political candidate to subsequently

4 publish the candidate's response.  418 U.S. 241, 244 (1974); *see*

5 Mtn. at 47.  The Court reasoned that, under the First Amendment,

6 the state could not compel a newspaper to publish political

7 speech that it disagreed with.  *Id.* at 256 ("the Court has

8 expressed sensitivity as to whether a restriction or requirement

9 constituted the compulsion exerted by government on a newspaper

10 to print that which it would not otherwise print.  The clear

11 implication has been that any such compulsion to publish that

12 which reason tells them should not be published is

13 unconstitutional"); *see also PruneYard Shopping Ctr. v. Robins*,

14 447 U.S. 74, 88 (1980) (*Miami Herald* "rests on the principle that

15 the State cannot tell a newspaper what it must print").

16     The challenged statute in *Miami Herald* is clearly

17 distinguishable from AB 587.  An analogous law would require

18 social media platforms to publish on the platform noncommercial

19 content that it did not wish to publish.  But AB 587 does not

20 compel or prohibit the publication of any noncommercial content—

21 it does not purport to regulate what posts a social media

22 platform must allow or disallow.  AB 587 merely requires

23 companies to disclose their terms of service (i.e., commercial

24 speech) and report to the Attorney General certain high level

25 information about how the company voluntarily elects to limit its

26 content.  Unlike the statute in *Miami Herald*, AB 587 therefore

27

28

1    does not dictate companies' editorial judgments about what is

2    included on their platforms.[10]

3        *Washington Post v. McManus* is also distinguishable. *See* 944

4    F.3d 506 (4th Cir. 2019); *see also Paxton*, 49 F.4th at 488, n.38.

5    That case involved burdensome campaign finance regulations of

6    political speech. *Id.* at 510-12. Specifically, the law required

7    online platforms (include news outlets) to, for every political

8    ad it posted, also post on its site "the identity of the

9    purchaser, the individuals exercising control over the purchaser,

10   and the total amount paid for the ad." *Id.* at 511. It also

11   required platforms to collect and retain records regarding the

12   political ad purchasers, which was subject to state inspection.

13   *Id.* at 512. While expressly noting the narrowness of its ruling

14   (*id.* at 513), the court emphasized that the regulatory scheme was

15   unconstitutional, in large part, because it singled out political

16   speech, "campaign-related speech," for regulation. *Id.* at 513-

17   14. It also emphasized that the law implicated constitutional

18   protections for anonymous political speech (*id.* at 515) and that

19   noncompliance would result in an injunction to remove the

20   political ad and, failing that, criminal penalties (*id.* at 514).

21       AB 587 does not implicate these concerns. It does not

22   require social media platforms to respond to political content

23   _____

24       [10] The editorial judgment theory also does not apply to AB 587 due to
     material differences between newspapers and social media platforms. *See* Br.
     of Amicus Curiae the Knight First Amendment Institute at Columbia University
25   in Support of Pltfs.-Appellees, *Netchoice LLC v. Atty Gen., St. of Fl.*, No.
     21-12355 (11th Cir. Nov. 15, 2021), 2021 WL 5358576 at *18-22 (describing
26   differences that should inform First Amendment analysis); *Netchoice (Tex.*), 49
     F.4th at 488 ("[social media p]latforms, of course, neither select, compose,
     nor edit (except in rare instances after dissemination) the speech they host.
27   So even if there was a different rule for disclosure requirements implicating
     a newspaper-like editorial process, that rule would not apply here because the
28   Platforms have no such process").

1   posted on their platforms with speech of their own.  It merely

2   requires them to disclose facts about their commercial services—

3   namely their terms of service, and high-level information on

4   their content moderation practices—so that consumers can take

5   that information into account in deciding whether to use that

6   service.  And, unlike the challenged law in *Washington Post*, AB

7   587 does not provide any penalties based on the content on the

8   platform.

9       Because their cited cases are inapposite, Plaintiffs have

10  failed to show that the "editorial judgment" theory, and not

11  *Zauderer*, applies to AB 587.

