1  CAHILL GORDON & REINDEL LLP
   JOEL KURTZBERG (admitted *pro hac vice*)
2  FLOYD ABRAMS (admitted *pro hac vice*)
   JASON ROZBRUCH (admitted *pro hac vice*)
3  LISA J. COLE (admitted *pro hac vice*)
   32 Old Slip
   New York, New York 10005
4  Telephone: 212-701-3120
   Facsimile: 212-269-5420
5  jkurtzberg@cahill.com

6  DOWNEY BRAND LLP
   WILLIAM R. WARNE (Bar No. 141280)
7  bwarne@downeybrand.com
   MEGHAN M. BAKER (Bar No. 243765)
   mbaker@downeybrand.com
8  621 Capitol Mall, 18th Floor
   Sacramento, CA 95814
9  Telephone: 916-444-1000
   Facsimile: 916-520-5910

10 *Attorneys for Plaintiff X Corp.*

11

12                UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

14                   SACRAMENTO DIVISION

15

16 X CORP.,                          No. 2:23-cv-01939-WBS-AC

17          Plaintiff,

18     v.                            **REPLY MEMORANDUM OF POINTS AND
                                     AUTHORITIES IN SUPPORT OF MOTION
19 ROBERT A. BONTA, Attorney        FOR PRELIMINARY INJUNCTION**
   General of California, in his
   official capacity,               EXTENDED ORAL ARGUMENT REQUESTED

20          Defendant.              Date:  November 13, 2023
                                    Time:  1:30 p.m.
21                                  Crtrm: 5

22

23

24

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................ 1

ARGUMENT ................................................... 7

I.   AB 587 Violates The First Amendment To The United States
Constitution And Article 1, Section 2, Of The California
Constitution ............................................. 7

  a.   Neither *Zauderer* Nor *Central Hudson* Applies Because The
Speech Compelled By AB 587 Is Not Commercial................ 8

    i. The Test For Determining Commercial Speech Is Whether The
Speech Does No More Than Propose A Commercial Transaction . 8

    ii. AB 587's Compelled Disclosures Do Not Propose A
Commercial Transaction And Are Intertwined With Otherwise
Fully Protected Speech .................................. 12

  b.   *Zauderer* Does Not Apply Because AB 587's Compelled
Disclosures Are Not Purely Factual And Uncontroversial..... 17

  c.   Strict Scrutiny Applies To AB 587 ..................... 22

    i. Strict Scrutiny Applies Because AB 587 Is A Content- And
Viewpoint-Based Speech Regulation ....................... 22

    ii. Laws Regulating "Speech About Speech," Such As AB 587,
Warrant Heightened Scrutiny ............................. 25

    iii. AG Bonta Is Using AB 587 To Coerce X Corp. Into
Moderating Content In A Particular Way, Which Further
Demonstrates Why Strict Scrutiny Applies ................ 30

    iv. AB 587 Interferes With X Corp.'s Constitutionally-
Protect Editorial Judgments ............................. 36

  d.   Notwithstanding Which Level Of Scrutiny Applies, AB 587
Cannot Stand.............................................. 39

    i. *Zauderer* .......................................... 39

    ii. *Central Hudson* .................................... 42

    iii. Strict Scrutiny .................................... 45

I.   Section 230 Of The Communications Decency Act Preempts AB
587. . .................................................... 48

II. X Corp. Has Established The Existence Of The Remaining
*Winter* Factors ........................................... 54

CONCLUSION ................................................ 54

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996)........................................ 43

5

*Animal Legal Def. Fund v. Wasden*,
    878 F.3d 1184 (9th Cir. 2018).......................... 45-46

6

7

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
    625 F. Supp. 3d 971 (N.D. Cal. 2022)...................... 50

8

9

*Board of Trustees v. Fox*,
    492 U.S. 469 (1989)....................................... 2, 9

10

*Bolger v. Youngs Drug Prod. Corp.*,
    463 U.S. 60 (1983).................................... *passim*

11

*Cal. Redevelopment Ass'n. v. Matosantos*,
    53 Cal. 4th 231 (2011)................................ 47-48n

12

13

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
    29 F.4th 468 (9th Cir. 2022).............................. 54

14

15

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 557 (1980).................................. *passim*

16

17

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993)....................................... 2, 9

18

*CTIA - The Wireless Ass'n v. City of Berkeley, California* ("*CITA I*"),
    854 F.3d 1105 (9th Cir. 2017), *cert. granted, judgment vacated sub nom.*, 138 S. Ct. 2708 (2018)...... 3-4, 18

19

20

*CTIA - The Wireless Ass'n v. City of Berkeley, California* ("*CTIA II*"),
    928 F.3d 832 (9th Cir. 2019).......................... 18-19

21

22

*Dex Media W., Inc. v. City of Seattle*,
    696 F.3d 952 (9th Cir. 2012) .......................... 14-15

23

24

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016).............................. 50

*Ent. Software Ass'n v. Blagojevic*,
   469 F.3d 641 (7th Cir. 2006).................................. 26

*Fair Hous. Council of San Fernando Valley v.*
   *Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008)............................... 53

*Gaudiya Vaishnava Soc. v. City & Cnty. of San*
   *Francisco*,
   952 F.2d 1059 (9th Cir. 1990), *as amended on denial*
   *of reh'g* (Dec. 26, 1991)............................. 11, 15-16

*Herbert v. Lando*,
   441 U.S. 153 (1979).................................... 5-6, 36

*Høeg v. Newsom*,
   2023 WL 414258 (E.D. Cal. Jan. 25, 2023)................. 26-27

*HomeAway.com v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019)............................. 51-52

*Hunt v. City of Los Angeles*,
   638 F.3d 703 (9th Cir. 2011)........................... *passim*

*Hurley v. Irish-Am Gay, Lesbian & Bisexual Grp. Of*
   *Boston*,
   515 U.S. 557 (1995)....................................... 37n

*Ibanez v. Fla. Dept. of Bus. and Prof'l Regul., Bd. of*
   *Acct.*,
   512 U.S. 136 (1994)........................................ 43

*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020).......................... *passim*

*Interpipe Contracting, Inc. v. Becerra*,
   898 F.3d 879 (9th Cir. 2018)............................... 25

*Italian Colors Rest. v. Becerra*,
   878 F.3d 1165 (9th Cir. 2018).............................. 43

*Jones v. Google LLC*,
   73 F.4th 636 (9th Cir. 2023)............................ 53-54

*Junior Sports Mags. Inc. v. Bonta*,
   80 F. 4th 1109 (9th Cir. 2023)......................... 42, 54

*Kronemyer v. Internet Movie Database Inc.*,
   150 Cal. App. 4th 941 (2007)............................... 15

*Manhattan Cmty. Access Corp.* v. *Halleck*,
    139 S. Ct. 1921 (2019) ...................................... 36

*Miami Herald Pub. Co.* v. *Tornillo*,
    418 U.S. 241 (1974) ................................... 6, 36-37

*Missouri* v. *Biden*,
    2023 WL 6425697 (5th Cir. Oct. 3, 2023), *cert.*
    *granted sub nom.*, *Murthy* v. *Missouri*, 2023 WL
    6935337 (U.S. Oct. 20, 2023) ............................ 35-36

*Motion Picture Ass'n of Am.* v. *Specter*,
    315 F. Supp. 824 (E.D. Pa. 1970) ........................... 27

*Nat'l Ass'n of Wheat Growers* v. *Becerra*,
    468 F. Supp. 3d 1247 (E.D. Cal. 2020) .................. *passim*

*Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra*
    ("NIFLA"),
    138 S. Ct. 2361 (2018) ................................ *passim*

*NetChoice, LLC* v. *Paxton*,
    49 F.4th 439 (5th Cir. 2022) ........................... 21, 37

*NetChoice, LLC* v. *Att'y Gen., Fla.*,
    34 F.4th 1196 (11th Cir. 2022) ........................ *passim*

*New York State Rest. Ass'n* v. *New York City Bd. of*
    *Health*,
    556 F.3d 114 (2d Cir. 2009) ................................ 18

*O'Handley* v. *Padilla*,
    579 F. Supp. 3d 1163 (N.D. Cal. 2022), *aff'd sub*
    *nom. on other grounds, O'Handley* v. *Weber*, 62 F.4th
    1145 (9th Cir. 2023) ...................................... 37n

*PC Drivers Headquarters, LP* v. *Malwarebytes Inc.*,
    371 F. Supp. 3d 652 (N.D. Cal. 2019) ....................... 49

*R.A.V.* v. *St. Paul*,
    505 U.S. 377 (1992) ..................................... 5, 25

*Reed* v. *Gilbert*,
    576 U.S. 155 (2015) .......................... 1, 5, 22, 45

*Republican Nat'l Comm.* v. *Google, Inc.*,
    2023 WL 5487311 (E.D. Cal. Aug. 24, 2023) .................. 53

*Riley* v. *Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988) .................................. 11, 15-16

*Rosenberger* v. *Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ........................................... 25

*Smith* v. *California*,
361 U.S. 147 (1959) ....................................... 27-28

*United States* v. *Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000) ........................................... 45

*United States* v. *United Foods, Inc.*,
533 U.S. 405 (2001) .................................... 2, 9-10

*Va. State Bd. Of Pharmacy* v. *Va. Citizens Consumer
Council, Inc.*,
425 U.S. 748 (1976) .................................... 2, 9-10

*Volokh* v. *James*,
2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023) .................... 21

*Washington Post* v. *McManus*,
944 F.3d 506 (4th Cir. 2019) ............................. 38-39

*Zauderer* v. *Office of Disciplinary Counsel*,
471 U.S. 626 (1985) .................................... *passim*

**Statutes**

47 U.S.C. § 230 ...................................... 7, 49, 53

Cal. Bus. & Prof. Code §§ 22675-22681 ..................... *passim*

**Other Authorities**

Daphne Keller, *Platform Transparency and the First
Amendment*, Stanford Cyber Policy Center (Mar. 3,
2023) ...................................................... 22

Eric Goldman, *The Constitutionality of Mandating
Editorial Transparency*, 73 Hastings L.J. 1203 (2022) ........ 33

Eric Goldman, *Zauderer and Compelled Editorial
Transparency*, 108 Iowa L. Rev 80 (2023) ............. 17, 34-35

1                            **INTRODUCTION**

2          Attorney General Bonta's brief opposing X Corp.'s motion for

3    a preliminary injunction contains a critical admission — buried on

4    page 32 — that "AB 587 is content based."  Defendant's Opposition

5    to Motion for Preliminary Injunction ("Opp.") at 32.  Under long-

6    standing United States Supreme Court precedent, such laws "are

7    presumptively unconstitutional" and subject to strict scrutiny,

8    the highest form of judicial review.  *Reed* v. *Gilbert*, 576 U.S.

