# EXHIBIT 1

# *Zauderer* and Compelled Editorial Transparency

*Eric Goldman*\*

*ABSTRACT: A 1985 Supreme Court opinion,* Zauderer v. Office of Disciplinary Counsel, *holds a key to the Internet's future.* Zauderer *provides a relaxed level of scrutiny for constitutional challenges to some compelled commercial speech disclosure laws. Regulators throughout the country are adopting "transparency" laws to force Internet services to disclose information about their editorial operations or decisions when they publish third-party content, based on their assumption that* Zauderer *permits such compelled disclosures. This Essay explains why these transparency laws do not qualify for* Zauderer's *relaxed scrutiny. Instead, given the inevitably censorial consequences of enacting and enforcing compelled editorial transparency laws, they should typically trigger strict scrutiny—just like outright speech restrictions do.*

INTRODUCTION ........................................................................................81

I. DEFINING THE *ZAUDERER* TEST ......................................................83
    A. *THE* ZAUDERER *DECISION*.......................................................83
    B. THE SUPREME COURT'S POST-ZAUDERER JURISPRUDENCE .....85

II. THE *ZAUDERER* TEST AND COMPELLED EDITORIAL TRANSPARENCY 87
    A. COMPELLED EDITORIAL TRANSPARENCY DEFINED ..................87
    B. COMPELLED EDITORIAL TRANSPARENCY AS CENSORSHIP........88
    C. COMPELLED EDITORIAL TRANSPARENCY DIFFERS FROM OTHER
       ADVERTISING DISCLOSURES ...................................................90
    D. COMPELLED EDITORIAL TRANSPARENCY DOES NOT FIT THE
       ZAUDERER PRECONDITIONS ...................................................91
         1. Compelled Editorial Transparency Reaches Beyond Ads

\* Associate Dean for Research, Professor of Law, & Co-Director of the High Tech Law Institute, Santa Clara University School of Law. Website: http://www.ericgoldman.org. Email: egoldman@gmail.com. Thanks to Hilary Cheung, Lisa Goldman, Daphne Keller, Jeff Kosseff, Mark Lemley, Lyrissa Lidsky, Jess Miers, Amanda Reid, Rebecca Tushnet, and participants at a Centro de Estudios en Libertad de Expresión y Acceso a la Información ("CELE") workshop, for their comments. This Essay does not comprehensively address developments after September 1, 2022.

...............................................................................91
2.  Compelled Editorial Transparency Is Not "Purely
Factual"...........................................................................92
3.  Compelled Editorial Transparency Is Not
"Uncontroversial"...........................................................94
4.  Compelled Editorial Transparency Usually Is Not About
Offer Terms....................................................................95
5.  Summary of the *Zauderer* Test's Applicability................96
E.  MANY COMPELLED EDITORIAL TRANSPARENCY LAWS WILL NOT
SURVIVE RELAXED SCRUTINY ..................................................96
1.  Compelled Editorial Transparency May Be Unjustified
or Unduly Burdensome ..................................................96
2.  Compelled Editorial Disclosures May Not Reasonably
Relate to Consumer Deception ......................................98

CONCLUSION............................................................................................ 101

## INTRODUCTION

Regulators' never-ending quest to censor online speech has entered a dangerous new phase.[1] In the most recent fad,[2] regulators are requiring online publishers of user-generated content ("UGC") and other third-party content ("UGC publishers") to provide greater visibility into their editorial decisions and operations. This Essay calls those efforts "compelled editorial transparency" laws. Since 2021, Florida,[3] Texas,[4] New York,[5] and California[6] have adopted compelled editorial transparency laws, and other jurisdictions will soon follow.[7]

Superficially, compelled editorial transparency laws typically appear content-neutral and speech-enhancing. In fact, they are powerful tools for censorship. Compelled editorial transparency laws tell UGC publishers what

---

1.   *E.g.*, Evelyn Douek, *Content Moderation as Systems Thinking*, 136 HARV. L. REV. 526, 528 (2022) ("Lawmakers need to embrace a second wave of regulatory thinking about content moderation institutional design that eschews comforting but illusory First Amendment-style analogies and instead adopts a systems thinking approach.").

2.   *Cf.* Derek E. Bambauer, *Orwell's Armchair*, 79 U. CHI. L. REV. 863, 870–71 (2012) (arguing that regulators adopt any censorial tools available to them).

3.   S.B. 7072, 2021 Leg., Reg. Sess. (Fla. 2021).

4.   H.B. 20, 2021 Leg., Sess. 87(2) (Tex. 2021).

5.   Assemb. B. 7865–A, 2021–22 Leg., Reg. Sess. (N.Y. 2022).

6.   Assemb. B. 587, 2021–22 Leg., Reg. Sess. (Cal. 2022).

7.   *E.g.*, Roslyn Layton, *Washington Gridlock Will Put States at the Forefront of Tech Policy in 2023*, FORBES (Dec. 20, 2022, 11:17 PM), https://www.forbes.com/sites/roslynlayton/2022/12/20/washington-gridlock-will-put-states-at-the-forefront-of-tech-policy-in-2023 [http://perma.cc/5FD8-F8C5].

types of editorial practices regulators expect to see.[8] Further, regulators can investigate and enforce the laws to punish UGC publishers for making editorial decisions the regulators do not like.[9] To mitigate those risks, UGC publishers change their editorial decisions to placate regulators rather than serve their audiences' best interests.[10]

Despite these censorial implications, regulators often justify compelled editorial transparency based on the 1985 Supreme Court opinion, *Zauderer v. Office of Disciplinary Counsel*.[11] In 2022, Fifth[12] and Eleventh[13] Circuit opinions indicated that *Zauderer* governs compelled editorial transparency, meaning that Texas'—and much of Florida's—disclosure laws were likely to survive *Zauderer*'s relaxed scrutiny.[14] When a similar dispute over Texas' compelled editorial transparency provisions reached the Supreme Court's "shadow docket" in 2022, Justice Alito signaled possible support for this interpretation.[15]

However, *Zauderer* does not support these conclusions. Instead, *Zauderer* is a unique variant of constitutional scrutiny designed for a narrow set of situations. To ensure its narrow application, the Supreme Court enumerated

---

8. Eric Goldman, *The Constitutionality of Mandating Editorial Transparency*, 73 HASTINGS L.J. 1203, 1205 (2022).

9. *Id.* at 1226–28 (discussing how Texas Attorney General Ken Paxton used editorial transparency enforcement to punish Twitter for "deplatforming" then-President Trump).

10. *Id.*

11. Zauderer v. Off. of Disciplinary Couns., 471 U.S. 626, 651–52 (1985). *Zauderer* recently has been getting increased judicial attention. This July 11, 2022 chart from Shepard's shows a recent uptick in judicial citations to *Zauderer*:



1985                    2022

*Shepard's® Citing Decision Analysis*, LEXISNEXIS, https://plus.lexis.com/api/permalink/a3675be 5-f6ed-4559-9c64-d9c4103ada35/?context=1530671 [https://perma.cc/J7P6-6PKY].

12. NetChoice, L.L.C. v. Paxton, 49 F.4th 439, 485 (5th Cir. 2022) ("Texas argues—and the Platforms do not dispute—that Section 2 advances the State's interest in 'enabl[ing] users to make an informed choice' regarding whether to use the Platforms. Therefore, the only question is whether the State has carried its burden to show that the three categories of disclosures required by Section 2 are not unduly burdensome.") (alteration in original) (citation omitted).

