1  Rob Bonta
   Attorney General of California
2  Anthony R. Hakl
   Supervising Deputy Attorney General
3  Anna Ferrari, SBN 261579
   Gabrielle D. Boutin, SBN 267308
4  Deputy Attorney General
    1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone:  (916) 210-6053
    Fax:  (916) 324-8835
7   E-mail:
    Gabrielle.Boutin@doj.ca.gov
8  *Attorneys for Defendant Attorney
   General Rob Bonta, in his official
9  capacity*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE EASTERN DISTRICT OF CALIFORNIA

12                   SACRAMENTO DIVISION

13

14

| | |
|---|---|
| **X CORP.,** | 2:23-CV-01939-WBS-AC |
| Plaintiff, | **DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, IN HIS OFFICIAL CAPACITY,** | Date:      November 13, 2023<br>Time:      1:30 p.m.<br>Dept:      5<br>Judge:     Hon. William B. Shubbbb |
| Defendant. | Trial Date:    None set<br>Action Filed: 9/08/2023 |

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

<strong>Page</strong>

Introduction ................................................... 1

AB 587's Terms of Service Report Requirements .................. 2

Argument ....................................................... 3

I.   AB 587's Terms of Service Report Requirements Are
     Subject to Zauderer Scrutiny ......................... 3

     A.   The Terms of Service Report Requirements
          Compel "Commercial Speech" ...................... 4

          1.   The determination of whether a
               communication is "commercial speech" is
               fact-driven. ............................... 4

          2.   In the compelled speech context,
               consumer product and service disclosures
               are treated as "commercial speech" for
               the purposes of applying Zauderer
               scrutiny ................................... 5

          3.   The terms of service report requirements
               compel "commercial speech" because they
               compel disclosures to consumers about
               the social media platform's commercial
               services. .................................. 8

          4.   The commercial speech in the terms of
               service reports is not "inextricably
               intertwined" with noncommercial speech .... 11

     B.   The Terms of Service Report Disclosures Are
          "Purely Factual and Uncontroversial" .......... 13

II.  Even If Zauderer Scrutiny Does Not Apply to the
     Terms of Service Report Requirements, Central
     Hudson Intermediate Scrutiny Applies ............... 15

III. The Terms of Service Report Requirements Are Not
     Subject Strict Scrutiny ............................ 16

     A.   Strict Scrutiny Does Not Apply to Content-
          Based Laws Compelling Commercial Speech ....... 16

     B.   The Terms of Service Report Requirements Are
          Viewpoint Neutral ............................. 18

     C.   The "Editorial Judgments" Theory Does Not
          Apply to the Terms of Service Report
          Requirements .................................. 20

     D.   The Terms of Service Report Requirements Are
          Not Analogous to the Challenged Laws in
          Plaintiff's "Speech About Speech" Cases ....... 23

i

**TABLE OF CONTENTS**
(continued)

Page

       E.    The Terms of Service Report Requirements Are
             Not Subject to Strict Scrutiny Based on
             Plaintiff's Unfounded Speculation That the
             Attorney General May Not Enforce AB 587
             Properly ..................................... 24

Conclusion ................................................. 25

ii

Defendant's Supp. Brief (2:23-CV-01939-WBS-AC)

1

**TABLE OF AUTHORITIES**

2

<u>Page</u>

3
Cᴀꜱᴇꜱ

4
*Alfasigma USA, Inc. v. First Databank, Inc.*
5
   398 F. Supp. 3d 578 (N.D. Cal. 2019)...................... 4, 5

6
*Am. Beverage Ass'n v. City and County of San Francisco*
   916 F.3d 749 (9th Cir. 2019).................................. 17

7
*Am. Fuel & Petrochem. Mfrs. v. O'Keefe*
8
   903 F.3d 903 (9th Cir. 2018).................................. 19

9
*Am. Hosp. Ass'n v. Azar*
   983 F.3d 528 (D.C. Cir. 2020)......................... 2, 9, 10
10

*Ariix, LLC v. NutriSearch Corp.*
11
   985 F.3d 1107 (9th Cir. 2021)........................... 4, 5, 9

12
*Bass v. Facebook, Inc.*
13
   394 F. Supp. 3d 1024 (N.D. Cal. 2019)........................ 9

14
*Bolger v. Youngs Drug Prod. Corp.*
   463 U.S. 60 (1983)..................................... *passim*
15

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of*
16
  *New York*
   447 U.S. 557 (1980)......................................... 16
17

*Chamber of Commerce of the United States of America v.*
18
  *S.E.C*
19
  No. 23-60255, 2023 WL 7147273 (5th Cir. Oct. 31,
   2023).................................................. 10, 11
20

*City of Austin, Texas v. Reagan Nat'l Advert. of*
21
  *Austin, LLC*
22
   596 U.S. 61 (2022)......................................... 17

*CTIA – The Wireless Association v. City of Berkeley,*
23
  *Cal.*
24
   928 F.3d 832, 843 (9th Cir. 2019)............... 6, 14, 15, 17

25
*Entertainment Software Ass'n v. Blagojevic*
   469 F.3d 641 (7th Cir. 2006)............................ 23, 24
26

*Env't Def. Ctr., Inc. v. U.S. E.P.A.*
27
   344 F.3d 832 (9th Cir. 2003)............................... 10

28

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v.*
  *Mayor & City Council of Baltimore*
  721 F.3d 264 (4th Cir. 2013)................................16

*Herbert v. Lando*
  441 U.S. 153 (1979).......................................21

*Hunt v. City of L.A.*
  638 F.3d 703 (9th Cir. 2011)...............................5

*Inst. v. U.S. Dep't of Agric.*
  760 F.3d 18 (D.C. Cir. 2014)...............................7

*Interpipe Contracting, Inc. v. Becerra*
  898 F.3d 879 (9th Cir. 2018)..............................19

*Jordan v. Jewel Food Stores, Inc.*
  743 F.3d 509 (7th Cir. 2014)............................4, 5

*King v. Facebook, Inc.*
  572 F.Supp.3d 776 (2021)...................................9

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*
  941 F.2d 970 (9th Cir. 1991)...............................2

*Miami Herald Pub. Co. v. Tornillo*
  418 U.S. 241 (1974).......................................21

*Motion Picture Ass'n of Am. v. Specter*
  315 F.Supp. 824 (E.D. Penn. 1970)......................23, 24

*Nat'l Ass'n of Wheat Growers v. Becerra*
  468 F. Supp. 3d 1247 (E.D. Cal. 2020)......................15

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
  272 F.3d 104 (2d Cir. 2001)................................6

