CAHILL GORDON & REINDEL LLP
JOEL KURTZBERG (admitted *pro hac vice*)
FLOYD ABRAMS (admitted *pro hac vice*)
JASON ROZBRUCH (admitted *pro hac vice*)
LISA J. COLE (admitted *pro hac vice*)
32 Old Slip
New York, New York 10005
Telephone: 212-701-3120
Facsimile: 212-269-5420
jkurtzberg@cahill.com

DOWNEY BRAND LLP
WILLIAM R. WARNE (Bar No. 141280)
bwarne@downeybrand.com
MEGHAN M. BAKER (Bar No. 243765)
mbaker@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone: 916-444-1000
Facsimile: 916-520-5910

*Attorneys for Plaintiff X Corp.*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| X CORP., | No. 2:23-cv-01939-WBS-AC |
| Plaintiff, | |
| v. | **PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| ROBERT A. BONTA, Attorney General of California, in his official capacity, | ORAL ARGUMENT |
| Defendant. | Date: November 13, 2023<br>Time: 1:30 p.m.<br>Crtrm: 5 |

**TABLE OF CONTENTS**

INTRODUCTION ................................................. 1

ARGUMENT .................................................... 4

  I.   *Zauderer* Does Not Apply ................................ 6

    i.   *Zauderer* Does Not Apply Because AB 587 Does Not Compel Commercial Speech........................................ 6

    ii.   *Zauderer* Does Not Apply Because AB 587's Compelled Disclosures Are Not Purely Factual And Uncontroversial..... 15

    iii.   *Zauderer* Does Not Apply Because AB 587 Does Not Further A Substantial Governmental Interest...................... 22

    iv.   *Zauderer* Does Not Apply Because, At The Very Least, AB 587's Compelled Disclosures Are Inextricably Intertwined With Core Political Speech..................................... 27

  II.  *Central Hudson* Does Not Apply ......................... 30

  III. Strict Scrutiny Applies ................................ 31

CONCLUSION ................................................. 36

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bolger* v. *Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983)........................................ 6, 30

*Boyer* v. *City of Simi Valley*,
    978 F.3d 618 (9th Cir. 2020)............................... 4

*Brown* v. *Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011)................................. 2, 4, 31

*Central Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n*
    *of New York*,
    447 U.S. 557 (1980)................................... *passim*

*City Council* v. *Taxpayers for Vincent*,
    466 U.S. 789 (1984).................................. 33, 34

*Core-Mark Int'l, Inc.* v. *Montana Bd. of Livestock*,
    2018 WL 5724046 (D. Mont. Nov. 1, 2018).................. 15

*CTIA – The Wireless Ass'n* v. *City of Berkeley,*
    *California ("CTIA II")*,
    928 F.3d 832 (9th Cir. 2019)......................... *passim*

*Frazier* v. *Boomsma*,
    2008 WL 3982985 (D. Ariz. Aug. 20, 2008)................ 29

*Gaudiya Vaishnava Soc.* v. *City & Cnty. of San*
    *Francisco*,
    952 F.2d 1059 (9th Cir. 1990), *as amended on denial*
    *of reh'g* (Dec. 26, 1991)............................. 29, 35

*Hunt* v. *City of Los Angeles*,
    638 F.3d 703 (9th Cir. 2011)...................... 6, 27, 30

*Hurley* v. *Irish-American Gay, Lesbian and Bisexual*
    *Group of Boston, Inc.*,
    515 U.S. 557 (1995)...................................... 8n

*IMDb.com Inc.* v. *Becerra*,
    962 F.3d 1111 (9th Cir. 2020)...................... 2, 4, 31

*Int'l Dairy Foods Ass'n* v. *Amestoy*,
    92 F.3d 67 (2d Cir. 1996)............................... 23

*Loan Payment Admin. LLC* v. *Hubanks*,
    2018 WL 6438364 (N.D. Cal. Dec. 7, 2018), *aff'd*, 821
    F. App'x 687 (9th Cir. 2020)................................ 14

*Masonry Bldg. Owners of Oregon* v. *Wheeler*,
    394 F. Supp. 3d 1279 (D. Or. 2019)......................... 15

*MedImmune, Inc.* v. *Genentech, Inc.*,
    549 U.S. 118 (2007)........................................ 36

*Medina* v. *Cuomo*,
    2015 WL 13744627 (N.D.N.Y. Nov. 9, 2015), *report and
    recommendation adopted*, 2016 WL 756539 (N.D.N.Y.
    Feb. 25, 2016)............................................. 32

*Miranda* v. *City of Casa Grande*,
    15 F.4th 1219 (9th Cir. 2021)............................. 33n

*Morales* v. *Daley*,
    116 F. Supp. 2d 801 (S.D. Tex. 2000)....................... 32

*N.A.A.C.P., W. Region* v. *City of Richmond*,
    743 F.2d 1346 (9th Cir. 1984).............................. 35

*Nat'l Ass'n. of Wheat Growers* v. *Bonta*,
    2023 WL 7314307 (9th Cir. Nov. 7, 2023).............. 8, 9, 19

*Nat'l Elec. Mfrs. Ass'n* v. *Sorrell*,
    272 F.3d 104 (2d Cir. 2001)................................ 23

*Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra*
    (*"NIFLA"*),
    138 S. Ct. 2361 (2018)................................ *passim*

*NetChoice, LLC* v. *Att'y Gen., Fla.*,
    34 F.4th 1196 (11th Cir. 2022)............................. 11

*NetChoice, LLC* v. *Paxton*,
    49 F.4th 439 (5th Cir. 2022)............................... 11

*Olsen* v. *Gonzales*,
    350 B.R. 906 (D. Or. 2006), *adhered to on
    reconsideration*, 368 B.R. 886 (D. Or. 2007), *aff'd
    in part, rev'd in part on other grounds sub nom.*,
    *Olsen* v. *Holder*, 402 F. App'x 311 (9th Cir. 2010).......... 15

*Reed* v. *Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015)........................................ 2

*Riley* v. *Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
   487 U.S. 781 (1988)........................................ 27

*Rivera* v. *Pugh*,
   194 F.3d 1064 (9th Cir. 1999)............................ 33n

*Rosenberger* v. *Rector and Visitors of Univ. of
   Virginia*,
   515 U.S. 819 (1995)........................................ 34

*Rubin* v. *Coors Brewing Co.*,
   514 U.S. 476 (1995)......................................... 9

*San Francisco Apartment Ass'n* v. *City & Cnty. of San
   Francisco*,
   142 F. Supp. 3d 910 (N.D. Cal. 2015), *aff'd*, 881
   F.3d 1169 (9th Cir. 2018)................................. 14

*Sorrell* v. *IMS Health Inc.*,
   564 U.S. 552 (2011)........................................ 34

*United States* v. *Arnold*,
   740 F.3d 1032 (5th Cir. 2014)............................. 32

*United States* v. *Playboy Ent. Grp., Inc.*,
   529 U.S. 803 (2000)........................................ 34

