# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

EUGENE VOLOKH, RUMBLE CANADA
INC., and LOCALS TECHNOLOGY INC.

        *Plaintiffs,*

      v.

LETITIA JAMES, in her official capacity as
Attorney General of New York,

        *Defendant.*

Civil Action No.: 1:22-cv-10195-ALC

**Oral Argument Requested**

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

DARPANA SHETH
(New York Bar No. 4287918)
DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
darpana.sheth@thefire.org
daniel.ortner@thefire.org
jay.diaz@thefire.org

*Attorneys for Plaintiff*
\**Pro Hac Vice* Motions Forthcoming
\*\* S.D.N.Y. Admission Pending

BARRY N. COVERT**
(N.Y. Bar No. 271118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave Suite 120
Buffalo, NY 14202
Tel: 716 849 1333 x 365
bcovert@lglaw.com

*Counsel for Plaintiffs Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc.*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ................................................................................................... 1

SUMMARY OF FACTS ......................................................................................... 3

ARGUMENT ......................................................................................................... 6

I.  Plaintiffs Have a Well-Founded Fear That the Online Hate Speech
    Law Will Be Enforced Against Their Online Services............................................ 6

II.  Plaintiffs Are Likely to Prevail on the Merits Because the Online
     Hate Speech Law Unconstitutionally Burdens and Compels
     Speech, is Overbroad, Void for Vagueness, and Preempted by
     Section 230................................................................................................ 8

     A.  The Online Hate Speech Law targets protected expression,
         based on content and viewpoint................................................................ 8

     B.  The Online Hate Speech Law compels Plaintiffs to endorse
         the State's message and respond to reports of protected
         speech........................................................................................... 12

         1.  The Hate Speech Policy and Report & Response
             Mechanism force Plaintiffs to endorse and parrot the
             State's message about "hate speech."..................................................12

         2.  The Online Hate Speech Law compels Plaintiffs to respond
             to complaints. ........................................................................15

     C.  The Online Hate Speech Law and its enforcement regime
         will unconstitutionally burden Plaintiffs' publication of
         protected speech............................................................................. 16

     D.  The Online Hate Speech Law is overbroad because it
         targets a wide-range of protected expression............................................. 17

     E.  The Online Hate Speech Law is unconstitutionally vague
         because its key terms are unclear and undefined. ....................................... 18

     F.  The Online Hate Speech Law is preempted by Section 230
         of the Communications Decency Act because it imposes
         liability by treating websites as publishers. ............................................. 20

III.  Plaintiffs Are Entitled to a Preliminary Injunction. ............................................. 21

     A.  There is no need for a bond.......................................................... 22

CONCLUSION...........................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ACLU v. Ashcroft,*
　322 F.3d 240 (3d Cir. 2003)................................................................23

*Agudath Israel of Am. v. Cuomo,*
　983 F.3d 620 (2d Cir. 2020)............................................................6, 23

*Am. Booksellers Found. v. Dean*,
　342 F.3d 96 (2d Cir. 2003)................................................................18

*Ancheta v. Watada,*
　135 F. Supp. 2d 1114 (D. Haw. 2001)................................................18

*Babbitt v. United Farm Workers Nat'l Union,*
　442 U.S. 289 (1979)...........................................................................6

*Backpage.com, LLC v. Cooper,*
　939 F. Supp. 2d 805 (M.D. Tenn. 2013)........................................20, 22

*Backpage.com, LLC v. Dart,*
　807 F.3d 229 (7th Cir. 2015) ...........................................................16

*Backpage.com, LLC v. Hoffman,*
　No. 13-CV-03952 DMC JAD, 2013 WL 4502097 (D.N.J. Aug. 20, 2013).....................22

*Backpage.com, LLC v. McKenna,*
　881 F. Supp. 2d 1262 (W.D. Wash. 2012).........................................22

*Bantam Books, Inc. v. Sullivan,*
　372 U.S. 58 (1963)...........................................................................16

*Battle v. City of Seattle,*
　89 F. Supp. 3d 1092 (W.D. Wash. 2015).........................................12

*Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*,
　206 F.3d 980 (10th Cir. 2000) .........................................................21

*Brandenburg v. Ohio,*
　395 U.S. 444 (1969)........................................................................18

*Bronx Household of Faith v. Bd. of Educ. of City of New York,*
　331 F.3d 342 (2d Cir. 2003).............................................................22

*Brown v. Ent. Merchants Ass'n,*
    564 U.S. 786 (2011)................................................................................11

*Capitol Recs., LLC v. Vimeo, LLC,*
    826 F.3d 78 (2d Cir. 2016).........................................................................7

*Carafano v. Metrosplash.com, Inc.,*
    339 F.3d 1119 (9th Cir. 2003) ...............................................................21

*CISPES (Comm. in Solidarity with People of El Salvador) v. F.B.I.,*
    770 F.2d 468 (5th Cir. 1985) ..................................................................12

*Cohen v. California,*
    403 U.S. 15 (1971)..............................................................................2, 10

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
    657 F.3d 936 (9th Cir. 2011) ..................................................................18

*Elliott v. Donegan,*
    469 F. Supp. 3d 40 (E.D.N.Y. 2020) ......................................................21

*Elrod v. Burns,*
    427 U.S. 347 (1976)................................................................................22

*Ent. Software Ass'n v. Blagojevich,*
    469 F.3d 641 (7th Cir. 2006) ..................................................................14

*Evergreen Ass'n, Inc. v. City of New York,*
    740 F.3d 233 (2d Cir. 2014).....................................................................10

*Farrell v. Burke,*
    449 F.3d 470 (2d Cir. 2006).....................................................................18

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012)................................................................................19

*Force v. Facebook, Inc.,*
    934 F.3d 53 (2d Cir. 2019 .......................................................................21

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
    841 F.3d 133 (2d Cir. 2016)......................................................................6

*FTC v. LeadClick Media, LLC,*
    838 F.3d 158 (2d Cir. 2016 .....................................................................21

*Herrick v. Grindr LLC,*
    765 F. App'x 586 (2d Cir. 2019) ............................................................21

*Hill v. Colorado*,
    530 U.S. 703 (2000)................................................................................................19

*Honeoye Cent. Sch. Dist., Town of Livonia v. Berle*,
    99 Misc. 2d 20, 415 N.Y.S.2d 565 (Sup. Ct. 1979)..........................................15