12

13      **D.   AB 587 Is Not Subject to Strict Scrutiny, But
             Satisfies It In Any Event**

14          **1.   *Zauderer*, not strict scrutiny, applies to laws
                 compelling commercial speech, even if content-
15               based**

16  AB 587 requires qualifying social media platforms to disclose

17  specified factual information.  This does not subject the law to

18  strict scrutiny.

19      Generally, many content-based speech regulations implicating

20  the First Amendment are subject to strict scrutiny.  However, as

21  the Supreme Court explained in *NIFLA*, *Zauderer* set forth an

22  exception to this rule for content-based regulations that compel

23  commercial speech.  *NIFLA*, 138 S. Ct. at 2365-66 (citing

24  *Zauderer*, 471 U.S. at 651).  Indeed, regulations compelling

25  speech are usually content-based by definition, because they set

26  forth some category of information that must be spoken—and

27  *Zauderer* scrutiny is applied in those cases.  *See, e.g.,*

28  *Zauderer*, 471 U.S. at 652 (attorney advertisements required to

28

1   disclose that clients may be responsible for litigation costs);

2   *CTIA*, 928 F.3d at 837-38 (cell phone retailers required to inform

3   prospective purchasers about cell phone radiation); *Am. Beverage*

4   *Ass'n v. City and County of San Francisco*, 916 F.3d 749, 753 (9th

5   Cir. 2019) (health warnings required in advertisements for

6   certain sugar-sweetened beverages).

7       Plaintiff argues that, as a content-based regulation, AB 587

8   is subject to strict scrutiny because the law requires

9   disclosures that are not "purely factual and uncontroversial."

10  However, as explained above, that is not the case. *Supra* at pp.

11  10-13.  *Zauderer* scrutiny therefore applies, and AB 587 satisfies

12  it.

13      *Volokh v. James* is not analogous to the circumstances here.

14  *See* --- F.Supp.3d ----, No. 22-cv-10195, 2023 WL 1991435,

15  (S.D.N.Y. Feb. 14, 2023); *see* Mtn. at 53.   In *Volokh*, the

16  challenged law required social media platforms to both have and

17  disclose a policy regarding hate speech, specifically.  *Id.* at

18  *2.  The court found that the law placed plaintiffs "in the

19  incongruous position of stating that they promote an explicit

20  pro-free speech ethos, but also require[d] them to enact a policy

21  allowing users to complain about 'hateful conduct' as defined by

22  the state."  *Id.* at *7.  The court concluded that the compelled

23  speech was therefore partly political in nature and that strict

24  scrutiny was therefore appropriate."  *Id.*

25      In contrast here, AB 587 does not force Plaintiff to have any

26  policy or take any position on any type of speech, because it

27  does not require Plaintiff to utilize any particular categories

28  in its terms of service or for the purposes of content

moderation.   The law merely requires Plaintiff to disclose the
factual information of whether it does, in fact, define certain
categories in its terms of service, and high-level statistics on
its actual content moderation practices.   The law therefore
requires Plaintiff to disclose factual information about its own
voluntary, existing practices and is not subject to strict
scrutiny.

>   **2.   Plaintiff's "speech about speech" cases do not apply here**

AB 587 is also not subject to strict scrutiny as a law that
purportedly regulates "speech about speech."  Mtn. at 54.
Plaintiff's cited cases do not support the application of that
theory here.

*Smith v. People of the State of California* did not involve
compelled commercial speech, but rather, an ordinance imposing
strict criminal liability on booksellers containing obscene
material.  361 U.S. 147, 148-49 (1959).  The Court concluded that
the statute would have the functional effect of banning books
that were not obscene, and thus, constitutionally protected.  *Id.*
at 152.  AB 587 is not analogous to the ordinance in *Smith*.  It
does not functionally require Plaintiff to change its terms of
service or content moderation practices; it merely requires
Plaintiff to disclose them.  The law is not unconstitutional
merely because the public may not have a wholly positive reaction
to those disclosures.