9    155, 163 (2015) (content-based laws "may be justified only if the

10   government proves that they are narrowly tailored to serve

11   compelling state interests").  To avoid application of strict

12   scrutiny, AG Bonta argues that AB 587 is subject to a narrow

13   exception to this general rule that applies a more-relaxed standard

14   of review to a law that compels (1) commercial speech that (2) is

15   both purely factual and uncontroversial.  *See Zauderer* v. *Office*

16   *of Disciplinary Counsel*, 471 U.S. 626 (1985).  But AG Bonta failed

17   to meet his burden of establishing these essential prerequisites.

18   *See id.* at 641 (discussing burden).  *Zauderer* cannot apply here

19   because AB 587 neither involves commercial speech nor speech that

20   is both purely factual and uncontroversial.

21         To begin, AG Bonta's opposition brief misstates the relevant

22   law about what constitutes commercial speech (Opp. at 21 n.8), and

23   the very cases cited by AG Bonta make plain that AB 587 comes

24   nowhere close to satisfying the relevant inquiry, which asks if

the speech in question "does no more than propose a commercial transaction." *Hunt* v. *City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011) (cited by Defendant) (quoting *United States* v. *United Foods, Inc.*, 533 U.S. 405, 409 (2001)); *see also Va. State Bd. Of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (same); *Central Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562 (1980) (describing commercial speech as "speech proposing a commercial transaction"); *Board of Trustees* v. *Fox*, 492 U.S. 469, 482 (1989) (holding that "speech that *proposes* a commercial transaction" is "what defines commercial speech") (emphasis in original); *Bolger* v. *Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983) (cited by Defendant) ("commercial speech" is speech "which does no more than propose a commercial transaction") (quotation marks omitted); *City of Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 422 (1993) (same). AG Bonta's Opposition relegates his entire discussion of this crucial issue to a footnote (Opp. at 21 n.8). And, perhaps understandably, that footnote neglects to cite the relevant inquiry: whether the speech in question proposes a commercial transaction. Of course, AB 587's compelled disclosures do not propose a commercial transaction. AG Bonta does not and cannot attempt to argue otherwise.

Nor does AB 587 compel speech that is "purely factual and uncontroversial," as is required for *Zauderer* to apply. Instead,

1  AB 587 requires controversial disclosures about content-moderation

2  decisions that involve highly subjective and contestable editorial

3  ***judgments*** about what content should be permitted on social media

4  platforms.  Indeed, as confirmed by the legislative history of AB

5  587 and the undisputed testimony of X Corp.'s witnesses, AB 587

6  forces social media companies to disclose sensitive editorial

7  decisions pertaining to how social media companies chose to define

8  and moderate content.  Such speech is "fraught with political bias"

9  and generates significant controversy regardless of the decisions

10 made.  Indeed, in this realm of speech, "both action and inaction"

11 are "equally maligned" by the public on the very topics that are

12 the focus of AB 587.  Affidavit of Joel Kurtzberg, dated Oct. 6,

13 2023 ("Kurtzberg Aff.") Ex. 6 (Cal. Assemb. Comm. on Privacy and

14 Consumer Protection Report, 2021–22 Sess. (AB 587), Apr. 22, 2021)

15 at 4; *see also* Affidavit of Trust & Safety Team, dated Oct. 6, 2023

16 ("T&S Aff.") ¶¶ 25–29; Affidavit of Ben Elron, dated Oct. 6, 2023

17 ("Elron Aff.") ¶¶ 5–8, 11–15 (noting that content moderation

18 decisions are so controversial that, if personal identifying

19 information about the persons who make them is publicly available,

20 those persons have a high likelihood of being subjected to doxing,

21 threats, and harassment).  The record is uncontroverted on these

22 points, which are fatal to the application of *Zauderer*.

23     In an effort to  suggest that AB 587 is "uncontroversial" for

24 purposes of applying *Zauderer*, AG Bonta relies on *CTIA-The Wireless*

1   *Ass'n v. City of Berkeley, California* ("*CTIA I*"), 854 F.3d 1105

2   (9th Cir. 2017), *cert. granted, judgment vacated sub nom.*, 138 S.

3   Ct. 2708 (2018).   Opp. at 10, 11–12, 34–35.   But, as this Court

4   previously recognized, *CTIA I* was vacated after the Supreme Court's

5   decision in *Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra ("NIFLA")*,

6   138 S. Ct. 2361 (2018), which revisited and clarified the holding

7   in *Zauderer*.   *See Nat'l Ass'n of Wheat Growers* v. *Becerra*, 468 F.

8   Supp. 3d 1247, 1253 n.7, 1258 (E.D. Cal. 2020) (Shubb, J.) (noting

9   that the decision in *CTIA I* was vacated after *NIFLA*).   The portion

10  of *CTIA I* addressing the meaning of "controversial" thus provides

11  no assistance to AG Bonta here.   *See id.* at 1258.

12       Under the relevant and controlling test, *Zauderer* does not

13  apply to AB 587 because it compels speech concerning editorial

14  judgments about content-moderation decisions that are

15  intrinsically controversial.   Thus, instead of the relaxed standard

16  in *Zauderer*, strict scrutiny applies because – as acknowledged by

17  the AG – AB 587 is content based.   See Opp. at 32.

18       As both the legislative history and AG Bonta's public

19  statements make clear, one purpose of AB 587 is to "pressure [X

20  Corp. and other covered social media companies] to become better

21  corporate citizens by doing more to eliminate hate speech and

22  disinformation."   Kurtzberg Aff. Ex. 5 (Cal. Assemb. Comm. on

23  Judiciary Report, 2021–22 Sess. (AB 587), Apr. 27, 2021) at 4).

24  That conceded purpose in and of itself requires application of

REPLY MEMORANDUM OF POINTS AND          4
AUTHORITIES IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

strict scrutiny, since the State acknowledges that one purpose of AB 587 is to coerce companies to disfavor or eliminate certain constitutionally-protected speech that the State finds objectionable.  *See Reed*, 576 U.S. at 166 ("strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based"); *R.A.V.* v. *St. Paul*, 505 U.S. 377, 391–96 (1992) (applying strict scrutiny when law targets particular viewpoints).

AB 587 permits the Attorney General to use his enforcement powers to impermissibly "pressure" social media companies to regulate content in ways that the Attorney General desires. Confirming this, AG Bonta has already sent a threatening letter to X Corp. and other social media companies insisting that they have an obligation to remove what he perceives as "disinformation" and "misinformation" from their platforms and making clear that he will use enforcement of AB 587 to pressure them to do so.  *See* Affidavit of Wifredo Fernandez, dated Oct. 4, 2023 ("Fernandez Aff.") Ex. 1 (Letter from Attorney General Bonta to Twitter, Inc., et al. (Nov. 3, 2022)) at 1–2, 4.   X Corp.'s evidence explaining that it interpreted AG Bonta's letter as any sophisticated reader of it would — namely, as a veiled threat, *id.* ¶ 19 — remains unrebutted.

AB 587 thus impermissibly interferes with social media companies' First Amendment rights to make editorial judgments free of governmental interference.  *See Herbert* v. *Lando,* 441 U.S. 153,

172-174 (1979) (noting that a law that "subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest . . . would not survive constitutional scrutiny as the First Amendment is presently construed" and concluding that "if inquiry into editorial conclusions threatens the suppression . . . of truthful information," it raises First Amendment problems); *Miami Herald Pub. Co.* v. *Tornillo*, 418 U.S. 241, 258 (1974) (holding that "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials — whether fair or unfair — constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.").

For these reasons and the others discussed below, AB 587 is subject to strict scrutiny, the highest form of judicial review. But in the end, regardless of what level of scrutiny applies, AB 587 cannot stand.  The State argues that the law furthers the lofty interest of keeping its citizens "informed, enfranchised, and safe," Opp. at 1-2, but AG Bonta fails to demonstrate, as is his evidentiary burden, that (1) the problem he seeks to solve is real, (2) AB 587 will "directly and materially" advance his goals, and (3) the means used under AB 587 do not restrict more speech than

1    is necessary to accomplish those goals.

2        Finally, AB 587 violates the immunity provided by Section 230

3    of the Communications Decency Act ("Section 230") because it

4    imposes penalties if social media companies fail to regulate

5    content on their platforms in the manner imposed by the statute.

6    Since Section 230 precludes liability for "*any action* voluntarily

7    taken in good faith to restrict access to or availability of

8    material that the provider or user considers to be obscene, lewd,

9    lascivious, filthy, excessively violent, harassing, or otherwise

10   objectionable," 47 U.S.C. § 230(c)(2) (emphasis added), AB 587

11   conflicts with that provision.  "Any action" means "any action" —

12   even those taken without the required disclosures imposed by AB

13   587.  For this additional reason, the Court should enjoin the

14   enforcement of AB 587.

**ARGUMENT**

16   **I.   AB 587 Violates The First Amendment To The United States
        Constitution And Article 1, Section 2, Of The California
17      Constitution**

18       AG Bonta concedes that "AB 587 is content based," Opp. at 32,

19   and attempts to avoid the consequences that flow from that

20   admission (i.e., application of strict scrutiny).  He attempts to

21   do so by arguing that AB 587 is subject to *Zauderer* or *Central*

22   *Hudson* scrutiny because it involves compelled "commercial speech"

23   that is "purely factual" and "uncontroversial."  But AB 587's

24   compelled disclosures are not commercial speech, which renders both

*Zauderer* and *Central Hudson* inapplicable.  And *Zauderer* does not apply for the additional reason that AG Bonta has not satisfied his burden of demonstrating that the speech compelled by AB 587 is both "purely factual" and "uncontroversial."  Thus, "[b]ecause AB [587] does not regulate commercial speech, or any other form of speech entitled to reduced scrutiny only," this Court must legally "apply strict scrutiny to determine its validity."  *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020).  In any event, AB 587 fails under any level of First Amendment scrutiny — whether it is *Zauderer*, intermediate scrutiny under *Central Hudson*, or strict scrutiny.

       **a. Neither *Zauderer* Nor *Central Hudson* Applies Because The Speech Compelled By AB 587 Is Not Commercial**

           i. <u>The Test For Determining Commercial Speech Is Whether The Speech Does No More Than Propose A Commercial Transaction</u>

Because AB 587 regulates non-commercial speech, neither the test set forth under *Zauderer* nor the intermediate scrutiny test under *Central Hudson* applies.  AG Bonta concedes that the standards of review under *Zauderer* and *Central Hudson* apply only to regulations that govern *commercial* speech.  *See* Opp. at 8, 13 n.5, 19 (noting that the *Zauderer* test applies to "compelled commercial disclosures" or "compelled commercial speech"); *id.* at 20 (noting that the "*Central Hudson* intermediate scrutiny test" applies to "commercial speech"); *see also Nat'l Ass'n of Wheat Growers*, 468 F. Supp. 3d at 1253, 1257 (*Zauderer* governs "compelled *commercial*

speech" and *Central Hudson* governs "*commercial* speech") (Shubb, J.) (emphasis added).