13. NetChoice, L.L.C. v. Att'y Gen., 34 F.4th 1196, 1230–31 (11th Cir. 2022) ("We assess S.B. 7072's disclosure requirements . . . under the *Zauderer* standard . . . . It is substantially likely that S.B. 7072's content-moderation restrictions . . . and its requirement that platforms provide a thorough rationale for every content-moderation action . . . violate the First Amendment. The same is not true of the Act's other disclosure provisions . . . .").

14. *Zauderer* did not use the phrase "rational basis" scrutiny and adopted different test elements than the standard rational basis test. *See Zauderer*, 471 U.S. at 651–52. To distinguish *Zauderer*'s unique approach, this Essay calls it "relaxed" scrutiny.

15. NetChoice, L.L.C. v. Paxton, 142 S. Ct. 1715, 1718–19 (2022) (mem.) (Alito, J., dissenting).

four preconditions to obtain relaxed scrutiny.[16] Compelled editorial transparency will rarely, if ever, satisfy *any* of those preconditions. Furthermore, should a compelled editorial transparency law unexpectedly satisfy all four preconditions, the law is not likely to survive the relaxed test.

If a compelled editorial transparency law does not qualify for *Zauderer*'s special treatment, some other scrutiny will apply. Given the censorial effects of compelled editorial transparency, those laws should get the same constitutional scrutiny as outright speech restrictions: typically, strict scrutiny.[17]

This Essay proceeds in two parts. Part I defines the *Zauderer* test—a surprisingly tricky task given thirty-seven years of limited but confusing Supreme Court jurisprudence. Part II distinguishes compelled editorial transparency from other types of compelled commercial speech and then demonstrates why compelled editorial transparency laws do not qualify for the *Zauderer* test (and would fail it even if they do). The Essay concludes with a reminder about *Zauderer*'s importance to the future of Internet speech.

## I.    DEFINING THE *ZAUDERER* TEST

Normally, defining a Supreme Court's legal test is simple—just cut-and-paste the applicable language from the precedent opinion. That methodology also works for *Zauderer*. Unfortunately, confusion about the test's elements has fueled a mythology about the test and its scope.[18]

### A.    THE ZAUDERER DECISION

*Zauderer* is a key part of the Supreme Court's late twentieth-century jurisprudence on advertising by professionals.[19] After the Supreme Court clarified that the First Amendment protected commercial speech, and that commercial speech regulations were subject to intermediate scrutiny—the "*Central Hudson* test"[20]—the Supreme Court applied those precedents to various restrictions on advertising by professionals, as seen in *Zauderer*.

---

16.    As discussed in Part I, the four preconditions are: (1) a regulation applies to advertising; (2) the required disclosure is purely factual information; (3) the required disclosure is uncontroversial; and (4) the regulation addresses disclosures of the terms on which the regulated entity offers its goods or services. *See infra* Part I.

17.    Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 138 S. Ct. 2361, 2371 (2018) ("As a general matter, such [content-based regulations] 'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'").

18.    *See* REBECCA TUSHNET & ERIC GOLDMAN, ADVERTISING LAW: CASES AND MATERIALS 227–42 (6th ed. 2022).

19.    *See Zauderer*, 471 U.S. at 651–52; *see, e.g.*, RODNEY A. SMOLLA, 2 SMOLLA & NIMMER ON FREEDOM OF SPEECH § 20:37.40 (2022); Claudia E. Haupt, *Professional Speech*, 125 YALE L.J. 1238, 1280–81 (2016).

20.    Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 566 (1980).

Zauderer was an Ohio attorney.[21] The Ohio State Bar objected to two of his advertisements.[22] Much of *Zauderer* was spent striking down several attorney advertising restrictions due to *Central Hudson Gas & Electric Corp. v. Public Service Commission*.[23]

However, Ohio also required attorneys to explain when contingency fee rates covered court costs and expenses.[24] Zauderer's advertisements did not do so.[25] Because there are "material differences between disclosure requirements and outright prohibitions on speech," the Court did not apply the *Central Hudson* test.[26] Instead, the Court said:

> In requiring attorneys who advertise their willingness to represent clients on a contingent-fee basis to state that the client may have to bear certain expenses even if he loses, Ohio has not attempted to prevent attorneys from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present. . . . The State has attempted only to prescribe what shall be orthodox in commercial advertising, and its prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available. . . . [U]njustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech. But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers.[27]

This short passage—consisting of approximately one hundred fifty words—represents the *Zauderer* test. Clearly, the majority did not view the test as worthy of much detail. The majority used broad undefined phrases (e.g., "purely factual," "uncontroversial," "unjustified," "unduly burdensome")[28] and did not explain why it chose its test elements.

The majority's analysis of the *Zauderer* test was equally unenlightening. The majority upheld Ohio's requirement that attorneys disclose details about

---

21.   *Zauderer*, 471 U.S. at 629.

22.   *Id.* at 630–31.

23.   *See id.* at 637–49; *see also Central Hudson*, 477 U.S. at 566.

24.   *Zauderer*, 471 U.S. at 633. Justice Brennan's opinion indicates that the precise disclosure obligations upheld by the majority were not clear. *Id.* at 668–70 (Brennan, J., concurring in part and dissenting in part). The majority acknowledged this problem. *Id.* at 653 n.15 (majority opinion).

25.   *Id.* at 633.

26.   *Id.* at 650. Justice Brennan's concurrence/dissent said, "[T]he Court greatly overstates the distinction between disclosure and suppression in these circumstances." *Id.* at 657 n.1 (Brennan, J., concurring in part and dissenting in part).

27.   *Id.* at 650–51 (majority opinion).

28.   *See id.* at 651.

contingency fees because consumers do not understand the difference between attorneys' fees and other litigation-associated costs, so consumers may be deceived by an advertisement that promotes contingency fees.[29]

Summarizing the foregoing, *Zauderer* scrutiny applies when the regulation: (1) governs the text of advertising; (2) requires the disclosure of purely factual information; (3) requires the disclosure of uncontroversial information; and (4) requires disclosure about the terms of the advertiser's services.[30] If those preconditions are satisfied, the regulation will be unconstitutional if the disclosures: (1) are unjustified; (2) are unduly burdensome; or (3) do not reasonably relate to preventing consumer deception.[31]

## B. *The Supreme Court's Post-Zauderer Jurisprudence*

In the thirty-seven years since *Zauderer*, the Supreme Court has cited the opinion twenty-six times (including certiorari dissents and emergency "shadow docket" denials).[32] Nine opinions mention *Zauderer*'s disclosure provisions in the majority opinion and six others discuss the disclosure provision only in a concurrence or dissent.[33] Of those, only *Zauderer* and *Milavetz, Gallop, & Milavetz, P.A. v. United States* used *Zauderer*'s relaxed scrutiny to uphold a disclosure requirement.[34]

Like *Zauderer*, *Milavetz* addressed an affirmative disclosure obligation for professionals' commercial advertising to avoid misleading consumers.[35] The Court said:

> [T]he Government maintains that § 528 is directed at misleading commercial speech. For that reason, and because the challenged provisions impose a disclosure requirement rather than an affirmative limitation on speech, the Government contends that the less exacting scrutiny described in Zauderer governs our review. We agree. . . . The challenged provisions of § 528 share the essential features of the rule at issue in Zauderer. As in that case, § 528's required disclosures are intended to combat the problem of

---

29.   *Id.* at 651–53.

30.   *See id.* at 650–51. *NIFLA* rejected any "professional speech" precondition. Nat'l Inst. of Fam. & Life Advocs. v. Becerra ("*NIFLA*"), 138 S. Ct. 2361, 2371–72 (2018).

31.   *See Zauderer*, 471 U.S. at 651.