*Nat'l Wheat Growers Assn. v. Bonta*
  --- F.4th ---, No. 20-16753, 2023 WL 7314307 (9th
  Cir. Nov. 7, 2023), ..................................*passim*

*National Institute of Family and Life Advocates v.*
  *Becerra*
  138 S.Ct. 2361 (2018).................................6, 16

**TABLE OF AUTHORITIES**
(continued)

Page

*Nationwide Biweekly Admin. v. Owen*
   873 F.3d 716 (9th Cir. 2017)............................. 3, 16

*NetChoice, LLC v. Att'y Gen.*
   34 F.4th 1196 (11th Cir. 2022).................... 4, 7, 20, 21

*NetChoice, LLC v. Paxton*
   49 F.4th 439 (5th Cir. 2022)...................... 4, 7, 21, 22

*Orantes-Hernandez v. Thornburgh*
   919 F.2d 549 (9th Cir. 1990)................................. 2

*PruneYard Shopping Ctr. v. Robins*
   447 U.S. 74 (1980) ......................................... 21

*Reed v. Town of Gilbert, Ariz.*
   576 U.S. 155 (2015)........................................ 17

*Resort, Inc. v. Herrera*
   860 F.3d 1263 (9th Cir. 2017)......................... 5, 7, 18

*S.E.C. v. AT&T, Inc.*
   626 F. Supp. 3d 703 (S.D.N.Y. 2022)........................ 17

*Smith v. People of the State of California*
   361 U.S. 147 (1959)........................................ 23

*United States v. Philip Morris*
   855 F.3d 321 (D.C. Cir. 2017).............................. 10

*Swift v. Zynga Game Network, Inc.*
   805 F. Supp. 2d 904 (N.D. Cal. 2011)........................ 9

*United States v. Swisher*
   811 F.3d 299 (9th Cir. 2016)............................... 16

*United States v. United Foods, Inc.*
   533 U.S. 405 (2001)......................................... 6

*Volokh v. James*
   No. 22-CV-10195 (ALC), 2023 WL 1991435 (S.D.N.Y.
   Feb. 14, 2023)................................... 7, 8, 18, 19

*Washington Post v. McManus*
   944 F. 3d 506 (4th Cir. 2019).......................... 22, 23

v

Defendant's Supp. Brief (2:23-CV-01939-WBS-AC)

**TABLE OF AUTHORITIES**
(continued)

Page

*Zauderer v. Office of Disciplinary Counsel*
    471 U.S. 626 (1985)..................................... *passim*

STATUTES

United States Code, Title 42,
    Section 300gg-18......................................... 10

California Business & Professions Code
    § 22676............................................. 1, 12
    § 22676(a)(5)........................................... 3
    § 22676(c)........................................... 3, 8
    § 22677.......................................... 1, 2, 12
    § 22677(a)............................................. 8
    § 22677(a)(1)........................................... 3
    § 22677(a)(2).......................................... 12
    § 22677(a)(3)........................................ 3, 13
    § 22677(a)(4)........................................... 3
    § 22677(a)(4)(A)........................................ 3
    § 22677(a)(5).......................................... 12
    § 22677(a)(5)(A)................................... 13, 14
    § 22677(a)(5)(B)(1).................................... 13
    § 22677(a)-(b).......................................... 2
    § 22678............................................... 25

CONSTITUTIONAL PROVISIONS

First Amendment ...................................... *passim*

OTHER AUTHORITIES

Brief of Respondent Securities and Exchange Commission
    at 1, *Chamber of Commerce of the United States of
    America v. S.E.C.*, 2023 WL 5274579 (5th Cir. Aug. 9,
    2023) ................................................. 11

# TABLE OF AUTHORITIES
## (continued)

**Page**

Medicare Program; Hospital Inpatient Prospective
   Payment Systems for Acute Care Hospitals and the
   Long-Term Care Hospital Prospective Payment System
   and Policy Changes and Fiscal Year 2019 Rates;
   Quality Reporting Requirements for Specific
   Providers; Medicare and Medicaid Electronic Health
   Record (EHR) Incentive Programs (Promoting
   Interoperability Programs) Requirements for Eligible
   Hospitals, Critical Access Hospitals, and Eligible
   Professionals; Medicare Cost Reporting Requirements;
   and Physician Certification and Recertification of
   Claims, 83 FR 41144-01, 41686 (Aug. 17, 2018)................ 10

Purchases of equity securities by the issuer and
   affiliated purchasers, 17 C.F.R. § 229.703 (2023)........... 11

X Terms of Service, https://twitter.com/en/tos (last
   visited Nov. 20, 2023)....................................... 9

vii

Defendant's Supp. Brief (2:23-CV-01939-WBS-AC)

1

**INTRODUCTION**

AB 587 requires Plaintiff and other large social media platforms to make factual disclosures in two forms: 1) by posting the platform's terms of service for users (Cal. Bus. & Prof. Code § 22676), and 2) by submitting to the Attorney General, for public posting, a bi-annual "terms of service report" (*id.* § 22677).  Under AB 587, the terms of service report is to include certain types of information about the platform's terms of service and content moderation practices.  *Id.*  At the November 13, 2023 hearing on Plaintiff's motion for preliminary injunction, the Court asked the parties to submit supplemental briefs that address the proper standard of review for determining if the required disclosures in the terms of service report violate the First Amendment.  Defendant respectfully submits this supplemental brief in response to that request.

The answer to the Court's query is that *Zauderer* scrutiny applies to the required disclosures in the terms of service report.  *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).  *Zauderer* scrutiny applies to laws compelling (1) commercial speech, (2) that is "purely factual and uncontroversial."  *Nat'l Wheat Growers Assn. v. Bonta*, ---F.4th---, No. 20-16753, 2023 WL 7314307 (9th Cir. Nov. 7, 2023), at *10. ("*Nat'l Wheat*").

Here, the terms of service report requirements compel commercial speech because they compel businesses (social media companies) to make factual disclosures to consumers about their services (their online platforms).  In these circumstances, courts generally do not apply the *Bolger* factors or the test for

1

1   whether the communication "does not more than propose a

2   transaction."  Nor is *Zauderer* scrutiny "limited to restrictions

3   on advertising and point-of-sale labeling."  *Am. Hosp. Ass'n v.*

4   *Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020).

5       The information in required in terms of service reports is

6   "purely factual," because it consists only of facts about a

7   social media company's voluntary, existing terms of service and

8   its actual content moderation conduct.  The information is

9   "uncontroversial" under establish Ninth Circuit precedent,

10  because it relates only to a company's own services and does not

11  require a company to take any position fundamentally at odds with

12  its mission.  For these reasons, AB 587's terms of service report

13  requirements are subject to *Zauderer* scrutiny.