*United States* v. *Sindel*,
   53 F.3d 874 (8th Cir. 1995)............................... 32

*United States* v. *United Foods, Inc.*,
   533 U.S. 405 (2001)......................................... 6

*Volokh* v. *James*,
   2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023)........... 10, 12, 13

*West Virginia State Bd. of Educ.* v. *Barnette*,
   319 U.S. 624 (1943)........................................ 32

*Zauderer* v. *Office of Disciplinary Counsel*,
   471 U.S. 626 (1985)................................... *passim*

**Statutes**

Cal. Bus. & Prof. Code §§ 22675–81 ...................... *passim*

**Other Authorities**

Eric Goldman, *Zauderer and Compelled Editorial
   Transparency*, 108 Iowa L. Rev. 80 (2023) .................. 17

# INTRODUCTION

The parties have agreed, and this Court recognized at oral argument, that the law in this case, AB 587, is content-based. *See* Defendant's Opposition to Motion for Preliminary Injunction ("Opp.") at 32 (conceding that AB 587 is content based); Defendant's Supplemental Brief in Opposition to Motion for Preliminary Injunction ("Supp. Br.") at 16 (same); Transcript of Nov. 13, 2023 Hearing on Motion for Preliminary Injunction ("Hearing Tr.") at 16:11 ("The statute here is content based."); *id.* at 23:19 ("THE COURT: I think I said it was content-based."). At the November 13 hearing, the Court repeatedly asked the parties what standard of review applies to content-based laws that compel speech that is not commercial. In this regard, the Court posed numerous hypotheticals, such as existing requirements to provide information in connection with income tax laws and on applications for driver's licenses. *See, e.g.*, Hearing Tr. at 27:3-7 (Court asking what standard of review applies "where there's compelled speech that is not commercial"); *id*. at 30:12-17 (Court asking whether laws compelling personal factual information in connection with "fill[ing] out [] income tax returns" or "tak[ing] the DMV test" would trigger strict scrutiny). AG Bonta's supplemental brief neither answers this Court's question about the standard of review for content-based laws governing non-commercial speech nor addresses the Court's hypotheticals.

Nevertheless, controlling case law provides a clear answer. The Supreme Court has repeatedly held that "content-based regulation[s] of speech" are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests [i.e., are subject to strict scrutiny]." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra ("NIFLA")*, 138 S. Ct. 2361, 2371 (2018); *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (same). The Court has also observed that there are some "categories of speech" that are "exemp[t]" from "the normal prohibition on content-based restrictions," but has outlined a stringent test that applies to such exceptions — namely, that they apply only if there is "'persuasive evidence . . . of a long (if heretofore unrecognized) tradition' to that effect.'" *NIFLA*, 138 S. Ct. at 2372 (rejecting application of less-than-strict-scrutiny protection for content-based laws that constitute "professional speech" under this test) (quoting *Brown* v. *Entm't Merchs. Ass'n*, 564 U.S. 786, 792 (2011)); *see also IMDb.com Inc.* v. *Becerra*, 962 F.3d 1111, 1121 (9th Cir. 2020) (same). This standard (which AG Bonta does not even mention, let alone address) provides the answers to the hypotheticals asked by the Court at oral argument — e.g., it explains why strict scrutiny does *not* apply to tax laws, even if those laws are content-based and compel non-commercial speech — and also makes clear why strict scrutiny applies in this case.

1    In arguing that strict scrutiny does not apply, AG Bonta puts

2  all of his proverbial eggs in the *Zauderer* and *Central Hudson*

3  baskets.  Those cases recognize two limited exceptions to the

4  general rule that content-based laws, like AB 587, are subject to

5  strict scrutiny, both of which are limited to the context of

6  commercial speech.  But AB 587 does not satisfy the standard for

7  either exception.  It does not satisfy *Zauderer* because it (1) does

8  not involve commercial speech; (2) does not compel speech that is

9  "purely factual"; (3) does not compel speech that is

10 "uncontroversial"; (4) does not advance the type of substantial

11 interest *Zauderer* requires; and (5) is inextricably intertwined

12 with fully protected political speech to the extent that the speech

13 at issue is commercial at all.  *Central Hudson* does not apply

14 either because the speech here is not commercial under the relevant

15 tests.

16    Significantly, AG Bonta can point to no other basis for

17 applying any standard other than strict scrutiny – and the case

18 law puts the burden on him to do so.  Under *NIFLA*, *Brown*, and

19 *IMDb.com*, unless AG Bonta comes forward with persuasive evidence

20 that there is a long tradition of permitting the type of content-

21 based regulation of speech exemplified by AB 587, strict scrutiny

22 applies.  There is no such "persuasive evidence" of a "long

23 tradition" here, as there is with the income tax hypothetical posed

24 by this Court.  For this reason — and because AB 587 is also (1)

viewpoint-based, (2) regulates "speech about speech," (3) impermissibly interferes with X Corp.'s right to exercise editorial judgment about content on its platform, and (4) provides the AG with nearly unfettered discretion to pressure X Corp. into regulating content that the State disfavors — strict scrutiny unquestionably applies.

**ARGUMENT**

Where, as here, a law is both (1) "content based" (Opp. at 32) and (2) does not regulate a "category of speech" that is "exemp[t]" from the "normal prohibition on content-based restrictions," the "content-based regulation[] of speech [is] subject to strict scrutiny." *NIFLA*, 138 S. Ct. at 2371-72. *See also id.* at 2372 ("This Court's precedents do not permit governments to impose content-based restrictions on speech without 'persuasive evidence . . . of a long (if heretofore unrecognized) tradition' to that effect.") (quoting *Brown*, 564 U.S. at 792); *IMDb.com Inc.*, 962 F.3d at 1121 (same); *Boyer* v. *City of Simi Valley*, 978 F.3d 618, 623 (9th Cir. 2020) (describing a "firm rule" required by Supreme Court precedent that "mandates strict scrutiny review" whenever an ordinance makes content-based distinctions — "no matter how sensible the distinction[s] may be").

It is undisputed here that AB 587 is content based. And AG Bonta points to only two possible exceptions to the general rule that strict scrutiny applies: those set forth in the Supreme

Court's decisions in *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626 (1985), and *Central Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980). Opp. at 8, 20; Supp. Br. at 16. Neither exception applies to AB 587, however, as discussed in detail below.

*Zauderer* does not apply because AB 587 compels (1) non-commercial speech that is (2) neither purely factual nor uncontroversial, and (3) AB 587 does not further a "substantial interest" beyond "the satisfaction of mere 'consumer curiosity,'" as is required for *Zauderer*'s application in the Ninth Circuit. *CTIA - The Wireless Ass'n* v. *City of Berkeley, California ("CTIA II")*, 928 F.3d 832, 844 (9th Cir. 2019). *Zauderer* also does not apply because (4) AB 587's compelled disclosures are, at the very least, inextricably intertwined with otherwise fully protected speech.