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*,
    515 U.S. 557 (1995)..................................................................................1, 11, 12

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016)..................................................................................21

*Janus v. Am. Fed'n of State, Cnty. and Mun. Emps.*,
    138 S. Ct. 2448 (2018)....................................................................................2, 10

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
    567 U.S. 298 (2012)..............................................................................................13

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ................................................................................ *passim*

*Miami Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974)..............................................................................................15

*Minnesota Voters Alliance v. Mansky*,
    138 S. Ct. 1876 (2018)...................................................................................10, 20

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018).........................................................................................10

*Nat'l Org. for Marriage, Inc. v. Walsh*,
    714 F.3d 682 (2d Cir. 2013)...................................................................................6

*NetChoice, LLC v. Moody*,
    546 F. Supp. 3d 1082 (N.D. Fla. 2021) ...............................................................21

*NetChoice, LLC v. Moody*,
    34 F.4th 1196 (11th Cir. 2022).............................................................................21

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013)......................................................................6, 22, 23

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003)................................................................................17

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*,
    |475 U.S. 1 (1986)................................................................................................15

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
    No. 4:22CV304-MW/MAF, 2022 WL 16985720 (N.D. Fla. Nov. 17, 2022)..................12

*Pharm. Soc. of State of New York, Inc. v. New York State Dep't of Soc. Servs.*,
    50 F.3d 1168 (2d Cir. 1995)....................................................................23

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009)............................................................................10

*PSINet v. Chapman*,
    167 F. Supp. 2d 878 (W.D. Va. 2001) ....................................................17

*PSINet v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ...............................................................17

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)...................................................................1, 9, 18

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015).............................................................................9

*Reno v. ACLU*,
    521 U.S. 844 (1997).............................................................................8

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988)......................................................................10, 14

*Rosenberger v. Rectors and Visitors of the Univ. of Va.*,
    |515 U.S. 819 (1995)............................................................................9

*Sable Commc'ns of Cal., Inc. v. FCC*,
    492 U.S. 115 (1989)...........................................................................11

*Smith v. Goguen*,
    415 U.S. 566 (1974)...........................................................................19

*Snyder v. Phelps*,
    562 U.S. 443 (2011)....................................................................3, 8, 18

*Stuart v. Loomis*,
    992 F. Supp. 2d 585 (M.D.N.C.) ..........................................................13

*U.S. v. Stevens*,
    559 U.S. 460 (2010).............................................................................3

*United States v. Eichman*,
    496 U.S. 310 (1990).......................................................................1, 10

*United States v. Schwimmer*,
   279 U. S. 644 (1929) ................................................................................................1

*United States v. Wunsch*,
   84 F.3d 1110 (9th Cir. 1996) ...............................................................................19

*Vill. of Schaumburg v. Citizens for a Better Env't*,
   444 U.S. 620 (1980) .............................................................................................11

*Virginia v. Hicks*,
   539 U.S. 113 (2003) .............................................................................................18

*Vt. Right to Life Comm. v. Sorrell*,
   221 F.3d 376 (2d Cir. 2000) ..................................................................................6

*West Virginia State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) .............................................................................................12

*Wooley v. Maynard*,
   430 U.S. 705 (1977) .............................................................................................14

**Statutes:**

47 U.S.C § 230 ..........................................................................................................20

Fed. R. Civ. P. 65 ........................................................................................................6

N.Y. Gen. Bus. Law § 394-ccc ...................................................................1, 4, 15, 16

N.Y. Lab. Law § 190 ....................................................................................................7

N.Y. Pub. Serv. Law § 224-c ......................................................................................7

**Other Authorities:**

Eugene Volokh, New N.Y Law Aimed at Getting Social Media Platforms to Restrict
   'Hateful' Speech, The Volokh Conspiracy (June 7, 2022) ....................................7

Eugene Volokh, *No, There's No "Hate Speech" Exception to the First Amendment*, The
   Volokh Conspiracy (May 7, 2015) ......................................................................19

## <u>INTRODUCTION</u>

New York General Business Law § 394-ccc, titled "Social media networks; hateful conduct prohibited," ostensibly targets "hateful conduct." But the law regulates speech—"hate speech," in the words of its chief sponsor, Verified Complaint for Injunctive Relief ¶ 42, ECF No. 1 ("Verified Complaint")—by forcing online services to "address" and "handle[]" speech perceived by a visitor to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected category, under pain of investigation and fines. *See* § 394-ccc(a), (3) (the "Online Hate Speech Law"). And as the Supreme Court recently explained, while "[s]peech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; [] the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (quoting *United States v. Schwimmer*, 279 U. S. 644, 655 (1929) (Holmes, J., dissenting)).

New York cannot meet the heavy constitutional burden required to justify this sweepingly broad, disturbingly vague regulation of speech on the basis of content and viewpoint. "The First Amendment does not permit . . . special prohibitions on those speakers who express views on disfavored subjects." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391–92 (1992). Moreover, "the suppression of free expression" is not even a legitimate governmental interest. *United States v. Eichman*, 496 U.S. 310, 315 (1990), but rather "a decidedly fatal objective." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 579 (1995).

New York's Online Hate Speech Law violates the First Amendment twice over. First, it targets protected speech by forcing websites, online platforms, and apps (collectively, "online services") to develop and publish policies and mechanisms singling out "hate speech"—defined

solely in accordance with the State's viewpoint, not the online services' viewpoints—and to accept and respond to visitor complaints about it. In this manner, New York's law unconstitutionally compels speech. Second, it burdens Plaintiffs' right to publish protected, but disfavored expression through explicit threats of New York Attorney General investigations, subpoenas, and daily fines of $1,000 per violation, and implicit threats from the Governor and Attorney General.

Being compelled to speak against core free speech in this way is of critical concern to Plaintiffs Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc. Each operates an online service subject to the Online Hate Speech Law: The Volokh Conspiracy, Rumble, and Locals, respectively. Each service is committed to free speech on the internet. Accordingly, Plaintiffs object to being conscripted to endorse New York's views regarding "hate speech" and the concomitant requirement to police speech on their sites. *Janus v. Am. Fed'n of State, Cnty. and Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018) (Laws requiring "individuals to mouth support for views they find objectionable" "violate[] that cardinal constitutional command").