In *Entertainment Software Ass'n v. Blagojevic*, the Seventh
Circuit considered a challenge to an Illinois law that required
video game retailers to label any "sexually explicit" video game

with the numeral "18."   469 F.3d 641, 643 (7th Cir. 2006).   The

law also required retailers to "place a sign in their stores

explaining the video game rating system and to provide customers

with brochures about the video game rating system." *Id*.   The

court initially applied *Zauderer*, but determined that the laws'

particular requirements were not "purely factual" or

"uncontroversial" because both compelled disclosures were

subjective and "opinion-based" according to the content of the

video games.   *Id*. at 652-63.   That is why the court then turned

to strict scrutiny.   Meanwhile, in *Motion Picture Ass'n of Am. v.*

*Specter*, which predated *Zauderer*, the district court held that a

state law violated the First Amendment where it criminalized a

film exhibitor's misrepresentation that a film is "suitable for

family viewing," reasoning that the standard was entirely

subjective.   315 F.Supp. 824, 825-26 (E.D. Penn. 1970).

Here, AB 587's requirements meet the *Zauderer* standard,

because the disclosures are factual and uncontroversial.   The law

does not require companies to categorize content in any

particular way, but merely requires them to report on the

categories they already elect to use, which is a factual matter.

In other words, the law also does not require social media

companies to adopt, adhere to, or endorse any government

definition of harmful or otherwise disfavored speech.

### 3.   AB 587's legislative purpose does not subject the statute to strict scrutiny

Plaintiff appears to argue that statements by public

officials indicate that the law is a content-based and viewpoint-

1   discriminatory regulation, and therefore subject to strict

2   scrutiny.  Mtn. at 55-58.

3       As previously discussed, just like most laws compelling

4   commercial speech, AB 587 is content based.  *See supra* at pp. 28-

5   29.  But that subjects the bill only to *Zauderer* scrutiny.  *See*

6   *Zauderer*, 471 U.S. at 652.  Although Plaintiff cites *Reed* and

7   *City of Austin* for the proposition that content-based regulations

8   are subject to strict scrutiny, those case involved restricted

9   speech not compelled speech.  Mtn. at 56-57; *see Reed v. Town of*

10  *Gilbert, Ariz.*, 576 U.S. 155, 159 (2015); *City of Austin, Texas*

11  *v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 64-65

12  (2022).

13      AB 587 is, however, viewpoint neutral (and not viewpoint-

14  discriminatory), both facially and considering its legislative

15  history and purpose.  "A regulation engages in viewpoint

16  discrimination when it regulates speech 'based on 'the specific

17  motivating ideology or perspective of the speaker.' " *First*

18  *Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017)

19  (quoting *Reed*, 576 U.S. at 168).  If a law is facially neutral, a

20  court "will not look beyond its text to investigate a possible

21  viewpoint-discriminatory motive." *Interpipe Contracting, Inc. v.*

22  *Becerra*, 898 F.3d 879, 899 (9th Cir. 2018).  A court may only

23  turn to the legislative history and other extrinsic evidence of

24  legislative intent if the law includes "indicia of discriminatory

25  motive." *Id.*

26      The text of AB 587 is facially neutral and there are no

27  indicia in the text of discriminatory motive.  It does not impose

28  any terms of service or content regulation policies on any social

media platform.  The law merely requires the companies to

disclose the policies and practices that it has already,

voluntarily, put into place.  It therefore does not favor any

disclosures over others.  This Court therefore need not look

beyond the state's text to conclude that it is viewpoint-neutral,

and therefore not subject to strict scrutiny.

Even if it were appropriate to look beyond AB 587's text, the

legislative history establishes that the law is not viewpoint

discriminatory.  Courts "assume that the objectives articulated

by the legislature are actual purposes of the statute, unless an

examination of the circumstances forces [the courts] to conclude

that they could not have been a goal of the legislature." *Am.*

*Fuel & Petrochem. Mfrs. v. O'Keefe*, 903 F.3d 903, 912 (9th Cir.

2018).  As the Legislature put it, AB 587 is, "[i]n essence . . .

a transparency measure."  Boutin Dec., Ex. 2 at 4 (Assem.