AG Bonta buries his entire discussion of whether the speech at issue in this case is "commercial" in a footnote that misstates the relevant legal test. Opp. at 21 n.8 (citing *Hunt* and *Bolger* in support of a three-factor test for determining when speech is commercial, examining whether (1) the speech is an advertisement, (2) the speech refers to a particular product, and (3) the speaker has an economic motivation). The relevant legal test, however, is not in doubt. The United States Supreme Court has repeatedly held — no less than six times — that speech is commercial when it "does no more than propose a commercial transaction." *Va. State Bd. Of Pharmacy*, 425 U.S. at 762 (quotation marks omitted); *see also Central Hudson*, 447 U.S. at 562 (describing commercial speech as "speech proposing a commercial transaction"); *Bolger*, 463 U.S. at 66 ("commercial speech" is speech "which does no more than propose a commercial transaction") (quotation marks omitted); *City of Cincinnati*, 507 U.S. at 422 (same); *Fox*, 492 U.S. at 482 ("speech that *proposes* a commercial transaction" is "what defines commercial speech") (emphasis in original); *United Foods, Inc.*, 533 U.S. at 409 ("commercial speech" is "defined as speech that does no more than propose a commercial transaction"). Ninth Circuit case law, including that relied on by Defendant, similarly holds that the correct test for identifying commercial speech is whether it "does

no more than propose a commercial transaction." *IMDb.com Inc.*, 962 F.3d at 1122 (quoting *Va. State Bd. of Pharmacy*, 425 U.S. at 762); *Hunt*, 638 F.3d at 715 ("Commercial speech is 'defined as speech that does no more than propose a commercial transaction.'") (quoting *United Foods, Inc.*, 533 U.S. at 409).

Unable to satisfy the relevant test, AG Bonta chooses to ignore it, instead citing *Hunt* and *Bolger* for the three-factor test cited above and suggesting — erroneously — that it supplies the relevant standard. Opp. at 21 n.8. As the very case cited by AG Bonta (*Hunt*) explains, however, it is only in cases "[w]here the facts present a close question" as to whether the speech "does no more than propose a commercial transaction" that courts will even consider the three factors cited by AG Bonta — i.e., whether (1) "the speech is an advertisement," (2) "the speech refers to a particular product," and (3) "the speaker has an economic motivation." 638 F.3d at 715 (citing *Bolger*, 463 U.S. at 66–67). If all three of those factors are present, then a strong case can be made that the speech is commercial. *Id.*

As *Hunt* makes clear, the three-factor test for difficult cases comes from *Bolger*, where the Supreme Court found that contraceptive advertisement mailings were commercial speech because, despite "contain[ing] discussions of important public issues," they were "advertisements," they "refer[red] to a specific product," and appellants had "an economic motivation for mailing the pamphlets."

1   *Bolger*, 463 U.S. at 66–68.  The question there was whether speech

2   that *did* propose a commercial transaction *and* also touched on

3   issues of public concern, was or was not commercial speech.  That

4   is the type of difficult case to which the *Bolger* test applies.

5   In contrast, the speech compelled by AB 587 does not propose any

6   commercial transaction whatsoever; thus, the three-factor test is

7   inapplicable.

8       Defendant also fails to acknowledge Supreme Court and Ninth

9   Circuit precedent holding that "[c]ommercial speech does not retain

10  its commercial character 'when it is inextricably intertwined with

11  otherwise fully protected speech.'"  *Hunt*, 638 F.3d at 715 (quoting

12  *Riley* v. *Nat'l Fed'n of the Blind of N. Carolina, Inc.,* 487 U.S.

13  781, 796 (1988)); *see also id.* at 713 (quoting *Gaudiya Vaishnava*

14  *Soc.* v. *City & Cnty. of San Francisco*, 952 F.2d 1059 (9th Cir.

15  1990), *as amended on denial of reh'g* (Dec. 26, 1991) ("First

16  Amendment protection applies to the sale of merchandise so long as

17  the 'sale of merchandise [] is inextricably intertwined with a

18  statement carrying a religious, political, philosophical or

19  ideological message'")).

20      AG Bonta's omissions about the relevant legal standard are

21  telling here because AB 587 compels disclosures that do not in any

22  way propose a commercial transaction, and, at the very least,

23  encompass communications that convey information about issues of

24  public concern — namely, how X Corp. moderates controversial

1   content on its social media platform.

2               ii.  AB 587's Compelled Disclosures Do Not Propose A
                     Commercial Transaction And Are Intertwined With
3                    Otherwise Fully Protected Speech

4        AB 587's compelled disclosures are not commercial speech

5   because they do not propose a commercial transaction at all.

6   *IMDb.com Inc.*, 962 F.3d at 1122 (*Bolger* factors should be analyzed

7   only if there is a "close question" about whether the speech does

8   nothing more than propose a commercial transaction); *Hunt*, 638 F.3d

9   at 715 (same).  Here, on the other hand, X Corp.'s content-

10  moderation policies and information about how those policies have

11  been applied have various purposes — e.g., they inform users who

12  are already on the platform what the rules are; they outline X's

13  free speech principles; and they convey X's political views about

14  what kind of content moderation rules promote the public good.

15  None of these purposes are remotely related to proposing a

16  commercial transaction.

17       The facts in both *Hunt* and *IMDb.com Inc.* are illustrative.

18  The plaintiffs in *Hunt* were two Venice Beach Boardwalk salesmen,

19  who sold shea butter and incense holders, respectively, and the

20  regulated speech involved the sales pitches for both products

21  (e.g., the shea butter salesman's "standard sales pitch" and the

22  incense salesman's explanation that his product was "better than a

23  lot of the other commercial available incense").  *Hunt*, 638 F.3d

24  at 708.  The Ninth Circuit found that the speech "clearly propose[d]

a commercial transaction" because "the core of Plaintiffs' speech [was] directed to their products and why a consumer should buy them." *Id.* at 716.  The Ninth Circuit also found that "any noncommercial aspect of Plaintiffs' speech [was] not inextricably intertwined with commercial speech" because plaintiffs could "easily sell their wares without reference to any religious, philosophical, and/or ideological element, and they could also express any noncommercial message without selling these wares." *Id.*  This is the sort of pure commercial speech that qualifies for *Central Hudson* review, but it bears no relation to the type speech AB 587 is focused upon, which has nothing to do with "why a consumer should [use]" X.  *Id.*

In contrast, in *IMDb.com Inc.*, the Ninth Circuit found that the speech at issue — publication of the ages and dates of birth of entertainment industry professionals on a website — was *not* commercial speech because the "public profiles on IMDb.com," on which the regulated speech appeared, did "not propose a commercial transaction."  962 F.3d at 1122.  The Ninth Circuit stated that it "need not reach the *Bolger* factors" because analysis of those factors is only "relevant if the facts present a 'close question.'" *Id.* (citing *Hunt*, 638 F.3d at 715).

Just as IMDb.com's "public profiles" did not propose a commercial transaction, *id.*, neither do the types of disclosures at issue in connection with AB 587 — i.e., X Corp.'s content-

moderation policies and statistics about how it applies those policies to certain categories of speech. Both may be features of the company's overall product, but that does not mean the speech proposes a commercial transaction and deserves less protection under the First Amendment as a result.

In any event, even if this were a "close question" (and it is not), and if the *Bolger* factors were to apply, the speech at issue would still not be commercial. As to the first *Bolger* factor, AG Bonta concedes that AB 587's compelled disclosures are not an advertisement. Opp. at 21 n.8. As to the second and third factors, AG Bonta argues that the disclosures "relate to a 'particular product' (i.e., the platforms) and are made with the economic motivation for people to elect to properly utilize the platforms." *Id.* But speech does not automatically "relate to a particular product" merely by referring to some aspect of it. *See IMDb.com Inc.*, 962 F.3d at 1122 ("nothing in the record indicates that IMDb.com profiles . . . refer to a particular product"). Thus, even if statements about content moderation on X refer to an aspect of the platform, the statements that are compelled by AB 587 are not referring to a particular product – and certainly are not part of an effort to entice someone to purchase a product. Accordingly, AB 587's compelled disclosures are not commercial speech, "even assuming [X Corp.] has a financial interest in its [content-moderation policies]." *Id.* (quoting *Dex Media W., Inc.* v. *City of*

1  *Seattle*, 696 F.3d 952, 960 (9th Cir. 2012) ("economic motive in

2  itself is insufficient to characterize a publication as

3  commercial")).   Under AG Bonta's conception of the commercial

4  speech test, any statement made by any company could be, if it

5  concerned the company in any way, commercial speech.   That is

6  clearly not the law.   *See Kronemyer* v. *Internet Movie Database*

7  *Inc.*, 150 Cal. App. 4th 941, 949 (2007) ("If appellant's position

8  that the prospect of some financial benefit from a publication

9  places the material in the area of 'commercial speech,' it would

10  include virtually all books, magazines, newspapers, and news

11  broadcasts.  There is no authority for so sweeping a definition.").

12      Finally, even if the speech at issue here were considered

13  commercial under *Bolger* (and it is not), it would still be subject

14  to strict scrutiny because it is, at the very least, "inextricably

15  intertwined" with speech "carrying a religious, political,

16  philosophical or ideological message."   *Hunt*, 638 F.3d at 715

17  (quoting *Riley*, 487 U.S. at 796; *Gaudiya*, 952 F.2d at 1066).   It

18  is clear, based on AB 587's plain text, its legislative history,

19  and X Corp.'s evidence, that AB 587's compelled disclosures are

20  inextricably intertwined with core political speech.   *See, e.g.*,

21  Kurtzberg Aff. Ex. 6 at 4 (The categories of content regulated by

22  AB 587 are "often fraught with political bias."); *id.* ("both action

23  and inaction by [social media] companies seems to be equally

24  maligned: too much moderation and accusations of censorship and

suppressed speech arise; too little, and the platform risks fostering a toxic, sometimes dangerous community"); T&S Aff. ¶ 25 ("deciding what content should appear on a social media platform is a question that engenders considerable debate among reasonable people about where to draw the correct proverbial line"); *id.* ¶ 26 ("no matter what we do, some portion of the public will likely take issue with the way we have made these difficult judgment calls"); Elron Aff. ¶¶ 5-8, 11-15. Critically, the manner in which X Corp. defines controversial categories of speech — such as "misinformation" or "hate speech" — to moderate on its social media platform, how it applies those definitions in specific cases, and statistics concerning how often it "flags" such content are all statements that reveal X Corp.'s position on important questions of public concern about what kinds of content moderation rules promote the public good.  As such, the speech compelled by AB 587 is, at the very least, "inextricably intertwined" with a core "political, philosophical or ideological message."  *Hunt*, 638 F.3d at 715; *see also Riley*, 487 U.S. at 796; *Gaudiya*, 952 F.2d at 1066. It is therefore subject to strict scrutiny, and not any less-stringent standard of review that applies to compelled commercial speech.