32.   *See* Eric Goldman, *Analysis of U.S. Supreme Court Citations to* Zauderer (July 12, 2022), https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=3700&context=historical [https://perma.cc/D5FJ-4RYL]. Lower courts have cited *Zauderer* hundreds of times, but "*Zauderer*'s treatment in various circuits most closely resembles a fractured, frequently contradictory mosaic." Note, *Repackaging* Zauderer, 130 HARV. L. REV. 972, 979 (2017). To sidestep that mess, this Essay only addresses Supreme Court rulings.

33.   Goldman, *supra* note 32.

34.   *See Zauderer*, 471 U.S. at 651–62; Milavetz, Gallop, & Milavetz, P.A. v. United States, 559 U.S. 229, 252–53 (2010). A subject law did not survive relaxed scrutiny in *NIFLA*. *NIFLA*, 138 S. Ct. at 2378.

35.   *Milavetz*, 559 U.S. at 232.

inherently misleading commercial advertisements—specifically, the
promise of debt relief without any reference to the possibility of
filing for bankruptcy, which has inherent costs. Additionally, the
disclosures entail only an accurate statement identifying the
advertiser's legal status and the character of the assistance provided,
and they do not prevent debt relief agencies like Milavetz from
conveying any additional information.[36]

Collectively, *Zauderer* and *Milavetz* demonstrate how the *Zauderer* test applies
to a narrow slice of commercial regulations. The test is not meant to be the
comprehensive rule for all compelled commercial speech, nor can it support
such heavy responsibilities. If a compelled commercial disclosure does not
satisfy all of *Zauderer*'s preconditions, it simply means a different scrutiny
applies.

Unfortunately, Justices have sometimes paraphrased *Zauderer*
incompletely in cases where the regulations did not qualify for *Zauderer*'s
relaxed scrutiny. For example, Justice Breyer has implied that *Zauderer*
categorically allows regulators to freely compel disclosures of "purely factual
and uncontroversial information."[37] This is not what *Zauderer* or *Milavetz* said,
and, accordingly, Justice Breyer's positions never garnered majority support.

In 2018, the Court revisited *Zauderer* in *National Institute of Family and Life
Advocates v. Becerra* ("*NIFLA*"), a case involving two disclosure obligations.[38] A
majority held that one obligation did not qualify for the *Zauderer* test because
the required disclosure "in no way relate[d] to the services that licensed
clinics provide. Instead, it require[d] these clinics to disclose information
about state-sponsored services—including abortion, anything but an
'uncontroversial' topic."[39] Thus, that provision failed at least two of *Zauderer*'s
preconditions.

Regarding the other obligation, the majority said it did not need to
decide if the *Zauderer* standard applied.[40] Instead, the Court found the
disclosure obligation unduly burdensome, meaning it would not survive
*Zauderer*'s relaxed scrutiny even if it qualified.[41] Although *NIFLA* did not

---

36.    *Id.* at 249–50.

37.    Expressions Hair Design v. Schneiderman, 581 U.S. 37, 50 (2017) (Breyer, J.,
concurring) ("If, however, a challenged regulation simply requires a commercial speaker to
disclose 'purely factual and uncontroversial information,' courts will apply a more permissive
standard of review."); Chrysafis v. Marks, 141 S. Ct. 2482, 2484 (2021) (Breyer, J., dissenting)
("[T]here are persuasive arguments that CEEFPA requires only the dissemination of 'purely
factual and uncontroversial information' in the context of commercial speech and is therefore
authorized by our precedents."). Justice Breyer's *NIFLA* dissent expressed similar sentiments. *See
NIFLA*, 138 S. Ct. at 2379 (Breyer, J., dissenting).

38.    *NIFLA*, 138 S. Ct. at 2372.

39.    *Id.*

40.    *Id.* at 2377.

41.    *Id.* at 2377–78.

reference or analyze the consumer deception factor, Section II.E.2 explains why this factor likely remains part of *Zauderer*'s scrutiny.[42]

## II.  THE *ZAUDERER* TEST AND COMPELLED EDITORIAL TRANSPARENCY

Part I shows the *Zauderer* test applies when: (1) a regulation applies to advertising; (2) the required disclosure contains purely factual information; (3) the required disclosure is uncontroversial; and (4) the regulation addresses disclosures of the terms on which the regulated entity offers its goods or services.[43]

Part II evaluates when compelled editorial transparency laws qualify for this treatment. First, it defines compelled editorial transparency and explains how compelled editorial transparency differs from other types of compelled commercial disclosures. Part II then shows why compelled editorial transparency laws typically do not satisfy *any* of *Zauderer*'s preconditions, and, if the *Zauderer* test unexpectedly applies to compelled editorial transparency laws, these laws are nevertheless likely to fail relaxed scrutiny.

### A.  *COMPELLED EDITORIAL TRANSPARENCY DEFINED*

Compelled editorial transparency means "requirements for publishers to disclose information about their editorial operations and decisions."[44] This regulatory niche is largely historically unprecedented. Before the Internet, such blatant intrusions into publishers' editorial functions would have been considered clearly unconstitutional[45] and were rarely, if ever, attempted.

Compelled editorial transparency laws typically fit into one of the following four categories:[46]

> (1) disclosures of the publisher's editorial standards, such as including them in the UGC publisher's terms of service ("TOS"). For example, Florida's social media censorship law states: "A social media platform must publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban."[47] Similarly, New York requires that a "social media network shall have a clear and concise policy readily available and accessible on their website and application which includes how such social media network will respond and address the reports of incidents of hateful conduct on their platform."[48]

---

42.   *See* discussion *infra* Section II.E.2.
43.   *See supra* Part I.
44.   Goldman, *supra* note 8, at 1207.
45.   *Cf.* Mia. Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 256–58 (1974).
46.   *See* Goldman, *supra* note 8, at 1207.
47.   FLA. STAT. ANN. § 501.2041(2)(a) (West 2022).
48.   N.Y. GEN. BUS. LAW § 394-ccc(3) (McKinney 2022).

(2) explanations of the publisher's editorial decisions, such as why the service chose to reject, remove, or deprioritize a user's content. For example, Florida's social media censorship law requires platforms to provide "a thorough rationale explaining the reason that the social media platform censored the user."[49]

(3) statistics about the publisher's editorial decisions, such as the number of editorial actions the publisher took and why. For example, Texas' social media censorship law requires platforms to disclose "the number of instances in which the social media platform took action . . . [on] illegal content, illegal activity, or potentially policy-violating content."[50]

(4) disclosures of source data, such as materials that shaped the publisher's editorial outputs. For example, Maryland required online platforms to "collect records concerning their political ad purchasers and retain those records for at least a year after the election so that the Maryland Board of Elections can review them upon request."[51] Even if a statute does not expressly require publishers to collect source data or make it available, source data disclosures are inherent in other editorial transparency requirements. Regulators often need access to publishers' source data—such as the complete corpus of accepted and rejected or removed user content—to verify the accuracy of the publisher's disclosures.[52]

Ultimately, none of these disclosure types will likely qualify for *Zauderer*, but the reasons depend on the regulation's specific terms.

### B. COMPELLED EDITORIAL TRANSPARENCY AS CENSORSHIP

Compelled editorial transparency may not be as obviously censorial as outright speech regulations, but both types of laws effectuate censorship.

The censorial implications are easiest to see when publishers must make disclosures about constitutionally protected categories of speech, such as New York's disclosure law focused on "hateful conduct,"[53] which unquestionably includes constitutionally protected speech.[54] These disclosure obligations

---

49.  FLA. STAT. ANN. § 501.2041(3)(c).

50.  TEX. BUS. & COM. CODE ANN. § 120.053(a)(2) (West 2021).

51.  Wash. Post v. McManus, 944 F.3d 506, 512 (4th Cir. 2019); MD. CODE ANN., ELEC. LAW § 13-405(c) (West 2021). The law was enjoined.