14          **AB 587'S TERMS OF SERVICE REPORT REQUIREMENTS**[1]

15      AB 587 provides that, commencing January 1, 2024, social

16  media companies subject to the law must submit to the Attorney

17  General a semiannual "terms of service report" containing

18  specified factual information.  Cal. Bus. & Prof. Code

19  § 22677(a)-(b).

20      The reports must include the "current version of the

21  platform's terms of service" and a "detailed description of

22  _____

23      [1] This brief refers to the report "requirements" because the
    various requirements are set forth in separate provisions of
24  California Business and Professions Code section 22677 and are
    severable.  Thus, even if this Court were to find that one
25  subdivision of section 22677 is likely unconstitutional, it
    should not preliminarily enjoin any other requirements of the
26  statute.  *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558
    (9th Cir. 1990) ("an injunction must be narrowly tailored to give
27  only the relief to which plaintiffs are entitled"); *see also*
    *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th
28  Cir. 1991) (an injunction "must be tailored to remedy the
    specific harm alleged").

2

content moderation practices used by the social media company …."
*Id.* § 22677(a)(1), (a)(4).  The reports must also include a
statement of simply "whether" the current version of the terms of
service define several categories of content enumerated in the
statute and, if so, the definitions of those categories, and "any
existing policies intended to address the categories." *Id.*
§ 22677(a)(3), (a)(4)(A).  The reports must also include
specified "information on content that was flagged by the social
media company as content belonging to any of the [enumerated]
categories." *Id.* § 22676(a)(5).

AB 587 does not direct the Attorney General to take any
action in response to submitted reports other than to "make all
terms of service reports submitted pursuant to this section
available to the public in a searchable repository on its
official internet website." *Id.* § 22676(c).

**ARGUMENT**

**I.   AB 587'S TERMS OF SERVICE REPORT REQUIREMENTS ARE SUBJECT TO *ZAUDERER*
SCRUTINY**

*Zauderer* scrutiny applies to laws compelling commercial
speech that is "purely factual and uncontroversial." *Nat'l Wheat
Growers Assn. v. Bonta* --- F.4th ---, No. 20-16753, 2023 WL
7314307 (9th Cir. Nov. 7, 2023), at *10. ("*Nat'l Wheat*").
*Zauderer* and its progeny reflect the unexceptional principle that
"[t]he First Amendment does not generally protect corporations
from being required to tell prospective customers the truth."
*Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721 (9th Cir.
2017).

1    *Zauderer* scrutiny applies to the terms of service report

2    requirements because, as explained below, the compelled speech is

3    "commercial" and "purely factual and uncontroversial

4    information."  *Nat'l Wheat*, 2023 WL 7314307, at \*10; *see also*

5    *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1230 (11th Cir.

6    2022), *cert. granted in part sub. nom. Moody v. NetChoice*, ---

7    S.Ct. ----, 2023 WL 6319654 ("*NetChoice (Fla.)*") (applying

8    *Zauderer* scrutiny to compelled disclosures regarding platforms'

9    terms of service and related information; *NetChoice, LLC v.*

10   *Paxton*, 49 F.4th 439, 485 (5th Cir. 2022), *cert. granted in part*,

11   --- S.Ct. ----, 2023 WL 6319650 ("*NetChoice (Tex.)*") (applying

12   *Zauderer* scrutiny to compelled disclosures regarding information

13   on platforms' terms of service and content moderation practices).

14       **A.  The Terms of Service Report Requirements Compel**
15          **"Commercial Speech"**

16         **1.  The determination of whether a communication is**
               **"commercial speech" is fact-driven.**

17   Courts are "loath to identify a strict test" for commercial

18   speech.  *Alfasigma USA, Inc. v. First Databank, Inc.*, 398 F.

19   Supp. 3d 578, 586 (N.D. Cal. 2019).  "Commercial speech is

20   'usually defined as speech that does no more than propose a

21   commercial transaction.'"  *Ariix, LLC v. NutriSearch Corp.*, 985

22   F.3d 1107, 1115 (9th Cir. 2021) (quoting *United States v. United*

23   *Foods, Inc.*, 533 U.S. 405, 409 (2001)).  However this definition

24   defines only the "core notion" of commercial speech – other

25   communications may also constitute commercial speech.  *Jordan v.*

26   *Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014)

27   (quoting *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66

28   (1983)).  Courts therefore view this definition as "just a

4

starting point" of the commercial speech analysis. *Id.*; *accord Ariix*, 985 F.3d at 1115. The full analysis "is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (internal quotation marks omitted); *accord Ariix*, 985 F.3d at 1115.

"Because of the difficulty of drawing clear lines between commercial and non-commercial speech, the Supreme Court in *Bolger* outlined three factors to consider." *Ariix*, 985 F.3d at 1115; *see Bolger*, 463 U.S. at 66-67. These are whether [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger*, 463 U.S. at 66-67). "These so-called *Bolger* factors are important guideposts, but they are not dispositive." *Ariix*, 985 F.3d at 1116.

> **2. In the compelled speech context, consumer product and service disclosures are treated as "commercial speech" for the purposes of applying *Zauderer* scrutiny**

If a law compels a business to make consumer disclosures regarding a product or service, courts generally treat this as sufficient to meet *Zauderer*'s commercial speech requirement. In these cases, courts do not strictly apply the *Bolger* factors or the "do no more than propose a commercial transaction" test, and often do not apply them at all. This is logical because, while businesses' government-compelled product or service disclosures to consumers are commercial in nature, they do not "propose a

5

1    commercial transaction" (*United States v. United Foods, Inc.*, 533

2    U.S. 405, 409 (2001)), they often do not appear in advertisements

3    (*see Bolger*, 463 U.S. at 66-67), and the businesses certainly do

4    not have an economic motivation to make them (*see id.*).

5         The cases below illustrate this rule.

6         In *National Inst. of Family and Life Advocates v. Becerra*,

7    the Supreme Court considered a California law requiring licensed

8    pregnancy-related clinics to disclose information about certain

9    state-sponsored medical services, including abortion.  138 S.Ct.

10   2361, 2369-70.  The Court applied *Zauderer* scrutiny to the law

11   without considering whether or not the speech it compelled was

12   commercial.  *See id.* at 2372.

13        In *CTIA - The Wireless Association v. City of Berkeley,*

14   *Cal.*, a city ordinance required cell phone retailers to provide a

15   notice to customers about cell phone radiation.  928 F.3d 832,

16   843 (9th Cir. 2019).  The Ninth Circuit applied *Zauderer* scrutiny

17   since the parties agreed that the compelled speech was commercial

18   and the court did not disagree.  *Id.* at 841-42; *see also Nat'l*

19   *Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001)

20   (applying *Zauderer* scrutiny where plantiff did not dispute that

21   labeling requirement for mercury-containing products involved

22   commercial speech and court did not disagree).