*Central Hudson* does not apply because the speech at issue is not commercial under the relevant tests.

Since neither *Zauderer* nor *Central Hudson* applies — and there is no "persuasive evidence" of "a long [] tradition" of some other exception to the general rule that content-based laws are subject to strict scrutiny and are presumptively unconstitutional — strict scrutiny applies to AB 587.

## I. *Zauderer* Does Not Apply

### i. *Zauderer* Does Not Apply Because AB 587 Does Not Compel Commercial Speech

In his opening brief (Opp. at 21 n.8), AG Bonta misstated the relevant test for determining whether speech qualifies as "commercial speech" under the First Amendment by ignoring the primary test established by both Supreme Court and Ninth Circuit case law — namely, whether the speech "does no more than propose a commercial transaction." *Hunt* v. *City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011) (quoting *United States* v. *United Foods, Inc.*, 533 U.S. 405, 409 (2001)); *see also* Plaintiff's Reply in Support of Motion for Preliminary Injunction ("Reply") at 2, 9-10 (citing six Supreme Court cases, *Hunt,* and *IMDb.com* in support of this standard). AG Bonta urged the Court (Opp. at 21 n.8) to apply the test set forth in *Bolger* v. *Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983), even though the Ninth Circuit has made clear that that test applies only "[w]here the facts present a close question." *Hunt*, 638 F.3d at 715. In his supplemental brief, AG Bonta retreats even further from the relevant standards, arguing that the *Bolger* test – which he had previously urged this Court to apply – need not be applied "strictly" or even at all in cases involving the potential application of *Zauderer*. Supp. Br. at 5. AG Bonta now suggests, without any real support, that compelled disclosures about consumer products and services are just "treated as 'commercial speech'" without the need to apply ***any*** test for

commercial speech whatsoever. *Id.* at 5–8.

AG Bonta's effort to avoid the relevant tests is understandable — since AB 587 comes nowhere close to satisfying them — but it is contrary to established, binding law. As AG Bonta concedes, Opp. at 8–9, 13 n.5, 19, 28; Supp. Br. at 1, 3–4, 16, *Zauderer* applies only to compelled speech that is commercial, *see* Opp. at 8 ("The standard for analyzing compelled disclosures in the context of commercial speech is the test established in *Zauderer*[.]"). While some cases may engage in only a perfunctory analysis of the commercial speech question – perhaps because the parties do not dispute that the speech is commercial – that provides no justification for avoiding well-established, controlling case law about what constitutes commercial speech.

Each of the cases AG Bonta cites in support of his extraordinary proposition — that no analysis of the commercial nature of speech is necessary in *Zauderer* cases (Supp. Br. at 6–7) — in fact supports the opposite conclusion. For example, AG Bonta argues that, in *NIFLA*, the Supreme Court applied *Zauderer* without considering whether the compelled speech at issue was commercial. *Id.* at 6. This misstates the holding in *NIFLA*, where the Court plainly held that "[t]he *Zauderer* standard does not apply," 138 S. Ct. at 2372, to one portion of the challenged law (the licensed notice requirement) and that it "need not decide whether the *Zauderer* standard applies" to another portion (the unlicensed

notice requirement), *id.* at 2377; *see also Nat'l Ass'n. of Wheat Growers* v. *Bonta*, 2023 WL 7314307, at *12 (9th Cir. Nov. 7, 2023) ("The Supreme Court [in *NIFLA*] found that *Zauderer* was inapplicable[.]"). Thus, the Supreme Court did not hold that *Zauderer* applied at all. Moreover, the Court did not suggest that *Zauderer* applies even when there is no showing that the compelled speech at issue is commercial. Instead, the Court confirmed the opposite: that *Zauderer* "govern[s] only 'commercial advertising.'" *NIFLA*, 138 S. Ct. at 2372 (quoting *Zauderer*, 471 U.S. at 651).[1] *NIFLA* thus provides no support for AG Bonta's argument that no commercial speech analysis is necessary in *Zauderer* cases.

AG Bonta's citation to *Nat'l Ass'n. of Wheat Growers* fares no better. AG Bonta's supplemental brief argues that, in that case, "the Ninth Circuit applied *Zauderer* scrutiny to the State's proposed warning language without any explicit consideration of whether the law compelled commercial speech." Supp. Br. at 6-7. This too misstates the holding of that case. As this Court knows, in *Nat'l Ass'n. of Wheat Growers*, the Ninth Circuit expressly held that the Proposition 65 product warning at issue, concerning the presence of a particular chemical, "does not qualify for the lower level of review under *Zauderer*" "because it is neither 'purely factual' nor 'uncontroversial.'" *Nat'l Ass'n of Wheat Growers*,

---

[1] *See also Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995) (explaining that *Zauderer* does not apply outside the context of compelled disclosures in commercial advertising).

2023 WL 7314307, at *12–14.

Moreover, the case does not stand for the proposition, let alone even suggest, that speech under *Zauderer* need not meet the test for commercial speech. To the contrary, the Court there acknowledged that "[t]he Supreme Court has held that *Zauderer* review is only available 'in certain contexts,'" and unequivocally reaffirmed that *Zauderer* applies only to compelled disclosures of commercial speech. *Id.* at *10 ("The Supreme Court recognizes two levels of scrutiny governing compelled ***commercial*** speech . . . *Central Hudson* . . . [and] *Zauderer*[.]") (emphasis added); *id.* (To qualify for review under *Zauderer*, the compelled ***commercial*** speech at issue must disclose "purely factual and uncontroversial information.") (emphasis added).

In any event, the compelled disclosures in *Nat'l Ass'n of Wheat Growers* — which consisted of warning labels on products — are inherently distinct from AB 587's forced disclosures. Speech on product labels — unlike the speech at issue in AB 587 — is designed to promote sales and facilitate purchase of the product. *See Rubin* v. *Coors Brewing Co.*, 514 U.S. 476, 476–77 (1995) (subjecting regulation of speech on product labels to intermediate scrutiny applicable to commercial speech). AB 587's compelled disclosures serve neither of these purposes.

AG Bonta's reliance on *CTIA II* fails for the same reason, as the law at issue in that case mandated a health warning about cell

phone radiation by cell phone retailers to "prospective cell phone purchasers" on a "prominently displayed poster" in their stores or "on a handout" provided to the customer in the store. 928 F.3d at 836–38. In other words, the warning was essentially appended to the product itself at the point of sale. It is no surprise, then, that the defendant in *CTIA II* did not even dispute whether the compelled disclosures at issue constituted commercial speech. *Id.* at 841. *CTIA II* also expressly affirmed that *Zauderer* applies only to "compelled **commercial** speech." *Id.* at 837 (emphasis added). It was undeniable that the speech there — physical health warnings about a product provided at the point of sale — met the test for commercial speech.