In addition to compelling speech and burdening expression based on content and viewpoint, the Online Hate Speech Law violates the First Amendment because it is overbroad, forcing online services like Plaintiffs to address vast swaths of protected political, social, scholarly, and artistic discussion and debate on all manner of topics. New York's law is also void as unconstitutionally vague. Finally, it is preempted by Section 230 of the Communications Decency Act.

The First Amendment does not tolerate efforts like those of New York to "cleanse public debate." *Cohen v. California*, 403 U.S. 15, 25 (1971). The Court should grant this motion and enjoin New York's law because (i) it will cause Plaintiffs irreparable harm; (ii) Plaintiffs are

likely to succeed on the merits, and (iii) the public interest weighs heavily in Plaintiffs' favor.[1]

## SUMMARY OF FACTS

Only a few narrow, carefully defined categories of expression lie beyond the First Amendment's protection. *See U.S. v. Stevens*, 559 U.S. 460, 468–69 (2010). "Hate speech" is not one of them. *Id.* "As a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). Indeed, "it is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal*, 137 S. Ct. at 1765. But the state of New York has done exactly that by compelling Plaintiffs and other online services to parrot the state's preferred view on "hate speech" and imposing burdens upon the publication of this disfavored speech.

After New York's lawmakers spent several years targeting online "hate speech," the state passed the Online Hate Speech Law to single it out and discourage its publication. Verif. Compl. at ¶ 18. Enacted in the wake of a tragic mass shooting in Buffalo by a white supremacist, the law requires "social media network[s]"—a category that, because of the law's breadth, includes virtually every online service that is accessed by New Yorkers and allows third parties to publicly post information—to endorse and publish the state's message, and respond to complaints, under the state's definition of "hate speech" under pain of investigation and fines. *Id.*

Specifically, the statute requires three actions by social media networks with respect to "prohibited" hate speech. *Id.* at ¶ 77. First, they must develop and publish a policy describing

---

[1] Plaintiffs filed their Verified Complaint on Thursday, December 1, 2022. The following day, Plaintiffs served their complaint on Defendant via process server. Plaintiffs also included a letter urging Defendant to agree to suspend enforcement of the law for the duration of this lawsuit. Plaintiffs informed Defendant that if they did not receive a response confirming that enforcement would be suspended by close of business on Monday, December 5, 2022, that they would file this motion for a preliminary injunction.

how they "will respond [to] and address" visitor complaints about "hate speech" (the "Hate

Speech Policy"). *Id*. at ¶ 78. Second, they must create a "clear and easily accessible mechanism"

for visitors to complain about perceived "hate speech" on the site and to receive responses (the

"Report & Response Mechanism"). *Id*. at ¶ 79. Third, social media networks must "provide a

direct response" to individual complainants, "informing them of how the matter is being

handled" (the "Reply Requirement"). *Id.* at ¶ 80. These requirements are enforceable through

New York Attorney General investigations, subpoenas, and daily fines of $1,000 per violation.

*Id.* ¶¶ 83-84. In sum, the law targets protected speech that someone, somewhere believes will

"vilify, humiliate, or incite violence against a group or a class of persons" based on race, color,

religion, or other protected categories. § 394-ccc(a).

There can be little doubt that the Attorney General will expansively interpret and

zealously enforce the Online Hate Speech Law. Indeed, when signing the Online Hate Speech

Law, Governor Hochul boasted that "[o]ur great leader, our Attorney General, will be

championing this cause with every power her office can bring in at their disposal." *Id*. at ¶ 44.

The Governor also directed Attorney General James to investigate "social media companies and

other online resources," alleging the Buffalo shooting "revealed the depths and danger of the

online forums that spread and promote hate." *Id*. at ¶¶ 38-39. On October 18, 2022, Attorney

General James released her responsive investigative report, calling for "online platforms [to] be

held accountable for allowing hateful and dangerous content to spread on their platforms." *Id*. at

¶¶ 46, 53. The report investigated a variety of online services: video sharing services like

Rumble; online messaging like Reddit, 4Chan, and 8kun, "and their [d]erivatives"; Quora, a

community-based question-and-answer service; Twitch; Discord; and more widely known social

network sites, like Facebook and Twitter. *Id*. at ¶ 47. It squarely blames "[a]nonymous, virtually

unmoderated websites and platforms" for a purported rise in mass shootings, alleging that "their refusal to moderate content in any meaningful way ensures that these platforms are and remain breeding grounds for racist hate speech and radicalization." *Id*. at ¶ 48.

Plaintiffs Volokh, Rumble, and Locals each operate an online service committed to free speech and are subject to the Online Hate Speech Law. *Id*. at ¶¶ 86, 93, 107-108, 113, 126, 130-31. They each qualify as a "social media network" because each is a "service provider" that operate an "internet platform" "designed to enable users to share … content" with each other and the public. *See Id*. at ¶¶ 93,113, 130; § 394-ccc(b). Each regulates content along lines it has chosen for itself rather than those favored by New York. None has policies addressing the category of speech labeled by the state of New York as "hateful conduct," and none wishes to do so, preferring instead a more open exchange of ideas. *Verif. Compl.* at ¶¶ 97, 118, 134, 176. Although Rumble and Locals provide an email address for complaints about content, none of the Plaintiffs have the Report & Response Mechanism required by the law. *Id.* at ¶ 180. Nor have they felt obligated to respond to complaints consistently before the enactment of New York's Online Hate Speech Law *Id.* at ¶ 184.

Plaintiffs all disagree with and do not want to convey the State's message communicated by the mandated Hate Speech Policy, Report & Response Mechanism, and Reply Requirement. *Id*. at ¶¶ 143, 145, 147. Because the law targets speech based on its content and viewpoint, compliance is likely to cause harm to Plaintiffs' reputations as serious advocates of free speech and open debate. *Id*. at ¶ 148. Rumble and Locals will likely be inundated with complaints and either need to devote additional resources to process them, to more aggressively remove content, or to limit users' ability to participate in comment sections. *Id*. at ¶ 150. This is also likely to cause Rumble and Locals to suffer additional financial burdens and may force them to make

significant changes to their platforms and visitor experience. *Id.* Volokh, as owner and operator of his blog, will need to respond to each comment personally, a significant new burden. *Id*. at ¶ 151. In these and other ways outlined below, the Online Hate Speech Law will cause Plaintiffs irreparable harm by burdening and compelling speech under pain of punishment via overbroad and vague statutory terms. *Id*. at ¶ 152-57.