Judiciary Comm. Analysis).  The Legislature's express purpose in

enacting the bill was "to increase transparency around what terms

of service social media companies are setting out and how it

ensures those terms are abided by.  The goal is to learn more

about the methods of content moderation and how successful they

are." *Id.*, Ex. 6 at 12 (Sen. Judiciary Comm. Analysis).  The

Governor's press release following enactment prominently referred

to AB 587 in its title as a "social media transparency bill."

*See* Mtn. at 69.

Plaintiff argues that the main purpose of AB 587 is to

pressure social media platforms to eliminate certain types of

speech on their platforms.  Mtn. at 55-56.  The Legislature did

33

1  consider that, by requiring greater transparency about platforms'

2  content-moderation rules and decisions, AB 587 may encourage—

3  *though not require*—social media companies to "become better

4  corporate citizens by doing more to eliminate hate speech and

5  disinformation" on their platforms.  Boutin Dec., Ex. 2 at 4

6  (Assem. Judiciary Comm. Analysis).  But any *public* pressure from

7  consumers that results from the factual disclosures does not

8  equate to discriminatory treatment by the *state* through AB 587.

9      To hold otherwise would mean that strict scrutiny would

10  presumably apply to any consumer protection law that forces a

11  company to disclose unfavorable information about its product.

12  That is not the rule under *Zauderer*.  *See, e.g.*, *Milavetz, Gallop*

13  *& Milavetz v. United States*, 559 U.S. 229, 251 (2010) (requiring

14  bankruptcy lawyers to disclose themselves as "debt relief

15  agencies") *Nat'l Biweekly Admin. v. Owen*, 873 F.3d at 733

16  (requiring mortgage refinancing company to disclose that its

17  solicitations were not authorized by the lender); *CTIA*, 928 F.3d

18  at 846-47 (requiring cell phone retailers to disclose information

19  on cell phone radiation); *S.F. Apartment Ass'n v. City & Cnty. of*

20  *S.F.*, 881 F.3d 1169, 1176-77 (9th Cir. 2018) (requiring landlords

21  to provide tenants with information about tenants' rights

22  organizations before engaging in lease buyout negotiations); *N.Y.*

23  *State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114 (2d Cir.

24  2009) (requiring restaurants to post calorie content on menus);

25  *see also Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721

26  (9th Cir. 2017) ("[t]he First Amendment does not generally

27  protect corporations from being required to tell prospective

28  customers the truth").  To the contrary, *Zauderer* does not

34

1   require a law's "subjective impact on the audience" to be

2   "uncontroversial." *CTIA*, 854 F.3d at 1117.

3

4   **4.   AB 587's does not "lend itself to government coercion"**

5       Finally, Plaintiff argues that strict scrutiny should apply

6   to AB 587 because the bill "lends itself to impermissible

7   government coercion" as a result of a post-enactment letter from

8   the Attorney General, together with his routine investigatory

9   powers and role in enforcing AB 587 in court.   Mtn. at 59-60.

10      First, Plaintiff does not accurately represent the letter

11  from the Attorney General.   The letter was sent to five of the

12  largest social media companies, including Plaintiff, shortly

13  before the November 2022 mid-term elections.   Exh. 1 to Fernandez

14  Dec., ECF No. 18-3, at 1-2.   Its legitimate purpose was to

15  encourage the companies to take steps to "stop the spread of

16  disinformation and misinformation that attack the integrity of

17  our electoral processes." *Id.* at 2.   The Attorney General sent

18  this message in his role as the state official in charge of

19  protecting Californians' right to vote and out of concern for

20  widespread online election misinformation that deters and

21  disenfranchises voters. *Id.*   The eight-page letter briefly

22  mentions AB 587 only once, and even then only as one of the

23  state's numerous laws that protect voters from disenfranchisement

24  and election disinformation. *Id.* at 4.   The letter then

25  rightfully states that the Attorney General will enforce *all* of

26  these laws. *Id.*   Nowhere does the letter state that AB 587 would

27  be enforced beyond the scope of its facial disclosure

28  requirements.   The letter does not constitute any attempt to

1  coerce Plaintiff to take any action related to AB 587 beyond

2  those requirements, as even Plaintiff appears to concede.  Mtn.