### b. *Zauderer* Does Not Apply Because AB 587's Compelled Disclosures Are Not Purely Factual And Uncontroversial

*Zauderer* does not apply for the additional reason that AB 587's compelled disclosures are neither (1) purely factual nor (2) uncontroversial.  *See Zauderer*, 471 U.S. at 650-51 (reasonably related test applies only if advertising in question is "purely factual and uncontroversial information").

First, AB 587's compelled disclosures are not "purely factual" because speaking about one's own editorial judgments is an exercise inherently bound up in expressing opinions and discretion.  While the Supreme Court has not clarified what constitutes "purely factual" information for *Zauderer* purposes, the qualifier "purely" strongly suggests that it was not intended to apply to the types of disclosures about content-moderation policies that are governed by AB 587.  As one leading commentator has stated:

> For example, it might be a pure fact whether the publisher has an editorial policy, but it would not be a pure fact to disclose the policy's details, which remain subject to the publisher's editorial discretion. . . . Similarly, consider California's requirement that an online publisher disclose the number of items it has 'actioned.'  This disclosure is impossible because it assumes there are only two outcomes for any content item: actioned or not.  In reality, *every* item is prioritized or deprioritized relative to other items.  Furthermore, if [social media companies] personalize content ordering, items may be 'actioned' for some readers and not actioned for others.  This complexity and ambiguity makes it impossible to characterize 'actioned' as a 'purely factual' disclosure.

Affidavit of Joel Kurtzberg, dated November 2, 2023 ("Kurtzberg II Aff.") Ex. 1 (Eric Goldman, *Zauderer and Compelled Editorial Transparency*, 108 Iowa L. Rev. Online 80, 93 (2023)).  Similarly,

while certain content-moderation statistics, such as the total number of flagged items, *see* § 22677(a)(5)(A), may be purely factual, the act of explaining *why* they were flagged — e.g., by "disaggregat[ing]" those statistics by content category or by revealing who brought the content to X's attention, *see* §§ 22677(a)(5)(B)(i), (iv) — is not.  The disclosures compelled by AB 587 are a far cry from "simple factual disclosure of caloric information" and other "pure facts" of the sort that have triggered the less-stringent standard of review under *Zauderer*.  *See, e.g.*, *New York State Rest. Ass'n* v. *New York City Bd. of Health*, 556 F.3d 114, 118 (2d Cir. 2009) (applying *Zauderer* to law requiring disclosures of caloric information of items sold at restaurants).

Second, AB 587's compelled disclosures are nowhere close to being uncontroversial.  On this point, AG Bonta again misstates the relevant legal test, arguing that, under the Ninth Circuit's decision in *CTIA I*, "'[u]ncontroversial' refers to the 'factual accuracy of the compelled disclosure, not to its subjective impact on the audience.'"  Opp. at 10, 11–12, 34–35 (quoting *CTIA I*, 854 F.3d at 1117–18) (holding that *Zauderer* requires "only that information be 'purely factual'").  But, of course, that is not the law.  As this Court has noted, the Supreme Court vacated *CTIA I* in light of the Supreme Court's decision in *NIFLA*, which clarified the *Zauderer* standard, and, on remand, the Ninth Circuit "did not repeat its prior rule that 'controversial' under *Zauderer* means factually accurate."  *Nat'l Ass'n of Wheat Growers*, 468 F. Supp. 3d at 1258 (citing *CTIA – The Wireless Ass'n* v. *City of Berkeley*,

*California ("CTIA II")*, 928 F.3d 832, 846–48 (9th Cir. 2019)).   In fact, *NIFLA* could not have come down the way it did if Defendant's view of the meaning of the term "uncontroversial" were accurate, since the Supreme Court in *NIFLA* found the compelled speech at issue (a statement that California provides abortions) controversial, despite it being factually accurate.  *NIFLA*, 138 S. Ct. at 2372; *see also CTIA II*, 928 F.3d at 845 (explaining that, in *NIFLA*, "[w]hile factual, the compelled statement took sides in a heated political controversy, forcing the clinic to convey a message fundamentally at odds with its mission," and was therefore "controversial within the meaning of *Zauderer* and *NIFLA*").

Under the relevant law, *Zauderer* review is not warranted simply because a statement is factually accurate.  *See CTIA II*, 928 F.3d at 847 ("We recognize, of course, that a statement may be literally true but nonetheless misleading and, in that sense, untrue.").   While the meaning of "purely factual and uncontroversial" has "not been completely examined by the Supreme Court or the Ninth Circuit," *Nat'l Ass'n of Wheat Growers*, 468 F. Supp. 3d at 1258, AB 587's compelled disclosures are not of the sort that warrant lessened constitutional protection under *Zauderer*.

First, as its legislative history makes crystal clear, AB 587 compels extremely controversial speech.  Defining controversial categories of speech, such as hate speech, racism, extremism,

radicalization, disinformation, misinformation, harassment, and foreign political interference is "anything but an 'uncontroversial' topic." *NIFLA*, 138 S. Ct. at 2372.[1]  Each such definition is "fraught with political bias" and decisions about how to apply such definitions generate significant controversy no matter what because, as regards content moderation of these categories, "both action and inaction" are "equally maligned" by the public.  Kurtzberg Aff. Ex. 6 at 4; *see also* T&S Aff. ¶¶ 25-29; Elron Aff. ¶¶ 5-8, 11-15.  Similarly, AB 587's legislative record makes clear that one purpose of the law is to "pressure" social media companies to "eliminate hate speech and disinformation." *See, e.g.*, Kurtzberg Aff. Ex. 5 at 4.  That, in itself, is an admission that AB 587's compelled disclosures are controversial.  If there were no controversy about the disclosures, it is difficult to understand how the legislation would generate public "pressure" to moderate content a certain way.  Indeed, it is precisely because AB 587's compelled disclosures focus on how the most controversial categories of content are moderated that "*no matter what*," X Corp. will be met with public scorn about its decisions.  T&S Aff. ¶¶ 26, 28 (emphasis added); *see also* Elron Aff. ¶ 6 (controversy occurs whether X Corp. "take[s] enforcement action against certain posts or users" or "do[es] not take enforcement action against certain posts or users").

---

[1] Choosing not to define/moderate such categories is equally controversial.

Second, AB 587's disclosure provisions are inherently distinct from those at issue in *NetChoice, LLC* v. *Att'y Gen., Fla. ("NetChoice (Fla.)")*, 34 F.4th 1196 (11th Cir. 2022) and *NetChoice, LLC* v. *Paxton ("NetChoice (Tex.)")*, 49 F.4th 439 (5th Cir. 2022), to which the 11th and 5th Circuit Courts of Appeal applied *Zauderer*, and are analogous to the compelled disclosures at issue in *Volokh* v. *James*, 2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023), to which the court applied strict scrutiny.  Specifically, the disclosure provisions at issue in the *NetChoice* cases were content-neutral.  *See NetChoice (Fla.)*, 34 F.4th at 1227 ("S.B. 7072's disclosure provisions" are "content-neutral regulations"); *NetChoice (Tex.)*, 49 F.4th at 446.  Here, not only is "AB 587 [] content based," Opp. at 32, it targets content categories that are "among the most difficult to define and most controversial to apply," T&S Aff. ¶ 29.  AB 587's compelled disclosures are thus analogous to those required by the New York law at issue in *Volokh*, which "regulate[d] speech based on its content" by forcing social media networks to publish certain policies and statistics about regulation of a particular type of content, "hateful conduct."  2023 WL 1991435, at *8.  The court therefore determined that "the appropriate level of review [was] strict scrutiny" and struck down the law on that basis.  *Id.*  AB 587 similarly applies only to particular content categories, *see* § 22677(a)(3), and the same result that occurred in *Volokh* is warranted here.  As one leading commentator put it,

"[p]latform transparency mandates like the ones in New York [at issue in *Volokh*] and California [i.e., AB 587] create burdens and enforcement risks that, like those in *NetChoice*, may affect the platforms' actual editorial functions.  But they do so only for particular kinds of editorial policies.  The result, recognized in [*Volokh*] . . . is a content-based burden on editorial processes" that warrants application of strict scrutiny.  Kurtzberg Aff. Ex. 27 (Daphne Keller, *Platform Transparency and the First Amendment*, Stanford Cyber Policy Center (Mar. 3, 2023)) at 36–37.

### c. Strict Scrutiny Applies To AB 587

#### i. <u>Strict Scrutiny Applies Because AB 587 Is A Content- And Viewpoint-Based Speech Regulation</u>

AG Bonta concedes that "AB 587 is content based," Opp. at 32, and argues that strict scrutiny does not apply because AB 587 compels commercial speech.  But, as shown above, AB 587 does not compel commercial speech, which renders *Zauderer* and *Central Hudson* inapplicable.  In light of that, the law is clear: strict scrutiny must apply.  *Reed*, 576 U.S. at 171 ("Because [the challenged law] imposes content-based restrictions on speech, those provisions can stand only if they survive strict scrutiny[.]").

Not only does AB 587 "target speech based on its communicative content," which makes it "presumptively unconstitutional," *id.* at 163, it favors particular viewpoints among those content categories.  AG Bonta's arguments to the contrary, *see* Opp. at 32, are unavailing.  Sections 22677(a)(4) and (5) of the law, on their

face, impose additional burdens and reporting requirements on social media companies, such as X Corp., when they choose to regulate certain categories of constitutionally-protected speech — i.e., hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference.

AG Bonta offers no justification for the law's focus on these categories of content, and it is difficult to take seriously his suggestion that the law is "facially neutral" and treats all viewpoints the same. Opp. at 32. Given that the law is about **content moderation requirements** — indeed, the Chapter the law is contained in says as much in the heading — the very selection of these categories of content strongly suggests that the State views them as the type of content that **should** be moderated. The very selection of speech categories like "hate speech" and "disinformation" in this context as opposed to "LGBTQ+ speech" or "government research" sends an obvious message about what kind of content is expected to be limited on these platforms. If there were any doubt about this, the legislative history and evidentiary record make this abundantly clear. *See, e.g.*, Kurtzberg Aff. Ex. 5 at 4 ("if social media companies are forced to disclose what they do in this regard [i.e., how they moderate online content], it may **pressure them** to become better corporate citizens by doing more **to eliminate hate speech and disinformation.**") (emphasis added); *id.*

1    Ex. 1 (Mot. to Dismiss, Minds, Inc., et al. v. Bonta, No. 23-cv-

2    2705 (ECF 23-1) (C.D. Cal. May 25, 2023)) at 15-16 ("[T]he

3    Legislature also considered that, by requiring greater transparency

4    about platforms' content-moderation rules and decisions, AB 587

5    may result in public pressure on social media companies to 'become

6    better corporate citizens by doing more to ***eliminate hate speech***

7    ***and disinformation' on their platforms***. . . . This, too, is a

8    substantial state interest.") (emphasis added); Memorandum of

9    Points and Authorities in Support of Motion for Preliminary

10   Injunction ("PI Mot.") at 36-39 (citing additional instances of

11   legislative history attacking particular viewpoints within these

12   categories); Fernandez Aff. Ex 1 (letter from AG Bonta threatening

13   enforcement of AB 587 while conveying to social media companies

14   that they have a "duty" and "obligation" to limit "disinformation"

15   and "misinformation" on their platforms).