52.  Goldman, *supra* note 8, at 1209.

53.  Assemb. B. 7865–A, 2021–22 Leg., Reg. Sess. (N.Y. 2022). While this Essay was in press, the law was preliminarily enjoined. Volokh v. James, No. 22-CV-10195, 2023 WL 1991435, at *1 (S.D.N.Y. Feb. 14, 2023).

54.  The bill defines "hateful conduct" as "the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender

send the message to publishers that regulators will be scrutinizing those disclosures. That message is coupled with an impossible-to-ignore threat that regulators will pursue the publisher if the disclosures do not satisfy the regulators' normative objectives regarding "hateful conduct."[55] Knowing this risk, publishers will distort their editorial decisions so their disclosures placate regulators and mitigate the risk of future investigations or enforcements.[56] Inevitably, compelled editorial transparency changes the publisher's constitutionally protected editorial decision-making and affects constitutionally protected speech—exactly like an outright speech restriction would. It does not matter if an investigation or enforcement would be unconstitutional once pursued because the speech harms occur well before then.

Partisan-driven investigations and enforcements exacerbate these concerns.[57] Regulators want UGC publishers' editorial decisions to advance their partisan goals. That puts UGC publishers in a no-win position. Whatever editorial choice a publisher makes, a partisan regulator can criticize it and weaponize compelled editorial transparency laws as punishment. Thus, compelled editorial transparency helps censorial regulators pretextually pursue partisan-motivated censorship.

The censorship analysis is only slightly more complicated when compelled editorial transparency is superficially content-neutral, such as a law that requires the disclosure of all editorial policies or production of statistics about number of submissions removed, regardless of substantive content categories. Unlike New York's "hateful conduct" disclosures, content-neutral disclosure requirements affect all speech of the publisher's user-authors, whether constitutionally protected or not. As a result, this purported neutrality puts *more* constitutionally protected speech at risk, not

---

expression." *Id.* Inciting violence is unprotected only when the threat is imminent. Brandenburg v. Ohio, 395 U.S. 444, 447–49 (1969). Otherwise, as Justice Alito wrote: "Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" Matal v. Tam, 137 S. Ct. 1744, 1764 (2017) (quoting United States v. Schwimmer, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)).

55.    N.Y. Assemb. B. 7865-A. The normative goal varies by partisan affiliation. "Liberal" partisans may want hateful conduct reduced. "Conservative" partisans may want tolerance of "lawful but awful" conduct, even if "hateful." These disagreements emphasize the law's censorial effects and the controversial nature of publishers' disclosures.

56.    As Twitter explained in response to Texas Attorney General Paxton's editorial transparency investigation:

> Any time a Twitter employee thinks about writing something related to content moderation, the employee knows that AG Paxton has already demanded production of whatever the employee chooses to write. . . . [That] would lead a person of 'ordinary firmness' to think twice about what to write or what editorial decisions to make and document.

Plaintiff-Appellant's Opening Brief on Appeal at 23, Twitter, Inc. v. Paxton, 26 F.4th 1119 (9th Cir. 2022) (No. 21-15869), 2021 WL 3135024, at *23.

57.    *See Twitter, Inc.*, 26 F.4th at 1121–22, 1126–27 (an editorial transparency investigation launched for partisan purposes).

less. Knowing that partisan enforcers will cherry-pick the disclosures that best support their partisan agenda, the disclosure laws still motivate the publishers to consider the regulators' interests when setting their editorial policies and making their editorial decisions. The disclosure usurps the publishers' constitutionally protected rights by getting them to prioritize flattering disclosures over their audience's informational needs.

Collectively, because compelled editorial transparency steers UGC publishers' editorial operations and decisions in the directions favored by regulators, it functions like outright speech restrictions.[58] Accordingly, the laws should be subject to the same constitutional scrutiny that applies to outright speech restrictions—often, strict scrutiny.[59]

### C. *COMPELLED EDITORIAL TRANSPARENCY DIFFERS FROM OTHER ADVERTISING DISCLOSURES*

As explained in Section II.B, the nature of compelled editorial disclosure—compounded by the likelihood of partisan enforcement—impels publishers to change their editorial decisions. Other kinds of compelled commercial disclosures do not create similar censorial risks.

First, compelled commercial disclosures routinely induce producers to change their products to make more flattering disclosures.[60] Often, that is the regulator's goal: to shape commercial offerings indirectly through information disclosures that redirect consumer marketplace choices, rather than through outright edicts.[61]

The regulation-via-compelled-disclosure approach usually does not raise serious free speech concerns because the induced product or service changes do not affect constitutionally protected publication decisions.[62] For example, if a food labeling law prompts a soda manufacturer to add less sugar because the disclosures look embarrassing or deter consumers, the manufacturer's product reconfigurations do not raise speech issues.

In contrast, when regulation-by-disclosure targets a UGC publisher, any induced "product" changes distort or override the publishers' constitutionally protected choices.[63] With respect to speech "producers," "product" changes motivated by disclosure-based regulation are functionally indistinguishable from outright government edicts. Instead of aiding consumers' marketplace choices, compelled editorial disclosures undermine the marketplace of constitutionally protected speech.

---

58. *E.g.*, Wash. Post v. McManus, 944 F.3d 506, 517–18 (4th Cir. 2019).

59. Goldman, *supra* note 8, at 1217.

60. *E.g.*, OMRI BEN-SHAHAR & CARL E. SCHNEIDER, MORE THAN YOU WANTED TO KNOW: THE FAILURE OF MANDATED DISCLOSURE 162–67 (2014).

61. Goldman, *supra* note 8, at 1206–07.

62. *Id.* at 1218–20.

63. *See* Smith v. California, 361 U.S. 147, 152–54 (1959) (strict liability for speech products causes collateral censorship, unlike strict liability for food and drug products).

Second, many compelled commercial disclosures—such as tax or securities laws—do not have the same censorial impact when imposed on UGC publishers because the disclosures do not target or steer their editorial decision-making or operations. As a result, even if *Zauderer* authorizes compelled commercial disclosures generally, compelled editorial transparency warrants more rigorous scrutiny.

Furthermore, if compelled editorial transparency laws for UGC publishers survive constitutional scrutiny, regulators will almost certainly impose similar obligations on publishers across all media—coupled with the same threat of partisan-motivated investigation and enforcement. If regulators should not be able to force transparency from traditional publishers, those concerns must extend to UGC publishers too.

### D.    *Compelled Editorial Transparency Does Not Fit the* Zauderer *Preconditions*

In response to a "shadow docket" appeal, the Supreme Court temporarily restored an injunction against Texas' social media censorship law—including the editorial transparency provisions in *NetChoice, L.L.C. v. Paxton*.[64] Justice Alito dissented, stating:

> [Texas] notes that we have upheld laws requiring that businesses disclose "purely factual and uncontroversial information about the terms under which [their] services will be available," so long as those requirements are not "unjustified or unduly burdensome." If we were to agree with the applicants' arguments, the decision could have widespread implications with regard to other disclosures required by federal and state law.[65]

As already discussed, the Supreme Court can and should distinguish editorial transparency laws from "other disclosures required by federal and state law."[66] More importantly, Texas summarized *Zauderer*'s preconditions incompletely.[67] When the *Zauderer* preconditions are properly enumerated and analyzed, it becomes clear that compelled editorial transparency laws do not qualify for *Zauderer*'s special treatment.