23        In *Nat'l Assn. of Wheat Growers v. Bonta*, the Ninth Circuit

24   considered a challenge to California's Proposition 65 requirement

25   that businesses provide a "clear and reasonable warning" to

26   persons exposed to a particular chemical.  --- F.4th. --- (9th

27   Cir. Nov. 7, 2023), 2023 WL 7314307 at *2.  Again, the Ninth

28   Circuit applied *Zauderer* scrutiny to the State's proposed warning

language without any explicit consideration of whether the law compelled commercial speech. *Id.* at *10-15; *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 21 (D.C. Cir. 2014) (proceeding directly to *Zauderer* scrutiny of law requiring country-of-origin labeling for meat products without explicit consideration of whether law compelled commercial speech).

Finally, in *NetChoice (Fla.)* and *NetChoice (Tex.)*, like here, the circuit courts considered state laws requiring social media platforms to make certain disclosures regarding content moderation policies and practices. *NetChoice (Fla.)*, 34 F.4th at 1206-07; *NetChoice (Tex.)*, 49 F.4th at 445-46. In both cases, the circuit courts applied *Zauderer* scrutiny to the disclosure laws without discussing whether the compelled speech was "commercial." *NetChoice (Fla.)*, 34 F.4th at 1230; *NetChoice (Tex.)*, 49 F.4th at 485.

In contrast with the cases above, Plaintiff has cited no Supreme Court or Ninth Circuit case—and Defendant is aware of none—in which a court has invalidated a consumer product or service disclosure law because the law did not "propose a commercial transaction" or satisfy the *Bolger* factors. At the hearing on this motion, Plaintiff did cite the Southern District of New York case of *Volokh v. James*, No. 22-CV-10195 (ALC), 2023 WL 1991435, at *7 (S.D.N.Y. Feb. 14, 2023). There, the challenged law required social media platforms to both have and disclose a policy regarding hate speech. *Id.* at 2. Although the court concluded that the compelled speech was not commercial, it did not engage in a "fact-driven" analysis (*First Resort, Inc.*, 860 F.3d at 1272) or even apply the *Bolger* factors. *Volokh* at

7

1  *7.  As the other cases above indicate, the mode of analysis and

2  conclusion in *Volokh* is out of step with Ninth Circuit

3  authorities and, in any event, not binding here.

4

5         **3.  The terms of service report requirements compel "commercial speech" because they compel disclosures to consumers about the social media platform's commercial services.**

6

7      AB 587's terms of service report requirements compel the

8  same type of product or service disclosure to consumers that

9  courts subject to *Zauderer* scrutiny as commercial speech.  The

10  terms of service reports disclose the social media platform's

11  terms of service, information on the platform's content

12  moderation practices, and, in some cases, high-level statistics

13  about categories of content that the company actually flagged as

14  violating their terms of service.  Cal. Bus. & Prof. Code

15  §22677(a).  AB 587 requires that the Attorney General must "make

16  all terms of service reports submitted pursuant to this section

17  available to the public in a searchable repository on its

18  official internet website." *Id.* § 22676(c).  In other words, the

19  terms of service reports require businesses (large social media

20  platforms) to disclose facts about how their own commercial

21

22

23

24

25

26

27

28

*services* function.[2]   And, the reports are then made available, in full, to the public that uses these services.   Under case law precedent, the terms of service reports are precisely the type of compelled consumer disclosure that constitutes commercial speech.

It is immaterial to the commercial speech analysis that AB 587 requires platforms to transmit the terms of service reports to the Attorney General rather than directly to individual platform users.   The purpose of requiring disclosure to the Attorney General in the first instance is so the Attorney General can compile the reports and make the information searchable and widely available to the public.   Moreover, case law supports the application of *Zauderer* scrutiny where compelled disclosures are made to the public or to the government, instead of directly to a specific individual at the point of sale.   *See Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (*Zauderer* scrutiny is "not limited to restrictions on advertising and point-of-sale labeling"); *see also Ariix*, 985 F.3d at 1116 (a publication that is "not in a traditional advertising format but that still refers to a specific product" can be commercial speech).

_____

[2] Plaintiff's terms of service expressly state that they are part of a "legally binding contract" between X Corp. and its users. *See* X Terms of Service, https://twitter.com/en/tos (last visited Nov. 20, 2023).   And, in cases between users and online platforms, the terms of service have been treated as enforceable contracts.   *See, e.g., Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 913 (N.D. Cal. 2011) (ruling that user's assent to arbitration clause in platform's terms of service was binding) *See King v. Facebook, Inc.*, 572 F.Supp.3d 776, 790 (2021) (ruling that Facebook user had stated a cognizable claim for breach of contract claim based on Facebook's terms of service); *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1038 (N.D. Cal. 2019) (ruling that limitation-of-liability provision in terms of service precluded user's breach of contract claims against Facebook).

9

For example, courts have applied *Zauderer* to laws compelling companies to post their product or service disclosures on the internet, even though they did not provide their products or services primarily over the internet.  *See, e.g., Am. Hosp. Ass'n*, 983 F.3d at 540-41 (applying *Zauderer* to 42 U.S.C. § 300gg-18(e), which requires hospitals to post on the internet a list of their standard prices for offered services)[3]; *United States v. Philip Morris*, 855 F.3d 321, 323, 327-28 (D.C. Cir. 2017) (applying *Zauderer* to compelled statements regarding smoking and health matters on tobacco company's website).  In *Env't Def. Ctr., Inc. v. U.S. E.P.A.*, the Ninth Circuit invoked *Zauderer* while rejecting a First Amendment challenge to a law that generally required municipalities to "distribute educational materials" and "inform" the public regarding storm water sewer hazards.  344 F.3d 832, 848-50 (9th Cir. 2003).  And, in *Chamber of Com. of United States v. United States Sec. & Exch. Comm'n*, the court applied *Zauderer* to a regulation that required companies that repurchased their own shares to submit a report to the Securities and Exchange Commission explaining the rationale for the repurchase.  No. 23-60255, 2023 WL 7147273, at *3 (5th

---

[3] Section 300gg-18(e) requires hospitals to make the lists "public" as required by federal regulation.  42 U.S.C. § 300gg-18.  Federal regulation requires hospitals to make the list public by posting them on the internet.  *See* Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Policy Changes and Fiscal Year 2019 Rates; Quality Reporting Requirements for Specific Providers; Medicare and Medicaid Electronic Health Record (EHR) Incentive Programs (Promoting Interoperability Programs) Requirements for Eligible Hospitals, Critical Access Hospitals, and Eligible Professionals; Medicare Cost Reporting Requirements; and Physician Certification and Recertification of Claims, 83 FR 41144-01, 41686 (Aug. 17, 2018).