Finally, AG Bonta is correct that, in the *NetChoice* cases, the Eleventh and Fifth Circuit Courts of Appeal applied *Zauderer* without engaging in fulsome analysis of whether the compelled speech at issue was commercial. But that does not support the proposition that no such analysis is necessary. As noted at the oral argument, X Corp. respectfully submits that these courts erred in failing to perform any analysis on this threshold issue. Hearing Tr. at 16:5–18:3. In any event, unlike AB 587, those laws do not impose content-based restrictions about controversial categories such as "hate speech," "extremism," "misinformation," and so forth.

On this point, the more recent case of *Volokh* v. *James* is instructive. 2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023). Of the

three laws at issue in the two *NetChoice* cases and *Volokh*, the law in *Volokh* is the most analogous to AB 587 because it compelled social media companies to speak about particular categories of content (there, "hateful conduct"), and found that strict scrutiny applied on that basis. *Cf. NetChoice, LLC* v. *Att'y Gen., Fla.*, 34 F.4th 1196, 1227 (11th Cir. 2022) ("S.B. 7072's disclosure provisions" are "content-neutral regulations"); *NetChoice, LLC* v. *Paxton*, 49 F.4th 439, 446 (5th Cir. 2022) (listing HB 20's content-neutral disclosure requirements).

X Corp. acknowledges that, at oral argument, the Court suggested that the law in *Volokh* differed from AB 587 because the law there defined the category of speech at issue – there, hateful conduct – while AB 587 allows the social media companies to define the categories of content at issue. *See, e.g.*, Hearing Tr. at 25:5-6 (THE COURT: "[In *Volokh*,] I think they didn't ask the plaintiffs, whoever they were, to define it [i.e., hateful conduct]. They defined it."). While the Court is correct that the New York statute in *Volokh* differed from AB 587 in that regard, X Corp. respectfully submits that the statute was more similar to AB 587 than the laws at issue in the *NetChoice* cases, which the courts treated as content-neutral. The New York statute in *Volokh* was the same as AB 587 in the ways that matter for determining the correct standard of review in this case.

That is because the law in *Volokh*, like AB 587, did not require

social media companies to moderate "hateful conduct," as defined by the State, at all.  Rather, the law "had two main requirements: (1) a mechanism for social media users to file complaints about instances of 'hateful conduct' and (2) disclosure of the social media network's policy for how it will respond to any such complaints." *Volokh*, 2023 WL 1991435, at *2.  Significantly, there was nothing under the law that required a social media company to adopt any particular policy toward hateful conduct.  *See id.* at *7 ("[T]he Hateful Conduct Law ostensibly does not dictate what a social media website's response to a complaint must be and does not even require that the networks respond to any complaints or take down offensive material[.]"); Affidavit of Joel Kurtzberg, dated Nov. 28, 2023 ("Kurtzberg III Aff.") Ex. 1 (Defendant Letitia James' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction, *Volokh*, No. 22-cv-10195 (S.D.N.Y. Dec. 13, 2022)) at 9-10 ("There is no requirement as to how the network must respond or what such a policy with respect to such reports must be . . . Plaintiffs are not *required* to take any action with respect to anything reported to them by their users . . . Plaintiffs may, indeed, do nothing.") (emphasis in original).  Thus, a social media company could comply by (1) providing a mechanism for complaints about hateful conduct and (2) disclosing that its policy was not to censor constitutionally-protected hateful conduct and therefore to respond to complaints by merely informing users of that fact.

In that sense, the New York statute did ***not*** require the social media companies to moderate specific content (there, hateful conduct) the way the state wanted them to, but rather merely tried to "pressure" them to do so by disclosing their policies (or lack thereof) for addressing such content. *See* Kurtzberg III Aff. Ex. 2 (Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction, No. 22-cv-10195 (S.D.N.Y. Dec. 6, 2022)) at 15-16 (The Hateful Conduct Law "implies an affirmative duty to remove hateful conduct. . . . Even if the law merely requires a response (without dictating the substance), . . . they must either indicate they will not handle speech the state has labelled as 'hateful' differently, and risk alienating visitors who share the State's animating concern, or reinforce the State's message and alienate visitors opposed to censorship.").

Against this backdrop, the court in *Volokh* applied the standard required by precedent - strict scrutiny - and struck down the law. *See Volokh*, 2023 WL 1991435, at *8 ("Because the Hateful Conduct Law regulates speech based on its content, the appropriate level of review is strict scrutiny.") And, significantly, in doing so the court specifically analyzed whether the law compelled commercial speech. *Id.* at *7. It held that the compelled disclosures did "not constitute commercial speech" because the "law's requirement that Plaintiffs publish their policies explaining how they intend to respond to hateful content on their

websites does not simply 'propose a commercial transaction.' Nor is the policy requirement 'related solely to the economic interests of the speaker and its audience.' Rather, the policy requirement compels a social media network to speak about the range of protected speech it will allow its users to engage (or not engage) in." *Id.*

Here, it is hard to see how, under Ninth Circuit precedent, AB 587's compelled disclosures — which are provided to the AG in a written report that will then be posted on the AG's website — could be considered commercial speech warranting lessened First Amendment protection. They are not appended to X Corp.'s product and do not appear on X Corp.'s website. And the Terms of Service Report does not merely require a plain, purely factual description of the services provided by X Corp.; rather, it forces X Corp. to create statistics about the kinds of actions taken (or not taken) to moderate speech on the platform pursuant to X's content moderation policies. That goes far beyond a simple factual description of the product or service being offered.

AB 587's compelled disclosures are thus materially distinct from the types of commercial disclosures to which courts in the Ninth Circuit have applied *Zauderer*. *See San Francisco Apartment Ass'n* v. *City & Cnty. of San Francisco*, 142 F. Supp. 3d 910, 916 (N.D. Cal. 2015), *aff'd*, 881 F.3d 1169 (9th Cir. 2018) (disclosures by landlords to tenants "of the tenants' rights before the landlord commences buyout negotiations"); *Loan Payment Admin. LLC* v.

*Hubanks*, 2018 WL 6438364, at *2, *7 (N.D. Cal. Dec. 7, 2018), *aff'd*, 821 F. App'x 687 (9th Cir. 2020) (disclosures on financial service "solicitation letters"); *Olsen* v. *Gonzales*, 350 B.R. 906, 910 (D. Or. 2006), *adhered to on reconsideration*, 368 B.R. 886 (D. Or. 2007), *aff'd in part, rev'd in part on other grounds sub nom.*, *Olsen* v. *Holder*, 402 F. App'x 311 (9th Cir. 2010) (disclosures by "debt relief agencies" rendering "bankruptcy assistance" regarding "the extent of services provided and fees charged," and "that their services contemplate bankruptcy"); *CTIA II*, 928 F.3d at 836-38 (health warnings to "prospective cell phone purchasers" on in-store poster or handout); *Core-Mark Int'l, Inc.* v. *Montana Bd. of Livestock*, 2018 WL 5724046, at *2 (D. Mont. Nov. 1, 2018) (requiring "code date" labeling on milk packaging); *Masonry Bldg. Owners of Oregon* v. *Wheeler*, 394 F. Supp. 3d 1279, 1288, 1298 (D. Or. 2019) (provision of information in "lease or rental application[s]" to "prospective tenant[s]"). Significantly, each of these courts, before applying *Zauderer*, expressly acknowledged that the compelled speech at issue was commercial. AG Bonta's suggestion that the state of the law is otherwise (i.e., that courts may apply *Zauderer* without determining whether the compelled speech at issue is commercial) is simply incorrect and contrary to precedent.

        ii. *Zauderer* Does Not Apply Because AB 587's Compelled Disclosures Are Not Purely Factual And Uncontroversial

Even *if* this Court found that AB 587's compelled disclosures

constitute commercial speech - which they do not - *Zauderer* still does not apply because the disclosures are neither purely factual nor uncontroversial.