## **ARGUMENT**

The court should preliminarily enjoin New York's Online Hate Speech Law under Fed. R. Civ. P. 65 because Plaintiffs can show "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (citing *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016)). As this case involves First Amendment claims, "[c]onsideration of the merits is virtually indispensable" as "likelihood of success . . . is the dominant, if not the dispositive, factor." *New York Progress & Prot. PAC v. Walsh,* 733 F.3d 483, 488 (2d Cir. 2013). Each factor supports a preliminary injunction here.

**I.    Plaintiffs Have a Well-Founded Fear That the Online Hate Speech Law Will Be Enforced Against Their Online Services.**

Plaintiffs have standing to bring a pre-enforcement challenge to the Online Hate Speech Law. Plaintiffs have a "real and imminent fear" of a "chilling" of rights, *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013), as well as "an actual and well-founded fear that the law will be enforced against" them. *Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Plaintiffs likely qualify as "social media network[s]" subject to the Online Hate Speech Law

because they (1) "conduct[] business" in New York, (2) are "service provider[s]" that[2] (3) "for profit-making purposes,"[3] (4) operate "internet platforms,"[4] (5) "that are designed to enable users to share any content . . . or make such content available to the public." Although the law lacks relevant definitions, it seemingly applies to any "for-profit" online service with a comment section and sufficient ties to New York.[5] Plaintiffs each have connections to New York and generate revenue from New York-based creators, commenters, and visitors. Verif. Compl. at ¶¶ 89-91, 109-12, 128-29. Each Plaintiff also takes a strong stance on the content New York now labels "hateful," *see id.* at ¶¶ 5–6, 12–14, 100-102, 115–20, 131–36, and one plaintiff has written directly about his opposition to the Online Hate Speech Law,[6] leaving Plaintiffs apprehensive the Attorney General will target them. In fact, her report mentions Rumble by name.[7]

---

[2] The Online Hate Speech Law does not define "service provider," but another New York statue defines "internet service provider" expansively. *See* Verif. Compl. at ¶ 63-64 (quoting N.Y. Pub. Serv. Law § 224-c); *see also* 17 U.S.C.A. § 512 (defining "service provider" as "a provider of online services or network access, or the operator of facilities therefor"); *Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 81 (2d Cir. 2016) (finding that Vimeo was an "internet service provider" under DMCA because it is "a website on which members can post videos . . . which are then accessible to the public").

[3] The Online Hate Speech Law does not define "profit-making purpose," but another New York statute suggests the term means entities that have "net earnings . . . which inure to the benefit of any private shareholder or individual. *See* Verif. Compl. at ¶ 65 (citing N.Y. Lab. Law § 190). It thus stands to reason that "profit-making purpose" encompasses the Plaintiffs, whose online services attempt or intend to produce earnings for the benefit of an individual or shareholder.

[4] Neither the Online Hate Speech Law nor New York law defines "internet platform." However, as discussed below, Plaintiffs qualify as "interactive computer services" for purposes of Section 230, which is analogous to the use of "internet platforms" here. *See infra* n. 15 and accompanying text.

[5] *See* Verif. Compl. at ¶ 74 (Assemblywoman Fahy explaining on the floor of the New York Assembly that the law applies to online services that have a "footprint" in New York or are "used by residents here").

[6] Eugene Volokh, New N.Y Law Aimed at Getting Social Media Platforms to Restrict 'Hateful' Speech, The Volokh Conspiracy (June 7, 2022), https://reason.com/volokh/2022/06/07/new-n-y-law-aimed-at-getting-social-media-platforms-to-restrict-hateful-speech/.

[7] Office of New York State Attorney General Letitia James, Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022, at 36 (Oct. 18, 2022), https://ag.ny.gov/sites/default/files/buffaloshooting-onlineplatformsreport.pdf.

II.     **Plaintiffs Are Likely to Prevail on the Merits Because the Online Hate Speech Law Unconstitutionally Burdens and Compels Speech, is Overbroad, Void for Vagueness, and Preempted by Section 230.**

      A.     **The Online Hate Speech Law targets protected expression, based on content and viewpoint.**

Since the end of World War II, as other nations passed laws to regulate "hate speech," our Supreme Court has repeatedly struck down such laws.[8] "As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 562 U.S. at 461. As the Court recently emphasized, regulating speech that some, many, or even most perceive as hateful, insulting, or offensive "strikes at the heart of the First Amendment." *Matal*, 137 S. Ct. at 1764. For the United States, "the interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." *Reno v. ACLU,* 521 U.S. 844, 885 (1997). Hateful, insulting, or offensive speech is protected. *See Snyder*, 562 U.S. at 460–61 (finding "God Hates Fags," "Thank God for 9/11," "Priests Rape Boys," among other signs, are constitutionally protected).

The First Amendment protects a wide variety of "humiliating" or "vilifying" speech about groups on the basis of race, color, religion, or other protected categories. In *R.A.V.*, for example, the Supreme Court struck down a St. Paul ordinance outlawing words "that insult[s], or provoke[s] violence, on the basis of race, color, creed, religion, or gender" because it was a content- and viewpoint-based speech regulation. 505 U.S. at 391–92 ("The First Amendment does not permit . . . special prohibitions on those speakers who express views on disfavored subjects."); *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic

---

    [8] *See* Roni Cohen, Regulating Hate Speech: Nothing Customary About It, 15 Chi. J. Int'l L. 229, 238–48 (2014).

discussed or the idea or message expressed."). As the Supreme Court recently explained in *Matal v. Tam* when striking down a federal statute prohibiting registration of trademarks that "disparage": "Giving offense is a viewpoint." 137 S. Ct. at 1763.

Despite settled precedent protecting such speech, New York's law targets much of this expression, mislabeling it "hateful conduct." Specifically, the law aims at the "use of a social media network"—which, by definition, is speech—in a way perceived by someone, somewhere to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories. Verif. Compl. at ¶¶ 56-57. It then forces online services to penalize "bias-motivated" speech, by singling it out for special procedures, targeting "speech on the basis of its content." *R.A.V.,* 505 U.S. at 392. In addition, the law focuses on speech perceived to "vilify, humiliate, or incite violence against a group or class of persons"—as opposed to, for instance, speech that affirms, uplifts, or protects—and is therefore viewpoint-based. *Id.*; *Matal*, 137 S. Ct. at 1763. The Online Hate Speech Law thus targets only internet speech, not conduct, in a presumptively unconstitutional content- and viewpoint-based manner.