3  at 59 ("AG Bonta has 'made clear' that X Corp. will 'suffer

4  adverse consequences' if it 'fail[s] to comply' *with AB 587's*

5  *disclosure requirements*" (emphasis added) (quoting letter).

6      Second, AB 587 does not confer on the Attorney General

7  improper coercive powers merely because the Attorney General has

8  general subpoena and investigatory powers and the power to

9  initially determine when a social media platform as made a

10  "reasonable, good faith attempt to comply" with AB 587's

11  disclosure obligations.  (Cal. Bus. & Prof. Code §

12  22678(a)(2)(C)) ; *see* Mtn. at 59-60.  With respect to those

13  powers, AB 587 is no different than any other valid state statute

14  that the Attorney General enforces.  As explained above, the

15  subpoena and investigatory powers arise from the California

16  Government Code and are general powers attendant to the office.

17  Cal. Gov. Code § 11180; *see also* Mtn. at 40.  Similarly, it is

18  normal for the Attorney General to preliminarily determine that a

19  statute has been violated before initiating a court action for a

20  trier of fact to adjudicate the dispute and assess any

21  appropriate penalties.

22      AB 587 does not give rise to any improper government coercion

23  and is not subject to strict scrutiny.

24      **5.  In any event, AB 587 satisfies strict scrutiny**

25      Even if AB 587 were subject to strict scrutiny, it would

26  satisfy that level of review because it serves a compelling state

27  interest and is narrowly tailored.  *See Reed,* 576 U.S. at 171.

28

First, AB 587 serves a compelling interest—empowering the 70% of adults that use social media with information to allow them to navigate among the disinformation, threats, and hate speech that inevitably appears on social media platforms.  This ability is essential to maintain an informed, enfranchised, and safe populace.  Electoral integrity and public safety are compelling state interests.  *See Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 538 (9th Cir. 2015) (holding that state's interest in electoral integrity, including combatting fraud and promoting transparency and accountability, was "undoubtedly important"); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("protecting the community from crime" is a compelling state interest); *Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 730 (9th Cir. 2016) (The district court did not err in finding that the City had a compelling interest in promoting public safety and in preventing crime").

Second, AB 587 is also narrowly tailored.  The law is minimally burdensome on social media companies.  Unlike the challenged laws in *Netchoice (Fla.)* and *Netchoice (Tex.)*, AB 587 does nothing that regulates the speech *content*—by either users or the companies—on the social media platforms.  Companies may regulate the content however they see fit.  AB 587 merely requires the companies to disclose their existing terms of service and certain information about the manner in which they currently moderate content.

Plaintiff offers three proposals for how AB 587 could be more narrowly-tailored.  Mtn. at 63.  None would be sufficient to

serve the state's compelling interest here.  First, the law
cannot effectively apply only to companies "that do not disclose
how content is moderated at all," *id.*, because this would set no
minimum bar for the information that is disclosed to the public.
Companies could disclose the bare minimum of information that is
entirely useless to the public.  Second, the law would not
sufficiently serve its compelling purpose without its use of
specific categories of conduct.  *See id.*  The subjects are
commonly used in content moderation and provide points of
comparison across platforms for the public.  Third, AB 587
already satisfies Plaintiff's final proposal for narrow
tailoring, because the law already does not "require [social
media companies] to take positions on specific categories of
controversial speech."  *See supra* at p. 11; *see* Cal. Bus. & Prof.
Code §§ 22676, 22677.

Thus, while strict scrutiny does not apply to AB 587, the law
satisfies that level of review.