16      AG Bonta's effort to avoid having the Court look at the

17   legislative history on this point is understandable, as the

18   legislative history overwhelmingly proves what is already obvious

19   from a common sense reading of the statute itself — namely, that

20   AB 587 and the State are not neutral as between efforts to promote

21   hate speech, racism, disinformation, extremism, radicalization,

22   disinformation, misinformation, harassment, and foreign political

23   interference on social media and efforts to limit or eliminate

24   those categories of speech.  AG Bonta would never seriously argue

1   that, and no rational person reading AB 587 (even without the

2   legislative history) would ever conclude that.

3       Nor does the case law support AG Bonta's argument that the

4   Court should ignore the legislative history of AB 587 because the

5   law is "facially neutral."  AG Bonta cites *Interpipe Contracting,*

6   *Inc.* v. *Becerra*, 898 F.3d 879, 899 (9th Cir. 2018), in support of

7   this proposition, but *Interpipe* supports the opposite conclusion.

8   *Interpipe* squarely acknowledges that a law's "underinclusiveness

9   and overinclusiveness," which are "[t]wo indicia of discriminatory

10  motive," would "prompt [a court] to consider extrinsic evidence to

11  help determine whether the California legislature did, in fact,

12  act with discriminatory intent."  *Id.*  Such is the case here, as

13  AB 587 is clearly underinclusive, applying only to particular

14  "categories of content," *see* § 22677(a)(3), (4), and (5), as

15  opposed to content moderation efforts generally, regardless of what

16  content is covered.

17      Because AB 587 is a viewpoint-discriminatory speech

18  regulation, it is "presumptively unconstitutional" and subject to

19  strict scrutiny.  *Rosenberger* v. *Rector & Visitors of Univ. of Va.*,

20  515 U.S. 819, 830-31 (1995); *see R.A.V.*, 505 U.S. at 391-96 (laws

21  that target particular viewpoints trigger strict scrutiny).

22        ii.  <u>Laws Regulating "Speech About Speech," Such As AB</u>
    <u>587, Warrant Heightened Scrutiny</u>

23

24      In its opening brief, Plaintiff pointed out that AB 587 should

    be subjected to heightened scrutiny for an additional reason —

namely, that the statute creates a "double whammy" of First Amendment problems that warrant heightened review because it violates both the social media companies' constitutionally-protected right to decide what is permitted on their platforms and the public's right to access and disseminate constitutionally-protected content on those platforms that the State deems objectionable. PI Mot. at 54-55. AG Bonta's efforts to distinguish Plaintiff's "speech about speech" cases based on minor factual differences fail. *See* Opp. at 30-31.

For example, Plaintiffs seek to distinguish *Ent. Software Ass'n* v. *Blagojevic*, 469 F.3d 641 (7th Cir. 2006), on the ground that the law at issue there, which required labeling "sexually explicit" videogames with the numeral "18", compelled disclosures that were "subjective" and "opinion-based." Opp. at 30-31 (quoting *id.* at 643, 652-53). But disclosing which posts should be actioned as "hate speech," "misinformation," "extremism," and so forth, is also subjective and opinion-based, as it involves judgments about controversial content moderation categories that are "quickly evolving," subject to "ongoing disagreement," and where "certain conclusions once considered to be within" the "consensus [are] later proved to be false." *Høeg* v. *Newsom*, 2023 WL 414258, at *1, *9 (E.D. Cal. Jan. 25, 2023) (Shubb, J.).

In the same vein, Plaintiffs seek to distinguish *Motion Picture Ass'n of Am.* v. *Specter*, 315 F. Supp. 824 (E.D. Pa. 1970),

on the ground that the law there, which imposed criminal penalties on a film exhibitor's misrepresentation that a film is "suitable for family viewing," was "entirely subjective."   Opp. at 31 (quoting *id.* at 825-26).  But the same is true here: AB 587 permits the California Attorney General to fine social media companies for misrepresentations about whether posts are subject to being actioned as, for example, "hate speech" or "extremism" under the companies' policies, which is likewise entirely subjective.

As to *Smith* v. *California*, 361 U.S. 147 (1959), AG Bonta argues that the same concerns that motivated the Supreme Court to strike down a law imposing strict liability on booksellers for selling obscene books are not present with AB 587 because AB 587 "does not functionally require Plaintiff to change its terms of service or content moderation practices" and the fact that the public might pressure it to change its practices does not make the law unconstitutional.  Opp. at 30.  That supposed distinction is based on a misunderstanding of the concerns that motivated the Court in *Smith*.

The Court in *Smith* was not concerned about booksellers refusing to sell obscene works, but rather that the pressures of a strict liability regime might cause them to self-censor in a way that would impact sales of protected works to the public as well. *See Smith*, 361 U.S. at 153-54.  As the Court made clear, it struck down the law to avoid "self-censorship, compelled by the State,

which would be a censorship affecting the whole public, hardly less virulent for being privately administered.   Through it, the distribution of all books, both obscene and not obscene, would be impeded." *Id.*  So too with AB 587.  Like the ordinance at issue in *Smith*, AB 587 is designed to and will likely have the functional effect of pressuring social media companies to change their content-moderation practices. *See* PI Mot. at 10, 56.  That self-censorship "would be a censorship affecting the whole public, hardly less virulent for being privately administered."   *Smith*, 361 U.S. at 154.

In any event, regardless of whether the cases cited — *Smith*, *Blagojevic*, and *Specter* — are factually identical to this one, they all illustrate the need for heightened review when restrictions or burdens are placed on gatekeepers of speech.

All three cases make that point.  By substantively impacting Plaintiff's constitutionally-protected speech (its moderation of content), AB 587, like the regulations at issue in those cases, impacts multiple layers of constitutionally-protected speech (i.e., AB 587 impacts what speech X users can see and disseminate on the platform in addition to X Corp.'s constitutionally-protected right to exercise judgments about what speech it wants on its platform).  In other words, when regulations directly or indirectly impact the speech of those charged with making decisions about the proverbial "gates of speech" — e.g., books (*Smith*), video games

(*Blagojevic*), and motion pictures (*Specter*) — they necessarily interfere with the speech rights of both the gatekeepers and speakers on the other side of the gate, thus causing a "double whammy" of constitutional infirmities.  It is for this reason that AB 587 warrants heightened scrutiny as a regulation of "speech about speech."

AG Bonta does not dispute that AB 587 impacts both the speech of X Corp. and of those who use the X platform; in fact, the legislative history and AG Bonta's briefs in defense of the statute both say outright that the law is intended to do so.  *See, e.g.*, Kurtzberg Aff. Ex. 5 at 4 ("if social media companies are forced to disclose what they do in this regard [i.e., how they moderate online content], it may **pressure them** to become better corporate citizens by doing more **to eliminate hate speech and disinformation**.") (emphasis added); *id.* Ex. 1 ("[T]he Legislature also considered that, by requiring greater transparency about platforms' content-moderation rules and decisions, AB 587 may result in public pressure on social media companies to 'become better corporate citizens by doing more to **eliminate hate speech and disinformation' on their platforms**. . . . This, too, is a substantial state interest.").  And while AG Bonta tries to offer factual distinctions between this case, on the one hand, and *Smith, Blagojevic*, and *Specter*, on the other, he tellingly never denies that AB 587 regulates "speech about speech" or explains why the

1   fact that the law impacts two separate and significant sets of
2   speech rights does not warrant heightened scrutiny.

3       In the end, AB 587's compelled disclosure regime is designed
4   to and will pressure social media companies, such as X Corp., to
5   alter their content moderation practices.  Compelled speech regimes
6   may be constitutional in areas where they do not substantively
7   alter First Amendment-protected speech, but by "pressur[ing]" X
8   Corp. to "eliminate," for instance, "hate speech and
9   disinformation" from its platform, Kurtzberg Aff. Ex. 5 at 4, that
10  is exactly what AB 587 does.

11              iii.  AG Bonta Is Using AB 587 To Coerce X Corp. Into
                      Moderating Content In A Particular Way, Which
12                    Further Demonstrates Why Strict Scrutiny Applies

13      In describing the "pressure" that AB 587 will cause to be
14  applied to social media companies to change their content
15  moderation policies, AG Bonta takes great care to focus solely on
16  the public pressures that might result from the law.  *See, e.g.*,
17  Opp. at 30 ("The law is not unconstitutional merely because the
18  public may not have a wholly positive reaction to those
19  disclosures").  But, as the undisputed record makes clear, that is
20  not the only pressure with which the Court should be concerned.
21  One of the main dangers of AB 587 is that it permits **the government**
22  to pressure social media companies to regulate content on their
23  platforms to disfavor content that the State finds objectionable.
24  That concern is not theoretical.  It has already happened in the

1   form of a November 3, 2022 letter from AG Bonta to the CEOs of

2   major social media companies (including X Corp.) wherein the AG

3   threatens to enforce AB 587 against the companies if they do not

4   do more to remove or limit on their sites what AG Bonta calls

5   "disinformation" and "misinformation."  *See* Fernandez Aff. Ex. 1.

6        On this point, X Corp. submitted substantial evidence in the

7   form of an affidavit from Wifredo Fernandez.  The affidavit, which

8   attached the November 3 letter, highlighted language emphasizing

9   AG  Bonta's  message  that  the  companies  had  a  "duty,"

10  "responsibility," and "obligation" to do more to combat these kinds

11  of speech, and, at the same time, threatened to enforce AB 587.

12  Mr. Fernandez concluded that "letters from Attorneys General, such

13  as this one, that 'urge' companies to take action that the Attorney

14  General claims they have a 'duty' or 'responsibility' to do, and,

15  at the same time, threaten enforcement of certain specified laws,

16  are a precursor to legal action taken by the Attorney General if

17  the companies don't 'voluntarily' take the actions requested by

18  the Attorney General."  *Id.* ¶ 18.

19       In response to this evidence, AG Bonta could have submitted

20  evidence saying that he did not intend to use enforcement of AB

21  587 as a way of pressuring social media companies to change their

22  content moderation policies to suit his preferences — but he chose

23  not to do so.  That decision speaks volumes.

24       In defending the November 3 letter, AG Bonta submits that "the

letter is not part of the bill's legislative history," "[t]he eight-page letter briefly mentions AB 587 only once," and "[n]owhere does the letter state that AB 587 would be enforced beyond the scope of its facial disclosure requirements." Opp. at 16 n.7, 35. But those statements miss the point. The letter is significant, not because it constitutes "legislative history," but rather because it starkly reveals the "pressures" that AB 587 imposes on social media companies to change their content moderation policies. Those pressures come not just from the public but also, more importantly, from governmental threats of enforcement.