### 1.    Compelled Editorial Transparency Reaches Beyond Ads

*Zauderer* involved a regulation of advertising, as did *Milavetz*.[68] This was an essential, not incidental, fact. The *Zauderer* majority explained that Ohio had "attempted only to prescribe what shall be orthodox in commercial

---

64.    *See* NetChoice, L.L.C. v. Paxton, 142 S. Ct. 1715, 1716 (mem.) (2022).

65.    *Id.* at 1717–18 (Alito, J., dissenting) (second alteration in original) (citation omitted).

66.    *Id.*

67.    Note the irony when Texas' brief uses a misleading omission to claim that the State should benefit from a legal standard designed to curb misleading omissions.

68.    *See* Zauderer v. Off. of Disciplinary Couns., 471 U.S. 626, 629–34 (1985); *see also* Milavetz, Gallop, & Milavetz, P.A. v. United States, 559 U.S. 229, 232–34 (2010).

advertising" and noted that its ruling only circumscribed "an advertiser's rights."[69] Similarly, *Milavetz* said that the regulation at issue "combat[ed] the problem of inherently misleading commercial advertisements."[70] *NIFLA* reiterated that *Zauderer* applies to advertising.[71]

In contrast, compelled editorial transparency usually reaches way beyond advertising (unless everything a company says is "commercial speech"). For example, a mandated explanation is not advertising. It is the opposite of advertising when the UGC publisher is terminating the relationship. When the relationship is continuing, an explanation is as much of an advertisement as an invoice for past services rendered.

Additionally, disclosures about editorial policies or statistics are not advertising. Public disclosures of company practices do not always constitute advertising,[72] and the disclosures are being produced and disseminated involuntarily. In contrast, both *Zauderer* and *Milavetz* involved paid advertisements voluntarily distributed to generate new business for the advertisers.[73] The Supreme Court has never used *Zauderer* to force businesses to create and disseminate new material.[74]

*Zauderer*'s advertising precondition provides an easy way to reject *Zauderer*'s application to compelled editorial transparency laws that do not restrict their effects only to advertising.

### 2. Compelled Editorial Transparency Is Not "Purely Factual"

The Supreme Court has not defined what constitutes "purely factual" information. Superficially, pricing details—like those at issue in *Zauderer*—seem like straightforward facts, but that reasoning has limits. As Justice Brennan noted in his concurrence/dissent, a mandate to disclose contingency fees would have been problematic because an attorney may charge different fees in different circumstances, each subject to conditions and caveats.[75] The *Milavetz* case also involved seemingly straightforward facts: As the court recapitulates, the regulation required only "an accurate statement identifying the advertiser's legal status and the character of the assistance provided."[76] Justice Brennan's contingency-fee hypothetical may

---

69.   *Zauderer*, 471 U.S. at 651.

70.   *Milavetz*, 559 U.S. at 250.

71.   Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 138 S. Ct. 2361, 2374 (2018) ("[T]he lawyer's statements in *Zauderer* would have been 'fully protected' if they were made in a context other than advertising" (quoting *Zauderer*, 471 U.S. at 637 n.7)).

72.   *E.g.*, Prager Univ. v. Google L.L.C., 951 F.3d 991, 1000 (9th Cir. 2020) (finding that YouTube's "representations related to Restricted Mode, such as those in the terms of service, community guidelines, and contracts are not advertisements or a promotional campaign" (citations omitted)).

73.   *See Zauderer*, 471 U.S. at 629–34; *see also Milavetz*, 559 U.S. at 232–34.

74.   *Cf. NIFLA*, 138 S. Ct. at 2374 (noting that *Zauderer* did not protect government compulsion to speak involuntarily).

75.   *Zauderer*, 471 U.S. at 662 n.5 (Brennan, J., concurring in part and dissenting in part).

76.   *Milavetz*, 559 U.S. at 250.

help distinguish between "pure facts" and everything else. It might be a "pure fact" if an attorney discloses whether or not consumers owe money, but more specific disclosures about fees—such as contingency fee percentages or conditions for payout—go too far.

Regarding compelled editorial transparency, each publisher's constitutionally protected editorial freedom ensures that the publisher's disclosures will not be "pure facts." For example, it might be a pure fact whether the publisher has an editorial policy, but it would not be a pure fact to disclose the policy's details, which remain subject to the publisher's editorial discretion. Similarly, it might be a pure fact to tell a user that their account has been terminated, but it is not a pure fact to explain the reason for the termination because the termination decision reflects the publisher's subjective decision.

Similarly, consider California's requirement that an online publisher disclose the number of items it has "actioned."[77] This disclosure is impossible because it assumes there are only two outcomes for any content item: actioned or not.[78] In reality, every editorial decision necessarily prioritizes some items over others, so *every* item is prioritized or deprioritized relative to other items. Furthermore, if UGC publishers personalize content ordering, items may be "actioned" for some readers and not actioned for others. This complexity and ambiguity makes it impossible to characterize "actioned" as a "purely factual" disclosure.

Furthermore, classifying content items into a statutorily specified taxonomy involves highly subjective and contestable judgments.[79] For example, California requires publishers to issue statistics about "hate speech or racism" but does not define either term.[80] This creates an intractable classification problem because there is no consensus about the definition of "hate speech" or "racism."[81] The uncertainty of the classifications enables investigatory and enforcement abuse, as regulators can pursue partisan or other illegitimate objectives under the pretextual guise that they are validating the publisher's judgment calls. Whatever *Zauderer* meant by "purely

---

77.    *See* Assemb. B. 587, 2021 Leg., Reg. Sess. (Cal. 2021) (codified at Cal. Bus. & Prof. Code § 22677(a)(5)(A)(ii) (West 2023)). "Actioned" occurs when "a social media company, due to a suspected or confirmed violation of the terms of service, has taken some form of action, including, but not limited to, removal, demonetization, deprioritization, or banning, against the relevant user or relevant item of content." *Id.*

78.    The verb "actioned" includes a large number of options. *See* Eric Goldman, *Content Moderation Remedies*, 28 Mich. Tech. L. Rev. 1, 9 n.29, 23–24 (2021).

79.    Disclosures involving subjective judgments may also be "controversial" for *Zauderer* purposes.

80.    *See* Cal. Bus. & Prof. Code § 22677(a)(3)(A) (West 2023).

81.    *E.g.*, Karen Hao, *AI Still Sucks at Moderating Hate Speech*, MIT Tech. Rev. (June 4, 2021), https://www.technologyreview.com/2021/06/04/1025742/ai-hate-speech-moderation [https://perma.cc/454J-SNRK]; Jacob Crabb, Sherry Yang & Anna Zubova, *Classifying Hate Speech: An Overview*, Towards Data Sci. (May 28, 2019), https://towardsdatascience.com/classifying-hate-speech-an-overview-d307356b9eba [https://perma.cc/8J26-4KFS].

factual" disclosures, it should not cover disclosures that inherently involve judgment calls.

### 3.  Compelled Editorial Transparency Is Not "Uncontroversial"

*Zauderer* requires that the regulation discloses "uncontroversial information,"[82] but the Supreme Court has not defined this term. *NIFLA* said that abortion is "anything but an 'uncontroversial' topic."[83] While that is surely correct, this phrasing is problematic. First, *NIFLA* referred to "topics," while *Zauderer* referred to "information."[84] This semantic substitution may be inconsequential, but it leaves open what should happen if regulations require the disclosure of controversial information on uncontroversial topics. Second, there remains a significant and unresolved gap between the controversial abortion topics and the uncontroversial pricing information in *Zauderer*.