1   Cir. Oct. 31, 2023).[4]

2       The terms of service reports therefore fit comfortably in a

3   long line of cases treating product or service disclosures, made

4   directly or indirectly to consumers, as commercial speech subject

5   to *Zauderer* scrutiny.

6           **4.   The commercial speech in the terms of service
               reports is not "inextricably intertwined" with

7              noncommercial speech**

8       Plaintiff argues that the terms of service reports

9   requirements are subject to strict scrutiny, because even if the

10  compelled disclosures are commercial speech, they are

11  "inextricably intertwined" with noncommercial speech.  Mtn. at

12  56, n.12.  However, "advertising which 'links a product to a

13  current public debate' is not thereby entitled to the

14  constitutional protection afforded noncommercial speech."

15  *Bolger*, 463 U.S. at 68 (quoting *Central Hudson*, 447 U.S. at 563,

16  n.5).

17      Here, the terms of service report requirements compel only

18  commercial disclosures about Plaintiff's commercial service.  The

19  requirements do not compel any political message.  Plaintiff

20  argues that "the topics on which AB 587 forces X Corp. to take a

21  position are core political speech."  Mtn. at 64, n.12.  However,

22  Plaintiff fails to identify how any provision of the terms of

23  service report requirements (or any part of AB 587) forces

24  Plaintiff to take a position on any political topic.  Plaintiff

25  is only required to disclose its own definitions of content

26      ⸻⸻⸻⸻⸻
           [4] *See also* Brief of Respondent Securities and Exchange

27  Commission at 1, *Chamber of Commerce of the United States of
    America v. S.E.C.*, 2023 WL 5274579 (5th Cir. Aug. 9, 2023)
    (summarizing the S.E.C. rule); Purchases of equity securities by

28  the issuer and affiliated purchasers, 17 C.F.R. § 229.703 (2023).

1   categories that Plaintiff has already voluntarily elected to

2   publicly define in its terms of service.  Cal. Bus. & Prof. Code

3   § 22677(a)(2) (requiring a "statement of *whether* the current

4   version of the terms of service defines each of the following

5   categories of content and, *if so*, the definitions of those

6   categories" (emphasis added)).  The statute's provision requiring

7   "[i]nformation on content that was flagged by the social media

8   company as content belonging to any of the categories" also does

9   not force Plaintiff to take a position on any political topic.

10  It merely requires Plaintiff to report statistics about actions

11  it has taken based on its own policies.  *Id.* § 22677(a)(5).

12      Plaintiff has also argued that the terms of service report

13  requirements compel Plaintiff to "convey information about issues

14  of public concern — namely, how X Corp. moderates controversial

15  content on its social media platform."  Reply Br., ECF No. 25, at

16  11-12.  Even if this were so, it means that the disclosures only

17  "link[] [Plaintiff's] product to a current debate" regarding how

18  social media platforms moderate content.  *Bolger*, 463 U.S. at 68.

19  This mere link does not confer the disclosures with the

20  constitutional protection afforded noncommercial speech.  *Id.*

21      The terms of service report disclosures are commercial speech

22  only, and are not "inextricably intertwined" with noncommercial

23  speech.[5]

24

25  _____

26      [5] Plaintiff also asserts that information on "how it
    applies" definitions of controversial categories "in specific
    cases" carries a political message.  Reply, ECF No. 25, at 16.
27  However, AB 587 does not require the disclosure of any
    information related to particular posts.  *See* Cal Bus. & Prof.
28  Code §§ 22676, 22677.

1    **B.  The Terms of Service Report Disclosures Are "Purely
         Factual and Uncontroversial"**

2

3         AB 587's terms of service report requirements are also

4    subject to *Zauderer* scrutiny because they compel only speech that

5    is "purely factual and uncontroversial." *Nat'l Wheat*, No. 20-

6    16753, at *10.

7         In Plaintiff's motion, the only terms of service report

8    requirements that it argues are not purely factual and

9    uncontroversial are those related to the statute's specified

10   categories of content

11   ("disinformation," "hate speech," etc.).  See Mtn. at 65-67; *see*

12   Cal. Bus. & Prof. Code §§ 22677(a)(3), (5)(B)(1).  But those

13   provisions require the disclosure of purely factual information;

14   they merely require companies to disclose <u>whether</u> their terms of

15   service "define" specified categories of content (and what those

16   definitions are) (*id.* § 22677(a)(3)) and "[i]nformation on

17   content that was flagged by the social media company <u>as</u> content

18   belonging to any of" those categories (*id.* § 22677(a)(5)(A)

19   (emphasis added).[6]  This is purely factual information about the

20   company's actual policies and actual conduct, whose accuracy is

21   not subject to reasonable dispute.  If a social media company's

22   _____

23        [6] Plaintiff suggested at the hearing that compliance with
     section 22677(a)(5)(A) may require Plaintiff to exercise
     subjective judgments because the statute's content categories may
24   overlap with the categories that Plaintiff actually utilizes.
     However, section 22677(a)(5)(A) does not require Plaintiff to
25   report statistical information about flagged content that merely
     might fall into one of the statute's categories.  It only
26   requires information about content that Plaintiff actually
     flagged "<u>as</u>" content belonging in the statutory categories.  In
27   other words, the disclosure relates to Plaintiff's factual prior
     conduct of identifying (and flagging) content as belonging to the
28   categories.

13

1   terms of service do not define the categories listed in AB 587 in

2   its terms of service, its report to the Attorney General would

3   simply disclose that fact.  Likewise, if a social media company

4   does not moderate—or "flag"—according to those categories, it

5   will have no numerical data on that subject to include its

6   report.  *See id*.

7       The category-related terms of service report requirements are

8   also uncontroversial.  For the purposes of determining whether to

9   apply *Zauderer* scrutiny, the Ninth Circuit has defined

10  "uncontroversial" to mean that the compelled speech: (1)

11  "relate[s] to the product or service that is provided by an

12  entity subject to the requirement"; and, (2) does not force the

13  speaker to "convey a message fundamentally at odds with its

14  mission."  *CTIA*, 928 F.3d at 845; *accord Nat'l Wheat*, No. 20-

15  16753, at *12.  If these requirements are met, a disclosure is

16  "uncontroversial" even if it "can be tied in some way to a

17  controversial issue," and even if the disclosure may be used by

18  others to support arguments "in a heated political controversy."