First, AB 587's compelled disclosures are not purely factual. For example, § 22677(a)(4)(A) requires X Corp. to provide a "detailed description of content moderation practices used by the social media company for [its] platform, including, but not limited to, . . . [a]ny existing policies ***intended to address*** the categories of content described in paragraph (3)" (emphasis added). It is difficult to see how providing a "detailed description" of which of its policies are "intended to address" (a phrase which the statute does not define) hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference, can be a disclosure of purely factual information. Whether a company has adopted a policy that is "intended to address" difficult-to-define categories of constitutionally-protected speech requires the exercise of judgment and the expression of opinions that could be the subject of disagreement among reasonable individuals.[2] It is certainly not "purely" factual.

That is just one example. With respect to other portions of the statute, statistics such as the total number of items flagged

---

[2] Indeed, these categories are subject to not just any disagreement, but the most significant form of disagreement for First Amendment purposes — political disagreement. *See infra* at Sec. I(iv).

by the social media company as falling within the various categories of content, *see* § 22677(a)(5)(A), are not purely factual either, because placing a user's post in a particular category is itself an act of judgment.  Similarly, the act of explaining *why* posts were flagged — e.g., by "disaggregat[ing]" those statistics by content category, *see* § 22677(a)(5)(B)(i) — is not purely factual either.  *See also* Affidavit of Joel Kurtzberg, dated Nov. 2, 2023 ("Kurtzberg II Aff.") Ex. 1 (Eric Goldman, *Zauderer and Compelled Editorial Transparency*, 108 Iowa L. Rev. Online 80, 93 (2023)).

Second, AB 587's compelled disclosures are not uncontroversial.  By forcing X Corp. to publicly state **whether** it has policies intended to address hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference, and how it **defines** each of these topics, AB 587 forces X Corp. to take a position on the most controversial, political topics in the public discourse today and to disclose that position publicly.  Decisions about how to define these categories *or whether to moderate them at all* are controversial and political.

AB 587 forces social media companies to take a public stance on whether to define and regulate any of the categories of content identified in the statute.  The legislation of that requirement allows the state to frame the debate about content moderation — by

suggesting categories of speech that the State seems to think should be disfavored or censored — rather than allowing the social media companies to frame the debate themselves.  The State argues that AB 587 is not controversial because it only requires social media companies to disclose information about their own choices in regulating content and that does not force them to "convey a message fundamentally at odds with [their] mission."  Supp. Br. at 14 (citing *CTIA II*, 928 F.3d at 845).  While that argument may have some superficial appeal, it is an oversimplification.  Sometimes, being forced to publicly disclose your own position on highly contentious topics in response to questions formulated by the State *is* controversial, even if you are not forced to adopt the State's views.  That is why the Ninth Circuit in *CTIA II* strongly suggested that cell phone warnings would be controversial under *Zauderer* if they "force[d] cell phone retailers to take sides in a heated political controversy."  928 F.3d at 848.

An analogy outside of the commercial speech context helps illustrate the point.  Imagine a state law that, in the interest of transparency, forced individuals running for President of the United States to publish their positions on several "hot button" political issues (e.g., whether abortion should be permitted in cases of incest and rape or whether former President Trump committed any crimes) on which, in the government's view, most political candidates were avoiding stating their positions.  Even

if the law did not mandate politicians to take any particular position, but simply required them, under the threat of civil penalties, to publicly spell out their position (or lack thereof) on those controversial issues, there can be little doubt that such a law would compel controversial disclosures. That law would be subject to heightened scrutiny under the First Amendment. AB 587 is no different.

In this sense, forcing X Corp. to take positions on the categories of content **selected by the state** does, in fact, force X Corp. to "convey a message fundamentally at odds with its mission" and "business[]." *Nat'l Ass'n of Wheat Growers*, 2023 WL 7314307, at *12. Indeed, X Corp.'s mission is to provide a robust engagement and debate community pursuant to its own principles of content moderation, rather than to frame the issues in the manner preferred by the State, and AB 587 directly interferes with that mission.

In any event, whether a law forces a person to "convey a message fundamentally at odds with [their] mission" is only part of the relevant inquiry concerning what is "uncontroversial" under *Zauderer*. As the Ninth Circuit made clear in its extended discussion of the issue in *Nat'l Ass'n of Wheat Growers*, "*NIFLA* tells us that the topic of the disclosure and its effect on the speaker is probative of determining whether something is subjectively controversial." *Id.* AB 587 flunks the subjective part of the test quite dramatically — and perhaps that is why AG

Bonta chooses not to address it. As the legislative history makes abundantly clear, the categories of speech that AB 587 asks social media companies to define — or announce that they have chosen not to define — are those having no "general public consensus" about how to define or moderate them because their boundaries are "fraught with political bias" and are "difficult to reliably define." Affidavit of Joel Kurtzberg, dated Oct. 6, 2023 ("Kurtzberg Aff.") Ex. 6 (Cal. Assemb. Comm. on Privacy and Consumer Protection Report, 2021–22 Sess. (AB 587), Apr. 22, 2021) at 4. And the detailed information that the companies are compelled to provide about their content-moderation decisions concern the most controversial decisions that lead them to be "equally maligned" by members of the public, whether they restrict such content or not. *Id.*

Nor is AG Bonta able to reconcile his argument that the law compels uncontroversial speech with the statute's legislative history or with his own statements that one of the law's purposes is to apply pressure from the public about content-moderation decisions that will lead the companies to change their content-moderation policies. *See, e.g.,* Kurtzberg Aff. Ex. 5 (Cal. Assemb. Comm. on Judiciary Report, 2021–22 Sess. (AB 587), Apr. 27, 2021) at 4 ("if social media companies are forced to disclose what they do in this regard [i.e., how they moderate online content], it may ***pressure them*** to become better corporate citizens by doing more ***to***

*eliminate hate speech and disinformation.*") (emphasis added); *id.* Ex. 1 (Mot. to Dismiss, *Minds, Inc., et al.* v. *Bonta,* No. 23-cv-2705 (ECF 23-1) (C.D. Cal. May 25, 2023)) at 18-19 ("[T]he Legislature also considered that, by requiring greater transparency about platforms' content-moderation rules and decisions, AB 587 may result in public pressure on social media companies to 'become better corporate citizens by doing more to *eliminate hate speech and disinformation' on their platforms*. . . . This, too, is a substantial state interest.") (emphasis added). Indeed, the very notion that the disclosures will result in "public pressure" on the social media companies to change their policies *presupposes* that the disclosures are so controversial that they will result in the public demanding such changes.