Regulations of speech based on content are subject to strict scrutiny. *Reed,* 576 U.S. at 163. Viewpoint-based discrimination is an "egregious form of content discrimination" that is "presumptively unconstitutional," and also subject (at least) to strict scrutiny. *Rosenberger v. Rectors and Visitors of the Univ. of Va.*, 515 U.S. 819, 829–30 (1995). Indeed, the Court has stated that, while "restrictions based on content must satisfy strict scrutiny," "those based on viewpoint are prohibited." *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 490 (2009)) (discussing speech in traditional public fora, for which the rules are the same as for speech online). Laws that compel speech are likewise subject to strict scrutiny because they "plainly alter[] the content of []

9

speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("NIFLA");

*Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 244 (2d Cir. 2014) ("'Mandating

speech that a speaker would not otherwise make necessarily alters the content of the speech.'"

(quoting *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988)).[9] The

Online Hate Speech law is subject to strict scrutiny on all three of these grounds.

      Strict scrutiny is a "stringent standard" that "reflects the fundamental principle that

governments have no power to restrict expression because of its message, its ideas, its subject

matter, or its content." *NIFLA*, 138 S. Ct. at 2371 (quotation marks omitted). Under strict

scrutiny, the Attorney General bears the burden to prove that New York's law is "narrowly

tailored to serve compelling state interests." *Id.*

      The Online Hate Speech Law does not include any findings articulating the State's

interest, but certainly, New York lacks any "asserted interest [] related to the suppression of free

expression" in and of itself on a broad swath of the internet, *Eichman*, 496 U.S. at 315 (quotation

marks and citation omitted), nor is it entitled to "cleanse public debate," given that "verbal

tumult, discord, and even offensive utterance" are "not a sign of weakness but of strength."

*Cohen*, 403 U.S. at 24-25. Yet, notably, the only purported interest in the Governor's § 394-ccc

signing statement and the Attorney General's report is silencing protected speech, that expresses

certain viewpoints, which is not a compelling interest. *See* Verif. Compl. at ¶ 53 (calling for

"online platforms [to] be held accountable for allowing hateful and dangerous content to

spread."). Indeed, regulating speech in an effort to eliminate "biases," is "a decidedly fatal

---

    [9] Strict scrutiny applies because New York's Online Hate Speech Law applies to non-commercial
speech, requires disclosures that are not "purely factual and uncontroversial," *NIFLA*, 138 S. Ct. at 2372,
and regulates speech directly rather than incidentally. *Janus*, 138 S. Ct. at 2463 ("Compelling individuals
to mouth support for views they find objectionable" "violates that cardinal constitutional command").

objective." *Hurley*, 515 U.S. at 579. *Matal* wholly rejects any government "interest in preventing speech expressing ideas that offend," even under the laxer *Central Hudson* standard for commercial speech. *Matal*, 137 S. Ct. at 1764. The interest cannot withstand the full weight of strict scrutiny required here.

The government has not articulated any other compelling interest, nor has it shown that the Online Hate Speech Law furthers these hypothetical interests "with the degree of certitude that strict scrutiny requires." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 801 n. 8 (2011). Furthermore, even if the State could articulate some other compelling governmental interest, the record "contains no legislative findings that would justify us in concluding that there is no constitutionally acceptable less restrictive means," a burden that the government has to carry under strict scrutiny. *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989). In fact, there are many less restrictive alternatives rather than restricting or co-opting online services, such as enforcing criminal laws against the kinds of violence visited on Buffalo (taking just one example), increased law enforcement efforts toward such ends, and the government engaging in its own anti-"hate speech" expression. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (speech restriction could not be upheld because the unlawful conduct that the restriction was targeting "can be prohibited and the penal laws used to punish such conduct directly").[10]

---

[10] The law's "savings clause" does not place "adequate publicly disclosed limits on . . . discretion." *Battle v. City of Seattle*, 89 F. Supp. 3d 1092, 1107 (W.D. Wash. 2015). The savings clause says the law is not to be construed (a) as imposing any obligation that would affect the rights or freedoms of any person, or (b) to increase "liability" for anything other than not developing and publishing the report and response mechanism. But the Report & Response Mechanism is itself based on viewpoint,  imposing an obligation and increasing liability, in the form of civil penalties for noncompliance, contrary to Plaintiffs First Amendment rights.The savings clause therefore does nothing to ameliorate the law's unconstitutional burden. *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, No. 4:22CV304-MW/MAF, 2022 WL 16985720, at *39  n. 55 (N.D. Fla. Nov. 17, 2022) (explaining that "including a 'savings clause'" does not "immunize[] that statute from a constitutional challenge"). *See also CISPES (Comm. in Solidarity with*

**B.     The Online Hate Speech Law compels Plaintiffs to endorse the State's
        message and respond to reports of protected speech.**

"If there is any fixed star in our constitutional constellation, it is that no official, high or

petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of

opinion or force citizens to confess by word or act their faith therein." *West Virginia State Bd. of

Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The Online Hate Speech Law seeks to defy the First

Amendment's "fixed star" by demanding under threat of punishment that Plaintiffs and similar

online services endorse the State's message of disdain for "hate speech" by explaining to those

who complain how they will "address" and "handle" it. Indeed, each of the Hate Speech Policy,

Report & Response Mechanism, and Reply Requirement compel Plaintiffs to endorse the State's

political message that such speech is worthy of censure and censorship—a message the Plaintiffs

do not wish to convey. The bottom line is that "[t]he government may not . . . compel the

endorsement of ideas that it approves." [11] *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S.

298, 309 (2012). Because the Online Hate Speech Law does just that, it violates the First

Amendment.

> ### 1.     *The Hate Speech Policy and Report & Response Mechanism force Plaintiffs to endorse and parrot the State's message about "hate speech."*

The Hate Speech Policy and Report & Response Mechanism unconstitutionally compel

Plaintiffs to mouth New York's views, so that State-defined hate speech on their platforms will

at a minimum receive negative attention. To publish a policy describing "how [they] will

respond [to] and address the reports of incidents" of "hateful conduct," Plaintiffs must use or

---

*People of El Salvador) v. F.B.I.*, 770 F.2d 468, 474 (5th Cir. 1985) (explaining that a savings clause "cannot
substantively operate to save an otherwise invalid statute").