## II.  PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS BECAUSE THE AB 587 IS NOT PREEMPTED BY SECTION 230 OF THE COMMUNICATIONS DECENCY ACT

The Communications Decency Act of 1996 ("CDA"), 47 U.S.C.
§ 230, provides internet companies with immunity from certain
claims to further its policy "to promote the continued
development of the Internet and other interactive computer
services."  *Id.* § 230(b)(1).  Construing this immunity broadly,
Plaintiff argues that AB 587's reporting requirements are in
conflict with, and thus preempted by, the CDA's protections
against liability for hosting "objectionable" third-party content
on Plaintiff's platform.  Mtn. at 71.  Alternatively, Plaintiff

38

1  contends that AB 587 is inconsistent with the CDA's express

2  preemption provisions.  Plaintiff cannot prevail on the merits of

3  its preemption claim under either theory.

4      **A.  Section 230 Does Not Conflict-Preempt AB 587**

5      Section 230 of the CDA "protects certain internet-based

6  actors from certain kinds of lawsuits." *Barnes v. Yahoo!, Inc.*,

7  570 F.3d 1096, 1099 (9th Cir. 2009).  In enacting section 230,

8  Congress intended to serve "two parallel goals," *id.* at 1099:

9  First, to "promote the free exchange of information and ideas

10  over the Internet," *Carafano v. Metrosplash.com, Inc.,* 339 F.3d

11  1119, 1122 (9th Cir. 2003), and second, to "encourage voluntary

12  monitoring for offensive or obscene material," *id.*  But section

13  230 is "not meant to create a lawless no-man's-land on the

14  Internet." *Doe v. Internet Brands,* 824 F.3d 846, 852-53 (9th

15  Cir. 2016); *Fair Hous. Council of San Fernando Valley v.*

16  *Roommates.com,* 521 F.3d 1157, 1163 (9th Cir. 2008).  It does not

17  declare "a general immunity from liability" broadly relating to

18  third-party content.  *Internet Brands*, 824 F.3d at 852 (quoting

19  *Barnes*, 570 F.3d at 1100); *accord City of Chicago, Ill. v.*

20  *StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010).  Rather, the

21  statute's protections must be limited to "its narrow language and

22  its purpose." *Internet Brands*, 824 F.3d at 853.  And as the

23  Ninth Circuit has repeatedly cautioned, courts "must be careful

24  not to exceed the scope of the immunity provided by Congress."

25  *Id.* at 853 (quoting *Roommates.com*, 521 F.3d at 1164 n.15).

26      Plaintiff bases its conflict preemption challenge on section

27  230(c)(2)(A) of the CDA, Mtn. at 71, which states that "[n]o

28  provider or user of an interactive computer service shall be held

liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." *Id.* § 230(c)(2)(A).

AB 587 regulates Plaintiff's activities in accordance with section 230's limits. It penalizes only the failure to post the platform's terms of service, Cal. Bus. & Prof. Code § 22678(a)(2)(A), the failure to timely submit the required, semiannual terms of service report, *id.* § (a)(2)(B), and the material omission or misrepresentation of required information in a report, *id.* § (a)(2)(C).

Plaintiff contends that AB 587 conflicts with section 230(c)(2)(A) because it creates a civil penalty for platforms that "take actions in good faith to restrict access to content as described in 230(c)(2) without making AB 587's required disclosures." Mtn. at 70. AB 587's plain terms do not support this construction, which is premised upon a faulty assumption that a platform cannot both comply with AB 587's reporting requirement while also enforcing its independent content-moderation policies. AB 587 does not require social media platforms to restrict access to content or take any other actions to moderate content. It merely requires certain platforms to make timely informational disclosures about their actual and existing terms of service and content-moderation practices. *See HomeAway.com v. City of Santa Monica*, 918 F.3d 676 (9th Cir.