These dangers are real. AG Bonta's Opposition does not dispute that he maintains unfettered discretion to determine what may constitute a "material[] omi[ssion] or misrepresent[ation]" in violation of the statute, § 22678(a)(2)(C), or that he could issue costly subpoenas and document demands or initiate a costly enforcement proceeding based on nothing more than his interpretation of whether a report submitted by a social media company failed to include certain requisite material. While AG Bonta's Opposition focuses on § 22678(a)(3), which states that, when assessing penalties, the "court shall consider" whether a "reasonable, good faith attempt" of compliance has been made, Opp. at 41-42, this argument ignores the fact that the pressure applied by the State through the AG specifically begins well before the

issue would reach a court.  Indeed, it is up to AG Bonta whether to bring "an action pursuant to" AB 587, *see* § 22678(c), with respect to which he is free to utilize his broad pre-litigation powers under Cal. Gov't Code §§ 11180-81 in a way that will likely "influence what content [X Corp.] publish[es]" on its platform. Kurtzberg Aff. Ex. 26 (Eric Goldman, *The Constitutionality of Mandating Editorial Transparency*, 73 Hastings L.J. 1203, 1227 (2022)).

That AG Bonta's November 3 letter does not "state that AB 587 would be enforced beyond the scope of its facial disclosure requirements," Opp. at 35, is also beside the point.  If AB 587 "merely" imposes disclosure requirements, as AG Bonta argues, the Court must ask itself why AG Bonta felt it appropriate to include a threat to enforce it in the November 3 letter at all.  The 8-page letter is a direct effort to "urge" social media companies to do more to limit or disfavor constitutionally-protected content that AG Bonta finds objectionable.  Fernandez Aff. ¶ 16.  Why then, did AG Bonta think that a threat to enforce AB 587 was relevant to these efforts?  The answer is obvious.  As Wifredo Fernandez put it, the November 3 letter and its accompanying press release "make clear that the Attorney General intends to use enforcement of AB 587 as one of his many tools to 'urge' or pressure social media companies to 'enforce[] their content moderation policies and terms of service' in order 'to stop the spread of disinformation and

1   misinformation that attack the integrity of our electoral
2   processes.'"  *Id.* ¶ 19.

3       That, of course, is the problem.  The November 3 letter
4   specifically states that AG Bonta "will not hesitate to enforce"
5   AB 587, while at the same "urg[ing]" and "implor[ing]" X Corp. to
6   "do more" to censor certain disinformation and misinformation.  *Id.*
7   ¶¶ 15–16.  It is unclear what such "enforce[ment]" could refer to
8   other than the prospect of AG Bonta issuing costly document demands
9   or bringing an enforcement action against X Corp. — both of which
10  he could easily do.  As one leading commentator has noted, these
11  threats of enforcement make compelled "transparency statutes," like
12  AB 587, more troubling from a First Amendment perspective than they
13  might seem at first blush:

14          These disclosure obligations send the message to
            publishers that regulators will be scrutinizing those
15          disclosures.  That message is coupled with an impossible-
            to-ignore threat that regulators will pursue the
16          publisher if the disclosures do not satisfy the
            regulators' normative objectives[.] . . . Knowing this
17          risk, publishers will distort their editorial decisions
            so their disclosures placate regulators and mitigate the
18          risk of future investigations or enforcement.
            Inevitably, compelled editorial transparency changes the
19          publisher's constitutionally protected editorial
            decision-making and affects constitutionally protected
20          speech – exactly like an outright speech restriction
            would.  It does not matter if an investigation or
            enforcement would be unconstitutional once pursued
21          because the speech harms occur well before then.

22  Kurtzberg II Aff. Ex. 1 at 88-89.  AG Bonta's November 3 letter is
23  just one example of this.  As X Corp. knows all too well, there
24  are already other examples in other states.  *See, e.g.*, *id.* at 82

n.9 ("Texas Attorney General Ken Paxton used editorial transparency enforcement to punish Twitter for 'deplatforming' then-President Trump").

AG Bonta also argues that the pre-litigation powers granted to him under §§ 11180-81 are of no moment because they are merely ordinary enforcement tools that apply equally to other California statutes. Opp. at 19. That too misses the point. It is *exactly* because of AG Bonta's "normal" (*id.*) practice of using §§ 11180-81 to investigate potential statutory violations that the November 3 letter improperly coerces X Corp. *See* Opp. at 59-60. AG Bonta has already stated unequivocally that he "will not hesitate to enforce" AB 587, Fernandez Aff. Ex. 1 at 4, which X Corp. has taken as a "threat from the Attorney General" that it must regulate particular speech, *id.* ¶ 19. This is exactly the sort of pressure that results in the State "regulat[ing] constitutionally-protected content in ways that the State wants or insists upon." *Id.* ¶ 20. AG Bonta has "ma[de] clear" that X Corp. will "suffer adverse consequences" if it "fail[s] to comply" with AB 587 as desired by the State, and because of that AB 587 is an impermissible government intrusion on free speech in violation of the First Amendment. *See Missouri* v. *Biden*, 2023 WL 6425697, at *22 (5th Cir. Oct. 3, 2023), *cert. granted sub nom.*, *Murthy* v. *Missouri*, 2023 WL 6935337 (U.S. Oct. 20, 2023).

iv. AB 587 Interferes With X Corp.'s
Constitutionally-Protect Editorial Judgments

X Corp.'s editorial judgments about content moderation decisions on its platform are protected by the First Amendment. To quote AG Bonta, "[a]s made clear by case law in this circuit, social media companies are private actors with their own First Amendment rights[.]" *See* Kurtzberg Aff. Ex. 1 at 18–19. The Supreme Court has recognized that these First Amendment protections extend to private actors' exercise of "editorial control over speech and speakers on their properties or platforms." *Manhattan Cmty. Access Corp.* v. *Halleck*, 139 S. Ct. 1921, 1932 (2019); *Miami Herald*, 418 U.S. at 258 (holding that a newspaper's decision about what content to publish and its "treatment of public issues and public officials — whether fair or unfair — constitute the exercise of editorial control and judgment" are protected by the First Amendment).[2] Further, laws that "subject[] the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest" do not "survive constitutional scrutiny[,]" according to the Supreme Court. *Herbert* v. *Lando*, 441 U.S. 153, 174 (1979).

Defendant's attempt to liken AB 587 to the laws at issue in

---

[2] Defendant incorrectly posits that, because AB 587 concerns social media platforms, and not newspapers, the editorial judgment theory does not apply. Opp. at 27 n.10. That is not so. The right to choose whether and how to tailor a message is "enjoyed by business corporations generally and by ordinary people engaged in unsophisticated expression as well as by professional publishers" and is not "restricted to the press." *Hurley* v. *Irish-Am Gay, Lesbian & Bisexual Grp. Of Boston*, 515 U.S. 557, 574

1    *NetChoice (Fla.)* and *NetChoice (Tex.)* is unpersuasive.  The laws

2    at issue in the *NetChoice* cases were *content-neutral* laws.  *See*

3    *NetChoice (Fla.)*, 34 F.4th at 1227 ("S.B. 7072's disclosure

4    provisions" are "content-neutral regulations"); *NetChoice (Tex.)*,

5    49 F.4th at 446.  Here, "AB 587 is content based."  Opp. at 32;

6    *see also* Kurtzberg Aff. Ex. 27 at 11, 37 (stating that AB 587 is

7    "more clearly content-based, and thus more vulnerable to First

8    Amendment challenge[,]" whereas the Texas and Florida laws at issue

9    in the *NetChoice* cases were "not based on the content of moderated

10   speech").

11       Defendant's attempts to distinguish *Miami Herald* and

12   *Washington Post* are similarly unpersuasive.  In *Miami Herald*, the

13   Court held that the law would "fail[] to clear the barriers of the

14   First Amendment because of its intrusion into the function of

15   editors," *even if* the newspaper would not "be forced to forgo

16   publication of news or opinion by the inclusion of a reply" or

17   "would face no additional costs to comply."  418 U.S. at 258

18   (holding that a newspaper's decision about what content to publish

19   and its "treatment of public issues and public officials . . .

20   constitute the exercise of editorial control and judgment"

21   protected by the First Amendment).  Here, AB 587 intrudes upon the

22   _____

23   (1995); *O'Handley* v. *Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal.
     2022), *aff'd sub nom. on other grounds, O'Handley* v. *Weber*, 62 F.4th 1145

24   (9th Cir. 2023) ("Like a newspaper or a news network, [X Corp.] makes
     decisions about what content to include, exclude, moderate, filter,
     label, restrict, or promote, and those decisions are protected by the
     First Amendment.").

1   function of X Corp. editors/moderators by dictating the method it

2   moderates content.   In *Washington Post* v. *McManus*, 944 F.3d 506

3   (4th Cir. 2019), the court struck down a law requiring online

4   platforms to make disclosures and maintain records related to

5   campaign finance.   AB 587 similarly requires social media platforms

6   to make disclosures surrounding a variety of content including

7   "foreign political interference."[3]   *Washington Post* involved a

8   content-based law, like AB 587, that was "a compendium of

9   traditional First Amendment infirmities."   944 F.3d at 513, 515

10  ("Indeed, the freedom of speech includes both the right to speak

11  freely and the right to refrain from speaking at all.   *It is the*

12  *presence of compulsion from the state itself that compromises the*

13  *First Amendment.*   The Amendment extends not only to expressions of

14

15  [3] Defendant contends that the information required to be disclosed under
    AB 587 is "high-level."   Opp. at 28.   But that claim is belied by the
16  language of AB 587.   For the "foreign political interference" category
    alone, X Corp. must include in a bi-annual detailed report the number of
    posts, comments, messages, profiles of users, and groups of users flagged
17  for "foreign political interference."   X Corp. must also detail the total
    number of actioned content and the number of times those actions were
18  taken by X Corp. against the individual(s) responsible for that content.
    X Corp. must detail the volume of actioned content that was removed,
19  demonetized, or deprioritized.   X Corp. must also disclose the number of
    times this content was shared and viewed, including how many times the
20  actioned content was viewed before being actioned.   X Corp. must further
    detail whether the flagged or actioned items were texts, images, videos,
21  or other forms of content.   X Corp. must also explain how the content
    was flagged or actioned, including whether it was flagged by employees,
22  contractors, artificial intelligence, users, community moderators, civil
    society partners, or others.   X Corp. must provide the number of times
23  users appealed these actions and how many of these appeals resulted in
    reversals.   Again, this information must be specific to "foreign
    political interference" related content.   The same detailed disclosures
24  are required for hate speech or racism, extremism or radicalization,
    disinformation or misinformation, and harassment – and must be prepared
    bi-annually, in perpetuity.

value, opinion, or endorsement, but *equally to statements of fact the speaker would rather avoid.*") (quotation marks omitted) (emphasis added).

Thus, X Corp. has First Amendment rights to make editorial judgments free from government interference, and AB 587 impermissibly interferes with those Constitutional rights.

### d. Notwithstanding Which Level Of Scrutiny Applies, AB 587 Cannot Stand

For the reasons outlined above, strict scrutiny applies to AB 587.  But even if that were not the case, AB 587 fails to pass constitutional muster under any level of scrutiny.