In any case, compelled editorial transparency inevitably requires the production of "controversial" information on "controversial" topics. UGC publishers' editorial decisions have zero-sum outcomes that produce winners and losers,[85] so every publication decision inevitably allocates power in ways that the "losers" can protest. That makes every content moderation decision intrinsically controversial. The power associated with publishing content also attracts regulators who want to arrogate it for their own personal or partisan benefit. Indeed, Florida and Texas expressly articulated partisan motivations for their social media censorship laws.[86]

Even when regulators do not explicitly declare their partisan motivations for compelled editorial transparency, it is often lurking just below the surface. For example, New York requires disclosures in publishers' terms of service about "hateful conduct."[87] Bill co-sponsor, Assemblymember Gina Sillitti, hoped the bill would suppress constitutionally protected speech:

---

82.    *See* Zauderer v. Off. of Disciplinary Couns., 471 U.S. 626, 651 (1985).

83.    Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 138 S. Ct. 2361, 2372 (2018).

84.    *See id.*; *see also Zauderer*, 471 U.S. at 632–33.

85.    Eric Goldman, *Top Myths About Content Moderation*, TECH. & MKTG. L. BLOG (Oct. 15, 2019), https://blog.ericgoldman.org/archives/2019/10/top-myths-about-content-moderation.htm [https://perma.cc/5J86-EJBT].

86.    *E.g.*, Staff, *Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big Tech*, RON DESANTIS: 46TH GOVERNOR OF FLA. (May 24, 2021), https://www.flgov.com/2021/05/24/governor-ron-desantis-signs-bill-to-stop-the-censorship-of-floridians-by-big-tech [https://perma.cc/5B3S-RJAT] (quoting Lieutenant Governor Jeanette Nuñez as saying, "What we've been seeing across the U.S. is an effort to silence, intimidate, and wipe out dissenting voices by the *leftist media* and big corporations. Today, by signing SB 7072 into law, Florida is taking back the virtual public square as a place where information and ideas can flow freely" (emphasis added)); Greg Abbott (@GregAbbott_TX), TWITTER (Mar. 4, 2021, 10:52 PM), https://twitter.com/GregAbbott_TX/status/1367699473703579652 [https://perma.cc/Q4GH-4AAK] (emphasis added) ("I am joining @SenBryanHughes to announce a bill prohibiting social media companies from censoring viewpoints. Too many social media sites *silence conservative speech* and ideas and trample free speech." (emphasis added)).

87.    *See* N.Y. GEN. BUS. LAW § 394-ccc(1)(a) (McKinney 2022) (defining "hateful conduct" as "the use of a social media network to vilify, humiliate, or incite violence against a group or a

*Hate has no place in New York State,* whether on our streets or online . . . . It's unconscionable that a white supremacist livestreamed his terrorist attack on the Buffalo community, and that the clips were viewed millions of times. We've seen how such heinous footage can embolden other extremists and traumatize unsuspecting viewers. *I helped pass legislation to enhance accountability across social networks* and ensure users can easily report hateful content. I'd like to thank Senator Kaplan for . . . working collaboratively to stamp out hate wherever it is found in New York.[88]

This law implicates many controversial questions, including: (1) what constitutes "hateful conduct" online; (2) when is that conduct constitutionally protected;[89] (3) should UGC publishers identify and reduce constitutionally protected "hateful conduct;" and (4) is it appropriate for legislatures to pressure or coerce UGC publishers to scrutinize and remove constitutionally protected "hateful conduct?" No matter how the Supreme Court ultimately defines "controversial," a transparency bill targeting constitutionally protected speech—because regulators do not like this speech—is dramatically more "controversial" than *Zauderer*'s pricing terms.

### 4.   Compelled Editorial Transparency Usually Is Not About Offer Terms

*Zauderer* pertained to disclosures "about the terms under which [the attorney's] services will be available."[90] This requirement makes sense in the advertising context, where advertisers describe their offerings to consumers. However, the phrase is incoherent when delinked from advertisements.[91] If "offer terms" mean any detail about a business, it becomes a non-factor.

Instead, this phrase should exclude disclosures that do not describe *offer terms*, even if they describe *the business*. For example, statistics about the publisher's editorial decisions might enumerate past operational decisions but are not considered "offer terms" because they are not promises about future operational choices. Similarly, disclosures about prevailing editorial policies are not "offer terms" because future editorial choices remain subject to the publisher's editorial discretion.

---

class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression").

88.     Port News Staff, *Assemblywoman Sillitti Passes Bill To Help Combat Hateful Content*, PORT WASH. NEWS (June 23, 2022), https://portwashington-news.com/assemblywoman-sillitti-passes-bill-to-help-combat-hateful-content [https://perma.cc/JP7Z-ZCC6] (emphasis added).

89.     For example, a video showing a murderer killing victims is almost certainly constitutionally protected speech. *E.g.*, United States v. Stevens, 559 U.S. 460, 481–42 (2010) (finding that a statute prohibiting animal crush videos was substantially overbroad in violation of the First Amendment).

90.     Zauderer v. Off. of Disciplinary Couns., 471 U.S. 626, 651 (1985).

91.     *Cf.* Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 138 S. Ct. 2361, 2372 (2018) (holding that *Zauderer* did not apply because the compelled disclosures referred to the offerings of other vendors, not the compelled entities).

5.    Summary of the *Zauderer* Test's Applicability

The *Zauderer* test was not designed to apply to compelled editorial transparency, so it is not surprising that these laws do not satisfy the *Zauderer* test preconditions. This structural mismatch makes it functionally impossible to draft a compelled editorial transparency law that warrants the relaxed *Zauderer* standard. Ideally, the Supreme Court will make this mismatch clear so regulators will stop invoking *Zauderer* to justify their censorship.

E.    *Many Compelled Editorial Transparency Laws Will Not Survive Relaxed Scrutiny*

In the counterfactual scenario where compelled editorial transparency laws qualify for *Zauderer*'s relaxed scrutiny, they should nevertheless typically fail to satisfy even that level of scrutiny. As a reminder, if the *Zauderer* test applies, the laws survive constitutional scrutiny only if the regulator shows[92] that the disclosures: (1) are not unjustified; (2) are not unduly burdensome; and (3) reasonably relate to preventing consumer deception.[93] Section II.E shows how those considerations should be evaluated.

1.    Compelled Editorial Transparency May Be Unjustified or Unduly Burdensome

The *Zauderer* test provides that compelled commercial disclosure laws will fail if they are "unjustified or unduly burdensome."[94] Like other parts of *Zauderer*, the Supreme Court has not defined either term. *NIFLA* discussed both factors together without distinguishing them.[95] Presumably, however, the two terms do not mean the same thing. For now, the "unjustified" factor remains poorly described and has little independent value.

"Unduly burdensome" is a standard phrase in constitutional interpretation.[96] The word "unduly" indicates that compelled disclosures can permissibly impose *some* burden—just not too much. So, when does a disclosure burden become undue?

In his *Zauderer* concurrence/dissent, Justice Brennan observed that "it is extremely burdensome—and in fact potentially misleading—to attempt to set forth a particular advertised 'rate' for personal injury cases."[97] That perspective makes sense for advertising materials, where space is at a premium. Detailed disclosures can prevent the advertiser's message from

---

92.    *Id.* at 2377 ("California has the burden to prove that the unlicensed notice is neither unjustified nor unduly burdensome.").

93.    *Zauderer*, 471 U.S. at 651.

94.    *Id.*

95.    *See NIFLA*, 138 S. Ct. at 2377–78.

96.    On January 22, 2023, I did a search in Westlaw's U.S. Supreme Court database for "undue burden" or "unduly burdensome" and got thirty-nine results.