19  *CTIA*, 928 F.3d at 845.[7]

20      The speech compelled by the statute's category-related

21  provisions meet both prongs of this test.  The speech relates to

22  ─────────

    [7] In *Nat'l Wheat,* the Ninth Circuit added that "an objective
23  evaluation of 'controversy' is also an important consideration."
    *Nat'l Wheat*, No. 20-16753, at *12.  However, the brief subsequent
24  discussion indicates that the court was referring to whether
    there is actually controversy about the factual accuracy of the
25  speech.  *Id.*  Here, the terms of service report requirements only
    require social media platforms to disclose accurate facts about
26  their actual, existing content moderation policies and practices.
    Even if the Court also meant that courts should evaluate whether
27  there is actually a public controversy over the speech's subject
    matter, the Court did not suggest that this alone would be
28  sufficient to establish that the speech was "controversial"  and
    not subject to *Zauderer*.

    14

1    Plaintiff's own product or services, because it provides

2    information about how Plaintiff's own social media platform

3    works.  The provisions also do not force Plaintiff to "convey a

4    message fundamentally at odds with its mission." *Id*.  To the

5    contrary, the provisions simply require the disclosure of

6    information regarding Plaintiff's own choices about how its

7    commercial service should function. It is hard to imagine how

8    such information might be inconsistent with Plaintiff's own

9    mission.  Surely Plaintiff is not arguing that its voluntary

10   business choices are fundamentally at odds with its own mission.

11        The terms of service report requirements are subject to

12   *Zauderer* scrutiny because they compel only commercial speech that

13   is "purely factual and uncontroversial." *Nat'l Wheat*, No. 20-

14   16753, at *10.

15

16   **II.  EVEN IF *ZAUDERER* SCRUTINY DOES NOT APPLY TO THE TERMS OF SERVICE REPORT REQUIREMENTS, *CENTRAL HUDSON* INTERMEDIATE SCRUTINY APPLIES**

17        Even if AB 587's terms of service report requirements did not

18   qualify for *Zauderer* scrutiny, they would still be subject only

19   to the *Central Hudson* intermediate scrutiny test for commercial

20   speech.  Under circumstances similar to those here, the Ninth

21   Circuit and this Court already have concluded as much.  *See Nat'l*

22   *Wheat*, 2023 WL 7314307, at *10 (applying *Central Hudson* scrutiny

23   after concluding that the challenged disclosure requirements did

24   not compel purely factual and uncontroversial speech under

25   *Zauderer*); *see also Nat'l Ass'n of Wheat Growers v. Becerra*, 468

26   F. Supp. 3d 1247, 1258 (E.D. Cal. 2020) (same) (citing *National*

27   *Institute of Family and Life Advocates v. Becerra*, 138 S.Ct.

28   2361, 2372 (2018) ("*NIFLA*") (internal quotation omitted)); *see*

15

1   *also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New*

2   *York*, 447 U.S. 557, 564 (1980).

3   **III.  THE TERMS OF SERVICE REPORT REQUIREMENTS ARE NOT SUBJECT STRICT**

4   **SCRUTINY**

**A.  Strict Scrutiny Does Not Apply to Content-Based Laws**

5   **Compelling Commercial Speech**

6       AB 587's terms of service report requirements require large

7   social media platforms to disclose specified types of factual

8   information.  Even if this renders the requirements "content-

9   based" to some degree, content-based restrictions are "not

10  necessarily subject to strict scrutiny." *United States v.*

11  *Swisher*, 811 F.3d 299, 313 (9th Cir. 2016).

12      Generally, some content-based speech regulations implicating

13  the First Amendment are subject to strict scrutiny.  However, as

14  the Supreme Court explained in *NIFLA*, *Zauderer* set forth an

15  exception to this rule for content-based regulations that compel

16  commercial speech.  *NIFLA*, 138 S. Ct. at 2365-66 (citing

17  *Zauderer*, 471 U.S. at 651).  Thus, content-based regulations that

18  qualify for *Zauderer* scrutiny are not subject to strict scrutiny.

19  *See id.*  The Ninth Circuit also has expressly concluded that

20  strict scrutiny does not apply to all content-based compelled

21  disclosures, and that an exception applies when *Zauderer* or

22  *Central Hudson* scrutiny is appropriate.  *See Nationwide Biweekly*

23  *Admin., Inc. v. Owen*, 873 F.3d 716, 732 (9th Cir. 2017).  Other

24  courts have reached the same conclusion.  *See, e.g., Greater*

25  *Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City*

26  *Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) ("While

27  the strict scrutiny standard generally applies to content-based

28  regulations, including compelled speech, less-demanding standards

16

apply where the speech at issue is commercial" (internal citation
omitted)); *S.E.C. v. AT&T, Inc.*, 626 F. Supp. 3d 703, 743
(S.D.N.Y. 2022) ("But defendants' suggestion that all content-
based regulations must satisfy strict scrutiny overlooks the
significant body of decisions involving laws and regulations
mandating affirmative disclosures of information").

     Indeed, regulations compelling speech are usually content-
based by definition, because they set forth some category of
information that must be spoken—and *Zauderer* scrutiny is applied
in those cases. *See, e.g., Zauderer*, 471 U.S. at 652 (attorney
advertisements required to disclose that clients may be
responsible for litigation costs); *CTIA*, 928 F.3d at 837-38 (cell
phone retailers required to inform prospective purchasers about
cell phone radiation); *Am. Beverage Ass'n v. City and County of
San Francisco*, 916 F.3d 749, 753 (9th Cir. 2019) (health warnings
required in advertisements for certain sugar-sweetened
beverages).

     Plaintiff, on the other hand, offers no authorities
supporting the argument that compelled commercial disclosure
requirements are subject to strict scrutiny merely because they
are "content-based." Although Plaintiff has cited *Reed* and *City
of Austin* for the proposition that all content-based regulations
are necessarily subject to strict scrutiny, those case involved
restricted speech not compelled speech. Mtn., ECF No. 20, at 56-
57; *see Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 159 (2015);
*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596
U.S. 61, 64-65 (2022).

1    Here the terms of service report requirements compel

2  commercial speech that is subject to *Zauderer* scrutiny (or, at

3  most, *Central Hudson* scrutiny), and are therefore not subject to

4  strict scrutiny merely because they may be content-based to some

5  degree.