AG Bonta argues that the statements compelled by AB 587 are uncontroversial because the Ninth Circuit has held that, just because a purely factual statement "can be tied in some way to a controversial issue," does not make it "for that reason alone controversial." *See* Supp. Br. at 14 (citing *CTIA II*, 928 F.3d at 845). But the disclosures compelled by AB 587 are not merely "tied in some way to a controversial issue"; rather, they are *designed* to *generate* public controversy about the actions of the social media companies by framing a divisive debate in such a way that will pressure the social media companies to change their content-moderation policies to align with those desired by the State. To

this end, the statute focuses on what the legislative history concedes are the most controversial and politically charged categories of content that, no matter how they are moderated, will invariably leave some set of users dissatisfied. *See, e.g.,* Kurtzberg Aff. Ex. 6 at 4 (noting that, while there is agreement that some categories of illegal content (e.g., child pornography) should be eliminated from social media platforms, "hate speech, racism, extremism, misinformation, political interference, and harassment, are far more difficult to reliably define, and assignment of their boundaries is often fraught with political bias. In such cases, [as regards moderating such content,] both action and inaction by these companies seems to be equally maligned: too much moderation, and accusations of censorship and suppressed speech arise; too little, and the platform risks fostering a toxic, sometimes dangerous community."); *id.* Ex. 5 at 4 ("[I]f social media companies are forced to disclose [how they moderate such content], it may pressure them to become better corporate citizens by doing more to eliminate hate speech and disinformation."). That is not the kind of disclosure to which *Zauderer* was meant to apply. AG Bonta cites no case finding an even remotely comparable statute to be "uncontroversial" under *Zauderer*. We are aware of none either.

              iii. <u>*Zauderer* Does Not Apply Because AB 587 Does Not</u><br><u>Further A Substantial Governmental Interest</u>

      *Zauderer* may apply only where the speech regulation at issue

"further[s] some substantial — that is, more than trivial — governmental interest." *CTIA II*, 928 F.3d at 844.

To date, the only interests that have been recognized by the Supreme Court or Ninth Circuit as sufficiently substantial to trigger *Zauderer* review are prevention of consumer deception and, in some instances, "furthering public health and safety." *Id.* While the Ninth Circuit made clear in *CTIA II* that it was not "foreclos[ing] that other substantial interests in other cases may suffice as well," it also clarified that, to qualify, the "interest at stake must be more than the satisfaction of mere 'consumer curiosity.'" *Id.* (quoting *Nat'l Elec. Mfrs. Ass'n* v. *Sorrell*, 272 F.3d 104, 115 n.6 (2d Cir. 2001)); *see also Int'l Dairy Foods Ass'n* v. *Amestoy*, 92 F.3d 67 (2d Cir. 1996) (Vermont law was substantially likely to violate First Amendment by requiring labeling of milk produced by cows given recombinant Bovine Growth Hormone, even though the milk produced by such cows was indistinguishable from milk produced by untreated cows).

AB 587 does not further a sufficiently substantial governmental interest to trigger *Zauderer*. There is simply no proof in the record – and ***the burden is on AG Bonta to provide such proof***[3] – that the law prevents consumer deception or furthers a "public health and safety" interest of the type that would satisfy

---

[3] *See, e.g., CTIA II*, 928 F.3d at 844 (when applying *Zauderer*, the burden is on the government to come forward with evidence that the disclosures at issue "remedy a harm that is potentially real not purely hypothetical") (quoting *NIFLA*, 138 S. Ct. at 2367).

the "substantial interest" threshold. AG Bonta cites a governmental interest in "requiring social media companies to be transparent about their content-moderation policies and decisions so that consumers can make informed decisions about where they consume and disseminate news and information," Opp. at 13, but AG Bonta cites no evidence at all that this addresses a real problem and that consumers actually need the information provided by the statute (on top of the already-public content-moderation policies provided by covered social media companies) to make informed decisions about what platforms to use.

Put another way, "transparency" is not a substantial interest in itself, unless it serves some other important goal. That is precisely why the Ninth Circuit held in *CTIA II* that the "interest at stake must be more than the satisfaction of mere 'consumer curiosity.'" 928 F.3d at 844. And while AG Bonta states that the law will help "consumers make informed decisions" about the social media platforms they use, there is just no evidence that AB 587 will do anything to actually accomplish that goal.

In fact, there is no evidence in the record that suggests that there is any need for "increasing transparency" (Opp. at 23) — beyond that already provided by the social media companies covered by AB 587 — about how companies moderate the categories of content set forth in § 22677(a)(3) that would satisfy anything other than "consumer curiosity." There is no evidence, for example, that

consumers have been deceived in some significant way about social media companies' current content moderation policies, feel ill-"informed" about the differences in content-moderation policies for the handful of social media companies covered by the statute, or need this kind of information about content-moderation policies to keep "safe" or "enfranchised." Opp. at 1-2. As a result, *Zauderer* cannot supply the standard for AB 587's constitutional review.

Nor is it at all clear that AB 587 will do anything to address a problem that is real and not just "purely hypothetical."[4] AG Bonta argues that the information required by the Terms of Service Report is somehow "necessary to navigate among the disinformation, threats, and hate speech on social media." Opp. at 2. But AG Bonta does not offer any explanation (let alone any evidence, as is his burden) as to ***why*** consumers need this information to navigate those threats or ***how*** this information will help them do so. Indeed, AG Bonta does not even explain what legitimate basis the State has in deeming pure speech a "threat" in the first place. This is not a straight-forward matter of common sense. It is actually not the slightest bit clear that AG Bonta is pursuing legitimate ends or that the information will actually support those ends. How, for example, does knowing the number of times a social media platform

---

[4] In *CTIA II*, the Ninth Circuit held that the "substantial interest" requirement is simply another way of stating that, in "the words of the Supreme Court, 'Disclosures must remedy a harm that is 'potentially real not purely hypothetical.'" 928 F.3d at 844 (quoting *NIFLA*, 138 S. Ct. at 2367).

took "action[]" against hate speech, disinformation, harassment, etc., do anything to protect a consumer?  It does not.  The information compelled by AB 587, while burdensome to compile, does not even provide enough information to adequately assess how often platforms are removing particular kinds of content — that is, AB 587 does not compel information that would reveal how many posts are on the social media platform overall, so the Report would not reveal the percentage of posts that are actioned or how often speech that arguably falls within these categories of content was not actioned.  Moreover, as the Court recognized at oral argument, because AB 587 allows social media companies to define the categories however they want (or not at all), it is not clear how the statute provides consumers with statistics that are truly needed to make informed choices about anything.  Hearing Tr. at 53:23-54:2 (THE COURT: "What good does that do you?  Why don't you give them your definition?  If you really wanted to know something, if I asked you a question and I said, you can make your own definitions, I'm not going to get much of a meaningful response from you.").  Finally, as the Court acknowledged at oral argument if in fact, as the State has argued, the statute does not require social media companies to make any statistical disclosures at all as long as their categories of content moderation differ from those listed in the statute, Hearing Tr. at 41:7-42:24 (AG Bonta arguing that, since X Corp. claims not to use the categories listed in AB

587, it will not need to make any burdensome statistical disclosures); Opp. at 18 (same), it is not clear that the statute will do anything other than incentivize the social media companies to use content-moderation categories that are different than those in the statute — which would further no substantial government interest at all.  Hearing Tr. at 38:5-13 (THE COURT: "Well, it would incentivize companies just to not have any categories, not to do anything. . . .  Your point's well taken in that regard.  The easy way out of it would be to do something that would not satisfy the very purpose that they're trying to satisfy.").