[11]     This freedom from compelled speech is enjoyed by individual and corporation alike. *Hurley*, 515
U.S. at 574.

describe the law's definition, thereby appearing to endorse it. They must also convey that "hate speech" as defined by New York warrants not only a call-out in a dedicated Hate Speech Policy but also a "see something, say something" Report & Response Mechanism, and a Reply Requirement by the platform. The same is true insofar as the Report & Response Mechanism must be "clear and easily accessible," leaving platform visitors to naturally assume it "conveys ideas and messages the [social media network] endorses and has deemed worthy of presentation." *Stuart v. Loomis*, 992 F. Supp. 2d 585, 598 (M.D.N.C.), *aff'd sub nom Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014) (quotation marks omitted) (concluding that patients visiting a medical provider forced to display and describe ultrasound images would assume the doctor has "adopted the state's message").

Labeling speech as "hateful" requires an inherently subjective judgment, as does determining whether speech serves to "vilify, humiliate, or incite violence." The Online Hate Speech Act's definition is inescapably subjective—one site's reasoned criticism is another's "vilification"; one site's parody is another's "humiliation"—and New York cannot compel social medial networks to adopt it. *See Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006) (applying strict scrutiny to compelled "sexually explicit" video game label because the term is an inherently "subjective message" and "opinion-based"). The definition of "hateful," and the understanding of what speech is "vilifying," "humiliating," or "incites violence," will vary from person to person, and are just as subjective as the term "sexually explicit" at issue in *Entertainment Software Association*, in which the Seventh Circuit struck down a labeling law as unconstitutional compelled speech under strict scrutiny. *Id*.

The First Amendment empowers citizens to make these value judgments themselves, because speech that some might consider "hateful" appears in a wide variety of comedy, art,

journalism, historical documentation, and commentary on matters of public concern. *See* Verif. Compl. at ¶ 23 (describing and linking videos and articles on various platforms that would fall within the State's definition of "hate speech"). For instance, New York's law sweeps up an interview by ReasonTV discussing a satirical tweet by the Babylon Bee calling the Biden Administration's Assistant Secretary for Health Rachel Levine its "man of the year" which may be "vilifying" or "humiliating" to transgender people, or a historical video of Malcom X discussing white people's guilt which could be viewed by some as vilifying or humiliating white people based on their race. *Id.*

The First Amendment bars New York from forcing Plaintiffs to implement New York's about which viewpoints should be disapproved. New York cannot thus pressure Plaintiffs to be "an instrument for fostering public adherence to an ideological point of view [they] find[] unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). As New York's law does just that, it violates the First Amendment. *See Riley*, 487 U.S. at 798 (finding unconstitutional a North Carolina law requiring telemarketers for charities to devote space in their solicitations to convey information that might undermine their overall message).

Ultimately, New York cannot force Plaintiffs to undermine their own pro-free speech messages. Plaintiffs intentionally maintain moderation policies and practices that do not arbitrarily exclude viewpoints that some may perceive as "hateful." Verif. Compl. at ¶¶ 20, 95, 115, 132. The Online Hate Speech Law unconstitutionally compels Plaintiffs to endorse the State's message that "hate speech," as defined by the State, is of such societal concern that it requires a dedicated policy and necessitates direct response. Being forced to endorse this message will limit the open debate that Plaintiffs prefer to encourage. *See Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 9 (1986) (plurality opinion) (compelling a

14

speaker "to provide a forum for the views other than its own" violates the First Amendment);

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 257 (1974) (forced inclusion of contrary

messages "inescapably 'dampens the vigor and limits the variety of public debate.'").

### 2.   The Online Hate Speech Law compels Plaintiffs to respond to complaints.

The Online Hate Speech Law further violates the First Amendment by compelling Plain-

tiffs to respond to complaints of State-defined "hate speech." At a minimum New York's law

requires a response to complaints. Subsection 3 is particularly explicit, requiring the policy to

"include[] how such social media networks *will respond [to] and address* the reports of incidents

of hateful conduct on their platform." § 394-ccc(3) (emphasis added). But New York's law may

even go further and impose an affirmative obligation to take action in the face of "hateful

conduct." The title of the law—Social media networks; hateful conduct *prohibited*—supports

this conclusion. It implies an affirmative duty to remove hateful conduct. § 394-ccc. *See* N.Y.

Stat. § 123 ("The title of a statute may be resorted to as an aid in the ascertainment of the

legislative intent . . . in case of ambiguity in meaning . . . ."); *Honeoye Cent. Sch. Dist., Town of

Livonia v. Berle*, 99 Misc. 2d 20, 28, 415 N.Y.S.2d 565, 571 (Sup. Ct. 1979) ("The title of a

statute . . . may be resorted to as an aid in interpreting a statute where the wording is unclear or

ambiguous.").

Even if the law merely requires a response (without dictating the substance), requiring

Plaintiffs to respond to each complaint is a paradigmatic unconstitutional speech compulsion.

Being forced to reply forces Plaintiffs into a Hobson's choice: they must either indicate they will

not handle speech the state has labelled as "hateful" differently, and risk alienating visitors who

share the State's animating concern, or reinforce the State's message and alienate visitors opposed

to censorship. By compelling speech, the law denies Plaintiffs the option of not inviting complaints

and not responding to them, and thus forces Plaintiffs to speak in ways they would otherwise forgo.

### C.   The Online Hate Speech Law and its enforcement regime will unconstitutionally burden Plaintiffs' publication of protected speech.

New York's Online Hate Speech Law regulates State-defined "hate speech" on the

internet in part by unconstitutionally burdening that protected expression. Even when indirect,

such as in the form of threats or intimations of punishment for failure to act, State burdens on the

publication of protected speech violate the First Amendment. This is because "[p]eople do not

lightly disregard public officers' thinly veiled threats to institute… proceedings against them if

they do not come around." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963). New York's

law impermissibly "coupl[es] threats with denunciations of the activity that the official wants

stamped out," *Backpage.com, LLC v. Dart*, 807 F.3d 229, 237-38 (7th Cir. 2015), including the

threat of investigation and the imposition of daily fines of $1,000 per violation if Plaintiffs do not

properly "address" and "handle" disfavored but protected speech on their platforms. § 394-ccc

(2), (3).