1   2019) (finding section 230 did not preempt ordinance prohibiting

2   short-term home rentals; although ordinance required platforms to

3   confirm the host's eligibility before permitting rental, it

4   "creates no obligation on [platforms'] part to monitor, edit,

5   withdraw or block the content supplied by hosts).[11]

6        Plaintiff also argues that section 230(c)(2)(A) conflicts

7   with AB 578's penalty for material omissions or

8   misrepresentations in the semiannual terms of service report,

9   Cal. Bus. & Prof. Code § 22678(a)(2)(C), which Plaintiff claims

10  gives the Attorney General "unfettered discretion" to punish

11  Plaintiff should the Attorney General find that Plaintiff has

12  restricted access to content in a manner inconsistent with its

13  own policies.  Mtn. at 70.  This argument misunderstands both AB

14  587's requirements and the Attorney General's role.  Nothing in

15  AB 587 gives the Attorney General authority to penalize social

16  media platforms based on the provisions of their terms of service

17  or how platforms choose to enforce (or not enforce) those terms.

18  Further, none of the topics of the terms of service report

19  requires Plaintiff to disclose particular instances of content

20  moderation, including the underlying content itself or any action

21  taken by Plaintiff in response to it.  Instead, the report covers

22  general disclosures about what mechanisms the platform uses to

23  moderate content, Cal. Bus. & Prof. Code § 22677(a)(4), as well

24  as aggregated statistical information about the number of times

25       [11] Under Plaintiff's logic, section 230 could arguably conflict-preempt
     virtually any state law.  A state law penalizing the failure to pay income tax
26   could be preempted by section 230 because it creates a civil penalty for
     social media platforms that "take actions in good faith to restrict access to
27   content as described in 230(c)(2)," Mtn. at 70, without paying state income
     tax.  In actuality, the tax law only penalizes non-payment of taxes, just as
     here, AB 587 penalizes only non-compliance with its disclosure requirements.

28

1   the platform flagged or took action on third-party content during

2   the reporting period, *id.* § 22677(a)(5).  No penalty can be

3   imposed against Plaintiff under AB 587 for making these

4   disclosures unless its report is untimely or contains material

5   omissions or misstatements.  *Id.* § 22678(a)(2)(B), (C).  And, as

6   previously explained, any discretion over whether to impose a

7   penalty for a material omission or misrepresentation in the

8   report rests with the reviewing court, not the Attorney General.

9   *Id.* § 22678(a)(1), (3).  Thus, AB 587 poses no obstacle to

10  compliance with section 230(c)(2).

11       Accordingly, AB 587 creates no liability for Plaintiff based

12  on how it moderates third-party content on its site, steering

13  clear of any conflict with section 230(c)(2).[12]

14       **B.  Section 230 Does Not Expressly Preempt AB 587**

15       For similar reasons, Plaintiff cannot prevail on its

16  argument that the CDA expressly preempts AB 587's disclosure

17  requirements.  Under the CDA's express preemption provision,

18  "[n]othing in this section shall be construed to prevent any

19  State from enforcing any State law that is consistent with this

20  section.  No cause of action may be brought and no liability may

21  be imposed under any State or local law that is inconsistent with

22  this section."  47 U.S.C. § 230(e)(3).  As explained above, AB

23  587's penalty provisions are not inconsistent with section

24  ───────────────
         [12] Further, because AB 587's penalties are not tied to whether Plaintiff
25  engages in content moderation, Plaintiff's argument that the thread of
    sanction under AB 587 effectively forces it to moderate content is unavailing.
26  *See* Mtn. at 72.  *HomeAway.com* recognizes a clear distinction between
    *monitoring* third-party content for the purpose of complying with a regulation,
    which does not offend the CDA, and *moderating* that content, i.e., determining
27  the extent to which it can be or remain published.  918 F.3d at 682-83.  In
    the former case, the platform's "*choice* to remove [noncompliant] listings is
28  insufficient to implicate the CDA."  *Id.* at 683.

                                   42

1  230(c)(2) because they do not require Plaintiff to engage in

2  content moderation, and they do not impose liability for

3  Plaintiff's particular content-moderation decisions.

4      When analyzing express preemption claims, courts "assume

5  federal law was not intended to supersede the states' historic

6  police powers 'unless that was the clear and manifest purpose of

7  Congress.'"  *Arellano v. Clark County Collection Service, LLC*,

8  875 F.3d 1213, 1216 (9th Cir. 2017).  Thus, courts "read even

9  express preemption provisions narrowly," using as the "ultimate

10  touchstone" the actual purpose of Congress.  *Id.* at 1216-17.