### i. *Zauderer*

Even if *Zauderer* applied (and it most clearly does not), AB 587 would fail that level of scrutiny because its disclosure requirements are "unduly burdensome" and "unjustified."  *Zauderer*, 471 U.S. at 651.

As the Supreme Court recently made clear in *NIFLA*, even in cases where *Zauderer* applies, the Court's "precedents require disclosures to remedy a harm that is potentially real not purely hypothetical" and to extend "no broader than reasonably necessary." *NIFLA*, 138 S. Ct. at 2377 (quotation marks omitted).  AB 587 cannot satisfy these requirements.

AG Bonta has not demonstrated that AB 587 "remed[ies] a harm" that is not purely hypothetical.  On the one hand, the State asserts that the interest served by AB 587 is "maintaining an informed,

enfranchised, and safe populace by providing Californians with information necessary to navigate among the disinformation, threats, and hate speech on social media." Opp. at 1-2. But it is not at all clear how AB 587 will do anything to further those lofty goals. For example, as to X Corp., AG Bonta admits that X Corp. already makes public its rules about content moderation and uses categories that are different than those listed in the statute. As a result, AG Bonta asserts that X Corp. could satisfy AB 587's requirements and avoid the significant financial penalties set forth in § 22678 without having to include **any** numerical data in its Terms of Service Report. Opp. at 11. If that is so, however, then it is not clear what, if anything, the statute will accomplish. It will certainly not "remedy a harm" that is "real" or help "maintain an informed, enfranchised, and safe populace" (Opp. at 1-2) in any way. It could not be said to be "reasonably related" to that interest. *Zauderer*, 471 U.S. at 651; *see also id.* at 648 ("The State's arguments amount to little more than unsupported assertions: nowhere does the State cite any evidence or authority of any kind for its contention that the potential abuses associated with the use of illustrations in attorneys' advertising cannot be combated by any means short of a blanket ban.").

If, on the other hand, AB 587 does, in fact, require 161 categories of reporting requirements (*see* PI. Mot. at 67-68), even

for social media companies that do not use the same categories for content moderation — e.g., if § 22677(a)(4) requires detailed disclosures about existing policies "intended to address the categories of conduct described [in the statute]" and § 22677(a)(5) requires disclosures concerning content "flagged by the social media company as belonging to the categories of conduct described [in the statute]," even if the categories used by the social media company for content moderation are not identical to those listed in the statute — then AB 587 is unduly burdensome. *See also* T&S Aff. ¶¶ 11, 18, 20, 22-24.

AG Bonta argues that X Corp. has put in no evidence of the burdens imposed by AB 587.  Opp. at 18.  That argument turns the burden of proof under *Zauderer* on its head.  The "State has the burden of demonstrating that a disclosure requirement is  . . . not unduly burdensome," *Nat'l Ass'n of Wheat Growers*, 468 F. Supp. 3d at 1258 (citing *Zauderer*, 471 U.S. at 641), not the other way around.  The argument is also untrue.  As the undisputed evidence in the record makes clear, AB 587's reporting requirements are unduly burdensome for reasons including, but not limited to, the fact that X Corp. would need to (1) carefully analyze and categorize billions of posts, *see* T&S Aff. ¶ 20; (2) design, build, and implement entirely new tools and workflow, including a new categorization system for moderation actions, in order to comply in good faith with AB 587's requirements, *id.;* and (3) spend

hundreds of thousands or millions of dollars hiring new employees and/or onboarding contractors in order to allocate resources to achieve good faith compliance with AB 587, *id.* ¶ 23.

Moreover, (4) the requirements set forth in §§ 22677(a)(5)(B)(iv)–(v) (requiring an explanation of "[h]ow the content" was "flagged or actioned," "including, but not limited to, whether it was "flagged or actioned" by "artificial intelligence software," by "community moderators," by "civil society partners," or by "users") are nearly identical to certain of the disclosure requirements at issue in *NetChoice (Fla.)* (requiring a "precise and thorough explanation of how the social media platform became aware" of the content that triggered its decision), that were struck down under *Zauderer* as "unduly burdensome." 34 F.4th at 1207, 1230–31.

### ii. *Central Hudson*

Likewise, even if *Central Hudson* applied (and it does not), AB 587 would not stand. The *Central Hudson* test would require that AB 587 "directly and materially advance[] a substantial government interest" and not be "more extensive than is necessary to further that interest." *Junior Sports Mags. Inc.* v. *Bonta*, 80 F. 4th 1109, 1116 (9th Cir. 2023) (quoting *Central Hudson*, 447 U.S. at 566). Under *Central Hudson*, the government also "has the burden to 'demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'"

1   *Nat'l Ass'n of Wheat Growers*, 468 F. Supp. 3d at 1264 (quoting

2   *Ibanez* v. *Fla. Dept. of Bus. and Prof'l Regul., Bd. of Acct.*, 512

3   U.S. 136, 136 (1994)).

4       AG Bonta has not and cannot meet this "heavy" burden, which

5   requires an evidentiary showing by the government. *44 Liquormart,*

6   *Inc.* v*. Rhode Island*, 517 U.S. 484, 506 (1996) (government did not

7   meet its burden of establishing that a regulation directly and

8   materially advanced government interest where it "presented no

9   evidence to suggest that its speech prohibition will *significantly*

10   [achieve the public interest asserted]") (emphasis in original);

11   *see Italian Colors Rest.* v. *Becerra*, 878 F.3d 1165, 1177 (9th Cir.

12   2018) (California Attorney General did not meet his burden where

13   he "relie[d] solely on the legislative history of [the law] to

14   argue that the California Legislature understood the [public

15   interest] to be real and adopted [the law] to eliminate that danger.

16   . . . the Attorney General has pointed to no evidence that [the

17   harm was] in fact real before the enactment of [the law], or that

18   [the law] actually alleviates these harms to a material degree.")

19   (quotation marks omitted).

20       AG Bonta attempts to meet this burden by pointing only to a

21   single *MIT Technology Review* opinion piece that is cited for the

22   proposition that "social media has become the terrain for a low-

23   grade war on our cognitive security, with misinformation campaigns

24   and conspiracy theories proliferating" and a quote from the

1   legislative history saying that social media platforms "rarely

2   provide detailed insight into their content moderation practices."

3   Opp. at 22.  But even if that were true — and there is no **evidence**

4   presented that it is — AG Bonta fails to demonstrate how AB 587

5   would directly and materially advance this goal.  Given that X

6   Corp. already makes public its content moderation policies and AG

7   Bonta's suggestion that X Corp. could apparently satisfy AB 587's

8   reporting requirements by submitting "no numerical data," Opp. at

9   11, it is not at all clear that AB 587 will accomplish anything at

10  all.  And if that interpretation were correct, then *all* social

11  media companies could avoid making any numerical disclosures merely

12  by ensuring that their content moderation categories were slightly

13  different than the categories listed in the statute.

14      AG Bonta cannot meet this burden for the additional reason

15  that consumers do not lack information about how content is

16  regulated on X.  AB 587's unduly burdensome reporting requirements

17  are therefore more extensive than necessary to further its interest

18  in content-moderation transparency because (1) X Corp.'s content-

19  moderation policies are already entirely transparent, *see* T&S Aff.

20  ¶¶ 30-32, 34, and (2) AB 587's reporting requirements interfere

21  with X Corp.'s constitutionally-protected speech.  Any *increase* in

22  transparency that would be caused by the statute is juice that is

23  not worth the squeeze.

24

iii. <u>Strict Scrutiny</u>

AB 587 cannot withstand strict scrutiny, which requires that a law be "narrowly tailored to serve compelling state interests," *Reed*, 576 U.S. at 171, and that there be no "less restrictive alternative[s] [that] would serve the Government's purpose," *IMDb.com Inc.*, 962 F.3d at 1125 (quoting *United States* v. *Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)); *see also id.* (citing *Animal Legal Def. Fund* v. *Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018) ("a statute is not narrowly tailored if it is either underinclusive or overinclusive in scope")).

Again, the State has drawn a double-edged sword, which, one way or the other, is fatal to its defense of AB 587.  The State propounds the lofty goal of keeping Californians "informed, enfranchised, and safe," and AB 587 apparently accomplishes this by providing them "with information necessary to navigate among the disinformation, threats, and hate speech on social media." Opp. at 1–2.  Even if "increasing transparency" in this context were a compelling state interest — which, as to X Corp., whose content-moderation policies are already entirely transparent, it is not — AB 587's means are not narrowly tailored to serve this interest.  AG Bonta has not carried his burden of demonstrating *how* AB 587's reporting requirements will serve this interest, particularly if it is true that companies can satisfy AB 587's reporting requirements by submitting "no numerical data"

1   whatsoever.  Opp. at 11.  How will AB 587's reporting requirements

2   keep Californians safe?  How will it keep them enfranchised?  The

3   absence of any evidence demonstrating that AB 587 will not only

4   advance these goals, but that it will do so in a "direct and

5   material way" is fatal, and the result is that AB 587 utterly fails

6   constitutional muster.

7       The law is also not narrowly tailored because it is both

8   underinclusive and overinclusive in scope.  *See Wasden*, 878 F.3d

9   at 1204.  AB 587 is underinclusive because, despite its goal to

10  keep Californians informed, safe, and enfranchised, it applies only

11  to the categories of content set forth in § 22677(a)(3) and applies

12  only to a handful of social media companies, *see* § 22680.  It is

13  also overinclusive because it applies to X Corp. and any other

14  social media company whose content-moderation policies are already

15  entirely transparent.

16      Finally, AG Bonta's responses to X Corp.'s three proposed

17  "less restrictive alternatives" to AB 587 are unpersuasive.  *See*

18  Opp. at 38.  First, X Corp. proposed a version of AB 587 that

19  applies only to social media companies that do not disclose how

20  content is moderated at all, PI Mot. at 63, which AG Bonta

21  disregarded because it would apparently "set no minimum bar for

22  the information that is disclosed to the public," Opp. at 38.  But

23  this alternative would require the same level of information as

24  does the current version of AB 587.  The only difference would be

1    to whom the law applies.  Second, X Corp. proposed a version of AB

2    587 that does not target specific categories of content, PI Mot.