97.    *Zauderer*, 471 U.S. at 661 n.5 (Brennan, J., concurring in part and dissenting in part).

reaching consumers and make the advertisement uneconomic to run.[98] Thus, the *NIFLA* majority indicated that it may be an undue burden if "a billboard for an unlicensed facility that says 'Choose Life' would have to surround that two-word statement with a twenty-nine-word statement from the government, in as many as thirteen different languages."[99]

These principles break down when disclosures are required outside of advertising materials because—as discussed above—the *Zauderer* test was not designed for that situation. When disclosure regulations burden constitutionally protected editorial decisions, that should qualify as a facially undue burden. Indeed, in *NIFLA*, speech burdens were an undue burden.[100]

Beyond their speech burden, compelled editorial transparency laws are routinely operationally burdensome. For example, publishers can never completely disclose their editorial policies because: (1) like contingency fee policies, UGC publishers' editorial policies are often extremely detailed, with many caveats, exceptions, and qualifications;[101] (2) complete disclosures of editorial policies risk revealing trade secrets or helping malefactors engage in abusive and unwanted activity; (3) UGC publishers constantly adopt new policies or exceptions—sometimes ad hoc—in response to evolving circumstances and priorities,[102] and updating the public disclosures with each new editorial judgment would be onerous; and (4) a snapshot of current policies can never completely anticipate all future editorial decisions.

Statistics disclosures are also extremely burdensome. First, services must build and maintain reporting systems that accurately reflect their constantly evolving editorial policies and practices. Second, when jurisdictions adopt heterogeneous statistics disclosure requirements, the publisher must maintain separate reporting systems. Third, regulators' demands may be overwhelming. For example, California requires statistical disclosures in 161 different categories:[103] If that is not considered unduly burdensome, then what is?

---

98.    *See NIFLA*, 138 S. Ct. at 2378 (observing how the required "notice drowns out the facility's own message" in its advertising).

99.    *Id.*

100.    *Id.* at 2377.

101.    For example, Facebook's "Community Standards" are (currently) broken into 24 categories, each with multiple subparts. *Facebook Community Standards*, META, https://transparenc y.fb.com/policies/community-standards [https://perma.cc/9VU9-7RK2].

102.    Stanford Cyber Policy Center, *Trust & Safety Research Conference*, YOUTUBE (Sept. 30, 2022), https://www.youtube.com/watch?v=TQyB9AnoWfg [https://perma.cc/4YAG-QX76] (comments of Del Harvey).

103.    Eric Goldman, *Will California Clone-and-Revise Some Terrible Ideas from Florida/Texas' Social Media Censorship Laws? (Analysis of CA AB587)*, TECH. & MKTG. L. BLOG (June 21, 2022), https://b log.ericgoldman.org/archives/2022/06/will-california-clone-and-revise-some-terrible-ideas-fr om-florida-texas-social-media-censorship-laws-analysis-of-ca-ab587.htm [https://perma.cc/Q6 ZK-UYMT].

In evaluating a disclosure's burden or justification, courts should also consider how the disclosures improve consumer decision-making.[104] For example, editorial policy disclosures cannot help consumers make better choices when they do not predict future editorial decisions. Statistics are even more unhelpful to consumers. Each publisher uses idiosyncratic classifications, making it impossible for consumers to compare statistics across publishers.[105] Changes to the publisher's definitions or policies prevent consumers from fairly comparing current disclosures with past disclosures.

Statistics that are not comparable could confuse or deceive consumers.[106] When compelled editorial transparency can counterproductively mislead consumers, it conflicts with *Zauderer*'s stated objective of "preventing deception of consumers"[107] and should render the disclosures unduly burdensome or unjustified.

Some UGC publishers voluntarily provide editorial transparency,[108] but non-identical regulatory demands may be unduly burdensome if the publishers must change their reporting systems or operations to comply. Furthermore, to satisfy the deceptive omissions factor, regulators must show that the voluntary disclosures contain deceptive omissions that the regulatory intervention would fix.[109]

### 2. Compelled Editorial Disclosures May Not Reasonably Relate to Consumer Deception

The *Zauderer* test requires that the disclosures reduce consumer deception.[110] As the *Zauderer* majority said, "an advertiser's rights are

---

104.  *See NIFLA*, 138 S. Ct. at 2377 (discussing that unhelpful disclosures may be unduly burdensome).

105.  For example, the California Consumer Privacy Act ("CCPA") requires privacy-related disclosures, but the data cannot be fairly compared between businesses. *See* Susannah Luthi, *'Functionally Useless': California Privacy Law's Big Reveal Falls Short*, POLITICO (Aug. 6, 2021, 4:07 PM), https://www.politico.com/states/california/story/2021/08/05/functionally-useless-califo rnia-privacy-laws-big-reveal-falls-short-1389429 [https://perma.cc/VZE3-M64M] ("[F]irms have published widely disparate figures that make it impossible to evaluate the law's effectiveness. . . . [C]ompanies may be taking totally different views of their new responsibilities. Some could be using different measures to track their compliance. Others are using nationwide numbers instead of California-specific ones."); *CCPA Disclosure Metrics: FAANGM (aka Big Tech) Edition*, DATAGRAIL (July 15, 2021), https://www.datagrail.io/blog/privacy-trends/ccpa-metrics-faangm [https://pe rma.cc/P2FH-NJ9Z].

106.  See the old adage about "lies, damn lies, and statistics." *Lies, Damned Lies, and Statistics,* WIKIPEDIA (Jan. 6, 2023), https://en.wikipedia.org/wiki/Lies,_damned_lies,_and_statistics [http s://perma.cc/38JJ-L5H2].

107.  Zauderer v. Off. of Disciplinary Couns., 471 U.S. 626, 651 (1985).

108.  Voluntary disclosures are encouraged by the Santa Clara Principles, guidance from UNESCO, and other efforts. *See* ANDREW PUDDEPHATT, UNESCO, LETTING THE SUN SHINE IN: TRANSPARENCY AND ACCOUNTABILITY IN THE DIGITAL AGE (2021), https://unesdoc.unesco.org/a rk:/48223/pf0000377231 [https://perma.cc/V79P-DC6G].

109.  *See infra* Section II.E.2.

110.  *See Zauderer*, 471 U.S. at 651.

adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."[111] The consumer deception factor has been an integral part of the *Zauderer* test since the beginning, and Justices have reinforced it over the years.[112] As the Court summarized in 2001, *Zauderer* permitted "a rule requiring that attorneys who advertised by their own choice and who referred to contingent fees should disclose that clients might be liable for costs" and "not[ed] that substantial numbers of potential clients might be misled by omission of the explanation."[113] Justice Thomas echoed this point in his *Milavetz* concurrence:

> [O]ur precedents make clear that regulations aimed at false or misleading advertisements are permissible only where "the particular advertising is inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive." Therefore, a disclosure requirement passes constitutional muster only to the extent that it is aimed at advertisements that, by their nature, possess these traits.[114]

Despite this clear and essential requirement, *NIFLA* did not reference the consumer deception factor when recapitulating the *Zauderer* test. Given that the *NIFLA* majority struck down one of the disclosure requirements based on the undue burden factor, the Court could skip the consumer deception factor without changing the outcome. It would be odd for the Supreme Court to strip this venerable and important factor from the *Zauderer* test *sub silento*, without discussing why it no longer applies. Because the only two cases that upheld disclosure regulations using the *Zauderer* test—*Zauderer* and *Milavetz*—required the consumer deception factor, this factor probably remains part of the *Zauderer* test.

Like other parts of *Zauderer*, the consumer deception factor makes sense with respect to advertising. Indeed, the factor functionally overlaps with standard false advertising doctrines about materially deceptive omissions.[115] The advertisers in *Zauderer* and *Milavetz* likely had to make the required

---

111.    *Id.*

112.    *E.g.*, Lowe v. Sec. & Exch. Comm'n, 472 U.S. 181, 225 (1985) (White, J., concurring) (noting *Zauderer*'s antifraud predicate that "there is no suggestion that the application of the antifraud provisions of the Act to require investment advisory publishers to disclose material facts would present serious First Amendment difficulties"); Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 491 (1997) (Souter, J., dissenting) ("*Zauderer* carries no authority for a mandate unrelated to the interest in avoiding misleading or incomplete commercial messages."). Justice Souter reinforced the concern about deceived consumers: "*Zauderer* thereby reaffirmed a longstanding preference for disclosure requirements over outright bans, as more narrowly tailored cures for the potential of commercial messages to mislead by saying too little." *Id.* at 490.

113.    United States v. United Foods, Inc., 533 U.S. 405, 416 (2001).

114.    Milavetz, Gallop, & Milavetz, P.A. v. United States, 559 U.S. 229, 257 (2010) (Thomas, J., concurring) (citations omitted).

115.    For more on deceptive omissions in advertising, see TUSHNET & GOLDMAN, *supra* note 18, ch. 6.

disclosures in their advertisements to avoid false advertising, even without a compelled disclosure law.[116]

Consistent with this false advertising origin, *Zauderer* reinforces legislatures' authority to require disclosures that redress deceptive advertising omissions to consumers.[117] However, *Zauderer* does not authorize legislatures to require disclosures when the discloser's silence is not otherwise actionable.[118] Regulators can always claim that compelled disclosures help consumers by providing them with more information.[119] Courts should require the regulators to show more than this—that the disclosure cures consumer "deception," not just generates more consumer information.[120] For example, there is no consumer deception when a publisher makes an unexplained editorial decision[121] or does not disclose details about operational activities.

Finally, compelled disclosures of editorial practices (in TOSes or elsewhere) will not cure consumer deception because consumers can never fully understand publishers' editorial standards.[122] The Constitution

---

116.    *See* Borgner v. Fla. Bd. of Dentistry, 537 U.S. 1080, 1080 (2002) (mem.) (Thomas, J., dissenting) ("[T]he advertisement in *Zauderer* was misleading as written.").

117.    Zauderer v. Off. of Disciplinary Couns., 471 U.S. 626, 651 (1985).

118.    *Cf.* Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 138 S. Ct. 2361, 2377 (2018) (finding that the State burdened speech by imposing "a government-scripted, speaker-based disclosure requirement that is wholly disconnected from California's informational interest").

119.    *See* Alexis Mason, Comment, *Compelled Commercial Disclosures:* Zauderer's *Application to Non-Misleading Commercial Speech*, 72 U. MIAMI L. REV. 1193, 1200 (2018) ("[A]pplying rational basis to such large swaths of disclosures may lead to compelling too much information, compelling the wrong kind of information, or bolstering the government's ideological beliefs because there will always be a legitimate government interest to compel, i.e. the consumer 'right to know.'").

120.    Indeed, *NIFLA* struck down one of the required disclosures because the State had not made a non-hypothetical justification for consumers' need for the information. *NIFLA*, 138 S. Ct. at 2377.

121.    For example, law journals routinely reject submissions without explanations. *See* Noah C. Chauvin, Essay, *The Banality of Law Journal Rejections*, 106 MINN. L. REV. HEADNOTES 18, 24–25 (2021); *We Asked Authors What They Think About Law Reviews' Article Selection Processes, Here's What They Had To Say*, SCHOLASTICA (Apr. 25, 2019), https://blog.scholasticahq.com/post/what-auth ors-think-about-law-review-article-selection [https://perma.cc/AZ5W-GPZH]; Elli Olson, *5 Reasons Your Law Review Should be Sending Rejections*, SCHOLASTICA (Mar. 29, 2016), https://blog.sc holasticahq.com/post/5-reasons-your-law-review-should-be-sending-rejections [https://perma.c c/QY66-JEPF] ("[M]any journals still fail to notify authors of article rejections.").

122.    Also, publishers' marketing descriptions of their editorial standards are often puffery and thus incapable of consumer deception. Examples include: the *Wall Street Journal*'s tagline "The Daily Diary of the American Dream," the *New York Times*' tagline "All the News That's Fit to Print," W. Joseph Campbell, *Story of the Most Famous Seven Words in Journalism*, BBC (Feb. 10, 2012), https://www.bbc.com/news/world-us-canada-16918787 [https://perma.cc/ADC2-Z7FN], the *Washington Post*'s tagline "Democracy Dies in the Darkness," *'Democracy Dies in Darkness,'* WASH. POST (Feb. 3, 2019), https://www.washingtonpost.com/graphics/2019/national/democracy-dies-in-darkness [https://perma.cc/P8UP-6ERS], and Fox News' "fair and balanced" slogan, Michael M. Grynbaum, *Fox News Drops 'Fair and Balanced' Motto*, N.Y. TIMES (June 14, 2017), https://www.nytimes.com/2017/06/14/business/media/fox-news-fair-and-balanced.html [htt

guarantees publishers' freedom to exercise editorial discretion as they see fit, and UGC publishers can easily reinforce this discretion contractually.

CONCLUSION

In *Milavetz*, Justice Thomas questioned *Zauderer*'s legacy:

> I am skeptical of the premise on which *Zauderer* rests—that, in the commercial-speech context, "the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed[.]" . . . I would be willing to reexamine *Zauderer* and its progeny in an appropriate case to determine whether these precedents provide sufficient First Amendment protection against government-mandated disclosures.[123]

The Supreme Court could reexamine *Zauderer* in a challenge to a compelled editorial transparency law, but it does not have to do so. Instead, the Court can sidestep this question because compelled editorial transparency laws do not qualify for the test's prerequisites.

Either way, the Court's interpretation of *Zauderer* will shape the future of UGC. If compelled editorial transparency laws qualify for *Zauderer*'s relaxed constitutional scrutiny, a regulatory frenzy will follow, and regulators around the country will enthusiastically pursue censorship-via-transparency. Even if those compelled editorial transparency laws eventually fail the *Zauderer* test, the consequences for UGC will be dire. UGC publishers would be embroiled in lots of constitutional litigation, besieged by discovery requests (many censorially-minded), and endlessly updating their reporting systems to produce the desired information. UGC publishers would change their editorial decisions to mitigate these pressures.

Thus, the Internet is on the brink of a new era of pervasive and unrelenting censorship that will structurally reconfigure the Internet in unwanted ways. The Supreme Court can ensure that *Zauderer* does not fuel that censorship.

---

ps://perma.cc/N9TL-K2TL]. *See* Press Release, FTC, Statement of Federal Trade Commission Chairman Timothy J. Muris on the Complaint Filed Today by MoveOn.org (July 19, 2004), https://www.ftc.gov/news-events/news/press-releases/2004/07/statement-federal-trade-comm ission-chairman-timothy-j-muris-complaint-filed-today-moveonorg [https://perma.cc/5UQR-W X54] ("I am not aware of any instance in which the Federal Trade Commission has investigated the slogan of a news organization. There is no way to evaluate [Fox News' 'fair and balanced' slogan] without evaluating the content of the news at issue. That is a task the First Amendment leaves to the American people, not a government agency.").

   123.   Milavetz, Gallop, & Milavetz, P.A. v. United States, 559 U.S. 229, 255–56 (2010) (Thomas, J., concurring) (citations omitted).