6

7        **B.   The Terms of Service Report Requirements Are
               Viewpoint Neutral**

8    The terms of service report requirements are also not subject

9  to strict scrutiny as viewpoint discriminatory, because the

10 requirements are viewpoint neutral.  "A regulation engages in

11 viewpoint discrimination when it regulates speech 'based on 'the

12 specific motivating ideology or perspective of the speaker.' "

13 *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir.

14 2017) (quoting *Reed*, 576 U.S. at 168).

15   The terms of service report requirements are facially

16 viewpoint neutral.  Although the requirements direct companies to

17 provide certain types of information, the requirements do not

18 mandate that the disclosed information include any particular

19 message or substance.  In other words, the requirements do not

20 impose any terms of service or content regulation policies or

21 outcomes on any social media platform.  They merely require

22 companies to disclose the policies and practices that they have

23 actually and voluntarily put into place.

24   AB 587's terms of service report requirements in AB 587

25 therefore materially differ from the challenged law in *Volokh*,

26 2023 WL 1991435.  *See* Mtn. at 53.   There, the law required

27 platforms to implement hate speech policies which put plaintiffs

28 "in the incongruous position of stating that they promote an

18

1 explicit pro-free speech ethos, but also require[d] them to enact
2 a policy allowing users to complain about 'hateful conduct' as
3 defined by the state." *Id.* at *7.  The court concluded that the
4 compelled speech was therefore partly political in nature and
5 that strict scrutiny was therefore appropriate." *Id.*  In
6 contrast here, AB 587's terms of service report requirements
7 merely require Plaintiff to disclose factual information about
8 its own voluntary, existing content moderation policy practices.
9 The requirements do not require Plaintiff to adopt or communicate
10 anything else, much less promote a particular ethos.

11      Where, as here, a law is facially neutral, a court "will not
12 look beyond its text to investigate a possible viewpoint-
13 discriminatory motive." *Interpipe Contracting, Inc. v. Becerra*,
14 898 F.3d 879, 899 (9th Cir. 2018).  A court may only turn to the
15 legislative history and other extrinsic evidence of legislative
16 intent if the law includes "indicia of discriminatory motive."
17 *Id.*  The court here therefore need not, and should not, look
18 beyond AB 587's text to conclude that it is not viewpoint-
19 discriminatory.

20      Even if the Court were to consider legislative history,
21 however, it would reach the same conclusion.  Courts "assume that
22 the objectives articulated by the legislature are actual purposes
23 of the statute, unless an examination of the circumstances forces
24 [the courts] to conclude that they could not have been a goal of
25 the legislature." *Am. Fuel & Petrochem. Mfrs. v. O'Keefe*, 903
26 F.3d 903, 912 (9th Cir. 2018).  As the Legislature put it, AB 587
27 is, "[i]n essence . . . a transparency measure."  Boutin Dec.,
28 ECF No. 24-1, Ex. 2 at 4 (Assem. Judiciary Comm. Analysis).  The

1    Legislature's express purpose in enacting the bill was "to

2    increase transparency around what terms of service social media

3    companies are setting out and how it ensures those terms are

4    abided by.  The goal is to learn more about the methods of

5    content moderation and how successful they are."  *Id.*, Ex. 6 at

6    12 (Sen. Judiciary Comm. Analysis).   And, the Governor's press

7    release following enactment prominently referred to AB 587 in its

8    title as a "social media transparency bill."  *See* Mtn. at 69.

9         Plaintiff argues that the main purpose of AB 587 is to

10   pressure social media platforms to eliminate certain types of

11   speech on their platforms.  Mtn. at 55-56.  The Legislature was

12   aware that, by requiring greater transparency about platforms'

13   content-moderation rules and decisions, AB 587 may encourage—

14   *though not require*—social media companies to "become better

15   corporate citizens by doing more to eliminate hate speech and

16   disinformation" on their platforms.   Boutin Dec., Ex. 2 at 4

17   (Assem. Judiciary Comm. Analysis).   But any *public* pressure from

18   consumers that results from the factual disclosures does not

19   equate to discriminatory treatment by the *state* through AB 587.

20

21        **C.   The "Editorial Judgments" Theory Does Not Apply to
             the Terms of Service Report Requirements**

22        Plaintiff argues that the terms of service report

23   requirements are subject to strict scrutiny based on a theory

24   that the report interferes with Plaintiff's "editorial judgments

25   about content."  Mtn. at 46.  This argument is unavailing here,

26   just as it was in *NetChoice (Fla.)* and *NetChoice (Tex.)*, where

27   both the Fifth and Eleventh Circuits held that the challenged

28   disclosure statutes did not violate the First Amendment based on

1   the "editorial judgments" theory. *NetChoice (Fla.)*, 34 F.4th at

2   1233; *NetChoice (Tex.)*, 49 F.4th 487-88.  Indeed, none of

3   Plaintiffs' cited cases involve regulations compelling commercial

4   speech and none even consider whether *Zauderer* should apply.

5       *Herbert v. Lando* is a defamation case that merely says, in

6   dicta, that "[t]here is no law that subjects the editorial

7   process to private or official examination merely to satisfy

8   curiosity or to serve some general end such as the public

9   interest; and if there were, it would not survive constitutional

10  scrutiny as the First Amendment is presently construed."  441

11  U.S. 153, 174 (1979).  The Fifth Circuit explained in *NetChoice*

12  *(Tex.)* why *Herbert* is distinguishable from social media

13  transparency laws: "*Herbert* held that a defamation plaintiff

14  could obtain discovery into the editorial processes that

15  allegedly defamed him.  And in the course of so holding, the

16  Court rejected the editor's request to create 'a constitutional

17  privilege foreclosing direct inquiry into the editorial

18  process.'"  *NetChoice (Tex.)*, 49 F.4th at 487 (quoting *Herbert*,

19  441 U.S. at 176) (internal citation omitted).

20      In *Miami Herald Pub. Co. v. Tornillo*, the Supreme Court ruled

21  that a Florida statute violated the First Amendment by requiring

22  a newspaper that criticized a political candidate to subsequently

23  publish the candidate's response.  418 U.S. 241, 244 (1974); *see*

24  Mtn. at 47.  The Court reasoned that, under the First Amendment,

25  the state could not compel a newspaper to publish political

26  speech that it disagreed with.  *Id.* at 256; *see also PruneYard*

27  *Shopping Ctr. v. Robins*, 447 U.S. 74, 88 (1980) (*Miami Herald*

28  "rests on the principle that the State cannot tell a newspaper

what it must print"). Here, AB 587's terms of service report requirements do not tell Plaintiff what noncommercial content to publish or not to publish. The law merely requires Plaintiff to report factual information about its terms of service and content moderation practices.

*Washington Post v. McManus* is also distinguishable. *See* 944 F.3d 506 (4th Cir. 2019); *see also Paxton*, 49 F.4th at 488, n.38. That case involved burdensome campaign finance regulations of political speech. *Id.* at 510-12. Specifically, for every political ad posted by an online platform (including news outlets), the law required the platform to also post on its site "the identity of the purchaser, the individuals exercising control over the purchaser, and the total amount paid for the ad." *Id.* at 511. It also required platforms to collect and retain records regarding the political ad purchasers, which were subject to state inspection. *Id.* at 512. While expressly noting the narrowness of its ruling (*id.* at 513), the court emphasized that the regulatory scheme was unconstitutional, in large part, because it singled out political speech—"campaign-related speech"—for regulation. *Id.* at 513-14. It also emphasized that the law implicated constitutional protections for anonymous political speech (*id.* at 515) and that noncompliance would result in an injunction to remove the political ad and, failing that, criminal penalties (*id.* at 514).

The terms of service report requirements do not implicate these concerns. The requirements do not require social media platforms to respond to political content on the platforms and they do not give the government unlimited power to inspect

1   Plaintiff's records in connection with particular political

2   content on its site.  And, unlike the challenged law in

3   *Washington Post*, AB 587 does not provide any penalties based on

4   the content on the platform, much less criminal penalties.

5        Because their cited cases are inapposite, Plaintiffs have

6   failed to show the terms of service reports requirements are

7   subject to strict scrutiny based upon the "editorial judgments"

8   theory.

9        **D.   The Terms of Service Report Requirements Are Not**
         **Analogous to the Challenged Laws in Plaintiff's**
10       **"Speech About Speech" Cases**

11       The terms of service report requirements are also not subject

12  to strict scrutiny as purportedly regulating "speech about

13  speech."  Mtn. at 54.  Plaintiff's cited cases do not support the

14  application of that theory here.

15       *Smith v. People of the State of California*, which predates

16  *Zauderer*, did not involve compelled commercial speech, but

17  rather, an ordinance imposing strict criminal liability on

18  booksellers for selling books containing obscene material.  361

19  U.S. 147, 148-49 (1959).  The Court concluded that the statute

20  would have the functional effect of banning books that were not

21  obscene, and thus, constitutionally protected.  *Id.* at 152.

22  Here, the terms of service report requirements do not

23  functionally require Plaintiff to change its terms of service or

24  content moderation practices or restrict any content on its

25  platform.

26       In both *Entertainment Software Ass'n v. Blagojevic*, 469 F.3d

27  641 (7th Cir. 2006) and *Motion Picture Ass'n of Am. v. Specter*,

28  315 F.Supp. 824 (E.D. Penn. 1970) the challenged laws were

1   invalidated not because they were "speech about speech," but

2   because the laws compelled the expression of opinions rather than

3   facts.   In *Entertainment Software Ass'n*, the court concluded that

4   "sexually explicit" video game labeling requirements did not

5   qualify for *Zauderer* scrutiny because they required retailers to

6   make disclosures that were subjective and "opinion-based" rather

7   than purely factual and uncontroversial.   469 F.3d at 652.   In

8   *Motion Picture Ass'n of Am.*, which predated *Zauderer*, the court

9   held that a state law violated the First Amendment where it

10  criminalized a film exhibitor's misrepresentation that a film is

11  "suitable for family viewing," because that standard was entirely

12  subjective.   315 F.Supp. 824, 825-26 (E.D. Penn. 1970).

13      Here, the terms of service requirements qualify for *Zauderer*

14  scrutiny, because the required disclosures are factual and

15  uncontroversial, not subjective or opinion-based.

16

    **E.   The Terms of Service Report Requirements Are Not**
17             **Subject to Strict Scrutiny Based on Plaintiff's**
           **Unfounded Speculation That the Attorney General May**
18             **Not Enforce AB 587 Properly**

19      Finally, the terms of service report requirements are not

20  subject to scrutiny merely because Plaintiff speculates, without

21  meaningful evidence, that the Attorney General *might* attempt to

22  use his generally-applicable investigatory powers to enforce AB

23  587 in a manner that violates Plaintiff's First Amendment rights.

24      The terms of service report requirements merely require

25  Plaintiff to make factual disclosures.   They do not purport to

26  empower the Attorney General, or any other official, to undertake

27  an unconstitutionally-intrusive investigation.   Plaintiff

28  complains that other provisions of AB 587 will permit the

Attorney General to investigate if Plaintiff's disclosures appear to contain material omissions or misrepresentations. *See* Cal. Bus. & Prof. Code § 22678. The proper procedure to address this concern, if necessary, is not to facially invalidate or subject the disclosure requirements themselves to strict scrutiny, but to bring an as-applied challenge to any investigatory action that Plaintiff believes violates the First Amendment. This avenue is not unduly burdensome to Plaintiff, a company that makes over $100 million in revenue every year.

The fact is that Plaintiff is not currently under investigation or under suspicion for noncompliance with AB 587, since its first terms of service report has not even come due. And, the November 3, 2022 letter from the Attorney General to numerous large social media companies does not support Plaintiff's speculation that the Attorney General plans to use AB 587 as a vehicle to conduct an unconstitutional investigation. *See* Exh. 1 to Fernandez Dec., ECF No. 18-3, at 1-2. The Attorney General sent the letter just prior to the 2022 midterm elections to encourage social media companies to "stop the spread of disinformation and misinformation that attack the integrity of our electoral processes." *Id.* at 2. The eight-page letter briefly mentions AB 587 once in a footnote. *Id.* at 4. The letter then understandably states that the Attorney General will enforce *all* of these laws. *Id.* Nowhere does the letter state that AB 587 would be enforced beyond the scope of its facial disclosure requirements.

1

**CONCLUSION**

2      AB 587's terms of service report requirements are subject to

3 *Zauderer* scrutiny.  As explained in earlier briefing and

4 arguments, all of AB 587's challenged provisions satisfy *Zauderer*

5 scrutiny, and *Central Hudson* scrutiny if the Court were to apply

6 it.  Plaintiff's motion for preliminary injunction should

7 therefore be denied.

8

Dated:   November 20, 2023         Respectfully submitted,

9

                                   ROB BONTA
10                                 Attorney General of California
                                   ANTHONY R. HAKL
11                                 Supervising Deputy Attorney
                                   General

12

13

14                                 /s/ Gabrielle D. Boutin

                                   GABRIELLE D. BOUTIN
15                                 Deputy Attorney General
                                   *Attorneys for Attorney General*
16                                 *Rob Bonta, in his official*
                                   *capacity*

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's Supp. Brief (2:23-CV-01939-WBS-AC)