In the end, there is no real basis for asserting that AB 587's compelled disclosures will do anything to "maintain[] an informed, enfranchised, and safe populace," Opp. at 2, and what remains is a "purely hypothetical" harm and a desire to satisfy "mere 'consumer curiosity,'" *CTIA II*, 928 F.3d at 844, which are insufficient to trigger review under *Zauderer*.

              iv. *Zauderer* Does Not Apply Because, At The Very Least, AB 587's Compelled Disclosures Are Inextricably Intertwined With Core Political Speech

Assuming, *arguendo*, that AB 587's compelled disclosures were commercial speech (and they are not), they would still be entitled to full First Amendment protection because they are "inextricably intertwined with otherwise fully protected speech." *Hunt*, 638 F.3d at 715 (quoting *Riley* v. *Nat'l Fed'n of the Blind of N. Carolina*,

*Inc.*, 487 U.S. 781, 796 (1988)).

The disclosures compelled by AB 587 provide information about the content-moderation decisions made by social media companies. Those include whether to define and, if so, how to define categories of constitutionally-protected speech that are "fraught with political bias" and information about how those categories of content were moderated. They clearly — and obviously purposely — require the platforms to reveal their positions on hotly debated and controversial political topics. Take for example, the requirement to disclose whether the social media company believes that "hate speech" or "racism" are categories of speech that should be disfavored on its platform and, if so, how those controversial categories should be defined. The answers to those questions are, by their nature, political – that is, they reveal a vision of how debate should be structured on social media platforms to promote the public good. Likewise, take AB 587's requirement that X Corp. provide a "detailed description" of "[a]ny existing policies intended to address" hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference. *See* § 22677(a)(4)(A). If X Corp. were to include in its Terms of Service Report a "detailed description" as to how its Hateful Conduct Policy — which states, among other things, that "X's mission is to give everyone the power to create and share ideas

and information, and to express their opinions and beliefs without barriers" (Affidavit of Trust & Safety Team, dated Oct. 6, 2023, Ex. 4 at 2) — there is no way that X Corp. could separate this 'commercial information' from the "political or social issues" with which it is "inextricably intertwined." *Gaudiya Vaishnava Soc.* v. *City & Cnty. of San Francisco*, 952 F.2d 1059, 1063-64 (9th Cir. 1990), *as amended on denial of reh'g*, (Dec. 26, 1991); *see also Frazier* v. *Boomsma,* 2008 WL 3982985, at *3–4 (D. Ariz. Aug. 20, 2008) (finding commercial speech "inextricably intertwined" with fully protected speech where it was "impossible to separate the political from the commercial aspects"). The same is true of the mandate to provide statistics flowing from those decisions. For instance, AB 587 requires X Corp. to provide the total number of flagged and actioned items "belonging to" the categories of content in § 22677(a)(3). *See* § 22677(a)(5)(A). But, similarly, X Corp. cannot provide that information without revealing its views on those core political topics.

The speech compelled by AB 587's Terms of Service Report is thus materially distinct from that at issue in *Bolger*, where the Supreme Court refused to grant full First Amendment protection to the advertisements of a contraceptive manufacturer on the basis that they did nothing more than "link[] [the] product to a current public debate." *See Bolger*, 463 U.S. at 68. Here, in contrast, AB 587 forces X Corp. to **take a position** on extremely controversial

topics — either by defining controversial and difficult-to-define categories of speech or by stating publicly that the company chooses not to use those categories, which is a controversial political position in itself.

## II.  *Central Hudson* **Does Not Apply**

Because AB 587 does not compel commercial speech, the standard of review set forth in *Central Hudson* cannot apply either. *See Central Hudson*, 447 U.S. at 562 (describing commercial speech as "speech proposing a commercial transaction"). AB 587's compelled disclosures do not propose a commercial transaction, *see* Reply at 12-17, and, since it is not a "close question" as to whether that is so, this Court should not even proceed to an examination of the three *Bolger* factors. *See Hunt*, 638 F.3d at 715 (citing *Bolger*, 463 U.S. at 66-67). In any event, the *Bolger* factors — whether (1) "the speech is an advertisement," (2) "the speech refers to a particular product," and (3) "the speaker has an economic motivation" (*id.*) — clearly support the conclusion that AB 587 does not compel commercial speech. *See* Reply at 14-15. AB 587 plainly does not regulate advertisements, and it compels X Corp. to take a position on how to categorize and action user speech, not to describe the product it sells, as to which it has an economic motivation. Accordingly, the intermediate scrutiny test of *Central Hudson* does not apply.

### III.  Strict Scrutiny Applies

AB 587 triggers strict scrutiny because it is content based and does not regulate any "categories of speech" that are "exemp[t]" from the normal prohibition on content-based restrictions."  *NIFLA*, 138 S. Ct. at 2372.  *NIFLA*, *Brown*, and *IMDb.com* make clear that the test for determining whether such an exemption exists is stringent.  It is only where there is "'persuasive evidence . . . of a long (if heretofore unrecognized) tradition' to that effect."  *NIFLA*, 138 S. Ct. at 2372; *Brown*, 564 U.S. at 792; *IMDb.com*, 962 F.3d at 1121.

At oral argument, this Court asked whether strict scrutiny automatically applies to content-based laws that compel speech that is not commercial and posed several hypothetical questions about laws that seem ill-suited for strict scrutiny, but appear to be content-based and do not involve commercial speech.  For example, the Court asked what standard of review applies to laws requiring people or companies to fill out income tax returns or requiring certain information in the application for a driver's license.  *See* Hearing Tr. at 30:12-17.  AG Bonta failed to address these hypotheticals in his supplemental brief.

We respectfully submit that *NIFLA*, *Brown*, and *IMDb.com* provide a clear answer: strict scrutiny applies to content-based laws absent "persuasive evidence" of a tradition of excluding such speech from that kind of First Amendment scrutiny.  One such

historically-recognized exception – relevant to the tax law hypothetical posed by the Court at oral argument – occurs when "essential operations of government . . . require [speech] for the preservation of an orderly society." *West Virginia State Bd. of Educ.* v. *Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring). Such speech is granted no First Amendment protection at all.

For this reason, in *United States* v. *Sindel*, 53 F.3d 874 (8th Cir. 1995), the Eighth Circuit rejected a First Amendment challenge to a criminal prosecution based on a failure to disclose certain transactions on IRS Form 8300. Citing *Barnette*, the court held that, even if the law compelled the defendant to provide certain personal information against his will, "[t]here is no right to refrain from speaking when 'essential operations of government may require it for the preservation of an orderly society.'" *Id*. at 878 (quoting *Barnette*, 319 U.S. at 645). Courts have relied on this recognized "essential operations" exception in similar contexts as well, for instance in requiring the completion of decennial census questionnaires, *see Morales* v. *Daley*, 116 F. Supp. 2d 801, 816 (S.D. Tex. 2000), or in forcing convicted sex offenders to disclose their current addresses, *see United States* v. *Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014); *Medina* v. *Cuomo*, 2015 WL 13744627, at *10 (N.D.N.Y. Nov. 9, 2015), *report and recommendation*

*adopted*, 2016 WL 756539 (N.D.N.Y. Feb. 25, 2016).[5]  With AB 587,

however, there are simply no "essential operations of government"

that require covered social media companies to provide the speech

compelled by AB 587's Terms of Service Report.

That should end the inquiry.  Since AB 587 is content based,

and since there exists no historically-recognized exemption to the

rule that content-based speech regulations trigger strict scrutiny,

strict scrutiny must apply.  In the case of AB 587, however, there

exist additional reasons as to why strict scrutiny applies.  As

these have already been covered extensively in prior briefing, we

highlight them only briefly here:

- **AB 587 discriminates against certain speech based on its**
  **viewpoint.**  Plaintiff's Memorandum in Support of Motion for
  Preliminary Injunction ("PI Mot.") at 38-39, 55-58; Reply at
  22-25.  As the Supreme Court made clear in *City Council* v.
  *Taxpayers for Vincent*, "the First Amendment forbids the
  government to regulate speech in ways that favor some
  viewpoints or ideas at the expense of others."  466 U.S. 789,

---

[5] In response to the Court's hypothetical about laws requiring the disclosure of information to get a driver's license, we note that, while we are aware of no reported cases addressing that scenario, the "essential operations of government" exception likely applies to that as well.  Moreover, the fact that having a driver's license is a privilege and not a right, *see Miranda* v. *City of Casa Grande*, 15 F.4th 1219, 1224 (9th Cir. 2021) ("There is, of course, no express constitutional guarantee or other federal right to a driver's license."); *Rivera* v. *Pugh*, 194 F.3d 1064, 1068 (9th Cir. 1999) ("An individual with a driver's license has been given a privilege by the state; license revocation is the loss of a privilege, rather than a punishment."), also lessens the force of any First Amendment argument against compelled disclosures.  One need not get a driver's license at all, but if one wants a license, one may need to waive any First Amendment right not to provide the information requested.

804 (1984). "It is of no moment," moreover, that AB 587 "does not impose a complete prohibition" on particular viewpoints because the "distinction between laws burdening and laws banning speech is but a matter of degree." *United States* v. *Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000); *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 555–56 (2011) (same). Even if AB 587 does not outright ***ban*** the categories of content set forth in § 22577(a)(3) — hate speech, racism, extremism, radicalization, disinformation, misinformation, harassment, and foreign political interference — it ***burdens*** particular viewpoints among them, with the intent of pressuring the social media companies to ban, limit, and censor those viewpoints. Under Supreme Court precedent, that is enough to trigger strict scrutiny. *Taxpayers for Vincent*, 466 U.S. at 804; *see also Rosenberger* v. *Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. . . . The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

- **AB 587 regulates "speech about speech" because it infringes several layers of constitutionally-protected speech** — that

is, it infringes both the social media companies'
constitutionally-protected right to decide what is permitted
on their platforms and the public's right to access and
disseminate constitutionally-protected content on those
platforms that the State deems objectionable. PI Mot. at 54–
55; Reply at 25–30.

- **AB 587 impermissibly interferes with X Corp.'s
  constitutionally-protected editorial judgments.** PI Mot. at
  46–50; Reply at 36–39.

- **AB 587 gives AG Bonta "unfettered discretion" to place burdens
  on constitutionally protected speech that he disapproves of
  and AG Bonta has already used AB 587 in an effort to coerce X
  Corp. into moderating content and viewpoints as he sees fit.**
  PI Mot. at 58–60; Reply at 30–35. In other words, AB 587 is
  unconstitutional because it grants AG Bonta "unfettered
  discretion" to regulate First Amendment activity. *See, e.g.*,
  *N.A.A.C.P., W. Region* v. *City of Richmond*, 743 F.2d 1346, 1357
  (9th Cir. 1984); *Gaudiya Vaishnava Society*, 952 F.2d at 1065–
  66. AG Bonta's November 3, 2022 letter is evidence that he
  is already threatening to use AB 587 to impose costly burdens
  on X Corp. if it does not moderate content in the manner that
  he prefers. Affidavit of Wifredo Fernandez, dated Oct. 4,
  2023, Ex. 1 (Letter from Attorney General Bonta to Twitter,
  Inc., et al. (Nov. 3, 2022)) at 4; *see also id.* ¶¶ 14–19.

1   Under Supreme Court precedent, relief is appropriate when an

2   unconstitutional application of a statute is threatened, even

3   if there is no pending prosecution. *See, e.g., MedImmune,*

4   *Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here

5   threatened action by *government* is concerned, we do not

6   require a plaintiff to expose himself to liability before

7   bringing suit to challenge the basis for the threat — for

8   example, the constitutionality of a law threatened to be

9   enforced.") (emphasis in original).

10                              **CONCLUSION**

11

12      The Court should apply strict scrutiny to AB 587 and grant

13   Plaintiff's request for preliminary injunctive relief as to AB 587.

14

15

16

17

18

19

20

21

22

23

24

DATED: November 28, 2023  /s/ Joel Kurtzberg

                              CAHILL GORDON & REINDEL LLP
                              Joel Kurtzberg (admitted *pro hac vice*)
                              Floyd Abrams (admitted *pro hac vice*)
                              Jason Rozbruch (admitted *pro hac vice*)
                              Lisa J. Cole (admitted *pro hac vice*)
                              32 Old Slip
                              New York, NY 10005
                              Telephone: 212-701-3120
                              Facsimile: 212-269-5420

                              DOWNEY BRAND LLP
                              William R. Warne (Bar No. 141280)
                              Meghan M. Baker (Bar No. 243765)
                              621 Capitol Mall, 18th Floor
                              Sacramento, CA 95814
                              Telephone: 916-444-1000
                              Facsimile: 916-444-2100

                              *Attorneys for Plaintiff X Corp.*