After the law goes into effect, online services like Plaintiffs will have good reason to

limit State-defined "hate speech" on their platforms. New York's law is titled "Social media

networks; hateful conduct *prohibited*." § 394-ccc (emphasis added). As the Attorney General's

investigation and report (at the Governor's direction) show, New York's officials have websites

and other platforms in their sights. Verif. Compl. at ¶¶ 39, 47-48, 53. The Attorney General has

called for "online platforms [to] be held accountable for allowing hateful and dangerous content

to spread on their platforms." *Id.* at ¶ 53. And the Governor confirmed that the Attorney General

will use "every power her office can bring in at their disposal" to enforce the Online Hate Speech

Law. *Id.* at ¶ 44. All of that "can reasonably be interpreted as intimating that some form of

punishment or adverse regulatory action will follow the failure to accede to the official's request.'" *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003) (internal citation omitted).

Because failing to promptly remove "hate speech" from a platform may increase the risk of investigation and penalty, online services like Plaintiffs will be pressured to address the protected speech that New York has targeted. The State cannot so burden the publication of protected speech. Doing so has an impermissible chilling effect on online speech: "[t]he sword of Damocles causes harm because it hangs, not necessarily because it drops." *PSINet v. Chapman*, 167 F. Supp. 2d 878, 888 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004).

On a practical level, the law burdens online services that do not prohibit or remove State-disfavored speech by requiring them to receive, review, and respond to visitor complaints. For Rumble and Locals, this may require devoting additional resources to processing complaints, more aggressively removing content, and limiting their members' ability to participate in comment sections. Verif. Compl. at ¶ 149-151. For Volokh, he will have to personally process and respond to complaints enabled by the Online Hate Speech Law. *Id*. at ¶ 151. The First Amendment does not permit these burdens on protected speech standing alone, and certainly not as an implied command to eliminate it.

> **D.    The Online Hate Speech Law is overbroad because it targets a wide-range of protected expression.**

The Online Hate Speech Law is overbroad because it applies to a substantial amount of protected speech, especially compared to its nonexistent or minimal lawful application. *See Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) (discussing the scope of the overbreadth doctrine); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (same). "The overbreadth doctrine exists 'out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech . . . .'" *Comite de Jornaleros de Redondo*

*Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (quoting *Virginia v. Hicks*,

539 U.S. 113, 119 (2003)).

The Online Hate Speech Law targets a wide variety of constitutionally protected speech.

Indeed, the law applies only to protected speech except for rare instances of incitement as the

Supreme Court has defined it.[12] This would include a broad array of comedy, art, journalism,

historical documentation, and commentary on matters of public concern. *See supra* Part II. B.1.

Such efforts to curtail or prohibit "hate speech" simply because it is offensive have been rejected

repeatedly. *See Snyder*, 562 U.S. at 460–61 (2011). New York's law therefore sweeps in a wide

variety of protected expression to target a tiny, perhaps non-existent, sliver of unprotected

speech—precisely what the overbreadth doctrine is meant to protect against. *See Ancheta v.*

*Watada*, 135 F. Supp. 2d 1114, 1125 (D. Haw. 2001) (striking down a law that barred campaign

speech that engaged in "personal vilification" on overbreadth grounds).

### E.    The Online Hate Speech Law is unconstitutionally vague because its key terms are unclear and undefined.

New York's Online Hate Speech Law is unconstitutionally vague for two independent

reasons": It "fails to provide people of ordinary intelligence a reasonable opportunity to

understand what conduct it prohibits," and "it authorizes or even encourages arbitrary and

discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). This violates the

requirement that laws "capable of reaching expression sheltered by the First Amendment" must

"have a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573

---

[12] *See Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969) ("[C]onstitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is *directed to inciting or producing imminent lawless action and is likely to incite or produce such action*") (emphasis added) (citations omitted)). *See also R.A.V.*, 505 U.S.at 402 n.4 (noting that laws banning First Amendment-excepted speech, like speech within *Brandenburg's* incitement exception, cannot be limited to race, color, religion, or other protected category because the law would then be unconstitutionally content-based).

(1974); *accord FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012). New York's

Online Hate Speech Law fails to provide Plaintiffs and other online services "a reasonable

opportunity to understand" what is required by failing to define many of its key terms. *Hill*, 530

U.S. at 732; *see also supra* notes 1-3 and accompanying text. Most glaringly, it fails to provide

any definition of "vilify," "humiliate," or "incite violence,"[13] and those terms do not carry with

them an objective plain meaning. *See, e.g.*, *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th

Cir. 1996) (invalidating as unconstitutionally vague statute that required attorneys to abstain

from "offensive personality"). And as Plaintiff Eugene Volokh has argued, terms like "hateful

conduct" or "hate speech" similarly have no objective plain meaning.[14]

Because the law's operative terms are not "capable of reasoned application," and provide

no "sensible basis for distinguishing what may come in from what must stay out," Plaintiffs

cannot know what speech falls under the law's requirements. *Minn. Voters All. v. Mansky*, 138 S.

Ct. 1876, 1888 (2018).

The Online Hate Speech Law also "encourages arbitrary and discriminatory

enforcement" for the same reasons. Armed with Section 394-ccc's vague terms, the New York

Attorney General may selectively enforce the law against a vast swath of the internet—from

small blogs like *The Volokh Conspiracy* to social media platforms like Locals to video streaming

sites like Rumble—based solely on which comments most offend the Attorney General's

sensibilities. This type of broad discretion is precisely what the Constitution forbids. In light of

---

[13] As discussed above, the term "incite violence" is used in the New York Hate Speech Law more broadly than the narrow constitutional incitement standard. *See supra* n. 11. To the extent that the law exceeds the standard set out in *Brandenburg*, it provides no objective standard for Plaintiffs to comply with.

[14] Eugene Volokh, *No, There's No "Hate Speech" Exception to the First Amendment*, The Volokh Conspiracy (May 7, 2015), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/05/07/no-theres-no-hate-speech-exception-to-the-first-amendment.

the title of the law, the Governor's signing statement implying an obligation to remove hateful

conduct, and the Attorney General's report demanding online services take more aggressive

action against "hate speech," the vagueness of the law creates a chilling effect, with the threat of

enforcement action constantly hanging over the heads of a variety of internet platforms.

### F.   The Online Hate Speech Law is preempted by Section 230 of the Communications Decency Act because it imposes liability by treating websites as publishers.

New York's Online Hate Speech Law is preempted by 47 U.S.C § 230, which establishes

that "no liability may be imposed under any State or local law . . . inconsistent with" the

command that a "provider" of an "interactive computer service" shall "not be treated as the

publisher or speaker of any information provided by another" user. 47 U.S.C. § 230(c)(1), (e)(3).

*See also*, *e.g.*, *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013)

(invalidating a Tennessee law that regulated websites due to Section 230 preemption). The

Second Circuit, like the majority of Circuits, recognizes that "Section 230 immunity is broad,"

because purpose is to protect "the vibrant and competitive free market that presently exists for

the Internet and other interactive computer services, unfettered by Federal or State regulation."

*FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016).[15]

Section 230 preempts the Online Hate Speech Law because Plaintiffs are interactive

computer services,[16] and it would hold them "liable for [] failure to combat . . . offensive third-

party content," *Herrick v. Grindr LLC*, 765 F. App'x 586, 590 (2d Cir. 2019)—specifically,

---

[15] *See also, e.g., Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016); *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1123 (9th Cir. 2003); *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000).

[16] Each of the Plaintiffs is an interactive computer service because they "provide[] a publicly accessible platform where individuals can post" comments and content. *Elliott v. Donegan*, 469 F. Supp. 3d 40, 56 (E.D.N.Y. 2020).

"hate speech" posted by platform users—and for failing to adopt "policies and practices" to address it. *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 20 (1st Cir. 2016). Further, by refusing to promote a "clear and easily accessible" Report & Response Mechanism, Plaintiffs would risk liability for rejecting New York's demand to "organiz[e] and display[]" the targeted third-party content in a particular fashion. *See Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) (holding that Section 230 applied because choosing to promote certain content was Facebook's editorial decision related to "organizing and displaying content"); *see also NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1089-90 (N.D. Fla. 2021) (finding that provisions of a Florida social media law were preempted by Section 230 to the extent that they imposed liability for decisions related to moderation), *aff'd in relevant part on other grounds*, *rev'd in part*, 34 F.4th 1196 (11th Cir. 2022).

Even if the Online Hate Speech Law was not unconstitutional for all the reasons outlined above—and it surely is—its application and enforcement are preempted by Section 230.

*          *          *          *          *

For these reasons, the Plaintiffs have a strong likelihood of success on the merits of each of their claims. The Online Hate Speech Law targets speech shared on Plaintiffs' online services based on its content and viewpoint. First, it compels Plaintiffs to speak, and, in doing so, to endorse the State's view of "hate speech." Second, it burdens Plaintiffs' publication of "hate speech." Suppressing speech is the law's goal and it cannot survive strict scrutiny. The law is also overbroad, impermissibly vague, and imposes publisher liability in a manner foreclosed by Section 230.

### III.   Plaintiffs Are Entitled to a Preliminary Injunction.

With success on the merits established, the remaining preliminary injunction factors cut decidedly in Plaintiffs' favor. *See New York Progress & Prot. PAC*, 733 F.3d at 488 (explaining

that in First Amendment cases, "the likelihood of success on the merits is the dominant, if not the dispositive, factor"). They are suffering irreparable harm because "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, when a law "directly limits speech, the irreparable nature of the harm may be presumed." *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003). The Online Speech law causes irreparable harm by both (1) conscripting Plaintiffs to target speech on the basis of content and viewpoint on their private online services by compelling expression that undermines their core messages and (2) pressuring them into removing "hate speech" with explicit and implicit threats. The same is true for the law's incompatibility with Section 230. *See Backpage.com*, 939 F. Supp. 2d at 845 (granting preliminary injunction on both First Amendment and Section 230 preemption grounds); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1273 (W.D. Wash. 2012) (same); *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *6 (D.N.J. Aug. 20, 2013) (same).

The balance of hardships and public interest also weigh heavily in Plaintiffs' favor, as allegations of violations of fundamental rights tip the balance sharply in favor of Plaintiffs. *See Agudath Israel*, 983 F.3d at 637 ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal."). It is well-settled that "the Government does not have an interest in the enforcement of an unconstitutional law," and that "securing First Amendment Rights is in the public interest." *Walsh*, 733 F.3d at 488 (quoting *ACLU v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)).

A.      **There is no need for a bond.**

No bond should be required in this case because the injunction sought only requires compliance with the Constitution and therefore "the nature of the rights being enforced" are "in

the public interest." *Pharm. Soc. of State of New York, Inc. v. New York State Dep't of Soc. Servs.,* 50 F.3d 1168, 1174 (2d Cir. 1995).

## CONCLUSION

This Court should grant Plaintiffs' motion for a preliminary injunction because the Online Hate Speech Law improperly compels endorsement of the State's message with which Plaintiffs disagree and burdens their publication of protected speech. The law is also vague, overbroad, and preempted by Section 230. The Court should also grant Plaintiffs request for oral argument on this motion.

DATED: December 6, 2022

Respectfully submitted,

/s/ Darpana Sheth

Darpana Sheth
(New York Bar No. 4287918)
DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
darpana.sheth@thefire.org
daniel.ortner@thefire.org
jay.diaz@thefire.org

BARRY N. COVERT**
(N.Y. Bar No. 271118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave Suite 120
Buffalo, NY 14202
Tel: 716 849 1333 x 365
bcovert@lglaw.com

*Attorneys for Plaintiff*
*\*Pro Hac Vice* Motions Forthcoming
** S.D.N.Y. Admission Pending

## <u>CERTIFICATE OF SERVICE</u>

Plaintiff's counsel confirms that a true and correct copy of the foregoing was served via the Court's electronic filing system on this day, December 6, 2022. Notice of this filing will be sent by operation of the Court's electronic filing system

DATED: December 6, 2022

Respectfully submitted,

<u>/s/ Darpana Sheth</u>

Darpana Sheth
(New York Bar No. 4287918)
DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
darpana.sheth@thefire.org
daniel.ortner@thefire.org
jay.diaz@thefire.org

BARRY N. COVERT**
(N.Y. Bar No. 271118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave Suite 120
Buffalo, NY 14202
Tel: 716 849 1333 x 365
bcovert@lglaw.com

*Attorneys for Plaintiff*
**Pro Hac Vice* Motions Forthcoming
** S.D.N.Y. Admission Pending