11      Contrary to Plaintiff's arguments, Congress's purpose in

12  enacting section 230 was not to preempt disclosure laws like AB

13  587 that impose no requirement to moderate content published on

14  the site.  As noted above, Congress sought to "encourage

15  voluntary monitoring for offensive or obscene material,"

16  *Carafano,* 339 F.3d at 1122.  This concern is reflected in section

17  230(c)'s title, "Protection for 'Good Samaritan' blocking and

18  screening of offensive material," which highlights Congressional

19  intent to allow and encourage online providers to act voluntarily

20  as publishers without fear of liability when they take steps to

21  ferret out defamatory or otherwise unlawful speech.

22  *Roommates.com*, 521 F.3d at 1163-64.  AB 587's disclosure

23  requirements serve this interest, giving platforms that

24  voluntarily engage in content moderation an opportunity to share

25  with consumers the general steps they take to moderate

26  objectionable content, without requiring them to divulge

27  particular content moderation decisions or imposing any penalty

28

1   for their action or inaction on specific content.

2       Because AB 587's limited penalty provisions are not

3   inconsistent with section 230(c)(2) immunity, Plaintiff cannot

4   establish any likelihood of success on the merits of its

5   preemption claim.

6

7   **III. PLAINTIFF HAS FAILED TO ESTABLISH THE REMAINING *WINTER* FACTORS NECESSARY FOR A PRELIMINARY INJUNCTION**

8       Even if Plaintiff had demonstrated a likelihood of success on

9   the merits as to any claim, it would still need to show that it

10  would suffer irreparable harm absent a preliminary injunction,

11  and that the balance of the equities and public interest favor a

12  preliminary injunction. *See Winter*, 555 U.S. at 20. Plaintiff

13  has established none of these.

14      As Plaintiffs point out, the loss of First Amendment freedoms

15  does constitute "irreparable harm" for purposes of seeking

16  injunctive relief. *See* Mtn. at 74-75. But as demonstrated

17  above, AB 587 does not unconstitutionally burden Plaintiff's

18  First Amendment rights. And, Plaintiff has not argued or shown

19  that it will suffer any other irreparable harm absent preliminary

20  injunctive relief.[13] Plaintiff has therefore failed to establish

21  this essential *Winter* factor.

22      Plaintiff also has not and cannot show that the balance of

23  the equities and the public interest weigh in its favor. The

24  public interest favors prompt transparency by social media

25  platforms so that consumers can make informed decisions about

26  where they consume and disseminate news and information. And,

27      [13] Plaintiff does not argue that a finding by this Court that AB 587

28  likely violates the Supremacy Clause would suffice to establish irreparable harm.

1   because AB 587 requires only that large social media platforms

2   merely disclose their actual terms of service and content

3   moderation policies and practices, its burden on them is minimal.

4   Moreover, any potential need for a preliminary injunction pending

5   final judgment is due largely to Plaintiff's lack of diligence in

6   bringing this litigation.  After AB 587, Plaintiff waited for

7   nearly one year before filing the complaint and more than one

8   year before moving for a preliminary injunction.  *See* ECF Nos. 1,

9   18.  Had Plaintiff acted with diligence, it would have likely

10  mitigated any need for preliminary, hurried relief.

11      The remaining *Winter* factors therefore favor denial of the

12  requested preliminary injunction.

13                              **CONCLUSION**

14      For the reasons above, the Court should deny Plaintiff's

15  motion for preliminary injunction.

16  Dated:  October 27, 2023          Respectfully submitted,

17                                    ROB BONTA
                                      Attorney General of California
18                                    ANTHONY R. HAKL
                                      Supervising Deputy Attorney
19                                    General

20

21

22                                    */s/ Gabrielle D. Boutin*
                                      GABRIELLE D. BOUTIN
23                                    Deputy Attorney General
                                      *Attorneys for Defendant*
24                                    *Attorney General Rob Bonta, in*
                                      *his official capacity*

25

26

27

28

45