3    at 63, to which AG Bonta has responded by stating that such a "law

4    would not sufficiently serve its compelling purpose without its

5    use of specific categories of [content]," Opp. at 38.  It is unclear

6    how that would be the case, particularly considering that, as AG

7    Bonta himself points out, the majority of the content-neutral

8    disclosure provisions at issue in *NetChoice (Fla.)* and *NetChoice*

9    *(Tex.)* were upheld by those courts.  Finally, X Corp. proposed a

10   version of AB 587 that, while requiring covered companies to

11   disclose their content-moderation policies, would not require them

12   to take positions on specific categories of controversial speech,

13   PI Mot. at 63, to which AG Bonta replies that AB 587 does not so

14   require, Opp. at 38.  But, for the various reasons set forth

15   throughout this brief, AB 587 is a concerted effort to apply

16   pressure — both from the government and the public — to do just

17   that.[4]

18   _____

19   [4] Defendant argues that, even if the Court preliminarily enjoins the "disclosure requirements of AB 587" (the Terms of Service Report), it should "sever[]" the remaining provisions.  *See* Opp. at 24 n.9.  As

20   Plaintiff has argued, the entirety of AB 587, including its Terms of Service Requirement, *see, e.g.,* PI Mot. at 53 n.10, is unconstitutional and should be enjoined.  But even if the Court determines that only AB

21   587's Terms of Service Report is likely unconstitutional, contrary to Defendant's contention, those provisions cannot be severed from the

22   remainder of AB 587 because they are not "volitionally separable."  *Cal. Redevelopment Ass'n.* v. *Matosantos,* 53 Cal. 4th 231, 271 (2011)

23   ("Volitional separability depends on whether the remainder would have been adopted by the legislative body had the latter foreseen the partial

24   invalidation of the statute") (quotation marks omitted).  As the legislative history makes clear, the primary focus of the California legislature in enacting AB 587 was on the Terms of Service Report, not

## I. Section 230 Of The Communications Decency Act Preempts AB 587

AB 587 is preempted by Section 230 of the Communications Decency Act of 1996 because (1) it imposes civil liability on social media companies if they take actions in good faith to restrict access to content as described in § 230(c)(2) without making AB 587's required disclosures and (2) it permits the Attorney General to issue civil discovery demands and initiate civil actions against social media companies, despite Section 230's express preemption against doing so.

AG Bonta asserts that these arguments rest on faulty premises, but it is AG Bonta's response that misses the mark. First, AG Bonta argues that "AB 587 does not require social media platforms to restrict access to content or take other actions to moderate content." Opp. at 40. That, however, is not the standard for Section 230 preemption, which prohibits liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be

---

the Terms of Service Requirement. *See generally* Kurtzberg Aff. Exs. 5–6, 9–10, 20–21, 25. Indeed, nothing in the legislative record suggests that the legislature thought the companies covered by AB 587 (those generating $100 million annually in revenue) do not already publicly post their terms of service. *Id.* As the record in this matter makes clear, that is not an issue as to X Corp., which already makes public its terms of service covering content moderation. *See* PI Mot. at 29–35. Accordingly, the Terms of Service Requirement "would [not] have been adopted" (*id.*) by the legislature separate from the Terms of Service Report, particularly when considering the legislature's stated goal of using the law to "maintain[] an informed, enfranchised, and safe populace." Opp. at 1–2. The Terms of Service Requirement would do little to nothing to accomplish that goal.

obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."  47 U.S.C. § 230(c)(2).  AB 587 does just that.  It imposes liability on social media companies, like X Corp., for content moderation if it is not done in the precise manner dictated by the State — i.e., with Terms of Service covering certain topics and with required disclosures mandated by the State about content moderation policies and practices.

Such liability falls within the broad scope of immunity intended by Congress, as evidenced by the use of the term "any action."  *See PC Drivers Headquarters, LP* v. *Malwarebytes Inc.,* 371 F. Supp. 3d 652, 660 (N.D. Cal. 2019) (the "any action" language in Section 230 evidences Congressional intent to apply "broad" immunity).  In fact, this is the very type of regulation Section 230 was intended to prevent.  If social media companies take action in good faith to moderate such content — but do not conform their actions to the content moderation disclosures or other requirements set forth in AB 587 — they will be subject to liability, despite Section 230(c)(2)'s immunity.

Section 230 prohibits liability for dictating not only the results of content moderation decisions, but also the manner in which they are made.  An analogy illustrates the point.  Imagine a state law that imposed liability on content-moderation decisions on social media sites unless they were made by a board consisting

1   of an equal number of Democrats and Republicans.  Such a law would

2   also "not require social media platforms to restrict access to

3   content or take other actions to moderate content."  Opp. at 40.

4   Nor would it dictate what the outcome of any content moderation

5   decisions should be.  Such a law would, however, still be preempted,

6   because it would impose liability for good faith decisions made

7   about content moderation; Section 230 was intended to protect self-

8   regulation of content moderation by social media companies, free

9   of government interference as to both the results and the manner

10  of deciding.  *See Doe* v. *Internet Brands, Inc.*, 824 F.3d 846, 851–

11  52 (9th Cir. 2016) ("[A] website should be able to act as a 'Good

12  Samaritan' to ***self-regulate*** offensive third party content without

13  fear of liability.") (emphasis added); *In re Apple Inc. App Store*

14  *Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971, 979 (N.D.

15  Cal. 2022) ("The legislative history . . . makes clear that Congress

16  enacted Section 230 to remove the disincentives to ***self-***

17  ***regulation***[.]") (emphasis added).

18      Defendant's response also rests on the incorrect statement

19  that "[n]othing in AB 587 gives the Attorney General authority to

20  penalize social media platforms based on the provisions of their

21  terms of service or how platforms choose to enforce (or not enforce)

22  those terms."  Opp. at 41.  That is exactly what AB 587 does.  Armed

23  with broad pre-litigation enforcement powers under Cal. Gov't Code

24  §§ 11180-81, AG Bonta can investigate (through costly discovery

demands), and ultimately pursue and fine, companies such as X Corp. for moderating certain objectionable content, which is exactly what Section 230 bars.  Given (1) AB 587's vague structure, (2) its hefty penalty provisions, and (3) the fact that AG Bonta has already used threats of enforcement of AB 587 to pressure social media companies, such as X Corp., to limit or disfavor content covered by AB 587, *see* Fernandez Aff. ¶ 16, it is clear that the statute facilitates governmental pressure to conform content moderation decisions to the State's liking, subject to threats of enforcement.

Defendant's reliance on *HomeAway.com* v. *City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019) is unavailing.  The regulation in *HomeAway.com* prohibited short-term vacation rentals for 30 consecutive days or less and prohibited platforms from processing transactions for unregistered rental properties.  *Id.* at 683.  Accordingly, it "[did] not require the Platforms to monitor third-party content and thus [fell] outside of [Section 230's] immunity." *Id.*  AB 587 is plainly different.  It **does** impose liability on social media companies if they make content moderation decisions without making the requisite disclosures.

AG Bonta also argues that Plaintiff's logic leads to absurd results because it would allow for an argument that Section 230 preempts a law penalizing social media companies for failing to pay income taxes because, such a law that "creates a civil penalty for social media platforms that take actions in good faith to

1   restrict access to content as described in 230(c)(2), [] without

2   paying state income tax."  Opp. at 41 n.11 (quotation marks

3   omitted).  That argument is without merit.  Unlike the penalties

4   imposed by AB 587, the liabilities imposed by state laws penalizing

5   the failure to pay income tax have nothing to do with content

6   moderation.  In contrast, AB 587 directly ties its penalties to

7   actions taken or not taken in moderating content.  AB 587

8   essentially requires that, if social media companies regulate

9   content on their platforms, they must do so in the manner dictated

10  by the State of California or be subject to "meaningful remedies."

11  *See* AB 587 Bill Text, Section 1 ("It is the intent of the

12  Legislature that a social media company that violates this act

13  shall be subject to meaningful remedies sufficient to induce

14  compliance with this act.").  Unlike the vacation rental law in

15  *HomeAway.com* or the tax law example posed by AG Bonta — both of

16  which impose no liability relating to content-moderation decisions

17  — AB 587 imposes liability for content-moderation decisions that

18  are not made in a particular way.  That "pose[s] an obstacle to

19  Congress's aim to encourage self-monitoring of third-party

20  content," *HomeAway.com*, 918 F.3d at 683–84, and it means that AB

21  587 is preempted by Section 230.

22      AB 587 is also preempted by Section 230 because its

23  enforcement provisions allow AG Bonta to bring a civil action

24  (potentially already after issuing costly and invasive document

demands and other requests) against a social media company if he believes it has "omit[ted] or misrepresent[ed]" any of the information it reported. *See* 47 U.S.C. § 230(e)(3) ("**No cause of action may be brought** and no liability may be imposed under any State or local law that is inconsistent with this section.") (emphasis added).  Defendant's focus on whether discretion to determine the amount of the civil penalty lies with the Attorney General or the court is misplaced.  That the Attorney General can bring an action and subject a social media company to burdensome discovery requests, *regardless of whether any civil penalty is assessed*, contravenes the immunity afforded by Section 230.  "Section 230 must be construed to protect defendants 'not merely from ultimate liability, but from having to fight costly and protracted legal battles.'"  *Republican Nat'l Comm.* v. *Google, Inc.*, 2023 WL 5487311, at *3 (E.D. Cal. Aug. 24, 2023) (quoting *Fair Hous. Council of San Fernando Valley* v. *Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc)); *see also id.* ("In 'close cases' section 230 claims 'must be resolved in favor of immunity.'") (quoting *Roommates.com*, 521 F.3d at 1174).

AB 587 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Jones* v. *Google LLC*, 73 F.4th 636, 644 (9th Cir. 2023) (quotation marks omitted), and is therefore preempted by Section 230.

## II.   X Corp. Has Established The Existence Of The Remaining *Winter* Factors

Defendant concedes that "the loss of First Amendment freedoms does constitute 'irreparable harm' for purposes of seeking injunctive relief." Opp. at 44.  And here, because "the government is a party, the last two factors merge." *Junior Sports Mags.*, 80 F.4th at 1120; *Nat'l Ass'n of Wheat Growers*, 468 F. Supp. 3d at 1265.  Moreover, in a First Amendment case, Plaintiff "need only demonstrate the existence of a *colorable* First Amendment claim" in order to establish irreparable harm.  *Cal. Chamber of Com.* v. *Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (emphasis added); *see also id.* ("Irreparable harm is relatively easy to establish in a First Amendment case.").  X Corp. has not only met this lesser burden of demonstrating a "colorable" First Amendment claim, it has put forth one that is likely to succeed on the merits.  Accordingly, X Corp. has established the existence of the remaining *Winter* factors.

### CONCLUSION

The Court should grant Plaintiff's request for preliminary injunctive relief as to AB 587.

DATED: November 3, 2023    /s/ Joel Kurtzberg

CAHILL GORDON & REINDEL LLP
Joel Kurtzberg (admitted *pro hac vice*)
Floyd Abrams (admitted *pro hac vice*)
Jason Rozbruch (admitted *pro hac vice*)
Lisa J. Cole (admitted *pro hac vice*)
32 Old Slip
New York, NY 10005
Telephone: 212-701-3120
Facsimile: 212-269-5420

DOWNEY BRAND LLP
William R. Warne (Bar No. 141280)
Meghan M. Baker (Bar No. 243765)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone: 916-444-1000
Facsimile: 916-444-2100

*Attorneys for Plaintiff X Corp.*

REPLY MEMORANDUM OF POINTS AND          55
AUTHORITIES IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION